1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF TEXAS

3       MARSHALL DIVISION

4 VOCALIFE LLC,     ) (

5   PLAINTIFF,    ) (  CIVIL ACTION NO.

6         ) (  2:19-CV-123-JRG

7 VS.        ) (  MARSHALL, TEXAS

8         ) (

9 AMAZON.COM, INC. and  ) (

10 AMAZON.COM LLC,    ) (  OCTOBER 1, 2020

11   DEFENDANTS.   ) (  9:24 A.M.

12      TRANSCRIPT OF JURY TRIAL

13       MORNING SESSION

14   BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15    UNITED STATES CHIEF DISTRICT JUDGE

16

17 FOR THE PLAINTIFF:

18 MR. ALFRED R. FABRICANT
  MR. PETER LAMBRIANAKOS
19 MR. VINCENT J. RUBINO, III
  MS. AMY PARK
20 MR. ENRIQUE ITURRALDE
  FABRICANT LLP
21 230 Park Avenue, 3rd Floor W.
  New York, NY 10169

22
  MR. SAMUEL F. BAXTER
23 MS. JENNIFER L. TRUELOVE
  MCKOOL SMITH, P.C.
24 104 East Houston Street, Suite 300
  Marshall, TX 75670

25

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:     Shelly Holmes, CSR, TCRR
                         Official Reporter
20                       United States District Court
                         Eastern District of Texas
21                       Marshall Division
                         100 E. Houston Street
22                       Marshall, Texas  75670
                         (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

```
09:15:45    1                    P R O C E E D I N G S
09:15:45    2            (Venire panel in.)
09:15:52    3            COURT SECURITY OFFICER:  All rise.
09:15:53    4            THE COURT:  Good morning.  Please be seated.
09:24:07    5            Good morning, ladies and gentlemen.  Thank you for
09:24:19    6   being here.
09:24:20    7            My name is Rodney Gilstrap, and I am the Chief
09:24:25    8   United States District Judge for the U.S. District Court
09:24:28    9   for the Eastern District of Texas.
09:24:30   10            I have lived in Marshall since 1981, when I got
09:24:34   11   out of law school.  I practiced law in this community and
09:24:37   12   in the general East Texas area for 30 years.  And in 2011 I
09:24:44   13   was appointed to this position and have been here ever
09:24:47   14   since.
09:24:47   15            I have a confession to make to all of you.  I was
09:24:50   16   not born in Texas, but I got here as quick as I could.
09:24:54   17            I came to Texas to attend college and then law
09:24:57   18   school at Baylor University in Waco.
09:25:00   19            I am married.  I have two grown children.  And my
09:25:04   20   wife owns and operates a retail floral business here in
09:25:07   21   Marshall.
09:25:07   22            Now, I tell you all these things, because in a few
09:25:11   23   minutes, I'm going to ask each of you to tell me the same
09:25:14   24   type of information about yourselves, and I think you're
09:25:17   25   entitled to know as much about me as I'm about to find out
```

09:25:21  1   about each of you.

09:25:22  2        We are about to engage in the selection of a jury

09:25:26  3   in a civil case involving allegations of patent

09:25:30  4   infringement.

09:25:33  5        However, before we go any further, I'd like to

09:25:35  6   mention some of the health and safety precautions that

09:25:39  7   we're going to be taking during this trial.

09:25:41  8        Each of you should have received a letter signed

09:25:44  9   by me attached to your summons outlining in a general sense

09:25:51  10  some of the things you could expect from a health and

09:25:53  11  safety standpoint when you arrived at the courthouse this

09:25:56  12  morning.  There are going to be additional safeguards that

09:26:00  13  will be implemented during the trial.

09:26:02  14       As regards the eight of you that will be selected

09:26:05  15  to serve as the jury in this case, and once we begin the

09:26:09  16  trial, each morning during the trial, the members of the

09:26:13  17  jury will have their temperature taken when they enter the

09:26:16  18  courthouse.

09:26:17  19       And each evening after we recess for the day, the

09:26:21  20  jury room, the jury box, and the restrooms that are

09:26:24  21  attached to the jury room will all be specially deep

09:26:27  22  cleaned.

09:26:28  23       Once the jury is selected and seated, we're going

09:26:32  24  to position you in the jury box so that there's a vacant

09:26:36  25  chair between everyone on the jury; that no one is seated

09:26:39  1  directly next to each other.

09:26:41  2       Also, ladies and gentlemen, once you are selected

09:26:44  3  as a member of the jury and seated, I'm going to ask you to

09:26:50  4  take off your masks and, instead, put on one of these

09:26:55  5  plastic face shields.

09:26:58  6       It's very important throughout the trial process

09:27:01  7  that the lawyers in this case are able to see the faces of

09:27:04  8  the eight members of the jury.  It's important for me to be

09:27:07  9  able to see the eight faces of the members of the jury.

09:27:11  10       It's important for the jury to see the lawyers.

09:27:13  11  And whether they are masked at counsel table or not,

09:27:16  12  whenever they go to the podium to address the Court or the

09:27:19  13  jury, they will remove a mask if they have one.

09:27:23  14       And since I'm more than six feet away from

09:27:25  15  everybody, I've taken my mask off.  It's important for

09:27:28  16  everyone to be able to see everyone through the process,

09:27:31  17  and that's why I'm going to ask the eight members of the

09:27:34  18  jury, once they're selected and seated, to replace their

09:27:37  19  masks with a plastic face shield.

09:27:39  20       Also, those of you that are selected on the jury

09:27:44  21  should know that the Court has ordered the clerk's office

09:27:48  22  to provide separately-boxed lunches every day for the

09:27:53  23  members of the jury, and they'll be brought to you in the

09:27:55  24  jury room.  That way no one will have to leave the

09:27:59  25  courthouse, mix socially in the public for lunch, and then

09:28:01  1  come back.

09:28:02  2        Also, it has the added benefit of saving us some

09:28:05  3  time in the process so we won't have to take as long a

09:28:08  4  break each day for lunch.

09:28:10  5        Now, these are some of the precautions we're going

09:28:13  6  to be taking.  As I said, there will be more that will come

09:28:17  7  out over the course of the trial, but I wanted to mention

09:28:20  8  these to you in addition to those that I mentioned in my

09:28:24  9  letter that was attached to your summons.

09:28:25  10        All of these are in place so that we can ensure we

09:28:29  11  have not only a fair and an impartial trial, but a safe

09:28:34  12  trial as well.

09:28:35  13        Also, at this time, ladies and gentlemen, if you'd

09:28:38  14  indulge me for a minute, I'd like to review with you how we

09:28:42  15  came to have our American civil jury trial system.

09:28:44  16        If you look back in ancient history, and if you

09:28:48  17  begin with the Pentateuch, the first five books of the Old

09:28:52  18  Testament, you'll see that the ancient Hebrew nation

09:28:55  19  empaneled juries to determine questions of property

09:28:59  20  ownership and property value.

09:29:00  21        The ancient Greeks began using a jury system about

09:29:04  22  1500 BC.  The Romans, as they did with many things, copied

09:29:09  23  the jury system from the Greeks.  And it was the Romans

09:29:14  24  that brought the jury system with them in the 4th Century

09:29:19  25  AD when they conquered what is now England and the United

09:29:24 1   Kingdom.  And that jury system was transported to England

09:29:28 2   in the 4th Century AD.

09:29:31 3        By the 12th Century AD, there had been 800 years

09:29:35 4   of jury trials in England.  But in the 12th Century AD, a

09:29:41 5   tyrannical king came to the throne of England named King

09:29:45 6   John, and King John became embroiled in many different

09:29:48 7   disputes with his nobles that led that country to the brink

09:29:52 8   of a civil war.

09:29:53 9        That civil war, however, was avoided.  One of the

09:29:55 10  disputes between King John and his nobles that led them to

09:30:00 11  the brink of civil war was King John's attempt to restrict

09:30:04 12  and do away with the right to trial by jury in England.

09:30:06 13       As I say, those disputes were resolved not by war

09:30:10 14  but by a written document that King John and all his nobles

09:30:15 15  signed at a place in England called Runnymede.  And the

09:30:20 16  document that was a result of those discussions,

09:30:23 17  resolutions, and settlements that set forth the right to

09:30:25 18  trial by jury in England thereafter is called the Magna

09:30:30 19  Carta.

09:30:31 20       In fact, ladies and gentlemen, as a point of

09:30:35 21  interest, you might be interested to know that there are 28

09:30:38 22  of our American United States -- our states, 28 of them

09:30:41 23  have directly copied the exact language from the Magna

09:30:47 24  Carta addressing the right to trial by jury into their

09:30:50 25  state constitutions.

```
09:30:51   1        So you can see that the right to trial by jury in
09:30:53   2   civil and in criminal cases was well ingrained in our
09:30:59   3   forefathers when they came to this continent as British
09:31:05   4   colonists.  And the jury system in colonial America thrived
09:31:07   5   and flourished for over a hundred years until another
09:31:10   6   tyrannical king came to the throne of Great Britain.
09:31:14   7        This time his name was King George, the III.  King
09:31:20   8   George, the III, became embroiled with many disputes and
09:31:23   9   conflicts between the throne in England and his British
09:31:30  10   colonists here in America.  Among those disputes was an
09:31:34  11   attempt by King George to, again, limit or do away with the
09:31:39  12   right to trial by jury.
09:31:40  13        As a matter of fact, when Thomas Jefferson wrote
09:31:43  14   the Declaration of Independence, which specifically
09:31:45  15   outlines the various disputes and issues existing between
09:31:48  16   the Crown and the colonies that led to a -- a determination
09:31:53  17   by our forefathers that they needed to break away from and
09:32:00  18   form their own independent country, in the Declaration of
09:32:03  19   Independence, Thomas Jefferson specifically recited the
09:32:06  20   King's attempt to restrict or limit the right to trial by
09:32:09  21   jury as one of the reasons why we needed to leave England
09:32:13  22   and become our own independent nation.
09:32:15  23        In fact, all of you know that that did happen.
09:32:20  24   And after we formed our own independent country as the
09:32:24  25   United States of America, we went through a period of
```

09:32:29  1   developing our own governing documents.  And out of that

09:32:33  2   process, came the United States Constitution, the supreme

09:32:36  3   law of the land.

09:32:37  4        And shortly after the Constitution was ratified,

09:32:40  5   there were 10 amendments that everybody voted to ratify the

09:32:45  6   Constitution for, because they'd effectively been promised

09:32:48  7   those 10 amendments would follow shortly thereafter.  And,

09:32:52  8   in fact, those 10 amendments were adopted, those 10

09:32:57  9   amendments you all know as the Bill of Rights.

09:32:59  10       And among the first 10 amendments to the United

09:33:04  11  States Constitution, is the Seventh Amendment.  The Seventh

09:33:08  12  Amendment to our Constitution guarantees the right to every

09:33:11  13  American citizen to resolve their civil disputes before a

09:33:13  14  jury of their peers.

09:33:17  15       So the civil jury system is enshrined and

09:33:19  16  guaranteed by the Seventh Amendment to our Constitution.

09:33:23  17  That and the other nine amendments that form the Bill of

09:33:28  18  Rights were ratified in 1791.

09:33:30  19       So you can see that for over two -- well over 200

09:33:34  20  years, every American citizen has had a guaranteed

09:33:38  21  constitutional right to resolve their disputes through a

09:33:40  22  civil jury trial.

09:33:41  23       I always tell citizens who appear for jury duty,

09:33:46  24  as you have this morning, that, in my personal opinion,

09:33:48  25  jury service is the second highest form of public service

09:33:51  1  that any citizen can perform.  In my personal view, the

09:33:56  2  highest form of public service are those young men and

09:34:01  3  women that serve in our military.

09:34:03  4        Now, when the lawyers address you this morning,

09:34:06  5  and they'll do that shortly hereafter, they're going to ask

09:34:11  6  various questions.

09:34:11  7        And I want all of you to understand that they will

09:34:14  8  not be trying to pry unduly into your personal affairs.

09:34:18  9  Said another way, ladies and gentlemen, they're not trying

09:34:21 10  to be nosy.  They're trying to obtain relevant information

09:34:27 11  to secure the selection of a fair and impartial jury to

09:34:30 12  hear the evidence and to decide the issues in this case.

09:34:32 13        So please keep that in mind.  They are not trying

09:34:37 14  to pry unduly into any of your personal business, and they

09:34:41 15  are entitled to ask the questions they ask.

09:34:43 16        The important thing for each of you to keep in

09:34:46 17  mind is that your answers to their questions should be

09:34:48 18  full, complete, and truthful.  There are no wrong answers

09:34:53 19  to any question you'll be asked, as long as your response

09:34:56 20  is full, complete, and truthful.

09:34:58 21        I -- I don't know if it will happen today, ladies

09:35:03 22  and gentlemen, it rarely does, but, occasionally, there's a

09:35:06 23  question asked during jury selection that a member of the

09:35:08 24  jury panel finds to be personally so private and so

09:35:14 25  intimate that they're not comfortable answering that

09:35:16  1  question in front of everybody in the courtroom.  Again,

09:35:19  2  that doesn't happen very often.

09:35:21  3       But if that should happen, you always have the

09:35:24  4  option to say, as an answer, I'd like to talk about that

09:35:28  5  with Judge Gilstrap.  And if that's your answer, I'll

09:35:32  6  provide an opportunity for you to answer the question

09:35:34  7  outside of the presence of everyone else on the panel.

09:35:38  8  But, again, that doesn't come up very often.

09:35:40  9       The trial in this case is going to begin today

09:35:45  10  after the jury is selected, seated, and sworn.  It will go

09:35:49  11  through tomorrow.  And I anticipate -- my best estimate is

09:35:53  12  that it will take all of next week.

09:35:55  13       So today's the 1st of October.  And by my

09:35:59  14  calculations, my best estimate is we should be finished by

09:36:02  15  Friday of next week, which would be the 9th of October.

09:36:06  16       Now, if there are any of you on the panel who

09:36:10  17  could not be here during that period of time, if you were

09:36:13  18  selected, either because you or an immediate member of your

09:36:21  19  family have a surgical procedure that's scheduled that

09:36:24  20  can't be easily rescheduled or you have some other very

09:36:26  21  serious reason why you couldn't be here if you were

09:36:28  22  selected, that's something I need to know about at this

09:36:31  23  time.

09:36:31  24       If any of you fall in that category, please raise

09:36:34  25  your hands and let me make a note of it.

09:36:39   1          I see one hand.

09:36:41   2          Ma'am, would you stand up so I can see your

09:36:44   3   number?  No. 23.  Okay.  Thank you.

09:36:47   4          Anybody -- please have a seat.

09:36:49   5          Anybody else?  One more?  Couple more.

09:36:53   6          23, 31, and 25.  I can see your number.  Thank

09:36:59   7   you.

09:36:59   8          Anybody else?  23, 31, and 25.  Thank you.

09:37:06   9          All right.  I'm going to call for announcements on

09:37:10  10   the record at this time in the case of Vocalife LLC versus

09:37:16  11   Amazon.com, Inc. and Amazon.com LLC.  This is Civil Case

09:37:28  12   No. 2:19-cv-123.

09:37:29  13          And, counsel, if you'll introduce those with you

09:37:32  14   at the counsel table when you give your announcements.

09:37:34  15          What says the Plaintiff?

09:37:42  16          MS. TRUELOVE:  Good morning, Your Honor.  Jennifer

09:37:44  17   Truelove with McKool Smith for Plaintiff, Vocalife.  At

09:37:46  18   counsel table with me today, I have my partner, Mr. Sam

09:37:49  19   Baxter, and I also have Mr. Fred Fabricant from the

09:37:55  20   Fabricant law firm.

09:37:57  21          And we're ready to proceed, Your Honor.

09:37:59  22          THE COURT:  Thank you.

09:37:59  23          What says the Defendants?

09:38:01  24          MR. DACUS:  Good morning, Your Honor.  Deron

09:38:06  25   Dacus, here with Dave Hadden.  And we also have with us

09:38:17   1   Phil Hilmes from Amazon, Your Honor.  And we're ready to

09:38:17   2   proceed.

09:38:18   3           THE COURT:  Thank you.

09:38:18   4           As I told you, ladies and gentlemen, this is a

09:38:20   5   case -- a civil case arising out of the patent laws of the

09:38:24   6   United States.

09:38:24   7           And what the Plaintiff is claiming is that its

09:38:26   8   patent has been infringed by the Defendants.  And it's

09:38:29   9   seeking money damages because of that alleged infringement.

09:38:35  10           The Defendant denies that it infringes the

09:38:38  11   Plaintiff's patent, and they contend that this particular

09:38:40  12   patent is invalid.

09:38:45  13           Now, what I've just told you is a very shorthand,

09:38:48  14   informal way of describing the case in layman's terms.  And

09:38:48  15   I know you've all seen this morning the patent video

09:38:54  16   prepared by the Federal Judicial Center, so you already

09:38:55  17   know more about patent cases than most people do when they

09:38:58  18   appear in federal court.

09:38:59  19           As I've said, the lawyers for both sides are going

09:39:02  20   to proceed to ask questions of the panel later in the

09:39:05  21   process to gather the information that they need to

09:39:09  22   exercise their strikes, their peremptory challenges, to

09:39:12  23   complete the process of selecting the jurors that will hear

09:39:15  24   the evidence and try this case.

09:39:18  25           Again, there aren't any wrong answers as long as

09:39:20   1   the answers to their questions that you give are full,

09:39:23   2   complete, and truthful.

09:39:24   3           If any attorney in the case should ask you a

09:39:30   4   question as a part of jury selection this morning, ladies

09:39:32   5   and gentlemen, that I think is improper, I will certainly

09:39:35   6   stop them.  But I don't expect that to happen.  These are

09:39:38   7   very experienced and skilled trial lawyers.  They

09:39:41   8   understand the rules of this court, and they understand the

09:39:48   9   Federal Rules of Civil Procedure and the Rules of Evidence.

09:39:50  10   I do not expect that to come up.

09:39:52  11           One thing I do want to call your attention to

09:39:54  12   before the lawyers begin with their questioning is that --

09:39:57  13   is the burden of proof that will be required and applied in

09:40:00  14   this case.

09:40:00  15           In a patent case such as this, the jury may be

09:40:04  16   called upon to apply two different burdens of proof to the

09:40:09  17   evidence that's presented.

09:40:10  18           The jury may apply the burden of proof known as

09:40:14  19   the preponderance of the evidence -- I'll say that again,

09:40:19  20   the preponderance of the evidence -- as well as a second

09:40:22  21   and different burden of proof known as clear and convincing

09:40:24  22   evidence -- clear and convincing evidence.

09:40:32  23           Now, when you're responding to lawyers' questions

09:40:35  24   about the burden of proof, I need to instruct you that when

09:40:37  25   a party has the burden of proof on any claim or defense by

09:40:42   1   a preponderance of the evidence, it means that you, the

09:40:46   2   jury, must be persuaded by the credible and believable

09:40:50   3   evidence that that claim or defense is more probably true

09:40:54   4   than not true.  I'll say that again, more probably true

09:40:59   5   than not true.

09:41:00   6          Sometimes this is talked about as being the

09:41:04   7   greater weight and degree of credible testimony.

09:41:08   8          Let me give you an example that I hope will be

09:41:12   9   helpful.  I think you can all see in front of me and in

09:41:15  10   front of our court reporter there is a statue of the Lady

09:41:19  11   of Justice.

09:41:19  12          She is blindfolded.  She holds a sword of justice

09:41:23  13   lowered in her right hand.  In her left hand she holds,

09:41:28  14   raised above her, the Scales of Justice.

09:41:30  15          Those scales are balanced and equal -- completely

09:41:34  16   balanced and completely equal.  And that should be where

09:41:37  17   the parties in this case start off at the beginning of this

09:41:40  18   trial, completely equal.

09:41:41  19          Over the course of the trial, each side is going

09:41:44  20   to put on their evidence that they believe benefits them

09:41:48  21   and proves the issues that they contend are true in this

09:41:51  22   case.

09:41:52  23          And when all that evidence is in, the jury that's

09:41:57  24   heard the evidence will retire to the jury room when I

09:42:00  25   instruct them to, and they will deliberate on the verdict.

09:42:04   1        And as a part of that verdict, they're going to

09:42:07   2   answer certain questions.  And in answering a question

09:42:09   3   where one party has the burden of proof, if you think about

09:42:14   4   all the evidence that's been put on either side of those

09:42:17   5   scales, one side for the Plaintiff and one side for the

09:42:19   6   Defendant, considering all the evidence, if those scales

09:42:24   7   should tip in favor of the party who has the burden of

09:42:28   8   proof by a preponderance of the evidence, even if those

09:42:31   9   scales tip ever so slightly, then that party has met their

09:42:36   10  burden of proof by a preponderance of the evidence.

09:42:38   11       On the other hand, ladies and gentlemen, when a

09:42:45   12  party has the burden of proof on any issue by clear and

09:42:49   13  convincing evidence, that second burden of proof that I

09:42:52   14  mentioned to you, it means that the jury must have an

09:42:55   15  abiding conviction that the truth of the parties' factual

09:43:02   16  contentions are highly probable.  Let me say that again for

09:43:05   17  emphasis.  An abiding conviction that the truth of the

09:43:08   18  parties' factual contentions are highly probable.

09:43:17   19       This second burden of proof, this clear and

09:43:18   20  convincing evidence burden of proof, is a higher burden of

09:43:21   21  proof than the preponderance of the evidence burden of

09:43:23   22  proof.

09:43:23   23       Let's go back to the example I gave you.  If all

09:43:29   24  the evidence in your minds is placed on one side or the

09:43:31   25  other of those scales during this trial, Plaintiff's

09:43:36  1   evidence on one side, the Defendants' evidence on the

09:43:39  2   other, and a party has the burden of proof by clear and

09:43:42  3   convincing evidence, for that party to meet their burden of

09:43:45  4   proof, those scales must tip in that party's favor, and

09:43:49  5   they must definitely tip in that party's favor.  It's not

09:43:53  6   adequate that they tip ever so slightly.

09:43:56  7        Again, it is a higher burden of proof.  It

09:44:00  8   requires a greater degree of persuasion than the

09:44:02  9   preponderance of the evidence standard.

09:44:04  10       Now, just so there's no confusion, ladies and

09:44:08  11  gentlemen, none of you should think about or consider or

09:44:13  12  apply in this case a third and a very different burden of

09:44:18  13  proof called beyond a reasonable doubt.

09:44:20  14       I'm sure you've all heard of the burden of proof

09:44:24  15  of beyond a reasonable doubt in the media, on television,

09:44:28  16  in movies.  That burden of proof is the burden of proof

09:44:32  17  applied in a criminal case.

09:44:33  18       It has absolutely no application whatsoever in a

09:44:35  19  civil case like this.  You should not confuse the clear and

09:44:40  20  convincing evidence standard -- the clear and convincing

09:44:44  21  evidence standard with beyond a reasonable doubt.  They're

09:44:47  22  not the same thing.

09:44:50  23       The clear and convincing evidence standard is not

09:44:52  24  as high as beyond a reasonable doubt, but it is higher than

09:44:56  25  the preponderance of the evidence.

09:44:58   1          I give you these instructions in case during their

09:45:02   2   questioning the lawyers for either or both sides ask you

09:45:05   3   about your ability to fairly apply both of those burdens of

09:45:10   4   proof to the evidence if you're selected to serve on this

09:45:13   5   jury.

09:45:13   6          Now, before we go any further, this is the point

09:45:16   7   in the process where I'm going to learn as much about you

09:45:19   8   as I told you about me when I first sat down.

09:45:22   9          We're going to go through nine separate questions

09:45:25  10   that are on the monitors in front of you and should be in

09:45:29  11   laminated copies for you to look at.

09:45:33  12          Here's how we're going to do this, ladies and

09:45:35  13   gentlemen:  We have two Court Security Officers with us

09:45:38  14   this morning.  They're both going to be in the gallery.

09:45:41  15   They're both going to have two sanitized handheld

09:45:45  16   microphones.

09:45:46  17          When it's your turn to answer these questions,

09:45:48  18   they will hand you one of these microphones.  I'm going to

09:45:52  19   ask you at that point to stand, to take off or lower your

09:45:56  20   masks so we can see your smiling face, and give us your

09:45:59  21   answers to these nine questions.

09:46:02  22          Once you've finished, you'll hand the microphone

09:46:04  23   back to the Court Security Officer, replace your mask, and

09:46:06  24   have a seat.

09:46:08  25          Also, ladies and gentlemen, later in the process,

09:46:10   1   the lawyers are going to be able to pose specific questions

09:46:14   2   to individual members of the panel.

09:46:16   3         If you're asked a specific question by one of the

09:46:19   4   lawyers in the case, you should follow the very same

09:46:23   5   procedure in giving your answer.  You should wait until the

09:46:26   6   Court Security Officer hands you a handheld microphone.

09:46:30   7   You should stand, you should take off your mask, give your

09:46:34   8   answer, replace your mask, hand the microphone back to the

09:46:38   9   Court Security Officer, and have a seat.

09:46:40   10         Please do it that way.  We are in a very large

09:46:43   11   courtroom.  There are a lot of people here.  Especially

09:46:45   12   those of you in the back of the panel are a long way from

09:46:48   13   me, from the Court staff, and from the lawyers.  It's very

09:46:53   14   important that you just follow these instructions.  Use

09:46:56   15   that handheld microphone.  Hold it close enough to your

09:46:58   16   mouth so that it makes a difference, and let us hear from

09:47:02   17   you in that manner.

09:47:05   18         As I say, we have two of these handheld

09:47:07   19   microphones.  And after each juror uses one, when it's

09:47:10   20   handed back to the Court Security Officers, they're going

09:47:13   21   to sanitize it, use the other clean microphone in the

09:47:15   22   meantime, and this process will rotate so that none of you

09:47:19   23   are handed a microphone that hasn't been immediately

09:47:23   24   sanitized before it's used.

09:47:25   25         All right.  With those instructions, we'll begin

```
09:47:27   1   with Panel Member No. 1, Ms. Banks.
09:47:31   2          As soon as you get a microphone, if you would
09:47:33   3   stand and hand -- and answer for us those nine questions,
09:47:38   4   please, ma'am.
09:47:38   5          JUROR BANKS:  My name is Ellen Banks.  I live in
09:47:44   6   Leesburg, Texas.  Have lived there for 49 years.  I have
09:47:49   7   one child.
09:47:52   8          I am retired from the United States Postal
09:47:56   9   Service.  I was a postmaster.  I worked there for 23 years.
09:48:03  10   I attended Baylor University.
09:48:07  11          My husband's name is Michael Lynn Banks.  He is a
09:48:14  12   truck driver for Eastex Crude in Leesburg.  And he's worked
09:48:20  13   there for 21 years.
09:48:26  14          I have served on a criminal case before, on a jury
09:48:30  15   in Camp County, Texas.  I think that's all the questions.
09:48:36  16          THE COURT:  How long ago was that, ma'am?
09:48:39  17          JUROR BANKS:  It's been at least 10 years.
09:48:40  18          THE COURT:  All right.  Thank you very much,
09:48:42  19   Ms. Banks.  If you'll have a seat, please.
09:48:44  20          Next is Panel Member No. 2, Mr. Sheppard.
09:48:49  21          JUROR SHEPPARD:  Hello.  My name is Trajon
09:48:54  22   Sheppard.  I was -- I live in Pittsburg, Texas, for 21
09:48:57  23   years.  I am currently laid off from Union Pacific
09:49:03  24   Railroad.  I was an engineer there.  I worked there for two
09:49:06  25   years.
```

09:49:07  1          I went to Pittsburg High School, graduated from

09:49:09  2   there.

09:49:10  3          I have no spouse.  She doesn't work.  And I have

09:49:16  4   no children, by the way.

09:49:19  5          And I have not served on any jury cases.

09:49:22  6          THE COURT:  Never served on a jury.  Thank you,

09:49:24  7   sir.  Please have a seat.

09:49:25  8          Next is Panel Member No. 3, Mr. Wallace.

09:49:30  9          JUROR WALLACE:  Thank you, Judge.

09:49:31  10          My name is Barry Wallace.  I make my home in

09:49:36  11   Gladewater, Texas, where I've lived since 1993.  I have

09:49:40  12   four children, two stepchildren.

09:49:43  13          I'm celebrating three years today working for the

09:49:47  14   Upshur County Criminal District Attorney's Office.  I have

09:49:50  15   all the child protective service cases in that county.

09:49:54  16   Prior to that, I had a private office, solo practitioner in

09:49:59  17   Gladewater from 1993 until 2018.

09:50:02  18          I got my high school education, Greenville, Texas.

09:50:06  19   East Texas State University, I got my Bachelor of Arts

09:50:10  20   degree in 1989.  I got my Juris Doctorate degree at

09:50:15  21   St. Mary's University in 1992.

09:50:17  22          My wife's name is Susan Budjenska Wallace.  She's

09:50:20  23   a retired federal probation officer from the Eastern

09:50:24  24   District of Texas, presently working for the census and

09:50:27  25   helping the good folks out in New Mexico with a bunch of

```
09:50:30  1   other Texas folks, trying to count heads.
09:50:35  2         She worked in the Eastern District as a probation
09:50:38  3   officer about 20-plus years.
09:50:38  4         I served on a civil jury over in Upshur County
09:50:42  5   within the last 10 years.  And that wraps that up.
09:50:45  6         THE COURT:  All right, sir.  Thank you very much.
09:50:46  7         Next is No. 4, Mr. Miller.
09:50:50  8         JUROR MILLER:  Good morning.
09:50:51  9         THE COURT:  Good morning.
09:50:52 10         JUROR MILLER:  My name is Tanner Miller.  I live
09:50:55 11   in New Diana, Texas.  I have three children ranging from 20
09:50:59 12   to six years old.
09:51:00 13         I work at Eastman Chemical.  I've been there for
09:51:03 14   14 years.  I have a high school degree out of Pine Tree.
09:51:09 15         My wife's name is Megan Miller.  She's a
09:51:11 16   substitute teacher there in New Diana.  And she's been
09:51:16 17   there for two years.
09:51:18 18         And I have not been on a previous case.
09:51:20 19         THE COURT:  Never served on a jury?
09:51:22 20         JUROR MILLER:  No, sir.
09:51:23 21         THE COURT:  Thank you very much.
09:51:24 22         Next is No. 5, Ms. Edwards.
09:51:27 23         JUROR EDWARDS:  My name is Elizabeth Edwards.  And
09:51:31 24   I live in Ore City.  I have two children.  And I work at
09:51:36 25   Grubbs-Loyd Funeral Home in Diana.  I'm the office manager.
```

09:51:41  1          I have an Associate's from the University of

09:51:45  2  Phoenix, in psychology.

09:51:47  3          My spouse's name is -- his name is Tracy Edwards.

09:51:50  4  He works for Graphic Packaging.  He's a millwright, and

09:51:55  5  he's been there four years.

09:51:56  6          And I've never been on a jury before.

09:51:58  7          THE COURT:  Thank you very much.

09:51:58  8          No. 6 is next, Mr. Green.

09:52:02  9          JUROR GREEN:  My name is Ron Green.  I have one --

09:52:06  10  one son.  He's 49 years old.  I'm retired.  I work

09:52:11  11  different construction job sites.  I'm a high school

09:52:17  12  graduate.

09:52:19  13          My wife is deceased.

09:52:21  14          And I have been called to jury service but never

09:52:26  15  served.

09:52:26  16          THE COURT:  All right, sir.  Thank you very much,

09:52:28  17  Mr. Green.

09:52:28  18          Next is No. 7, Mr. Hirt.

09:52:37  19          JUROR HIRT:  My name is Charles Hirt.  I've got

09:52:42  20  three children, four grandchildren.

09:52:45  21          I work for International Paper.  I'm a forester,

09:52:52  22  basically supplying wood and fuel to the Graphic Packaging

09:52:57  23  Paper Mill in Domino.  I've worked there going on five

09:53:00  24  years.  This is my second trip.  I had 15 years in with

09:53:05  25  International Paper earlier in my career.

| | | |
|---|---|---|
| 09:53:07 | 1 | I have a Bachelor of Science in forest management. |
| 09:53:10 | 2 | My spouse's name is Deanne.  She basically was a |
| 09:53:14 | 3 | stay-at-home mother and homemaker, but for five years we |
| 09:53:18 | 4 | had a picture-framing business, until she got MS.  So we |
| 09:53:26 | 5 | had that five years. |
| 09:53:27 | 6 | And I have no prior jury service. |
| 09:53:29 | 7 | THE COURT:  Thank you, sir. |
| 09:53:29 | 8 | Next is No. 8, Ms. Burton. |
| 09:53:36 | 9 | JUROR BURTON:  Hello.  My name is Dyan Burton. |
| 09:53:40 | 10 | I'm from Atlanta, Texas.  I have no children.  I currently |
| 09:53:41 | 11 | work for Texarkana Regional Arts Center & Humanities |
| 09:53:43 | 12 | Council.  I'm an assistant.  I've only worked there for a |
| 09:53:47 | 13 | year. |
| 09:53:48 | 14 | I graduated from Queen City High School, and then |
| 09:53:50 | 15 | I just recently graduated from Texas A&M Texarkana with my |
| 09:53:56 | 16 | Bachelor's of Science in psychology with a minor in |
| 09:53:59 | 17 | criminal justice.  And I'm currently working on my Master's |
| 09:54:02 | 18 | in counseling. |
| 09:54:04 | 19 | I have no spouse. |
| 09:54:05 | 20 | And have never served. |
| 09:54:06 | 21 | THE COURT:  All right.  Thank you very much, |
| 09:54:07 | 22 | ma'am. |
| 09:54:08 | 23 | Next is No. 9, Mr. Evers. |
| 09:54:12 | 24 | JUROR EVERS:  My name is Anthony Evers.  I go by |
| 09:54:18 | 25 | Craig, but Anthony is good.  I am from Harleton, Texas, so |

| | | |
|---|---|---|
| 09:54:18 | 1 | I'm from the Marshall area and have been for a while. |
| 09:54:18 | 2 | I was in education for 28 years.  I taught math |
| 09:54:23 | 3 | and was a principal.  I have my mid-management degree, and |
| 09:54:27 | 4 | I also have my superintendent certificate, but I'm retired |
| 09:54:35 | 5 | from there.  I've also pastored for 30 years and am a |
| 09:54:36 | 6 | pastor of a local church here. |
| 09:54:38 | 7 | I am divorced.  And I have three grown daughters, |
| 09:54:41 | 8 | who are very beautiful. |
| 09:54:42 | 9 | And I have never served on a jury duty. |
| 09:54:45 | 10 | THE COURT:  All right.  Thank you, Mr. Evers. |
| 09:54:47 | 11 | Next is Panel Member No. 10, Ms. Friday. |
| 09:54:52 | 12 | JUROR FRIDAY:  My name is Angela Friday.  I have |
| 09:54:54 | 13 | two children. |
| 09:54:55 | 14 | THE COURT:  Ms. Friday, will you hold that |
| 09:54:57 | 15 | microphone close? |
| 09:54:58 | 16 | JUROR FRIDAY:  Oh, I'm sorry. |
| 09:54:59 | 17 | THE COURT:  Thank you. |
| 09:55:00 | 18 | JUROR FRIDAY:  Angela Friday.  I have two |
| 09:55:03 | 19 | children.  My place of -- I used to work at the Sonoco |
| 09:55:06 | 20 | Products in Jefferson, Texas, for 31 years.  Now I work at |
| 09:55:13 | 21 | the primary school in Jefferson, Texas.  I been there three |
| 09:55:18 | 22 | and a half years.  I'm a food server. |
| 09:55:21 | 23 | I finished high school. |
| 09:55:22 | 24 | Divorced. |
| 09:55:22 | 25 | And I served on a grand jury once before. |

| | | |
|---|---|---|
| 09:55:25 | 1 | THE COURT:  Ever served on a petit jury like this? |
| 09:55:28 | 2 | JUROR FRIDAY:  (Shakes head negatively.) |
| 09:55:29 | 3 | THE COURT:  Okay.  Thank you very much, ma'am. |
| 09:55:30 | 4 | No. 11 is next.  Mr. Amick or Amick -- I'm not |
| 09:55:36 | 5 | sure how to pronounce it. |
| 09:55:38 | 6 | JUROR AMICK:  William Amick is how you pronounce |
| 09:55:41 | 7 | it. |
| 09:55:41 | 8 | THE COURT:  Thank you, sir. |
| 09:55:42 | 9 | JUROR AMICK:  I live in Jefferson.  I have a grown |
| 09:55:45 | 10 | stepdaughter.  I work at Caddo Creek Resources, which is |
| 09:55:51 | 11 | coal mine on south 59 off of Gill community.  I worked |
| 09:55:57 | 12 | there six years.  High school education. |
| 09:56:01 | 13 | My wife, Lois, is retired.  She was a bookkeeper |
| 09:56:09 | 14 | during her career. |
| 09:56:11 | 15 | And I have served on two criminal cases. |
| 09:56:14 | 16 | THE COURT:  And where were those and how long ago |
| 09:56:15 | 17 | has it been? |
| 09:56:17 | 18 | JUROR AMICK:  Limestone County, and it's been 15 |
| 09:56:23 | 19 | years, probably, or better. |
| 09:56:25 | 20 | THE COURT:  All right, sir.  Thank you very much. |
| 09:56:27 | 21 | Next is No. 12, Ms. Wheeler. |
| 09:56:37 | 22 | JUROR WHEELER:  My name is Marquitta Wheeler. |
| 09:56:40 | 23 | And I live here in Marshall.  I don't have any children.  I |
| 09:56:40 | 24 | work as a meat clerk in Kroger, and I've been there for two |
| 09:56:45 | 25 | years.  And I graduated from high school in Fountain Hill, |

09:56:49  1   Arkansas.

09:56:50  2        My spouse's name is Ilea, and she is an Army

09:56:56  3   veteran, and she was in for six years.

09:56:58  4        And I've never served on a jury.

09:57:00  5        THE COURT:  Thank you very much.

09:57:01  6        Next is No. 13, Ms. Stansbury.

09:57:03  7        JUROR STANSBURY:  My name is Ashley Stansbury.  I

09:57:10  8   live in Gilmer, Texas.  I have zero children, and I have

09:57:14  9   one on the way.

09:57:15  10       I work for the Upshur County District Attorney.

09:57:18  11  I'm a receptionist there.  I've worked there a little over

09:57:22  12  a year.

09:57:24  13       I graduated from Gilmer High School, and I got an

09:57:28  14  Associate's in business.

09:57:30  15       My spouse's name is Cody Stansbury.  And he lives

09:57:32  16  in -- he works at Kia in Longview.  He's been there eight

09:57:37  17  years.

09:57:39  18       And I have never served on a jury.

09:57:40  19       THE COURT:  Ma'am, do you mind me asking when your

09:57:43  20  due date is?

09:57:44  21       JUROR STANSBURY:  Sir?

09:57:45  22       THE COURT:  When is your due date?

09:57:49  23       JUROR STANSBURY:  January 23rd.

09:57:51  24       THE COURT:  Great.  Thank you.

09:57:52  25       All right.  Next is No. 14, Ms. Huskey.

| | | |
|---|---|---|
| 09:57:55 | 1 | JUROR HUSKEY:  Good morning.  I'm Tracie Huskey. |
| 09:57:58 | 2 | I'm from Leesburg, Texas. |
| 09:58:00 | 3 | My husband is Don Huskey.  We do not have any |
| 09:58:03 | 4 | children. |
| 09:58:03 | 5 | We own two businesses, Pittsburg and Alba Tractor |
| 09:58:08 | 6 | in Pittsburg, Texas. |
| 09:58:10 | 7 | I have a BS in hospitality management with a minor |
| 09:58:17 | 8 | in business. |
| 09:58:17 | 9 | And we've owned those businesses for about 15 |
| 09:58:20 | 10 | years. |
| 09:58:20 | 11 | And I have not served on a jury. |
| 09:58:22 | 12 | THE COURT:  Thank you very much, ma'am. |
| 09:58:24 | 13 | Next is No. 15, Mr. Smith. |
| 09:58:28 | 14 | JUROR SMITH:  Yes.  My name is name is James |
| 09:58:32 | 15 | Smith.  I live in Pittsburg, Texas.  I have three children. |
| 09:58:36 | 16 | I work at Parker Trailer Sales in Mt. Pleasant, |
| 09:58:42 | 17 | Texas.  I repair trailers.  I've been there about 26 years. |
| 09:58:47 | 18 | I graduated high school. |
| 09:58:49 | 19 | Divorced. |
| 09:58:51 | 20 | I've served on a criminal case in Pittsburg. |
| 09:58:55 | 21 | THE COURT:  How long ago has that been, sir? |
| 09:58:58 | 22 | JUROR SMITH:  It's been about three years ago. |
| 09:59:00 | 23 | THE COURT:  Thank you very much. |
| 09:59:00 | 24 | Next is Mr. Stephenson, No. 16. |
| 09:59:04 | 25 | JUROR STEPHENSON:  Steve Stephenson.  Live in |

09:59:08  1    McLeod.  Got four grown kids.

09:59:11  2            Been working at Day & Zimmermann for three weeks

09:59:14  3    now.

09:59:15  4            And I'm divorced.

09:59:16  5            And never been on a jury.

09:59:17  6            THE COURT:  What do you do at your work, sir?

09:59:20  7            JUROR STEPHENSON:  I don't know if -- they -- I

09:59:22  8    didn't sign an NDA, but they asked me to not say stuff.

09:59:27  9            THE COURT:  Okay.

09:59:30  10           JUROR STEPHENSON:  You want me --

09:59:31  11           THE COURT:  I don't want you to violate anything.

09:59:34  12   I just would like a general idea of what you do for a

09:59:38  13   living, if -- if you can give me that.

09:59:39  14           JUROR STEPHENSON:  Day & Zimmermann builds

09:59:45  15   ammunition for the military.

09:59:46  16           THE COURT:  Okay.  That's plenty.  Thank you.

09:59:48  17           All right.  No. 17 is next.  Mr. Porter.

09:59:48  18           JUROR BOBBY PORTER:  My name is Bobby Ray Porter.

09:59:50  19   I'm from Pittsburg, Texas.  And I have eight children;

09:59:54  20   seven sons and one daughter.

09:59:56  21           And I worked at Texas Utility Coal Mine for 30

10:00:00  22   years.  I have a high school education.

10:00:02  23           And my wife's name is Joslyn Porter.  She's a

10:00:09  24   full-time housewife.

10:00:09  25           And I've did -- I've done grand jury about 20

10:00:14  1  years ago.

10:00:14  2          THE COURT:  All right, sir.  Thank you very much.

10:00:16  3          No. 18 is next, Ms. Bowen.

10:00:20  4          JUROR BOWEN:  My name is Amber Bowen.  I live in

10:00:23  5  Hallsville, Texas.  I have three children.

10:00:26  6          I work at Arrowhead Contractors Supply as a

10:00:30  7  billing specialist.  I've worked there for almost two

10:00:34  8  years.  I went to college at Indian River State College in

10:00:43  9  Port St. Lucie, Florida.

10:00:43  10         My spouse's name is Leonard Bowen.  He's in

10:00:48  11  management at Lowe's.  He's worked there for about 10

10:00:52  12  years.

10:00:52  13         And I have served on a criminal case almost a year

10:00:55  14  ago.

10:00:55  15         THE COURT:  Where was that?

10:01:00  16         JUROR BOWEN:  Here in Hallsville -- or, I'm sorry,

10:01:03  17  in Harrison County.

10:01:03  18         THE COURT:  Okay.  Thank you very much, ma'am.

10:01:04  19         Next is No. 19, Ms. Hodges.

10:01:07  20         JUROR HODGES:  My name is Betty Hodges.  I have

10:01:10  21  three kids and two stepchildren.  I'm a homemaker.  I drove

10:01:14  22  my children to out-of-district schools for a better

10:01:17  23  education.  I've done that for 21 years, almost.

10:01:25  24         I got my GED, my CNA license, bartending license,

10:01:34  25  and a journal -- not a journal -- electrical -- a journey

```
10:01:40   1    electrician with my father.
10:01:41   2           My spouse's name is Alfred Phillips.  He's also an
10:01:48   3    electrician, and he's done that for probably 30 years.
10:01:51   4           And I've never served on a jury.  I've always had
10:01:53   5    to drive children back and forth to school.
10:01:56   6           THE COURT:  All right.  Thank you, Ms. Hodges.
10:01:58   7           Next is No. 20, Ms. Duncan.
10:02:01   8           JUROR DUNCAN:  Good morning.  My name is Shannon
10:02:04   9    Duncan.  And I'm from Bloomburg.  I have two children.
10:02:08  10           I currently work at Christus St. Michael in
10:02:12  11    Texarkana in the trauma department.  And I've been there
10:02:17  12    for 29 years.  Graduated high school.
10:02:21  13           My husband, Douglas, is a mechanic, heavy
10:02:26  14    equipment and diesel.  And he has been in business for
10:02:30  15    about 36 years.
10:02:31  16           And I've never been on a jury before.
10:02:33  17           THE COURT:  Thank you very much.
10:02:34  18           Next is No. 21, Mr. Lindsey.
10:02:40  19           JUROR LINDSEY:  My name is Daniel Lindsey.  I live
10:02:47  20    in Gilmer, Texas.  I have two children.
10:02:51  21           I work at Custom Auto Sales, buy and sell cars and
10:02:57  22    trucks.  Worked there for 26 years.  High school graduate.
10:03:00  23           Wife's name is Karen Lindsey.  She is a
10:03:06  24    stay-at-home mother.
10:03:07  25           Never served on a jury.
```

```
10:03:09   1              THE COURT:  Thank you, sir.
10:03:10   2              Next is No. 22, Ms. Jones.
10:03:12   3              JUROR JONES:  My name is Glenda Jones.  I live in
10:03:20   4    Hallsville, Texas.  I have one grown stepson.
10:03:23   5              I work for Christus Good Shepherd Home Health in
10:03:29   6    Longview.  I've worked there for five years.  I have an
10:03:32   7    Associate's degree.
10:03:32   8              I'm divorced.  But I still claim a stepchild.
10:03:36   9              And no prior jury service.
10:03:38   10             THE COURT:  Thank you very much.
10:03:39   11             Next is No. 23, Ms. Walker.
10:03:43   12             JUROR WALKER:  Hello.  My name is Jacqueline
10:03:46   13   Walker.  I'm from Marshall, Texas.  I have no children.
10:03:49   14             I am employed with the Marshall Independent School
10:03:53   15   District.  I am a teacher's assistant.  I've been there two
10:03:56   16   years.
10:03:57   17             I'm -- I obtained my CNA license, my Bachelor's
10:04:01   18   degree in business administration, and I'm obtaining my
10:04:05   19   teacher's certification.
10:04:07   20             I'm not married.
10:04:11   21             And I've never served, but I've always gotten a
10:04:16   22   letter.
10:04:16   23             THE COURT:  Okay.  Thank you, Ms. Walker.
10:04:17   24             Next is No. 24, Ms. Fondren.
10:04:22   25             JUROR FONDREN:  Hi.  I'm Jennifer Fondren.  I live
```

10:04:27  1   in Omaha.  I have one stepson and two children of my own.

10:04:33  2         I work at Smauley's Small World in Daingerfield.

10:04:36  3   I'm a daycare teacher.  I've worked there for two years.  I

10:04:40  4   graduated high school.

10:04:41  5         My spouse's name is Joseph Fondren.  He is a

10:04:45  6   firefighter at Red River Army Depot.  He's been there for

10:04:50  7   15 years.

10:04:50  8         And I've never served.

10:04:51  9         THE COURT:  Thank you, ma'am.

10:04:53  10        Next is No. 25, Ms. Greene.

10:04:57  11        JUROR GREENE:  My name is Deanna Greene.  I live

10:05:00  12   in Longview.  I have two daughters.

10:05:01  13        I work for Region VII Education Service Center.

10:05:01  14   I'm an educational specialist.  I've been there for three

10:05:05  15   years.  I have my Master's degree in curriculum and

10:05:10  16   instruction.

10:05:10  17        My husband is Kevin Greene, and he works for

10:05:16  18   American Electric Power as a serviceman out of Kilgore, and

10:05:17  19   he's been there for 20 years.

10:05:19  20        And I have never served on a jury.

10:05:21  21        THE COURT:  Thank you.

10:05:22  22        No. 26 is next.  Ms. Rangel.

10:05:27  23        JUROR RANGEL:  My name is Tara Rangel.  And I have

10:05:30  24   two boys, ages 11 and 7.

10:05:30  25        I work for Hallsville ISD, and I'm the

10:05:35  1  speech-language pathologist there.  I have worked there for

10:05:38  2  15 years.  I have a Master's degree in speech-language

10:05:42  3  pathology.

10:05:43  4      My husband's name is David Rangel, and he works at

10:05:48  5  Kilgore College.  And he is the assistant department chair

10:05:51  6  for the math department, and he's also a math instructor

10:05:54  7  there.  He has worked there for, I think going on four

10:05:57  8  years.

10:05:58  9      And I have no jury -- prior jury service.

10:06:00  10      THE COURT:  Thank you, Ms. Rangel.

10:06:03  11      No. 27 is next.  Mr. Gardner.

10:06:12  12      JUROR GARDNER:  My name is Marlin Gardner.  I've

10:06:16  13  lived in Hallsville since 2018.  I have three -- three

10:06:20  14  boys.

10:06:21  15      I work for BP Energy.  They acquired a company.

10:06:28  16  We've built out the natural gas systems.  I've worked with

10:06:34  17  BP for two years, but the company prior to that, eight

10:06:40  18  years.

10:06:41  19      Education, I completed a third-year electrical

10:06:46  20  engineering.  I've got a variety of Associate's degrees.

10:06:50  21      My spouse, her name is Jennifer Gardner.  She's a

10:06:57  22  stay-at-home mom.  She used to do the books for our

10:07:01  23  previous business that we sold.  It's been -- she's been

10:07:07  24  doing that for about 15 years or so.

10:07:15  25      And I've not been selected to serve in any jury

10:07:18  1  cases.

10:07:19  2          THE COURT:  Thank you very much, sir.

10:07:20  3          All right.  We'll go next to No. 28, Mr. Parker.

10:07:25  4          JUROR PARKER:  Hi.  My name is Shad Parker.  I've

10:07:30  5  lived in Atlanta for 47 years.  I have two children.

10:07:37  6  They're both grown.

10:07:38  7          I work at GPI paper mill, Domino, as a mechanic.

10:07:45  8  I've worked there about 12 years.  Graduated Quincy High

10:07:49  9  School.

10:07:50  10          My wife's name is Angela Parker.  She works at

10:07:54  11  Quincy High School admin -- administration building.  And

10:07:58  12  she's worked there probably 10 years.  And I never have

10:08:00  13  served.

10:08:01  14          THE COURT:  Thank you very much, Mr. Parker.

10:08:02  15          Next is No. 29, Mr. Jenkins.

10:08:08  16          JUROR JENKINS:  Yes.  My name is Randall Shane

10:08:12  17  Jenkins.  I have two children.

10:08:14  18          I'm a central office technician for Frontier

10:08:18  19  Communications in Kilgore, Texas.  I've worked there 20

10:08:22  20  years.

10:08:22  21          I graduated from the former college of Lon Morris

10:08:29  22  in Jacksonville, Texas.  My Associate's in arts.

10:08:33  23          My wife's name is Jill Jenkins.  She works for

10:08:38  24  Hallsville ISD.  She's a school teacher.  She's worked

10:08:43  25  there for 13 years.

| | | |
|---|---|---|
| 10:08:44 | 1 | And I've only served on a traffic case, city, |
| 10:08:47 | 2 | Longview. |
| 10:08:47 | 3 | THE COURT:  How long ago? |
| 10:08:49 | 4 | JUROR JENKINS:  Three years ago. |
| 10:08:50 | 5 | THE COURT:  Okay.  Thank you very much, sir. |
| 10:08:51 | 6 | All right.  Next is No. 31, Ms. Porter. |
| 10:08:57 | 7 | JUROR LAVESA PORTER:  My name is Lavesa Porter.  I |
| 10:08:59 | 8 | live in Longview, Texas.  I have one son. |
| 10:09:02 | 9 | I work at PeopleReady, which is a company, they |
| 10:09:06 | 10 | have contracts with different companies to help find |
| 10:09:12 | 11 | candidates for work.  I've been there for four years.  I |
| 10:09:12 | 12 | went to Panola College. |
| 10:09:14 | 13 | My spouse's name is Derek Head.  He works for |
| 10:09:19 | 14 | Southwest Steel, and he's been there for eight years. |
| 10:09:21 | 15 | And I have never served. |
| 10:09:22 | 16 | THE COURT:  Thank you very much, ma'am. |
| 10:09:23 | 17 | Next is No. 32, Ms. Lewis. |
| 10:09:26 | 18 | JUROR LEWIS:  Hi.  My name is Glenda Lewis.  I |
| 10:09:29 | 19 | live in Omaha, Texas.  Born and raised there.  I have two |
| 10:09:36 | 20 | grown boys. |
| 10:09:37 | 21 | I currently work for Texarkana Aluminum.  I've |
| 10:09:39 | 22 | been there since May.  Prior to it being Texarkana |
| 10:09:44 | 23 | Aluminum, it was Arconic.  And I've worked there for two -- |
| 10:09:46 | 24 | it would be a total of two years if you combine the two |
| 10:09:50 | 25 | companies.  I am a health and safety coordinator.  I've |

10:09:56  1   done that most of my working life.

10:10:01  2         I graduated from Paul Pewitt High School.  I have

10:10:06  3   a BAAS from Texarkana A&M.  I have a Master of Business

10:10:07  4   degree from Texarkana A&M.

10:10:09  5         I have a significant other.  I do not have a

10:10:11  6   spouse.  His name is Phillip Smith.  He is retired from

10:10:17  7   Luminant, and he was an operator there.  Prior to that, he

10:10:21  8   had 30 years as a supervisor at Lone Star Steel.

10:10:26  9         And I was selected for a criminal jury probably 20

10:10:30  10  years ago.  I did not get to serve because the person pled

10:10:33  11  out.  And then I served on the grand jury in -- I believe

10:10:36  12  it was 2009, and that was in Morris County.

10:10:39  13        THE COURT:  But you never served on a civil jury

10:10:41  14  in a case like this?

10:10:43  15        JUROR LEWIS:  No.

10:10:44  16        THE COURT:  Thank you very much, ma'am.

10:10:45  17        All right.  Next is No. 33 on our panel,

10:10:48  18  Mr. Wiley.

10:10:49  19        JUROR WILEY:  My name is Leonard Wiley.  I live

10:10:52  20  here in Marshall.  I have three children and six

10:10:55  21  grandchildren.

10:10:55  22        I'm a retired school teacher, but I still teach

10:10:59  23  half a day at Elysian Fields.  I retired from there, so I

10:11:06  24  had about 25 years in there.

10:11:07  25        And then I worked for 13 years for -- as a

| | | |
|---|---|---|
| 10:11:11 | 1 | wireline engineer for Schlumberger Well Services.  I have a |
| 10:11:17 | 2 | physics degree from Michigan State University. |
| 10:11:20 | 3 | My spouse is Betty Wiley.  She's retired, also, as |
| 10:11:24 | 4 | an administrative assistant, and she worked there 20 years |
| 10:11:29 | 5 | at the school. |
| 10:11:30 | 6 | And I have no prior jury service. |
| 10:11:33 | 7 | THE COURT:  Which school did your wife work at? |
| 10:11:35 | 8 | JUROR WILEY:  Elysian Fields. |
| 10:11:37 | 9 | THE COURT:  Thank you, sir. |
| 10:11:38 | 10 | No. 34 is next, Ms. Blackwell. |
| 10:11:42 | 11 | JUROR BLACKWELL:  I'm Renae Blackwell.  I live in |
| 10:11:45 | 12 | Leesburg, Texas.  Go Leesburg.  Three children, six |
| 10:11:50 | 13 | grandchildren. |
| 10:11:51 | 14 | I have been at City Cleaners in Mt. Pleasant as |
| 10:11:57 | 15 | alterations manager for 19 years. |
| 10:12:00 | 16 | I was -- graduated from high school in Chisago, |
| 10:12:05 | 17 | Minnesota. |
| 10:12:06 | 18 | My husband's name is Robert.  He's been at |
| 10:12:09 | 19 | Priefert Manufacturing as the ranch foreman for 28 years. |
| 10:12:16 | 20 | And I have done civil, and I have done criminal, |
| 10:12:20 | 21 | and I have done grand jury in Camp County. |
| 10:12:22 | 22 | THE COURT:  When did you serve on a civil jury |
| 10:12:24 | 23 | last, ma'am? |
| 10:12:25 | 24 | JUROR BLACKWELL:  It's probably been close to 10 |
| 10:12:27 | 25 | years. |

| | | |
|---|---|---|
| 10:12:27 | 1 | THE COURT:  And was that in Camp County in the |
| 10:12:30 | 2 | state system? |
| 10:12:30 | 3 | JUROR BLACKWELL:  Yes, yes. |
| 10:12:32 | 4 | THE COURT:  Okay.  Thank you very much. |
| 10:12:33 | 5 | All right.  Next is No. 35, Ms. Wexler. |
| 10:12:37 | 6 | JUROR WEXLER:  Good morning. |
| 10:12:38 | 7 | THE COURT:  Good morning. |
| 10:12:39 | 8 | JUROR WEXLER:  My name is Kendra Wexler.  I live |
| 10:12:43 | 9 | in Gilmer, Texas.  I have three children and one stepson. |
| 10:12:47 | 10 | I work at Walmart in Gilmer.  Been there almost 29 |
| 10:12:47 | 11 | years.  I have a high school diploma. |
| 10:12:51 | 12 | My spouse's name is Greg Wexler.  He's retired. |
| 10:12:54 | 13 | He's a welding inspector. |
| 10:13:00 | 14 | And I served on a criminal case probably 15 years |
| 10:13:05 | 15 | or more, in Upshur County. |
| 10:13:06 | 16 | THE COURT:  Next is No. 36, Mr. Ayres. |
| 10:13:09 | 17 | JUROR AYRES:  My name is William Ayres.  I live in |
| 10:13:11 | 18 | Elysian Fields, but my postal address says I live in |
| 10:13:16 | 19 | Marshall.  I have five children through two marriages. |
| 10:13:20 | 20 | My place of employment is -- was Jefferson ISD for |
| 10:13:25 | 21 | 19 years.  I'm a retired teacher from there.  I taught |
| 10:13:29 | 22 | science and instructional inter -- intervention. |
| 10:13:34 | 23 | I have a Master's degree in educational leadership |
| 10:13:36 | 24 | from Stephen F. Austin. |
| 10:13:38 | 25 | My wife's name is Kathy.  She works for Blue Cross |

10:13:41  1  Blue Shield of Texas.  And she deals with the providers,

10:13:45  2  not the members.  She's worked there for probably 24 years.

10:13:52  3        I've served both on a civil and a criminal, I

10:13:56  4  think.  The civil was probably about two years ago.

10:13:58  5        THE COURT:  And where was that, sir?

10:14:00  6        JUROR AYRES:  It was in Marshall.

10:14:01  7        THE COURT:  I'm sorry?

10:14:02  8        JUROR AYRES:  It was in Marshall.

10:14:05  9        THE COURT:  Okay.  Not in this court?

10:14:05  10        JUROR AYRES:  Sir?

10:14:07  11        THE COURT:  Not in this court?

10:14:07  12        JUROR AYRES:  No, sir.

10:14:07  13        THE COURT:  Okay.

10:14:12  14        JUROR AYRES:  Across the street.

10:14:13  15        THE COURT:  Thank you.

10:14:13  16        All right.  Next is No. 37, Mr. Weaver.

10:14:16  17        JUROR WEAVER:  My name is Dekota Weaver.  I live

10:14:20  18  in Linden, Texas.  I have one son, and a daughter on the

10:14:20  19  way around Thanksgiving time.

10:14:22  20        I work for my father's construction company and

10:14:25  21  have been for many years.  I've also been in the Texas

10:14:28  22  National Guard for nine years.

10:14:31  23        I graduated in Arp, Texas, out of high school.  I

10:14:35  24  have two technical diplomas and a Bachelor's in criminal

10:14:35  25  justice.

10:14:35   1          My wife's name is Jerrika Weaver, and she's been a

10:14:43   2  patrol officer for Texarkana, Texas Police Department for

10:14:43   3  five years.

10:14:45   4          And I've never served on a jury.

10:14:46   5          THE COURT:  Thank you, Mr. Weaver.

10:14:47   6          Next is No. 38, Mr. Hooten.

10:14:53   7          JUROR HOOTEN:  My name is Kenneth Hooten.  I have

10:14:56   8  two kids, eight and four.

10:14:58   9          I work at Linden-Kildare ISD as a CPA.  Been there

10:15:04  10  for three years.  I have a Master's degree in accounting.

10:15:06  11          My wife's name is Jennifer Hooten.  She is a

10:15:09  12  special education aide at Linden-Kildare CISD.  She's been

10:15:10  13  there for two years.

10:15:10  14          And never served on a jury.

10:15:12  15          THE COURT:  All right.  Thank you.

10:15:13  16          No. 39 is next.  Ms. Bolton.

10:15:19  17          JUROR BOLTON:  My name is Jessica Bolton.  I live

10:15:22  18  in Gilmer.  I have two kids.  My place of employment is

10:15:26  19  INDEVCO Plastics.  I actually just started Monday, but I'm

10:15:29  20  a QA and the lab tech.

10:15:31  21          Educational background, I have a degree in office

10:15:34  22  support assistant.  I'm working on my nursing degree, as

10:15:38  23  well.

10:15:39  24          I'm not married.

10:15:40  25          And I've never served on a jury.

```
10:15:42   1              THE COURT:  Thank you, ma'am.
10:15:43   2              Next is No. 40, Mr. Ragsdale.
10:15:47   3              JUROR RAGSDALE:  Ronnie Ragsdale.  I live in
10:15:51   4   Daingerfield.  I work for Morris County.  Worked there
10:15:55   5   about nearly 11 or 12 years.  High school education.
10:16:01   6              And don't have -- not married.
10:16:04   7              And never served.
10:16:06   8              THE COURT:  What do you do for Morris County, sir?
10:16:13   9              MR. RAGSDALE:  Operator.
10:16:13  10              THE COURT:  Road and bridge department?
10:16:16  11              JUROR RAGSDALE:  Pardon me?
10:16:16  12              THE COURT:  Road and bridge?
10:16:16  13              JUROR RAGSDALE:  Yes, sir.
10:16:17  14              THE COURT:  Okay.  Thank you very much.
10:16:17  15              All right.  Ladies and gentlemen, thank you very
10:16:23  16   much.
10:16:23  17              Now, I need to say a couple things to you before I
10:16:27  18   turn the questioning over to the lawyers.
10:16:29  19              The jurors that are actually selected to serve in
10:16:33  20   this case will serve in the role as the judges of the
10:16:38  21   facts, and the jurors selected to serve here will make the
10:16:40  22   sole determination about what the facts are in this case.
10:16:46  23              Now, my job, as the Judge, is to rule on questions
10:16:49  24   of law, evidence, procedure, maintain the decorum of the
10:16:53  25   courtroom, and to oversee the efficient flow of the
```

10:16:55  1   evidence during the course of the trial.

10:16:56  2         Also, I want to say a couple things to you about

10:17:00  3   our judicial system that I hope will put things in a proper

10:17:04  4   perspective for you.

10:17:05  5         In every civil jury trial like this one, besides

10:17:10  6   the parties themselves, there are always three

10:17:13  7   participants, the jury, the judge, and the lawyers.

10:17:17  8         With regard to the lawyers, I think it's important

10:17:19  9   for each of you to understand that our judicial system is

10:17:24  10  an adversary system, which simply means that during the

10:17:28  11  trial, each of the parties will seek to present their

10:17:31  12  respective cases to the jury through their counsel in the

10:17:34  13  very best light possible.

10:17:36  14        Now, it's no surprise to any of you that lawyers

10:17:40  15  are sometimes criticized in the public and in the media,

10:17:43  16  but the Court's observed that at least some of that

10:17:47  17  criticism is the result of a basic misunderstanding of our

10:17:52  18  adversary system in which the lawyers act as advocates for

10:17:56  19  the competing parties.

10:17:59  20        And as an advocate, a lawyer is ethically and

10:18:02  21  legally obligated to zealously assert his or her client's

10:18:06  22  positions under the rules of our adversary system.  And by

10:18:11  23  presenting the best case possible on behalf of their

10:18:15  24  clients, the lawyers hopefully will enable the jury to

10:18:18  25  better weigh the relevant evidence, to determine the truth,

10:18:20   1   and to arrive at a just verdict based on that evidence.

10:18:23   2          This adversary system of justice has served our

10:18:28   3   country well, for over 200 years.  And America's lawyers

10:18:32   4   have been, are now, and will be in the future an

10:18:34   5   indispensable part of that process.

10:18:36   6          So as we go forward with the trial, even though

10:18:40   7   it's possible I might occasionally frown or grumble at the

10:18:47   8   lawyers, I'm simply trying to make sure that their advocacy

10:18:51   9   doesn't get outside the boundaries of our adversary system

10:18:54  10   and our Rules of Procedure.

10:18:55  11          But keep in mind, ladies and gentlemen, those of

10:18:59  12   you that are selected to serve on the jury, that the

10:19:00  13   lawyers are just doing their jobs, and I think it's

10:19:02  14   important for you to be aware of that as we go forward.

10:19:05  15          Also, ladies and gentlemen, for those of you that

10:19:08  16   are selected to serve on this jury, during the course of

10:19:10  17   the trial, I am going to do my very best to make sure that

10:19:13  18   none of you have any idea about how I feel about the

10:19:18  19   evidence in this case, because it's the jury's job and not

10:19:22  20   mine to determine what the facts are from the evidence

10:19:26  21   that's presented.

10:19:27  22          And those of you selected on the jury should not

10:19:29  23   take any expression that you see or you think you see or

10:19:33  24   anything that you think you see as coming from me, as a

10:19:36  25   factor to consider in determining what the ultimate facts

```
10:19:39   1   are in this case.
10:19:40   2           All right.  At this time, counsel will address the
10:19:47   3   jury.
10:19:47   4           Ms. Truelove, you may address the jury on behalf
10:19:50   5   of -- the panel on behalf of Plaintiff.  Would you like a
10:19:54   6   warning on your time?
10:19:55   7           MS. TRUELOVE:  I would, Your Honor.  If you would
10:19:57   8   tell me five minutes left and a minute left.
10:20:00   9           THE COURT:  I will do that.
10:20:01  10           MS. TRUELOVE:  Thank you.
10:20:08  11           THE COURT:  Please proceed when you're ready.
10:20:10  12           MS. TRUELOVE:  Thank you, Your Honor.
10:20:10  13           May it please the Court.
10:20:13  14           Mr. Dacus, Mr. Hilmes, Mr. Hadden.
10:20:20  15           Good morning, ladies and gentlemen.  I want to
10:20:21  16   begin first by just saying thank you.  Thank you for
10:20:23  17   showing up today.
10:20:26  18           In ordinary times, it's -- it's still remarkable
10:20:28  19   to have folks show up for jury service for such an
10:20:32  20   important thing.  And in these times, it's even more
10:20:35  21   remarkable to have you here.  And on behalf of myself,
10:20:39  22   Mr. Baxter, Mr. Fabricant, our client Vocalife, and
10:20:44  23   Vocalife's owner Dr. Li, we thank you for your time this
10:20:48  24   morning.
10:20:48  25           I'll begin, just as His Honor began, and tell you
```

10:20:52   1   about myself.

10:20:53   2          As you heard, my name is Jennifer Truelove.  I

10:20:55   3   live here in Marshall, Texas.  I have ever since I

10:20:59   4   graduated law school back in 1999.  I met my husband Kurt

10:21:04   5   there, and he is a Marshall boy, so he brought me back

10:21:04   6   here.  And we've both been practicing law since that time.

10:21:08   7          I've been at McKool Smith for the last 10 years,

10:21:10   8   where I've had the honor of working with Sam Baxter here in

10:21:15   9   Marshall and trying these interesting and exciting patent

10:21:18  10   cases that you're going to get to hear about.

10:21:20  11          Kurt and I have three children.  Our oldest

10:21:20  12   daughter, Cate, is a freshman at UT where we are paying for

10:21:25  13   her to sit in her dorm room and take classes, virtually.

10:21:28  14   Our daughter, Maggie, is a junior at Marshall High School.

10:21:31  15   And our son, Walt, is in 8th grade at the junior high here

10:21:37  16   in Marshall.

10:21:37  17          I have actually sat on a criminal jury before up

10:21:40  18   in Jefferson when we lived up there in Marion County.  And

10:21:44  19   so that's -- that's me.

10:21:46  20          Before we get to asking questions, I thought I

10:21:49  21   would take just a minute to give you a little bit of an

10:21:52  22   overview of what this case is about, to kind of put it in

10:21:55  23   context for you.

10:21:56  24          Vocalife is a company.  They make products.

10:22:02  25   They're in Plano, Texas.  And Dr. Li is the owner.  And you

10:22:05  1  all know now, we have this technology where you can stand

10:22:11  2  in the middle of your house and speak, and you can turn

10:22:15  3  your thermostat up, you can turn your lights out, you can

10:22:21  4  turn your radio on, all by the sound of your voice, talking

10:22:23  5  to a computer.  In this case, we're going to be talking

10:22:27  6  about Amazon's Echo.

10:22:28  7        But that wasn't the case back in the 2000s.  Back

10:22:34  8  in the 2007 time frame, what you're going -- what you're

10:22:37  9  going to understand is we couldn't do that.  We didn't have

10:22:41 10  the technology to do that, and Dr. Li was very involved in

10:22:44 11  that kind of microphone technology.  Right?

10:22:47 12        And at that point in time, you could talk directly

10:22:49 13  into a microphone, and it could identify your voice, but

10:22:52 14  you couldn't -- you couldn't be in the middle of a room and

10:22:55 15  do the things that you can do now.

10:22:56 16        And so he recognized that problem.  He recognized

10:22:59 17  that that's where the future was going and technology was

10:23:01 18  going, and he set out to find a solution.  And he very

10:23:05 19  wisely hired a Dr. Manli Zhu, and she and he set about

10:23:12 20  coming up with a solution to the problem.

10:23:14 21        And, ultimately, what they -- what they did is

10:23:16 22  they took some things that were out there, technology-wise,

10:23:19 23  they took something called adaptive beamforming, another

10:23:23 24  thing called sound source localization, and another thing

10:23:29 25  called noise cancellization.

10:23:31  1          And they spent years, trial and error, coming up

10:23:35  2  with an algorithm, right, something -- a very detailed plan

10:23:38  3  on putting these things together, and they figured out a

10:23:41  4  way to make it work, to solve the problem, where you can

10:23:44  5  stand in a room and do those kinds of things by talking to

10:23:48  6  a device.

10:23:48  7          They put that in a chip.  This was a very novel

10:23:48  8  and new way to do things.

10:23:51  9          And they actually got an award for it in 2011, and

10:23:56  10 Amazon invited them to come to their lab and talk to them

10:23:59  11 about this technology.

10:24:01  12         And they did something, they signed an NDA, and

10:24:04  13 you heard -- we heard that word mentioned just a moment

10:24:07  14 ago.  And they shared their technology.  And lo and behold,

10:24:10  15 three years later the Echo comes out, and they're invited

10:24:14  16 again by Amazon to come to a launch party to see this new

10:24:17  17 device.  So that's kind of why we're here.

10:24:19  18         Those of you that are selected are going to hear a

10:24:23  19 lot more about the patent in this case that Dr. Li and

10:24:27  20 Dr. Zhu are inventors on, and you're going to hear a lot

10:24:32  21 more about the technology and why it is that Vocalife

10:24:34  22 thinks Amazon infringes.

10:24:42  23         So I know that a couple of you, just from your

10:24:45  24 questionnaires, have an Echo product.

10:24:51  25         I think you do, Ms. Edwards, is that right,

| | | |
|---|---|---|
| 10:24:55 | 1 | Juror 5? |
| 10:24:55 | 2 | JUROR EDWARDS:  Yes, ma'am. |
| 10:24:57 | 3 | MS. TRUELOVE:  Sorry, I'm going to put you guys to |
| 10:24:59 | 4 | work. |
| 10:24:59 | 5 | THE COURT:  And this is where I'm going to ask |
| 10:24:59 | 6 | everybody to wait until the microphone gets there.  Do it |
| 10:25:01 | 7 | like we've been doing it. |
| 10:25:01 | 8 | JUROR EDWARDS:  Yes. |
| 10:25:02 | 9 | MS. TRUELOVE:  You have an Echo Dot; is that |
| 10:25:04 | 10 | right? |
| 10:25:04 | 11 | JUROR EDWARDS:  Yes. |
| 10:25:04 | 12 | MS. TRUELOVE:  How long have you had that? |
| 10:25:05 | 13 | JUROR EDWARDS:  Just a couple months. |
| 10:25:07 | 14 | MS. TRUELOVE:  Okay.  Are you enjoying it? |
| 10:25:08 | 15 | JUROR EDWARDS:  Yeah, it wakes me up in the |
| 10:25:10 | 16 | morning. |
| 10:25:10 | 17 | MS. TRUELOVE:  Okay.  Have you noticed that -- |
| 10:25:13 | 18 | does it have lights that go around it when you speak to it? |
| 10:25:16 | 19 | JUROR EDWARDS:  Yes. |
| 10:25:16 | 20 | MS. TRUELOVE:  Have you noticed that when you're |
| 10:25:18 | 21 | speaking to it, maybe one particular light will light up? |
| 10:25:21 | 22 | JUROR EDWARDS:  Like there's a blue light that |
| 10:25:23 | 23 | comes on when you're talking to it. |
| 10:25:25 | 24 | MS. TRUELOVE:  Okay.  Anything about the fact that |
| 10:25:27 | 25 | you have this product and you like it, going to kind of put |

| | | |
|---|---|---|
| 10:25:30 | 1 | me a little behind in the game? |
| 10:25:33 | 2 | JUROR EDWARDS:  I wouldn't think so. |
| 10:25:34 | 3 | MS. TRUELOVE:  Okay.  You can still sit there and |
| 10:25:36 | 4 | listen to the evidence and be -- be fair to my client, |
| 10:25:40 | 5 | Vocalife, even though you have this Amazon product in your |
| 10:25:42 | 6 | home? |
| 10:25:43 | 7 | JUROR EDWARDS:  Yes, ma'am. |
| 10:25:44 | 8 | MS. TRUELOVE:  Okay.  Thank you very much. |
| 10:25:45 | 9 | And I think -- is it Ms. Bowen, am I saying that |
| 10:25:49 | 10 | right, Juror No. 18? |
| 10:25:54 | 11 | JUROR BOWEN:  It's Bowen. |
| 10:25:55 | 12 | MS. TRUELOVE:  Bowen, thank you.  Ms. Bowen, you |
| 10:25:57 | 13 | have an Echo, right? |
| 10:25:58 | 14 | JUROR BOWEN:  Yes. |
| 10:25:59 | 15 | MS. TRUELOVE:  How long -- |
| 10:26:00 | 16 | THE COURT:  Ms. Bowen, would you pull your mask |
| 10:26:02 | 17 | down so we can see you? |
| 10:26:04 | 18 | JUROR BOWEN:  Oh, I'm sorry. |
| 10:26:05 | 19 | THE COURT:  Thank you. |
| 10:26:05 | 20 | JUROR BOWEN:  Yes.  We've had our Echo a year. |
| 10:26:09 | 21 | MS. TRUELOVE:  Okay.  And do you like it? |
| 10:26:10 | 22 | JUROR BOWEN:  Yes. |
| 10:26:11 | 23 | MS. TRUELOVE:  Is it able to do things for you |
| 10:26:12 | 24 | like turn off the lights and turn on music? |
| 10:26:16 | 25 | JUROR BOWEN:  It could.  We don't utilize it for |

| | | |
|---|---|---|
| 10:26:19 | 1 | that. |
| 10:26:19 | 2 | MS. TRUELOVE:  Okay.  What do you use it for? |
| 10:26:21 | 3 | JUROR BOWEN:  The kids like to play the trivia |
| 10:26:23 | 4 | games and, you know, we get weather and alarms and stuff |
| 10:26:26 | 5 | from it. |
| 10:26:27 | 6 | MS. TRUELOVE:  Have you noticed the lights like |
| 10:26:29 | 7 | Juror No. 5, Ms. Edwards, mentioned? |
| 10:26:32 | 8 | JUROR BOWEN:  Yes. |
| 10:26:33 | 9 | MS. TRUELOVE:  And does it light up when it |
| 10:26:35 | 10 | detects your voice? |
| 10:26:37 | 11 | JUROR BOWEN:  Yes. |
| 10:26:37 | 12 | MS. TRUELOVE:  Anything about the fact that you |
| 10:26:39 | 13 | have this product in your home going to be a problem for me |
| 10:26:42 | 14 | as Vocalife's attorney suing Amazon, going forward in this |
| 10:26:46 | 15 | case? |
| 10:26:46 | 16 | JUROR BOWEN:  No. |
| 10:26:47 | 17 | MS. TRUELOVE:  Okay.  Thank you, Ms. Bowen. |
| 10:26:48 | 18 | And I think, is it Ms. Wexler, way back there, |
| 10:26:52 | 19 | Juror 35?  You have an Alexa, right? |
| 10:26:54 | 20 | JUROR WEXLER:  Yes, ma'am, I do. |
| 10:26:58 | 21 | MS. TRUELOVE:  And -- and, you know, this is good |
| 10:27:00 | 22 | news for you, there's probably not a very strong likelihood |
| 10:27:04 | 23 | that we're going to get all the way back to you folks in |
| 10:27:08 | 24 | the back of the room.  So I'll just ask, you know, if you |
| 10:27:09 | 25 | were selected, anything about owning that Amazon product |

```
10:27:12   1  going to be a problem for me, going forward in this case?
10:27:15   2          JUROR WEXLER:  No, ma'am.
10:27:15   3          MS. TRUELOVE:  All right.  Thank you very much.
10:27:16   4          Anybody else, just looking at the questionnaires,
10:27:19   5  those are the three people that I saw that had products.
10:27:22   6          Anybody else have an Echo product in your home?  A
10:27:24   7  couple people do.
10:27:26   8          Juror No. 3, Mr. Wallace?
10:27:30   9          JUROR WALLACE:  I didn't know it was an Amazon
10:27:34  10  product until you mentioned Alexa.  It was a gift at
10:27:37  11  Christmas, and -- and it helps me listen to music I want to
10:27:41  12  listen to, so...
10:27:42  13          MS. TRUELOVE:  Great.
10:27:43  14          JUROR WALLACE:  No, it wouldn't affect my -- my --
10:27:46  15  put you behind the line or anything like that.
10:27:48  16          MS. TRUELOVE:  Right.  Well, let me -- while I've
10:27:49  17  got you standing there so we don't have to do the
10:27:50  18  microphone shuffle.
10:27:51  19          JUROR WALLACE:  Okay.
10:27:52  20          MS. TRUELOVE:  You're from Gilmer county, you're
10:27:54  21  an attorney, right?
10:27:55  22          JUROR WALLACE:  Yes.
10:27:56  23          MS. TRUELOVE:  And we have that in common, I used
10:27:57  24  to prosecute and do the CPS cases for Harrison County.
10:28:00  25          JUROR WALLACE:  Very good.
```

10:28:01  1          MS. TRUELOVE:  And do you know Judge Lauren Parish
10:28:04  2   up there in Upshur?
10:28:06  3          JUROR WALLACE:  Very well, yes.
10:28:07  4          MS. TRUELOVE:  And "very well," do you have a nice
10:28:08  5   relationship with her?
10:28:09  6          JUROR WALLACE:  I do.  It's -- social relationship
10:28:12  7   outside the courtroom, professional.  She's one of my dear
10:28:16  8   friends.
10:28:16  9          MS. TRUELOVE:  Okay.  So I'm sure you're aware
10:28:18 10   that she married Mr. Baxter?
10:28:20 11          JUROR WALLACE:  Yes, I am.  I thought I recognized
10:28:22 12   Mr. Baxter when he came in.
10:28:23 13          MS. TRUELOVE:  All right.  And that's what I
10:28:24 14   really want to know, is that a problem?  I understand that
10:28:24 15   you and Judge Parish get along well, the fact that she's
10:28:27 16   married to Mr. Baxter?
10:28:28 17          JUROR WALLACE:  She'd be very disappointed in our
10:28:32 18   friendship if that was a problem.  It's not going to be a
10:28:34 19   problem.
10:28:34 20          MS. TRUELOVE:  Okay.  I appreciate that.  Thank
10:28:35 21   you very much.  Oh, and one more question since you're
10:28:37 22   standing, I noticed that one of your co-workers is on our
10:28:40 23   panel, it's Ms. Stansbury, right?
10:28:43 24          JUROR WALLACE:  That's correct, yes, we're very
10:28:45 25   proud of her.

```
10:28:46   1          MS. TRUELOVE:  I imagine.  So anything -- you
10:28:48   2    know, if by off chance you're both selected to sit on this
10:28:51   3    panel, anything about that situation give you pause?
10:28:54   4          JUROR WALLACE:  No, ma'am, we work very well
10:28:56   5    together.
10:28:57   6          MS. TRUELOVE:  Okay.  Great.  I appreciate it.
10:28:58   7    Thank you.
10:28:59   8          JUROR WALLACE:   Thank you.
10:28:59   9          MS. TRUELOVE:  And -- and could I ask
10:29:01   10   Ms. Stansbury, that's Juror 13?
10:29:06   11         Good morning.  Just -- just the same question, if
10:29:11   12   you -- if you were selected to sit on the jury with your
10:29:15   13   co-worker here Mr. Wallace, would that be a problem for you
10:29:18   14   at all?
10:29:18   15         JUROR STANSBURY:  No, ma'am.
10:29:19   16         MS. TRUELOVE:  You'd still be able to make up your
10:29:22   17   own mind and -- and decide the case based on your own
10:29:25   18   thoughts and ideas, as opposed to your co-worker's?
10:29:29   19         JUROR STANSBURY:  Yes, ma'am.
10:29:29   20         MS. TRUELOVE:  Okay.  I appreciate that.  Thank
10:29:31   21   you very much.
10:29:31   22         So during the quarantine, back -- back to Amazon,
10:29:37   23   if you -- if your house is anything like my house, about
10:29:40   24   every other day you were getting an Amazon package show up
10:29:43   25   at the door.  And -- and it was a good thing, right,
```

10:29:46   1   because of the circumstances we were in.

10:29:48   2       Just raise your hand if you've ever ordered

10:29:51   3   anything on Amazon?  It's the majority of the people in the

10:29:55   4   room.

10:29:55   5       Anything about that going to be a problem?  You

10:29:59   6   know, anybody sitting there thinking, it's a great company,

10:30:02   7   they provide a great service, there's just no way that they

10:30:07   8   could do the things that Vocalife is saying in regards to

10:30:13   9   infringing the patent?  Is there anybody that just right

10:30:15   10  now feels that way?  Okay.  I appreciate that.  Thank you.

10:30:18   11      Let's see, I think Juror No. 4, Mr. Miller.

10:30:31   12      JUROR MILLER:  Yes, ma'am.

10:30:32   13      MS. TRUELOVE:  Let me talk to you for just a

10:30:34   14  minute.  You work at Eastman, right?

10:30:37   15      JUROR MILLER:  Yes, ma'am.

10:30:39   16      MS. TRUELOVE:  Do you -- do you know if your

10:30:41   17  company has any intellectual property?

10:30:42   18      JUROR MILLER:  I'm sure we do.

10:30:43   19      MS. TRUELOVE:  Yeah.  I mean, Eastman deals with

10:30:46   20  lots of proprietary things, right?

10:30:48   21      JUROR MILLER:  Yes, ma'am.

10:30:49   22      MS. TRUELOVE:  Okay.  What -- what would Eastman

10:30:51   23  do if they found out that somebody was using some of their

10:30:56   24  intellectual property or proprietary information without

10:30:59   25  their permission?

10:31:00  1              JUROR MILLER:  I'm sure they would try to work out

10:31:02  2      a deal or go after them in court.

10:31:04  3              MS. TRUELOVE:  If they couldn't work out a deal,

10:31:06  4      if they approached them or talked to them and couldn't work

10:31:09  5      out a deal, do you think it's all right to take someone to

10:31:14  6      court?

10:31:14  7              JUROR MILLER:  Yes, ma'am.  That would be the next

10:31:16  8      step, I believe.

10:31:17  9              MS. TRUELOVE:  And there at Eastman, have you ever

10:31:18  10     been in a situation where you've had to sign an NDA, or a

10:31:22  11     non-disclosure agreement?

10:31:23  12             JUROR MILLER:  Yes.

10:31:23  13             MS. TRUELOVE:  And -- and what is that?  Can you

10:31:25  14     just tell everyone what that is?

10:31:27  15             JUROR MILLER:  It would be a -- you can't expose

10:31:32  16     company information to other companies --

10:31:35  17             MS. TRUELOVE:  You got to keep it -- you got to

10:31:37  18     keep it private, right?

10:31:39  19             JUROR MILLER:  Yes, ma'am.

10:31:40  20             MS. TRUELOVE:  If you're -- if you're provided

10:31:42  21     some proprietary information or an idea of an invention or

10:31:46  22     something like that, you can't go tell somebody else?

10:31:49  23             JUROR MILLER:  Correct.

10:31:50  24             MS. TRUELOVE:  Okay.  What -- what would you think

10:31:52  25     if you were in a meeting and both sides signed an NDA and

10:31:58   1   you're there to tell them about your invention or your

10:32:03   2   idea, you talk about it, and -- and you found out some time

10:32:07   3   later that they went and took your idea and put it in a

10:32:11   4   product?  That be the right thing to do?

10:32:17   5          JUROR MILLER:  No, I wouldn't believe -- I'd

10:32:20   6   probably feel undercut.

10:32:22   7          MS. TRUELOVE:  And if -- if your only recourse,

10:32:24   8   then, was to take that person to court for using your

10:32:27   9   invention, would you be all right with that?

10:32:30  10          JUROR MILLER:  Yes, ma'am.

10:32:30  11          MS. TRUELOVE:  Okay.  Thank you very much.

10:32:31  12          I think -- is it Juror 8 -- 16, rather,

10:32:39  13   Mr. Stephenson?  If I could speak with you for just a

10:32:46  14   minute.

10:32:46  15          And -- and you actually mentioned the word "NDA,"

10:32:49  16   which is why I'm picking on you, when -- when Judge was

10:32:52  17   talking to you earlier.

10:32:53  18          What -- what do you think about that?  If -- if

10:32:56  19   two parties entered into an NDA and they shared ideas with

10:33:00  20   each other and then one party went off and -- and took that

10:33:03  21   idea and put it in a product?  You don't really have any

10:33:09  22   sharp feelings about that?

10:33:11  23          JUROR STEPHENSON:  It's one of those -- it's one

10:33:12  24   of those things.  I don't know the situation or anything

10:33:14  25   like that.

10:33:15   1          MS. TRUELOVE:  Okay.  You said you had been at

10:33:16   2   your job for about three weeks?

10:33:19   3          JUROR STEPHENSON:  Uh-huh.

10:33:19   4          MS. TRUELOVE:  Is there anything about serving on

10:33:22   5   this jury cause a problem with you since you're just newly

10:33:25   6   at that job?

10:33:26   7          JUROR STEPHENSON:  Missing work.

10:33:28   8          MS. TRUELOVE:  Right.  Is -- is that going to

10:33:30   9   prevent you from being able to -- to focus on the issues

10:33:32  10   that are being discussed from the witnesses?

10:33:34  11          JUROR STEPHENSON:  No, I don't -- I don't think

10:33:36  12   so.

10:33:37  13          THE COURT:  Mr. Stephenson, would you hold that

10:33:40  14   mic a little closer?  I can barely hear you.

10:33:44  15          JUROR STEPHENSON:  I'm sorry.

10:33:45  16          THE COURT:  Thank you.

10:33:46  17          MS. TRUELOVE:  Okay.  Thank you very much.

10:33:47  18          Some of you made comments in your questionnaires

10:33:51  19   regarding lawsuits.  You were asked a question in there and

10:33:54  20   what your opinions were on lawsuits.  And a couple of you

10:33:56  21   said things -- you think there's too many frivolous or

10:34:01  22   people file too many lawsuits.

10:34:03  23          Anybody feel that way sitting here today?

10:34:07  24          And -- and that's Juror No. --

10:34:07  25          JUROR EVERS:  9.

```
10:34:12   1            MS. TRUELOVE:  -- 9, Mr. Evers, right?  Let's chat
10:34:15   2   for a moment if you don't mind.
10:34:17   3            JUROR EVERS:  Yes, ma'am.
10:34:18   4            MS. TRUELOVE:  You -- you think there's too many
10:34:19   5   lawsuits?
10:34:20   6            JUROR EVERS:  In some cases, yes, ma'am.  Some
10:34:22   7   people are just going out for a quick payday.
10:34:24   8            MS. TRUELOVE:  Okay.  And --
10:34:25   9            JUROR EVERS:  There are cases, though, where it is
10:34:28  10   necessary, though.
10:34:29  11            MS. TRUELOVE:  And -- and so if -- if someone has
10:34:31  12   done what they can to try and resolve a situation and it
10:34:34  13   turns out that their only recourse is to come to court, you
10:34:39  14   don't have a problem with that, do you?
10:34:41  15            JUROR EVERS:  No, ma'am, I do not.
10:34:42  16            MS. TRUELOVE:  Okay.  I think, Mr. Hirt, Juror
10:34:50  17   No. 7, you said, I think, they're a necessary evil to
10:34:59  18   correct a wrong.
10:35:01  19            JUROR HIRT:  That's correct.
10:35:01  20            MS. TRUELOVE:  All right.  And what do you mean by
10:35:03  21   that?
10:35:04  22            JUROR HIRT:  Well, when you can't resolve it
10:35:06  23   across the table and it gets to the point where neither
10:35:09  24   party can make amends, then you have to come to court and
10:35:13  25   try to plead your case to right the wrong that both sides
```

10:35:19   1   feel there is.

10:35:19   2          MS. TRUELOVE:  And so you're okay with -- with

10:35:22   3   folks engaging in that process and using the jury system to

10:35:25   4   resolve a dispute?

10:35:27   5          JUROR HIRT:  Correct.

10:35:27   6          MS. TRUELOVE:  Okay.  And I noticed that also in

10:35:30   7   your questionnaire, you had indicated that you had been

10:35:33   8   involved with the -- in a trial as a consultant?

10:35:35   9          JUROR HIRT:  That was years ago.  As a forestry

10:35:40  10   consultant at the time.  And so there was a trespass on a

10:35:44  11   timber sale, and so I basically evaluated the timber that

10:35:49  12   was cut in the wrong and put a value to it for the Court.

10:35:54  13          MS. TRUELOVE:  And did you have to testify?

10:35:56  14          JUROR HIRT:  They settled at the last minute.

10:35:57  15          MS. TRUELOVE:  Okay.

10:35:58  16          JUROR HIRT:  Probably 15 minutes before I was

10:36:01  17   supposed to take the chair, all of a sudden they came out

10:36:03  18   and said, well, y'all can go home.

10:36:05  19          MS. TRUELOVE:  Okay.  Well, that worked out well

10:36:07  20   for you, then?

10:36:08  21          JUROR HIRT:  Yes, it did.

10:36:09  22          MS. TRUELOVE:  Okay.  Great.  Thank you.  Thank

10:36:11  23   you, Mr. Hirt.  I appreciate that.

10:36:13  24          Anybody -- anybody else have feelings about

10:36:18  25   lawsuits that -- that potentially would prejudice my

10:36:20  1  client, Dr. Li?  You don't think folks should be able to

10:36:25  2  show up in court to resolve their disputes?  Anybody feel

10:36:30  3  that way?

10:36:31  4       I want to talk a minute about the inventors in

10:36:33  5  this case, Dr. Li, and you -- you'll see him, if you get

10:36:36  6  selected to sit on this jury.  He'll be at counsel table

10:36:39  7  throughout the course of the trial, and you'll hear from

10:36:41  8  him.

10:36:41  9       And you'll also hear from Dr. Zhu.  She, as the

10:36:44  10 co-inventor on the '049 patent -- that's the patent we're

10:36:47  11 going to be talking about in this case, and so you'll hear

10:36:50  12 from her, as well.

10:36:51  13      Both Dr. Li and Dr. Zhu are from China.  They both

10:36:57  14 were born there.  They both went to school there.  In fact,

10:37:02  15 Dr. Zhu got her Bachelor's and Master's in China.  Dr. Li

10:37:06  16 got his Bachelor's, and then he came to the U.S. and got

10:37:10  17 his Master's in Boston and his Ph.D. also up north.  And

10:37:16  18 Dr. Zhu came here, and she went to Ohio State University

10:37:21  19 where she got her Ph.D. in electrical engineering.

10:37:21  20      And I tell you all of this because being natives

10:37:25  21 of China, even though they are now both U.S. citizens, they

10:37:26  22 have very strong accents.  It's like when I go to try cases

10:37:31  23 up in New York City, they don't always understand what I'm

10:37:34  24 saying.

10:37:35  25      And so my first question is really, is that going

10:37:38  1  to be a problem for anyone?  You feel like you would have

10:37:43  2  problems really focusing in and paying attention to what

10:37:46  3  these two inventors are going to have to say.  Does anybody

10:37:50  4  feel that way or has that concern?  Good.

10:37:54  5          Oh, I see a hand.  That's Juror No. 27.  Is that

10:38:05  6  Mr. Gardner?  Yes.

10:38:08  7          JUROR GARDNER:  It's been five years, but I

10:38:10  8  have -- I wear hearing aids, and it's -- I struggle a

10:38:13  9  little bit more with hearing than most people.

10:38:15  10          MS. TRUELOVE:  Okay.  Thank you.  And that --

10:38:17  11  that's very helpful information.  I appreciate that.

10:38:19  12          The -- the next question I want to ask is -- just

10:38:24  13  kind of has to do with the political climate right now.

10:38:30  14  We're coming up on an election, and there's a lot of things

10:38:33  15  that have been politicized, particularly about China.

10:38:37  16          And so I just feel obligated to ask whether

10:38:40  17  anybody has strong feelings about just China in general

10:38:44  18  that could potentially bleed over onto our clients, our

10:38:48  19  inventors in this case?  Anybody feel that way?

10:38:51  20          And if it's not something you want to talk about

10:38:55  21  in front of your 39 new best friends, that's fine.  We can

10:38:58  22  always talk to the Court after.  But I don't see any hands.

10:39:02  23  So I appreciate that, as well.

10:39:03  24          Mr. Jenkins, where are you?  Towards the back, I

10:39:08  25  think.  There you are.

| | | |
|---|---|---|
| 10:39:09 | 1 | I know you're in telecommunications. |
| 10:39:16 | 2 | JUROR JENKINS:  That's correct. |
| 10:39:17 | 3 | MS. TRUELOVE:  Are you -- are you familiar with |
| 10:39:18 | 4 | adaptive beamforming? |
| 10:39:19 | 5 | JUROR JENKINS:  No. |
| 10:39:20 | 6 | MS. TRUELOVE:  Know anything about sound source |
| 10:39:24 | 7 | localization? |
| 10:39:25 | 8 | JUROR JENKINS:  Not really, no. |
| 10:39:26 | 9 | MS. TRUELOVE:  Okay.  What about noise -- noise |
| 10:39:29 | 10 | cancellation? |
| 10:39:29 | 11 | JUROR JENKINS:  A little bit.  We just know about |
| 10:39:29 | 12 | BP levels or something like that. |
| 10:39:30 | 13 | MS. TRUELOVE:  Okay.  So at a high level, you know |
| 10:39:32 | 14 | about that? |
| 10:39:33 | 15 | JUROR JENKINS:  Little bit. |
| 10:39:34 | 16 | MS. TRUELOVE:  Okay.  Anything about your |
| 10:39:35 | 17 | profession and work that you think is going to bleed over |
| 10:39:39 | 18 | into this case? |
| 10:39:39 | 19 | JUROR JENKINS:  No. |
| 10:39:40 | 20 | MS. TRUELOVE:  Okay.  I appreciate that.  Thank |
| 10:39:42 | 21 | you very much, Mr. Jenkins. |
| 10:39:45 | 22 | Anybody else on the panel ever heard of adaptive |
| 10:39:48 | 23 | beamforming?  Sound source localization?  Or noise |
| 10:39:53 | 24 | cancellation?  Anybody have any experience or background |
| 10:39:56 | 25 | with electrical engineering or someone -- someone that you |

| | | |
|---|---|---|
| 10:39:59 | 1 | know well?  No one? |
| 10:40:00 | 2 | Okay.  I want to talk a few minutes about some of |
| 10:40:05 | 3 | the terms that you've already heard in the patent video and |
| 10:40:09 | 4 | some of the things that His Honor has talked about that -- |
| 10:40:14 | 5 | that are going to be things that you have to decide if |
| 10:40:16 | 6 | you're -- if you're selected in this case. |
| 10:40:17 | 7 | And you can see up here infringement, validity, |
| 10:40:20 | 8 | prior art, and reasonable royalty. |
| 10:40:22 | 9 | As His Honor told you, Vocalife, the Plaintiff, is |
| 10:40:29 | 10 | going to have the burden to prove infringement. |
| 10:40:31 | 11 | If we can go to the next slide. |
| 10:40:33 | 12 | And there's something about that -- |
| 10:40:36 | 13 | And, Mr. Wallace, this is going to resonate with |
| 10:40:37 | 14 | you, probably. |
| 10:40:38 | 15 | If we can go back one, Mr. Baxter, sorry.  The |
| 10:40:42 | 16 | presumption of validity.  There we go. |
| 10:40:46 | 17 | Patents issued by the United States Patent Office |
| 10:40:48 | 18 | are presumed to be valid. |
| 10:40:49 | 19 | Let's talk about that for just a second, |
| 10:40:51 | 20 | Mr. Wallace, if you don't mind.  You had to guess you were |
| 10:40:55 | 21 | going to get picked on since you're the attorney in the |
| 10:40:58 | 22 | room. |
| 10:40:58 | 23 | JUROR WALLACE:  Thank you. |
| 10:40:59 | 24 | MS. TRUELOVE:  You try -- well, you do CPS cases, |
| 10:41:03 | 25 | but just being over there in the DA's office, you've heard |

10:41:06  1   of the presumption of innocence, haven't you?

10:41:10  2            MR. WALLACE:  Yes, absolutely.

10:41:11  3            MS. TRUELOVE:  What does that mean?

10:41:12  4            JUROR WALLACE:  It means in the beginning of the

10:41:14  5   case the Defendant is presumed to be innocent, and it's the

10:41:17  6   burden of the State of Texas to prove that person is guilty

10:41:21  7   beyond a reasonable doubt by putting on evidence that would

10:41:24  8   be persuasive to the jury.

10:41:24  9            MS. TRUELOVE:  Right.  So when any individual

10:41:24  10  charged with a crime walks in, everybody in that jury has

10:41:27  11  to presume their innocence.

10:41:30  12           JUROR WALLACE:  That's correct.

10:41:30  13           MS. TRUELOVE:  There's been no evidence or

10:41:32  14  anything to demonstrate otherwise, right?

10:41:34  15           JUROR WALLACE:  Correct.

10:41:35  16           MS. TRUELOVE:  And that's the same situation we

10:41:37  17  have here in regards to if there's a presumption that the

10:41:39  18  patent is valid, meaning before you hear any evidence, you

10:41:42  19  just have to go with that presumption.  Is that something

10:41:46  20  you can do?

10:41:48  21           JUROR WALLACE:  Yes, absolutely.

10:41:49  22           MS. TRUELOVE:  Okay.  Thank you.

10:41:50  23           And so as Mr. Wallace was saying, what we then

10:41:54  24  have to do as a Plaintiff is we have to bring you evidence

10:41:57  25  to show you that Amazon infringes.  And the Judge talked to

10:42:00    1    you a little bit about this.

10:42:01    2         And what he told you -- and you can kind of look

10:42:04    3    at our picture on the screen -- is that starting out before

10:42:07    4    you hear any evidence at all, everyone is at an equal

10:42:11    5    standing, haven't heard witnesses testify or seen

10:42:13    6    documents, and we will put on a case that we say, here's

10:42:18    7    what happened.

10:42:19    8         You'll hear testimony from witnesses.  You'll see

10:42:21    9    documents.  And we just have to demonstrate by something

10:42:24   10    called the preponderance of the evidence, that you must be

10:42:27   11    persuaded that our claim of infringement is more probably

10:42:35   12    true than not true.

10:42:36   13         And what that looks like if you want a visual on

10:42:38   14    the scales is that, you know, as all the evidence piles up,

10:42:42   15    you have these little BBs on the scales, we just have to

10:42:48   16    tip the scales just ever so slightly.  We've got that one

10:42:51   17    extra BB or that one piece of evidence that you feel weighs

10:42:55   18    it a little bit in our favor, and then you find

10:42:58   19    infringement.

10:42:58   20         Can everybody follow that particular standard and

10:43:01   21    only hold us accountable to a preponderance of evidence

10:43:07   22    standard and nothing higher?  I see a lot of people shaking

10:43:11   23    their heads.

10:43:12   24         Is there anybody that things, man, if they want to

10:43:15   25    prove Amazon has infringed and used their patent and then

10:43:18  1  get money for it, they should have to prove it by a higher

10:43:21  2  standard than a preponderance of evidence?  Does anybody

10:43:27  3  feel that way?  I don't see any hands.

10:43:29  4       Well, the other standard that we talked about,

10:43:32  5  that you heard Judge talk about --

10:43:33  6       Okay.  Oh, there is a hand back there.

10:43:33  7       Thank you.  Thanks, Mr. Dacus.

10:43:38  8       JUROR WEAVER:  Talking about the -- excuse me.

10:43:40  9  Talking about the -- in a way that sometimes things are

10:43:47  10  presented in a higher standard, I purchase things from --

10:43:53  11  from online quite a bit.

10:43:56  12       With the COVID 19 coming about, I purchased some

10:44:00  13  things, and they were through Amazon.  And the instructions

10:44:05  14  and the description online didn't tell me where it came

10:44:07  15  from.  When it came, it came from China.

10:44:11  16       Many, many times that I -- you don't know, they do

10:44:13  17  outsourcing to different sellers, but we don't know where

10:44:18  18  they come from.  And I think companies like Amazon have

10:44:21  19  to -- need to reach a little higher standard to where they

10:44:24  20  tell us where do they buy things from.

10:44:27  21       MS. TRUELOVE:  Okay.  Thank you.

10:44:28  22       Amazon -- to turn to Amazon --

10:44:34  23       Thank you, Mr. Ayres.

10:44:35  24       -- standard in this case, and I expect they're

10:44:38  25  going to come in and try and overcome that presumption of

10:44:41   1   validity.  They're going to come in and tell you that the

10:44:44   2   patent is not valid, that there's something out there

10:44:47   3   called prior art, that something was already out there in a

10:44:50   4   known field that disclosed this invention or taught this

10:44:55   5   invention or -- or just that the Patent Office got it

10:44:58   6   wrong.

10:44:58   7          But in order to do that, in order for you all if

10:45:02   8   you're selected to sit on this jury to take away that

10:45:06   9   presumption of validity --

10:45:07   10          THE COURT:  You have five minutes remaining.

10:45:09   11          MS. TRUELOVE:  Thank you, Your Honor.

10:45:11   12          -- you have to hold them to a higher standard of

10:45:13   13   proof.  They have to come in and prove by what's known as

10:45:17   14   clear and convincing evidence.

10:45:17   15          And -- and what His Honor told you and what you

10:45:20   16   see on the screen is it means you must have an abiding

10:45:24   17   conviction that the truth of the parties' contentions are

10:45:28   18   highly probable.

10:45:29   19          And if you think about that -- if we could see the

10:45:31   20   next slide -- in the scale illustration, what you see is

10:45:36   21   they've got to come forward with a greater weight of

10:45:39   22   evidence, right?  Highly probable.  So those scales are

10:45:42   23   really going to have to tip.

10:45:43   24          So my question to you is, can everyone hold Amazon

10:45:48   25   to that standard?  To come in here, if they want to try and

10:45:51   1   prove this patent invalid, they're going to have to do it

10:45:54   2   by a higher standard, that of clear and convincing.  Is

10:45:58   3   everyone okay with that?

10:46:01   4        Is there anyone out there that thinks they should

10:46:03   5   have a lower standard or even the same standard, the lower

10:46:06   6   standard that we have to prove infringement?  Anybody think

10:46:08   7   that?

10:46:08   8        Okay.  The last thing I really want to talk to you

10:46:13   9   about today is damages.  And in this case, that's why we're

10:46:19  10   here, right?  Vocalife is saying you took our invention,

10:46:24  11   you put it in your product, you used it, and, therefore, we

10:46:28  12   should be compensated for your use of our invention.  And

10:46:31  13   we're going to be asking for $31 million when it's all said

10:46:34  14   and done.

10:46:35  15        And if I could talk to you, Mr. Hirt, I'm going to

10:46:38  16   pick on you.  You see I've got trees on the screen.  So I

10:46:47  17   want you to think about -- and you might have done this in

10:46:49  18   your career, but you own this property here, and you go out

10:46:53  19   there every once in a while with your family.  You like to

10:46:56  20   picnic and have family reunions and that kind of thing.

10:46:59  21   It's been a few months, and you haven't been out there in a

10:47:00  22   while.  And you get out there and you show up, and it looks

10:47:02  23   like this.

10:47:07  24        JUROR HIRT:  Bad logging job.

10:47:09  25        MS. TRUELOVE:  That's your first thought.  I would

10:47:12  1   imagine your second thought would be, what happened to all

10:47:15  2   my trees?

10:47:16  3           JUROR HIRT:  Correct.

10:47:17  4           MS. TRUELOVE:  And let's say you found out that

10:47:19  5   somebody just got it wrong, you know, they thought that was

10:47:22  6   a piece of land they were supposed to clear.  It turns out

10:47:25  7   they were wrong, and they were very sorry about it.  They

10:47:28  8   didn't mean to do it.  How about we pay you for one out of

10:47:31  9   every three trees?  Is that all right with you?

10:47:34  10          JUROR HIRT:  No.

10:47:35  11          MS. TRUELOVE:  One out of every two?

10:47:37  12          JUROR HIRT:  No.

10:47:38  13          MS. TRUELOVE:  How many trees do you want to get

10:47:41  14  paid for?

10:47:41  15          JUROR HIRT:  If I knew the law well enough, I'd

10:47:43  16  probably ask for treble damages.

10:47:44  17          MS. TRUELOVE:  But you'd want to get paid for all

10:47:47  18  of the trees?

10:47:48  19          JUROR HIRT:  Correct.

10:47:49  20          MS. TRUELOVE:  And maybe get your land put back in

10:47:51  21  shape or whatever you can recover.

10:47:52  22          JUROR HIRT:  Right.

10:47:53  23          MS. TRUELOVE:  Okay.  Anybody have a problem with

10:47:55  24  that under the law?  Mr. Hirt wants to get paid for all his

10:47:58  25  trees.  Anybody feel differently?  You shouldn't get

10:48:01  1  compensated for what was taken from you?

10:48:06  2      Okay.  Thank you, Mr. Hirt.

10:48:07  3      I have just a couple minutes left, and -- and I

10:48:10  4  think what us lawyers do is we -- we worry that maybe there

10:48:17  5  was a question we could have asked and didn't ask, and

10:48:22  6  you're sitting there thinking, gosh, if Ms. Truelove knew

10:48:26  7  this, she wouldn't want me on her jury, or this would just

10:48:31  8  be of interest to her?

10:48:32  9      Is there anybody out there that as you sit there

10:48:35  10  you're thinking to yourself, I've got a reason why I may

10:48:39  11  not be a good jury for this -- or a juror for this kind of

10:48:42  12  case, or I have this reason that's going to make it

10:48:44  13  difficult for me to serve?

10:48:46  14      Mr. Wallace?

10:48:55  15  JUROR WALLACE:  Not really difficult to serve, but

10:48:58  16  I would like to know if I'd be given an opportunity to call

10:49:01  17  the home office and have someone stand in for me if I were

10:49:05  18  selected, because I've got a full day of court tomorrow,

10:49:09  19  and I'm going to have to get people working on that if

10:49:12  20  that's the case.  That's the only concern I have.

10:49:14  21      MS. TRUELOVE:  All right.  I appreciate that, and

10:49:15  22  I'm sure that --

10:49:16  23      THE COURT:  We'll accommodate that if it's

10:49:21  24  necessary.

10:49:22  25      MS. TRUELOVE:  Thank you, Your Honor.

10:49:23  1          THE COURT:  You have one minute, Ms. Truelove.

10:49:25  2          MS. TRUELOVE:  Thank you, Your Honor.

10:49:25  3          Anyone else, as you sit here, have a concern, big

10:49:29  4  or small, that you want to raise at this time?

10:49:31  5          Well, with that, I want to thank you very

10:49:34  6  sincerely for your attention.  I -- I want to thank in

10:49:37  7  advance the eight of you that are going to be selected to

10:49:40  8  serve on this jury.

10:49:41  9          We -- we pledge to you to put our case forward and

10:49:44  10  do it in a way that is not wasteful of your time because we

10:49:48  11  know your time is very important, as you're away from your

10:49:53  12  families and your life.

10:49:53  13          So thank you again, and we look forward to

10:49:55  14  presenting our case to the eight of you who are selected.

10:50:00  15          Thank you.

10:50:05  16          THE COURT:  All right.  Mr. Dacus, you may address

10:50:08  17  the panel on behalf of the Defendants.

10:50:10  18          MR. DACUS:  Thank you, Your Honor.

10:50:10  19          THE COURT:  Would you like a warning on your time?

10:50:13  20          MR. DACUS:  If you'd let me know when I have five

10:50:15  21  minutes, please.

10:50:17  22          THE COURT:  I will.

10:50:17  23          MR. DACUS:  Thank you.

10:50:18  24          THE COURT:  You may proceed when you're ready.

10:50:19  25          MR. DACUS:  Thank you.

| | | |
|---|---|---|
| 10:50:21 | 1 | Good morning.  I'll reintroduce myself.  I'm Deron |
| 10:50:29 | 2 | Dacus.  I want to start by saying this morning on behalf of |
| 10:50:32 | 3 | the men and women that work at Amazon a very sincere thanks |
| 10:50:36 | 4 | to you. |
| 10:50:36 | 5 | I want you to know it's not lost on anyone at this |
| 10:50:39 | 6 | table that you have very busy lives.  You have other things |
| 10:50:42 | 7 | you need to be doing today.  You need to be tending to your |
| 10:50:45 | 8 | jobs, tending to your kids, tending to your grandkids.  And |
| 10:50:50 | 9 | I want you to know we would not be here if this case was |
| 10:50:53 | 10 | not very important to Amazon.  It is very important. |
| 10:50:56 | 11 | I know from your questionnaires and from what some |
| 10:50:59 | 12 | of you have said that many of you know who Amazon is, what |
| 10:51:03 | 13 | it's about.  Many of you know that they actually sell this |
| 10:51:06 | 14 | device right here, which is called an Echo Dot, that we |
| 10:51:09 | 15 | heard referenced a minute ago. |
| 10:51:12 | 16 | And you can actually -- for those of you who don't |
| 10:51:17 | 17 | have one -- you can actually talk to this thing, and it |
| 10:51:19 | 18 | will talk back to you.  It will provide information.  You |
| 10:51:23 | 19 | can order things over the Internet. |
| 10:51:26 | 20 | It operates through this term we heard earlier |
| 10:51:29 | 21 | called "Alexa," which is this intelligent voice system. |
| 10:51:32 | 22 | And Alexa basically is a brain out there in the Amazon |
| 10:51:36 | 23 | cloud that functions very much like a human brain in |
| 10:51:41 | 24 | determining what you say to it and then responding back to |
| 10:51:43 | 25 | you. |

```
10:51:44   1        What you've heard the folks at the other table say
10:51:46   2   from Vocalife is that this device contains some
10:51:53   3   microphones -- several microphones, what they call a
10:52:01   4   microphone array, that they contend infringes or uses
10:52:03   5   Dr. Li and Vocalife's patents.
10:52:05   6        And if you sit on the jury in this case, what
10:52:08   7   you'll hear is testimony both from Amazon witnesses, people
10:52:12   8   who work on this device and the Alexa on a daily basis and
10:52:14   9   know it inside and out, you'll hear testimony from
10:52:17  10   third-party experts that, in fact, we do not nor have we
10:52:20  11   ever used Vocalife patents.
10:52:24  12        In addition to that, if you sit on this jury,
10:52:29  13   equally important to Amazon, you may remember from the
10:52:35  14   video this morning that the Court played for you, that a
10:52:37  15   jury is -- makes the ultimate determination as to whether
10:52:40  16   or not a patent is valid.  The Patent Office doesn't make
10:52:44  17   that -- the Patent Office doesn't always have all the
10:52:46  18   information.
10:52:47  19        And I'll tell you that the evidence in this case
10:52:48  20   will show you that the patent that was actually issued to
10:52:54  21   Vocalife contained information that was already known in
10:52:58  22   the public.
10:52:58  23        You know from your video that an invention has to
10:53:02  24   be new.  You can't take stuff from the public that's
10:53:04  25   already known in the public, write it down in a patent, and
```

10:53:08  1   have a valid patent issued.  And that's what I think the

10:53:10  2   evidence will ultimately show you in this case.

10:53:13  3          And I tell you all that not to -- not to try to

10:53:20  4   persuade you, because you need to listen to the evidence,

10:53:23  5   obviously.  But I tell you that so that as we go through

10:53:25  6   questions this morning, you know a little bit about what

10:53:28  7   this case is about.  And if there's something about what I

10:53:30  8   said to you that concerns you, then I want us to talk about

10:53:33  9   it.

10:53:37  10          I do think it's important -- the Judge has done

10:53:40  11   it, you've been kind enough to do it, Ms. Truelove did

10:53:40  12   it -- for you to know a little bit about who I am.  I wish

10:53:45  13   I could tell you that it is interesting enough that someone

10:53:45  14   was going to make a movie or a book about it, but it's not.

10:53:49  15          I grew up over in Gilmer, Texas.  Graduated from

10:53:53  16   Gilmer High School.  Was fortunate enough to get a baseball

10:53:57  17   scholarship and play baseball at Texas A&M.  Graduated from

10:54:01  18   there.

10:54:02  19          Like the Judge, I went to Baylor Law School where

10:54:06  20   I also met my wife who was in law school, to whom I've been

10:54:10  21   happily married now for 26 years.  Please make sure you

10:54:15  22   write "happily" in there, Ms. Holmes, as you take that

10:54:19  23   down.

10:54:19  24          We have two college-aged kids.  Like Ms. Truelove,

10:54:19  25   mine are in their apartment doing it.  And I'm paying for

| | | |
|---|---|---|
| 10:54:25 | 1 | an apartment as they attend virtually, like many of you |
| 10:54:26 | 2 | are, probably, trying to make our way in this strange world |
| 10:54:29 | 3 | we live in. |
| 10:54:30 | 4 | So that's -- that's a little bit about me. |
| 10:54:33 | 5 | But the purpose -- the main purpose this morning |
| 10:54:36 | 6 | is for me to learn more about you.  And as the Judge said |
| 10:54:39 | 7 | to you, there's no wrong answer.  If -- if I ask you |
| 10:54:44 | 8 | something, please just tell me what you're thinking. |
| 10:54:47 | 9 | That's the great thing about this country.  We're all |
| 10:54:50 | 10 | entitled to our opinions.  And we're all -- I certainly |
| 10:54:53 | 11 | want to hear yours this morning. |
| 10:54:55 | 12 | Now, let -- let me start off by determining |
| 10:55:01 | 13 | whether or not anyone on this panel knows folks sitting at |
| 10:55:04 | 14 | this table here. |
| 10:55:05 | 15 | So you've been introduced to Mr. Sam Baxter. |
| 10:55:09 | 16 | Mr. Baxter is a lawyer here in Marshall, has been for many |
| 10:55:13 | 17 | years. |
| 10:55:13 | 18 | I know, Mr. Wallace, that -- that you know |
| 10:55:15 | 19 | Mr. Baxter, and I want to talk to you about that. |
| 10:55:18 | 20 | But does anyone know or know of Sam Baxter, would |
| 10:55:22 | 21 | you raise your hand and let me know, please?  Okay.  I |
| 10:55:25 | 22 | don't -- I don't see any hands. |
| 10:55:27 | 23 | And sort of to complete this table, Ms. Truelove |
| 10:55:30 | 24 | just spoke to you.  Does anyone know Jennifer Truelove? |
| 10:55:34 | 25 | Raise your hand and let me know. |

10:55:35   1          And her -- as she said her husband, Kurt, also

10:55:42   2   practices here in Marshall.  Anyone know Kurt, raise your

10:55:45   3   hand and let me know.

10:55:46   4          All right.  Mr. Wallace, can I talk to you for one

10:55:49   5   second, please, sir?

10:55:51   6          JUROR WALLACE:  Yes.

10:55:52   7          MR. DACUS:  Now, Ms. Truelove asked you if it was

10:55:54   8   a problem for her that you knew Mr. Baxter's wife and him,

10:55:59   9   and you said no.  You want to guess what my question is?

10:56:03  10          JUROR WALLACE:  Yeah.

10:56:04  11          MR. DACUS:  Is that a problem for me?

10:56:05  12          JUROR WALLACE:  No, sir, it's not.

10:56:07  13          MR. DACUS:  Are you sure?

10:56:08  14          JUROR WALLACE:  I'm sure.  I don't actually know

10:56:12  15   Mr. Baxter, but I've known Laurie for years, practiced in

10:56:17  16   front of her for years.  I respect her greatly.  And I'd

10:56:22  17   like to think she thinks the same about me.

10:56:25  18          And I would say that -- that part of that respect

10:56:27  19   is predicated on we do what we're counted on to do in our

10:56:33  20   roles when we enter into the courtroom.  And if I were

10:56:37  21   asked to serve as a juror, then I would understand what

10:56:39  22   that role is.

10:56:40  23          I certainly understand what it means to be an

10:56:42  24   officer of the court.

10:56:44  25          So, you know, what you good folks have to say is

10:56:46   1   not evidence.  What the people from the witness stand says
10:56:50   2   is evidence, and eight of us are going to tell you whether
10:56:52   3   that's a fact or not.
10:56:53   4           MR. DACUS:  So those Scales of Justice are
10:56:55   5   completely even on Lady Justice right there?  You're
10:56:58   6   telling me that if you sat on this jury, the scales for
10:57:01   7   Amazon and for me as their lawyer would be equal, we'd
10:57:05   8   start out equal just like the Scales of Justice; is that
10:57:08   9   what you're telling me?
10:57:09  10           JUROR WALLACE:  Yes, sir, because those are the
10:57:11  11   rules we play by.
10:57:13  12           MR. DACUS:  I appreciate it very much.  Thank you,
10:57:14  13   sir.
10:57:14  14           And let me just cover this table.  Fred Fabricant
10:57:20  15   sits at this table also.  Mr. Fabricant has his own law
10:57:23  16   firm in New York.  I assume no one knows Mr. Fabricant or
10:57:26  17   his law firm.  But if you do, raise your hand and let me
10:57:28  18   know.  Okay.  I don't see any hands.
10:57:30  19           Thank you.
10:57:32  20           You know -- let -- let me ask a global question
10:57:36  21   about Amazon.  Many of you know who Amazon is.  A lot of
10:57:40  22   you raised your hands as to whether or not you've ever
10:57:42  23   ordered something from Amazon.
10:57:45  24           What I need to know, and this is what you might
10:57:47  25   expect, is there any reason that you would slightly

10:57:52   1   disfavor and the scales would not be completely even for

10:57:56   2   Amazon if you sat on this jury?  Is anyone in that boat?

10:58:01   3   Is any -- and, look, Amazon is in the customer service

10:58:04   4   business.  And when you're in that business and even though

10:58:06   5   your philosophy is to put the customer first, every now and

10:58:10   6   then you make somebody mad, right?

10:58:13   7        So that's what I need to know.  If anyone for any

10:58:15   8   reason, any reason at all, says, look, Amazon is going to

10:58:18   9   start off just a little bit behind in my book, can you

10:58:22   10  raise your hand and let me know that?  Okay.  I see no

10:58:24   11  hands.  Thank you.

10:58:25   12       Let me do this:  Mr. Porter, can I talk with you

10:58:40   13  for a second, sir?  And I'm going to tell you why.  Did I

10:58:43   14  hear you say you had eight kids and seven boys?

10:58:46   15       JUROR BOBBY PORTER:  That is correct.

10:58:47   16       MR. DACUS:  All right.  So let me ask you this:

10:58:49   17  Those seven boys ever get in any scuffles or little fights

10:58:54   18  when they were growing up?

10:58:55   19       JUROR BOBBY PORTER:  They most certainly did.

10:58:57   20       MR. DACUS:  And so when you caught them in those

10:58:59   21  scuffles or fights, I bet they ran to momma; is that true?

10:59:04   22       JUROR BOBBY PORTER:  Didn't do them any good,

10:59:06   23  though.

10:59:06   24       MR. DACUS:  We're going to get to that.  And they

10:59:08   25  didn't walk to momma, they ran, didn't they?

| | | |
|---|---|---|
| 10:59:11 | 1 | JUROR BOBBY PORTER:  That's right. |
| 10:59:12 | 2 | MR. DACUS:  And let me tell you why I ask you |
| 10:59:14 | 3 | that.  There's something innate in all of us that says it's |
| 10:59:18 | 4 | important to tell our story first.  And that's why those |
| 10:59:21 | 5 | boys were running to momma because they wanted to tell her |
| 10:59:24 | 6 | their story first; isn't that true? |
| 10:59:26 | 7 | JUROR BOBBY PORTER:  That's right. |
| 10:59:27 | 8 | MR. DACUS:  Now, the reason I'm asking you this is |
| 10:59:29 | 9 | because these folks over here brought this lawsuit, so |
| 10:59:32 | 10 | they're going to get to talk first.  No matter how fast I |
| 10:59:34 | 11 | run, I can't beat them.  They get to talk first.  Do you |
| 10:59:38 | 12 | understand that? |
| 10:59:38 | 13 | JUROR BOBBY PORTER:  I gotcha. |
| 10:59:40 | 14 | MR. DACUS:  Now, here's what I want to know about |
| 10:59:41 | 15 | your wife.  Being the good momma that she was, and I know |
| 10:59:45 | 16 | she was, she didn't just take that story from that first |
| 10:59:50 | 17 | boy and accept it, did she?  She made sure she got the full |
| 10:59:53 | 18 | story from both kids before she made a decision on who was |
| 10:59:56 | 19 | right or wrong; am I correct about that? |
| 10:59:58 | 20 | JUROR BOBBY PORTER:  You're correct. |
| 11:00:00 | 21 | MR. DACUS:  So that's -- that's my long-winded way |
| 11:00:02 | 22 | of saying to you, I'm not going to get to talk in this |
| 11:00:05 | 23 | lawsuit until next week, okay?  I'm going to have to go |
| 11:00:08 | 24 | second. |
| 11:00:08 | 25 | So can you sit here in this courtroom and not make |

11:00:11  1  a decision until you hear evidence from the both -- both

11:00:14  2  sides?

11:00:15  3          JUROR BOBBY PORTER:  I have to.

11:00:16  4          MR. DACUS:  Okay.  So that means you will, right?

11:00:19  5          JUROR BOBBY PORTER:  Yes, I will.

11:00:20  6          MR. DACUS:  Yeah, and that's -- I mean, that's why

11:00:22  7  your wife did it, right?  That's the fair thing to do, to

11:00:24  8  get both sides -- let me ask you this:  Did you ever find

11:00:27  9  that one of those boys, the one that ran there first, might

11:00:30  10  not have given the full story?

11:00:32  11          JUROR BOBBY PORTER:  Not only him, but the rest of

11:00:35  12  them, too.

11:00:36  13          MR. DACUS:  And that's a good point.  You've got

11:00:38  14  to listen to everything and then figure out where the truth

11:00:42  15  lies, right?

11:00:43  16          JUROR BOBBY PORTER:  That's right.

11:00:45  17          MR. DACUS:  And you can do that in this courtroom?

11:00:47  18          JUROR BOBBY PORTER:  Yes, I can.

11:00:48  19          MR. DACUS:  Okay.  Thank you so much.  Let me ask

11:00:49  20  you a question, Mr. Porter.  Did you happen to know Ken

11:00:52  21  Reeves?

11:00:53  22          JUROR BOBBY PORTER:  Yes.

11:00:53  23          MR. DACUS:  Well, I went to A&M.  Ken is about two

11:00:53  24  years older than I am, so I didn't know if you knew him or

11:00:53  25  not.

| | | |
|---|---|---|
| 11:00:57 | 1 | JUROR BOBBY PORTER:  I was his hero. |
| 11:00:58 | 2 | MR. DACUS:  He's a -- you were his hero? |
| 11:01:00 | 3 | JUROR BOBBY PORTER:  I was his hero. |
| 11:01:02 | 4 | MR. DACUS:  Let me tell you what, he's a fine |
| 11:01:05 | 5 | human being. |
| 11:01:05 | 6 | JUROR BOBBY PORTER:  He is. |
| 11:01:06 | 7 | MR. DACUS:  I'll say that.  Thank you. |
| 11:01:07 | 8 | So here's what I need to know from everybody. |
| 11:01:09 | 9 | You've heard my long-winded story, and the purpose of which |
| 11:01:13 | 10 | is to say, it's very serious. |
| 11:01:15 | 11 | The Plaintiff is going to get to put their case on |
| 11:01:17 | 12 | first.  You're going to hear their evidence today and |
| 11:01:20 | 13 | tomorrow, and probably part of Monday.  And no one from |
| 11:01:23 | 14 | this table is going to get to take the witness stand until |
| 11:01:26 | 15 | probably Tuesday or so of next week. |
| 11:01:28 | 16 | And so that I can sleep well tonight and over the |
| 11:01:31 | 17 | weekend, is there anybody who says, look, I just cannot |
| 11:01:35 | 18 | wait that long to make a decision?  I'm just going to |
| 11:01:38 | 19 | listen to the evidence from the Plaintiff, and I might make |
| 11:01:40 | 20 | a decision just based on what they say?  Is there anybody |
| 11:01:43 | 21 | in that boat?  In that camp? |
| 11:01:46 | 22 | Okay.  Let me ask it a different way.  So that I |
| 11:01:48 | 23 | sleep better, can you raise your hand if you'll agree to |
| 11:01:51 | 24 | wait and hear all of the evidence before you make a |
| 11:01:53 | 25 | decision?  Will you raise your hand and let me know?  Okay. |

11:01:57   1   That looks like everybody.  Thank you.

11:01:58   2        Now, I want to ask you a question, and before I do

11:02:05   3   it, I want to preface it by saying the Judge told you I'm

11:02:11   4   not going to pry into your private lives, and I'm not.  So

11:02:14   5   when I ask this question, don't think that I'm going to ask

11:02:17   6   for details.

11:02:18   7        But has anyone here ever been falsely accused of

11:02:22   8   doing something?  I'm not talking about in a court of law.

11:02:22   9   I'm just talking about in your everyday life, somebody

11:02:26  10   accused you of doing something that you know you didn't do?

11:02:29  11   Any -- anybody in that boat?  Just in everyday life?

11:02:32  12        Let's see, Mr. Stephenson, can I talk to you about

11:02:35  13   it?

11:02:36  14        That's -- I'm sorry, that's 16 -- Juror 16.

11:02:42  15        And I'm not asking for details, Mr. Stephenson.

11:02:46  16   Let me tell you that up front.  So here's what I want to

11:02:49  17   know from you, though:  Did you feel like you had the right

11:02:51  18   to defend yourself?

11:02:54  19        JUROR STEPHENSON:  Oh, yeah.

11:02:55  20        MR. DACUS:  Okay.  And when you were falsely

11:02:56  21   accused, how did it make you feel?

11:03:00  22        JUROR STEPHENSON:  It's not good.  Doesn't make

11:03:02  23   you feel good at all.

11:03:03  24        MR. DACUS:  Make you mad?

11:03:04  25        JUROR STEPHENSON:  Oh, yeah.

| | | |
|---|---|---|
| 11:03:04 | 1 | THE COURT:  Mr. Stephenson, I'm going to ask you |
| 11:03:07 | 2 | again to hold that microphone up. |
| 11:03:08 | 3 | MR. DACUS:  So you understand that Amazon is in |
| 11:03:11 | 4 | this courtroom because they've been accused of doing |
| 11:03:13 | 5 | something that Plaintiff says is wrong, right? |
| 11:03:17 | 6 | JUROR STEPHENSON:  Right. |
| 11:03:18 | 7 | MR. DACUS:  Do you agree, as the Judge said this |
| 11:03:21 | 8 | morning, under the Seventh Amendment of the Constitution, |
| 11:03:24 | 9 | we have the right to come here and defend ourselves? |
| 11:03:26 | 10 | JUROR STEPHENSON:  Yes. |
| 11:03:28 | 11 | MR. DACUS:  Even though we're Amazon, even though |
| 11:03:30 | 12 | we're this company, and they're a smaller company in Plano, |
| 11:03:34 | 13 | Vocalife, you think we have the right to present evidence |
| 11:03:36 | 14 | to a jury and defend ourselves? |
| 11:03:38 | 15 | JUROR STEPHENSON:  Right. |
| 11:03:40 | 16 | MR. DACUS:  Thank you, sir. |
| 11:03:41 | 17 | So -- so can you -- does anyone disagree with |
| 11:03:44 | 18 | Mr. Stephenson, that we do -- that Amazon does not have a |
| 11:03:47 | 19 | right to defend itself?  Anybody in that boat?  Okay. |
| 11:03:52 | 20 | Mr. Sheppard, let me ask you a question -- I'll |
| 11:04:08 | 21 | tell you why once I get you the microphone. |
| 11:04:10 | 22 | That's No. 2.  I'm sorry, Mr. Fitzpatrick. |
| 11:04:15 | 23 | When Ms. Truelove asked a question -- I don't |
| 11:04:17 | 24 | remember the exact question -- but it was something along |
| 11:04:20 | 25 | the lines of, do you blame them for bringing a case against |

| | | |
|--|--|--|
| 11:04:25 | 1 | Amazon or something like that, and I thought I saw you |
| 11:04:27 | 2 | shake your head. |
| 11:04:28 | 3 | And I want to make sure, do you have anything that |
| 11:04:29 | 4 | I should be worried about as it relates to Amazon? |
| 11:04:31 | 5 | JUROR SHEPPARD:  No, sir, I don't. |
| 11:04:33 | 6 | MR. DACUS:  Okay, perfect.  I just didn't know. |
| 11:04:34 | 7 | Maybe you weren't shaking your head.  I just wanted to make |
| 11:04:34 | 8 | sure. |
| 11:04:36 | 9 | And, by the way, do you know Mr. Porter?  I know |
| 11:04:39 | 10 | y'all are both from Pittsburg. |
| 11:04:41 | 11 | JUROR SHEPPARD:  I probably know his kids. |
| 11:04:43 | 12 | MR. DACUS:  That's -- he's got a few of them.  All |
| 11:04:47 | 13 | right.  Thank you, sir. |
| 11:04:48 | 14 | And, by the way, let me ask this -- it reminds me |
| 11:04:52 | 15 | to ask, because I'm not sure anybody is left in Leesburg, |
| 11:04:56 | 16 | but does anybody on this panel know someone else?  I mean, |
| 11:05:00 | 17 | can you look around and see if you know anybody on the |
| 11:05:02 | 18 | panel?  And, if you do, would you raise your hand and let |
| 11:05:05 | 19 | me know? |
| 11:05:05 | 20 | Okay.  Juror No. 9, that's Mr. Evers, No. 9.  Who |
| 11:05:13 | 21 | do you know on the panel, Mr. Evers? |
| 11:05:15 | 22 | JUROR EVERS:  I know Mr. William Ayres.  He and I |
| 11:05:18 | 23 | worked together at Jefferson. |
| 11:05:20 | 24 | MR. DACUS:  Mr. Ayres, what number is Mr. Ayres? |
| 11:05:22 | 25 | Oh, perfect.  All right.  And where did y'all work? |

```
11:05:25   1                JUROR EVERS:  In Jefferson ISD.

11:05:28   2                MR. DACUS:  And since I have you up, Mr. Evers,

11:05:31   3    you said you were principal somewhere.

11:05:33   4                JUROR EVERS:  I was principal at Harleton Junior

11:05:33   5    High, and then Jefferson at the high school and at the

11:05:37   6    primary school.

11:05:37   7                MR. DACUS:  Okay.  And -- but you've retired from

11:05:39   8    that.

11:05:39   9                JUROR EVERS:  Yes, sir.

11:05:39  10                MR. DACUS:  And now you're a pastor?

11:05:41  11                JUROR EVERS:  Yes, sir.  I still drive a bus,

11:05:44  12    though.

11:05:44  13                MR. DACUS:  I got you.  That's tough work these

11:05:47  14    days.

11:05:47  15                JUROR EVERS:  I love it.  I love kids.

11:05:49  16                MR. DACUS:  I hear you.  I imagine, like

11:05:51  17    Mr. Porter, you've settled a dispute or two between kids?

11:05:55  18                JUROR EVERS:  A couple, a couple, yes, sir.

11:05:57  19                MR. DACUS:  And you agree with him that you don't

11:05:59  20    always get the full story on the first go-round?

11:06:02  21                JUROR EVERS:  Don't always get the full story.

11:06:05  22    Have to ask several questions.

11:06:06  23                MR. DACUS:  All right.  Thank you, sir.

11:06:07  24                Who else said they know somebody?  That's

11:06:11  25    Ms. Rangel.  Am I pronouncing that correctly?
```

11:06:14    1              JUROR RANGEL:  Rangel.

11:06:14    2              MR. DACUS:  Rangel.

11:06:14    3              JUROR RANGEL:  I -- actually -- he probably

11:06:16    4    doesn't realize this, but I actually know Shane Jenkins.  I

11:06:16    5    work really closely with his wife at Hallsville ISD.

11:06:20    6              MR. DACUS:  Okay.  Perfect.  Thank you very much

11:06:22    7    for letting me know that.

11:06:23    8              Anyone else know someone on the panel?

11:06:31    9              That's Ms. Blackwell.  Who do you know

11:06:33   10    Ms. Blackwell?

11:06:34   11              JUROR BLACKWELL:  I know Ms. Huskey, she's a

11:06:36   12    customer of mine, and also Ms. Banks, she's -- was the

11:06:42   13    postmaster, worked at the post office.

11:06:45   14              MR. DACUS:  You said she was a customer.  What do

11:06:47   15    you do?

11:06:48   16              JUROR BLACKWELL:  I'm a manager, alterations.

11:06:50   17              MR. DACUS:  Okay.  Your husband works at Priefert

11:06:53   18    you said, right?

11:06:53   19              JUROR BLACKWELL:  Correct.

11:06:54   20              MR. DACUS:  What does he do there?

11:06:56   21              JUROR BLACKWELL:  He's a ranch foreman.

11:06:58   22              MR. DACUS:  Okay.  Thank you very much.

11:06:59   23              Did I -- Ms. Banks, No. 1.  Ms. Banks, who do you

11:07:13   24    know?

11:07:13   25              JUROR BANKS:  Ms. Huskey and Ms. Blackwell.

11:07:16   1                MR. DACUS:  Okay.

11:07:16   2                JUROR BANKS:  Simply because I was the postmaster,

11:07:20   3     they were customers.

11:07:21   4                MR. DACUS:  They were on your Leesburg route.

11:07:27   5                JUROR BANKS:  There you go.

11:07:28   6                MR. DACUS:  Okay.  Anyone else know someone on the

11:07:31   7     panel?  All right.  Great.

11:07:34   8                Let me say a word of thanks to each of you for

11:07:37   9     filling out a questionnaire, and the reason it's important

11:07:39  10     to do that, I'll just tell you, is it shortens this

11:07:43  11     process.

11:07:44  12                This process is probably, in your minds, still a

11:07:47  13     little bit too long.  But by filling out those

11:07:49  14     questionnaires in advance, it does shorten this process,

11:07:52  15     and it makes our job easier.  So I want to thank you for

11:07:55  16     that.

11:07:56  17                And I wish I was smart enough to memorize all

11:07:58  18     those things, but I did see that some of you checked or

11:08:02  19     wrote that either you or someone that was close to you had

11:08:05  20     a patent.  And that's what I want to know.

11:08:07  21                Who -- who -- can you raise your hand and let me

11:08:10  22     know?

11:08:10  23                So, let's see, No. 7, that's Mr. Hirt.  Let me

11:08:16  24     talk to you first, and I'm going to cover everybody.

11:08:18  25                Who -- who do you know that has a patent,

11:08:21   1   Mr. Hirt?

11:08:22   2        JUROR HIRT:  My best friend when I grew up and

11:08:25   3   knew each other since we were four years old.  And after he

11:08:28   4   got out of college, he worked for an oil services company

11:08:33   5   in their chemical lab, and he developed -- they'd been

11:08:39   6   working on chemicals -- and chemicals to stop corrosion of

11:08:42   7   the pipes, pipelines.

11:08:46   8        And he came in with new eyes and new ideas and

11:08:50   9   things, and he developed six different chemicals that they

11:08:52   10  ended up putting patents on.

11:08:54   11       MR. DACUS:  Okay.

11:08:55   12       JUROR HIRT:  And so I told him, I said, what

11:08:56   13  they're going to do is they're going to come to you and

11:09:00   14  give you a dollar, and you're going to hand them that

11:09:04   15  patent.  And that's exactly what they did.

11:09:06   16       MR. DACUS:  So let me ask you this:  These folks

11:09:07   17  over here claim they have a patent.  And, obviously,

11:09:09   18  they're suing Amazon.  Is there anything about that

11:09:12   19  experience that would cause you to disfavor my side or to

11:09:14   20  disfavor Amazon in any way?

11:09:17   21       JUROR HIRT:  No, this is just a normal dispute.

11:09:20   22       MR. DACUS:  Okay.  And let me -- since I have you

11:09:23   23  up, I know Ms. Truelove asked you -- showed you that

11:09:25   24  picture of trees cut down, and you said something about,

11:09:28   25  I'd make them pay a lot of money, treble damages.

| | | |
|---|---|---|
| 11:09:32 | 1 | If I had a heart rate monitor on, my heart rate |
| 11:09:37 | 2 | probably went up pretty good there.  So what I need to know |
| 11:09:39 | 3 | from you, sir, is -- |
| 11:09:39 | 4 | JUROR HIRT:  You also have to prove that there was |
| 11:09:42 | 5 | egregious -- |
| 11:09:44 | 6 | MR. DACUS:  Thank you. |
| 11:09:45 | 7 | JUROR HIRT:  The burden of proof then comes on my |
| 11:09:47 | 8 | side, too, if we have to prove that the logger that did it |
| 11:09:50 | 9 | did it egregiously. |
| 11:09:53 | 10 | MR. DACUS:  And that's really what I want to know |
| 11:09:54 | 11 | from you, in all seriousness -- I mean, this is -- this is |
| 11:09:57 | 12 | a serious issue, and patent lawsuits are kind of like |
| 11:10:03 | 13 | trespass. |
| 11:10:03 | 14 | JUROR HIRT:  Right. |
| 11:10:04 | 15 | MR. DACUS:  I mean, if you're going to say you |
| 11:10:05 | 16 | trespassed, you need to show that you came within |
| 11:10:08 | 17 | somebody's fence line, right, in their borders? |
| 11:10:11 | 18 | JUROR HIRT:  Correct. |
| 11:10:11 | 19 | MR. DACUS:  So could you do that in this case?  I |
| 11:10:15 | 20 | mean, would you force these folks to actually prove their |
| 11:10:19 | 21 | case? |
| 11:10:19 | 22 | JUROR HIRT:  I think both sides have got to prove |
| 11:10:21 | 23 | their case. |
| 11:10:22 | 24 | MR. DACUS:  Understood.  That's all I need you to |
| 11:10:24 | 25 | say.  And so you don't -- because she showed you -- |

11:10:25  1          JUROR HIRT:  Neither one of you -- you're both at

11:10:27  2     the table right now, so we don't know which side is which.

11:10:30  3          MR. DACUS:  Perfect.  That's all I need you to

11:10:32  4     say.  I appreciate that very much.

11:10:36  5          Now, somebody else had their hand up.

11:10:38  6          No. 33 is Mr. Wiley.

11:10:40  7          JUROR WILEY:  Yes, my father was a lamp physicist

11:10:44  8     at General Electric.  He has over 300 patents with his name

11:10:48  9     on it.  He invented the quartz-halogen lamp.

11:10:53  10         And also I have an uncle who was an entrepreneur,

11:10:59  11    and he patented a rotary engine and a talking device for

11:11:02  12    people with a larynx out.

11:11:06  13         MR. DACUS:  Is it -- and did you say 300 patents

11:11:09  14    your father has?

11:11:10  15         JUROR WILEY:  Yeah, he has over 300 patents.

11:11:12  16         MR. DACUS:  Okay.  Is there anything about that

11:11:14  17    experience that would cause you to tend to favor the folks

11:11:18  18    who claim they have a patent in this lawsuit?

11:11:20  19         JUROR WILEY:  No.  That was just his job, and we

11:11:23  20    didn't really talk about it a lot.

11:11:25  21         MR. DACUS:  Understood.  You could be fair, is the

11:11:27  22    bottom line?

11:11:28  23         JUROR WILEY:  Absolutely.

11:11:30  24         MR. DACUS:  All right.  Did somebody else right

11:11:31  25    next to you have their hand up?

11:11:39   1          Ms. Lewis?

11:11:44   2          No, I'm sorry, Ms. Blackwell.

11:11:45   3          JUROR BLACKWELL:  Yeah, I briefly had a patent

11:11:46   4   with inseparable sheets with my boss.

11:11:51   5          MR. DACUS:  I saw that.

11:11:52   6          JUROR BLACKWELL:  When I changed jobs, I signed

11:11:54   7   off on the patent, so, yeah.

11:11:55   8          MR. DACUS:  Is there anything about that

11:11:57   9   experience that would cause you to -- to favor Vocalife in

11:12:00  10   this case?

11:12:01  11          JUROR BLACKWELL:  Huh-uh, no.

11:12:03  12          MR. DACUS:  Thank you very much.

11:12:03  13          Anybody else who has personal experience with

11:12:09  14   filing a patent?

11:12:11  15          All right.  Great.

11:12:13  16          JUROR LEWIS:  I don't have personal experience

11:12:14  17   with filing a patent, but when I worked for Lone Star

11:12:18  18   Steel, we had our premium threads that were patented.  And

11:12:21  19   I worked with all those guys.

11:12:23  20          And I also worked with a subsidiary of Lone Star

11:12:26  21   Steel with the hydrosonic system.  And they had some

11:12:29  22   patents on some scrubbing devices, and I worked with the

11:12:32  23   engineers on the selling of those products.

11:12:34  24          MR. DACUS:  Perfect.  Thank you very much,

11:12:40  25   Ms. Lewis.

| | | |
|---|---|---|
| 11:12:45 | 1 | Let me talk to you for a second, Mr. Miller, if I |
| 11:12:49 | 2 | could. |
| 11:12:49 | 3 | That's No. 4, Mr. Fitzpatrick. |
| 11:12:53 | 4 | JUROR MILLER:  Yes, sir. |
| 11:12:54 | 5 | MR. DACUS:  Ms. Truelove asked you some questions |
| 11:12:56 | 6 | about whether or not you thought it would be okay if |
| 11:12:59 | 7 | somebody was using Eastman patents for Eastman to -- to |
| 11:13:02 | 8 | file a lawsuit and protect themselves, and you said yes. |
| 11:13:06 | 9 | JUROR MILLER:  Yes, sir. |
| 11:13:07 | 10 | MR. DACUS:  As you naturally should, right? |
| 11:13:10 | 11 | JUROR MILLER:  Right. |
| 11:13:11 | 12 | MR. DACUS:  And my question to you, sir, is, do |
| 11:13:13 | 13 | you agree that people who are accused of patent |
| 11:13:15 | 14 | infringement have a right to come to the courtroom and |
| 11:13:18 | 15 | defend themselves also? |
| 11:13:20 | 16 | JUROR MILLER:  Completely. |
| 11:13:21 | 17 | MR. DACUS:  All right.  That's all I needed.  So I |
| 11:13:23 | 18 | can sleep well tonight knowing that if you sat on this |
| 11:13:27 | 19 | jury, you'd just listen to the evidence and make a decision |
| 11:13:30 | 20 | based on the evidence? |
| 11:13:32 | 21 | JUROR MILLER:  Yes, sir. |
| 11:13:33 | 22 | MR. DACUS:  All right.  Thank you very much. |
| 11:13:34 | 23 | Let's see, Ms. Edwards, there's something in your |
| 11:13:37 | 24 | questionnaire I wanted to ask you about -- |
| 11:13:39 | 25 | JUROR EDWARDS:  Okay. |

11:13:39  1          MR. DACUS:  -- if I might.  I'm not picking on

11:13:42  2    you.

11:13:42  3          I thought your questionnaire said that you had

11:13:45  4    some expertise in computer programming.

11:13:48  5          JUROR EDWARDS:  No.  Just like computer training

11:13:50  6    and all that for work.

11:13:51  7          MR. DACUS:  Okay.  You did check something on the

11:13:54  8    questionnaire?  I didn't make that up, did I?

11:13:57  9          JUROR EDWARDS:  I don't -- I don't know.

11:13:57 10          MR. DACUS:  Okay.

11:13:58 11          JUROR EDWARDS:  That was last week or the week

11:14:00 12    before, so it may have gone out of my mind.

11:14:03 13          MR. DACUS:  The bottom line is, you don't really

11:14:06 14    consider yourself to have any particular expertise in

11:14:10 15    computer programming?

11:14:11 16          JUROR EDWARDS:  Oh, no, no.

11:14:13 17          MR. DACUS:  All right.  Thank you very much.

11:14:14 18          Let me ask a question about expertise.  I mean, I

11:14:18 19    told you that this lawsuit is going to be about, in large

11:14:21 20    part, these microphone arrays and this beamforming that

11:14:25 21    Ms. Truelove talked to you about and how these things

11:14:28 22    listen.

11:14:28 23          Does anybody have any expertise in acoustics or

11:14:32 24    microphones, any expertise in those areas?  Can you raise

11:14:36 25    your hand and let me know?

| | | |
|---|---|---|
| 11:14:37 | 1 | That's Ms. Hodges.  Can you tell me about that, |
| 11:14:45 | 2 | please, ma'am, once you get the microphone? |
| 11:14:51 | 3 | JUROR HODGES:  Well, I don't have the expertise, |
| 11:14:53 | 4 | but my dad had the knowledge, and I listened and watched |
| 11:14:57 | 5 | growing up, of him, with microphones.  And he was an |
| 11:15:00 | 6 | electrician, so he put a speaker system through our house |
| 11:15:05 | 7 | that he pretty much -- I don't want to use the wrong |
| 11:15:09 | 8 | word -- he rigged up himself.  So, yes, I have knowledge of |
| 11:15:13 | 9 | how it works. |
| 11:15:14 | 10 | MR. DACUS:  Okay.  All right.  Thank you. |
| 11:15:17 | 11 | JUROR HODGES:  Okay. |
| 11:15:19 | 12 | MR. DACUS:  Thank you very much. |
| 11:15:20 | 13 | Anybody else? |
| 11:15:21 | 14 | Let's see, that's Mr. Gardner, 27. |
| 11:15:24 | 15 | THE COURT:  You have five minutes remaining. |
| 11:15:27 | 16 | MR. DACUS:  Thank you, Your Honor. |
| 11:15:28 | 17 | Mr. Gardner, did you say you have -- |
| 11:15:35 | 18 | COURT SECURITY OFFICER:  Hang on, we're waiting on |
| 11:15:37 | 19 | a microphone. |
| 11:15:37 | 20 | MR. DACUS:  Oh, I'm sorry. |
| 11:15:37 | 21 | COURT SECURITY OFFICER:  He's got one if you want |
| 11:15:39 | 22 | to -- |
| 11:15:39 | 23 | MR. DACUS:  Yes, sir, I do. |
| 11:15:39 | 24 | Mr. Wiley. |
| 11:15:41 | 25 | JUROR WILEY:  I wouldn't call it expertise, but we |

11:15:43   1   have to have in physics a general understanding of all that

11:15:46   2   stuff, so I've studied it in general.

11:15:49   3           And I'm also a musician, so I know a little more

11:15:53   4   about noise cancellation and that stuff.

11:15:56   5           But nothing professional or long-term.  Just

11:16:00   6   general studies in all those fields.

11:16:03   7           MR. DACUS:  Perfect.

11:16:03   8           Mr. Gardner, please don't take offense.  As

11:16:07   9   Ms. Truelove said, we're not likely to reach you, and the

11:16:07  10   Judge told me I had five minutes, so I want to ask one more

11:16:13  11   different question if that's okay?  Is that all right?

11:16:13  12           All right.  So here's what I want to cover before

11:16:16  13   I need to sit down, and that is this issue about invalidity

11:16:22  14   and this presumption of validity, that you heard about this

11:16:25  15   morning.

11:16:25  16           You hear -- you heard on the video that you

11:16:27  17   watched, that the Judge provided, that despite that

11:16:31  18   presumption of validity, the jury makes the ultimate

11:16:35  19   determination as to whether or not a patent is valid.  And

11:16:37  20   what you're going to hear in this case and the evidence is

11:16:40  21   that the Patent Office, at least in our opinion, did not

11:16:43  22   have all of the information in front of them to make that

11:16:47  23   decision.

11:16:47  24           So -- so here's what I need to know from folks.

11:16:53  25   Can you -- are you willing -- even though a patent -- the

| | | |
|---|---|---|
| 11:16:56 | 1 | Patent and Trademark Office has issued a patent, are you |
| 11:16:58 | 2 | willing to sit as a juror here and invalidate that patent |
| 11:17:03 | 3 | if the evidence shows you that, in fact, the stuff was |
| 11:17:07 | 4 | known in the public and the patent is not valid?  Are you |
| 11:17:10 | 5 | willing to do that?  I need you to raise your hand and let |
| 11:17:13 | 6 | me know that you are willing to do that.  I need to -- I |
| 11:17:17 | 7 | need to make sure. |
| 11:17:28 | 8 | Is there anyone who is not willing to do that? |
| 11:17:28 | 9 | Raise your hand. |
| 11:17:30 | 10 | Mr. Green, you seem hesitant. |
| 11:17:32 | 11 | JUROR GREEN:  I'm trying to understand. |
| 11:17:33 | 12 | MR. DACUS:  Let me get you a microphone -- let me |
| 11:17:35 | 13 | get you a microphone, please, sir. |
| 11:17:36 | 14 | JUROR GREEN:  I'm not sure I understood the |
| 11:17:38 | 15 | question. |
| 11:17:39 | 16 | MR. DACUS:  It's probably because it was poor. |
| 11:17:42 | 17 | And it won't be the last one I'll ask. |
| 11:17:43 | 18 | So we're going to prove to you -- so we're going |
| 11:17:46 | 19 | to put on evidence to show you that this patent, we think, |
| 11:17:48 | 20 | is invalid, even though the Patent Office issued it. |
| 11:17:54 | 21 | Are you willing to sit as a juror, and if we prove |
| 11:17:57 | 22 | that to you, are you willing to say that, in fact, this |
| 11:17:59 | 23 | patent is invalid, even though it was issued by the Patent |
| 11:18:01 | 24 | Office? |
| 11:18:01 | 25 | JUROR GREEN:  Yes. |

| | | |
|---|---|---|
| 11:18:03 | 1 | MR. DACUS:  Okay.  Perfect.  Thank you very much. |
| 11:18:04 | 2 | And, Mr. Smith, let me -- let me ask you a |
| 11:18:08 | 3 | question. |
| 11:18:09 | 4 | That's No. 15. |
| 11:18:13 | 5 | JUROR SMITH:  Yes, sir. |
| 11:18:14 | 6 | MR. DACUS:  I know you've sat on a criminal jury, |
| 11:18:17 | 7 | right? |
| 11:18:17 | 8 | JUROR SMITH:  Yes, sir. |
| 11:18:17 | 9 | MR. DACUS:  Did y'all find that person -- that |
| 11:18:19 | 10 | Defendant guilty? |
| 11:18:20 | 11 | JUROR SMITH:  Yes, sir. |
| 11:18:21 | 12 | MR. DACUS:  Do you remember the Judge told you |
| 11:18:24 | 13 | that there was a presumption of innocence, just like what's |
| 11:18:26 | 14 | been talked about this morning? |
| 11:18:28 | 15 | JUROR SMITH:  Yes, sir. |
| 11:18:28 | 16 | MR. DACUS:  And so my assumption is the State |
| 11:18:30 | 17 | overcame that presumption of innocence by evidence, and |
| 11:18:31 | 18 | y'all were able to find the Defendant guilty; is that |
| 11:18:33 | 19 | right? |
| 11:18:34 | 20 | JUROR SMITH:  That's right. |
| 11:18:34 | 21 | MR. DACUS:  So you know firsthand that there's a |
| 11:18:40 | 22 | presumption but that can be overcome by evidence; you agree |
| 11:18:42 | 23 | with that? |
| 11:18:43 | 24 | JUROR SMITH:  Yes, I do. |
| 11:18:43 | 25 | MR. DACUS:  All right.  Thank you very much. |

11:18:44   1        I'm going to sit down now because the Judge is

11:18:50   2   going to make me.  But before I do, I'm going to ask the

11:18:53   3   same question Ms. Truelove did.  And, that is, I've done

11:18:57   4   this long enough that I know I do not always ask all the

11:19:02   5   right questions.

11:19:02   6        So if you're sitting there thinking, man, that --

11:19:05   7   this -- that lawyer, if he knew this about me, he would not

11:19:10   8   want me on this jury.

11:19:11   9        Is anybody sitting there thinking there's

11:19:13   10  something that I should have asked you, that if you were in

11:19:17   11  my shoes you would want me to know about you and your

11:19:20   12  service on this jury?  Can you raise your hand and let me

11:19:23   13  know that now?

11:19:25   14       Okay.  I don't see any hands at all.

11:19:27   15       I want to, again, say thank you to each of you

11:19:30   16  for -- for coming to jury service today.  It's a very

11:19:34   17  important part of what we're called to do as citizens, and

11:19:38   18  we can't thank you enough.  And I appreciate your attention

11:19:40   19  this morning.

11:19:41   20       Thank you, Your Honor.

11:19:43   21       THE COURT:  Thank you, counsel.

11:19:44   22       All right.  Ladies and gentlemen, at this time,

11:19:46   23  there are certain matters that I need to discuss with

11:19:50   24  counsel outside of your presence.

11:19:52   25       And given our safety protocols, I'm not going to

| | | |
|---|---|---|
| 11:19:56 | 1 | ask you to leave me, I'm going to leave you.  I'm going to |
| 11:20:00 | 2 | get up and ask the court reporter to come with me, and I'm |
| 11:20:03 | 3 | going to ask Ms. Truelove and Mr. Dacus to join me in the |
| 11:20:07 | 4 | jury room. |
| 11:20:08 | 5 | I'll take up with them outside of your presence |
| 11:20:11 | 6 | those things I need to discuss without you being present, |
| 11:20:14 | 7 | and then I'll be back in the courtroom and give you further |
| 11:20:17 | 8 | instructions. |
| 11:20:18 | 9 | While I'm out of the courtroom, please keep your |
| 11:20:20 | 10 | seats.  If you'd like to visit quietly with someone in the |
| 11:20:24 | 11 | general vicinity, that's fine.  If you'd like to sit there |
| 11:20:28 | 12 | quietly and not visit with somebody around you, that's |
| 11:20:31 | 13 | fine, as well.  It's strictly up to you. |
| 11:20:32 | 14 | If you choose to have a conversation with anyone, |
| 11:20:35 | 15 | remember, don't talk about anything that's happened in the |
| 11:20:39 | 16 | courtroom this morning so far.  Nobody has heard any |
| 11:20:43 | 17 | evidence in this case whatsoever. |
| 11:20:46 | 18 | The -- the process won't take me long in the jury |
| 11:20:51 | 19 | room.  I expect to be back here in a few minutes, and then |
| 11:20:56 | 20 | I'll give you further instructions about how we proceed |
| 11:20:59 | 21 | from there.  But in the meantime, if you'll just maintain |
| 11:21:04 | 22 | your seats.  I want you to have some idea that I am coming |
| 11:21:04 | 23 | back.  I'm just not walking away. |
| 11:21:04 | 24 | All right.  Counsel, if you'll join me in the jury |
| 11:21:09 | 25 | room, please. |

11:21:09  1          COURT SECURITY OFFICER:  All rise.

11:22:31  2          (Proceedings conducted in the jury room outside

11:22:48  3           the presence of the venire panel.)

11:22:48  4          THE COURT:  Ms. Truelove, do you have any

11:22:50  5   challenges for cause?

11:22:51  6          MS. TRUELOVE:  I do not, Your Honor.

11:22:53  7          THE COURT:  Okay.  Mr. Dacus, do you have any

11:22:57  8   challenges for cause?

11:22:58  9          MR. DACUS:  I challenge No. 3, Your Honor.

11:23:03  10         THE COURT:  All right.  In addition to questioning

11:23:21  11  these -- No. 3, who was challenged for cause by

11:23:26  12  Defendant -- is that your only challenge for cause?

11:23:28  13         MR. DACUS:  Yes, Your Honor.

11:23:29  14         THE COURT:  Okay.  In addition to questioning

11:23:31  15  No. 3, I'm going to also bring back and Question No. 12.

11:23:37  16         There apparently is some uncertainty about whether

11:23:40  17  she lives in the Marshall Division.  She's got a P.O. Box

11:23:43  18  in Laneville, Texas, which is the south end of Rusk County.

11:23:47  19  And that's not -- that's in the Tyler Division.  But she

11:23:50  20  works in Marshall at the local Kroger grocery store.  So I

11:23:55  21  want to make sure she's a qualified juror before we leave

11:23:58  22  her on the panel.

11:23:59  23         In addition to that, I'm going to bring back

11:24:03  24  No. 23, Ms. Walker; No. 25, Ms. Greene; and No. 31,

11:24:16  25  Ms. Porter, who all indicated they had scheduling issues.

| | | |
|---|---|---|
| 11:24:20 | 1 | Let me ask you this, counsel:  With only one juror |
| 11:24:31 | 2 | challenged for cause and No. 12 having some question about |
| 11:24:34 | 3 | her qualification, we're not going to reach 23, 25, or 31, |
| 11:24:42 | 4 | are we? |
| 11:24:43 | 5 | MS. TRUELOVE:  We will not, Your Honor. |
| 11:24:45 | 6 | MR. DACUS:  No, sir. |
| 11:24:46 | 7 | THE COURT:  Okay.  So at this point, I don't see a |
| 11:24:50 | 8 | need to take the time to bring them back and discuss their |
| 11:24:52 | 9 | scheduling issues.  I'll just bring back No. 12 and No. 3. |
| 11:24:57 | 10 | Do either of you have a problem with that? |
| 11:25:00 | 11 | MR. DACUS:  No, Your Honor. |
| 11:25:04 | 12 | MS. TRUELOVE:  Not from Plaintiff. |
| 11:25:05 | 13 | THE COURT:  We'll go back in the courtroom, go |
| 11:25:07 | 14 | back on the record, I'll tell the panel what we're doing, |
| 11:25:09 | 15 | and then we'll come back in here and I'll have the Court |
| 11:25:13 | 16 | Security Officer bring in No. 3 and No. 12 separately so |
| 11:25:17 | 17 | that we can visit with them about the challenge for cause, |
| 11:25:19 | 18 | and I can visit with No. 12 about her residence.  Thank |
| 11:25:25 | 19 | you. |
| 11:26:19 | 20 | (The Court on the Bench - Open Court.) |
| 11:26:19 | 21 | COURT SECURITY OFFICER:  All rise. |
| 11:26:20 | 22 | THE COURT:  Be seated, please. |
| 11:26:20 | 23 | Mr. Elliott, do we have all the members of the |
| 11:26:42 | 24 | venire panel in the courtroom? |
| 11:26:44 | 25 | COURT SECURITY OFFICER:  No. 6, Mr. Green, I think |

11:26:47  1   is gone.

11:26:48  2              THE COURT:  All right.  We'll wait for Mr. Green.

11:28:41  3         All right.  Ladies and gentlemen, there are a few

11:28:46  4   of you that I am going to need to talk with outside of the

11:28:50  5   presence of the rest of the panel.  And I will talk with

11:28:53  6   you with Ms. Truelove and Mr. Dacus present in the jury

11:28:58  7   room.  We are going to go back and be in the jury room in

11:29:04  8   just a minute.

11:29:05  9         I'll have the Court Security Officer come in and

11:29:09  10  bring in one at a time those members of the panel that I

11:29:12  11  need to speak with.  It's just a couple members of the

11:29:17  12  panel.  I don't think it will take long.

11:29:20  13        The same rules apply while I'm off the bench and

11:29:23  14  out of the courtroom.  You're free to have a quiet

11:29:27  15  conversation with somebody near you if you'd like.  You're

11:29:29  16  not required to.

11:29:30  17        If you do, don't discuss anything about what's

11:29:32  18  happened in court today or since you got to the courthouse

11:29:35  19  this morning.

11:29:35  20        And there will also be an opportunity for the

11:29:43  21  Court Security Officers to see if anybody needs a restroom

11:29:46  22  break.

11:29:47  23        Part of the challenge we have in selecting a jury

11:29:50  24  for an in-person trial in our present circumstances is,

11:29:54  25  ordinarily, I would just say you all are recessed, and you

11:29:57  1  can all walk out the backdoor together, and whoever needs a

11:30:00  2  restroom can go to it.  Whoever doesn't, doesn't.  We

11:30:03  3  obviously can't do that in today's world.

11:30:06  4       So while I'm off the bench, there'll be a chance,

11:30:10  5  if you need to, to one at a time with the work -- with the

11:30:13  6  help of the CSOs, the Court Security Officers, be excused

11:30:18  7  for a restroom break.  I'll be back on the bench fairly

11:30:22  8  soon, and then we'll proceed from there.

11:30:26  9       Again, while I'm out of the courtroom, don't

11:30:28  10  discuss anything that's happened since you've arrived at

11:30:31  11  the courthouse this morning.

11:30:32  12       All right.  Counsel, if you'll meet me in the jury

11:30:37  13  room at this time.

11:30:38  14            COURT SECURITY OFFICER:  All rise.

11:32:18  15            (Proceedings in the jury room outside the presence

11:33:04  16             of the venire panel.)

11:33:04  17            THE COURT:  Would you ask him to bring in Panel

11:33:20  18  Member No. 3, please?

11:33:28  19            (Juror brought into the jury room.)

11:33:28  20            Come in, Mr. Wallace.

11:33:55  21            JUROR WALLACE:  Hi, y'all.

11:33:56  22            THE COURT:  If you'd have a seat right there.

11:33:59  23            JUROR WALLACE:  Yes, sir.

11:34:01  24            THE COURT:  I'm pretty confident you can guess

11:34:03  25  that part of why you're back here is so we can inquire as

| | | |
|---|---|---|
| 11:34:06 | 1 | to your ability to be fair and impartial. |
| 11:34:08 | 2 | JUROR WALLACE:  Yes, sir. |
| 11:34:09 | 3 | THE COURT:  It's not anything about the fact that |
| 11:34:11 | 4 | you are an officer of the court or a trained lawyer, but |
| 11:34:17 | 5 | you've indicated that not only do you know Judge Parish |
| 11:34:24 | 6 | professionally and have for some time, but you know her |
| 11:34:30 | 7 | socially and personally and consider her a close, personal |
| 11:34:33 | 8 | friend. |
| 11:34:34 | 9 | Her husband is on the Plaintiff's trial team and |
| 11:34:36 | 10 | in the courtroom and going to be here throughout the trial. |
| 11:34:38 | 11 | What level of participation in the trial he's going to |
| 11:34:41 | 12 | undertake, I don't know.  But I'm sure some level of |
| 11:34:44 | 13 | participation in the trial. |
| 11:34:45 | 14 | So that being the case, I need you to tell me, |
| 11:34:49 | 15 | again, that you're confident that you can completely put |
| 11:34:53 | 16 | out of your mind and remove from any part of your service |
| 11:34:57 | 17 | as a potential juror in this case that friendship and that |
| 11:35:01 | 18 | long association, the fact that you're going to be back in |
| 11:35:05 | 19 | Gilmer seeing Judge Parish in the community, perhaps |
| 11:35:08 | 20 | socially after this, and how you might feel if you end up |
| 11:35:13 | 21 | on a jury that comes back with a verdict that disappoints |
| 11:35:17 | 22 | her husband. |
| 11:35:18 | 23 | JUROR WALLACE:  Right. |
| 11:35:19 | 24 | THE COURT:  So what can you tell me about your |
| 11:35:21 | 25 | ability to do what is I think pretty clearly a difficult -- |

```
11:35:26   1    a difficult thing?

11:35:28   2         JUROR WALLACE:  I would acknowledge that that's a

11:35:30   3    difficult thing, but I know, you know, professionally what

11:35:33   4    I'm called upon to do.

11:35:36   5         Since I got my license in 1992, you know,

11:35:39   6    sometimes you have to make hard decisions, and sometimes

11:35:42   7    that upsets people that you know.  Sometimes it upsets

11:35:49   8    people that are in your own family, but you still have to

11:35:53   9    do your job.  And I'm very keen on doing my job.

11:35:59   10        So I know as an officer of the court, that's one

11:36:03   11   thing -- I took that very seriously when I was a juror

11:36:07   12   on -- in Judge Parish's court actually.  She was a

11:36:11   13   presiding judge in a case that I ended up being a

11:36:15   14   foreperson over that jury and returned a verdict for

11:36:18   15   Plaintiff in that one.

11:36:19   16        But, you know, that -- that's -- it is very

11:36:29   17   important to me whether -- as an officer of the court,

11:36:32   18   whether I'm serving on a jury, whether I'm standing watch

11:36:35   19   on the USS Independence, or whether I was cooking chicken

11:36:40   20   for the Colonel many, many years ago.  Do my job.  So I

11:36:43   21   don't know how to say that any plainer to you or y'all.  If

11:36:50   22   it's my job, I'm going to do my job.

11:36:53   23        THE COURT:  All right.  I have one other question

11:36:54   24   I'm going to ask and then I'm going to let counsel ask any

11:36:59   25   question they want to.  But my other question is this:
```

```
11:37:02   1   Assume that you're on the jury, assume that you're the only
11:37:05   2   lawyer on the jury, assume you've heard all the evidence in
11:37:08   3   the case, and counsel's made their closing arguments and I
11:37:14   4   send the eight of you back into this jury room to
11:37:17   5   deliberate on the verdict, and the other seven jurors sit
11:37:20   6   down around this table, the first question to answer on the
11:37:23   7   verdict form comes up, and they all look at you and say,
11:37:26   8   you're a lawyer, Mr. Wallace, what should we do?
11:37:30   9           JUROR WALLACE:  That's not my job.
11:37:31   10          THE COURT:  Are you going to make sure that each
11:37:33   11  juror -- if you're among the jury, are you going to avoid
11:37:37   12  becoming a jury of one?  And are you going to not fall into
11:37:41   13  the easy trap of telling everybody else what to do, but
11:37:44   14  make sure they all make their own independent decisions?
11:37:47   15          JUROR WALLACE:  I think that would violate my oath
11:37:49   16  if I started doing that, and I'm not going to do that.
11:37:51   17          THE COURT:  Okay.  And you understand why I ask
11:37:53   18  the question?
11:37:54   19          JUROR WALLACE:  Yes, sir, I do.  I understand.
11:37:56   20          THE COURT:  Mr. Dacus, do you have any questions
11:37:58   21  of Mr. Wallace?
11:38:00   22          MR. DACUS:  Nothing, Your Honor.
11:38:01   23          THE COURT:  Ms. Truelove?
11:38:02   24          MS. TRUELOVE:  I have nothing, Your Honor.
11:38:04   25          THE COURT:  All right.  Thank you, Mr. Wallace.
```

| | | |
|---|---|---|
| 11:38:07 | 1 | JUROR WALLACE:  Thank you, Judge. |
| 11:38:11 | 2 | (Juror excused to return to the courtroom.) |
| 11:38:11 | 3 | THE COURT:  All right.  I'm going to do -- |
| 11:38:14 | 4 | overrule the challenge for cause as to Mr. Wallace. |
| 11:38:17 | 5 | And, if you will, Ms. Lockhart, ask the Court |
| 11:38:23 | 6 | Security Officer to bring back Panel Member No. 12, |
| 11:38:27 | 7 | Ms. Wheeler. |
| 11:39:06 | 8 | (Juror brought into the jury room.) |
| 11:39:06 | 9 | THE COURT:  Come in, Ms. Wheeler.  Would you come |
| 11:42:01 | 10 | up and have a seat right here, please, ma'am? |
| 11:42:07 | 11 | I just have a simple question I need to ask to |
| 11:42:09 | 12 | clarify something, Ms. Wheeler.  I know you work here in |
| 11:42:12 | 13 | Marshall at Kroger.  I've been buying groceries there for |
| 11:42:18 | 14 | 35 years. |
| 11:42:18 | 15 | But according to our information, you have a post |
| 11:42:22 | 16 | office box in Laneville, and Laneville is in the south end |
| 11:42:26 | 17 | corner of Rusk County, and Rusk County is not in the |
| 11:42:29 | 18 | Marshall Division.  Do you live in Laneville? |
| 11:42:32 | 19 | JUROR WHEELER:  No.  I share the P.O. Box with my |
| 11:42:34 | 20 | sister. |
| 11:42:35 | 21 | THE COURT:  And where is your actual residence? |
| 11:42:38 | 22 | JUROR WHEELER:  Here in Marshall on Fairview |
| 11:42:42 | 23 | Street. |
| 11:42:42 | 24 | THE COURT:  That's all I needed to know.  Thank |
| 11:42:43 | 25 | you, ma'am. |

| | | |
|---|---|---|
| 11:42:44 | 1 | JUROR WHEELER:  You're welcome. |
| 11:42:47 | 2 | (Juror excused to return to the courtroom.) |
| 11:42:47 | 3 | THE COURT:  All right.  We'll leave Ms. Wheeler on |
| 11:42:52 | 4 | the venire list, and we'll leave Mr. Wallace on the list. |
| 11:42:56 | 5 | How long do you all need to exercise your |
| 11:43:01 | 6 | peremptory challenges? |
| 11:43:02 | 7 | MR. DACUS:  20 minutes. |
| 11:43:04 | 8 | THE COURT:  I'll give you until 10 minutes after |
| 11:43:06 | 9 | 12:00. |
| 11:43:08 | 10 | MR. DACUS:  Thank you. |
| 11:43:08 | 11 | MS. TRUELOVE:  Okay.  Great.  Thank you, |
| 11:43:12 | 12 | Your Honor. |
| 11:43:12 | 13 | MR. DACUS:  We'll strike through 16. |
| 11:43:14 | 14 | MS. TRUELOVE:  We'll strike through 16. |
| 11:43:17 | 15 | THE COURT:  Right. |
| 11:44:08 | 16 | MS. TRUELOVE:  Thank you. |
| 11:44:08 | 17 | THE COURT:  Let's go back on the record, and I'll |
| 11:44:08 | 18 | tell everyone what we're doing. |
| 11:44:08 | 19 | (Conference concluded in jury room.) |
| 11:44:08 | 20 | (The Court is back on the Bench - Open court.) |
| 11:44:09 | 21 | THE COURT:  Thank you, ladies and gentlemen, for |
| 11:44:10 | 22 | your forbearance and cooperation.  I'm going to recess in |
| 11:44:14 | 23 | just a minute so that the lawyers can exercise their |
| 11:44:17 | 24 | peremptory challenges, which is part of the process of |
| 11:44:20 | 25 | securing the eight of you that will be the jurors in this |

11:44:23   1   case.  That's going to take about 20 or 25 minutes.

11:44:27   2          While we're in recess, I'm going to need all of

11:44:31   3   you to stay in your seats.  We don't want to completely

11:44:35   4   frustrate the social distancing we've worked hard to

11:44:39   5   achieve this morning.

11:44:40   6          We'll follow the same course that we followed when

11:44:44   7   I was off the bench and in the jury room.  If you'd like,

11:44:44   8   please feel free to have a conversation with anyone near

11:44:48   9   you, if you're comfortable doing that, as long as it's

11:44:49  10   quiet and respectful.  You are in a court of law.

11:44:52  11          Don't discuss anything about what's happened since

11:44:55  12   you've arrived at the courthouse today or anything you've

11:44:57  13   heard.

11:44:59  14          Also, given the length of time here, we'll

11:45:02  15   continue, through our Court Security Officers, to see who

11:45:04  16   may need to leave one at a time or in small groups for

11:45:09  17   restroom breaks.

11:45:10  18          Also, ladies and gentlemen, it's a quarter until

11:45:12  19   12:00.  It's going to be probably 12:30 or so before I can

11:45:18  20   possibly be back in here, and I am concerned that some of

11:45:24  21   you might not do well if you don't have something to eat

11:45:29  22   right at 12:00 noon.

11:45:31  23          So I've instructed the clerk's office to have

11:45:33  24   peanut butter crackers and bottled water available.  While

11:45:38  25   I'm off the bench, if you would like some crackers and some

11:45:41  1  water, if you'll let the Court Security Officers know,

11:45:44  2  they'll see that it's brought in to you one at a time.

11:45:47  3       If you don't care for that, don't feel any need to

11:45:49  4  do it.  But I do want to make it available to you, against

11:45:52  5  the prospect that some of you would feel better if you had

11:45:56  6  something to eat past the noon hour.

11:45:59  7       So with all those instructions, please maintain

11:46:03  8  your social distancing in your seats, follow the

11:46:05  9  instructions that I've given you, and I'll be back here as

11:46:08  10  soon as I can to continue with the process.

11:46:11  11       The Court stands in recess.

11:46:12  12       COURT SECURITY OFFICER:  All rise.

11:46:15  13       (Recess.)

12:25:04  14       COURT SECURITY OFFICER:  All rise.

12:25:12  15       THE COURT:  Be seated, please.

12:25:16  16       All right.  Ladies and gentlemen, if you will

12:25:19  17  listen carefully.  As your name is called, if you'll come

12:25:21  18  forward and take your position in the jury box.

12:25:24  19       I'm going to ask that of our eight jurors that are

12:25:28  20  selected, that the first four be positioned on the front

12:25:31  21  row of the jury box, and the second four on the second row

12:25:35  22  of the jury box.

12:25:37  23       You'll also find a plastic face shield in the

12:25:44  24  chairs up there.  I mentioned that earlier.  What I'd like

12:25:48  25  you to do is stand in front of a chair that has a plastic

12:25:54  1  face shield in it.  When everybody's in place, then I'll

12:25:58  2  ask you to all be seated, and if you'll pick up that

12:26:01  3  plastic face shield and have a seat, that should position

12:26:05  4  you as well as we can and as socially distanced as we can

12:26:09  5  in the jury box.

12:26:09  6       All right.  I'm going to ask our courtroom deputy,

12:26:13  7  Ms. Lockhart, to announce the name of our eight -- names of

12:26:16  8  our jurors at this time.

12:26:18  9       COURTROOM DEPUTY:  Ellen Banks, Elizabeth Edwards,

12:26:26  10  Dyan Burton, Angela Friday, William Amick, Ashley

12:26:52  11  Stansbury -- bury, Tracie Huskey, and James Smith.

12:27:13  12       THE COURT:  Thank you, ladies and gentlemen.

12:27:33  13  Please be seated.

12:27:33  14       Those of you who were not selected for the jury in

12:27:43  15  this case, I'm about to excuse you at this time.  But I

12:27:47  16  want to say this before I excuse you:  Everybody in this

12:27:52  17  courtroom, the Court, the Court staff, the parties, counsel

12:27:56  18  for both of the parties, everyone here appreciates the

12:28:00  19  sacrifice that each of you made to be here this morning and

12:28:03  20  to present yourself for jury duty.  And even though you

12:28:06  21  weren't selected, you performed a very real and significant

12:28:09  22  and important public service by being here.

12:28:13  23       It is not lost on any of us that every one of you

12:28:17  24  had other places to be today, things to do that were

12:28:20  25  important in your respective lives, and you set that aside,

12:28:24  1   and you sacrificed and came and presented yourselves, as

12:28:27  2   you were called upon to do as good citizens.

12:28:30  3          Quite honestly, ladies and gentlemen, the Court

12:28:33  4   could not function and discharge its duties under the

12:28:41  5   Constitution without ordinary citizens such as yourselves

12:28:43  6   doing what you've done this morning, putting your other

12:28:46  7   responsibilities and the other important things in your

12:28:49  8   lives on hold and presenting yourself for jury duty.

12:28:53  9          We can't thank you enough.  Believe me, we

12:28:57 10   appreciate you more than I can express this morning, and I

12:29:00 11   want you to know that, on behalf of everybody here, before

12:29:02 12   you leave.

12:29:03 13          Also, as you leave, if you will go by the clerk's

12:29:06 14   office, they want to retrieve those very expensive numbers

12:29:09 15   you have pinned to your garments.  They also will answer

12:29:12 16   any questions you have.

12:29:14 17          If you need any kind of a document to show to an

12:29:17 18   employer, to explain where you have been this morning,

12:29:21 19   they'll assist you with that, and they'll take any other

12:29:24 20   questions you have and assist you in any other way they

12:29:29 21   can.

12:29:29 22          Again, ladies and gentlemen, thank you so very

12:29:32 23   much for the important role you played in being here today.

12:29:33 24          Those on the panel not selected as members of the

12:29:37 25   jury are now excused.

12:29:42    1            COURT SECURITY OFFICER:  All rise.

12:30:23    2            (Unselected venire panel members out.)

12:30:28    3            THE COURT:  All right.  I'd like to ask everyone

12:30:30    4    but the members of the jury to be seated, please.

12:30:32    5            Members of the jury, I'm going to ask

12:30:34    6    Ms. Lockhart, our courtroom deputy, to administer the oath

12:30:37    7    as jurors to you now.

12:30:39    8            (Jurors sworn.)

12:30:43    9            THE COURT:  Please have a seat.

12:30:56   10            Ladies and gentlemen, I'm about to excuse you for

12:31:01   11    lunch.  I'm told by the clerk's office that your lunch is

12:31:05   12    in the jury room and available to you.

12:31:07   13            But before I do, I need to go over a few brief

12:31:11   14    things with you.

12:31:11   15            First of all, during the lunch break, please make

12:31:16   16    sure that you give to Ms. Clendening a good working cell

12:31:20   17    phone number for each of you.  If there were any reason why

12:31:24   18    we would need to get you before you were to appear the next

12:31:28   19    day, we would need a good number where we could reach you.

12:31:31   20            I know that several of you have a good distance to

12:31:33   21    drive to get to the courthouse from where you live, and

12:31:35   22    it's not likely, but if we needed to reach you before you

12:31:38   23    arrived or overnight, we'd like to have that number.

12:31:42   24            Also, let me give you a couple instructions that

12:31:47   25    I'm expecting you to follow and that are important enough

12:31:50  1   I'm going to give them to you now and not wait until after

12:31:54  2   lunch.

12:31:54  3        First of all, do not discuss this case with

12:31:57  4   anyone.  Do not discuss this case with anyone.  And when I

12:32:01  5   say "discuss," I mean communicate about the case or

12:32:09  6   anything related to it, in the broadest sense possible.

12:32:13  7        Let me explain this to you.  At the end of the

12:32:15  8   trial when all the evidence has been presented and I've

12:32:18  9   given you my final instructions on the law that you are to

12:32:21  10  follow and counsel for the two parties have presented their

12:32:23  11  closing arguments to you, I'm going to instruct you to

12:32:27  12  retire to the jury room and to deliberate on your verdict.

12:32:29  13       The verdict is going to be a list of questions

12:32:31  14  that you will need to answer, and your answers to those

12:32:35  15  questions will have to be unanimous.

12:32:40  16       However, it is absolutely essential and

12:32:41  17  fundamental to this process that the only information you

12:32:46  18  have to draw upon in answering those questions in the

12:32:49  19  verdict form must come to you solely and only through the

12:32:54  20  evidence that's presented in this trial.

12:32:56  21       And that means the sworn testimony of the

12:32:58  22  witnesses presented, subject to cross-examination, and the

12:33:03  23  exhibits and other documents that the Court has found to be

12:33:07  24  admissible under the Rules of Evidence and has admitted as

12:33:12  25  exhibits in this case.

12:33:13  1          Those things must be the sole universe of the

12:33:16  2   information that you draw upon to answer those questions in

12:33:19  3   the verdict form.

12:33:20  4          If you have other information from any other

12:33:23  5   source that's involved in you answering any of those

12:33:27  6   questions, then that will jeopardize the entire process and

12:33:32  7   result in us probably having to start over with another

12:33:35  8   jury and use all the time and resources again that have

12:33:39  9   been dedicated to this trial.

12:33:40  10          So all the instructions I'm going to give you,

12:33:44  11   ladies and gentlemen, are important.  This one is number

12:33:47  12   one for a reason, and it's so important that you're going

12:33:50  13   to hear this repeat -- repeated by me throughout the trial.

12:33:57  14          As a matter of fact, most jurors are sick and

12:33:59  15   tired of hearing this from me by the time the trial is

12:34:02  16   over, but I'm going to continue to repeat it.  Pretty much

12:34:06  17   any time you get out of those chairs, you're going to hear

12:34:09  18   that from me, because it is that critical and that

12:34:11  19   important that the sole and only source of information you

12:34:13  20   have to draw upon to answer the questions that will be

12:34:16  21   asked of you in the verdict must come only and solely from

12:34:19  22   the sworn testimony presented in court and the exhibits

12:34:22  23   that the Court introduces.

12:34:25  24          And when I say don't discuss the case

12:34:28  25   among your -- among -- with anyone, rather, that means

12:34:31   1   among yourselves, too.  And until all the evidence is in,

12:34:36   2   until I've given you my final instructions, and until I

12:34:40   3   have directed you to retire and deliberate on your verdict,

12:34:45   4   you must not discuss anything or communicate in any way

12:34:49   5   about this case with, not only everybody else, but among

12:34:53   6   the eight of you, as well.

12:34:54   7        Now, at that point when you have heard all the

12:34:57   8   evidence, when I've given you my final instructions, when

12:35:00   9   counsel have presented their closing arguments, and when I

12:35:04  10   have instructed you to retire to the jury room and to

12:35:06  11   deliberate on your verdict, at that moment, but not an

12:35:12  12   instant before, but at that moment, it becomes your duty to

12:35:16  13   discuss this case and the evidence among the eight of you

12:35:19  14   so that you can arrive at unanimous answers to those

12:35:22  15   questions that will be in the verdict form.

12:35:24  16        But until that point in time, you are not to

12:35:28  17   communicate in any way or discuss anything about the case

12:35:32  18   with each other or anyone else.

12:35:35  19        And when I say -- when I say "discuss" or

12:35:40  20   "communicate," I mean those words in the broadest sense of

12:35:44  21   the term.  That's not only oral communications.  That's

12:35:47  22   written communications.  That's digital communications.

12:35:50  23   That's electronic communications.

12:35:54  24        If any of you on the jury are users of social

12:35:58  25   media, don't post on Facebook, don't tweet on Twitter,

12:36:02  1   don't use Instagram, or any other possible social media

12:36:07  2   platform to communicate or discuss anything about the case.

12:36:12  3        Also, you're not to do any research about this

12:36:17  4   case in any shape, form, or fashion.  That means you are

12:36:20  5   not to get on the Internet and do a search for Amazon or

12:36:26  6   Vocalife or any of the lawyers or any of the witnesses or

12:36:29  7   anything you hear about in the case.

12:36:32  8        You're not to -- you're not to research anything

12:36:35  9   about this in any way.  That involve -- that means online.

12:36:39  10  That means if you happen to be in a library, don't pull an

12:36:43  11  encyclopedia off the shelf and do it that way.  Don't do

12:36:46  12  any research whatsoever.

12:36:47  13       Again, it all comes back to this fundamental

12:36:54  14  principle, that the sole source of the information you'll

12:36:56  15  have to draw upon to answer the questions in the verdict

12:36:58  16  form at the end of the trial must be limited and solely

12:37:03  17  confined to the witnesses who've testified under oath and

12:37:08  18  subject to cross-examination and the exhibits introduced

12:37:11  19  into evidence and approved as fully admissible by the

12:37:16  20  Court.  That's it.  And that is the fundamental basis upon

12:37:20  21  which this trial must go forward.  So don't do any research

12:37:23  22  of any kind.

12:37:23  23       As a matter of fact, ladies and gentlemen, if any

12:37:26  24  of you have smartphones with you, those are little

12:37:29  25  computers that also allow you to make telephone calls.  I'm

12:37:32  1   going to ask that beginning tomorrow, if you have

12:37:36  2   smartphones, if you have tablets, iPads, any kind of

12:37:40  3   electronic devices, if you have Apple watches that you can

12:37:43  4   do Internet searches on, leave all those electronic devices

12:37:48  5   either at home or leave them in your automobiles outside

12:37:52  6   the courtroom, but don't bring them in the courthouse.

12:37:58  7          It's sometimes tempting for jurors to, quote,

12:38:02  8   Google something real quick when they don't understand it,

12:38:04  9   and that's not proper, and that's not permissible.

12:38:07  10          So to remove the temptation, don't bring any

12:38:11  11  electronic devices into the courthouse starting tomorrow.

12:38:14  12  If you have them today, that's fine.  Leave them where you

12:38:14  13  have them, but don't bring anything into the courthouse

12:38:17  14  tomorrow that would fit in that category or would provide

12:38:19  15  that kind of temptation.

12:38:20  16          Also, ladies and gentlemen, during the course of

12:38:24  17  this trial, there are going to be times as you come in the

12:38:29  18  morning, you leave in the evenings, at other times, you are

12:38:34  19  going to come in relatively close contact to some of the

12:38:37  20  lawyers, some of the witnesses, some of the support staff,

12:38:41  21  the corporate representatives for these companies, other

12:38:44  22  people associated with this trial.

12:38:45  23          When that happens, they're not going to talk to

12:38:50  24  you.  They're not going to speak.  They're not going to say

12:38:53  25  good morning.  They're not going to say, how are you today?

12:38:56   1   They're not going to be friendly.  They're not going to be

12:39:00   2   engaging.  They're not going to be gregarious as we often

12:39:04   3   are in East Texas.

12:39:06   4        That's because I've instructed them not to be.

12:39:08   5   That's because the only communications that you should have

12:39:10   6   to draw on are the ones that come under oath in open court.

12:39:14   7        So when you walk by one of these lawyers coming

12:39:18   8   into the courthouse in the morning or you see one of the

12:39:21   9   witnesses and you walk by or are in close proximity to them

12:39:21  10   and they don't speak and they're not friendly and they're

12:39:24  11   not outgoing, don't hold that against them.  Don't think

12:39:27  12   they're being rude.  Don't consider that anything to be

12:39:32  13   negative in any way because they're simply doing what the

12:39:36  14   Court's instructed them to do.

12:39:37  15        Also, ladies and gentlemen, I think that I should

12:39:41  16   make sure that you understand this.  It is possible over

12:39:46  17   the course of this trial that some outside person, some

12:39:51  18   outside source might try to contact you about your service

12:39:55  19   as jurors and the ultimate decisions that you will make.  I

12:40:01  20   don't think that's likely.

12:40:02  21        But let me just say, ladies and gentlemen, there

12:40:04  22   are no unimportant cases that get to trial in a United

12:40:09  23   States District Court.

12:40:09  24        And if anywhere along the way anybody attempts to

12:40:12  25   contact you or has any interaction with you that you feel

12:40:16    1   is inappropriate or not what it should be in any way, then

12:40:21    2   you should immediately inform Ms. Clendening.  She will let

12:40:25    3   me know, and the Court will deal with it.

12:40:29    4           Again, I don't think that's likely, but it is

12:40:30    5   within the realm of possibility, and so I at least want to

12:40:33    6   put you on notice about it.

12:40:35    7           Also, ladies and gentlemen -- and I'll give you

12:40:39    8   more instructions on this after lunch -- but so you will

12:40:42    9   know for planning purposes, it's always been my experience

12:40:46   10   since I've been a United States District Judge, that

12:40:50   11   jurors, especially in our division, which includes six

12:40:53   12   counties and covers a lot of geographic area, would rather

12:40:57   13   get here early and stay late and be away from their homes

12:41:01   14   and their families and their work fewer days than come

12:41:04   15   late, break early, and take a longer number of days to try

12:41:07   16   the case.

12:41:08   17           So I am anticipating that we will start each

12:41:15   18   morning about 8:30.  And I'm going to ask you each evening

12:41:19   19   when you leave to be sure you're back the next day,

12:41:23   20   assembled in the jury room, and ready to go by 8:30.  And

12:41:27   21   we're not going to stop at 5:00 on the dot.  We won't run

12:41:32   22   this trial, as they say, like banker's hours.  And I can't

12:41:36   23   tell you exactly when we will stop each day.

12:41:38   24           Some of these witnesses that you're going to hear

12:41:40   25   may be on the witness stand an hour, sometimes two hours,

12:41:44  1  sometimes there are lengthy testimonies to be given, and

12:41:48  2  it's always heard to break a witness in the middle of their

12:41:52  3  testimony.

12:41:53  4       So depending on exactly how things fall, we'll

12:41:56  5  work each evening until probably not earlier than 5:30,

12:42:00  6  maybe 6:00 o'clock.  In some rare cases, maybe a little

12:42:04  7  later than 6:00 o'clock.

12:42:05  8       But I want to give you a general idea of what to

12:42:10  9  expect so those who may be waiting for you at home each

12:42:13  10 evening have an idea of when you'll be on the road and when

12:42:17  11 you'll be back at your homes.

12:42:18  12      Let me tell you one other thing relating back to

12:42:22  13 this first instruction that I gave you.  Unless you live

12:42:26  14 alone, whenever you get home tonight, wherever that is,

12:42:29  15 whoever is there when you get home, I guarantee the first

12:42:34  16 thing you're going to hear from them is, tell me what

12:42:37  17 happened in federal court in Marshall today.

12:42:39  18      Don't even try to answer that question, because if

12:42:42  19 you do, no matter how you try to answer it, you're going to

12:42:45  20 violate the instruction that I've given you.

12:42:48  21      So when that happens, and I promise you it will,

12:42:51  22 unless you live alone, just look at whoever it is and say,

12:42:58  23 that very stern Federal Judge told me not to talk about

12:43:01  24 this case with anyone, and that's what I'm going to do.  He

12:43:04  25 also told me that when this trial is over and when I was no

12:43:07   1   longer a juror in the case, I'd be free to talk about it

12:43:07   2   with anybody that I chose to talk about it with.

12:43:10   3        But don't even try to answer that question when

12:43:13   4   you get home tonight, because I promise you, unless you

12:43:16   5   live alone, somebody's going to ask you that question.  And

12:43:18   6   if you try to answer it, you'll violate that first

12:43:21   7   instruction that I've given you.

12:43:22   8        All right.  Ladies and gentlemen, it's roughly 15

12:43:27   9   minutes until 1:00.  Your lunches are in the courtroom --

12:43:31  10   excuse me, in the jury room, as I said.  I'm going to do

12:43:37  11   our best to start back at 1:30.  And please follow all the

12:43:40  12   instructions I've given you.

12:43:41  13        Also, while you're on lunch break, if you'll open

12:43:44  14   those plastic face shields.  One thing I need to remind you

12:43:48  15   of, there's a plastic film that protects the face shield on

12:43:52  16   the front and the back.  Please be sure you peel off that

12:43:56  17   plastic film, or you'll do like I did the first time I put

12:44:01  18   one on, everything will look blurry and smeared.  So don't

12:44:06  19   put it on without removing the film that protects the

12:44:06  20   plastic shield.

12:44:08  21        And then, if you will, please wear that in place

12:44:09  22   of your mask when you come back in after lunch.

12:44:12  23        If anybody on the jury has a very strong personal

12:44:16  24   conviction that they should keep their mask on, I'm not

12:44:18  25   going to make you take it off.  But, again, it's very

12:44:21    1    difficult for the lawyers to try this case the way they

12:44:25    2    should unless they have the benefit of seeing each of you

12:44:28    3    and have the ability to judge whether what they're trying

12:44:31    4    to get across is -- is getting home and whether it's

12:44:34    5    getting across to you or not.  And a lot of that is them

12:44:36    6    reading you over the course of the trial.

12:44:38    7            So, if at all possible, please wear those face

12:44:42    8    shields instead of your mask when you come back in after

12:44:44    9    lunch.

12:44:44   10            All right.  With those instructions, ladies and

12:44:47   11    gentlemen, you are excused for lunch.

12:44:48   12            COURT SECURITY OFFICER:  All rise.

12:44:49   13            (Jury out.)

12:44:50   14            THE COURT:  Any questions from either Plaintiff or

12:45:24   15    Defendant before we recess for lunch?

12:45:26   16            MS. TRUELOVE:  Nothing from Plaintiff, Your Honor.

12:45:28   17            MR. DACUS:  No, Your Honor.

12:45:29   18            THE COURT:  Over the break, feel free to bring

12:45:32   19    your remaining trial teams up and get positioned.  And I'll

12:45:39   20    begin with my preliminary instructions to the jury at 1:30.

12:45:44   21            The Court stands in recess.

           22            (Recess.)

           23

           24

           25

1                      <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8   <u>/S/ Shelly Holmes</u>                    <u>10/1/2020</u>
    SHELLY HOLMES, CSR, TCRR                Date
9   OFFICIAL REPORTER
    State of Texas No.: 7804
10  Expiration Date: 12/31/2020

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25