1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE EASTERN DISTRICT OF TEXAS

3                            MARSHALL DIVISION

4    VOCALIFE LLC,                    )(

5          PLAINTIFF,                 )(      CIVIL ACTION NO.

6                                     )(      2:19-CV-123-JRG

7    VS.                              )(      MARSHALL, TEXAS

8                                     )(

9    AMAZON.COM, INC. and             )(

10   AMAZON.COM LLC,                   )(      OCTOBER 2, 2020

11        DEFENDANTS.                 )(      8:25 A.M.

12                      TRANSCRIPT OF JURY TRIAL

13                         MORNING SESSION

14          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15            UNITED STATES CHIEF DISTRICT JUDGE

16

17   FOR THE PLAINTIFF:

18   MR. ALFRED R. FABRICANT
     MR. PETER LAMBRIANAKOS
19   MR. VINCENT J. RUBINO, III
     MS. AMY PARK
20   MR. ENRIQUE ITURRALDE
     FABRICANT LLP
21   230 Park Avenue, 3rd Floor W.
     New York, NY 10169
22
     MR. SAMUEL F. BAXTER
23   MS. JENNIFER L. TRUELOVE
     MCKOOL SMITH, P.C.
24   104 East Houston Street, Suite 300
     Marshall, TX 75670
25

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:     Shelly Holmes, CSR, TCRR
                         Official Reporter
20                       United States District Court
                         Eastern District of Texas
21                       Marshall Division
                         100 E. Houston Street
22                       Marshall, Texas  75670
                         (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 08:25:23 | 1  | P R O C E E D I N G S                                  |
| 08:25:23 | 2  | (Jury out.)                                            |
| 08:25:23 | 3  | COURT SECURITY OFFICER:  All rise.                     |
| 08:25:26 | 4  | THE COURT:  Be seated, please.                         |
| 08:25:33 | 5  | Are the parties prepared to read into the record       |
| 08:25:41 | 6  | those items from the list of pre-admitted exhibits used |
| 08:25:45 | 7  | during yesterday's portion of the trial?               |
| 08:25:49 | 8  | MR. LAMBRIANAKOS:  Yes, Your Honor.                    |
| 08:25:49 | 9  | THE COURT:  All right.  Please proceed to do so.       |
| 08:25:52 | 10 | MR. LAMBRIANAKOS:  Good morning, Your Honor.           |
| 08:25:59 | 11 | Peter Lambrianakos for Vocalife.                       |
| 08:26:01 | 12 | THE COURT:  Good morning.  Please proceed.             |
| 08:26:03 | 13 | MR. LAMBRIANAKOS:  Thank you.                          |
| 08:26:03 | 14 | The following exhibits were used yesterday and are     |
| 08:26:07 | 15 | being moved.  Plaintiff's:  PTX-644, 564, 205, 1, 273, 50, |
| 08:26:19 | 16 | 8, 2, 101, 46, 258, 36, 40, 144, 274, 1449, 276, 45, 44, |
| 08:26:43 | 17 | 131, and 1468.                                         |
| 08:26:45 | 18 | THE COURT:  These are all Plaintiff's exhibits?        |
| 08:26:50 | 19 | MR. LAMBRIANAKOS:  Yes, Your Honor.                    |
| 08:26:50 | 20 | THE COURT:  Does Defendant have any objection to       |
| 08:26:52 | 21 | that rendition?                                        |
| 08:26:53 | 22 | MR. AKIN:  Kyle Akin on behalf of Amazon.             |
| 08:26:57 | 23 | We have no objection.                                  |
| 08:26:58 | 24 | THE COURT:  Does Defendant have a similar              |
| 08:27:00 | 25 | rendition from the list of pre-admitted exhibits to offer |

08:27:03  1   into the record?

08:27:05  2           MR. AKIN:  Yes, Your Honor.

08:27:06  3           The exhibits that Amazon moves into evidence from

08:27:09  4   yesterday are DTX-49, DTX-51, DTX-71P, DTX-954, DTX-955,

08:27:28  5   DTX-956, DTX-957, and DTX-959.

08:27:36  6           THE COURT:  All right.  Does the Plaintiff have

08:27:41  7   any objection to that rendition from the Defendant?

08:27:44  8           MR. LAMBRIANAKOS:  No, Your Honor.

08:27:45  9           THE COURT:  All right.  Thank you, counsel.

08:27:48  10          Mr. Johnston, will you confirm that we have all

08:27:52  11  eight jurors assembled and ready, please?

08:28:14  12          I'm told we have one juror who hasn't arrived yet.

08:28:17  13  In the meantime -- hopefully, they'll be here any moment.

08:28:21  14          In the meantime, Dr. Li, if you'd like to return

08:28:24  15  to the witness stand.  Come around and have a seat on the

08:28:37  16  witness stand, sir.  And I remind you, you remain under

08:28:41  17  oath.

08:28:42  18          And, Mr. Re, if you'd like to go to the podium and

08:28:46  19  prepare to continue your cross-examination.

08:28:48  20          MR. RE:  Thank you, Your Honor.

08:28:51  21          THE COURT:  Have a seat.

08:28:52  22          (Pause in proceedings.)

08:28:52  23          THE COURT:  All right.  The jury is present and

08:31:16  24  ready to go.

08:31:17  25          Mr. Johnston, would you bring in the jury, please?

08:31:21   1            COURT SECURITY OFFICER:  All rise.

08:31:22   2            (Jury in.)

08:31:25   3            THE COURT:  Welcome back, ladies and gentlemen of

08:31:44   4    the jury.  Please have a seat.

08:31:46   5            We will continue this morning with the Defendants'

08:31:53   6    cross-examination of Dr. Peter Li.

08:31:57   7            Mr. Re, you may proceed.

08:32:04   8            MR. RE:  Thank you, Your Honor.

08:32:04   9       QI "PETER" LI, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

08:32:04  10                 CROSS-EXAMINATION CONTINUED

08:32:05  11    BY MR. RE:

08:32:05  12    Q.  Good morning, Dr. Li.  How are you?

08:32:09  13    A.  Good morning.

08:32:10  14            MR. RE:  I'd like to call up Defendants' Exhibit

08:32:14  15    955.

08:32:14  16    Q.  (By Mr. Re)  Yesterday, we were discussing this

08:32:16  17    publication from 2006.  Do you recall?

08:32:19  18    A.  Yes.

08:32:20  19    Q.  And in this application, you tried to patent adaptive

08:32:26  20    beamforming, correct?

08:32:26  21    A.  No.

08:32:33  22            MR. RE:  Let's take a look at Paragraph 11 of this

08:32:36  23    application.

08:32:37  24    Q.  (By Mr. Re)  And it states -- I'm going to read into

08:32:42  25    the record -- by using adaptive beamforming techniques,

| | | |
|---|---|---|
| 08:32:46 | 1 | once the beam focuses on a speaker, the acoustic beam can |
| 08:32:51 | 2 | further track a free-moving speakers. |
| 08:32:55 | 3 | Did I read that correctly? |
| 08:32:56 | 4 | A.  Yes. |
| 08:33:00 | 5 | MR. RE:  And if we can go to Paragraph 29. |
| 08:33:03 | 6 | Q.  (By Mr. Re)  This application describes that the |
| 08:33:06 | 7 | acoustic beams, and I quote, can be computed in real-time |
| 08:33:10 | 8 | to follow the speakers, as shown in Figure C.  Correct? |
| 08:33:15 | 9 | A.  Yeah. |
| 08:33:22 | 10 | MR. RE:  And -- and let's take a look at Figure C. |
| 08:33:25 | 11 | Q.  (By Mr. Re)  And -- and the real-time adaptive |
| 08:33:28 | 12 | beamformer is shown in Figure 6C, correct? |
| 08:33:33 | 13 | A.  Yes. |
| 08:33:39 | 14 | Q.  And you understand that this patent application was |
| 08:33:43 | 15 | rejected twice by the Patent Office because the prior art |
| 08:33:47 | 16 | already disclosed adaptive beamformers, correct? |
| 08:33:56 | 17 | A.  I don't have the document in front of me.  If you say |
| 08:34:00 | 18 | that, yes. |
| 08:34:00 | 19 | Q.  Okay.  And you -- and you abandoned this application, |
| 08:34:05 | 20 | correct? |
| 08:34:05 | 21 | A.  Yes. |
| 08:34:10 | 22 | Q.  I'd now like to move on to your article. |
| 08:34:13 | 23 | Isn't it true that in 2008, you were -- no, you |
| 08:34:18 | 24 | were traveling the country demonstrating your VoiceFocus |
| 08:34:22 | 25 | phone and promoting it as including circular array adaptive |

| | | |
|---|---|---|
| 08:34:35 | 1 | beamforming, noise reduction, and echo cancellation.  Isn't |
| 08:34:41 | 2 | that right? |
| 08:34:41 | 3 | A.  Yes. |
| 08:34:41 | 4 | Q.  And in 2009 you presented a paper at the IEEE |
| 08:34:41 | 5 | International Conference on Acoustics, Speech, and Signal |
| 08:34:47 | 6 | Processing, correct? |
| 08:34:48 | 7 | A.  Yes. |
| 08:34:49 | 8 | Q.  And that paper was published, from that conference, in |
| 08:34:55 | 9 | 2009, correct? |
| 08:34:59 | 10 | A.  Yes. |
| 08:35:00 | 11 | MR. RE:  And I'd like to call up that article, |
| 08:35:03 | 12 | DTX-14. |
| 08:35:06 | 13 | Q.  (By Mr. Re)  That's a copy of your article, correct? |
| 08:35:10 | 14 | A.  Yes. |
| 08:35:12 | 15 | MR. RE:  And I'd like to go to Diagram 2. |
| 08:35:18 | 16 | Q.  (By Mr. Re)  And isn't it true that Diagram 2 is the |
| 08:35:20 | 17 | system that you described in the article? |
| 08:35:22 | 18 | A.  Yes. |
| 08:35:28 | 19 | MR. RE:  And if we could color in green. |
| 08:35:31 | 20 | Q.  (By Mr. Re)  The green describes the microphone arrays, |
| 08:35:34 | 21 | correct? |
| 08:35:34 | 22 | A.  Yes. |
| 08:35:37 | 23 | Q.  And the yellow shows the DSP, or digital signal |
| 08:35:41 | 24 | processor, correct? |
| 08:35:41 | 25 | A.  Yes. |

08:35:41  1   Q.  And the beamforming unit is in pink, correct?

08:35:46  2   A.  Says beamforming.

08:35:47  3   Q.  And the noise reduction unit is shown in blue, correct?

08:35:53  4   A.  That's right.

08:35:54  5   Q.  And in the article at the end, you list several

08:35:58  6   references; isn't that right?

08:36:03  7   A.  That's right.

08:36:03  8   Q.  And references are other articles or books on this

08:36:06  9   subject, correct?

08:36:07  10  A.  Yes.  I --

08:36:09  11  Q.  And one -- excuse me.

08:36:11  12  A.  But this -- if you go back.

08:36:18  13  Q.  Go back --

08:36:20  14        THE COURT:  Just a minute.  Just a minute.

08:36:22  15        Dr. Li, you've answered the question.  You've said

08:36:25  16  yes, and that's a complete answer to the question.

08:36:27  17        THE WITNESS:  Okay.

08:36:28  18        THE COURT:  Let's go on to the next question by

08:36:29  19  counsel.

08:36:30  20        THE WITNESS:  Thank you.

08:36:31  21        MR. RE:  Thank you.

08:36:33  22  Q.  (By Mr. Re)  In one of the references that you list in

08:36:36  23  Reference No. 4 is, in fact, the Brandstein book that I've

08:36:39  24  been holding up yesterday, correct?

08:36:40  25  A.  Yes.

08:36:41  1    Q.  So you were aware of the Brandstein book, obviously,

08:36:45  2    before you published this article in April of 2009, right?

08:36:49  3    A.  Yes.

08:36:54  4    Q.  I now would like to move on to one of your data sheets.

08:36:57  5    I'd like to show you Plaintiff's Exhibit 258, which I

08:37:02  6    believe you discussed yesterday.

08:37:07  7          Do you recall Exhibit 258, your discussions with

08:37:10  8    Mr. Fabricant yesterday?

08:37:11  9    A.  Yes.

08:37:12  10   Q.  And this was revised -- if I see the date correctly on

08:37:17  11   this document, it was revised on or around August 11th,

08:37:20  12   2011, correct?

08:37:21  13   A.  Yes.

08:37:23  14   Q.  And so if we look at the bottom portion of this page,

08:37:27  15   we can see that in August 2011, before your meeting with

08:37:34  16   Amazon, you publicly described, one, circular microphone

08:37:41  17   array; two, sound source localization; three, adaptive

08:37:49  18   beamforming; four, noise reduction; five, echo

08:37:55  19   cancellation; and, six, a DSP chip.  Is that correct?

08:37:59  20   A.  Yes, just the titles.

08:38:02  21   Q.  Yes.  And so you were publicizing this information

08:38:05  22   before -- before you ever met with Amazon in August of

08:38:14  23   2011, correct?

08:38:14  24   A.  We had that document available.  I don't understand the

08:38:20  25   meaning of published.

| | | |
|---|---|---|
| 08:38:23 | 1 | Q.  But they were available.  Is that what you're saying? |
| 08:38:25 | 2 | A.  We had created that document at that time. |
| 08:38:27 | 3 | Q.  And were these downloadable from your website? |
| 08:38:30 | 4 | A.  I don't remember exactly if downloadable, but on our |
| 08:38:35 | 5 | website people can download data sheet.  Data sheet can be |
| 08:38:39 | 6 | updated. |
| 08:38:39 | 7 | Q.  Right.  And this is one of those data sheets, right? |
| 08:38:42 | 8 | A.  If you look today, it's not there.  But, at that time, |
| 08:38:47 | 9 | I could not remember. |
| 08:38:49 | 10 | Q.  Okay.  But the date looks right to you, August 2011, |
| 08:38:55 | 11 | right? |
| 08:38:55 | 12 | A.  Yes. |
| 08:38:56 | 13 | Q.  Okay.  We can move on. |
| 08:38:57 | 14 | Yesterday, you testified about an NDA between you |
| 08:39:00 | 15 | and Amazon.  Do you remember? |
| 08:39:01 | 16 | A.  Yes. |
| 08:39:03 | 17 | Q.  And NDA means nondisclosure agreement, right? |
| 08:39:07 | 18 | A.  Yes. |
| 08:39:07 | 19 | Q.  And you understand that an NDA only protects |
| 08:39:12 | 20 | information that is not publicly known, correct? |
| 08:39:21 | 21 | A.  Correct. |
| 08:39:21 | 22 | Q.  So if the information was publicly known, it would not |
| 08:39:26 | 23 | be protected by an NDA, right? |
| 08:39:29 | 24 | A.  I disagree since that's different.  The data sheet is |
| 08:39:31 | 25 | just the titles.  What I presented to Amazon also included |

| | | |
|---|---|---|
| 08:39:35 | 1 | all technical details. |
| 08:39:36 | 2 | Q.  Okay.  Let's take a look at the agreement itself. |
| 08:39:40 | 3 | MR. RE:  If we could call up Paragraph 1, the |
| 08:39:43 | 4 | second sentence in particular. |
| 08:39:46 | 5 | Q.  (By Mr. Re)  You do understand that the agreement |
| 08:39:49 | 6 | specifically states:  As used in this agreement, |
| 08:39:53 | 7 | confidential information means all non-public information. |
| 08:39:57 | 8 | Right? |
| 08:39:58 | 9 | A.  Right. |
| 08:40:00 | 10 | MR. RE:  And if we go to Paragraph 2 of the |
| 08:40:03 | 11 | agreement. |
| 08:40:03 | 12 | Q.  (By Mr. Re)  It specifically says -- and is this |
| 08:40:07 | 13 | correct -- that it says that not -- that confidential |
| 08:40:10 | 14 | information does not include any information that is |
| 08:40:13 | 15 | publicly available, right? |
| 08:40:14 | 16 | A.  Right. |
| 08:40:15 | 17 | Q.  And so that means, to you, and you understood it to |
| 08:40:21 | 18 | mean, that everything that was publicly known before the |
| 08:40:24 | 19 | meeting cannot be confidential information under this |
| 08:40:27 | 20 | agreement, right? |
| 08:40:28 | 21 | A.  From my understanding of the information, including all |
| 08:40:32 | 22 | the technical details.  Now, if just title -- publicly -- |
| 08:40:39 | 23 | just no title that I presented at Amazon that's included |
| 08:40:43 | 24 | all technical details from multiple hour meeting.  It's |
| 08:40:48 | 25 | much more information on the data sheet. |

| | | |
|---|---|---|
| 08:40:49 | 1 | Q.  And -- but we've established that these concepts on the |
| 08:40:54 | 2 | board that I wrote here that I will mark as Demonstrative |
| 08:41:00 | 3 | Exhibit 2A, that these concepts were publicly known and, |
| 08:41:06 | 4 | therefore, not confidential under the NDA, right? |
| 08:41:09 | 5 | A.  The concept -- the title, right. |
| 08:41:12 | 6 | Q.  And, in this case, you are not asserting in any way |
| 08:41:17 | 7 | that Amazon violated the NDA, right? |
| 08:41:19 | 8 | A.  That's not right.  Amazon violated our NDA because the |
| 08:41:27 | 9 | information -- on the NDA the information can only be used |
| 08:41:33 | 10 | for business relations.  But, actually, Amazon used our -- |
| 08:41:37 | 11 | the information which we present at the time in the meeting |
| 08:41:41 | 12 | to their product, and they sold the product. |
| 08:41:43 | 13 | Q.  But you understand that you're not asserting in this |
| 08:41:46 | 14 | case a claim for breach of contract under the NDA, right? |
| 08:41:51 | 15 | A.  Could you repeat your question? |
| 08:41:54 | 16 | Q.  You understand that in this trial, you are not |
| 08:41:59 | 17 | asserting any claim that Amazon violated the NDA, right? |
| 08:42:07 | 18 | A.  Amazon violated NDA.  I don't understand your question. |
| 08:42:13 | 19 | I -- as I said -- |
| 08:42:17 | 20 | Q.  Do you understand that the jury will not be deciding |
| 08:42:21 | 21 | any questions whatsoever concerning any possible breach of |
| 08:42:26 | 22 | any contract?  Do you understand that? |
| 08:42:29 | 23 | A.  Yeah, because what -- about the patent. |
| 08:42:33 | 24 | Q.  Right.  And so you understand that all the questions |
| 08:42:36 | 25 | the jury will be receiving in this case all pertain only to |

08:42:40  1  the '049 patent --

08:42:42  2  A.  Yes.

08:42:43  3  Q.  -- correct?  Okay.

08:42:47  4       And you understand that the '049 patent issued

08:42:53  5  seven years after this NDA was signed, right?

08:42:57  6  A.  You talk on issue -- right.

08:43:09  7  Q.  Right.  So the '049 patent that the jury is going to be

08:43:15  8  deciding about, that patent did not issue until September

08:43:20  9  18th, 2018, right?

08:43:23 10  A.  Right.  But we filed the provisional in 2010.

08:43:31 11  Q.  Right.  And you also understand that the provisional

08:43:34 12  gives you no patent rights until a patent issues, right?

08:43:39 13  A.  But -- right.  But I know since we filed the

08:43:43 14  provisional, our idea -- our patent -- our technology has

08:43:51 15  been covered -- protect by the patent law.

08:43:53 16  Q.  But the patent law, you understand, only gives you that

08:43:57 17  protection once the patent issues on September 18th, 2018?

08:44:04 18  A.  That's right.  So that's the reason we didn't sue you

08:44:08 19  until the patent was issued, right.

08:44:13 20  Q.  Yes.

08:44:15 21       Okay.  Let's now talk about how you were promoting

08:44:19 22  your technology.  And I want to ask you, do you recall

08:44:23 23  promoting your technology of your VoiceFocus to Cisco in

08:44:28 24  2010?

08:44:31 25  A.  To Wei Li.

08:44:33   1    Q.  Do you recall promoting your VoiceFocus to Cisco in

08:44:39   2    2010?

08:44:41   3    A.  I talked -- this information to Wei Li.  He was my

08:44:47   4    employee.  And at that time, he worked at Cisco.  I didn't

08:44:54   5    contact Cisco directly.

08:44:56   6    Q.  Oh, so Wei Li, he was your employee?

08:44:58   7    A.  He was my employee.

08:45:01   8    Q.  But he left your company in January 2008, correct?

08:45:07   9    A.  Based on our account information, he left on February

08:45:12  10    1st.

08:45:12  11    Q.  2008?

08:45:14  12    A.  2008.

08:45:15  13    Q.  And you're now contacting him because he works at Cisco

08:45:20  14    in 2010, right?

08:45:21  15    A.  Yes.

08:45:25  16    Q.  And you never entered into any business deal with

08:45:28  17    Cisco, right?

08:45:29  18    A.  Could you repeat your question?

08:45:31  19    Q.  You never entered in any business deal with your

08:45:35  20    VoiceFocus phone with Cisco, right?

08:45:37  21    A.  Right.

08:45:37  22    Q.  You also shopped your VoiceFocus phone to Apple,

08:45:45  23    correct?

08:45:45  24    A.  Actually, I don't remember if I brought the -- the

08:45:58  25    VoiceFocus -- the prototype to Apple.  But we did

| | | |
|--|--|--|
| 08:46:02 | 1 | demonstrate the circular microphone array technology to |
| 08:46:06 | 2 | Apple. |
| 08:46:06 | 3 | Q.  And you gave Apple essentially the same demonstration |
| 08:46:12 | 4 | that you later gave Amazon in 2011, right? |
| 08:46:15 | 5 | A.  That's different. |
| 08:46:17 | 6 | Q.  That's different?  But Apple wasn't interested in |
| 08:46:20 | 7 | licensing anything from you, right?  So no deal with Apple, |
| 08:46:24 | 8 | right? |
| 08:46:24 | 9 | A.  Apple was interested in our technology.  No deal of the |
| 08:46:30 | 10 | Apple not because of the technology.  That's because Apple, |
| 08:46:39 | 11 | they have some thinking about -- not on the technology |
| 08:46:46 | 12 | side, on the art side, on the enclosure side. |
| 08:46:50 | 13 | They were impressed with our microphone array |
| 08:46:53 | 14 | technology since we demoed it -- we compared some quality |
| 08:46:59 | 15 | with and without our microphone array. |
| 08:47:00 | 16 | And after that meeting, Apple -- Apple asked us to |
| 08:47:08 | 17 | send in the audio file to them because they want further |
| 08:47:12 | 18 | evaluation. |
| 08:47:13 | 19 | Later, they told me they were impressed on our |
| 08:47:16 | 20 | technology, but they cannot use that because at higher |
| 08:47:22 | 21 | level Apple, you know, is a company.  They really care |
| 08:47:28 | 22 | about the enclosure, the art part of -- of the work.  I'm |
| 08:47:32 | 23 | sorry, I cannot provide further information. |
| 08:47:36 | 24 | THE COURT:  Dr. Li, you need to limit your answers |
| 08:47:39 | 25 | to the questions that are asked.  As -- as I reminded you |

| 08:47:43 | 1 | yesterday, Mr. Fabricant is going to get a chance when |
| 08:47:47 | 2 | Mr. Re sits down to get back up and to ask you follow-up |
| 08:47:52 | 3 | questions. |
| 08:47:53 | 4 | So you should limit your answers to Mr. Re's |
| 08:47:55 | 5 | question to the question that's actually asked.  And if |
| 08:47:58 | 6 | there's more that needs to be brought out, Mr. Fabricant |
| 08:48:00 | 7 | will do that when he gets up again.  So, please, sir, if |
| 08:48:04 | 8 | you will limit your answers to the questions that have been |
| 08:48:07 | 9 | asked, all right? |
| 08:48:08 | 10 | THE WITNESS:  Thank you, Your Honor. |
| 08:48:09 | 11 | THE COURT:  That's fine. |
| 08:48:10 | 12 | Let's proceed, Mr. Re. |
| 08:48:12 | 13 | Q.  (By Mr. Re)  So my question was simply:  You never |
| 08:48:14 | 14 | entered into any deal with Apple concerning any of your |
| 08:48:18 | 15 | technology, right? |
| 08:48:18 | 16 | A.  Right. |
| 08:48:19 | 17 | Q.  You also shopped your technology to Volkswagen, right? |
| 08:48:21 | 18 | A.  Yes. |
| 08:48:25 | 19 | Q.  And you never made a deal with Volkswagen either, |
| 08:48:29 | 20 | right? |
| 08:48:29 | 21 | A.  Yes. |
| 08:48:29 | 22 | Q.  And you shopped your beamforming ideas to many |
| 08:48:33 | 23 | companies; isn't that right? |
| 08:48:34 | 24 | A.  Right. |
| 08:48:34 | 25 | Q.  At least 20 companies, right? |

08:48:37   1   A.   Many.

08:48:37   2   Q.   And these companies included Moen, M-o-e-n, right?

08:48:44   3   A.   But, as I said, they -- this company does not want to

08:48:51   4   license.   They want to buy our product.

08:48:53   5   Q.   And -- and you ended up shopping it to Moen, and you

08:48:58   6   got no deal at Moen, right?

08:49:01   7   A.   We demoed the technology to Moen.

08:49:03   8   Q.   Right.   And you demoed it also -- tried to have a deal

08:49:05   9   with American Standard, right?

08:49:06   10  A.   Yes.

08:49:06   11  Q.   And Siemens, right?

08:49:10   12  A.   Yes.

08:49:10   13  Q.   And TiVo?

08:49:11   14  A.   Yes.

08:49:11   15  Q.   And Samsung?

08:49:12   16  A.   Yes.

08:49:13   17  Q.   And after all those promotions to at least 20-something

08:49:17   18  companies, not a single company licensed any of your

08:49:20   19  beamformer patents, right?

08:49:21   20  A.   Right.

08:49:25   21  Q.   Okay.   Let's go on to when you pitched Amazon.

08:49:29   22       You pitched Amazon your VoiceFocus conference

08:49:32   23  phone, right?

08:49:33   24  A.   Yes.

08:49:34   25       MR. RE:   And let's call up Plaintiff's Exhibit 45,

08:49:37    1  Slide 10.

08:49:41    2  Q.  (By Mr. Re)  And when you pitched this to Amazon, you

08:49:43    3  did not have a working VoiceFocus product, right?

08:49:48    4  A.  Right.

08:49:49    5  Q.  Because you never got it to work, right?

08:49:53    6  A.  Right.

08:49:53    7  Q.  And, in fact, you gave up on this phone two years

08:49:58    8  before you even met with Amazon, right?

08:50:01    9  A.  How you know that?

08:50:08   10         MR. RE:  Well, let's call up your transcript from

08:50:10   11  your deposition.

08:50:12   12         If we can call up specifically your first day

08:50:16   13  deposition, which was taken by Zoom.

08:50:21   14  Q.  (By Mr. Re)  Do you remember?

08:50:22   15  A.  Right.

08:50:23   16         MR. RE:  Page 322, Lines 13 through 18.

08:50:28   17  A.  Uh-huh.

08:50:29   18  Q.  (By Mr. Re)  And you were asked:  Internally, when did

08:50:33   19  Li Creative Technologies decide it was not going to be able

08:50:36   20  to make the VoiceFocus product work?

08:50:39   21         And you responded:  I think around a year 2009.

08:50:44   22  Probably end of 2009.

08:50:46   23         Were you asked that question, and did you give

08:50:50   24  that answer?

08:50:51   25  A.  Yeah, that's my answer.

300

08:50:55  1   Q.  Okay.  Yesterday, you also mentioned that you told

08:50:59  2   Amazon about an award, and you had two issued patents.  Do

08:51:03  3   you remember that?

08:51:03  4   A.  Yes.

08:51:04  5   Q.  And the award you mentioned referred to a 2011 CES

08:51:10  6   award, right?

08:51:11  7   A.  Yes.

08:51:11  8   Q.  And isn't it true, sir, that that award that you

08:51:14  9   referred to was solely for the exterior design of the

08:51:19  10  product, right?

08:51:20  11  A.  If you read the -- the word, the language there, that's

08:51:36  12  Design and Engineering Award.

08:51:39  13  Q.  Correct.  And that award was for the exterior design of

08:51:44  14  your VoiceFocus conference phone, right -- the shell?

08:51:51  15  A.  Including the design.

08:51:52  16  Q.  All right.  The design is the way it looks, right?

08:51:55  17  A.  Right.

08:51:55  18  Q.  So the --

08:51:58  19  A.  When we submit our work, we submit information also

08:52:00  20  about the features.

08:52:02  21  Q.  Right.  But the award, though, did not refer to the

08:52:06  22  technical operation of the product, correct?

08:52:08  23  A.  I don't think so.

08:52:10  24  Q.  Let's take a look at your deposition.

08:52:13  25          MR. RE:  Let's go to the same Volume --

08:52:16  1    A.  Uh-huh.

08:52:18  2              MR. RE:  -- 1, Page 330, Lines 17 to 24.

08:52:22  3              MR. FABRICANT:  Objection, Your Honor.

08:52:23  4              THE COURT:  What's your objection, counsel?

08:52:25  5              MR. FABRICANT:  I don't think it's a proper

08:52:28  6    attempt to impeach the witness with his prior testimony in

08:52:33  7    light of the answer that Mr. -- Dr. Li just gave.

08:52:35  8              THE COURT:  This is not proper impeachment,

08:52:37  9    Mr. Re.  I'll sustain the objection.

08:52:39  10   Q.  (By Mr. Re)  So you agree that the award was for the

08:52:42  11   ornamental appearance, despite the fact that it has the

08:52:46  12   word "engineering" in the title?

08:52:48  13   A.  I agree with the title of the award.

08:52:51  14   Q.  But you agree that the award was not for the technical

08:52:54  15   operation of the product?

08:52:57  16   A.  When we submit our work, some of the -- the photo of

08:53:09  17   the enclosure and also the feature of the technique.

08:53:12  18   Q.  But the people who gave the award to you never saw the

08:53:17  19   VoiceFocus product actually work, correct?

08:53:19  20   A.  That's right.

08:53:27  21   Q.  Similarly, you referred to two patents you had by the

08:53:32  22   time you came to see Amazon in 2011.  Do you remember that?

08:53:33  23   A.  Yes.

08:53:33  24   Q.  But those two patents, sir -- isn't it correct that

08:53:37  25   those two patents were design patents only, right?

08:53:40  1    A.   Right.

08:53:40  2    Q.   And design patents only relate to how something looks,

08:53:44  3    not how it works, correct?

08:53:46  4    A.   Right.

08:53:46  5    Q.   And those two design patents have absolutely no

08:53:50  6    relationship whatsoever to the '049 patent in this case,

08:53:58  7    correct?

08:53:58  8    A.   Well, design patent is how it look, and other design

08:54:08  9    patent on the photo -- on the picture, the circular array

08:54:13  10   is on top of that.

08:54:14  11   Q.   But -- but the patents that you had by the time you met

08:54:17  12   with Amazon were only design patents, correct?

08:54:25  13   A.   Only the issued patents are design patent.  At the same

08:54:31  14   time, we have a patent application submitted.

08:54:35  15   Q.   So the -- the only issued patents you had were the two

08:54:39  16   design patents, correct?

08:54:41  17   A.   Yes.

08:54:42  18   Q.   You later shopped your ideas to Samsung, correct?

08:54:47  19   A.   Would you say again?

08:54:49  20   Q.   You -- excuse me.

08:54:50  21        You later shopped your ideas to Samsung, right?

08:54:53  22   A.   Yes, in the -- in the --

08:54:57  23   Q.   And Sam -- and Samsung never licensed or bought any of

08:55:01  24   your ideas, right?

08:55:03  25   A.   Right.

08:55:03  1   Q.  And by this time, it was 2017, right?

08:55:12  2   A.  The meeting was in 2011.

08:55:17  3   Q.  Do you recall meeting with Samsung, pitching Samsung in

08:55:22  4   2017?

08:55:26  5   A.  I -- I don't know what you mean by we attended Samsung.

08:55:45  6   Echo release was 2014.

08:55:48  7   Q.  So the Echo was released -- the Echo, my client's

08:55:54  8   product, was released in 2014, right?

08:55:56  9   A.  Right.

08:55:56  10  Q.  Do you recall meeting with Samsung about the Echo in

08:56:00  11  2017?

08:56:00  12  A.  We never had any meeting with Samsung about the Echo.

08:56:05  13  Q.  Okay.

08:56:06  14       MR. RE:  I'd like to call up Defendants'

08:56:09  15  Exhibit 689.

08:56:11  16  Q.  (By Mr. Re)  Do you recall this presentation or paper

08:56:14  17  dated October 17th, 2017?

08:56:17  18  A.  Right.

08:56:22  19  Q.  And do you recall that this was prepared for a demo and

08:56:25  20  presentation at Samsung headquarters on October 26th, 2017?

08:56:32  21  A.  2000 -- Samsung -- Echo -- yes.

08:56:39  22  Q.  And at this time, you believed that your technology was

08:56:43  23  better than the Echo, right?

08:56:46  24  A.  I'm still saying our technology is better than Echo.

08:56:50  25  Q.  You believe that still to this day, right?

08:56:52  1   A.  Yes.

08:56:52  2   Q.  Because the two technologies are different, right?

08:56:57  3   A.  No.  Same technology but with our implementation.

08:57:02  4   Q.  I didn't quite understand that.  If you could just

08:57:04  5   repeat that.

08:57:05  6   A.  Okay.  We believe Amazon Echo was built based on the

08:57:17  7   technology which we presented in -- filed in our patent.

08:57:22  8   Q.  And -- and -- but yours was still better, right?

08:57:28  9   A.  On the implementation.

08:57:31  10  Q.  Let's -- let's take a look to make sure we can see.

08:57:34  11        MR. RE:  Let's go to Page 6 of this demonstration

08:57:37  12  document of 2017.

08:57:39  13  Q.  (By Mr. Re)  Do you see in this presentation you had a

08:57:42  14  comparison with Echo side-by-side?  Do you see that on

08:57:47  15  Line 3?

08:57:48  16  A.  Yes.

08:57:48  17  Q.  And you noted in this presentation to Samsung that:

08:57:54  18  Most time, Echo cannot even wake up with TV background

08:57:58  19  noise.  Do you see that?

08:57:59  20  A.  I saw that.

08:58:00  21  Q.  And then two bullets down you say that your technology

08:58:04  22  is newer technology than Amazon Echo.  Do you see that?

08:58:09  23  A.  I saw that.

08:58:09  24  Q.  And you believe and still believe that your newer

08:58:12  25  technology is better than the Echo, right?

| | | |
|---|---|---|
| 08:58:17 | 1 | A.  The same technology with a newer implementation. |
| 08:58:24 | 2 | Q.  Okay. |
| 08:58:24 | 3 | A.  So we call this newer technology, including the theory |
| 08:58:30 | 4 | part and also including the implementation part. |
| 08:58:34 | 5 | Q.  Okay.  Let's move on. |
| 08:58:36 | 6 | Let's go back to that launch event that you |
| 08:58:39 | 7 | said -- 2014. |
| 08:58:40 | 8 | So you were aware that Echo and Alexa -- not just |
| 08:58:45 | 9 | Echo, but Echo and Alexa were introduced in that New York |
| 08:58:52 | 10 | City event in November of 2014, right? |
| 08:58:54 | 11 | A.  Yes. |
| 08:58:54 | 12 | Q.  And at that event you concluded that Echo was using the |
| 08:58:58 | 13 | real-time beamforming ideas that you discussed at the 2011 |
| 08:59:02 | 14 | meeting, right? |
| 08:59:03 | 15 | A.  Right. |
| 08:59:03 | 16 | Q.  And at that event, you determined that Echo was |
| 08:59:12 | 17 | infringing your now surrendered '756 patent, right? |
| 08:59:15 | 18 | A.  Right. |
| 08:59:15 | 19 | Q.  And -- and yesterday, you also discussed your |
| 08:59:21 | 20 | $700,000.00 offer to Google; do you recall that? |
| 08:59:27 | 21 | A.  Right. |
| 08:59:27 | 22 | Q.  And this was after you had determined that Amazon was |
| 08:59:31 | 23 | allegedly infringing your surrendered '756 patent, right? |
| 08:59:34 | 24 | A.  Right. |
| 08:59:34 | 25 | Q.  And you knew -- excuse me. |

306

| | | |
|---|---|---|
| 08:59:40 | 1 | And you knew, sir, at the time you made that |
| 08:59:42 | 2 | offer, that was an offer to sell your '756 patent, right? |
| 08:59:50 | 3 | A.  I understand at that time I still have the right to use |
| 08:59:53 | 4 | the patent to sue Amazon. |
| 08:59:56 | 5 | Q.  Right.  But -- |
| 08:59:57 | 6 | A.  Sorry -- yeah, to sue Amazon. |
| 09:00:00 | 7 | Q.  Yes.  But I -- but you would give title to the patent |
| 09:00:03 | 8 | to Google, right? |
| 09:00:05 | 9 | A.  From my understanding, we gave the right for Google to |
| 09:00:09 | 10 | use the patent. |
| 09:00:10 | 11 | Q.  But you were giving Google the ownership of the patent, |
| 09:00:14 | 12 | and you would receive what we call a grant-back license, |
| 09:00:19 | 13 | right? |
| 09:00:19 | 14 | A.  I don't remember that.  At that time, I didn't consult |
| 09:00:24 | 15 | with patent attorney. |
| 09:00:26 | 16 | Q.  But you knew at that time that you were going to allow |
| 09:00:32 | 17 | Google to purchase the patent, correct? |
| 09:00:36 | 18 | A.  Purchase is right, to use the patent. |
| 09:00:39 | 19 | Q.  Right.  But you knew it was not to merely give them a |
| 09:00:42 | 20 | license, right? |
| 09:00:49 | 21 | A.  Could you repeat your question? |
| 09:00:51 | 22 | Q.  You knew that your offer to sell Google was not merely |
| 09:00:56 | 23 | giving Google a license? |
| 09:01:02 | 24 | A.  I understand -- my understanding at that time is that |
| 09:01:07 | 25 | Google can -- can use the patent.  That's different than |

09:01:15  1   licensing -- from my understanding, licensing means they

09:01:19  2   can pay it back -- pay us every year when they use that.

09:01:25  3   Give them right means they pay us one time and then they

09:01:30  4   keep that.  So my understanding at that time, we gave them

09:01:33  5   right.

09:01:34  6   Q.  Let's go to your deposition.

09:01:37  7           MR. RE:  In particular, I'd like to go to Page 36

09:01:41  8   of the first volume of your deposition.  In particular,

09:01:46  9   Line --

09:01:47 10           MR. FABRICANT:  Objection, Your Honor.  I think

09:01:48 11   the --

09:01:49 12           THE COURT:  What's your objection?

09:01:50 13           MR. FABRICANT:  The witness should have been given

09:01:52 14   an opportunity to review his deposition and -- and before

09:01:55 15   there's an attempt to impeach him.

09:01:57 16           THE COURT:  That's the proper impeachment

09:02:00 17   procedure.

09:02:01 18           MR. RE:  Yes.  I assume the books have been given,

09:02:05 19   the deposition.  I'd like Mr. -- Dr. Li to have all of his

09:02:08 20   depositions.

09:02:10 21           THE COURT:  You should inquire of the witness

09:02:12 22   whether he gave those answers to those questions under oath

09:02:15 23   before you publish that section of the deposition to the

09:02:18 24   jury.

09:02:57 25           MR. RE:  May we approach the witness with the

09:02:59  1  binders?

09:02:59  2          THE COURT:  His prior deposition?

09:03:01  3          MR. RE:  Yes.

09:03:02  4          THE COURT:  Yes, you may approach.

09:03:23  5          For the record, Mr. Fabricant, your objection is

09:03:25  6  sustained.

09:03:26  7          MR. FABRICANT:  Thank you, Your Honor.

09:03:26  8          THE COURT:  Let's proceed, counsel.

09:03:29  9  Q.  (By Mr. Re)  Dr. Li?

09:03:30  10  A.  Yes.

09:03:30  11  Q.  Could you please go to Volume 1 of your deposition?

09:03:34  12  A.  Which page?

09:03:35  13  Q.  Page 96 --

09:03:38  14  A.  Line what --

09:03:39  15  Q.  -- of the transcript?

09:03:45  16  A.  Yes.

09:03:45  17  Q.  And I'd like you to look at Page 96, Lines 14 through

09:03:52  18  Page 97, Line 2.

09:03:54  19  A.  Yes.

09:03:54  20  Q.  Please read that to yourself.

09:04:23  21  A.  Yes.

09:04:24  22  Q.  And were you asked those questions, and did you give

09:04:26  23  those answers as shown on those pages?

09:04:30  24  A.  Yes.

09:04:30  25  Q.  Okay.

09:04:33   1          MR. RE:  Now, can we please --

09:04:35   2   Q.  (By Mr. Re)  Let me -- let me read to you the part in

09:04:38   3   particular.

09:04:38   4          Were you asked -- and go to Line 20, in

09:04:42   5   particular -- I mean, Line 14.

09:04:44   6          Did Li --

09:04:47   7   A.  Which page?

09:04:48   8          MR. FABRICANT:  Objection, Your Honor.

09:04:49   9          THE COURT:  What's your objection, counsel?

09:04:51   10          MR. FABRICANT:  Based on my reading of what he

09:04:53   11   just asked the witness to review, there's nothing

09:04:58   12   inconsistent about his testimony in this courtroom today.

09:05:02   13          THE COURT:  Well, whether the impeachment is

09:05:06   14   effective or not, will be a matter for the jury to

09:05:08   15   determine.  The form of the presentation is not

09:05:11   16   objectionable at this point.

09:05:13   17          MR. FABRICANT:  Thank you, Your Honor.

09:05:13   18          THE COURT:  Overruled.

09:05:14   19          Let's proceed.

09:05:15   20   Q.  (By Mr. Re)  I want to read into the record:  Did Li

09:05:23   21   Creative Technologies ever offer anyone a license under the

09:05:28   22   '756 or '949 patent?

09:05:31   23          Answer:  We offered, yes, we did.

09:05:33   24          Question:  To whom?

09:05:36   25          Answer:  Google.

09:05:39  1          When was that?

09:05:41  2          So Google decided not to license -- not to

09:05:48  3  purchase it.

09:05:51  4          Question:  Google decided not to purchase your

09:05:54  5  patents?

09:05:55  6          Right.

09:05:56  7          And what amount did you offer the patents to

09:06:00  8  Google for?

09:06:01  9          I don't remember.

09:06:05  10  A.  At that time --

09:06:06  11  Q.  Did I read it correctly?

09:06:08  12  A.  At that -- right.

09:06:10  13  Q.  And isn't it true, based on what I just read, you even

09:06:15  14  corrected yourself when you said the word "license" and you

09:06:19  15  changed it in your own answer voluntarily to the word

09:06:25  16  "purchase"; isn't that correct?

09:06:29  17  A.  That's right.

09:06:29  18  Q.  And so you knew, at least at the time of this

09:06:32  19  deposition, and at the time that you made the offer, that

09:06:34  20  it was a sale of your patent, not merely a license to

09:06:41  21  Google, correct?

09:06:41  22  A.  Mr. Re, I'm not an attorney.  At that time, from my

09:06:47  23  understanding of the language, I think that Google want to

09:06:56  24  use our multi -- okay.  Google pass the information.  We

09:07:02  25  submit a proposal to Google.  So Google can use our patent.

| | | |
|---|---|---|
| 09:07:08 | 1 | That's my understanding. |
| 09:07:09 | 2 | Q.  But when you were deposed, it was clear you knew this |
| 09:07:16 | 3 | was a sale of the patent, right? |
| 09:07:21 | 4 | A.  Again, English is not my first language.  And, here, |
| 09:07:27 | 5 | you say the -- the purchase of licensing is different |
| 09:07:36 | 6 | words.  When I answer your question in the deposition, I -- |
| 09:07:40 | 7 | the truth behind my mind at that time was that Google want |
| 09:07:45 | 8 | to -- we propose to let Google to use our patent. |
| 09:07:49 | 9 | Q.  But you knew at the time of your deposition, in |
| 09:07:53 | 10 | addition to letting Google use it, that you were going to |
| 09:07:56 | 11 | sell -- sell the '756 patent? |
| 09:08:00 | 12 | A.  Sell the right, and we still can use that. |
| 09:08:04 | 13 | Q.  Oh -- let's -- take a look at your deposition, |
| 09:08:09 | 14 | Volume 2, Page 533, Lines 15 to 18.  And read that to |
| 09:08:16 | 15 | yourself. |
| 09:08:23 | 16 | A.  You say 533? |
| 09:08:24 | 17 | Q.  Yes, of Volume 2 of the Zoom deposition.  Did you find |
| 09:08:44 | 18 | it? |
| 09:08:53 | 19 | A.  I'm on Page 533. |
| 09:08:56 | 20 | Q.  Do you see Lines 15 to 18? |
| 09:09:00 | 21 | A.  Yes. |
| 09:09:01 | 22 | Q.  Could you read to the ladies and gentlemen of the jury |
| 09:09:04 | 23 | what the question was and what the answer that you gave? |
| 09:09:08 | 24 | A.  Prior to this email -- the question:  Prior to this |
| 09:09:21 | 25 | email, you had made an offer to Google to sell '756 patent; |

09:09:31   1   is that right?

09:09:31   2         And the answer:  That's right.

09:09:35   3   Q.  So was this an accurate transcription of the exchange

09:09:39   4   you had at your deposition on that date?

09:09:41   5   A.  Right.

09:09:42   6   Q.  Okay.

09:09:42   7         MR. RE:  Let's go to Defendants' Exhibit No. 1.

09:09:52   8   Q.  (By Mr. Re)  This is the email that you received from

09:10:00   9   Google confirming that it has received your offer to sell

09:10:04   10   the now surrendered '756 patent for $700,000.00, correct?

09:10:15   11   A.  That's right.  That email, yeah, Google told us they

09:10:20   12   reject our offer.

09:10:21   13   Q.  Yes.  And you knew, based on the subject line of the

09:10:26   14   email, that this was part of Google's patent purchase

09:10:31   15   promotion program, correct?

09:10:33   16   A.  That's the title.

09:10:36   17   Q.  And this is an offer that you made yourself online,

09:10:41   18   right?

09:10:41   19   A.  We submitted the proposal online.

09:10:46   20   Q.  And you -- you -- you were the person who determined

09:10:49   21   how much to sell the patent for, right?

09:10:52   22   A.  Right.  We did not contact a patent attorney and expert

09:10:59   23   on the matter.

09:11:00   24   Q.  But you were the one authorized in charge of your

09:11:03   25   company who decided on the correct amount that you would

| | | |
|---|---|---|
| 09:11:06 | 1 | offer to sell the now surrendered '756, right? |
| 09:11:13 | 2 | A.  Says the proposal. |
| 09:11:14 | 3 | Q.  Yes. |
| 09:11:14 | 4 | A.  And when we submit the proposal, I thought that we |
| 09:11:17 | 5 | still have the right to negotiate a price later with Google |
| 09:11:23 | 6 | if they accept this proposal. |
| 09:11:26 | 7 | Q.  And this was clear to you from this that you were |
| 09:11:30 | 8 | accepting the terms for offering to sell the '756 to Google |
| 09:11:39 | 9 | for $700,000.00, right? |
| 09:11:45 | 10 | A.  It just accept -- I don't know what meaning. |
| 09:11:52 | 11 | Q.  Okay. |
| 09:11:52 | 12 | A.  There's no language around accept. |
| 09:11:56 | 13 | Q.  And you knew -- |
| 09:11:57 | 14 | A.  That could be Google received it -- our offer, our |
| 09:12:04 | 15 | proposal. |
| 09:12:05 | 16 | Q.  And you knew this was the sale of your most important |
| 09:12:10 | 17 | patent, right? |
| 09:12:13 | 18 | A.  We have many patents.  I don't think that at that time |
| 09:12:21 | 19 | I thought that most important because at that time, Google |
| 09:12:26 | 20 | don't have the far-field application.  There was no Google |
| 09:12:30 | 21 | Home. |
| 09:12:30 | 22 | Q.  No, I'm referring to all the intellectual property that |
| 09:12:32 | 23 | you held, you considered the now surrendered '756 at the |
| 09:12:38 | 24 | time of this offer your most important patent, right? |
| 09:12:50 | 25 | A.  At that time, I don't know which one is more important. |

09:12:55   1   We have many patents.

09:12:56   2   Q.  I'd like you to go to your deposition, Volume 2,

09:13:02   3   Page 542, Lines 6 through 16.  And if you could just read

09:13:08   4   to yourself those Lines 6 through 16.

09:13:21   5   A.  You said Line 6 --

09:13:23   6   Q.  Through 16?

09:13:24   7   A.  -- through 16?  Do you want I read, or do you want --

09:13:30   8   Q.  No, just read it to yourself.

09:13:35   9   A.  Read it to myself.

09:13:37   10          Yes.

09:14:08   11   Q.  And were you asked those questions, and did you give

09:14:11   12   that answer?

09:14:12   13   A.  Can you repeat?

09:14:18   14   Q.  Is the deposition that you just read, is that an

09:14:21   15   accurate transcription of the question and the answer that

09:14:25   16   you gave?

09:14:26   17   A.  Right.

09:14:27   18          MR. RE:  Mr. Berk, can we call up that page,

09:14:31   19   Page 542, Lines 6 through 16?  And I'll read it into the

09:14:38   20   record.

09:14:39   21   Q.  (By Mr. Re)  Question:  And in the exhibit that we are

09:14:41   22   looking at here at 1014 [sic], whatever number that you put

09:14:46   23   in the online form to sell your patent to Google, they

09:14:51   24   rejected it, correct?

09:14:55   25   A.  Right.

| | | |
|---|---|---|
| 09:14:57 | 1 | Q.  Answer -- answer:  We -- I remember -- that's -- that's |
| 09:15:06 | 2 | the -- the patent which we submit, that's the most |
| 09:15:11 | 3 | important patent, I remember.  That's -- we submit to |
| 09:15:14 | 4 | Google.  We have other patents.  I remember we submit this |
| 09:15:17 | 5 | one since we believe that's an important one. |
| 09:15:20 | 6 | Did I read it correctly? |
| 09:15:22 | 7 | A.  That's an important one. |
| 09:15:28 | 8 | Q.  Did I read it correctly? |
| 09:15:30 | 9 | A.  Last sentence says:  An important one. |
| 09:15:36 | 10 | Q.  Yes. |
| 09:15:36 | 11 | A.  And, also, as I said, at that time now the deposition |
| 09:15:44 | 12 | is now at that time, right?  Deposition was this year. |
| 09:15:47 | 13 | THE COURT:  Just -- just a minute, Dr. Li.  You |
| 09:15:52 | 14 | need to answer the question, did he read this correctly or |
| 09:15:55 | 15 | did he not read it correctly, and that should be the |
| 09:15:59 | 16 | totality of your answer. |
| 09:15:59 | 17 | So did he read it correctly, or did he not? |
| 09:16:03 | 18 | THE WITNESS:  Yes. |
| 09:16:03 | 19 | THE COURT:  Okay.  Next question, please. |
| 09:16:05 | 20 | Q.  (By Mr. Re)  And because you believed it was your most |
| 09:16:08 | 21 | important patent, you asked for a lot of money from Google, |
| 09:16:12 | 22 | right? |
| 09:16:12 | 23 | A.  At the deposition time. |
| 09:16:17 | 24 | Q.  So because -- I'm talking when you made the offer to |
| 09:16:22 | 25 | Google, you selected a number that you believed was a lot |

| | | |
|---|---|---|
| 09:16:26 | 1 | of money because this was your most important patent, |
| 09:16:32 | 2 | right? |
| 09:16:32 | 3 | A.  That's what I told you at the deposition time. |
| 09:16:35 | 4 | Q.  And that's still true today, right? |
| 09:16:38 | 5 | A.  What? |
| 09:16:39 | 6 | Q.  The truth didn't change from the time of your |
| 09:16:42 | 7 | deposition and this trial, right? |
| 09:16:47 | 8 | A.  It's different.  Because at the deposition time, we |
| 09:16:52 | 9 | already saw the products on the market.  At the time we |
| 09:16:55 | 10 | submit the proposal, we have not saw product yet. |
| 09:17:04 | 11 | Q.  But at the time of the deposition, you explained that |
| 09:17:06 | 12 | the amount of money you asked for from Google was a lot of |
| 09:17:09 | 13 | money, right? |
| 09:17:09 | 14 | A.  Yes. |
| 09:17:10 | 15 | Q.  And the amount you asked for, that was a lot of money. |
| 09:17:14 | 16 | It was $700,000.00, right? |
| 09:17:17 | 17 | A.  Could you repeat your question? |
| 09:17:19 | 18 | Q.  And the amount of money that you thought was a lot of |
| 09:17:22 | 19 | money was $700,000.00, right? |
| 09:17:26 | 20 | A.  Yes. |
| 09:17:27 | 21 | Q.  And you understood that if you sell your patent to |
| 09:17:35 | 22 | someone, that sale would give the new owner the right to |
| 09:17:40 | 23 | get any possible reissue, right? |
| 09:17:46 | 24 | A.  For that case, we saw that we gave the patent the right |
| 09:17:53 | 25 | to Google, but then we still have the right to use the |

| | | |
|---|---|---|
| 09:17:56 | 1 | patent.  That was my understanding at that time. |
| 09:18:00 | 2 | Q.  But that wasn't my question. |
| 09:18:02 | 3 | My question was:  You understood, even though you |
| 09:18:04 | 4 | could still have the ability to practice the patent, the |
| 09:18:08 | 5 | sale of the patent would give Google the authority to |
| 09:18:13 | 6 | decide whether to file for any possible future reissue |
| 09:18:17 | 7 | patent, right? |
| 09:18:19 | 8 | A.  I never saw that.  I'm not an attorney. |
| 09:18:25 | 9 | Q.  So you don't know that when you sell a patent, the new |
| 09:18:27 | 10 | owner would step in the shoes of the seller of the patent? |
| 09:18:32 | 11 | A.  We sell the right for Google to use the patent for |
| 09:18:36 | 12 | their product maybe. |
| 09:18:37 | 13 | Q.  So you're still maintaining that you only thought you |
| 09:18:41 | 14 | were licensing and not selling the patent? |
| 09:18:44 | 15 | A.  I'm not selling the whole patent. |
| 09:18:50 | 16 | Q.  Could you repeat that?  I don't -- I don't understand |
| 09:18:58 | 17 | that. |
| 09:18:58 | 18 | A.  I -- I -- I proposed to sell the right for Google to |
| 09:19:07 | 19 | use the patent, and I -- from my understanding, we still |
| 09:19:18 | 20 | can use the patent. |
| 09:19:19 | 21 | Q.  Yeah, but I'm talking about title to the patent.  Do |
| 09:19:22 | 22 | you know the difference between having ownership of the |
| 09:19:25 | 23 | patent versus the right to practice the patent?  Do you |
| 09:19:28 | 24 | understand the difference? |
| 09:19:29 | 25 | A.  I'm not attorney.  At that time, I didn't see it that |

09:19:35   1   way.

09:19:35   2   Q.  And we agree that Google rejected your offer of

09:19:43   3   $700,000.00 for the patent, right?

09:19:46   4   A.  Yes.

09:19:46   5   Q.  Okay.  Now, the year after you made this Google offer,

09:19:56   6   you realized that your patent -- the '756 patent was

09:19:58   7   invalid, right?

09:19:59   8   A.  We have '756 patent at that time.

09:20:04   9   Q.  Yet later, in 2016, a year after the Google offer, you

09:20:15   10   realized that the patent was invalid, right?

09:20:16   11   A.  Yes.

09:20:16   12   Q.  And you realized that it had to be reissued because of

09:20:23   13   the defect of invalidity, right?

09:20:25   14   A.  Repeat your question, please.

09:20:27   15   Q.  You realized that because the patent -- the '756 was

09:20:32   16   invalid, right -- you realized that, right?

09:20:34   17   A.  At which time?  After 2017?

09:20:42   18   Q.  2016.  In 2016, you realized that the patent that you

09:20:49   19   had, the '756 patent, was invalid, right?

09:20:54   20   A.  That's because we file a reissue.

09:20:56   21   Q.  Right.  And when you file for the reissue, you know to

09:21:00   22   get the reissue, you must surrender the '756 patent, right?

09:21:06   23   A.  I'm not an attorney.  I don't know the result when we

09:21:11   24   submit the reissue.

09:21:12   25   Q.  Are you saying that you did not understand that you had

| | | |
|---|---|---|
| 09:21:17 | 1 | to surrender the '756 to get the '049? |
| 09:21:22 | 2 | A.  When we submitted the reissue, I don't know -- I did |
| 09:21:28 | 3 | not know either we can hold it or we have to surrender the |
| 09:21:37 | 4 | '756. |
| 09:21:37 | 5 | Q.  Let's look at Volume 3 of your deposition, Page 189, |
| 09:21:42 | 6 | Lines 3 to 13.  Do you -- |
| 09:21:56 | 7 | A.  You say Page 189? |
| 09:21:57 | 8 | Q.  Right.  Lines 3 -- |
| 09:21:59 | 9 | A.  Yeah. |
| 09:22:00 | 10 | Q.  -- to 13? |
| 09:22:02 | 11 | A.  Lines 3 through 13? |
| 09:22:03 | 12 | Q.  Yes. |
| 09:22:35 | 13 | Did I ask you those questions, and did you give |
| 09:22:38 | 14 | those answers? |
| 09:22:39 | 15 | A.  The question I read from here is, do you agree that you |
| 09:22:53 | 16 | -- that -- Li article.  Which article you refer to? |
| 09:22:55 | 17 | Q.  My question was:  Did I give you these questions, and |
| 09:22:59 | 18 | did you give those answers on Page 189, Lines 3 through 13? |
| 09:23:04 | 19 | A.  Yes. |
| 09:23:05 | 20 | Q.  Okay. |
| 09:23:09 | 21 | MR. RE:  Mr. Berk, we can publish those lines.  I |
| 09:23:12 | 22 | will read them into the record. |
| 09:23:14 | 23 | Q.  (By Mr. Re)  And I was reading -- do you remember I was |
| 09:23:18 | 24 | reading and I -- and I wrote -- and I said to you:  And I |
| 09:23:23 | 25 | quote (as read):  Dr. Li surrendered the '756 patent to the |

| | | |
|---|---|---|
| 09:23:29 | 1 | Patent Office because he believed it to be invalid or |
| 09:23:34 | 2 | inoperable due to an error in the claims. |
| 09:23:40 | 3 | Do you see that statement? |
| 09:23:41 | 4 | Answer:  I saw that. |
| 09:23:43 | 5 | Do you agree with that statement? |
| 09:23:46 | 6 | The Witness:  Yes. |
| 09:23:49 | 7 | You were the witness, right? |
| 09:24:03 | 8 | A.  Yes. |
| 09:24:04 | 9 | Q.  So you understand that the '756 patent, the original |
| 09:24:06 | 10 | patent from the '049, it no longer exists and is not being |
| 09:24:10 | 11 | asserted in this case, right? |
| 09:24:11 | 12 | A.  Yes. |
| 09:24:11 | 13 | Q.  And so you understand that the jury will have no |
| 09:24:15 | 14 | questions whatsoever pertaining to the '756 patent? |
| 09:24:33 | 15 | A.  Right. |
| 09:24:33 | 16 | Q.  Now, you surrendered the '756 patent in order to get |
| 09:24:35 | 17 | the '049 patent that is at issue in this case, right? |
| 09:24:38 | 18 | A.  Right. |
| 09:24:38 | 19 | Q.  But you also filed for a second reissue patent, |
| 09:24:43 | 20 | correct? |
| 09:24:43 | 21 | A.  Yes. |
| 09:24:44 | 22 | Q.  And in July, you filed a declaration with the Patent |
| 09:24:49 | 23 | Office in connection with that second reissue application, |
| 09:24:53 | 24 | right? |
| 09:24:53 | 25 | A.  Could you repeat your question? |

09:24:58   1   Q.  In July of this year, 2020, you filed a declaration

09:25:02   2   with the Patent Office as part of obtaining a second

09:25:10   3   reissue patent, right?

09:25:12   4   A.  Yes.

09:25:12   5   Q.  And you understand that the reissue process is to

09:25:17   6   correct errors in an earlier patent, right?

09:25:19   7   A.  From my understanding, what's wrong with all these

09:25:27   8   patents are reissues.

09:25:33   9   Q.  That's not what I --

09:25:35   10        THE COURT:  Counsel, if you believe the witness is

09:25:38   11   non-responsive, don't tell him that's not the question I

09:25:42   12   asked you.  You raise it with the Court, and the Court will

09:25:45   13   address it.

09:25:46   14        MR. RE:  Your Honor, I move to strike as

09:25:49   15   non-responsive.

09:25:49   16        THE WITNESS:  You want to repeat your question?

09:25:51   17        THE COURT:  Just a minute, Dr. Li.

09:26:01   18        I'll overrule the objection.  The answer is

09:26:04   19   responsive.

09:26:07   20   Q.  (By Mr. Re)  Dr. Li, you understand the purpose of the

09:26:11   21   reissue process is to correct an error in an earlier

09:26:16   22   patent, right?

09:26:18   23   A.  You want a yes or no answer?  Can I explain that?

09:26:31   24   Q.  I --

09:26:32   25   A.  We --

09:26:33  1          THE COURT:  Just a minute.  You need to answer the

09:26:35  2   question that's called for.  If it calls for a yes or no

09:26:39  3   answer, then give a yes or no answer.  If it calls for an

09:26:43  4   explanation, give an explanation.

09:26:44  5          Is that clear, Dr. Li?

09:26:47  6          THE WITNESS:  Yeah, but this question, is it a yes

09:26:50  7   or no answer or is it --

09:26:51  8          THE COURT:  The question will determine whether

09:26:52  9   the answer is yes or no, not the subject.  You may think

09:26:56  10  there's a greater explanation than the question calls for.

09:27:01  11         But, again, that's why Mr. Fabricant will get a

09:27:04  12  chance to ask for further explanation later if he believes

09:27:08  13  that's appropriate, and the question you're asked now is

09:27:12  14  limited to a yes or no.  So answer the question as it's

09:27:18  15  called for.

09:27:18  16         Restate the question, Mr. Re.

09:27:25  17  Q.  (By Mr. Re)  You understand that the basic purpose of

09:27:27  18  the reissue process is to correct errors in an earlier

09:27:30  19  patent, right?

09:27:31  20  A.  Yes.

09:27:33  21  Q.  And I want to show you --

09:27:36  22         MR. RE:  If I can show exhibits -- Exhibit 980 at

09:27:41  23  Page 124.

09:27:48  24  Q.  (By Mr. Re)  As part of the second reissue application,

09:27:51  25  is this the declaration that you signed along with your

| | | |
|---|---|---|
| 09:27:58 | 1 | co-inventor, Dr. Manli Zhu? |
| 09:28:00 | 2 | A.  Yes. |
| 09:28:02 | 3 | Q.  And your signatures are shown on Page 126 of this |
| 09:28:10 | 4 | exhibit, right? |
| 09:28:13 | 5 | A.  Yes. |
| 09:28:13 | 6 | Q.  And this is dated July 22nd, 2020, correct? |
| 09:28:16 | 7 | A.  Yes. |
| 09:28:16 | 8 | Q.  And the statements in this declaration are sworn to be |
| 09:28:20 | 9 | true under the penalty of perjury, and, therefore, you |
| 09:28:23 | 10 | believe them to be true and accurate, right? |
| 09:28:25 | 11 | A.  Yes. |
| 09:28:29 | 12 | THE COURT:  Slow down a little bit, Mr. Re, |
| 09:28:32 | 13 | please. |
| 09:28:32 | 14 | Let's continue. |
| 09:28:33 | 15 | MR. RE:  Thank you. |
| 09:28:34 | 16 | Q.  (By Mr. Re)  And in this declaration, you and Dr. Zhu |
| 09:28:38 | 17 | swore under oath that the claims of the original patent |
| 09:28:41 | 18 | were wholly or partly inoperative or invalid, right? |
| 09:28:47 | 19 | A.  That's the box -- we checked one box, and I -- |
| 09:28:54 | 20 | Q.  I -- |
| 09:28:55 | 21 | A.  This form was prepared by our attorney. |
| 09:28:58 | 22 | Q.  Yes.  And your attorney knew which box to check.  He |
| 09:29:04 | 23 | checked one box, right? |
| 09:29:06 | 24 | A.  He checked one box, but I don't understand why he |
| 09:29:09 | 25 | checked that box. |

09:29:10  1  Q.  And you, in fact, signed a declaration with that same

09:29:15  2  box checked five times through the course of this reissue,

09:29:20  3  correct?

09:29:20  4  A.  Could you repeat your question?

09:29:23  5  Q.  Do you remember that you filed a declaration with this

09:29:29  6  one box checked five times between 2018 and July 2020?

09:29:40  7  A.  Five box checked -- I don't have that five box in front

09:29:49  8  of me.  If you have that, you may be right.  But I don't

09:29:53  9  have chance to go back and count how many boxes I checked.

09:29:56  10  Q.  No, the box was always the same, but this was done five

09:30:00  11  times through the course of trying to obtain a second

09:30:03  12  reissue.  Isn't that right?

09:30:05  13  A.  I already answered your question.

09:30:07  14  Q.  Okay.  And if we could go to the explanation.  You have

09:30:18  15  an explanation of what the error is on this declaration,

09:30:23  16  correct.

09:30:23  17  A.  Right.

09:30:24  18  Q.  And you -- and you attached a sheet explaining what the

09:30:30  19  error was, correct?

09:30:31  20  A.  Yes.

09:30:31  21  Q.  And this explains that since the sound source

09:30:43  22  localization unit, said adaptive beamforming unit, and said

09:30:47  23  noise reduction unit are already integrated into the

09:30:52  24  digital signal processor, it is wrong -- it is wrong -- are

09:31:01  25  you following along?

09:31:02  1   A.  I'm following you.

09:31:05  2   Q.  Okay.  It continues:  It is wrong to recite that the

09:31:10  3   sound source localization unit, the adaptive beamforming

09:31:12  4   unit, and the noise reduction unit are in operative

09:31:16  5   communication with the array of sound sensors.

09:31:22  6         Did I read it correctly?

09:31:23  7   A.  You read the sentence, yes.

09:31:24  8   Q.  And the next sentence says:  Instead -- instead the

09:31:29  9   correct recitation is that the digital signal processor is

09:31:32  10  in operative communication with the array of sound sensors.

09:31:36  11        Do you see that?

09:31:37  12  A.  Yes.

09:31:38  13  Q.  So there was an error in the claims, right?

09:31:43  14  A.  Yes.

09:31:46  15  Q.  And those -- those claims were wrong and needed to be

09:31:50  16  corrected, right?

09:31:50  17  A.  Nothing wrong with the claim.  The wrong is that the

09:32:04  18  '756 claim was not broad enough.

09:32:05  19  Q.  Okay.  Let's go to the next sentence.  The next

09:32:08  20  sentence --

09:32:09  21        MR. RE:  If we can just highlight that alone.

09:32:13  22  Q.  (By Mr. Re)  It states:  This error --

09:32:15  23        MR. RE:  About Line 6 or so.  Do you see that?

09:32:19  24  Q.  (By Mr. Re)  This error was not corrected in the first

09:32:22  25  reissue patent.

09:32:22  1            Did I read that correctly.

09:32:24  2   A.  Could you repeat your question?

09:32:29  3   Q.  Did I read that highlighted sentence correctly?

09:32:31  4   A.  You read that sentence.

09:32:32  5   Q.  Right.  And the -- the first reissue patent is, in

09:32:38  6   fact, the '049 patent in this case, right?

09:32:40  7   A.  Could you repeat -- could you -- may I ask you to be

09:32:49  8   close to the microphone or turn the microphone to your

09:32:51  9   mouth, please?

09:32:52  10  Q.  Okay.  The -- the statement is, this error was not

09:32:54  11  corrected in the first reissue patent.  Do you see that?

09:32:58  12  A.  Yes.

09:32:58  13  Q.  And the first reissue patent is the '049 patent at

09:33:04  14  issue in this case, right?

09:33:05  15  A.  Right.

09:33:13  16  Q.  And we know that the explanation is referring to the

09:33:16  17  '049 patent because that is the only patent specifically

09:33:18  18  mentioning the DSP in the claim, right?

09:33:25  19  A.  Right.

09:33:32  20  Q.  Because the DSP is not mentioned in any claim of the

09:33:36  21  '756 patent, correct?

09:33:38  22  A.  I only remember that may not be in the first claim.

09:33:46  23  Q.  Do you believe that the digital signal processor is in

09:33:49  24  any claim of the '756 patent?

09:33:56  25  A.  I don't have -- I didn't read that now.  I think part

| | | |
|--|--|--|
| 09:34:06 | 1 | was included but not in Claim 1. |
| 09:34:08 | 2 | Q.  Okay.  Let's -- let's clarify that. |
| 09:34:10 | 3 | MR. RE:  If we can call up Plaintiff's Exhibit 1, |
| 09:34:14 | 4 | Claim 1, Mr. Berk.  If you could blow up the first part of |
| 09:34:23 | 5 | Claim 1. |
| 09:34:28 | 6 | A.  Is this -- is this the '756? |
| 09:34:32 | 7 | Q.  (By Mr. Re)  Can you tell which patent this claim comes |
| 09:34:36 | 8 | from? |
| 09:34:37 | 9 | A.  I don't see that this is the '576 [sic]. |
| 09:34:43 | 10 | Q.  It is not.  It's the reissue, the '049, right? |
| 09:34:46 | 11 | A.  Yes, but if -- |
| 09:34:48 | 12 | Q.  And do you notice that it's the '049 because it has |
| 09:34:51 | 13 | italicized language in it.  Do you see that? |
| 09:34:53 | 14 | A.  I can recognize this as the '049. |
| 09:34:57 | 15 | Q.  Right.  And the -- and you see the italics language is |
| 09:35:01 | 16 | the language that was added by way of reissue, correct? |
| 09:35:05 | 17 | A.  Right. |
| 09:35:05 | 18 | Q.  And the -- and the brackets -- see the "arbitrary" |
| 09:35:11 | 19 | word, the bracket is the removal of language, right? |
| 09:35:14 | 20 | A.  You are right. |
| 09:35:15 | 21 | Q.  And you see that the '049 added in Claim 1, the claim |
| 09:35:17 | 22 | at issue in this case, the digital signal processor |
| 09:35:22 | 23 | language, correct? |
| 09:35:23 | 24 | A.  Right. |
| 09:35:24 | 25 | Q.  And you understand that the only other claim asserted |

| | | |
|---|---|---|
| 09:35:29 | 1 | in this case is Claim 8, right? |
| 09:35:33 | 2 | A.  Could you repeat your question? |
| 09:35:35 | 3 | Q.  You understand that the only other claim asserted in |
| 09:35:38 | 4 | this case is Claim 8, right? |
| 09:35:40 | 5 | A.  I don't understand your question.  Why is Claim 8? |
| 09:35:46 | 6 | Q.  Do you know that your company is alleging that my |
| 09:35:51 | 7 | client infringes Claim 8 somehow? |
| 09:35:58 | 8 | A.  You infringed the whole patent. |
| 09:36:02 | 9 | Q.  Do you know what a dependent claim is? |
| 09:36:06 | 10 | A.  Yes. |
| 09:36:12 | 11 | Q.  Do you know that Claim 8 depends from Claim 1? |
| 09:36:19 | 12 | A.  Sir, I don't have the -- the claims -- the whole claim |
| 09:36:26 | 13 | in front of me. |
| 09:36:29 | 14 | Q.  So when you suggested that you merely wanted to broaden |
| 09:36:34 | 15 | the claims, it's actually a little more complicated than |
| 09:36:37 | 16 | that, correct? |
| 09:36:39 | 17 | A.  Yes. |
| 09:36:39 | 18 | Q.  So the error that you identified to the Patent Office |
| 09:36:45 | 19 | was not merely, I want to claim more subject matter, right? |
| 09:36:55 | 20 | A.  Could you repeat your question? |
| 09:36:57 | 21 | Q.  So you never told the Patent Office that the purpose of |
| 09:37:02 | 22 | your second reissue was merely to claim additional subject |
| 09:37:07 | 23 | matter? |
| 09:37:25 | 24 | A.  Difficult for me to understand the meaning of your |
| 09:37:31 | 25 | question. |

| | | |
|---|---|---|
| 09:37:31 | 1 | Q.  So you never checked the box in any declaration -- |
| 09:37:38 | 2 | checking the box telling the Patent Office that you merely |
| 09:37:42 | 3 | wanted to broaden the claims? |
| 09:37:44 | 4 | A.  We didn't check that box.  Our attorney did not check |
| 09:37:47 | 5 | that box. |
| 09:37:49 | 6 | Q.  So you just simply relied on your attorney for filling |
| 09:37:52 | 7 | out this paperwork; is that what you're saying? |
| 09:37:55 | 8 | A.  I'm not an attorney. |
| 09:38:02 | 9 | Q.  And so looking at the explanation that you gave, since |
| 09:38:06 | 10 | it's discussing the digital signal processor, your |
| 09:38:09 | 11 | statement that the patent is "inoperative" or "invalid" |
| 09:38:14 | 12 | could only apply to the '049 patent, correct? |
| 09:38:16 | 13 | A.  I think the second reissue is based on the '756. |
| 09:38:24 | 14 | Q.  But the '756 doesn't mention the digital signal |
| 09:38:29 | 15 | processor in Claim 1, as you're amending here, correct? |
| 09:38:32 | 16 | A.  It doesn't matter what you say.  The second reissue is |
| 09:38:38 | 17 | from '756. |
| 09:38:41 | 18 | Q.  That's what you told the Patent Office when you |
| 09:38:45 | 19 | applied.  But your explanation is referring to the first |
| 09:38:49 | 20 | reissue patent, correct? |
| 09:38:57 | 21 | A.  Could you point out where is the language? |
| 09:38:59 | 22 | Q.  This error was -- see where it begins "this error" -- |
| 09:39:07 | 23 | this error was not corrected -- |
| 09:39:08 | 24 | A.  Could you highlight so the jury could read that? |
| 09:39:12 | 25 | Q.  If we go below -- |

09:39:14   1          THE COURT:  Just a minute.

09:39:15   2          Dr. Li, you don't need to be concerned about

09:39:17   3   whether the jury can read it or not.  That's the lawyer's

09:39:20   4   job.

09:39:21   5          THE WITNESS:  Okay.

09:39:21   6          THE COURT:  Don't ask him to highlight things for

09:39:23   7   the jury, okay?

09:39:24   8          THE WITNESS:  Thank you.

09:39:25   9          THE COURT:  Let's proceed.

09:39:26  10   Q.  (By Mr. Re)  I have done as you requested, and the

09:39:31  11   language is:  This error was not corrected in the first

09:39:34  12   reissue patent.

09:39:35  13          Isn't that statement referring to the '049 and not

09:39:37  14   the '756?

09:39:37  15   A.  The sentence refer to the first reissue.  But the

09:39:47  16   second reissue is based on '756.

09:39:52  17   Q.  Okay.  Let's move on.

09:40:04  18          MR. RE:  Let's call up Plaintiff's Exhibit 8.

09:40:08  19   Q.  (By Mr. Re)  Dr. Li, you recognize this exhibit as your

09:40:14  20   provisional application filed September 24th, 2010, right?

09:40:19  21   A.  Yes.

09:40:21  22   Q.  And this ultimately led to the surrendered '756 patent,

09:40:25  23   right?

09:40:25  24   A.  Right.

09:40:27  25   Q.  And that led to the '049 at issue in this case, right?

| | | |
|---|---|---|
| 09:40:31 | 1 | A.  '049 is based on '756. |
| 09:40:40 | 2 | Q.  Right.  And you wrote this original provisional |
| 09:40:43 | 3 | application, right? |
| 09:40:45 | 4 | A.  Prepared by our attorney. |
| 09:40:47 | 5 | Q.  And you reviewed it though, right? |
| 09:40:49 | 6 | A.  Oh, yeah. |
| 09:40:50 | 7 | Q.  And you approved it and signed it, right? |
| 09:40:52 | 8 | A.  The provisional?  Yes. |
| 09:40:55 | 9 | Q.  And approved the filing of it, right? |
| 09:40:56 | 10 | A.  Yeah. |
| 09:40:57 | 11 | Q.  And at the end of this application for a patent on |
| 09:41:03 | 12 | Page 29, you lists several earlier articles and books, |
| 09:41:10 | 13 | correct? |
| 09:41:10 | 14 | A.  Yes. |
| 09:41:10 | 15 | Q.  And the second one you list in this provisional |
| 09:41:14 | 16 | application is the book we've been discussing yesterday at |
| 09:41:19 | 17 | length, Brandstein and Ward, Microphone Arrays, published |
| 09:41:25 | 18 | by Springer in 2001, correct? |
| 09:41:29 | 19 | A.  Yes. |
| 09:41:30 | 20 | Q.  In fact, you relied on this book to write portions of |
| 09:41:34 | 21 | your patent application, right? |
| 09:41:35 | 22 | A.  That's just a reference, not means to rely on. |
| 09:41:40 | 23 | Q.  Do you recall taking any subject matter from Brandstein |
| 09:41:45 | 24 | to write this application? |
| 09:41:50 | 25 | A.  Our application is based on our invention, not based on |

09:41:53  1  the book.

09:41:57  2          MR. RE:  Your Honor, I'd like to move to strike as

09:41:59  3  non-responsive.

09:42:04  4          THE COURT:  Sustained.

09:42:06  5  Q.  (By Mr. Re)  Do you recall taking any of the words from

09:42:12  6  Brandstein and putting them in your provisional

09:42:15  7  application?

09:42:21  8  A.  Some of the word in my application could be -- you can

09:42:27  9  find that same word from that book or from other books.

09:42:31  10  Q.  Correct.  And let's look at some of those.

09:42:34  11          Do you see --

09:42:35  12          MR. RE:  Let's call up DTX-49, 189, Mr. Berk.

09:42:40  13  Q.  (By Mr. Re)  Do you see -- do you see on this page

09:43:01  14  where Dr. Brandstein states:  When the focus corresponds to

09:43:05  15  the location of the sound sensors [sic], the SRP should

09:43:12  16  reach a global maximum.

09:43:14  17          Do you see that?

09:43:14  18  A.  Yes.

09:43:14  19  Q.  And let's take a look now at your patent application at

09:43:18  20  136903 where it says:  When the focus corresponds to the

09:43:23  21  location of the sound source, the steered response power,

09:43:30  22  SRP, should reach a global maximum.

09:43:33  23  A.  Yes.

09:43:34  24  Q.  It's pretty clear that you knew about the content in

09:43:39  25  some parts of Brandstein when writing your application,

09:43:42  1   right?

09:43:42  2   A.   Right.

09:43:50  3   Q.   And this is just one example that I could pull to show

09:43:53  4   that you did have Brandstein open when you were writing

09:43:58  5   your patent application, right?

09:43:59  6   A.   Could you repeat your question?

09:44:04  7   Q.   This is just one example of many where you -- it is

09:44:09  8   clear that you had the Brandstein book open when you were

09:44:13  9   writing your patent application, right?

09:44:15  10  A.   No.  We didn't open the book when I write our patent

09:44:22  11  application.

09:44:22  12  Q.   So the language is merely a coincidence when it's

09:44:26  13  similar to Brandstein?

09:44:27  14  A.   When we wrote our patent application, we have the

09:44:33  15  knowledge.

09:44:34  16  Q.   But you also had the knowledge of Brandstein, correct?

09:44:39  17  A.   Knowledge of what?

09:44:42  18  Q.   You also had the knowledge of the Brandstein book

09:44:46  19  entitled Microphone Arrays?

09:44:53  20  A.   The knowledge is not just from this book.  The same

09:44:56  21  term you can find out from other books or papers, as well.

09:45:00  22  Q.   Let's look at another example to clear this up.

09:45:04  23        MR. RE:  Let's go to DTX-49 at 183.

09:45:08  24  Q.   (By Mr. Re)  Do you see where Brandstein states:  The

09:45:10  25  delay-and-sum SRP approach requires shorter analysis

09:45:17  1    intervals and exhibits an elevated insensitivity to

09:45:22  2    environmental conditions, though again, not to a degree

09:45:25  3    that allows for their use under excessive multi-path.

09:45:29  4          Did I read that correctly?

09:45:31  5    A.  Yes.

09:45:31  6    Q.  Now, let's look at your provisional application at that

09:45:34  7    Page 136903 from the production, Page 7.

09:45:39  8          It states:  The SRP approach requires shorter

09:45:43  9    analysis intervals and exhibits an elevated insensitivity

09:45:48  10   to environmental condition while not allowing for use under

09:45:52  11   excessive multi-path.

09:45:55  12          Right?

09:45:56  13   A.  Right.

09:45:57  14   Q.  Does this make it a little more clear to you that the

09:46:00  15   author of this patent application did, in fact, open and

09:46:05  16   use the Brandstein book when the application was written?

09:46:07  17   A.  Yes.

09:46:09  18   Q.  And I could show you additional examples, but for the

09:46:14  19   sake of time, you can see that the author of the

09:46:17  20   application had the Brandstein book, right?

09:46:19  21   A.  You haven't shown me yet.

09:46:26  22   Q.  Let's move on.

09:46:27  23          Now, you knew from the launch, that Echo launched

09:46:33  24   in 2014, right?

09:46:36  25   A.  Yes.

09:46:36    1    Q.   And the Dot, that was released and public by 2016, at
09:46:42    2    least, right?
09:46:43    3    A.   Could you repeat?
09:46:47    4    Q.   The Dot, the Echo Dot -- you knew about the Echo Dot?
09:46:52    5    A.   Right.
09:46:52    6    Q.   The Echo Dot is -- looks like a dot?
09:46:55    7    A.   Yes.
09:46:56    8    Q.   And you knew this had been launched at about 2016,
09:46:59    9    right?
09:46:59   10    A.   I don't remember exactly when that product launched.
09:47:04   11    Q.   Okay.  But this launched before you started selling
09:47:08   12    your CrispMic II, right?
09:47:13   13    A.   Right.
09:47:14   14    Q.   Right.  And when you were designing the CrispMic II, I
09:47:18   15    believe -- is this -- Plaintiff's Exhibit 644, is this the
09:47:21   16    CrispMic II?
09:47:22   17    A.   Yes.
09:47:23   18    Q.   And when you designed the CrispMic II, you designed it
09:47:28   19    to mimic the Amazon Echo Dot, no?
09:47:32   20    A.   What's this limit?
09:47:39   21    Q.   You -- you used the Amazon Echo as a reference product
09:47:44   22    and designed your CrispMic II to look like it, right?
09:47:53   23    A.   No.
09:47:54   24    Q.   Let's take a look at a demonstrative exhibit.
09:47:57   25              These are slides from your design process, right?

| | | |
|---|---|---|
| 09:48:01 | 1 | MR. RE:  If we can call up -- |
| 09:48:03 | 2 | Q.  (By Mr. Re)  Do you recognize this document? |
| 09:48:04 | 3 | A.  Yes. |
| 09:48:09 | 4 | Q.  And this is from June 5, 2017, right? |
| 09:48:17 | 5 | A.  This part covered -- okay. |
| 09:48:23 | 6 | MR. RE:  In the lower right corner, Mr. Berk. |
| 09:48:27 | 7 | A.  Right, that's right. |
| 09:48:29 | 8 | Q.  (By Mr. Re)  Do you recognize the document? |
| 09:48:30 | 9 | A.  Yes. |
| 09:48:31 | 10 | Q.  Okay.  It's from you, right, this document, your |
| 09:48:33 | 11 | company? |
| 09:48:34 | 12 | A.  Yes. |
| 09:48:34 | 13 | Q.  And Page 3 of this document shows that you wanted the |
| 09:48:40 | 14 | CrispMic II -- what you wanted it to look like, right? |
| 09:48:46 | 15 | A.  Yeah. |
| 09:48:47 | 16 | Q.  That's this, right? |
| 09:48:48 | 17 | A.  Right. |
| 09:48:49 | 18 | Q.  This -- this is a concept of what later became this, |
| 09:48:53 | 19 | right? |
| 09:48:53 | 20 | A.  Yes. |
| 09:48:55 | 21 | Q.  And you wanted this to look like the Amazon Echo Dot, |
| 09:49:01 | 22 | right? |
| 09:49:01 | 23 | A.  No. |
| 09:49:04 | 24 | MR. RE:  Let's take a look at Page 5. |
| 09:49:06 | 25 | Q.  (By Mr. Re)  Do you see on Page 5 that you were using |

09:49:10  1   the Amazon Echo Dot as a reference?  Do you see that?

09:49:15  2   A.   Right.

09:49:15  3   Q.   And, therefore, you at least wanted your CrispMic II to

09:49:22  4   be similar to other circular microphone array devices like

09:49:29  5   the Echo Dot, right?

09:49:35  6   A.   The shape is similar because we both need to use a

09:49:41  7   circular microphone array.

09:49:42  8   Q.   Correct.  And --

09:49:44  9   A.   And this document probably is prepared for our

09:49:50  10  industrial engineer to design the enclosure.  And that

09:49:55  11  invention, the Amazon Echo, as a reference, that's not --

09:49:59  12  does that mean we want to copy the design.

09:50:02  13  Q.   Right.  But you had other similar designs on the market

09:50:07  14  as part of this report, right?

09:50:10  15  A.   It looks similar.

09:50:17  16  Q.   And you were aware of all the other circular-type

09:50:24  17  microphone circular array products like the Dot at the time

09:50:28  18  of this design proposal, right?

09:50:30  19  A.   Okay.  You want to talk about the -- the examples on

09:50:36  20  this page?

09:50:37  21  Q.   You were aware of all of these designs that were

09:50:40  22  already on the market when you were conceptualizing

09:50:45  23  Plaintiff's Exhibit 644, right?

09:50:49  24  A.   Yes, but --

09:50:51  25  Q.   And you -- you did not begin selling the CrispMic II

09:50:55   1   device or developer board until November 2018, right?

09:51:03   2   A.  Right.

09:51:04   3   Q.  So isn't it unfair to suggest in any way that Amazon

09:51:10   4   somehow copied this product, 644, right?

09:51:20   5   A.  Mr. Re, Amazon -- we talk about infringe our patent,

09:51:30   6   not the design, right?

09:51:32   7   Q.  But Mr. Fabricant and you have raised this Plaintiff's

09:51:36   8   Exhibit 644 in this trial, right?

09:51:39   9   A.  That's our -- the design of the enclosure.

09:51:42  10   Q.  Correct.  And the CrispMic II product developer board

09:51:46  11   is inside?

09:51:47  12   A.  Right.

09:51:48  13   Q.  Right.  And this product by Amazon was out for years

09:51:52  14   before this product, right?

09:51:54  15   A.  Right.

09:51:57  16   Q.  So doesn't the evidence suggest that if anyone is doing

09:52:00  17   any copying, it could not be Amazon copying you, correct?

09:52:07  18   A.  We're not talking about the enclosure.  The patent is

09:52:11  19   about the technology, right?

09:52:17  20   Q.  But you --

09:52:18  21   A.  By the way, we have a patent on the enclosure design,

09:52:26  22   as well.

09:52:26  23   Q.  But there's no doubt that this product could not be

09:52:31  24   copying the attributes of the shape or design or circular

09:52:35  25   array of this product that you did not introduce until

| | | |
|---|---|---|
| 09:52:40 | 1 | November of 2018, right? |
| 09:52:41 | 2 | A.  You mentioned the shape, right. |
| 09:52:45 | 3 | MR. RE:  Your Honor, I have no further questions. |
| 09:52:47 | 4 | I would just like to mark the board as exhibit -- |
| 09:52:51 | 5 | Demonstrative Exhibit 2A. |
| 09:52:54 | 6 | THE COURT:  Duly noted.  That's fine. |
| 09:52:57 | 7 | Unless Mr. Fabricant is going to use that in |
| 09:53:00 | 8 | redirect, that board needs to come down. |
| 09:53:03 | 9 | MR. FABRICANT:  I'm not -- I'm not intending to. |
| 09:53:04 | 10 | THE COURT:  Then you need to take it down, Mr. Re. |
| 09:53:06 | 11 | MR. FABRICANT:  Well, actually I changed my mind, |
| 09:53:09 | 12 | Your Honor.  Could we leave it up for my redirect? |
| 09:53:10 | 13 | THE COURT:  Based on your change of mind, we'll |
| 09:53:13 | 14 | leave it up. |
| 09:53:14 | 15 | Let's proceed -- let's proceed with redirect, |
| 09:53:16 | 16 | Mr. Fabricant. |
| 09:53:16 | 17 | MR. FABRICANT:  Yes, Your Honor. |
| 09:53:36 | 18 | If we could bring up Plaintiff's Exhibit 1, |
| 09:53:48 | 19 | please.  If we could go to the claims in Plaintiff's |
| 09:53:49 | 20 | Exhibit 1. |
| 09:53:49 | 21 | REDIRECT EXAMINATION |
| 09:53:50 | 22 | BY MR. FABRICANT: |
| 09:53:50 | 23 | Q.  This is your patent, is it not, the '049 patent, |
| 09:53:52 | 24 | Dr. Li? |
| 09:53:53 | 25 | A.  Yes. |

09:53:53  1          MR. FABRICANT:  If we could look at Claim 1 at the

09:53:56  2  back of the '049 patent, and highlight the entire claim,

09:53:59  3  please.

09:53:59  4  Q.  (By Mr. Fabricant)  Dr. Li, while we have the board up,

09:54:06  5  before I ask for permission to take the board down --

09:54:09  6  A.  Right.

09:54:09  7  Q.  -- I'd like to just ask you some questions.

09:54:12  8          Mr. Re created this board, and he wrote some

09:54:16  9  information on it.  And then he wrote "known" next to the

09:54:19  10  various items.  Can you see the board from where you're

09:54:23  11  sitting?

09:54:23  12  A.  Yes.

09:54:23  13  Q.  So he started with the microphone array, linear or

09:54:27  14  circular.  And the questions to you were:  Did you invent

09:54:34  15  the microphone array --

09:54:34  16  A.  No.

09:54:35  17  Q.  -- linear and circular?

09:54:37  18          And what -- and you -- you said you did not -- you

09:54:39  19  didn't invent the microphone, correct?

09:54:42  20  A.  Right.

09:54:42  21  Q.  And he wrote "known," so that's known?

09:54:46  22  A.  Right.

09:54:46  23  Q.  In the '049 patent, Claim 1, which is at issue in this

09:54:53  24  lawsuit, do you claim ownership of a microphone array?  Is

09:54:55  25  that what this patent is about?

| | | |
|---|---|---|
| 09:54:57 | 1 | A.  No -- oh, I claimed -- the -- Claim 1 says the -- the |
| 09:55:06 | 2 | whole thing is -- is our invention. |
| 09:55:08 | 3 | Q.  So my question -- let's take them one at a time.  Do |
| 09:55:11 | 4 | you claim that you own the microphone? |
| 09:55:14 | 5 | A.  No. |
| 09:55:14 | 6 | Q.  The second item is noise reduction.  Your Claim 1 -- |
| 09:55:19 | 7 | within Claim 1, which has many, many words, we see all the |
| 09:55:23 | 8 | words here on the page.  Do you claim that you invented |
| 09:55:26 | 9 | noise reduction? |
| 09:55:26 | 10 | A.  No. |
| 09:55:29 | 11 | Q.  That was known, right? |
| 09:55:30 | 12 | A.  Correct. |
| 09:55:31 | 13 | Q.  Do you claim you created and invented echo cancellation |
| 09:55:37 | 14 | as a concept? |
| 09:55:40 | 15 | A.  No. |
| 09:55:40 | 16 | Q.  Do you claim that you created the concept of sound |
| 09:55:46 | 17 | source localization, the only one in the world who ever |
| 09:55:49 | 18 | knew about that? |
| 09:55:49 | 19 | A.  No. |
| 09:55:49 | 20 | Q.  Do you claim that that invented adaptive beamforming, |
| 09:55:54 | 21 | nobody's ever heard of it before, do you claim that? |
| 09:55:57 | 22 | A.  No. |
| 09:55:57 | 23 | Q.  And in your patent, do you claim any one of these |
| 09:55:59 | 24 | individual components as something that you claim you own? |
| 09:56:02 | 25 | A.  No. |

| | | |
|---|---|---|
| 09:56:05 | 1 | Q.  Well, Dr. Li, what do you claim you own in -- in the |
| 09:56:09 | 2 | '049 patent? |
| 09:56:09 | 3 | A.  We own the invention, including all these technology |
| 09:56:15 | 4 | components.  We put them together to be a system, to be a |
| 09:56:20 | 5 | product, to be our invention. |
| 09:56:22 | 6 | Q.  Separate and apart from them all being together, |
| 09:56:26 | 7 | working together on a single digital processor -- |
| 09:56:36 | 8 | A.  Right. |
| 09:56:37 | 9 | Q.  -- do you own anything?  Unless they're all combined |
| 09:56:37 | 10 | together working in the way you've claimed, do you own |
| 09:56:38 | 11 | anything? |
| 09:56:38 | 12 | A.  We own the whole thing combined together -- included |
| 09:56:42 | 13 | together. |
| 09:56:42 | 14 | MR. FABRICANT:  May I take the board down, |
| 09:56:44 | 15 | Your Honor? |
| 09:56:44 | 16 | THE COURT:  You may. |
| 09:57:14 | 17 | Q.  (By Mr. Fabricant)  Now, yesterday you were asked a |
| 09:57:16 | 18 | series of questions about old patent applications that you |
| 09:57:18 | 19 | filed.  Do you recall that you were asked that series of |
| 09:57:25 | 20 | questions, Dr. Li? |
| 09:57:25 | 21 | A.  Correct. |
| 09:57:26 | 22 | MR. FABRICANT:  So, first, if you could bring up |
| 09:57:28 | 23 | the 954 -- Defendants' 954. |
| 09:57:44 | 24 | Q.  (By Mr. Fabricant)  Now, you were asked questions -- |
| 09:57:46 | 25 | MR. FABRICANT:  If we could go to -- |

| | | |
|---|---|---|
| 09:57:48 | 1 | Q.  (By Mr. Fabricant)  Well, first, we'll look at the |
| 09:57:50 | 2 | first page.  What is the title of this patent application |
| 09:57:53 | 3 | that you submitted to the United States Patent Office? |
| 09:57:56 | 4 | A.  It says:  Voice-Operated Remote Control for TV and |
| 09:58:02 | 5 | Electronic Systems. |
| 09:58:04 | 6 |      MR. FABRICANT:  And now if we could go to Claim 1 |
| 09:58:07 | 7 | of this patent application. |
| 09:58:08 | 8 | Q.  (By Mr. Fabricant)  You were asked a series of |
| 09:58:16 | 9 | questions about this patent application and ultimately |
| 09:58:22 | 10 | asked whether this application was rejected over the prior |
| 09:58:25 | 11 | art.  Do you remember those questions? |
| 09:58:27 | 12 | A.  Right. |
| 09:58:27 | 13 | Q.  And Mr. Re asked you if it, in fact, was rejected, and |
| 09:58:32 | 14 | you said yes? |
| 09:58:33 | 15 | A.  Correct. |
| 09:58:33 | 16 | Q.  Now, this -- here's the claim, Claim 1 of this patent, |
| 09:58:37 | 17 | which sets forth what you were trying to get from the |
| 09:58:39 | 18 | Patent Office as ownership, correct? |
| 09:58:42 | 19 | A.  Right. |
| 09:58:42 | 20 | Q.  What does a handheld battery-powered wireless remote |
| 09:58:47 | 21 | control have to do with a microphone array in the '049 |
| 09:58:51 | 22 | patent, Dr. Li? |
| 09:58:55 | 23 | A.  Nothing. |
| 09:58:56 | 24 | Q.  Absolutely nothing? |
| 09:58:58 | 25 | A.  Absolutely nothing. |

344

09:59:06  1        MR. FABRICANT:  Let's go to 957, Defendants' 957.

09:59:12  2   Q.  (By Mr. Fabricant)  This, Mr. Re showed you and asked

09:59:18  3   you, isn't it true that the Patent Office rejected your

09:59:22  4   patent application that we just saw over prior art?  And

09:59:24  5   you admitted that it was true, correct?

09:59:28  6   A.  Right.

09:59:28  7   Q.  Is this the voice-operated remote control for TV and

09:59:33  8   electronic systems patent that we're talking about here in

09:59:37  9   this Defendants' exhibit?

09:59:39  10  A.  Yes.

09:59:39  11  Q.  What does this have to do with the '049 patent for a

09:59:42  12  microphone array?  Can you please tell the Court?

09:59:47  13  A.  Nothing.

10:00:10  14        MR. FABRICANT:  Let's go to Defendants'

10:00:12  15  Exhibit 059 -- 959, I'm sorry, I apologize.  Scroll down,

10:00:26  16  please.

10:00:26  17  Q.  (By Mr. Fabricant)  This is -- Mr. Re showed you a

10:00:36  18  Notice of Abandonment, and he asked you whether after

10:00:40  19  rejection of your application back in 2007 you abandoned

10:00:45  20  the application, you abandoned it, you gave it up.  Is that

10:00:49  21  true?

10:00:49  22  A.  Right.

10:00:50  23  Q.  And this is an abandonment of an application that had

10:00:53  24  absolutely nothing to do with microphone arrays; isn't that

10:00:53  25  right?

| | | |
|---|---|---|
| 10:00:56 | 1 | A.  That's right. |
| 10:00:58 | 2 | MR. RE:  Leading.  Your Honor, objection; |
| 10:01:00 | 3 | leading. |
| 10:01:01 | 4 | THE COURT:  Sustained as to leading. |
| 10:01:02 | 5 | Q.  (By Mr. Fabricant)  What, Dr. Li, did this abandonment |
| 10:01:05 | 6 | of this particular application, set forth in the 959 |
| 10:01:10 | 7 | Defendants' exhibit, have to do with microphone array '049 |
| 10:01:14 | 8 | patent? |
| 10:01:14 | 9 | A.  No. |
| 10:01:14 | 10 | Q.  You were asked some questions about this Brandstein |
| 10:01:47 | 11 | book, that textbook? |
| 10:01:50 | 12 | A.  Right. |
| 10:01:51 | 13 | Q.  Do you recall those questions? |
| 10:01:52 | 14 | A.  Yes. |
| 10:01:52 | 15 | Q.  And a few minutes ago, you were asked some questions |
| 10:01:55 | 16 | about your provisional patent application that you filed -- |
| 10:02:00 | 17 | A.  Correct. |
| 10:02:01 | 18 | Q.  -- in this case in connection with the '049, correct? |
| 10:02:07 | 19 | A.  Right. |
| 10:02:12 | 20 | MR. FABRICANT:  If we could bring up Plaintiff's |
| 10:02:14 | 21 | Exhibit 8, please.  And if we could go to Page 23. |
| 10:02:21 | 22 | Q.  (By Mr. Fabricant)  Now, you submitted this exhibit, |
| 10:02:29 | 23 | Plaintiff's 8.  This was your application to the United |
| 10:02:32 | 24 | States Patent Office in September of 2010; is that correct? |
| 10:02:38 | 25 | A.  That's right. |

10:02:39   1   Q.   And Mr. Re pointed you to Footnote 2 where it says
10:02:46   2   Brandstein and Ward.   That's the book; is that right?
10:02:48   3   A.   Right.
10:02:48   4   Q.   Did I understand your testimony that you submitted this
10:02:53   5   application and told the United States Patent Office that
10:02:56   6   one of your reference materials was the Brandstein book?
10:02:59   7   A.   Right.
10:03:01   8   Q.   Ultimately, was the '756 patent issued on this
10:03:05   9   provisional application?
10:03:07   10  A.   Right.
10:03:07   11  Q.   And what happened to the '049 patent?   Is that also
10:03:12   12  related to the provisional application?
10:03:14   13  A.   Yes.
10:03:15   14  Q.   What is the Brandstein textbook?   Can you explain that?
10:03:21   15  A.   Could you repeat your question?
10:03:23   16  Q.   Yes, sir.   What -- what is the Brandstein textbook?
10:03:28   17  A.   The textbook just talk each individual technical
10:03:33   18  components.
10:03:36   19  Q.   And what does that textbook contain with respect to
10:03:45   20  teaching all of the elements of your '049 claim combined
10:03:51   21  together and presented on a signal processor, what does it
10:03:57   22  teach?
10:03:58   23  A.   They didn't teach that.
10:04:33   24  Q.   You were asked questions today about having visited a
10:04:36   25  number of companies -- names of companies we've heard of

10:04:39   1   like Samsung and Volkswagen and Moen.  Do you remember that

10:04:41   2   line of questioning, sir?

10:04:43   3   A.  Yes.

10:04:43   4   Q.  When you went to companies like Moen and American

10:04:50   5   Standard and other companies that Mr. Re mentioned, he

10:04:53   6   asked you if you had visited those companies, and you said

10:04:57   7   yes.

10:04:58   8   A.  Uh-huh.

10:05:00   9   Q.  But I believe you tried to say some additional

10:05:02  10   explanation about what the visit was for?

10:05:04  11   A.  Right.

10:05:04  12   Q.  Did you have something else you wanted to add about why

10:05:07  13   did you visit these companies?

10:05:08  14   A.  These companies, they are interested in our technology

10:05:15  15   and also our products.  And some of these companies, they

10:05:20  16   purchased product from us, and also some of them sign a

10:05:28  17   contract with us.

10:05:29  18        So the proposal -- which these companies -- they

10:05:33  19   are not about licensing.  Some of the company want to use

10:05:37  20   our product and some others want to have a collaboration.

10:05:43  21   They want us to develop product for them.  They pay us to

10:05:47  22   do that.

10:05:48  23   Q.  At the time that you met with Amazon in New York City

10:06:01  24   in 2014 -- November of 2014, was the '756 patent a

10:06:08  25   surrendered patent at that time?

10:06:11   1   A.   No.   The patent was just issued.

10:06:14   2   Q.   With respect to the subject of reissued patents, I

10:06:25   3   believe you testified today that when you submitted the

10:06:28   4   '049 reissue application, the '756 was surrendered in light

10:06:33   5   of the reissue of the '049.   Was that your understanding?

10:06:38   6   A.   Right.

10:06:38   7   Q.   Now, this second reissue, in 2020, where Mr. Re showed

10:06:45   8   you the box and the checkmark, when you filed the second

10:06:49   9   reissue, was the '049 patent surrendered back to the United

10:06:56   10   States Patent Office?

10:06:57   11   A.   No.

10:06:57   12   Q.   What's the status of that patent today?

10:07:00   13   A.   Still active.

10:07:01   14   Q.   Well, why didn't you have to surrender that back to the

10:07:06   15   Patent Office like you had had to surrender the '756?   Why?

10:07:11   16   A.   I think that's based on the request of the Patent

10:07:22   17   Office.

10:07:22   18   Q.   So you don't -- you did not surrender the '049?

10:07:25   19   A.   No.

10:07:26   20   Q.   The second reissue was a reissue of the '756?

10:07:32   21   A.   That's right.

10:07:32   22   Q.   On the subject of the questions you were asked

10:07:38   23   regarding the Google proposal, do you recall questions on

10:07:41   24   that?

10:07:42   25   A.   Right.

10:07:42  1   Q.  And I want to make sure you understand my question very

10:07:52  2   clearly.

10:07:53  3        Did you ever propose to offer to license, to sell

10:07:57  4   the '049 patent to Google?  '049 patent?

10:08:06  5   A.  No.

10:08:07  6   Q.  Did the '049 patent even exist in 2015 when you made

10:08:13  7   your proposal to Google about the '756?

10:08:16  8   A.  No.

10:08:17  9   Q.  Had you even filed a patent application yet for the

10:08:22  10  '049 patent in 2015 when you made your proposal to Google?

10:08:27  11  A.  No.

10:08:29  12  Q.  Do you have any written terms from Google about if you

10:08:34  13  did a deal with Google and they paid you $700,000.00, as to

10:08:39  14  what the terms of that deal would have been?  Do you have

10:08:42  15  such a document?

10:08:43  16  A.  No, I did not see any terms.

10:08:45  17  Q.  Do you have a contract or a proposed contract with

10:08:48  18  Google that says, we get all the rights, we own it, we get

10:08:53  19  to file reissue applications?  Do you have that contract?

10:08:57  20  A.  No.

10:09:00  21  Q.  So what are the terms of the Google proposal you made?

10:09:04  22  A.  I don't have the term at that time.

10:09:07  23  Q.  You expected to negotiate those terms, sir?

10:09:10  24  A.  Yes.  As I said, I think we submit a proposal to

10:09:18  25  Google, and if they sign a proposal, then they come back so

| | | |
|---|---|---|
| 10:09:24 | 1 | we can start the negotiation. |
| 10:09:25 | 2 | Q.  I just want to know, there seemed in response to your |
| 10:09:35 | 3 | questions to Mr. Re some confusion in your mind as to the |
| 10:09:39 | 4 | difference between a license and a sale and the rights to |
| 10:09:42 | 5 | use. |
| 10:09:43 | 6 | Do you have a legal understanding as to the |
| 10:09:45 | 7 | difference between a sale, a license back, a license; do |
| 10:09:48 | 8 | you understand those concepts, sir? |
| 10:09:49 | 9 | A.  As I said several times, I'm not an attorney.  I don't |
| 10:09:55 | 10 | have a clear definition of these terms and the differences. |
| 10:10:00 | 11 | And also English is not my first language.  And sometimes, |
| 10:10:07 | 12 | you know, I use the word may not be very precisely. |
| 10:10:15 | 13 | Q.  When -- when you did have your proposal to Google back |
| 10:10:17 | 14 | in 2015, at that moment in time, to your understanding, did |
| 10:10:21 | 15 | Google have any product whatsoever that used -- that would |
| 10:10:25 | 16 | have used your technology? |
| 10:10:26 | 17 | A.  No. |
| 10:10:26 | 18 | Q.  At that moment in time in 2015, and we're talking -- I |
| 10:10:33 | 19 | believe it was like May/June of 2015 from the documents -- |
| 10:10:39 | 20 | did Amazon even have a successful product that used your |
| 10:10:43 | 21 | technology in the spring of 2015? |
| 10:10:45 | 22 | A.  2015, I think at that time Amazon has the Echo. |
| 10:10:51 | 23 | Q.  Right.  When did Echo launch, sir? |
| 10:10:52 | 24 | A.  2014. |
| 10:10:55 | 25 | Q.  You went to the launch party on November 20, 2014, |

| | | |
|---|---|---|
| 10:11:01 | 1 | correct? |
| 10:11:01 | 2 | A.  Right. |
| 10:11:01 | 3 | Q.  So your proposal to Google was just a few months after |
| 10:11:06 | 4 | they launched their product, their only product, correct, |
| 10:11:09 | 5 | Amazon? |
| 10:11:09 | 6 | A.  Amazon, right.  Yes. |
| 10:11:11 | 7 | Q.  So when you made your proposal to Google, you didn't |
| 10:11:14 | 8 | know that Amazon was going to be this hugely successful |
| 10:11:19 | 9 | Echo line of products, did you? |
| 10:11:21 | 10 | A.  Right. |
| 10:11:22 | 11 | Q.  Now, Google, I believe you just testified, had no |
| 10:11:24 | 12 | products that used this technology, correct? |
| 10:11:26 | 13 | A.  At that time, no. |
| 10:11:27 | 14 | Q.  And so you were offering them to use your -- your -- |
| 10:11:30 | 15 | your technology for $700,000.00, correct? |
| 10:11:33 | 16 | A.  Right. |
| 10:11:33 | 17 | Q.  But Amazon today -- you were here for the openings -- |
| 10:11:39 | 18 | they've sold, since the date this complaint was filed, |
| 10:11:42 | 19 | 19 million units, correct? |
| 10:11:45 | 20 | A.  Right.  Right. |
| 10:11:52 | 21 | Q.  That's a little different than offering rights to a |
| 10:11:55 | 22 | company that sold nothing, isn't it, sir? |
| 10:11:58 | 23 | A.  Right. |
| 10:11:58 | 24 | Q.  You were asked questions with respect to the subject of |
| 10:12:13 | 25 | that second reissue. |

| | | |
|---|---|---|
| 10:12:15 | 1 | A.   Uh-huh. |
| 10:12:16 | 2 | Q.   And you were shown the words that that document states |
| 10:12:20 | 3 | where it says that the original patent claims are partly -- |
| 10:12:27 | 4 | wholly or partly inoperative or invalid.  Do you remember |
| 10:12:31 | 5 | that? |
| 10:12:33 | 6 | A.   That's right.  I remember that's the standard form. |
| 10:12:37 | 7 | Q.   Does every reissue form printed say those words:  To |
| 10:12:41 | 8 | submit this application, you have to say that the claims of |
| 10:12:48 | 9 | the original patent are wholly or partly inoperative or |
| 10:12:53 | 10 | invalid? |
| 10:12:54 | 11 | A.   I think so. |
| 10:12:55 | 12 | Q.   Did you type those words? |
| 10:12:56 | 13 | A.   I didn't type that. |
| 10:12:57 | 14 | Q.   What does wholly or partly inoperative mean to you when |
| 10:13:01 | 15 | you submit an application of reissue?  What does it mean? |
| 10:13:05 | 16 | A.   To me, that means when we submit the reissue, for us, |
| 10:13:11 | 17 | we just make -- we want to make the claim broader. |
| 10:13:15 | 18 | Q.   And the documents which Mr. Re showed you when he |
| 10:13:23 | 19 | showed them to you several times, they actually expressly |
| 10:13:26 | 20 | say that this is a broadening reissue, do they not? |
| 10:13:30 | 21 | A.   Yeah. |
| 10:13:31 | 22 | MR. FABRICANT:  Can we please bring up Defendants' |
| 10:13:43 | 23 | Exhibit 980A?  If we could go to what they've got marked |
| 10:13:58 | 24 | DTX-980.124. |
| 10:14:02 | 25 | Q.   (By Mr. Fabricant)  So let's look at -- |

10:14:10  1        MR. FABRICANT:  If you could highlight the --

10:14:12  2   the -- from the check box down to the bottom of the

10:14:16  3   paragraph there.

10:14:19  4   Q.  (By Mr. Fabricant)  So, first, I believe you testified

10:14:21  5   your attorney checked the box "by reason of other errors."

10:14:27  6   Is that your testimony?

10:14:28  7   A.  Right.

10:14:29  8   Q.  And then this paragraph sets forth the explanation.  Is

10:14:33  9   that your understanding?

10:14:34  10  A.  Yes.

10:14:34  11  Q.  And it states in Claim 1 of the parent application:

10:14:41  12  U.S. 8,861,756 is broadened as explained in the attached

10:14:48  13  sheet.

10:14:48  14        Is that what it says?

10:14:50  15  A.  Yes.

10:14:50  16  Q.  Does it say that the '049 patent is broadened in any

10:14:52  17  respect?

10:14:53  18  A.  Could you repeat?

10:14:55  19  Q.  Does this application to the United States Patent

10:14:59  20  Office say that the '049 patent is being broadened in any

10:15:04  21  respect?

10:15:05  22  A.  No.

10:15:08  23        MR. FABRICANT:  I have nothing further for the

10:15:10  24  witness, Your Honor.

10:15:12  25        THE COURT:  You pass the witness, counsel?

| | | |
|---|---|---|
| 10:15:15 | 1 | MR. FABRICANT:  Yes. |
| 10:15:15 | 2 | THE COURT:  You have redirect? |
| 10:15:20 | 3 | MR. RE:  No more.  Thank you, Your Honor. |
| 10:15:22 | 4 | THE COURT:  All right.  No additional cross from |
| 10:15:26 | 5 | the Defendant, then, Dr. Li, you may step down, sir. |
| 10:15:28 | 6 | THE WITNESS:  Thank you, Your Honor. |
| 10:15:28 | 7 | THE COURT:  Ladies and gentlemen, we're going to |
| 10:15:30 | 8 | use this opportunity to take a short recess. |
| 10:15:32 | 9 | If you will simply close and leave your notebooks |
| 10:15:35 | 10 | in your chairs.  Follow all the instructions I've given you |
| 10:15:37 | 11 | about your conduct during the trial, including, of course, |
| 10:15:37 | 12 | not to discuss the case among yourselves.  And we'll be |
| 10:15:40 | 13 | back in here shortly to continue with the next Plaintiff's |
| 10:15:43 | 14 | witness. |
| 10:15:43 | 15 | The jury's excused for recess. |
| 10:15:49 | 16 | COURT SECURITY OFFICER:  All rise. |
| 10:15:50 | 17 | (Recess.) |
| 10:34:44 | 18 | (Jury out.) |
| 10:34:44 | 19 | COURT SECURITY OFFICER:  All rise. |
| 10:34:46 | 20 | THE COURT:  Be seated, please. |
| 10:34:51 | 21 | Mr. Fabricant, is the Plaintiff prepared to call |
| 10:34:52 | 22 | its next witness? |
| 10:34:53 | 23 | MR. FABRICANT:  Yes, Your Honor.  We intend to at |
| 10:34:56 | 24 | this point play several of the video depositions between |
| 10:34:59 | 25 | now and the lunch hour. |

355

| | | |
|---|---|---|
| 10:35:00 | 1 | THE COURT:  All right.  As typical in this court, |
| 10:35:05 | 2 | you're certainly free to announce the witness and identify |
| 10:35:08 | 3 | who they are and their position, and then we'll proceed |
| 10:35:11 | 4 | with the deposition. |
| 10:35:11 | 5 | MR. FABRICANT:  Thank you, Your Honor. |
| 10:35:12 | 6 | THE COURT:  All right.  Let's bring in the jury, |
| 10:35:22 | 7 | please. |
| 10:35:22 | 8 | COURT SECURITY OFFICER:  All rise. |
| 10:35:23 | 9 | (Jury in.) |
| 10:35:34 | 10 | THE COURT:  Please be seated. |
| 10:35:46 | 11 | Plaintiff, call your next witness. |
| 10:35:52 | 12 | MR. FABRICANT:  Yes, Your Honor, Mr. Lambrianakos |
| 10:35:55 | 13 | will announce the next witness. |
| 10:35:57 | 14 | THE COURT:  All right.  Please proceed. |
| 10:36:04 | 15 | MR. LAMBRIANAKOS:  Your Honor, we call by video |
| 10:36:06 | 16 | Scott Hayden, vice president of intellectual property at |
| 10:36:09 | 17 | Amazon. |
| 10:36:10 | 18 | The times of the deposition are 10 minutes, 48 |
| 10:36:16 | 19 | seconds for Plaintiff and 1 minute, 12 seconds for |
| 10:36:22 | 20 | Defendant. |
| 10:36:22 | 21 | THE COURT:  Proceed with this witness by |
| 10:36:24 | 22 | deposition. |
| 10:36:25 | 23 | MR. LAMBRIANAKOS:  Thank you. |
| 10:36:25 | 24 | SCOTT HAYDEN, PLAINTIFF'S WITNESS |
| 10:36:29 | 25 | PRESENTED BY VIDEO DEPOSITION |

| | | |
|---|---|---|
| 10:36:29 | 1 | (Videoclip played.) |
| 10:36:30 | 2 | Q. Amazon had a particular policy related to in-licensing? |
| 10:36:34 | 3 | A. Yes. |
| 10:36:34 | 4 | Q. And what is that policy? |
| 10:36:36 | 5 | A. We respect the -- |
| 10:36:43 | 6 | Q. Good morning. Could you please state your name and |
| 10:36:46 | 7 | location, for the record? |
| 10:36:46 | 8 | A. Scott Hayden in Woodinville, Washington. |
| 10:36:55 | 9 | Q. Okay. Now, I'm going to go back to some of the points |
| 10:36:57 | 10 | you just made. You said that if someone sends you |
| 10:37:01 | 11 | information or a letter or you become aware of a patent, |
| 10:37:05 | 12 | that's when you will determine whether Amazon is interested |
| 10:37:07 | 13 | in taking a license. |
| 10:37:10 | 14 | Are those -- are those the only ways that Amazon |
| 10:37:13 | 15 | becomes aware of patents that it may need to license? |
| 10:37:17 | 16 | A. No, there are other ways. There are things that we are |
| 10:37:24 | 17 | aware of as we've done our diligence before we launch |
| 10:37:28 | 18 | products. There are cases -- or patents that inventors |
| 10:37:31 | 19 | have created when they have worked at prior employers |
| 10:37:36 | 20 | and -- so that we have lots of opportunity or the |
| 10:37:41 | 21 | opportunity to look at those before they implement those |
| 10:37:43 | 22 | things. |
| 10:37:43 | 23 | So they are from several sources, but those are |
| 10:37:46 | 24 | the three principal ways of our people making them aware to |
| 10:37:51 | 25 | us. |

10:37:51   1        We find those as doing our sort of clearance when

10:37:54   2   we're doing that.  We do not do general clearance, but we

10:37:57   3   do -- you know, if we're aware of things, we would take a

10:38:01   4   look at those and investigate those.

10:38:02   5   Q.  Can you describe in more detail what is done in terms

10:38:05   6   of the diligence related to IP prior to launch of a

10:38:15   7   product?

10:38:15   8   A.  Yes.  Where there are -- well, once we meet with the

10:38:19   9   inventors to determine what it is that they're going to

10:38:22  10   build or planning on building, then we talk to them and ask

10:38:25  11   them if they're aware of any intellectual property rights

10:38:28  12   that exist so that we can make sure we -- we clear those.

10:38:31  13        And if they have none -- you know, if we're aware

10:38:34  14   of things because we're generally working in that area or

10:38:39  15   that technology, then we'll investigate those and do the

10:38:42  16   diligence associated with those.

10:38:44  17        If the inventors are not aware of anything and

10:38:46  18   we're not aware of anything, then we'll proceed with filing

10:38:50  19   the patent application on our idea and, you know, go from

10:38:54  20   there.

10:39:01  21   Q.  Are you speaking of inventors and engineers or

10:39:05  22   designers interchangeably?

10:39:06  23   A.  Inside the company, yes.  So our -- I think of our

10:39:10  24   inventors and engineers and developers are -- yes, they're

10:39:13  25   all the same.

10:39:14  1   Q.  Earlier, you also stated that one of the ways in which

10:39:22  2   Amazon becomes aware of patents is if someone sends a

10:39:24  3   letter; is that right?

10:39:25  4   A.  Yes.

10:39:27  5   Q.  In that instance, how does Amazon make a determination

10:39:33  6   of whether the particular patent is relevant?

10:39:37  7   A.  We would review the patent, review the way that we've

10:39:44  8   implemented our solution, and make that determination of

10:39:50  9   whether we believe that, you know, there's an issue or not.

10:39:52  10  Q.  And could you explain a little more specifically how

10:39:55  11  Amazon would determine what the value of a particular

10:39:58  12  patent is to what Amazon wants to do?

10:40:00  13  A.  If the -- their patent is valid, enforceable, and -- we

10:40:10  14  would look at the claims that determine the actual coverage

10:40:15  15  and the relevance of the patent to what we were doing.  If

10:40:18  16  it is something that is a small piece that doesn't make any

10:40:20  17  difference if we use that or an alternative, then,

10:40:24  18  obviously, it's going to be worth a lot less.

10:40:27  19          If it is on something that is the -- the essential

10:40:30  20  piece of that, then it can be worth more.  But all those

10:40:34  21  things still get to the point of being reasonable from the

10:40:37  22  standpoint.

10:40:38  23          We've had people in the past that have demanded --

10:40:42  24  you know, one -- one company came in and said, you know,

10:40:45  25  when I first started, that they want 5 percent of our gross

```
10:40:49   1   revenues.  Unfortunately, we didn't make 5 percent at the
10:40:52   2   time.
10:40:52   3         So that was one where we would say, well, our best
10:40:56   4   answer there is, so just turn the feature off and we won't
10:40:59   5   do it.  And so that's always an alternative that says if --
10:41:03   6   if we can't come to reasonable terms, then we'll stop doing
10:41:07   7   things.
10:41:07   8   Q.  Earlier, you testified that another way in which Amazon
10:41:12   9   becomes aware of patents is through employees that
10:41:15  10   previously worked elsewhere; is that correct?
10:41:16  11   A.  Yes.
10:41:17  12   Q.  Could you describe that process further, how Amazon
10:41:22  13   becomes aware through those employees?
10:41:24  14   A.  Usually, when we meet with the -- the
10:41:32  15   developers/designers and they're telling us about their new
10:41:34  16   product, we'll ask them if there's anything that they're
10:41:39  17   aware of as far as existing patents.
10:41:40  18         And sometimes those people have worked somewhere
10:41:42  19   else, and they have worked on relevant technology.  That
10:41:45  20   could be one of the reasons why they were hired or why they
10:41:48  21   were qualified to do this job, and so it's something that
10:41:51  22   we just ask initially.
10:41:52  23   Q.  If an employee tells you that they are aware of
10:42:00  24   intellectual property from their previous place of
10:42:05  25   employment, what steps are taken from that point?
```

10:42:08  1   A.  We would then -- if they know, we would ask them what

10:42:12  2   that is.  If not, then we -- and if it's, you know, a

10:42:16  3   publicly issued patent, then we can do a search on their

10:42:19  4   name and find that patent or patents and take a look at

10:42:25  5   those, then make a determination as we are reviewing their

10:42:30  6   product design -- product-specifics design.

10:42:33  7          Then we can evaluate that to determine if it is

10:42:36  8   relevant or, you know, necessary to either obtain a license

10:42:39  9   for that or make a design-around so that we do not, you

10:42:42  10  know, infringe the IP rights of others.

10:42:43  11  Q.  Are you only referring to instances where the

10:42:51  12  particular employee is the named inventor?

10:42:57  13  A.  No.  There are other cases where, you know, they could

10:43:01  14  have been working in the field for the last X number of

10:43:04  15  years.  And if they're aware of patents in that space, then

10:43:07  16  we ask them to share that information with us.

10:43:09  17          And we also educate them -- educate our

10:43:13  18  developers/designers employees not to look for patents of

10:43:17  19  others.  And sometimes they are aware of them just because

10:43:21  20  either their prior job taught them to look -- they were in

10:43:25  21  a job where they had to look, they saw it in a newspaper

10:43:28  22  article or on the Internet or things like that, so that's

10:43:31  23  why you always ask them if anyone is aware of any

10:43:34  24  third-party patents, regardless of whether they were the

10:43:40  25  inventor or not.

10:43:40    1          I've lost my train of thought there.

10:43:43    2          I think, you know, just a -- you know, they know

10:43:43    3    the cases that they're working on or that they were named

10:43:45    4    inventors on, they could be aware of third-party patents,

10:43:50    5    and if they saw it on the Internet or their prior job had

10:43:53    6    required them to look at patents or they were involved in a

10:43:56    7    design-around in a past job where they were aware of those

10:44:00    8    patents.

10:44:00    9    Q.   What about the situation where the employee is

10:44:03   10    generally aware of a patent application or patents that are

10:44:10   11    soon to issue from their prior employer?

10:44:13   12    A.   That fits in the same answer of, you know, we ask them

10:44:16   13    if they're aware of things.   And if they are public, then

10:44:19   14    they can tell us about them.   If they are not, then that's

10:44:22   15    the trade secret or intellectual property of that prior

10:44:27   16    employer.

10:44:27   17          And so those are, you know, sometimes tricky

10:44:30   18    discussions, I guess, from that standpoint of making sure

10:44:33   19    that we do not ask too much.   But we ask them, you know,

10:44:36   20    essentially for that employee to make that determination of

10:44:39   21    whether they believe that that prior work and patent --

10:44:43   22    pending patent application is relevant to what they are

10:44:47   23    doing.

10:44:47   24          So, you know, if we ask them, is this -- are you

10:44:50   25    doing it the same way you were doing it that was in that

10:44:57  1   last job, in that last patent application, and if they say,

10:45:01  2   no, it's completely different.

10:45:02  3        And depending on what it is, sometimes we ask

10:45:04  4   them, how is it different?  And so had that expectation

10:45:07  5   that they can, you know, share that information with us.

10:45:10  6   There may be instances where they can't.

10:45:13  7        And in those cases, typically what we'll do is

10:45:16  8   we'll either, you know, pull that person off of the team or

10:45:20  9   have them not be involved in the design of that feature so

10:45:24  10  that we verify or make sure to the best extent possible

10:45:27  11  that we don't become contaminated by their -- IP of the

10:45:33  12  prior employer.

10:45:33  13  Q.  Does Amazon have a specific policy related to

10:45:37  14  in-licensing?

10:45:37  15  A.  Yes.

10:45:38  16  Q.  And what is that policy?

10:45:40  17  A.  We respect the rights of others.  We'll engage in the

10:45:51  18  discussion.  And where we need to obtain a license, we

10:45:54  19  will.  And if we're able to do that in -- in terms of what

10:45:59  20  we're willing to do, then we'll proceed.

10:46:01  21       Generally, those are -- you know, the expectation

10:46:03  22  of the policy is to do a one-time, lump-sum fixed payment.

10:46:08  23  No running royalties.  We essentially take all the risk.

10:46:12  24       Then that says if we do it, we'll pay a certain

10:46:16  25  amount.  If we decide not to do it, we'll still pay the

10:46:19  1   same amount.  But that way you don't have to worry about.

10:46:19  2        If we pay something different -- where if we spend

10:46:23  3   more on advertising, if we sell more, then the licensor

10:46:26  4   gets more money.  Instead, we just take all that risk, and,

10:46:30  5   you know, pay them a certain amount and say, this is what

10:46:32  6   we think it's worth.

10:46:33  7        If they're willing to accept that, then we do the

10:46:35  8   deal and move on.  That way we don't have to deal with them

10:46:38  9   again later or worry about, you know, later they want to,

10:46:41 10   you know, jack up the rights or anything like that.

10:46:44 11   Instead, it's a -- it's a one-and-done approach.

10:46:47 12   Q.   How does Amazon determine what the customer would be

10:46:50 13   willing to pay for the feature?

10:46:51 14   A.   Sometimes that is looking at alternative products.  You

10:46:55 15   know, so we have, you know, a large catalog of, you know,

10:47:00 16   lots of devices that we could see what people are paying

10:47:04 17   for those things.

10:47:05 18   Q.   Where the feature is not paid for separately, how does

10:47:09 19   Amazon determine what its value is to the customer?

10:47:12 20   A.   Well, if they are similar products, then you can see

10:47:16 21   what, you know, one with the feature and one without the

10:47:19 22   feature, what's their sales price.  That's one indication.

10:47:21 23   You are going to have to think about the margin difference

10:47:24 24   associated with those, but that's -- that's one way that we

10:47:27 25   can get there.

| 10:47:27 | 1 | Q.  Where the feature is software-related, how does Amazon |
| 10:47:36 | 2 | determine whether it's present in other similar products? |
| 10:47:39 | 3 | A.  Usually, you can tell by the specifications of what it |
| 10:47:43 | 4 | does, and it could be it has, you know, this noise |
| 10:47:49 | 5 | canceling.  It could have that ability to turn something on |
| 10:47:55 | 6 | or off, or the ability to phone home, or lots of different |
| 10:47:59 | 7 | things.  But, usually, it's in the specification. |
| 10:48:01 | 8 | If it's not, then sometimes we're able to send |
| 10:48:04 | 9 | those to people that can do evaluations to try and run |
| 10:48:08 | 10 | numerous tests to determine if something has something |
| 10:48:10 | 11 | inside or not. |
| 10:48:11 | 12 | (Videoclip ends.) |
| 10:48:12 | 13 | THE COURT:  Does that complete this witness by |
| 10:48:18 | 14 | deposition? |
| 10:48:18 | 15 | MR. FABRICANT:  Yes, it does, Your Honor. |
| 10:48:19 | 16 | THE COURT:  Call your next witness. |
| 10:48:22 | 17 | MR. LAMBRIANAKOS:  Your Honor, Plaintiff calls by |
| 10:48:31 | 18 | deposition Wei Li, former hardware design manager at |
| 10:48:35 | 19 | Amazon's Lab126. |
| 10:48:38 | 20 | The splits are for Plaintiff, 24 minutes, 53 |
| 10:48:41 | 21 | seconds, and for Defendant 7 minutes, 38 seconds. |
| 10:48:44 | 22 | THE COURT:  Proceed with this witness by |
| 10:48:46 | 23 | deposition. |
| 10:48:46 | 24 | MR. LAMBRIANAKOS:  Thank you. |
| 10:48:46 | 25 | WEI LI, PLAINTIFF'S WITNESS |

| | | |
|---|---|---|
| 10:48:47 | 1 | <u>PRESENTED BY VIDEO DEPOSITION</u> |
| 10:48:47 | 2 | (Videoclip played.) |
| 10:48:48 | 3 | Q.  Mr. Li, could you please spell your name for the |
| 10:48:55 | 4 | record? |
| 10:48:56 | 5 | A.  Yes.  My first name is Wei, spelled as W-e-i.  My last |
| 10:49:05 | 6 | name is Li, spelled L-i. |
| 10:49:06 | 7 | Q.  And what did you do after receiving your Master's |
| 10:49:10 | 8 | degree? |
| 10:49:10 | 9 | A.  I went to work at the Li Creative. |
| 10:49:12 | 10 | Q.  And how long did you work at Li Creative? |
| 10:49:18 | 11 | A.  Let me do some math. |
| 10:49:28 | 12 | Three years and two months. |
| 10:49:37 | 13 | Q.  And where did you work after Cisco? |
| 10:49:42 | 14 | A.  Amazon. |
| 10:49:42 | 15 | Q.  Was there a certain division of Amazon that you were |
| 10:49:47 | 16 | working at? |
| 10:49:50 | 17 | ATTORNEY:  Object to form. |
| 10:49:51 | 18 | A.  It's called Lab126. |
| 10:49:52 | 19 | Q.  And what were you doing at Lab126? |
| 10:49:59 | 20 | A.  I was working on -- I was a hardware design engineer. |
| 10:50:05 | 21 | Q.  Okay.  Mr. Li, I'd like to talk about your time at Li |
| 10:50:10 | 22 | Creative. |
| 10:50:10 | 23 | And what time frame, again, did you work at Li |
| 10:50:13 | 24 | Creative? |
| 10:50:13 | 25 | A.  It's -- |

| | | |
|---|---|---|
| 10:50:16 | 1 | ATTORNEY:  Objection, form. |
| 10:50:18 | 2 | A.  -- 2000 -- 2004 to 2008. |
| 10:50:33 | 3 | Q.  And what was your job title while you were at Li |
| 10:50:37 | 4 | Creative? |
| 10:50:37 | 5 | A.  Research engineer. |
| 10:50:38 | 6 | Q.  What were your job responsibilities as research |
| 10:50:48 | 7 | engineer? |
| 10:50:48 | 8 | A.  So I was doing both firmware development and hardware |
| 10:50:52 | 9 | development for their product. |
| 10:50:53 | 10 | Q.  What projects were you working on while at Li Creative? |
| 10:51:01 | 11 | A.  I remember CrispMic. |
| 10:51:05 | 12 | Q.  Was the beamforming adaptive or fixed? |
| 10:51:09 | 13 | A.  It was fixed. |
| 10:51:10 | 14 | Q.  Can you explain to me what does fixed beamforming mean? |
| 10:51:21 | 15 | A.  Fixed beamforming means there's an assumption over the |
| 10:51:27 | 16 | desired signal come from one direction. |
| 10:51:30 | 17 | Q.  Was there an assumption for the CrispMic on which |
| 10:51:35 | 18 | direction it was coming from, the sound? |
| 10:51:37 | 19 | A.  Yes.  We assumed the sound come from in front of the |
| 10:51:47 | 20 | CrispMic. |
| 10:51:48 | 21 | Q.  By "in front of," do you mean 90-degree angle to the |
| 10:51:58 | 22 | linear microphone array? |
| 10:52:00 | 23 | ATTORNEY:  Form. |
| 10:52:01 | 24 | A.  Correct. |
| 10:52:01 | 25 | Q.  Did the CrispMic device include an elevation angle? |

| | | |
|---|---|---|
| 10:52:04 | 1 | A.  No. |
| 10:52:04 | 2 | Q.  Did you work on sound source localization while you |
| 10:52:07 | 3 | were at Li Creative? |
| 10:52:08 | 4 | A.  I don't remember. |
| 10:52:08 | 5 | Q.  While you were at Li Creative, did you work on any |
| 10:52:13 | 6 | devices with a circular microphone array? |
| 10:52:20 | 7 | A.  No, I don't.  I didn't. |
| 10:52:23 | 8 | Q.  To be clear, you did not work on any devices with a |
| 10:52:27 | 9 | circular microphone array? |
| 10:52:28 | 10 | A.  That is correct. |
| 10:52:38 | 11 | Q.  Digital signal processors, are they fixed point or |
| 10:52:40 | 12 | floating point? |
| 10:52:41 | 13 | A.  They could be. |
| 10:52:41 | 14 |         ATTORNEY:  Objection, form. |
| 10:52:42 | 15 | A.  So there are two kinds of digital signal processor. |
| 10:52:46 | 16 | One is using a fixed point.  The other type is floating |
| 10:52:50 | 17 | point. |
| 10:52:50 | 18 | Q.  And what type of beamforming was the CrispMic device |
| 10:52:54 | 19 | performing? |
| 10:52:56 | 20 | A.  Here it says fixed beamformer. |
| 10:52:58 | 21 | Q.  Do you recall if the fixed beamformer calculated any |
| 10:53:11 | 22 | delays? |
| 10:53:12 | 23 | A.  No, I think -- I remember we used the filter and some |
| 10:53:14 | 24 | method. |
| 10:53:14 | 25 | Q.  Earlier you mentioned you worked at Amazon Lab126.  Do |

| | | |
|---|---|---|
| 10:53:18 | 1 | you recall that? |
| 10:53:19 | 2 | A.  Correct. |
| 10:53:21 | 3 | Q.  What time frame did you work at Lab126? |
| 10:53:25 | 4 | A.  2011 to 2013. |
| 10:53:29 | 5 | Q.  Do you remember the month that you left in 2013? |
| 10:53:38 | 6 | A.  Yeah.  Around Thanksgiving. |
| 10:53:40 | 7 | Q.  And do you remember what month did you join in 2011? |
| 10:53:48 | 8 | A.  I joined Amazon in September. |
| 10:53:58 | 9 | Q.  And when did you leave Li Creative? |
| 10:54:04 | 10 | A.  January of 2008. |
| 10:54:11 | 11 | Q.  All right.  And what month was that that you joined |
| 10:54:14 | 12 | Lab126? |
| 10:54:15 | 13 | A.  I think it's September. |
| 10:54:18 | 14 | Q.  And what was your job -- job title when you joined? |
| 10:54:24 | 15 | A.  Hardware engineer. |
| 10:54:28 | 16 | Q.  And did you have that position the entire time you were |
| 10:54:33 | 17 | at Lab126? |
| 10:54:37 | 18 | A.  I had the one promotion from -- |
| 10:54:40 | 19 | Q.  When -- |
| 10:54:41 | 20 | A.  -- hardware engineer to -- |
| 10:54:47 | 21 | Q.  What was your promotion to? |
| 10:54:51 | 22 | A.  From hardware engineer to senior hardware engineer. |
| 10:54:56 | 23 | Q.  And what were your job responsibilities as a hardware |
| 10:55:03 | 24 | engineer? |
| 10:55:05 | 25 | A.  Develop hardware for Lab126 product. |

| | | |
|---|---|---|
| 10:55:15 | 1 | Q.  And what product was that? |
| 10:55:17 | 2 | A.  It was Echo. |
| 10:55:21 | 3 | Q.  Did the product have a code name at the time? |
| 10:55:25 | 4 | A.  Yes.  Project D, Doppler. |
| 10:55:30 | 5 | Q.  But did it have two code names, Project D and Doppler? |
| 10:55:38 | 6 | A.  Yeah, we -- it's the same thing.  But Doppler started |
| 10:55:43 | 7 | with D. |
| 10:55:44 | 8 | Q.  Can you describe, what were you doing for hardware |
| 10:55:49 | 9 | development for the Doppler project? |
| 10:55:56 | 10 | A.  I did the hardware for -- for Doppler audio.  That |
| 10:56:07 | 11 | means I have selected microphones, decided how to mount the |
| 10:56:13 | 12 | microphones on the product, and work on speakers. |
| 10:56:21 | 13 | I travel to China to support the hardware builds |
| 10:56:31 | 14 | to make sure we have a solid product from the factory. |
| 10:56:35 | 15 | Q.  Anything else? |
| 10:56:38 | 16 | A.  Can you be more specific? |
| 10:56:44 | 17 | Q.  Yeah.  Were there other aspects of Doppler that you |
| 10:56:50 | 18 | were working on? |
| 10:56:51 | 19 | A.  Yeah.  We also work closely with the software team to |
| 10:57:01 | 20 | develop microphone array. |
| 10:57:02 | 21 | Q.  Can you describe how you worked with the software team? |
| 10:57:15 | 22 | A.  We make sure the hardware has enough sensitivity |
| 10:57:21 | 23 | signal-to-noise ratio, and that the placement of the |
| 10:57:28 | 24 | microphones are optimized for certain digital signal |
| 10:57:38 | 25 | processing functions. |

| | | |
|---|---|---|
| 10:57:39 | 1 | Q.  Did you assist in writing any software with the |
| 10:57:41 | 2 | software team? |
| 10:57:42 | 3 | A.  No, I -- I -- I didn't. |
| 10:57:46 | 4 | Q.  Did you assist in developing any algorithms with the |
| 10:57:57 | 5 | software team? |
| 10:58:04 | 6 | A.  I think so.  Yes, we discussed -- |
| 10:58:09 | 7 | Q.  What algorithms -- |
| 10:58:11 | 8 | A.  -- algorithms together. |
| 10:58:13 | 9 | Q.  What algorithms did you discuss? |
| 10:58:15 | 10 | A.  We discussed a lot about AEC, which is acoustic echo |
| 10:58:28 | 11 | cancellation.  I don't recall other areas. |
| 10:58:30 | 12 | Q.  What did you discuss with respect to acoustic echo |
| 10:58:39 | 13 | cancellation? |
| 10:58:39 | 14 | A.  How to achieve the best performance of acoustic echo |
| 10:58:49 | 15 | cancellation.  What's the best way to control the -- the |
| 10:58:57 | 16 | speaker gain to benefit the algorithm. |
| 10:59:01 | 17 | Q.  Did you discuss -- while at Lab126, did you participate |
| 10:59:11 | 18 | in the discussion of any other algorithms? |
| 10:59:13 | 19 | A.  I think so. |
| 10:59:19 | 20 | Q.  Do you recall what? |
| 10:59:22 | 21 | A.  We -- I think we also discussed microphone array, |
| 10:59:30 | 22 | beamformer, speaker tuning, because it was a small team. |
| 10:59:36 | 23 | Q.  Was your role more limited to the hardware design and |
| 10:59:43 | 24 | how to implement that software into the hardware? |
| 10:59:50 | 25 | A.  That's correct.  I was a hardware engineer, and my work |

| | | |
|---|---|---|
| 10:59:53 | 1 | was -- was on hardware. |
| 10:59:54 | 2 | Q.  So you weren't really involved in the software design |
| 10:59:58 | 3 | that was going into the hardware? |
| 11:00:01 | 4 | A.  I was not. |
| 11:00:02 | 5 | Q.  Were you ever told why you weren't allowed to talk to |
| 11:00:05 | 6 | other project teams about what you were doing on -- in your |
| 11:00:08 | 7 | project? |
| 11:00:08 | 8 | A.  We really concerned about the project getting leak |
| 11:00:15 | 9 | before it launch.  There is an element of surprise just to |
| 11:00:21 | 10 | get best -- best coverage or get people excited.  Yeah, I |
| 11:00:32 | 11 | didn't ask why because I feel, yeah, that's the right thing |
| 11:00:37 | 12 | to do. |
| 11:00:37 | 13 | Q.  Was that normal in your experience to have project |
| 11:00:40 | 14 | teams not talk to each other, from your previous and other |
| 11:00:45 | 15 | work experience? |
| 11:00:46 | 16 | A.  Apple did the same. |
| 11:00:51 | 17 | Q.  In your observations while at Lab126, did people abide |
| 11:00:56 | 18 | by that policy and not talk to other project teams about |
| 11:00:59 | 19 | their work? |
| 11:01:01 | 20 | A.  That is correct.  We even don't have badge access to |
| 11:01:07 | 21 | other offices. |
| 11:01:13 | 22 | Q.  What did you mean by we didn't have access to other |
| 11:01:17 | 23 | offices? |
| 11:01:19 | 24 | A.  For example, I was working on second floor, and third |
| 11:01:25 | 25 | floor has a project -- the other project team working -- |

| | | |
|---|---|---|
| 11:01:29 | 1 | I -- actually, my badge doesn't work -- doesn't work on the |
| 11:01:33 | 2 | third floor.  So I couldn't have access to the third floor. |
| 11:01:36 | 3 | Q.  So was a different project team on the third floor? |
| 11:01:43 | 4 | A.  That was correct. |
| 11:01:45 | 5 | Q.  And so you didn't have access to where that project |
| 11:01:50 | 6 | team was located? |
| 11:01:53 | 7 | A.  Correct. |
| 11:01:54 | 8 | Q.  Do you recall if your employment agreement or NDA at |
| 11:02:00 | 9 | Lab126 included restrictions on using or disclosing a |
| 11:02:04 | 10 | previous employer's technology? |
| 11:02:07 | 11 | A.  I have a memory of such, of course, yes. |
| 11:02:15 | 12 | Q.  And what is that memory? |
| 11:02:31 | 13 | A.  Yeah, I -- it's hard for me to find out the details. |
| 11:02:39 | 14 | But that -- that's a general rule of thumb for engineers to |
| 11:02:46 | 15 | switch employers in Bay Area.  We -- we definitely don't |
| 11:02:50 | 16 | talk our previous projects with -- with the current |
| 11:02:57 | 17 | employee. |
| 11:03:02 | 18 | Q.  And did you abide by that practice while you were at |
| 11:03:07 | 19 | Lab126? |
| 11:03:09 | 20 | A.  Yeah. |
| 11:03:10 | 21 | Q.  Did you use or disclose Li Creative technology while |
| 11:03:14 | 22 | working at Lab126? |
| 11:03:15 | 23 | A.  No. |
| 11:03:26 | 24 | Q.  So just to clarify, did you use Li Creative technology |
| 11:03:29 | 25 | in your work at Lab126? |

| | | |
|---|---|---|
| 11:03:31 | 1 | A.  Li Creative technology?  Do you mean the trade secret |
| 11:03:37 | 2 | of Li Creative or just any skills I developed during my |
| 11:03:43 | 3 | employment with Li Creative? |
| 11:03:46 | 4 | Q.  Their confidential technology? |
| 11:03:51 | 5 | A.  Yeah, the -- the answer is no. |
| 11:03:54 | 6 | Q.  Did you disclose to anyone at Lab126 Li Creative |
| 11:03:58 | 7 | confidential technology? |
| 11:03:59 | 8 | A.  No. |
| 11:04:03 | 9 | Q.  Did Li Creative ever come to Lab126 for a meeting? |
| 11:04:10 | 10 | A.  Yes. |
| 11:04:13 | 11 | Q.  Do you recall when that was? |
| 11:04:20 | 12 | A.  I -- it's 2011. |
| 11:04:28 | 13 | Q.  Do you remember how long you had been at Lab126 when |
| 11:04:36 | 14 | that meeting happened? |
| 11:04:38 | 15 | A.  Very short period of time I spent at Lab126 at that |
| 11:04:45 | 16 | time. |
| 11:04:45 | 17 | Q.  And what was your role with respect to that meeting? |
| 11:04:51 | 18 | A.  I was -- I think -- yeah, I don't remember how I get |
| 11:05:07 | 19 | involved into a meeting.  I did attend the meeting. |
| 11:05:17 | 20 | This -- the email from Peter told me he was coming |
| 11:05:20 | 21 | to Lab126, and, of course, I -- I want to see him, but I |
| 11:05:27 | 22 | don't remember how was I invited into a meeting. |
| 11:05:31 | 23 | Q.  Do you recall if it was Dr. Li who invited you to the |
| 11:05:39 | 24 | meeting? |
| 11:05:40 | 25 | A.  I don't think that's the case because he's a guest to |

11:05:44  1   the meeting.  So he couldn't really invite me to the

11:05:49  2   meeting.

11:05:49  3   Q.  How did you first hear about the meeting?

11:05:51  4   A.  From Peter.

11:05:52  5   Q.  And what did Peter tell you about the meeting -- or

11:05:58  6   Dr. Li?  I apologize.

11:06:01  7   A.  He told me by email he's coming to Lab126 at certain

11:06:09  8   date.  That's it.

11:06:15  9   Q.  Why was Dr. Li coming to Lab126?

11:06:18  10  A.  I don't know.

11:06:23  11  Q.  Why did Dr. Li send you an email informing you that he

11:06:27  12  was coming to Lab126?

11:06:32  13  A.  We were still friends, so we tried our best to just

11:06:40  14  socialize if there is a chance.

11:06:42  15  Q.  Who was present at the meeting between Li Creative and

11:06:47  16  Lab126?

11:06:54  17  A.  I was there.  Peter was there.  Peter also had an

11:06:59  18  associate with him.  There were a few people from Lab126

11:07:07  19  which I didn't work closely, so I couldn't remember their

11:07:11  20  names.

11:07:11  21  Q.  What happened during the meeting?

11:07:13  22  A.  Peter had a few demos.  He also had a presentation.

11:07:27  23  Q.  What were the demos?

11:07:34  24  A.  I don't remember.

11:07:36  25  Q.  What was the presentation?

| | | |
|---|---|---|
| 11:07:39 | 1 | A.   No memory. |
| 11:07:46 | 2 | Q.   How long was the meeting? |
| 11:07:48 | 3 | A.   Usually, we schedule the window meeting for one |
| 11:07:56 | 4 | hour-long, but I don't have memory of that meeting. |
| 11:07:59 | 5 | Q.   Do you remember if there were physical samples at the |
| 11:08:02 | 6 | meeting? |
| 11:08:06 | 7 | A.   I -- I think so. |
| 11:08:08 | 8 | Q.   What were they of? |
| 11:08:16 | 9 | A.   What I remember was Peter actually gave me a CrispMic |
| 11:08:22 | 10 | sample after meeting, in the original package because it's |
| 11:08:26 | 11 | on sale already.   He -- he give for me -- give to me as a |
| 11:08:31 | 12 | souvenir.   So he could have showed that sample, but I don't |
| 11:08:38 | 13 | have memory about -- exactly about that meeting. |
| 11:08:42 | 14 | Q.   All right.   So I'm introducing Exhibit No. 1023 with |
| 11:08:49 | 15 | the Production No. LCT-AMAZON00032461? |
| 11:09:02 | 16 | A.   Yes. |
| 11:09:02 | 17 | Q.   Mr. Li, do you see at the top of the email it says from |
| 11:09:10 | 18 | Li, Wei -- |
| 11:09:12 | 19 | A.   That's right. |
| 11:09:13 | 20 | Q.   -- sent on October 5th, 2011? |
| 11:09:17 | 21 | A.   Uh-huh. |
| 11:09:18 | 22 | Q.   And is that from you? |
| 11:09:19 | 23 | A.   From this email, yeah, I think I wrote it. |
| 11:09:26 | 24 | Q.   And you wrote:  Hi, Peter.  I am glad you are coming to |
| 11:09:31 | 25 | showcase LcT's technologies. |

| | | |
|---|---|---|
| 11:09:36 | 1 | Do you recall the LcT's technology Dr. Li |
| 11:09:42 | 2 | showcased? |
| 11:09:43 | 3 | A.  I don't.  I don't remember. |
| 11:09:46 | 4 | Q.  Why don't you remember? |
| 11:09:51 | 5 | A.  Oh, it's -- it's been long.  Also, I don't want to |
| 11:09:57 | 6 | speak out the wrong technology.  If -- |
| 11:10:07 | 7 | Q.  Okay. |
| 11:10:08 | 8 | A.  Yeah, I just don't want to speculate. |
| 11:10:11 | 9 | Q.  That's fine. |
| 11:10:12 | 10 | Why were you glad Dr. Li was coming? |
| 11:10:18 | 11 | A.  That's just a pleasantry, right, you see your friends |
| 11:10:24 | 12 | after four or five years. |
| 11:10:29 | 13 | Q.  Prior to Dr. Li coming to visit Lab126, when had been |
| 11:10:38 | 14 | the last time you saw him? |
| 11:10:41 | 15 | A.  That should be a time I left Li Creative. |
| 11:10:48 | 16 | Q.  Had you corresponded with him between the time you left |
| 11:10:56 | 17 | and the time he came to Lab126? |
| 11:10:58 | 18 | A.  Yes, we do.  Sometimes we make phone calls. |
| 11:11:04 | 19 | Q.  What would you discuss? |
| 11:11:05 | 20 | A.  For example, I had a baby.  What else?  My employment. |
| 11:11:30 | 21 | Yeah, that's what I remember. |
| 11:11:31 | 22 | Q.  So back to the email.  You wrote:  I also recommended |
| 11:11:38 | 23 | your technology to my team. |
| 11:11:43 | 24 | What did you mean by that? |
| 11:11:46 | 25 | A.  That means I introduced his technology to some of my |

| | | |
|---|---|---|
| 11:11:53 | 1 | co-workers. |
| 11:11:56 | 2 | Q.  What technology did you introduce? |
| 11:12:00 | 3 | A.  Should be on the line of noise reduction, informal, |
| 11:12:09 | 4 | but -- yeah, I don't have precise memory.  At that time, |
| 11:12:20 | 5 | there's a website from Li Creative, and they will show |
| 11:12:24 | 6 | stuff on their website.  That's -- that's probably what -- |
| 11:12:32 | 7 | whatever they show on the website is reference.  I -- I |
| 11:12:39 | 8 | don't have full memory about that. |
| 11:12:42 | 9 | Q.  So, previously, you stated you wouldn't use or disclose |
| 11:12:47 | 10 | your previous employer's confidential information.  Do you |
| 11:12:50 | 11 | remember that? |
| 11:12:51 | 12 | ATTORNEY:  Objection to form. |
| 11:12:53 | 13 | A.  I do. |
| 11:12:55 | 14 | Q.  Were you talking to your team about public information |
| 11:12:59 | 15 | of Li Crea -- Li Creative or confidential information? |
| 11:13:05 | 16 | A.  We only talk about public informations. |
| 11:13:10 | 17 | Q.  And for that, were you looking at Li Creative's |
| 11:13:19 | 18 | website? |
| 11:13:20 | 19 | A.  That's what I would do. |
| 11:13:22 | 20 | Q.  Did you show your team members the Li Creative website? |
| 11:13:31 | 21 | A.  I don't have a memory.  But -- |
| 11:13:39 | 22 | Q.  Who did you talk to? |
| 11:13:42 | 23 | A.  -- I probably would have. |
| 11:13:44 | 24 | I would talk to my boss, to other team members in |
| 11:13:58 | 25 | the hardware team.  Maybe people in the software team, but |

11:14:05    1    not sure.  They all know -- they all knew that I worked for

11:14:09    2    the company.  They could just have looked at the website

11:14:14    3    to figure out what I have done.

11:14:16    4    Q.  In the email, you continued, you wrote:  They are quite

11:14:22    5    interested.

11:14:23    6          What did you mean by that?

11:14:24    7    A.  That means, oh, yeah, that sounds interesting.  Maybe

11:14:28    8    we can take a look.  Maybe we can invite them come for demo

11:14:41    9    or meeting.

11:14:43   10    Q.  Why did they say that sounds interesting?

11:14:45   11    A.  Because at that time, we were working on microphone

11:14:50   12    array, noise reduction for Echo.  If there's some other

11:14:59   13    company -- some other company working on same technology

11:15:02   14    and they want to sell, we -- we could take a look.

11:15:07   15    Q.  So you wrote:  What's your schedule at Lab126?

11:15:13   16          Why did you write that?

11:15:14   17    A.  I think probably it's related with -- the next

11:15:28   18    sentence, if he can have a separate demo.  Because if we

11:15:33   19    want him to demo, then we need to figure out the

11:15:37   20    availability of the people and his availability.

11:15:40   21    Q.  All right.  So, Mr. Li, I introduced what's previously

11:15:45   22    been marked as Exhibit 1014, with Bates No. AMZN0002007.

11:15:55   23          What is this?

11:15:56   24    A.  I would say that's a cover letter -- the cover page is

11:16:04   25    about the ICASSP conference in 2009.  Then there's a paper

11:16:15   1   co-authored Peter Li, Manli, and myself.

11:16:23   2   Q.  Is there a particular product that this article is

11:16:27   3   describing?

11:16:27   4   A.  Yeah, it looks like it's talking about CrispMic.

11:16:31   5   Q.  Mr. Li, as an engineer, when you read that

11:16:33   6   introduction, does this suggest the microphone array can be

11:16:38   7   used for sound source localization?

11:16:40   8   A.  I just scanned through the paper.  Nothing is mentioned

11:16:45   9   about sound source localization.  So, with that, I don't

11:16:49   10  think this paper is talking about sound source

11:16:51   11  localization.

11:16:51   12  Q.  Does the beamforming calculate a delay?

11:16:59   13  A.  I don't see it calculate delay.

11:17:02   14  Q.  Does it measure a delay?

11:17:05   15  A.  The delay will be -- let me see, how do I answer this?

11:17:13   16       It doesn't matter the delay, no.

11:17:15   17  Q.  Did you look at the patent when you were Googling the

11:17:19   18  case?

11:17:20   19  A.  I didn't -- I -- I don't remember there's a patent

11:17:26   20  number on that case.

11:17:27   21       But, you know, we -- we have a habit of not

11:17:33   22  looking at the patents.  That's what our lawyers told us

11:17:45   23  when we work for multiple -- for different tech --

11:17:49   24  technical companies.

11:17:50   25  Q.  When did you start using that practice?

| | | |
|---|---|---|
| 11:17:55 | 1 | A.  As far as I remember, I -- at least I started in Bay |
| 11:18:02 | 2 | Area. |
| 11:18:02 | 3 | Q.  When? |
| 11:18:02 | 4 | A.  Since I moved to Bay Area.  That's -- that's at |
| 11:18:11 | 5 | least -- I moved to Bay Area in 2009, March.  March 2000 -- |
| 11:18:19 | 6 | no -- yeah, March 2009. |
| 11:18:23 | 7 | Q.  Is that about when you started using the practice not |
| 11:18:26 | 8 | to look at patents? |
| 11:18:29 | 9 | A.  That's as early as I can remember.  I could have |
| 11:18:32 | 10 | started earlier. |
| 11:18:33 | 11 | Q.  Knowing that you had worked on microphone arrays at Li |
| 11:18:38 | 12 | Creative as part of your past experience, you testified |
| 11:18:44 | 13 | that Amazon hired you to work on the Echo devices, correct? |
| 11:18:48 | 14 | A.  Yes, Amazon hired me. |
| 11:18:50 | 15 | Q.  And you worked on the Echo devices, correct? |
| 11:18:54 | 16 | A.  Correct. |
| 11:18:54 | 17 | Q.  And knowing that you had worked on microphones at -- |
| 11:19:01 | 18 | microphone arrays at Li Creative as part of your past |
| 11:19:04 | 19 | experience, you testified that someone at Amazon invited |
| 11:19:07 | 20 | you to attend the meeting with Li Creative, correct? |
| 11:19:11 | 21 | A.  I don't remember who exactly invited me. |
| 11:19:17 | 22 | Q.  But someone at Amazon invited you to attend the meeting |
| 11:19:23 | 23 | with Li Creative; you just don't remember who that person |
| 11:19:25 | 24 | was, correct? |
| 11:19:26 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 11:19:26 | 1 | Q.  When you worked at Li Creative, you were aware that |
| 11:19:31 | 2 | Dr. Li had filed for patents while you worked at Li |
| 11:19:36 | 3 | Creative, correct? |
| 11:19:37 | 4 | A.  Yes. |
| 11:19:37 | 5 | Q.  Was that a yes? |
| 11:19:38 | 6 | A.  Yes. |
| 11:19:38 | 7 | Q.  So when you attended the meeting with Dr. Li at Amazon, |
| 11:19:43 | 8 | you personally knew that he had patents or patent |
| 11:19:47 | 9 | applications, correct? |
| 11:19:48 | 10 | A.  That's very broad.  But, yes, I know Peter has patents. |
| 11:19:52 | 11 | I knew it. |
| 11:19:53 | 12 | Q.  And you knew it at the time when Am -- when you -- when |
| 11:20:00 | 13 | you had the meeting with Dr. Li at Amazon that he had |
| 11:20:03 | 14 | patents or patents applications, right? |
| 11:20:05 | 15 |           ATTORNEY:  Objection, form. |
| 11:20:07 | 16 | A.  I did. |
| 11:20:08 | 17 | Q.  Can you repeat your answer? |
| 11:20:13 | 18 | A.  Yes.  I -- I did know that Peter had patents. |
| 11:20:23 | 19 | Q.  You said earlier that you may have applied for or |
| 11:20:26 | 20 | received a patent at Lab126 and that it may have been with |
| 11:20:31 | 21 | someone named Amit; is that correct? |
| 11:20:35 | 22 | A.  That's correct. |
| 11:20:38 | 23 | Q.  Is that Amit Chhetri? |
| 11:20:40 | 24 | A.  That sounds right. |
| 11:20:46 | 25 | Q.  You and Amit Chhetri both worked on the Echo devices, |

| | | |
|---|---|---|
| 11:20:51 | 1 | correct? |
| 11:20:51 | 2 | A.  Correct. |
| 11:20:51 | 3 | Q.  Did you ever say anything about Dr. Li's patents while |
| 11:20:57 | 4 | at Lab126? |
| 11:21:01 | 5 | A.  No. |
| 11:21:17 | 6 | Q.  Did you ever say anything about Dr. Li's patent |
| 11:21:21 | 7 | applications while at Lab126? |
| 11:21:23 | 8 | A.  No. |
| 11:21:26 | 9 | Q.  Did you hear anyone else refer to Dr. Li's patents or |
| 11:21:38 | 10 | patent applications while at Lab126? |
| 11:21:43 | 11 | A.  I don't remember. |
| 11:21:45 | 12 |           (Videoclip ends.) |
| 11:21:50 | 13 |           THE COURT:  Does that complete this witness by |
| 11:21:57 | 14 | deposition? |
| 11:21:57 | 15 |           MR. FABRICANT:  Yes, Your Honor. |
| 11:21:58 | 16 |           THE COURT:  Call your next witness, Plaintiff. |
| 11:22:00 | 17 |           MR. FABRICANT:  Thank you, Your Honor. |
| 11:22:01 | 18 |           MR. LAMBRIANAKOS:  Your Honor, Plaintiff calls |
| 11:22:09 | 19 | Rohit Prasad, vice president and head scientist for Alexa |
| 11:22:14 | 20 | artificial intelligence at Amazon.com. |
| 11:22:18 | 21 |           Plaintiff's runtime is 5 minutes, 56 seconds; |
| 11:22:21 | 22 | Defendants' is 3 minutes, 3 seconds. |
| 11:22:24 | 23 |           THE COURT:  Proceed with this witness by |
| 11:22:26 | 24 | deposition. |
| 11:22:27 | 25 |           MR. LAMBRIANAKOS:  Thank you. |

| | | |
|---|---|---|
| 11:22:27 | 1 | <u>ROHIT PRASAD, PLAINTIFF'S WITNESS</u> |
| 11:22:32 | 2 | <u>PRESENTED BY VIDEO DEPOSITION</u> |
| 11:22:32 | 3 | (Videoclip played.) |
| 11:22:33 | 4 | Q.  Could you please state your name and city and state of |
| 11:22:36 | 5 | residence for the record? |
| 11:22:38 | 6 | A.  Yeah.  My name is Rohit Prasad.  I live in Lexington, |
| 11:22:42 | 7 | Massachusetts. |
| 11:22:42 | 8 | Q.  Mr. Prasad, by whom are you employed? |
| 11:22:46 | 9 | A.  I'm employed by Amazon.com. |
| 11:22:49 | 10 | Q.  I'll refer to Amazon.com LLC as Amazon for the purposes |
| 11:22:55 | 11 | of this deposition. |
| 11:22:55 | 12 | What is your title currently? |
| 11:22:57 | 13 | A.  My title is vice president and head scientist for Alexa |
| 11:23:01 | 14 | AI. |
| 11:23:01 | 15 | Q.  What is your involvement in the Echo devices? |
| 11:23:06 | 16 | A.  As I said, my involvement in Echo devices is -- when I |
| 11:23:13 | 17 | was director of machine learning was focused on audio to |
| 11:23:18 | 18 | text and text to -- text to noting what Alexa should do. |
| 11:23:23 | 19 | Similar responsibilities now, except Alexa's |
| 11:23:25 | 20 | intelligence is more mature now, so it is more focused on |
| 11:23:29 | 21 | understanding the best action it can take for customers |
| 11:23:31 | 22 | amongst the 100,000 skills that exist on Alexa. |
| 11:23:37 | 23 | Q.  Have you had responsibilities for hiring employees for |
| 11:23:51 | 24 | the teams responsible for the Echo devices and for Alexa? |
| 11:23:54 | 25 | A.  I've had responsibility for hiring scientists and |

11:23:58  1   engineers and product managers on essentially components

11:24:02  2   that I discussed already.

11:24:04  3   Q.  Did your recruiting responsibilities also include

11:24:10  4   reviewing resumes for potential candidates?

11:24:15  5   A.  Yes, to the -- in terms of resumes that are -- that are

11:24:19  6   sent to me, yes.

11:24:20  7   Q.  Do you know who Peter Li is?

11:24:23  8   A.  Yeah, I know Peter Li.  I -- yes.

11:24:28  9   Q.  What do you know of Peter Li?

11:24:34  10  A.  I spoke to him in June 2013 time frame.

11:24:40  11  Q.  Why did you speak to Peter Li in June 2013?

11:24:44  12  A.  His resume was surfaced to me for -- by a recruiter.  I

11:24:54  13  was looking for a director or a senior manager roles for

11:24:58  14  speech recognition for Alexa.  And in that context, I

11:25:02  15  looked at Peter Li's resume and spoke to him.

11:25:06  16  Q.  What was the substance of your discussion with Peter Li

11:25:09  17  in June of 2013?

11:25:10  18  A.  I interviewed him to understand whether he's a fit for

11:25:13  19  the role I had or not.

11:25:15  20  Q.  During your conversations with Peter Li in June of

11:25:20  21  2013, did he inform you that he had previously provided a

11:25:23  22  demonstration to Lab126?

11:25:27  23  A.  Yes, he did mention a demonstration to Lab126.

11:25:31  24  Q.  What did he say about the demonstration to Lab126?

11:25:33  25  A.  He didn't say anything specific, nor I felt it was

11:25:43  1   pertinent for what I was looking for.

11:25:45  2   Q.  Why wasn't it pertinent?

11:25:47  3   A.  Because as I mentioned, my focus is more after the

11:25:56  4   speech signal has been sent to my systems whether we can

11:25:58  5   recognize it with high fidelity for converting the audio

11:25:59  6   into text.  I wasn't interested in speed signal processing,

11:26:05  7   which is where Peter's expertise lie.

11:26:09  8   Q.  Did you speak to anyone at Lab126 after your

11:26:11  9   conversation with Peter Li in June 2013?

11:26:13  10  A.  No, I did not speak to anyone.

11:26:15  11  Q.  You didn't inquire to anyone at Lab126 about the

11:26:22  12  demonstration?

11:26:22  13  A.  No, I did not.

11:26:23  14  Q.  I'm going to introduce Exhibit 1.  This is a document

11:26:33  15  produced by Amazon with beginning Production No.

11:26:40  16  AMZN0137694.

11:26:40  17       Please take a moment to review that document,

11:26:43  18  Mr. Prasad, and let me know if you recognize it.

11:26:45  19  A.  Yes, I recognize this document.  This is essentially

11:26:51  20  extract of -- of the phone screen notes that I took while

11:26:54  21  discussing the role with Peter.

11:26:56  22  Q.  And I will refer you to the portion of the document on

11:27:04  23  the first page where it reads:  Invited by Lab126 to

11:27:10  24  present technology.  Mic Array and RES and 3D song

11:27:18  25  playback.

| | | |
|---|---|---|
| 11:27:18 | 1 | Do you see that? |
| 11:27:19 | 2 | A.  Yeah, I see that. |
| 11:27:22 | 3 | Q.  You see that.  Do these notes that I just read from |
| 11:27:25 | 4 | Exhibit 1 reflect what you referred to earlier when you |
| 11:27:30 | 5 | indicated that Peter Li informed you about a demonstration |
| 11:27:33 | 6 | he had provided to Lab126? |
| 11:27:34 | 7 | A.  Yeah.  It's simply saying he made a demonstration.  And |
| 11:27:41 | 8 | as you can see, my focus was -- after asking when was this |
| 11:27:46 | 9 | meeting, it was immediately focused on his strengths and |
| 11:27:50 | 10 | fit for my role. |
| 11:27:51 | 11 | Q.  What is 3D song playback? |
| 11:27:56 | 12 | A.  In that one, he just mentioned that's not an expertise |
| 11:28:01 | 13 | area I have for song playback.  It's not my -- I just took |
| 11:28:08 | 14 | it as notes, but that's not where my expertise lies. |
| 11:28:12 | 15 | Q.  Do you have an understanding of what 3D song playback |
| 11:28:20 | 16 | refers to? |
| 11:28:20 | 17 | A.  Not in detail.  Because it's clearly about signal |
| 11:28:24 | 18 | processing on enhancing the input, which is what mic array |
| 11:28:29 | 19 | is, and playback is probably for announcing the output in |
| 11:28:33 | 20 | this case. |
| 11:28:34 | 21 | Again, I'm not the expert at this.  You need to |
| 11:28:35 | 22 | talk to an audio engineer for that. |
| 11:28:37 | 23 | Q.  Do you have any outside knowledge of Mr. Li's meeting |
| 11:28:47 | 24 | with Phil Hilmes, beyond this document? |
| 11:28:50 | 25 | A.  No, I don't. |

11:28:51  1   Q.  Did you speak to Mr. Hilmes about his interview with

11:28:55  2   Mr. -- Dr. Li, rather?

11:28:56  3   A.  No, I did not.

11:28:59  4   Q.  Did you meet with Dr. Li on any other occasions beyond

11:29:04  5   the phone interview you conducted in June of 2013?

11:29:10  6   A.  Not that I recall.

11:29:12  7   Q.  Did you participate in a launch event for the first

11:29:15  8   Echo device in New York in 2014?

11:29:17  9   A.  Yes, I did.

11:29:20  10  Q.  What was the nature of your participation in that

11:29:24  11  event?

11:29:25  12  A.  I demonstrated the product.  And I also talked briefly

11:29:31  13  about how it works, and this was a typical launch event and

11:29:38  14  venue where you had hundreds of people.

11:29:41  15  Q.  Do you recall meeting Dr. Li at that event?

11:29:45  16  A.  No, I don't recall meeting Dr. Li at that event.

11:29:49  17  Q.  Did you demonstrate any technology at that event?

11:29:55  18  A.  Yes.  We demonstrated the Echo product, at which the

11:30:01  19  original Echo speaker, and we -- a few of us spoke to it

11:30:04  20  and showed how it answers back.  That was the extent of the

11:30:08  21  demonstration.

11:30:09  22  Q.  I'm going to introduce Exhibit 2, which is a document

11:30:13  23  with beginning Production No. LCT-AMAZON00016226.

11:30:29  24          This is an email thread between Lexie Burnham and

11:30:33  25  Dr. Peter Li.  Do you know who Lexie Burnham is?

| | | |
|---|---|---|
| 11:30:35 | 1 | A.  Can you give me -- yeah, Lexie was a recruiter. |
| 11:30:37 | 2 | Q.  Did you work with Lexie Burnham in 2014 as part of your |
| 11:30:41 | 3 | recruiting responsibilities? |
| 11:30:41 | 4 | A.  Yes, I did. |
| 11:30:42 | 5 | Q.  The question is: |
| 11:30:50 | 6 | Is it your understanding that the portion of the |
| 11:30:52 | 7 | email states:  As you know, because you were already aware |
| 11:30:56 | 8 | of Li Creative Technologies from having interviewed Dr. Li |
| 11:31:03 | 9 | in 2013. |
| 11:31:06 | 10 | A.  Yes, from my interview I knew about his company because |
| 11:31:10 | 11 | he mentioned it in the interview. |
| 11:31:12 | 12 | Q.  Does reading this portion of the email refresh your |
| 11:31:17 | 13 | recollection as to whether you also met Dr. Li at the 2014 |
| 11:31:21 | 14 | launch event? |
| 11:31:23 | 15 | A.  No, it does not, because there were hundreds of people, |
| 11:31:27 | 16 | and I met many people.  I have no recollection of Peter Li |
| 11:31:31 | 17 | coming and talking to me. |
| 11:31:33 | 18 | (Videoclip ends.) |
| 11:31:34 | 19 | THE COURT:  Does that complete this witness by |
| 11:31:39 | 20 | deposition? |
| 11:31:39 | 21 | MR. LAMBRIANAKOS:  Yes, Your Honor. |
| 11:31:40 | 22 | THE COURT:  Call your next witness. |
| 11:31:41 | 23 | MR. LAMBRIANAKOS:  Your Honor, Plaintiff calls |
| 11:31:51 | 24 | Aleksandar Pance by deposition.  He is vice president of |
| 11:31:55 | 25 | technology and hardware development at Amazon's Lab126. |

| | | |
|---|---|---|
| 11:31:59 | 1 | Plaintiff's runtime is 29 minutes, 55 seconds; |
| 11:32:04 | 2 | Defendants', 3 minutes, 6 seconds. |
| 11:32:07 | 3 | THE COURT:  Proceed with this witness by |
| 11:32:08 | 4 | deposition. |
| 11:32:09 | 5 | MR. LAMBRIANAKOS:  Thank you. |
| 11:32:09 | 6 | ALEKSANDAR PANCE, PLAINTIFF'S WITNESS |
| 11:32:13 | 7 | PRESENTED BY VIDEO DEPOSITION |
| 11:32:13 | 8 | (Videoclip played.) |
| 11:32:13 | 9 | Q.  Good morning, sir.  Can you please state your name for |
| 11:32:16 | 10 | the record? |
| 11:32:16 | 11 | A.  Aleksandar Pance. |
| 11:32:19 | 12 | Q.  Mr. Pance, for whom do you presently work?  Who is your |
| 11:32:25 | 13 | employer? |
| 11:32:25 | 14 | A.  Amazon.com is my employer. |
| 11:32:27 | 15 | Q.  And what is your job title? |
| 11:32:29 | 16 | A.  I'm vice president of technology of hardware |
| 11:32:32 | 17 | development at -- at Lab126. |
| 11:32:32 | 18 | Q.  So with your -- in your current capacity, what are your |
| 11:32:39 | 19 | job duties? |
| 11:32:40 | 20 | A.  Yes.  So in my current capacity, I run a functional |
| 11:32:54 | 21 | organization responsible for hardware architecture and |
| 11:32:59 | 22 | certain technology domains that include display touch, |
| 11:33:08 | 23 | optics, camera technology, battery technology, audio |
| 11:33:15 | 24 | technology, some silicone development and whatnot. |
| 11:33:26 | 25 | And this organization supports all hardware |

| | | |
|---|---|---|
| 11:33:37 | 1 | products -- or almost all hardware products and product |
| 11:33:42 | 2 | lines that Lab126 is responsible for. |
| 11:33:44 | 3 | Q.  And is one of those hardware lines the Line of Echo |
| 11:33:48 | 4 | products? |
| 11:33:49 | 5 | A.  Yes.  Yeah, one of those lines is -- is our Echo |
| 11:33:57 | 6 | products, yes. |
| 11:33:58 | 7 | Q.  Where did you work immediately before Amazon? |
| 11:34:02 | 8 | A.  I worked at Apple in Cupertino before joining Amazon. |
| 11:34:09 | 9 | Q.  What did you do at Apple? |
| 11:34:11 | 10 | A.  So at Apple, I was part of the product architecture |
| 11:34:24 | 11 | team, and immediately -- or my -- again, my last -- my last |
| 11:34:45 | 12 | assignment at Apple was as a senior prototyping scientist. |
| 11:34:57 | 13 | And I believe I left Apple, I believe, in June |
| 11:35:04 | 14 | 2011, to join Amazon in July of 2011, I believe. |
| 11:35:10 | 15 | Q.  Sir, do you know what your email address is at Amazon? |
| 11:35:16 | 16 | A.  Excuse me, what is the question? |
| 11:35:20 | 17 | Q.  What is your email address at Amazon? |
| 11:35:22 | 18 | A.  It's A-P-A-N-C-E@Amazon.com. |
| 11:35:35 | 19 | Q.  And when you worked at Apple, was it |
| 11:35:44 | 20 | A-P-A-N-C-E@Apple.com? |
| 11:35:44 | 21 | A.  I believe so.  I also believe that it may have been my |
| 11:35:48 | 22 | first name.last name@Apple.com.  But I believe -- I believe |
| 11:35:52 | 23 | it is A-P-A-N-C-E@Apple.com, I believe. |
| 11:35:59 | 24 | Q.  In your tenure at Amazon, have you ever requested |
| 11:36:03 | 25 | meetings with any third parties? |

| | | |
|---|---|---|
| 11:36:04 | 1 | A.  Yes.  I believe I have, yes. |
| 11:36:06 | 2 | Q.  Sir, have you ever heard of a company called Li |
| 11:36:09 | 3 | Creative Technologies? |
| 11:36:09 | 4 | A.  Yes, I did.  They're -- they're part of this lawsuit, I |
| 11:36:17 | 5 | guess. |
| 11:36:28 | 6 | Q.  So I'm going to introduce as an exhibit a document |
| 11:36:34 | 7 | bearing production label Amazon -- or AMZN0006705. |
| 11:36:42 | 8 | Is this the document you were talking about? |
| 11:36:45 | 9 | And so you said this is an Outlook Note, right? |
| 11:36:50 | 10 | A.  That's correct. |
| 11:36:50 | 11 | Q.  And you can see under "CN" -- it says, "CN" about |
| 11:37:10 | 12 | two-thirds of the way to the right of the page on the front |
| 11:37:13 | 13 | line, "cn=A-P-A-N-C-E."  Do you see that? |
| 11:37:23 | 14 | A.  Yeah, CN equals A-P-A-N-C-E.  Yes, I see that. |
| 11:37:26 | 15 | Q.  That's one of the ways we know this is a note that you |
| 11:37:30 | 16 | had on your computer.  That's your user name or -- |
| 11:37:32 | 17 | A.  Yes. |
| 11:37:32 | 18 | Q.  -- user ID -- user ID, right? |
| 11:37:35 | 19 | A.  Yes. |
| 11:37:36 | 20 | Q.  And then there's a date under the sent? |
| 11:37:41 | 21 | A.  Yes. |
| 11:37:42 | 22 | Q.  11/17/2011, right? |
| 11:37:44 | 23 | A.  Yes. |
| 11:37:47 | 24 | Q.  And then the subject, it says:  Sergei, 1:1 10/17, |
| 11:37:59 | 25 | right? |

11:37:59  1   A.  That's correct.

11:37:59  2   Q.  So who is Sergei?

11:38:01  3   A.  Sergei is an audio engineer on my team, and he was also

11:38:09  4   at the time -- in October of 2011, he was also the only

11:38:13  5   audio engineer on my team.

11:38:23  6   Q.  So that second line -- well, the first line under

11:38:26  7   subject, where it says "not impressed with Li Creative

11:38:30  8   Tech," is that you or Sergei or someone else saying that,

11:38:34  9   or do you just not recall?

11:38:35  10  A.  Sorry, it's just blank.  Sorry.  I cannot -- since I

11:38:40  11  don't recall, I cannot say whether I was not impressed by

11:38:46  12  Li Creative Technologies, Sergei was not impressed, or we

11:38:54  13  were both not impressed, or whoever else was not impressed.

11:39:05  14  Q.  So you don't recall anything about that, right?  You

11:39:08  15  have no idea who could have been not impressed.  You just

11:39:12  16  don't remember, right?

11:39:13  17  A.  I don't -- I don't remember.

11:39:14  18  Q.  So if you testify at trial in this case, you don't have

11:39:18  19  any basis to tell the jury one way or the other whether you

11:39:22  20  were impressed or not with Li Creative Technologies's

11:39:26  21  presentation, right?

11:39:27  22  A.  My testimony is to the facts that I can recall, and the

11:39:51  23  fact is that we have this note, and the fact is that there

11:39:55  24  were emails -- there was an email -- email chain about a

11:39:59  25  meeting, but I don't recall details about that meeting in

| | | |
|---|---|---|
| 11:40:11 | 1 | 2011. |
| 11:40:13 | 2 | Q.  And no one else at Amazon has any better knowledge than |
| 11:40:16 | 3 | you about that meeting, right? |
| 11:40:18 | 4 | A.  So since Sergei is the audio engineer who is still at |
| 11:40:38 | 5 | Amazon, I did ask him if he remembers anything about |
| 11:40:52 | 6 | meeting, the technology, and he -- he doesn't remember any |
| 11:41:02 | 7 | specifics whatsoever. |
| 11:41:02 | 8 | Q.  Does this note mean you weren't impressed with Li |
| 11:41:11 | 9 | Creative Technologies? |
| 11:41:11 | 10 | A.  The note says:  Not impressed with Li Creative |
| 11:41:14 | 11 | Technologies.  Investigate audience. |
| 11:41:17 | 12 |         That's what the note says. |
| 11:41:18 | 13 | Q.  Sitting here today, you don't know what that statement |
| 11:41:24 | 14 | meant, right?  You don't know what "not impressed with Li |
| 11:41:30 | 15 | Creative Technology" meant, correct? |
| 11:41:30 | 16 | A.  Well, if I take that line out of context of the rest of |
| 11:41:36 | 17 | the note, then I say, I don't know whether that meant I was |
| 11:41:44 | 18 | not impressed, we were not impressed, or Sergei was not |
| 11:41:48 | 19 | impressed. |
| 11:41:49 | 20 |         However, the second part of that note says |
| 11:41:52 | 21 | "investigate audience."  And that means Audience is a |
| 11:41:58 | 22 | company or used to be a company that had audio-processing |
| 11:42:05 | 23 | technology. |
| 11:42:16 | 24 |         And so if we take those two together, that means |
| 11:42:23 | 25 | this note said that we should go investigate or talk to a |

11:42:36  1  dif -- or another company.  That's -- that's what this note

11:42:41  2  means to me.

11:42:42  3  Q.  So you said that you went -- you went to go evaluate

11:42:45  4  Audience.  Did you go evaluate anybody else other than

11:42:48  5  Audience?

11:42:48  6  A.  That's a great question.  I don't -- I don't recall,

11:43:01  7  you know, which audio companies we talked to in 2011 or

11:43:05  8  '12.

11:43:06  9  Q.  But sitting here today, you have no recollection of

11:43:13  10  either yourself or Sergei being impressed or not impressed

11:43:18  11  with Li Creative Technologies, right?

11:43:25  12  A.  As I said, I don't -- I -- I have no recollection of

11:43:29  13  that meeting.  So I don't -- I cannot say whether I was

11:43:33  14  impressed or not impressed.

11:43:35  15  Q.  I would like to introduce another document.  This one

11:43:41  16  bears production label LCT-AMAZON00016234 through 16244,

11:43:52  17  and this will be Exhibit 6.

11:44:01  18       Is this the email chain you said you reviewed in

11:44:07  19  refreshing your recollection for today's deposition?

11:44:11  20  A.  Yes, this was the email chain that had attachment that

11:44:15  21  you mentioned before.

11:44:16  22  Q.  And am I correct that you have no recollection of this

11:44:22  23  email outside -- outside of reviewing it for today's

11:44:25  24  deposition?

11:44:25  25  A.  That's correct.  I obviously acknowledge that on the

| | | |
|---|---|---|
| 11:44:41 | 1 | "to" line, but I don't recall this -- this email chain. |
| 11:44:46 | 2 | Q.  So do you see where it says:  I am with Lab126, |
| 11:44:51 | 3 | hardware design arm of Amazon.  We are very interested in |
| 11:44:57 | 4 | your 3D audio, noise/echo cancellation? |
| 11:45:03 | 5 | A.  Yes.  And this appears to be an email from Jerry Wu on |
| 11:45:08 | 6 | September 20th, who -- who admin@licreativetech.com with |
| 11:45:08 | 7 | the subject -- |
| 11:45:08 | 8 | Q.  So -- |
| 11:45:08 | 9 | A.  It's a meeting request.  I see that, yes. |
| 11:45:24 | 10 | Q.  So you were at Amazon at that time, right? |
| 11:45:27 | 11 | A.  That's correct. |
| 11:45:32 | 12 | Q.  And do you see on Page 10 where it says:  Below are the |
| 11:45:38 | 13 | audio technology that Lab126 is interested in seeing? |
| 11:45:41 | 14 | Do you see that? |
| 11:45:42 | 15 | A.  I do see that, yes. |
| 11:45:46 | 16 | Q.  And under there it says:  Adaptive beamforming on |
| 11:45:49 | 17 | input, 3D audio, and noise/echo cancellation, other. |
| 11:45:54 | 18 | Do you see that? |
| 11:45:55 | 19 | A.  Yes, I see that. |
| 11:45:56 | 20 | Q.  No, sir.  What I'm asking you is, who did that request |
| 11:46:03 | 21 | come from?  That information, who did it come from? |
| 11:46:07 | 22 | A.  I have no -- |
| 11:46:09 | 23 | ATTORNEY:  Objection to form. |
| 11:46:11 | 24 | A.  Well, I -- I have no -- I have no knowledge of where |
| 11:46:19 | 25 | this request came from. |

11:46:20  1   Q.  So you would at least agree with me that it was Amazon
11:46:23  2   that reached out to Li Creative, right?
11:46:25  3   A.  Well, more specifically, it was Jerry Wu who reached
11:46:37  4   out to Li Creative.
11:46:38  5   Q.  And Jerry Wu worked at Amazon at the time, right?
11:46:47  6   A.  Yes.  He worked at Lab126 at the time, yeah.
11:46:50  7   Q.  Was that part of your job duties in 2011 to meet with
11:46:59  8   vendors and suppliers?
11:47:00  9   A.  I wasn't required to meet with vendors or suppliers.
11:47:03  10  Q.  But today, that's part of your job duties, right?
11:47:06  11  A.  No.  Even today I am not required to meet with any
11:47:14  12  suppliers or vendors.
11:47:16  13  Q.  Then why do you do it?
11:47:16  14  A.  Well, today, I may meet with the suppliers or vendors
11:47:26  15  to resolve some issue that we have, to rely strategically
11:47:30  16  on the -- on the developments, to review roadmap of -- of
11:47:40  17  their products, stuff like that.
11:47:41  18  Q.  Do you recall meeting with any other supplier or vendor
11:47:51  19  before October 17th, 2011, at Amazon?
11:47:53  20  A.  I don't recall meeting any supplier or vendor in 2011
11:48:01  21  time frame.
11:48:08  22  Q.  Do you recall any meetings or demonstrations with any
11:48:14  23  vendor or supplier regarding 3D sound?
11:48:17  24  A.  I don't recall any specifics about demos about 3D sound
11:48:20  25  from any supplier or vendor.

11:48:20   1   Q.  So why do you say the word "specifics" in your answer?

11:48:24   2   Is there something more general that you remember?

11:48:26   3   A.  Yeah.  So the reason I say that is because I believe

11:48:38   4   that over the years, I was in bunch of meetings with

11:48:42   5   suppliers that might show microphone arrays, noise

11:48:47   6   reduction, 3D sound, echo cancellation, but I don't recall

11:48:59   7   any specifics whatsoever.

11:49:02   8   Q.  So you don't have a recollection of the subject matter

11:49:05   9   of any of the meetings in 2011; is that fair?

11:49:09   10  A.  I think it's fair to say that -- is that I don't have

11:49:13   11  any recollection of any meeting that I had in 2011.  I

11:49:16   12  think that's fair.

11:49:17   13  Q.  And I'm not asking you about any specific meeting.  I

11:49:22   14  am asking you about a general subject matter.  Do you

11:49:26   15  recall the subject matter of microphone arrays from any

11:49:30   16  meetings with vendors or suppliers in 2011?

11:49:37   17  A.  So -- so I don't recall any details about supplier or

11:50:16   18  vendor meetings from 2011, including the possible subjects

11:50:24   19  for those meetings.  I just don't recall.

11:50:29   20  Q.  Sir, if you take a look at the document you still have

11:50:32   21  in front of you.  Flip back to Page 2.  I would like you to

11:50:43   22  look at the middle email on the page from Jerry Wu to Li at

11:50:51   23  Li Creative Tech.  Do you see your --

11:50:55   24  A.  October 3rd, 2011?

11:50:56   25  Q.  Yes.  Do you see your -- your name on the "to" line

11:51:03  1  there, right?

11:51:05  2  A.  Yes, I do.

11:51:06  3  Q.  And the email is addressed to Jerry Wu, Li at Li

11:51:13  4  Creative Tech, you, Aleksandar Pance -- Pance, Matt

11:51:20  5  Holland, and Craig Adams, right?

11:51:21  6  A.  Yes.

11:51:22  7  Q.  And do you see where it says:  Hi, Peter.  Both Alex

11:51:32  8  and Matt are technical lead.  This meeting should be

11:51:35  9  focused on technology.  As far as topic goes, I will let

11:51:41  10  Alex and Matt get back to you.  Do you see that?

11:51:46  11  A.  Yes, I see that.  I see that email.

11:51:48  12  Q.  Now, do you know whether you or Matt got back to Peter

11:51:51  13  Li about technology?

11:51:52  14  A.  So as I said, I don't recall these emails and I cannot

11:52:07  15  speak for Matt.  I do not recall getting back to Peter

11:52:18  16  about this.  I just assume that if Matt or me or anybody

11:52:26  17  else sent Peter an email, you guys would have it here.  So

11:52:35  18  I just -- but I don't -- I don't have a recollection of any

11:52:38  19  emails.

11:52:39  20  Q.  So do you see it's addressed to numerous people?

11:52:42  21  A.  Yes, it says Alex, Sergei, Matt, David, and colleagues,

11:52:54  22  yes.

11:52:54  23  Q.  So and at the bottom there's a Jerry, comma, right?

11:52:57  24  A.  Yeah, Jerry -- let's see what it says.  Jerry, comma,

11:53:04  25  thanks for facilitating the technical discussion.

| | | |
|---|---|---|
| 11:53:07 | 1 | Yes, I see that. |
| 11:53:08 | 2 | Q.  Well, now, regarding the people addressed in this |
| 11:53:18 | 3 | email, Jerry, that's Jerry Wu, right? |
| 11:53:20 | 4 | A.  Must have been, yeah. |
| 11:53:21 | 5 | Q.  Alex, that's you, right? |
| 11:53:25 | 6 | A.  That's correct. |
| 11:53:26 | 7 | Q.  Sergei, that's the Sergei we've been talking about at |
| 11:53:31 | 8 | Lab126, right? |
| 11:53:31 | 9 | A.  Yes. |
| 11:53:36 | 10 | Q.  Matt, that's Matt Holland, right? |
| 11:53:41 | 11 | A.  That's right, Matthew Holland, yeah. |
| 11:53:44 | 12 | Q.  And then do you see after that it says and colleagues? |
| 11:53:51 | 13 | A.  Yes. |
| 11:53:52 | 14 | Q.  So do you know -- do you know how many colleagues had |
| 11:53:54 | 15 | attended the meeting other than Alex, Sergei, Matt, and |
| 11:53:59 | 16 | David? |
| 11:54:01 | 17 | A.  Well, as I said, I don't recall this meeting, so I |
| 11:54:04 | 18 | cannot confirm or deny who was in the meeting. |
| 11:54:09 | 19 | Q.  I want to introduce another exhibit.  Before I do, |
| 11:54:16 | 20 | Mr. Pance -- Pance, have you -- you spell your name, Aleks, |
| 11:54:20 | 21 | A-l-e-k-s? |
| 11:54:27 | 22 | A.  Well, my full name is A-l-e-k-s-a-n-d-a-r. |
| 11:54:32 | 23 | Q.  Do you ever go by Alex, A-l-e-x? |
| 11:54:36 | 24 | A.  Yeah, various people would shorten that to Alex, |
| 11:54:41 | 25 | A-l-e-x or sometimes Aleks, A-l-e-k-s. |

11:54:54  1   Q.  Have you ever gone by Sasha?

11:55:01  2   A.  Yes, Sasha is a common nickname for Aleksandar in -- in

11:55:14  3   a place where I grew up, where I was born.

11:55:29  4   Q.  And so you have gone by Aleks, A-l-e-k-s, Alex,

11:55:46  5   A-l-e-x, Aleksandar, and Sasha, right?

11:55:51  6   A.  Yes, so I believe -- I believe at Apple, some people

11:56:05  7   refer to me as Sasha.  I don't know anybody at Amazon that

11:56:08  8   is referring to me as Sasha.

11:56:10  9   Q.  Okay.  Thank you.

11:56:11  10          I'm going to introduce the next exhibit.

11:56:14  11          Have you ever seen this document before, sir?

11:56:18  12   A.  Yeah, this was a document that was in an attachment of

11:56:23  13   that email thread.

11:56:24  14   Q.  Do you know if you investigated any of Li Creative

11:56:26  15   Technologies's patents?

11:56:27  16   A.  I don't know of any Li Creative patents.

11:56:30  17   Q.  You didn't look into them, right?  You didn't search

11:56:33  18   for patent numbers.  You didn't search for Li Creative

11:56:37  19   Technologies at the Patent Office.  You just didn't

11:56:38  20   investigate; is that right?

11:56:39  21   A.  Our policy has always been that we don't investigate

11:56:51  22   patents, we don't search for patents, we don't look for

11:56:54  23   patents, we don't discuss other people's patents.

11:56:59  24          As engineers at Amazon, our job is to develop

11:57:07  25   technology, invent things, develop products, features.  And

| | | |
|---|---|---|
| 11:57:16 | 1 | it's up to our patent attorneys to see what's patentable |
| 11:57:23 | 2 | and what's protectable, and that's their job. |
| 11:57:26 | 3 | Our job is to invent, develop, and not really to |
| 11:57:31 | 4 | try to judge what's -- what's patentable and what's not. |
| 11:57:35 | 5 | (Videoclip ends.) |
| 11:57:41 | 6 | THE COURT:  Does that complete this witness by |
| 11:57:44 | 7 | deposition? |
| 11:57:44 | 8 | MR. LAMBRIANAKOS:  Yes, Your Honor. |
| 11:57:45 | 9 | THE COURT:  All right.  Ladies and gentlemen, |
| 11:57:46 | 10 | we're right at the noon hour.  We're going to use this |
| 11:57:50 | 11 | opportunity to break for lunch.  I'm told by the clerk's |
| 11:57:53 | 12 | office your lunch is awaiting you in the jury room. |
| 11:57:57 | 13 | If you will simply close your notebooks but please |
| 11:58:01 | 14 | take them with you over the lunch break.  Please follow all |
| 11:58:03 | 15 | the instructions I've given you about your conduct, |
| 11:58:05 | 16 | including not to discuss the case among yourselves, and |
| 11:58:08 | 17 | we'll be back to continue with the next Plaintiff's witness |
| 11:58:11 | 18 | immediately after lunch. |
| 11:58:12 | 19 | I would hope to reconvene about 12:45. |
| 11:58:18 | 20 | With that, the jury is excused for lunch. |
| 11:58:21 | 21 | COURT SECURITY OFFICER:  All rise. |
| 11:58:22 | 22 | (Jury out.) |
| 11:58:22 | 23 | THE COURT:  We stand in recess for lunch. |
| | 24 | (Recess.) |
| | 25 | |

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes _____          10/2/2020
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25