```
12:49:57   1              IN THE UNITED STATES DISTRICT COURT

           2              FOR THE EASTERN DISTRICT OF TEXAS

           3                      MARSHALL DIVISION

           4   VOCALIFE LLC,                  )(

           5        PLAINTIFF,                )(    CIVIL ACTION NO.

           6                                  )(    2:19-CV-123-JRG

           7   VS.                            )(    MARSHALL, TEXAS

           8                                  )(

           9   AMAZON.COM, INC. and           )(

          10   AMAZON.COM LLC,                )(    OCTOBER 2, 2020

          11        DEFENDANTS.               )(    12:49 P.M.

          12                  TRANSCRIPT OF JURY TRIAL

          13                     AFTERNOON SESSION

          14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

          15           UNITED STATES CHIEF DISTRICT JUDGE

          16

          17   FOR THE PLAINTIFF:

          18   MR. ALFRED R. FABRICANT
               MR. PETER LAMBRIANAKOS
          19   MR. VINCENT J. RUBINO, III
               MS. AMY PARK
          20   MR. ENRIQUE ITURRALDE
               FABRICANT LLP
          21   230 Park Avenue, 3rd Floor W.
               New York, NY 10169
          22
               MR. SAMUEL F. BAXTER
          23   MS. JENNIFER L. TRUELOVE
               MCKOOL SMITH, P.C.
          24   104 East Houston Street, Suite 300
               Marshall, TX 75670
          25
```

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:      Shelly Holmes, CSR, TCRR
                          Official Reporter
20                        United States District Court
                          Eastern District of Texas
21                        Marshall Division
                          100 E. Houston Street
22                        Marshall, Texas  75670
                          (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

```
            1                    P R O C E E D I N G S
12:49:57    2            (Jury out.)
12:49:57    3            COURT SECURITY OFFICER:  All rise.
12:49:58    4            THE COURT:  Be seated, please.
12:50:01    5            Plaintiff, are you prepared to call your next
12:50:09    6   witness?
12:50:09    7            MR. BAXTER:  Yes, Your Honor, we are.
12:50:10    8            THE COURT:  All right.  Let's bring in the jury,
12:50:12    9   please, Mr. Johnston.
12:50:21   10            COURT SECURITY OFFICER:  All rise.
12:50:29   11            (Jury in.)
12:50:39   12            THE COURT:  Please be seated.
12:50:45   13            Plaintiff, call your next witness.
12:50:51   14            MR. BAXTER:  Thank you, Your Honor.
12:50:52   15            Plaintiff calls Dr. Manli Zhu, please.
12:50:55   16            THE COURT:  All right.
12:50:56   17            MR. BAXTER:  Come forward, Doctor.
12:50:58   18            THE COURT:  If you'll come forward and be sworn,
12:51:01   19   please.
12:51:01   20            (Witness sworn.)
12:51:03   21            THE COURT:  Please come around, have a seat on the
12:51:17   22   witness stand.
12:51:18   23            Once you're seated and situated, if you would
12:51:22   24   please remove your mask.
12:51:29   25            All right.  Mr. Baxter, you may proceed with your
```

12:51:37  1  direct examination.

12:51:38  2           MR. BAXTER:  Thank you, Your Honor.

12:51:38  3           MANLI ZHU, PH.D., PLAINTIFF'S WITNESS, SWORN

12:51:38  4                    DIRECT EXAMINATION

12:51:42  5  BY MR. BAXTER:

12:51:42  6  Q.  Would you introduce yourself to the ladies and

12:51:44  7  gentlemen of the jury, please?

12:51:44  8  A.  Good afternoon, everyone.  My name is Manli Zhu.  Yes.

12:51:47  9  Q.  Spell your last name for the court reporter, if you

12:51:49  10  would, please, Doctor.

12:51:50  11  A.  Okay.  My last name is spelled as Z, as zero, H, as

12:51:54  12  house, U, as universe, pronounced as Zhu, yes.

12:51:57  13  Q.  So I'm going to try to say it right and call you

12:52:01  14  Dr. Zhu the whole afternoon long, if it's okay?

12:52:04  15  A.  Yeah, that's okay.

12:52:05  16  Q.  Have you ever testified before, Doctor?

12:52:07  17  A.  No, it's my first one.

12:52:09  18  Q.  Are you nervous?

12:52:09  19  A.  Yes.

12:52:09  20  Q.  Are you worried about understanding my accent because

12:52:11  21  it's a little hard to follow sometimes?

12:52:13  22  A.  Yes.

12:52:14  23  Q.  Okay.  I promise you I'm going to try to speak slowly.

12:52:18  24  And if you will do the same and then speak loudly.

12:52:23  25  A.  Yes, I will speak loudly and slowly.

| | | |
|---|---|---|
| 12:52:26 | 1 | Q. All right. Doctor, we'll get along fine then. |
| 12:52:29 | 2 | Tell me where you're from, please. |
| 12:52:31 | 3 | A. I'm from -- I live in New City, New York, yeah. |
| 12:52:34 | 4 | Q. And that's New City. How big is New City? |
| 12:52:38 | 5 | A. New City is a town in Upstate New York about 33,000 |
| 12:52:42 | 6 | populations, yeah. |
| 12:52:43 | 7 | Q. Are you married, ma'am? |
| 12:52:44 | 8 | A. Yes, I'm married. |
| 12:52:46 | 9 | Q. And what does your husband do? |
| 12:52:49 | 10 | A. My husband is an optical engineer. |
| 12:52:51 | 11 | Q. Is he a doctor, as well? |
| 12:52:53 | 12 | A. Yeah, he got his Ph.D. degree. |
| 12:52:56 | 13 | Q. Okay. Do you have any children? |
| 12:52:57 | 14 | A. I have two boys. |
| 12:53:00 | 15 | Q. How old are they? |
| 12:53:01 | 16 | A. One is 12, one is eight. |
| 12:53:03 | 17 | Q. Well, I'm sorry about the 12-year-old. How -- how is |
| 12:53:06 | 18 | school coming? Have they started school? |
| 12:53:08 | 19 | A. Yes, they start learning since beginning of September, |
| 12:53:13 | 20 | and actually, this week, started Wednesday, they started |
| 12:53:16 | 21 | hybrid. |
| 12:53:17 | 22 | Q. And what are your boys interested in, Doctor? |
| 12:53:20 | 23 | A. Both of my boys interested in basketball. |
| 12:53:27 | 24 | Q. Okay. Tell me where you were born and a little about |
| 12:53:31 | 25 | your educational background, please. |

| | | |
|---|---|---|
| 12:53:32 | 1 | A.  Okay.  I was born in China.  And I got my Bachelor's |
| 12:53:35 | 2 | and my Master's degree both in China in the area of |
| 12:53:40 | 3 | electrical engineering. |
| 12:53:41 | 4 | Q.  Tell me, Dr. Zhu, how many women were in the program |
| 12:53:47 | 5 | when you enrolled in college, in engineering? |
| 12:53:50 | 6 | A.  In my undergraduate study, there were about 60 students |
| 12:53:58 | 7 | in my class, and there are seven girls. |
| 12:54:03 | 8 | Q.  Okay.  Is it a little tough for girls to get into |
| 12:54:06 | 9 | engineering in college in China? |
| 12:54:07 | 10 | A.  Yeah, we are in minority in engineering. |
| 12:54:11 | 11 | Q.  Okay.  When you graduated with your Bachelor's degree, |
| 12:54:14 | 12 | tell me where you were in the class? |
| 12:54:16 | 13 | A.  Oh, I -- I was ranked No. 1 in my class. |
| 12:54:21 | 14 | Q.  Okay.  Did you then go to graduate school? |
| 12:54:23 | 15 | A.  Yeah, I went to graduate school in the same university. |
| 12:54:27 | 16 | Q.  And what was your field of study in graduate school, |
| 12:54:30 | 17 | Doctor? |
| 12:54:30 | 18 | A.  My field is in pattern recognition and looking for |
| 12:54:36 | 19 | object detection and tracking object. |
| 12:54:39 | 20 | Q.  Is that pattern recognition? |
| 12:54:41 | 21 | A.  Yes. |
| 12:54:47 | 22 | Q.  After you got your Master's what was your decision to |
| 12:54:51 | 23 | do about continuing your education?  What did you do? |
| 12:54:53 | 24 | A.  Yeah, I want to pursue my Ph.D. degree in the best |
| 12:54:58 | 25 | graduate -- get the best graduate education in the world. |

409

| | | |
|---|---|---|
| 12:55:02 | 1 | Q.  And where did you think that might be? |
| 12:55:04 | 2 | A.  That's in the U.S. |
| 12:55:08 | 3 | Q.  Did you apply to graduate schools in the U.S.? |
| 12:55:11 | 4 | A.  Yes, I did. |
| 12:55:12 | 5 | Q.  What did you have to do to apply to graduate school? |
| 12:55:14 | 6 | A.  You need to take several exams, including English as |
| 12:55:20 | 7 | second language.  Another exam is graduate entrance exam |
| 12:55:26 | 8 | called GRE. |
| 12:55:27 | 9 | Q.  Did you take that exam? |
| 12:55:28 | 10 | A.  Yeah, you have to take that exam. |
| 12:55:33 | 11 | Q.  What is the most you can make on the GRE? |
| 12:55:37 | 12 | A.  Is 2400. |
| 12:55:38 | 13 | Q.  What did you make? |
| 12:55:40 | 14 | A.  I make 2380. |
| 12:55:40 | 15 | Q.  2380? |
| 12:55:40 | 16 | A.  Yes. |
| 12:55:41 | 17 | Q.  You missed a question? |
| 12:55:41 | 18 | A.  I missed one question. |
| 12:55:42 | 19 | Q.  Do you know what it was? |
| 12:55:42 | 20 | A.  I don't know.  I have no idea. |
| 12:55:44 | 21 | Q.  Okay.  So you took that.  How did you do with English |
| 12:55:51 | 22 | as a second language? |
| 12:55:52 | 23 | A.  In China we start to learn English starting middle |
| 12:55:57 | 24 | school, but it most focus on reading and writing. |
| 12:55:59 | 25 | Q.  So the English that you learned was primarily how to |

12:56:03  1   read the written page?

12:56:04  2   A.  Yes.

12:56:04  3   Q.  And how to write a paper?

12:56:06  4   A.  Yes.

12:56:06  5   Q.  What about verbal communication, either saying English

12:56:09  6   or understanding English?

12:56:11  7   A.  We have very limited training on that back in China.

12:56:15  8   Q.  Did you get into graduate school in the United States?

12:56:17  9   A.  Yeah, we got into graduate school in United States.

12:56:22  10  Q.  Okay.  And you say "we"?

12:56:24  11  A.  Yeah, sorry.

12:56:25  12  Q.  Was there anybody else involved?

12:56:26  13  A.  Yeah, because me and my husband -- at that time my

12:56:31  14  boyfriend -- we applied at the same time.

12:56:32  15  Q.  Okay.

12:56:33  16  A.  Yeah.

12:56:33  17  Q.  And you got into what school?

12:56:36  18  A.  I got into the Ohio State University.

12:56:39  19  Q.  In Columbus, Ohio?

12:56:41  20  A.  In Columbus, Ohio.

12:56:42  21  Q.  In the engineering department?

12:56:43  22  A.  Yes.

12:56:43  23  Q.  And he got into what school?

12:56:46  24  A.  He got into University of Arizona.

12:56:48  25  Q.  Okay.  So you got into the Ohio State, and he had to go

```
12:56:51   1   to Arizona?
12:56:52   2   A.  Yes.
12:56:52   3   Q.  Okay.  Was there a time later on when you came to the
12:56:56   4   United States and started graduate studies?
12:56:59   5   A.  May I pardon your question?
12:57:03   6   Q.  Yes, ma'am.  Did you come and enroll in Ohio State?
12:57:06   7   A.  Yes.
12:57:06   8   Q.  Okay.  Did you have the finances to pay for your
12:57:11   9   education in the United States?
12:57:12  10   A.  Yeah.  Both of us get merit-based scholarship, yeah, so
12:57:20  11   that's how we support ourselves in university.
12:57:22  12   Q.  Okay.  So you got a merit-based scholarship?
12:57:26  13   A.  Yeah.
12:57:27  14   Q.  And you worked on your Ph.D.?
12:57:28  15   A.  Yes.
12:57:28  16   Q.  In what?
12:57:29  17   A.  In the area of electrical engineering.
12:57:31  18   Q.  How did you go about improving your English, Dr. Zhu?
12:57:38  19   A.  Yeah, it -- it was a tough time at that time, and
12:57:42  20   because I had a difficulty to understand people in the
12:57:48  21   normal conversation and speak out the word, it's hard.
12:57:52  22        So I tried to talk to people in the grocery store,
12:57:58  23   and when the utility guy call on the phone.  And I try to
12:58:02  24   improve my language in that conversation.  And we watched
12:58:06  25   TVs.  So that's how we improve our oral conversation.
```

12:58:10   1   Q.  Can you really learn a foreign language by watching TV?

12:58:16   2   A.  That's part of the lessons.

12:58:19   3   Q.  Okay.  And pretty soon were you able to converse with

12:58:22   4   people in English?

12:58:23   5   A.  Yes, gradually.  And I appreciate my professors'

12:58:28   6   patience on me, too.

12:58:29   7   Q.  What were you working on besides your Ph.D.?  Were you

12:58:33   8   working on a research project at Ohio State University?

12:58:36   9   A.  Yes.

12:58:36  10   Q.  What sort of projects were you working on?

12:58:38  11   A.  My Ph.D. thesis is about study on generalized

12:58:46  12   eigenvalue decomposition in discriminant analysis.  Yeah,

12:58:52  13   this complicate, it was.  But say it in a simple way is try

12:58:54  14   to looking for the best features in the data that can

12:58:57  15   differentiate the data from each other.

12:59:01  16   Q.  Okay.

12:59:01  17   A.  Yeah.

12:59:01  18   Q.  So you were dealing with a data set, and you wanted the

12:59:04  19   data set to be able to differentiate?

12:59:07  20   A.  Yeah.

12:59:07  21   Q.  Various either speech patterns or digital patterns or

12:59:12  22   things of that ilk?

12:59:13  23   A.  Yeah, the data is in a general form.  It can be radio,

12:59:16  24   it can be image, it can be signal speech.  Yeah, it's a

12:59:19  25   very general theoretical study.

| | | |
|---|---|---|
| 12:59:22 | 1 | Q.  Did you get your Ph.D., Doctor? |
| 12:59:25 | 2 | A.  Yes, I got my Ph.D. |
| 12:59:26 | 3 | Q.  How long did that take? |
| 12:59:27 | 4 | A.  About four years. |
| 12:59:29 | 5 | Q.  Okay.  Along the way, what happened to the boyfriend? |
| 12:59:32 | 6 | A.  What happened to -- |
| 12:59:35 | 7 | Q.  The boyfriend that came to Arizona? |
| 12:59:37 | 8 | A.  Yeah, he studied in University of Arizona.  And so we |
| 12:59:43 | 9 | decided to get -- get married in 2005, yeah, we got -- |
| 12:59:50 | 10 | yeah. |
| 12:59:50 | 11 | Q.  What year did you graduate from Ohio State with your |
| 12:59:55 | 12 | Ph.D.? |
| 12:59:55 | 13 | A.  2006. |
| 12:59:57 | 14 | Q.  Okay.  What did you do then, Doctor? |
| 12:59:59 | 15 | A.  At that time, my husband haven't graduated yet, so I |
| 01:00:04 | 16 | went to Arizona to join him because we decided we want to |
| 01:00:10 | 17 | end the long distance. |
| 01:00:11 | 18 |         So I waited for him graduate, and he got a job |
| 01:00:16 | 19 | offer on East Coast.  So we fly -- we flew together to East |
| 01:00:20 | 20 | Coast, and then I started to look for my job. |
| 01:00:23 | 21 | Q.  Okay.  So he had a job on the East Coast? |
| 01:00:25 | 22 | A.  Yes. |
| 01:00:25 | 23 | Q.  And you're now looking for a job? |
| 01:00:27 | 24 | A.  Yes. |
| 01:00:27 | 25 | Q.  Did you find one? |

414

01:00:28  1   A.  Yeah, I found one.

01:00:29  2   Q.  What is it?

01:00:30  3   A.  That's Dr. Peter Li's company called Li Creative

01:00:33  4   Technologies.

01:00:33  5   Q.  This Dr. Peter Li that's here at counsel table?

01:00:39  6   A.  Yes.

01:00:39  7   Q.  You went to work for his company?

01:00:40  8   A.  Yes.

01:00:41  9   Q.  Okay.  What was your job at his company, Doctor?

01:00:44  10  A.  Yeah, at Li Creative Technologies, I developed

01:00:48  11  algorithm and implemented code related to audio signal.

01:00:53  12  Q.  All right.  I meant to ask you before, did somewhere

01:00:57  13  along the way, were you able to apply for a U.S.

01:01:00  14  citizenship?

01:01:01  15  A.  Yes.

01:01:01  16  Q.  And are you a United States citizen?

01:01:04  17  A.  Now I'm a proud U.S. citizen.

01:01:07  18  Q.  Okay.  That also make you a proud Buckeye?

01:01:10  19  A.  Yes, come from Ohio State Buckeyes.

01:01:13  20  Q.  Okay.  Do you know what a Buckeye is?

01:01:15  21  A.  I know.

01:01:16  22  Q.  Okay.  So you apply for a job with Dr. Li.  And does he

01:01:22  23  give it to you?

01:01:23  24  A.  Can you pardon your question?

01:01:26  25  Q.  Did he give you a job?  Did you go to work for him?

01:01:30   1   A.   Yes, I got a job at Li Creative Technologies.

01:01:32   2   Q.   And what was your job at Creative Technologies?

01:01:36   3   A.   My first project in Li Creative Technologies is related

01:01:40   4   to the speech recognition.   And at end of '07, I had my

01:01:46   5   maternity leave.

01:01:49   6   Q.   Maternity?

01:01:50   7   A.   Yes.

01:01:51   8   Q.   Okay.

01:01:52   9   A.   When I came back, I started to work on the microphone

01:01:56  10   array technology for the far-field application.

01:01:58  11   Q.   So you had your first child?

01:02:00  12   A.   Yes, I had my first child back then.

01:02:03  13   Q.   Did -- did the research that you were doing ever turn

01:02:06  14   into any sort of product?

01:02:11  15   A.   We -- pardon your question, please?

01:02:16  16   Q.   Yes.   The research that you were doing on speech

01:02:19  17   recognition and patterns, did it ever turn into an actual

01:02:22  18   product?

01:02:23  19   A.   The speech recognition --

01:02:24  20   Q.   Yes, ma'am.

01:02:25  21   A.   -- project?   No, it -- it was a prototype.

01:02:29  22   Q.   Okay.

01:02:29  23   A.   Yeah.

01:02:29  24   Q.   Did you, in fact, though, build a prototype?   Was there

01:02:36  25   a prototype ever built?

| | | |
|---|---|---|
| 01:02:37 | 1 | A.  Yes. |
| 01:02:38 | 2 | Q.  Okay.  What was it called? |
| 01:02:40 | 3 | A.  Pardon your question?  Which project are -- you refer |
| 01:02:44 | 4 | to? |
| 01:02:45 | 5 | Q.  Well, the very first one -- |
| 01:02:47 | 6 | A.  Yeah. |
| 01:02:48 | 7 | Q.  -- did it -- either before the maternity leave or |
| 01:02:52 | 8 | after -- |
| 01:02:52 | 9 | A.  Yeah. |
| 01:02:53 | 10 | Q.  -- did it ever turn into a prototype product? |
| 01:02:56 | 11 | A.  Yeah, most of the them -- the project I talked about |
| 01:03:00 | 12 | went to prototype.  There's no product. |
| 01:03:03 | 13 | Q.  Okay. |
| 01:03:04 | 14 | A.  Yeah. |
| 01:03:04 | 15 | Q.  All right.  When you started working for Dr. Li, were |
| 01:03:09 | 16 | you working -- I think you said, on -- on pattern |
| 01:03:12 | 17 | recognition; is that right? |
| 01:03:16 | 18 | A.  The first project I worked for Li Creative Technology |
| 01:03:19 | 19 | is in the area of pattern recognition.  It's related to |
| 01:03:23 | 20 | speech recognition. |
| 01:03:23 | 21 | Q.  Okay.  Can you tell the ladies and gentlemen of the |
| 01:03:27 | 22 | jury what a microphone array is? |
| 01:03:28 | 23 | A.  Microphone array is different from a single microphone. |
| 01:03:35 | 24 | Microphone array is a number of microphones.  We configure |
| 01:03:39 | 25 | them to working together, so the sound come from some |

01:03:44  1  specific directions can be enhanced and the sound come from

01:03:47  2  other directions can be suppressed.  So that is microphone

01:03:50  3  array technology.

01:03:51  4  Q.  When you say the sound is suppressed, what do you mean?

01:03:54  5  A.  Suppressed means we want to reduce -- reduce the volume

01:04:00  6  of the background noise, and that's the background noise we

01:04:04  7  want to suppress.

01:04:06  8        And the enhance, we want to enhance the primary

01:04:10  9  talker's voice, yeah.

01:04:11  10  Q.  If you have multiple microphones, does it make any

01:04:15  11  difference about how they're arranged?

01:04:19  12  A.  Yes.

01:04:19  13  Q.  Tell the ladies and gentlemen of the jury the

01:04:21  14  difference, please, ma'am.

01:04:22  15  A.  Okay.  Now, pardon your question, please?

01:04:25  16  Q.  Yes, ma'am.  Tell them how microphones can be arranged.

01:04:30  17  Are there various ways?

01:04:31  18  A.  Yeah, there are different ways you can arrange your

01:04:34  19  microphone.  You can arrange them in linearship, so all the

01:04:41  20  microphone com -- components in a straight line.  And you

01:04:42  21  can also lay out them in a circular shape or a rectangle

01:04:49  22  shape.  There are different ways you can lay out microphone

01:04:53  23  components.

01:04:53  24  Q.  Did you also work on an idea that's called far-field

01:04:57  25  application?

| | | |
|---|---|---|
| 01:04:57 | 1 | A.   Yes. |
| 01:04:58 | 2 | Q.   Tell the ladies and gentlemen what that is, please. |
| 01:05:00 | 3 | A.   Okay.   Far-field application is compared with the |
| 01:05:11 | 4 | near-field application.   Near-field means when you are |
| 01:05:13 | 5 | talking to the microphone, you hold very closely to the |
| 01:05:16 | 6 | microphone.   So your voice is the primary sound.   All the |
| 01:05:19 | 7 | background noise is relatively low compared to your own |
| 01:05:23 | 8 | voice.   Like I'm talking to the goose -- gooseneck |
| 01:05:25 | 9 | microphone, that's close-talk microphone. |
| 01:05:27 | 10 | So as a comparison, far-field microphone means you |
| 01:05:31 | 11 | talk to the microphone at distance, like when we have the |
| 01:05:34 | 12 | Zoom meeting now, everybody has Zoom meeting for the |
| 01:05:37 | 13 | students.   And so you're talking at distance from the |
| 01:05:40 | 14 | microphone, yeah. |
| 01:05:41 | 15 | Q.   Are -- right now when you're speaking into that |
| 01:05:43 | 16 | microphone, is that near-field? |
| 01:05:46 | 17 | A.   Yeah, that's near-field microphone. |
| 01:05:49 | 18 | Q.   Can you show me far-field? |
| 01:05:51 | 19 | A.   Far-field is like very -- conference phone call, yeah. |
| 01:05:54 | 20 | Q.   And why were you working on that? |
| 01:05:56 | 21 | A.   Because, as I just said, when you're talking close to |
| 01:06:01 | 22 | the microphone, your voice is the primary sound. |
| 01:06:05 | 23 | Background noise was hardly picked up compared to your own |
| 01:06:09 | 24 | voice.   But when you talk far away from the microphone, |
| 01:06:12 | 25 | your voice -- it's just as important as any other sound. |

01:06:15   1          So the microphone pick up not only your voice and

01:06:19   2   any sound in the room, but we still want people on

01:06:23   3   the other the side of the line -- that's clearly what you

01:06:26   4   say.  We need to suppress all this background noise.  So

01:06:30   5   that's why I make this technology important.

01:06:33   6   Q.  In order to do that, what did you have to do to

01:06:39   7   suppress background noise and emphasize the direct speaker

01:06:44   8   voice, even no matter where that speaker was in the room?

01:06:47   9   What did you have to do?

01:06:48  10   A.  Yeah, we had to develop -- develop our algorithm

01:06:52  11   starting from very physic -- physic study, how the sound

01:06:56  12   propagate to the microphone.  Then we come out with

01:06:59  13   formulations to suppress the sound coming from other

01:07:02  14   direction.  And -- okay, yeah.

01:07:07  15   Q.  Now, I think you used the word "algorithm."  Did I say

01:07:10  16   that right?

01:07:10  17   A.  Yes.

01:07:11  18   Q.  Tell them what an algorithm is, please.

01:07:13  19   A.  Algorithm is like mathematical recipe.  So mathematical

01:07:19  20   step-by-step tell us how do you process a signal, yeah.

01:07:23  21   Q.  And so if I were to put it in my terms, it would be

01:07:27  22   first you put in the water and the flour, and later you

01:07:32  23   throw in the egg?

01:07:33  24   A.  Yeah.  You can understand algorithms in this way, but

01:07:36  25   it's mathematical step instead of ingredients.

01:07:40   1   Q.   All right.   Instead of ingredients, it's one

01:07:42   2   mathematical step after another?

01:07:44   3   A.   Yes.

01:07:44   4   Q.   And did you start writing algorithms to work on the

01:07:47   5   far-field technology?

01:07:47   6   A.   Yeah, we started to develop our algorithms, and we have

01:07:50   7   to write source code to implement -- to realize that.

01:07:56   8   Q.   Okay.   Just so we're all on the same page, tell the

01:08:00   9   ladies and gentlemen what source code is?

01:08:02   10   A.   Source code is the -- the language a computer can

01:08:05   11   understand, yeah.

01:08:06   12   Q.   And did you start writing source code?

01:08:09   13   A.   Yes.

01:08:09   14   Q.   Are there various languages that you can use to write

01:08:13   15   source code?

01:08:13   16   A.   Yeah, there are lots of languages.   And, specifically,

01:08:18   17   I used several language, MATLAB, C, C++.   And, yeah, so

01:08:25   18   that's the primary language I used.

01:08:27   19   Q.   So in addition to Chinese and English, you speak all

01:08:32   20   kinds of computer languages?

01:08:33   21   A.   Yes.

01:08:33   22   Q.   All right.   Did you write source code?

01:08:35   23   A.   Yeah, I wrote source code.

01:08:36   24   Q.   And if the -- how long did it take you to come up with

01:08:41   25   a solution of the far-field problem, Doctor?

01:08:43  1  A.  Yeah, for the specific project I have been working on,

01:08:50  2  we spend about two years.  Starting from the algorithm

01:08:52  3  development to implement the source code on the right

01:08:58  4  platform and get the working functional prototype, it's

01:09:02  5  about two years.

01:09:03  6  Q.  And what years were those?

01:09:04  7  A.  It's '08 and '09.

01:09:08  8  Q.  Okay.  When you finally got the problem solved, was

01:09:13  9  there a particular microphone array that you used?

01:09:16  10  A.  Yeah.  The beauty of our invention is it can work on

01:09:23  11  different layout of the microphone, but for the demo system

01:09:26  12  we used, we use a circular microphone array -- means all

01:09:32  13  the microphone components work in a circular shape.

01:09:35  14  Q.  How many microphones did you use?

01:09:37  15  A.  I used eight microphone components.

01:09:38  16  Q.  And they were in a circle?

01:09:40  17  A.  Yeah, they were in circle.

01:09:41  18  Q.  Okay.  Let me ask you about another term that I think

01:09:45  19  the jury has heard about, and that's adaptive beamforming.

01:09:49  20  A.  Yes.

01:09:50  21  Q.  Can you give us your definition of what adaptive

01:09:53  22  beamforming is, please, ma'am?

01:09:54  23  A.  Yeah.  And when we want to work on the microphone array

01:09:59  24  technology, we want to -- the microphone can focus the

01:10:02  25  sound coming from some directions.  That too means --

422

| | | |
|---|---|---|
| 01:10:08 | 1 | Q.  Can I stop you right there before you get to adaptive? |
| 01:10:10 | 2 | A.  Yes. |
| 01:10:11 | 3 | Q.  Is -- is that sort of the straight-on definition of |
| 01:10:14 | 4 | beamforming -- before we get to adaptive? |
| 01:10:16 | 5 | A.  Okay.  Yeah, beam -- yeah, beamforming is what I just |
| 01:10:21 | 6 | decide we want to focus the sound coming from specific |
| 01:10:23 | 7 | directions.  And adaptive beamforming means the -- the -- |
| 01:10:27 | 8 | the microphone array can focus on whatever the sound coming |
| 01:10:31 | 9 | from.  It's a dynamic process, yeah. |
| 01:10:34 | 10 | Q.  Is there also a term called sound source localization? |
| 01:10:39 | 11 | A.  Yes. |
| 01:10:39 | 12 | Q.  Tell the jury what that is, please, ma'am. |
| 01:10:42 | 13 | A.  The sound source localization will locate the sound, |
| 01:10:45 | 14 | where does it come from. |
| 01:10:47 | 15 | Q.  And why is that important? |
| 01:10:48 | 16 | A.  Because the application of our invention is we don't |
| 01:10:55 | 17 | want to fix the people's position when they talk into the |
| 01:10:58 | 18 | microphone.  All -- in a conference situation, you don't |
| 01:11:02 | 19 | want to fix the location of the primary talker.  You want |
| 01:11:04 | 20 | the -- we -- we want to track the primary talker, even his |
| 01:11:09 | 21 | moving. |
| 01:11:09 | 22 | Q.  So you developed a product that had adaptive |
| 01:11:15 | 23 | beamforming; is that right? |
| 01:11:16 | 24 | A.  Yes. |
| 01:11:16 | 25 | Q.  And had sound source localization? |

01:11:18  1    A.  Yes.

01:11:18  2    Q.  And had noise reduction or suppression?

01:11:23  3    A.  Yes.  We also continued it.  Yeah, we also had noise

01:11:27  4    reduction, too.

01:11:28  5    Q.  Did the source code and the algorithms that you used,

01:11:32  6    does that only work if you have a circle?

01:11:36  7    A.  No, it doesn't have to be a circle.  Like I said, the

01:11:41  8    invention we did is it can work with different kind of

01:11:46  9    layout of the microphone.

01:11:48  10   Q.  Will you tell the jury what a processor is, please,

01:11:51  11   ma'am?

01:11:51  12   A.  Yeah.  A processor is a chip that can carry all the

01:11:56  13   computations, yeah.

01:11:57  14   Q.  What -- what does a processor do?

01:11:59  15   A.  The -- in our application, we want the processor can do

01:12:05  16   all the calculations we need to process the signal.

01:12:08  17   Q.  Does it need to be fast or slow?

01:12:10  18   A.  Yeah, it has to be fast enough to make sure all the

01:12:14  19   algorithms can be implemented in -- close to real-time.

01:12:18  20   Q.  Did you find one that would do that?

01:12:20  21   A.  Yeah.  In our demo, we -- we end up using the ARM chip

01:12:27  22   to run our code.

01:12:27  23   Q.  Is that an A-R-M chip?

01:12:29  24   A.  Yes.

01:12:30  25   Q.  Called an ARM chip?

| | | |
|---|---|---|
| 01:12:31 | 1 | A.  Yes. |
| 01:12:31 | 2 | Q.  Okay.  Was it fast enough? |
| 01:12:33 | 3 | A.  Yeah, it's fast enough to run our code. |
| 01:12:35 | 4 | Q.  And so how did -- how did the processor end up |
| 01:12:41 | 5 | interacting with the microphones? |
| 01:12:43 | 6 | A.  The -- the processor take inputs, yeah.  There are |
| 01:12:47 | 7 | some -- there's a layer between microphone components and |
| 01:12:50 | 8 | the processor because microphone signal is analog.  We need |
| 01:12:58 | 9 | the -- like a -- analog-to-digital processor to put the |
| 01:13:01 | 10 | signal in that fit into the processor, yeah. |
| 01:13:06 | 11 | Q.  Did you get it to work? |
| 01:13:07 | 12 | A.  Yeah, I got it to work.  Yeah. |
| 01:13:09 | 13 | Q.  Okay. |
| 01:13:12 | 14 | MR. BAXTER:  Let me see if I can get PX-258. |
| 01:13:30 | 15 | Q.  (By Mr. Baxter)  Can you identify what's been marked as |
| 01:13:32 | 16 | Exhibit PX-258, Doctor? |
| 01:13:34 | 17 | A.  Yeah, this is the VoiceFocus.  Yeah. |
| 01:13:35 | 18 | Q.  Okay.  I notice on -- was this a document put out by |
| 01:13:39 | 19 | your company? |
| 01:13:40 | 20 | A.  Yes. |
| 01:13:42 | 21 | Q.  Okay.  I notice it's got a -- what looks like an award. |
| 01:13:47 | 22 | Can you tell the ladies and gentlemen what that is, please? |
| 01:13:51 | 23 | A.  This is a design award we got in 2011, CES. |
| 01:13:58 | 24 | Q.  And what is the CES? |
| 01:14:01 | 25 | A.  CES is Consumer Electronics Show.  It's a big tech |

| | | |
|---|---|---|
| 01:14:06 | 1 | event.  Has been there about -- more than decades, yeah. |
| 01:14:10 | 2 | Q.  Okay.  It's not just big, it's the biggest in the |
| 01:14:14 | 3 | world, isn't it? |
| 01:14:14 | 4 | A.  Yeah, it's international.  It brings -- all the big |
| 01:14:16 | 5 | small tech companies will bring their bricks and |
| 01:14:21 | 6 | technologies to this show. |
| 01:14:22 | 7 | Q.  Did you take the technology or did Dr. Li take the |
| 01:14:25 | 8 | technology to the show? |
| 01:14:26 | 9 | A.  Yeah, I didn't go to that event.  Dr. Li went there. |
| 01:14:30 | 10 | Q.  And what prize and award did you come off with? |
| 01:14:32 | 11 | A.  It's -- it's a design award. |
| 01:14:35 | 12 | Q.  So they gave you an award for having the best design in |
| 01:14:42 | 13 | the world at that electronics show? |
| 01:14:43 | 14 | A.  Yes, yes. |
| 01:14:44 | 15 | Q.  Were you happy about that? |
| 01:14:45 | 16 | A.  Yeah, we feel honored because that's international |
| 01:14:49 | 17 | event, yeah. |
| 01:14:50 | 18 | Q.  Now, do you know what year that marketing material came |
| 01:14:58 | 19 | out? |
| 01:14:59 | 20 | A.  I think it's -- I saw -- |
| 01:15:02 | 21 | MR. BAXTER:  Can we look at the bottom? |
| 01:15:04 | 22 | A.  Yeah, it's 2011. |
| 01:15:06 | 23 | Q.  (By Mr. Baxter)  Okay.  Now, you're an inventor on the |
| 01:15:20 | 24 | '049 patent, are you not, Doctor? |
| 01:15:22 | 25 | A.  Can you pardon me, please? |

01:15:23   1    Q.  Yes, ma'am.  I'm sorry, I changed topics on you.

01:15:26   2    A.  Okay.

01:15:27   3    Q.  Are you an inventor on the '049 patent?

01:15:29   4    A.  Yes.

01:15:30   5    Q.  Okay.  And who else is named as an inventor?

01:15:32   6    A.  Dr. Peter Li.

01:15:34   7    Q.  Okay.

01:15:36   8            MR. BAXTER:  Can we get the '049 up?  I think

01:15:37   9    that -- there we go.

01:15:39   10   Q.  (By Mr. Baxter)  Is that your -- is that the patent

01:15:42   11   that's the subject of this lawsuit, the '049?

01:15:43   12   A.  Yes.

01:15:44   13   Q.  And are you one of the inventors?

01:15:46   14   A.  Yes.

01:15:50   15   Q.  Okay.  And who else is an inventor, anybody?

01:15:53   16   A.  Dr. Peter Li.

01:15:55   17   Q.  Okay.  What would you say your contribution to the '049

01:15:59   18   was, Doctor?

01:16:00   19   A.  I -- I draft a white paper based on the technology we

01:16:06   20   developed in Li Creative Technologies, yeah.

01:16:08   21   Q.  Okay.  Now, this patent, I think the jury has heard, is

01:16:13   22   a reissue patent.  Do you know about that?

01:16:14   23   A.  Yes.

01:16:15   24   Q.  Was there a patent before this?

01:16:17   25   A.  There was a patent before that.

01:16:20    1   Q.   And what patent was that?

01:16:21    2   A.   It's '756.

01:16:23    3   Q.   Okay.   This case is not about the '756, is it?   This --

01:16:30    4   this case right --

01:16:31    5   A.   Yeah, this case is about the '049.

01:16:33    6   Q.   Okay.   Were you an inventor on both patents?

01:16:36    7   A.   Yes -- no, no, I'm not the owner -- I'm the inventor on

01:16:40    8   both patents, yeah.

01:16:41    9   Q.   Okay.   All right.

01:16:42   10   A.   Yeah.

01:16:42   11   Q.   Now, do you know what date this reissued patent was

01:16:46   12   issued?

01:16:46   13   A.   This patent issued in 2018, September 18.

01:16:51   14   Q.   I think, though, the jury has heard something about a

01:16:56   15   priority date.   Do you know about that?

01:16:57   16   A.   Yes.

01:16:58   17   Q.   Tell them your understanding of what a priority date

01:17:01   18   is.

01:17:01   19   A.   Priority date is a time we submit our provisional to --

01:17:08   20   yeah, that's much earlier than the patent was issued.

01:17:11   21   Q.   Is that the one that shows down here provisional

01:17:14   22   application?

01:17:15   23   A.   Yes.

01:17:15   24   Q.   September the 24th, 2010?

01:17:17   25   A.   Yes.

01:17:18   1   Q.   Okay.   And so even though this patent was issued in

01:17:21   2   2018, its effective date is September of 2010 for all prior

01:17:27   3   art purposes?

01:17:28   4   A.   Yes.

01:17:29   5   Q.   Okay.   Now, after you put a demonstration together,

01:17:46   6   were you ever invited to show your demonstrating materials

01:17:49   7   to anybody?

01:17:50   8   A.   Yes.

01:17:51   9   Q.   And who would that be, please?

01:17:53  10   A.   I went once to California with Dr. Peter Li to show our

01:17:59  11   demo to Apple.

01:18:00  12   Q.   Okay.   And did you demonstrate it to them?

01:18:03  13   A.   Yes.

01:18:03  14   Q.   Okay.   Did you give them any written materials?

01:18:07  15   A.   Pardon me?

01:18:08  16   Q.   Did you give Apple any written materials?

01:18:13  17   A.   I think Dr. Peter Li gave them.   That's not --

01:18:17  18   Q.   Not you?

01:18:18  19   A.   Not -- not me, yeah.

01:18:20  20   Q.   Do you know if an NDA was signed?

01:18:23  21   A.   That's what -- I aware, yeah.

01:18:25  22   Q.   Okay.   Apparently, there was another demonstration at

01:18:29  23   Amazon.   Did you go to that demonstration?

01:18:30  24   A.   I didn't go that one.

01:18:32  25   Q.   Okay.   Do you know who -- who did?

| | | |
|---|---|---|
| 01:18:34 | 1 | A.  Dr. Peter Li went there. |
| 01:18:38 | 2 | Q.  Was your understanding an NDA was signed then, too? |
| 01:18:41 | 3 | A.  Yes. |
| 01:18:41 | 4 | Q.  Okay.  And did he give them materials and explain how |
| 01:18:45 | 5 | your product and prototype worked? |
| 01:18:48 | 6 | A.  I think Dr. Peter Li can answer that question better |
| 01:18:51 | 7 | than me. |
| 01:18:52 | 8 | Q.  Okay.  But you were not there? |
| 01:18:53 | 9 | A.  Yeah, I were not there. |
| 01:18:55 | 10 | Q.  Okay.  Now, this lawsuit is about something that Amazon |
| 01:18:58 | 11 | makes called the Echo.  Are you familiar with the Echo? |
| 01:19:02 | 12 | A.  Yes. |
| 01:19:02 | 13 | Q.  And when did you first hear about the Echo? |
| 01:19:06 | 14 | A.  I first hear about the product, Echo, over when I got |
| 01:19:14 | 15 | the invitation from Amazon to join their launch meeting |
| 01:19:14 | 16 | about this product. |
| 01:19:19 | 17 | Q.  You got an invitation? |
| 01:19:20 | 18 | A.  I got invitation. |
| 01:19:23 | 19 | Q.  And it's called a launch party? |
| 01:19:25 | 20 | A.  I remember like that. |
| 01:19:27 | 21 | Q.  Okay.  Where was the launch party held? |
| 01:19:30 | 22 | A.  It was held in Manhattan, New York City. |
| 01:19:34 | 23 | Q.  Okay.  Do you remember what kind of hall or auditorium |
| 01:19:38 | 24 | it was in? |
| 01:19:38 | 25 | A.  It -- it's -- it was held in a place like a bar. |

01:19:41  1   Q.  A bar?

01:19:44  2   A.  Yeah.

01:19:44  3   Q.  So Amazon held the launch party in a bar?

01:19:48  4   A.  Yes.

01:19:48  5   Q.  Okay.  Was it -- about how many people were there?

01:19:51  6   A.  It was crowded, and I think about, like 200, 300

01:19:56  7   persons.  Yeah, that's a guess.

01:19:57  8   Q.  Did Dr. Li go with you?

01:19:59  9   A.  Yeah, Dr. Li, we went separately, yeah, because that's

01:20:02  10  after work.

01:20:03  11  Q.  Okay.  But you met up at the bar?

01:20:08  12  A.  Yes.

01:20:09  13  Q.  To see whatever it was that Amazon invited you to see?

01:20:12  14  A.  Yes.

01:20:12  15  Q.  But they sent you a specific invitation to come?

01:20:16  16  A.  Yes, they sent me email.

01:20:18  17  Q.  Okay.  And Dr. Li the same way?

01:20:20  18  A.  Yes.

01:20:20  19  Q.  Okay.  What -- what did you find at the -- at the

01:20:22  20  launch?  What were they launching?

01:20:24  21  A.  The engineer person from Amazon demonstrated the Echo

01:20:29  22  product to everyone.

01:20:30  23  Q.  Had you ever seen the Echo before?

01:20:32  24  A.  No, this was my first time.

01:20:34  25  Q.  What did the Echo do?

01:20:36  1   A.   The -- the engineer showed -- he talked to the Echo at

01:20:43  2   distance, and the Echo responds with a blue light, indicate

01:20:46  3   that direction.

01:20:52  4   Q.   Okay.  Did lights come on and circle around?

01:20:55  5   A.   Yeah.

01:20:55  6   Q.   Then did the light focus on the speaker?

01:20:58  7   A.   Yes.

01:20:59  8   Q.   What did you think about the Echo product, Doctor?

01:21:01  9   A.   I -- I watched it.  I felt that's very similar to the

01:21:05  10  one we invented.

01:21:07  11  Q.   Did you ask any questions of the Amazon engineers?

01:21:13  12  A.   Yeah, they did have a question section, and so I asked

01:21:17  13  them whether they had sound source recognition in this

01:21:21  14  unit, and they said yes.

01:21:22  15  Q.   So you asked them if they had a sound source locator?

01:21:26  16  A.   I asked them if they had sound source recognition in

01:21:29  17  this unit, yeah.

01:21:31  18  Q.   Okay.  And they said yes?

01:21:33  19  A.   Yeah, they said yes.

01:21:34  20  Q.   Okay.  Did you and Dr. Li talk about the Echo product

01:21:38  21  either there in the bar or later on at the office?

01:21:40  22  A.   Yes, we talked about that.

01:21:42  23  Q.   What was sort of the mood at the company between you

01:21:47  24  and Dr. Li after you saw the Echo product?

01:21:51  25  A.   We felt kind of sad because we put lots of effort for

01:22:05  1  these technologies, and we -- like we know it's the right

01:22:10  2  direction and there's market there, but we haven't

01:22:13  3  successfully commercialized it.  And Amazon already came

01:22:16  4  out a product very similar to our invention.

01:22:19  5  Q.  Did you eventually come out with a product from --

01:22:22  6  A.  After I left Li Creative Technologies, I think Peter

01:22:26  7  continued working on that.  They have a product.

01:22:29  8  Q.  Okay.

01:22:29  9  A.  Yeah.

01:22:30  10  Q.  When did you leave?

01:22:31  11  A.  I -- I leaved in May 2019.

01:22:33  12  Q.  And where do you work now, Doctor, if you do?

01:22:37  13  A.  I currently working at a company called the Prospecta.

01:22:42  14  Q.  Okay.  Can you give me a general idea of what you're

01:22:44  15  working on there?

01:22:46  16  A.  In Prospecta?

01:22:46  17  Q.  Yes, ma'am.

01:22:50  18  A.  In Prospecta, I'm an engineer working on motion

01:22:53  19  learning.

01:22:53  20  Q.  Okay.  And tell the jury what that is, please.

01:22:56  21  A.  Motion learning is a study of computer algorithms that

01:23:06  22  learn from the data, from thousands, big bunch of data, try

01:23:10  23  to looking for the patterns and the statistics in the data.

01:23:13  24  So when the new data comes in, the program can make the

01:23:16  25  decision themselves.

01:23:18  1          Example is like a face detection.  We can fit in

01:23:23  2  the motion learning algorithm, thousands of images of

01:23:27  3  people's face, and we can give the program a new image, the

01:23:31  4  image the program never saw, but it can detect whoever the

01:23:35  5  face is.  So this technology is called motion learning.

01:23:39  6  It's a subset of artificial intelligence.

01:23:42  7  Q.  Artificial intelligence?

01:23:44  8  A.  Yes.

01:23:44  9  Q.  Is artificial intelligence where actually you try to

01:23:47  10  get the machine to think?

01:23:49  11  A.  Yeah, try to let the machine learn from experience and

01:23:52  12  then work on the new data.

01:23:54  13  Q.  And that's what you're working on now?

01:23:56  14  A.  Yes.

01:23:56  15  Q.  Okay.  Doctor, there's been some talk in this case

01:24:05  16  about an article that was published in 2009.

01:24:10  17          MR. BAXTER:  That may be PX-273.

01:24:18  18  Q.  (By Mr. Baxter)  Are you familiar with this article?

01:24:19  19  A.  Yes.

01:24:20  20  Q.  And is your name on the -- on the article at the top?

01:24:23  21  A.  Yes.

01:24:25  22  Q.  Now, I noticed that there are three -- three authors,

01:24:28  23  Dr. Li and -- and a Mr. Li, not Qi, I take it -- Wei Li?

01:24:39  24  A.  Yes.

01:24:39  25  Q.  Did he help you write the article?

| | | |
|---|---|---|
| 01:24:41 | 1 | A.  Wei Li -- when I joined the company, Wei Li already |
| 01:24:44 | 2 | there, we have about half-year overlap, yeah, and Wei Li |
| 01:24:49 | 3 | worked on this product. |
| 01:24:50 | 4 | Q.  Okay.  Who is the main author of this paper? |
| 01:24:52 | 5 | A.  I remember I drafted this paper. |
| 01:24:54 | 6 | Q.  Okay. |
| 01:24:55 | 7 | A.  Yeah. |
| 01:24:55 | 8 | Q.  And you were kind enough to put both Mr. Peter Li and |
| 01:24:59 | 9 | Mr. Wei Li -- |
| 01:25:00 | 10 | A.  Yes. |
| 01:25:00 | 11 | Q.  -- on the paper? |
| 01:25:03 | 12 | A.  Yes. |
| 01:25:03 | 13 | Q.  But you're the primary author? |
| 01:25:06 | 14 | A.  I think Peter is the first author of this paper. |
| 01:25:09 | 15 | Q.  I know it's listed, but I want to know who really wrote |
| 01:25:11 | 16 | it. |
| 01:25:11 | 17 | A.  I think in terms of writing, I think I drafted it. |
| 01:25:14 | 18 | Q.  Okay. |
| 01:25:14 | 19 | A.  Yeah. |
| 01:25:15 | 20 | Q.  Now, I know you weren't here yesterday, but one of |
| 01:25:18 | 21 | these lawyers over here, that one, talked about your |
| 01:25:21 | 22 | paper -- |
| 01:25:21 | 23 | A.  Okay. |
| 01:25:22 | 24 | Q.  -- and was very proud of it.  But he said that this |
| 01:25:26 | 25 | paper told you how to do the '049 patent.  So I need you to |

01:25:33  1  tell the jury whether or not this paper had anything to do

01:25:39  2  with the '049 patent.

01:25:39  3  A.  Okay.  This paper, the technology mentioned in this

01:25:43  4  paper, it's different from the one we patent in '049.

01:25:48  5  Q.  Tell the jury the differences, please, ma'am.

01:25:53  6  A.  Okay.  So this paper talk about the technology related

01:25:56  7  to another product in Li Creative Technologies.  It's a

01:25:59  8  linear microphone array.  Means there are four microphone

01:26:03  9  sensors in a linear shape.

01:26:06  10         And the application of this product is you hook on

01:26:09  11  the monitor.  And you have to talk in front of it.  So it's

01:26:15  12  a fixed position.  It can only enhance the sound coming

01:26:18  13  from in front of it, yeah.

01:26:20  14  Q.  If you were to hook that to that monitor and stand over

01:26:23  15  here where I am and talk to it --

01:26:26  16  A.  Your voice is going to be very weak.

01:26:28  17  Q.  Okay.  It's not going to work?

01:26:29  18  A.  Yeah.

01:26:30  19  Q.  Okay.  Did it have anything, I mean anything, to do

01:26:37  20  with the development of the '049 patent, this paper?

01:26:39  21  A.  No, no.

01:26:47  22  Q.  So if lawyers for Amazon tell the jury that this paper

01:26:49  23  in 2009 was prior art, that is, it forecast the '049 patent

01:26:55  24  and told you how to write the '049 patent or build a

01:26:59  25  product, would that be correct?

01:27:02  1   A.  I think that different technologies, yeah.

01:27:04  2   Q.  Okay.  Not the same at all?

01:27:06  3   A.  Not same at all.  There's a noise reduction unit in

01:27:10  4   this one, and also there's a noise reduction unit in the

01:27:14  5   patent.  So that's the unit probably in common, yeah.

01:27:18  6   Q.  But that's it?

01:27:19  7   A.  Yeah, that's it.

01:27:20  8   Q.  Okay.  Thank you, Dr. Zhu.

01:27:23  9          MR. BAXTER:  I pass the witness, Your Honor.

01:27:25  10         THE COURT:  Cross-examination by the Defendants.

01:27:37  11         MR. LAQUER:  Permission to approach, Your Honor?

01:27:39  12         THE COURT:  You may approach with binders.

01:28:22  13         All right.  Mr. Hadden, you may proceed with

01:28:24  14   cross-examination.

01:28:25  15         MR. HADDEN:  Thank you, Your Honor.

01:28:25  16                    CROSS-EXAMINATION

01:28:26  17   BY MR. HADDEN:

01:28:26  18   Q.  Good afternoon, Dr. Zhu.

01:28:28  19   A.  Good afternoon.

01:28:28  20   Q.  Can you hear me okay?

01:28:30  21   A.  Yeah, I can hear you clearly.

01:28:32  22   Q.  Thank you.

01:28:32  23         MR. HADDEN:  Can we get DX-14, please, Mr. Berk?

01:28:33  24   Q.  (By Mr. Hadden)  I'm going to ask you some questions,

01:28:44  25   Dr. Zhu, about the paper that you were just discussing with

01:28:47  1  your counsel; is that all right?

01:28:48  2  A.  Yes.

01:28:48  3  Q.  Thank you.

01:28:49  4      MR. HADDEN:  Could we go to the second page of

01:28:55  5  this paper, Mr. Berk, where we have the heading Beam --

01:29:00  6  Broadband Beamforming?

01:29:06  7  Q.  (By Mr. Hadden)  Now, I heard you testify to your

01:29:08  8  counsel that you -- you drafted this paper; is that right,

01:29:11  9  Dr. Zhu?

01:29:12  10  A.  Yes.

01:29:12  11  Q.  Okay.  And if you look on the second page, there's a

01:29:16  12  heading Broadband Beamforming.  Do you see that?

01:29:18  13  A.  Yes.

01:29:18  14  Q.  Okay.  And underneath that in that column there's a

01:29:22  15  diagram, Figure 3.  Do you see that?

01:29:23  16  A.  Yes.

01:29:25  17      MR. HADDEN:  Could we blow that up, Mr. Berk,

01:29:28  18  Figure 3?

01:29:31  19  Q.  (By Mr. Hadden)  So Figure 3 shows a linear microphone

01:29:35  20  array; is that right, Dr. Zhu?

01:29:36  21  A.  Yes.

01:29:39  22  Q.  Okay.  And just to help the jury, that -- that dotted

01:29:42  23  line that is running horizontally toward the top, is that

01:29:46  24  the line that specifies the microphone array?

01:29:52  25  A.  Yes.

| | | |
|---|---|---|
| 01:29:52 | 1 | Q.  And what Mr. Berk has helpfully colored green, those |
| 01:30:00 | 2 | dots represent the different microphones in that array? |
| 01:30:03 | 3 | A.  Yes. |
| 01:30:03 | 4 | Q.  Okay.  And it's linear because they're all lined up in |
| 01:30:08 | 5 | a line; is that right, Dr. Zhu? |
| 01:30:09 | 6 | A.  Yes. |
| 01:30:11 | 7 | Q.  Okay.  And there are some arrows that are coming in at |
| 01:30:15 | 8 | an angle of that line.  Do you see that? |
| 01:30:17 | 9 | A.  The vertical one? |
| 01:30:21 | 10 | Q.  The ones that are coming in not at a vertical angle but |
| 01:30:24 | 11 | at a -- the dotted line -- |
| 01:30:25 | 12 | A.  Oh, the dotted line, yes. |
| 01:30:28 | 13 | Q.  And does that line represent the angle to the target |
| 01:30:33 | 14 | source or the speaker that the microphone array is trying |
| 01:30:35 | 15 | to pick up? |
| 01:30:36 | 16 | A.  Yeah, this dotted line is present in the sound source |
| 01:30:41 | 17 | direction. |
| 01:30:42 | 18 | Q.  Right.  And the sound source direction, as shown here |
| 01:30:44 | 19 | in your Figure 3 in the paper, it doesn't have to be 90 |
| 01:30:48 | 20 | degrees in front of that array, does it? |
| 01:30:50 | 21 | A.  Yes. |
| 01:30:52 | 22 | Q.  Yes, it doesn't have to be -- I'm sorry, my question |
| 01:30:55 | 23 | was not well formed. |
| 01:30:57 | 24 |      Is it a requirement, as shown in this diagram, if |
| 01:31:00 | 25 | that array is clipped onto your computer, you have to be |

01:31:04   1   straight in front of the computer, or can you be at an

01:31:07   2   angle?

01:31:08   3   A.  Oh, okay.  Let me clarify it.  The sound coming from

01:31:13   4   any directions.  When the sound coming into our system with

01:31:18   5   suppressed sound coming from the direction on the side, we

01:31:23   6   enhance the sound coming from in the front, yeah.

01:31:25   7   Q.  Okay.  But the example that you're showing here in

01:31:28   8   Figure 3, the sound is coming in at an angle to the array,

01:31:32   9   correct?

01:31:32  10   A.  Yeah.  In this figure, right.

01:31:34  11   Q.  Okay.  And the rest of this diagram, does this show

01:31:40  12   what you have called and I think others have called

01:31:43  13   filter-and-sum beamforming?

01:31:49  14   A.  This -- yeah, this figure, we try to implement the

01:31:55  15   filter-and-sum beamforming.

01:31:57  16   Q.  Okay.  And just to make that a little clearer to the

01:32:00  17   jury -- so we have these lines like $X_1$ and $X_2$ coming down

01:32:04  18   from those green dots.  Do you see those?

01:32:09  19   A.  $X_1$ and $X_2$, yes.

01:32:12  20   Q.  And those are indicating the output of those

01:32:14  21   microphones, $d_1$ and $d_2$; is that correct, Dr. Zhu?

01:32:20  22   A.  Yes.

01:32:20  23   Q.  Okay.  And then we have these $W_1$ and $W_2$ in little

01:32:25  24   circles.  Do you see those?

01:32:28  25   A.  Yes.

01:32:28   1   Q.  And are those the weights that are applied to the

01:32:32   2   outputs of those microphones in order to form a beam?

01:32:33   3   A.  Yeah, that's a filter, yeah.

01:32:35   4   Q.  Filter.  So that's the filter part of the

01:32:40   5   filter-and-sum algorithm; is that correct, Dr. Zhu?

01:32:42   6   A.  Yes.

01:32:43   7   Q.  Okay.  And the sum part is the circle at the bottom

01:32:48   8   with the Greek letter sigma, right?  That indicates

01:32:51   9   summation.  So you're adding up all of those results and

01:32:55  10   multiplying the microphone outputs by those weights; is

01:32:59  11   that correct, Dr. Zhu?

01:33:00  12   A.  Yes.

01:33:00  13   Q.  Okay.  And just -- you didn't invent filter-and-sum

01:33:09  14   beamforming, did you, Dr. Zhu?

01:33:09  15   A.  I didn't.

01:33:11  16   Q.  Okay.  And, in fact, if we look at your patent --

01:33:15  17           MR. HADDEN:  Could we go to the '049 patent now,

01:33:17  18   Mr. Berk?  Yeah, putting them side-by-side would be great.

01:33:26  19   Can we go to Figure 4?  Okay.  And blow that out.  Thank

01:33:41  20   you, Mr. Berk.

01:33:42  21   Q.  (By Mr. Hadden)  Now, if we look at Figure 4 -- and

01:33:44  22   this is from your '049 patent you were just talking to

01:33:48  23   Mr. Baxter about, correct?

01:33:49  24   A.  Yes, this is our patent.

01:33:50  25   Q.  Sure.

01:33:51   1   A.   Yeah.

01:33:52   2   Q.   And Figure 4 also shows a linear microphone array;

01:33:58   3   isn't that right, Dr. Zhu?

01:33:59   4   A.   Yes, this Figure 4 shows linear array.

01:34:03   5   Q.   Okay.   And this Figure 4 is showing essentially the

01:34:08   6   same thing as Figure 3 in your paper, but it looks like

01:34:12   7   there are more microphones in the array in Figure 4; is

01:34:17   8   that correct, Dr. Zhu?

01:34:18   9   A.   Yes.

01:34:19   10  Q.   Okay.   So, again, we have the -- the arrow that shows

01:34:25   11  this angle of the target sound signal, relative to the

01:34:32   12  microphone array in Figure 4.   Do you see that at the top?

01:34:35   13  A.   Yes.

01:34:36   14  Q.   Okay.   And in both Figure 3 from your paper and

01:34:42   15  Figure 4 in the patent, the purpose of this filter-and-sum

01:34:53   16  beamforming is to form a beam in the microphone array that

01:34:58   17  points in the direction of that target sound source, right,

01:35:02   18  Dr. Zhu?

01:35:03   19  A.   Yes.

01:35:08   20  Q.   Okay.   And that target sound source, the direction of

01:35:12   21  it is specified by this angle between the array and

01:35:20   22  wherever the sound source is, whatever it is you're trying

01:35:23   23  to listen to, right, Dr. Zhu?

01:35:26   24  A.   Yeah, that's illustrated in this figure.

01:35:29   25  Q.   Okay.   And to find that angle, you have to first locate

01:35:37    1    the sound source before you can perform this filter-and-sum

01:35:42    2    beamforming; isn't that correct, Dr. Zhu?

01:35:45    3    A.  Yes.

01:35:48    4    Q.  Because those weights, those little Ws in the diagram,

01:35:52    5    they depend on the angle of that sound source you're trying

01:36:00    6    to listen to?

01:36:00    7    A.  Yeah, that's in the simulation.  We have predefined

01:36:03    8    those angles and to generate these filters.

01:36:08    9         MR. HADDEN:  And if we go back to the paper,

01:36:10   10    Mr. Berk.  If we look at that same column we were looking

01:36:19   11    at underneath the Figure 3.  Can we blow up that text,

01:36:23   12    Mr. Berk?

01:36:34   13    Q.  (By Mr. Hadden)  Sure.  So this talks about the spatial

01:36:39   14    directivity pattern, and it's a function H of a couple of

01:36:42   15    Greek letters, one of which is the angle theta -- the sound

01:36:47   16    source angle theta, and the other is a frequency.  Do you

01:36:51   17    see that?

01:36:51   18    A.  Yes.

01:36:52   19    Q.  And this directivity pattern, that is what specifies

01:36:55   20    kind of the shape of the beam that you're trying to form;

01:36:58   21    isn't that right, Dr. Zhu?

01:36:59   22    A.  Yes.

01:37:03   23    Q.  Okay.

01:37:04   24         MR. HADDEN:  And if we go to the top of the next

01:37:08   25    column, Mr. Berk, in this same article.  Can you blow that

01:37:13  1  up?  Just -- yeah, just the formula at the top, if you

01:37:18  2  could.

01:37:18  3  Q.  (By Mr. Hadden)  Now, this is a -- a formula from your

01:37:27  4  paper.  And it specifies how that shape of that beam

01:37:30  5  depends on the frequency and that angle that -- to the

01:37:37  6  target sound source and these weights; isn't that right,

01:37:39  7  Dr. Zhu?

01:37:39  8  A.  Yeah, that's why we implemented the microphone array.

01:37:45  9  That's what we did in the paper.

01:37:47  10  Q.  Okay.  And if we look at your patent --

01:37:49  11       MR. HADDEN:  At Column 7, Mr. Berk.

01:38:10  12  Q.  (By Mr. Hadden)  I apologize.  The text here is not as

01:38:12  13  clear.

01:38:13  14       MR. HADDEN:  If you can move down.

01:38:15  15  Q.  (By Mr. Hadden)  The equation you have in the patent

01:38:17  16  for forming that beam shape that is pointed at the target

01:38:23  17  sound source you're trying to listen to, it's the same

01:38:26  18  formula that's in your paper, isn't it, Dr. Zhu?

01:38:29  19  A.  Yes.  Like I said, that's one way to implement

01:38:33  20  beamforming.

01:38:48  21       MR. HADDEN:  Now, if we go back to Figure 3 of the

01:38:50  22  patent, please -- the article, please, Mr. Berk.

01:38:54  23  Q.  (By Mr. Hadden)  Now, if you look at the top of this

01:39:03  24  figure again, Figure -- Figure 3 from your article from

01:39:07  25  2009, there's a little Greek letter tau with a subscript 3.

01:39:17   1   Do you see that, Dr. Zhu?

01:39:18   2   A.  Yes.

01:39:19   3   Q.  And that represents the delay to microphone that's

01:39:22   4   indicated as $d_3$ from the center of that microphone array;

01:39:26   5   isn't that right, Dr. Zhu?

01:39:27   6   A.  Yeah.  In this paper, yes.

01:39:28   7   Q.  Okay.  And, again, that delay depends on that angle to

01:39:38   8   the target sound source that has been located; isn't that

01:39:39   9   right?

01:39:40  10   A.  Yes.

01:39:41  11   Q.  Okay.  And that delay is used to calculate those

01:39:49  12   weights, $W_1$, $W_2$, $W_3$, $W_4$ that are used to form that beam that

01:39:57  13   is directed at that target sound source; isn't that right,

01:40:01  14   Dr. Zhu?

01:40:03  15   A.  Let me -- I think they're related, yes.

01:40:17  16   Q.  Okay.

01:40:17  17         MR. HADDEN:  And if we look at -- if we could,

01:40:22  18   Mr. Berk, to the second column on that same page of the

01:40:23  19   paper.  There's a sentence that begins, we use $tau_n$ and it

01:40:28  20   has a formula.

01:40:30  21   A.  Yes.

01:40:30  22   Q.  (By Mr. Hadden)  So this is the formula for that delay.

01:40:37  23   This has a subscript n, which just means it can be any one

01:40:42  24   of those microphones, right, so --

01:40:43  25   A.  Can you repeat your question?

01:40:45  1  Q.  Sure.  I'm sorry.  I'll start over.

01:40:47  2       Do you see this formula from your 2009 paper,

01:40:50  3  Dr. Zhu?

01:40:50  4  A.  Uh-huh, yes.

01:40:51  5  Q.  And -- and it has tau, which is the little Greek letter

01:40:55  6  that looks like a t, and it has a subscript n.  Do you see

01:40:59  7  that?

01:40:59  8  A.  Yes.

01:41:00  9  Q.  And n is just a -- kind of placeholder for the number

01:41:03  10  of the microphone that we're talking about, right?

01:41:08  11  A.  Yes.

01:41:08  12  Q.  Okay.  And then -- has a formula for that delay, and it

01:41:14  13  is a frequency -- a sampling frequency multiplied by $d_n$

01:41:23  14  which is the distance in the microphone from the center of

01:41:25  15  the array.  And then it's multiplied by the cosine of the

01:41:29  16  angle theta, which is the angle to the target sound source.

01:41:36  17  And all that's divided by c, which is the speed of sound.

01:41:41  18  Is that correct, Dr. Zhu?

01:41:42  19  A.  Yes.

01:41:43  20  Q.  Okay.  And if we look at Figure 6 in your patent.

01:42:01  21       MR. HADDEN:  If we could blow up 6A -- actually

01:42:07  22  6B, Mr. Berk.

01:42:08  23  Q.  (By Mr. Hadden)  And I'm sorry for that.  The text is

01:42:10  24  not as clear as I would hope on the patent version we have

01:42:15  25  here.  But if you can see, this is Table 6B from your

01:42:19   1   patent.  And it has in the column on the right delay tau,

01:42:27   2   and it says in parentheses number of samples.  Do you see

01:42:31   3   that.

01:42:32   4   A.  Yes.

01:42:33   5   Q.  Okay.  And if we look at the entry for 180 degrees, the

01:42:44   6   equation for the delay tau is the same as the equation from

01:42:47   7   your paper describing Figure 3; isn't that right, Dr. Zhu?

01:42:50   8   A.  Yeah, that's a specific situation.

01:42:56   9   Q.  Right.  So for a linear array, the angle between the

01:43:01   10  microphone and the center of the array is going to be

01:43:08   11  either 0 degrees or 180 degrees, depending on what side of

01:43:12   12  the midpoint it's on, right, Dr. Zhu?

01:43:14   13  A.  Can you repeat that question?

01:43:17   14  Q.  Sure.

01:43:17   15  A.  Sorry.

01:43:19   16  Q.  So you said it's a special case, and I'm just trying to

01:43:23   17  understand.  It's a special case because when we have a

01:43:26   18  linear microphone array, the only angle between a

01:43:32   19  microphone in the center of the array, because they're in a

01:43:35   20  line, it's either 0 degrees or 180 degrees, right?

01:43:40   21  A.  Can you put this figure back to the context because the

01:43:46   22  180 means the sound source sensor position.

01:43:54   23  Q.  Right.  Isn't the sound source sensor the microphone?

01:43:56   24  A.  Yeah, the sound source sensor is the microphone, yeah.

01:43:59   25  Q.  So this is the angle of the microphone relative to the

01:44:02  1  center of the microphone array, right, Dr. Zhu?

01:44:09  2  A.  I think this one, the sensor, I put in the linear

01:44:12  3  shape.

01:44:13  4  Q.  Right.  And that's the same shape that you show in

01:44:16  5  Figure 3 of your 2009 paper, right, Dr. Zhu?

01:44:20  6  A.  Yes.

01:44:20  7  Q.  Right.  So -- and to be clear, you describe linear

01:44:30  8  microphone arrays, as well as circular microphone arrays,

01:44:33  9  in the '049 patent, right, Dr. Zhu?

01:44:34  10  A.  Yes, they are two special cases for my invention.

01:44:38  11  Q.  Right.  And so for the case of the linear microphone

01:44:41  12  array, you show the same formula for calculating the delay

01:44:58  13  in your 2009 article as you do in this Figure 6B from your

01:45:03  14  '049 patent, don't you, Dr. Zhu?

01:45:04  15  A.  Yes.

01:45:05  16  Q.  Thank you.

01:45:24  17        MR. HADDEN:  Now, if we go to -- could we go to

01:45:27  18  the introduction of the paper, the 2009 paper?  Could you

01:45:37  19  blow up the first paragraph?  Now -- oh, I'm sorry, the

01:45:48  20  second paragraph, Mr. Berk.  My bad.

01:45:51  21  Q.  (By Mr. Hadden)  Now, this paper that you and Dr. Li

01:45:54  22  published in 2009, that was presented at a conference in

01:45:58  23  Taiwan; is that correct, Dr. Zhu?

01:46:00  24  A.  Yes.

01:46:04  25  Q.  And the purpose of the paper was to publicize the work

01:46:07    1   that you had -- you and Dr. Li had done; isn't that right,

01:46:13    2   Dr. Zhu?

01:46:13    3   A.  Yeah, presented the technology we had, yeah.

01:46:17    4   Q.  And you weren't trying to keep what is described in

01:46:20    5   this paper secret, were you?

01:46:22    6   A.  Yeah, this is public paper.

01:46:24    7   Q.  Right.  And the purpose was to put it out there so that

01:46:27    8   everybody could read it; isn't that correct?

01:46:28    9   A.  Yes.

01:46:30   10   Q.  Thank you.

01:46:36   11          MR. HADDEN:  Now, if we blow up the first sentence

01:46:38   12   of this, Mr. Berk.

01:46:40   13   Q.  (By Mr. Hadden)  You say in this paper you drafted, one

01:46:47   14   of the major challenges in applying a microphone array in

01:46:51   15   speech recognition is that speech is a wideband signal.

01:46:55   16   Narrow -- the traditional narrowband beamforming techniques

01:46:58   17   are not appropriate anymore.

01:47:00   18          Do you see that?

01:47:01   19   A.  Yes.

01:47:01   20   Q.  And you cite -- you have a cite there, No. 4, that's to

01:47:05   21   one of the references that you cite in the back of the

01:47:09   22   paper.  Isn't that right, Dr. Zhu?

01:47:10   23   A.  Yes.

01:47:16   24   Q.  Right.

01:47:16   25          MR. HADDEN:  And if we look at the references in

01:47:21  1   the back, please, Mr. Berk.  If you'll just blow those up.

01:47:23  2   Q.  (By Mr. Hadden)  Figure -- No. 4 that you cite there is

01:47:30  3   this book by Professor Brandstein, that we've heard a bit

01:47:36  4   about.  Do you see that, Dr. Zhu?

01:47:38  5   A.  Yes.

01:47:38  6   Q.  And you were familiar with Dr. Brandstein's book when

01:47:43  7   you were writing this paper in 2009, weren't you?

01:47:45  8   A.  That's one of our reference.

01:47:48  9   Q.  And as I understood your testimony, your Master's

01:47:53  10  degree and your Ph.D. were in -- related more to pattern

01:47:58  11  recognition rather than acoustic signal processing; is that

01:48:04  12  accurate?

01:48:04  13  A.  Yeah, but they're all related to signal processing,

01:48:08  14  more general --

01:48:09  15  Q.  But to learn the specifics of microphone arrays and

01:48:14  16  acoustical signal processing, you read technical books and

01:48:19  17  articles while you were working with -- with Dr. Li at Li

01:48:23  18  Creative, didn't you?

01:48:25  19  A.  Yes.

01:48:26  20  Q.  Okay.  And some of those technical books and articles,

01:48:31  21  you listed here as references in your 2009 paper; is that

01:48:36  22  correct, Dr. Zhu?

01:48:38  23  A.  Yes.

01:48:45  24  Q.  Okay.  Now -- and when you were getting up to speed and

01:48:56  25  learning about acoustic signal processing, you looked at

01:49:01  1  adaptive beamforming algorithms that were invented by other
01:49:06  2  people while you were working on your VoiceFocus prototype
01:49:11  3  in 2008; isn't that correct, Dr. Zhu?
01:49:14  4  A.  I read lots of paper when I develop -- everything,
01:49:20  5  yeah.
01:49:20  6  Q.  And, specifically, did you look at any adaptive
01:49:24  7  beamforming algorithms invented by others when you were
01:49:26  8  working on the VoiceFocus phone in 2008?
01:49:30  9  A.  Yeah, I read papers about that.
01:49:33  10 Q.  And you also looked at sound source localization
01:49:40  11 algorithms developed by others when you were working at Li
01:49:44  12 Creative in 2008 on that VoiceFocus phone; isn't that
01:49:48  13 correct, Dr. Zhu?
01:49:50  14 A.  Yes.
01:49:51  15 Q.  And your patent, the '049 patent, talks about a
01:50:00  16 particular sound source localization algorithm called
01:50:05  17 SRP-PHAT where PHAT is P-H-A-T.  Do you recall that,
01:50:11  18 Dr. Zhu?
01:50:12  19 A.  Yeah, I recall that term.
01:50:17  20      MR. HADDEN:  And if we look at the patent, if we
01:50:19  21 could, Mr. Berk, at Column 11, Lines 25 to 28.
01:50:29  22 Q.  (By Mr. Hadden)  Now, this is from the '049 patent.
01:50:33  23 And you're talking about methods for estimating a spatial
01:50:37  24 location of the target sound signal.  Do you see that,
01:50:40  25 Dr. Zhu?

01:50:42   1    A.   Yes.

01:50:43   2    Q.   And it mentions using a steered response power-phase

01:50:55   3    transform, SRP-PHAT.   Do you see that?

01:50:57   4    A.   I saw that.

01:50:58   5    Q.   And, again, you didn't invent that sound source

01:51:05   6    localization algorithm, SRP-PHAT, did you, Dr. Zhu?

01:51:08   7    A.   Yeah, I did not invent that.   This one of the method

01:51:13   8    over there.

01:51:13   9    Q.   So there were other methods, well-known methods for --

01:51:16   10   A.   Yeah, there are other methods.

01:51:18   11   Q.   Thank you, Dr. Zhu.

01:51:19   12          Now, you also, while you were learning about

01:51:25   13   acoustical signal processing, you looked at noise reduction

01:51:31   14   algorithms that were developed by others while you were

01:51:34   15   working on the VoiceFocus conference phone in 2008, didn't

01:51:39   16   you, Dr. Zhu?

01:51:45   17   A.   Yes.

01:51:48   18          MR. HADDEN:   And if we go back -- if we could just

01:51:50   19   blow up, again, those references from the 2009 paper.

01:52:00   20   Q.   (By Mr. Hadden)   Now, if we compare what we see here in

01:52:03   21   the references in the 2009 paper to the references that

01:52:08   22   were cited by the patent examiner on the '049 patent --

01:52:15   23          MR. HADDEN:   Could we do that, Mr. Berk?   Could we

01:52:22   24   just blow up -- there we go.

01:52:24   25   Q.   (By Mr. Hadden)   So you -- you understand, Dr. Zhu,

01:52:29  1   that on the front of a patent, it lists the references that

01:52:34  2   were considered by the patent examiner under this heading

01:52:37  3   References Cited?  You understand that, Dr. Zhu?

01:52:43  4   A.  Can you repeat your question?

01:52:45  5   Q.  Sure.  On the front of the patent, there is a heading

01:52:51  6   that says References Cited; do you see that?

01:52:54  7   A.  Yes.

01:52:54  8   Q.  Do you understand that underneath that heading,

01:52:58  9   References Cited, is a list of the prior art, the patents

01:53:01  10  and articles that the patent examiner considered when

01:53:04  11  they're deciding whether or not to allow the patent?  Do

01:53:07  12  you understand that?

01:53:07  13  A.  Yes.

01:53:12  14  Q.  Okay.  And if we look here on what the examiner

01:53:14  15  considered, we have some U.S. patent documents on the

01:53:18  16  front.  We have some foreign patent documents.

01:53:22  17          MR. HADDEN:  And then if you could, Mr. Berk, go

01:53:24  18  to the next page where it's continued so we can see all of

01:53:27  19  them.  Could you blow that up?

01:53:41  20  Q.  (By Mr. Hadden)  And there are some additional U.S.

01:53:43  21  patent documents cited here.  Do you see that, Dr. Zhu?

01:53:45  22  A.  Yes, I saw that.

01:53:46  23  Q.  But none of the articles or the Brandstein book or any

01:53:49  24  of these other technical articles that had other adaptive

01:53:53  25  beamforming algorithms that you looked at, other sound

01:54:01  1  source localization algorithms that you looked at, none of

01:54:03  2  those were cited or considered by the patent examiner when

01:54:06  3  he allowed your '049 patent.  Isn't that correct, Dr. Zhu?

01:54:10  4  A.  When we filed the patent, we give all our relevance --

01:54:15  5  our relevance materials to the patent attorney.  And I

01:54:19  6  think he, as a expert, decide what to include and what to

01:54:26  7  not include.  So I'm not expert on that.

01:54:30  8  Q.  Okay.  But we can both tell just looking at the face of

01:54:34  9  the patent that the technical papers and the Brandstein

01:54:40  10  book that you relied on in writing that 2009 article were

01:54:45  11  not considered by the patent examiner when he allowed the

01:54:51  12  '049 patent.  Isn't that correct, Dr. Zhu?

01:54:53  13  A.  I'm not a person that can judge that, I'm sorry, yeah.

01:54:56  14  Q.  Well, we can both read the patent.  You agree with what

01:55:00  15  is -- what you cited in your references in your 2009 paper

01:55:04  16  do not appear as cited references in the '049 patent?

01:55:08  17  A.  Yes.

01:55:08  18  Q.  Can you agree with that?

01:55:09  19  A.  Yeah, I agree with that.

01:55:10  20  Q.  Thank you, Dr. Zhu.

01:55:11  21  A.  Yeah.

01:55:13  22       THE COURT:  Dr. Zhu, please make sure he's

01:55:16  23  finished the question before you answer, all right?

01:55:18  24       THE WITNESS:  Okay.

01:55:18  25       THE COURT:  That's not as bad as talking over

01:55:21   1   people.  But neither one is to be encouraged.

01:55:25   2            THE WITNESS:  Thank you.

01:55:25   3            THE COURT:  Let's continue.

01:55:26   4            MR. HADDEN:  Thank you, Your Honor.

01:55:27   5   Q.  (By Mr. Hadden)  Now, I would like to talk a little

01:55:29   6   more about the '049 patent and how it works, if we could.

01:55:32   7   Is that all right, Dr. Zhu?

01:55:34   8   A.  Yes.

01:55:35   9   Q.  Thank you.

01:55:35  10            MR. HADDEN:  Can we go to Claim 1, please,

01:55:38  11   Mr. Berk?  And can we blow up -- can we blow up the

01:56:02  12   providing paragraph, please, Mr. Berk?

01:56:05  13   Q.  (By Mr. Hadden)  Now, while he's doing that, Dr. Zhu,

01:56:08  14   you understand that Claim 1 is a claim -- it's the

01:56:13  15   independent claim that Vocalife is asserting against Amazon

01:56:18  16   in this case?  Do you understand that, Dr. Zhu?

01:56:24  17   A.  I'm not so familiar with all these legal terms.  I

01:56:33  18   understand that Claim 1 is important, yeah.

01:56:35  19   Q.  Okay.  That's good enough.

01:56:36  20            And Claim 1 is important, you understand, because

01:56:40  21   if Amazon is liable in this case, it is only because the

01:56:47  22   jury finds that the accused Amazon Echos do everything that

01:56:55  23   Claim 1 requires.  You understand that, don't you?

01:56:55  24   A.  Yes.

01:57:11  25   Q.  Okay.  And so --

```
01:57:11    1           MR. BAXTER:  Seems like an expert question,
01:57:14    2   Your Honor, that she's probably not qualified to give, and
01:57:15    3   we'd object to it.
01:57:22    4           THE COURT:  Restate the question, Mr. Hadden.
01:57:25    5           MR. HADDEN:  Sure.
01:57:25    6   Q.  (By Mr. Hadden)  You understand, don't you, Dr. Zhu,
01:57:28    7   that the jury is going to have to decide whether or not the
01:57:31    8   accused Amazon Echos do what Claim 1 requires?  You
01:57:36    9   understand that, don't you?
01:57:37   10           MR. BAXTER:  Same objection, Your Honor.
01:57:39   11           THE COURT:  I think we're getting awfully close to
01:57:42   12   asking for opinion testimony, counsel.
01:57:44   13           I'll sustain that.
01:57:45   14           MR. HADDEN:  Okay.  Thank you, Your Honor.
01:57:46   15   Q.  (By Mr. Hadden)  Now, if we look at Claim 1, Dr. Zhu,
01:57:52   16   the first element that we've highlighted here talks about a
01:57:55   17   microphone array system.  Do you see that?
01:57:59   18   A.  Yes.
01:58:00   19   Q.  And do you understand, Dr. Zhu, that because this is a
01:58:03   20   reissue patent, as you heard about, some of the language is
01:58:08   21   in square, kind of bold brackets?  Do you see that?
01:58:15   22   There's an example here:  [An arbitrary].  Do you see that,
01:58:19   23   Dr. Zhu?
01:58:19   24   A.  Yes.
01:58:19   25   Q.  So that language is essentially taken out.  Do you
```

01:58:22   1   understand that when you're reading these claims?

01:58:23   2   A.   Yes.

01:58:24   3   Q.   And there's some italicized language, and that is

01:58:32   4   language that was added as part of the reissue.  Do you

01:58:35   5   understand that, in reading this claim?

01:58:37   6   A.   Okay.

01:58:43   7   Q.   So I just want to look at this first part that talks

01:58:45   8   about providing a microphone array system comprising an

01:58:48   9   array of sound sensors.  And then it says:  Positioned in a

01:58:54  10   linear, circular, or other configuration.

01:58:57  11        Do you see that?

01:58:58  12   A.   Yes.

01:59:05  13   Q.   So you understand that this claim applies to both

01:59:09  14   circular microphone arrays and also a linear microphone

01:59:13  15   array like you described in your 2009 paper?  You

01:59:15  16   understand that, don't you, Dr. Zhu?

01:59:17  17   A.   Yes, I understand our patent is a general design of the

01:59:22  18   microphone array to cover all configurations.

01:59:25  19   Q.   Thank you.

01:59:26  20   A.   Yeah.

01:59:27  21        MR. HADDEN:  Can we go to the determining step,

01:59:29  22   Mr. Berk?

01:59:42  23   Q.   (By Mr. Hadden)  Now, there's this long paragraph here

01:59:45  24   in this claim.  Just start at the beginning.  It talks

01:59:49  25   about determining a delay between each of said sound

01:59:52   1   sensors and an origin of said array of sound sensors.

01:59:56   2         Do you see that, Dr. Zhu?

01:59:57   3   A.  Yes.

01:59:58   4   Q.  And an example of that delay is that tau, little t,

02:00:08   5   with a 3, that we saw in your 2009 paper and also in

02:00:12   6   Figure 6B of the '049 patent; isn't that right, Dr. Zhu?

02:00:18   7   A.  I couldn't recall the specific figure number, but

02:00:23   8   that's the one, yeah --

02:00:26   9   Q.  Okay.

02:00:26   10  A.  -- in the -- on the paper -- the top, yeah.

02:00:30   11  Q.  And then this claim goes on, and it requires that that

02:00:35   12  delay is a function of distance between each of said sound

02:00:41   13  sensors and said origin.  You see that, Dr. Zhu?

02:00:47   14  A.  Yes.

02:00:47   15  Q.  And -- and that was that variable d that specified the

02:00:52   16  distance of the microphone from the center of the array.

02:00:57   17  It was in both your 2009 article and also in the formula in

02:01:02   18  6B of the patent.  Do you recall that, Dr. Zhu?

02:01:06   19  A.  Yeah, you can refer this to that figure.  Yeah.

02:01:10   20  Q.  Thank you.

02:01:16   21        Then that delay has to be determined also by a

02:01:20   22  predefined angle between each of said sound sensors and a

02:01:26   23  reference axis.  Do you see that?

02:01:29   24  A.  Yes.

02:01:31   25  Q.  So that is, again, talking about that angle between

| | | |
|---|---|---|
| 02:01:36 | 1 | either the linear axis of the linear array or an axis |
| 02:01:42 | 2 | across one diameter of a circle in a circular array and the |
| 02:01:47 | 3 | position of a particular microphone; isn't that right, |
| 02:01:50 | 4 | Dr. Zhu? |
| 02:01:50 | 5 | A.  Can you repeat your question? |
| 02:01:52 | 6 | Q.  Sure.  So the predefined angle that it's talking about |
| 02:01:56 | 7 | here in Claim 1 is the angle of one of those microphones |
| 02:02:02 | 8 | from either the linear -- the line that defines the linear |
| 02:02:09 | 9 | array or a diameter that is a reference in the circular |
| 02:02:17 | 10 | array, right, Dr. Zhu? |
| 02:02:18 | 11 | A.  Yeah, it's -- yeah, depending on where you put the |
| 02:02:26 | 12 | reference point is, yeah. |
| 02:02:27 | 13 | Q.  Okay.  And then that delay that has to be determined |
| 02:02:31 | 14 | has to depend on yet another variable.  And it goes on and |
| 02:02:41 | 15 | says here:  An azimuth angle between said reference axis |
| 02:02:45 | 16 | and said target sound signal. |
| 02:02:47 | 17 | Do you see that? |
| 02:02:48 | 18 | A.  Yes. |
| 02:02:48 | 19 | Q.  And that is that angle that we saw both in Figure 3 in |
| 02:02:52 | 20 | your 2009 paper and also in the formulas in 6B of the '049 |
| 02:03:00 | 21 | patent that -- that is the angle to that target sound, what |
| 02:03:07 | 22 | it is you're trying to listen to.  Isn't that right, |
| 02:03:09 | 23 | Dr. Zhu? |
| 02:03:09 | 24 | A.  Yes.  With respect to the reference axis, yeah. |
| 02:03:15 | 25 | Q.  Okay.  So in Figure -- in Claim 1 of your patent, this |

| | | |
|---|---|---|
| 02:03:27 | 1 | determining a delay step, requires calculating a delay is a |
| 02:03:33 | 2 | function of three different things, right?  It's got to be |
| 02:03:36 | 3 | the distance of a microphone to the origin, a predefined |
| 02:03:42 | 4 | angle between that microphone and a reference axis, and |
| 02:03:46 | 5 | this azimuth angle between that same reference axis and the |
| 02:03:51 | 6 | sound -- target sound signal.  Is that right, Dr. Zhu? |
| 02:03:56 | 7 | A.  This is a specific example to calculate the delay.  But |
| 02:04:02 | 8 | the delay defined in Claim 1 is more general. |
| 02:04:04 | 9 | Q.  But this is Claim 1, Dr. Zhu.  We're reading from |
| 02:04:11 | 10 | Claim 1. |
| 02:04:11 | 11 | A.  Can you zoom out, please? |
| 02:04:14 | 12 | Q.  Sure. |
| 02:04:15 | 13 |         MR. HADDEN:  Can you show this? |
| 02:04:43 | 14 | Q.  (By Mr. Hadden)  So the language that we were |
| 02:04:44 | 15 | discussing is in the middle of Claim 1 in this determining |
| 02:04:51 | 16 | paragraph. |
| 02:04:51 | 17 |         Do you see that, Dr. Zhu? |
| 02:04:52 | 18 | A.  Yes. |
| 02:04:53 | 19 | Q.  Okay.  So -- so in Claim 1, all of those requirements |
| 02:05:02 | 20 | of how the delay is determined are specified explicitly; |
| 02:05:08 | 21 | isn't that right, Dr. Zhu? |
| 02:05:09 | 22 | A.  All this related to the delay. |
| 02:05:11 | 23 | Q.  So the delay has to be calculated, according to |
| 02:05:18 | 24 | Claim 1, for each microphone in the array; isn't that |
| 02:05:24 | 25 | correct, Dr. Zhu? |

02:05:27  1  A.  Yeah, the delay has to be -- in this statement, the

02:05:34  2  delay need to be decided according to those parameters.

02:05:38  3  Q.  Those three -- the two angles that we talked about and

02:05:44  4  the distance, and that has to be done for each microphone

02:05:48  5  in the array.  Isn't that correct, Dr. Zhu?

02:05:49  6  A.  I think that's a specific example.

02:05:51  7  Q.  Well, let's just focus on Claim 1 and what it requires.

02:05:59  8  Doesn't it require what I just said, that it requires

02:06:03  9  determining a delay between each of the sound sensors --

02:06:06  10  those are microphones -- and an origin of that array.

02:06:10  11  Isn't that right, Dr. Zhu?

02:06:13  12  A.  Yeah, that's where you calculate the delay.

02:06:16  13  Q.  And in calculating that delay, the calculation has to

02:06:19  14  be a function of distance between the sound sensor and the

02:06:23  15  origin, a predefined angle between each of said sound

02:06:27  16  sensors and a reference axis, and this azimuth angle

02:06:31  17  between said reference and the target sound signal, right?

02:06:37  18  A.  People can define different functions to use all these

02:06:44  19  parameters.

02:06:45  20  Q.  Right.  But the function has to use all of those

02:06:48  21  parameters to calculate the delay, right, Dr. Zhu?  Isn't

02:07:00  22  that right, Dr. Zhu?

02:07:01  23  A.  I still think determine delay probably be more general

02:07:05  24  than that.

02:07:06  25  Q.  Well, sure.  There may be ways can you determine a

02:07:10  1  delay more general than that, but if they're going to use

02:07:14  2  Claim 1 of your patent, they have to do what Claim 1 of the

02:07:19  3  patent says, don't they, Dr. Zhu?

02:07:22  4         MR. BAXTER:  Once again, Your Honor.  It's expert

02:07:24  5  opinion.

02:07:24  6         THE COURT:  I'll overrule this question --

02:07:27  7  overrule this objection.

02:07:32  8  Q.  (By Mr. Hadden)  You can go ahead and answer, Dr. Zhu.

02:07:34  9  A.  Can you repeat your question?

02:07:34  10        THE COURT:  Counsel, if the witness has not

02:07:37  11  answered to your satisfaction, raise it with me.

02:07:40  12        MR. HADDEN:  Oh, I apologize, Your Honor.

02:07:41  13        THE COURT:  Don't instruct the witness.

02:07:42  14        MR. HADDEN:  I apologize, Your Honor.

02:07:43  15        THE COURT:  When you're ready, Dr. Zhu, please

02:07:45  16  answer the question.

02:07:46  17        MR. BAXTER:  I think she had asked for a repeat of

02:07:48  18  it, Your Honor, so we'll have it firmly in mind.

02:07:52  19        THE COURT:  Well, given the colloquy that's taken

02:07:55  20  place, let's start over.

02:07:57  21        Restate your question.

02:07:59  22        MR. HADDEN:  Yes, Your Honor.

02:08:00  23  Q.  (By Mr. Hadden)  My question was, Dr. Zhu, if somebody

02:08:03  24  is going to be using Claim 1 of your patent, they have to

02:08:06  25  calculate the delay as Claim 1 describes; isn't that

| | | |
|---|---|---|
| 02:08:13 | 1 | correct, Dr. Zhu? |
| 02:08:14 | 2 | A.  What I want to say, for the determine of the delay, |
| 02:08:41 | 3 | need to use spatial location, need to have the -- yes, |
| 02:08:47 | 4 | spatial location relationship between the sensors and |
| 02:08:53 | 5 | the -- the sound direction. |
| 02:09:00 | 6 | MR. HADDEN:  Object, Your Honor, non-responsive. |
| 02:09:03 | 7 | THE COURT:  I'll sustain that. |
| 02:09:03 | 8 | Dr. Zhu, you need to answer the question that's |
| 02:09:06 | 9 | asked. |
| 02:09:06 | 10 | The question is:  If somebody is going to be using |
| 02:09:09 | 11 | Claim 1 of your patent, they have to calculate the delay as |
| 02:09:14 | 12 | Claim 1 describes it; isn't that correct? |
| 02:09:17 | 13 | That's the question.  Can you answer that |
| 02:09:19 | 14 | question? |
| 02:09:38 | 15 | THE WITNESS:  I want -- |
| 02:09:40 | 16 | THE COURT:  If you -- |
| 02:09:41 | 17 | THE WITNESS:  I want to say if all these |
| 02:09:43 | 18 | parameters can be, like, expressed by a function of other |
| 02:09:48 | 19 | parameters.  So it's all related.  So, for example, there's |
| 02:09:55 | 20 | another parameter that related to some of them, but when |
| 02:10:01 | 21 | people determine the delay, use that parameter, I think it |
| 02:10:09 | 22 | still -- as long as it related, I think, yes. |
| 02:10:14 | 23 | THE COURT:  So your answer to the question is yes? |
| 02:10:16 | 24 | THE WITNESS:  Any -- any combination of those |
| 02:10:21 | 25 | parameters.  So any parameters that can be a combination of |

02:10:26  1  function of those parameters is part of the determine of

02:10:32  2  the delay.

02:10:32  3        So I -- I -- so may not be specific to those

02:10:43  4  parameters.  The new parameter can be a function of this

02:10:47  5  one.  But you -- still belonging to this statement.  That's

02:10:53  6  my understanding.

02:10:55  7        MR. HADDEN:  Same objection, Your Honor.

02:10:56  8        THE COURT:  All right.  I'm going to sustain the

02:11:01  9  objection again.

02:11:01  10        The question, Dr. Zhu, is:  If someone is using

02:11:07  11  Claim 1 of the '409 [sic] patent, is it or is it not true

02:11:16  12  that they have to calculate the -- the delay as called for

02:11:19  13  in Claim 1?

02:11:22  14        THE WITNESS:  Can I explain my concern,

02:11:25  15  for example --

02:11:25  16        THE COURT:  You can -- you can either answer that,

02:11:27  17  yes, they can; no, they can't; or I don't know.  One of

02:11:30  18  those three answers.

02:11:32  19        THE WITNESS:  I cannot explain.

02:11:34  20        THE COURT:  All right.  Then that's an acceptable

02:11:35  21  answer.

02:11:35  22        Let's proceed.

02:11:37  23        MR. HADDEN:  Thank you, Your Honor.

02:11:38  24  Q.  (By Mr. Hadden)  Now, to calculate a delay using an

02:11:47  25  azimuth angle between said reference axis and said target

02:11:54   1   sound signal, the system has to already know the angle to

02:11:57   2   the target sound signal; isn't that right, Dr. Zhu?

02:12:01   3   A.   Some parameters need to precalculate according to if

02:12:07   4   the sound coming from that direction, yeah.

02:12:13   5   Q.   So to use an azimuth angle between said reference axis

02:12:18   6   and said target sound signal, the system has to know when

02:12:24   7   it's calculating the delay, where the target sound is

02:12:27   8   coming from.  Isn't that correct, Dr. Zhu?

02:12:43   9   A.   For example, if we already -- the parameter is two

02:12:47  10   sides of a triangle.  If you know that, you know the third

02:12:56  11   side of the triangle.

02:12:57  12          So if they do not use -- for example, the known

02:13:01  13   parameters are the two sides of the triangle.  That's my

02:13:04  14   definition, for example.  People can still use the third

02:13:08  15   side as a parameter because they are correlated.  So --

02:13:22  16          MR. HADDEN:  Objection, non-responsive,

02:13:24  17   Your Honor.

02:13:24  18          THE COURT:  Restate the question.

02:13:25  19          MR. HADDEN:  Sure.

02:13:25  20   Q.   (By Mr. Hadden)  To determine a delay using an azimuth

02:13:32  21   angle between said reference axis and said target sound

02:13:36  22   signal, the system has to know the angle to the target

02:13:40  23   sound signal.  Isn't that right, Dr. Zhu?  Yes or no?

02:13:43  24   A.   It has to know the relation -- the spatial relationship

02:13:47  25   between the sound source and this -- the -- the spatial

02:13:53  1   relationship is more general than just azimuth angle and

02:13:59  2   other angle.  So...

02:14:03  3   Q.  So it's true, isn't it, Dr. Zhu, that to determine a

02:14:11  4   delay using an azimuth angle between said reference axis

02:14:17  5   and said target sound signal, the system has to know the

02:14:21  6   location of the target sound signal?  Isn't that correct?

02:15:09  7   A.  The system has to know the spatial relationship between

02:15:13  8   the sound sensor and the sound direction.

02:15:23  9   Q.  And is spatial relationship different than location?

02:15:26  10  A.  It's related to it.

02:15:30  11  Q.  All right.  So if you -- well, if we look at the claim

02:15:39  12  underneath the determining, there is a step that says,

02:15:42  13  estimating a spatial location of said target sound signal

02:15:48  14  from said received sound signals by said sound source

02:15:54  15  localization unit.  Do you see that?

02:15:55  16  A.  The highlight -- the highlight yellow part?

02:15:59  17  Q.  Yes, Dr. Zhu.

02:16:00  18  A.  Okay.

02:16:01  19  Q.  Do you see that?

02:16:03  20  A.  Yes.

02:16:04  21  Q.  And -- and that sound source localization unit is what

02:16:12  22  locates the target sound source; isn't that right, Dr. Zhu?

02:16:18  23  A.  Yes.

02:16:24  24  Q.  Okay.  And the -- and if we look at -- strike that.

02:16:30  25  Let me ask a better question.

02:16:32  1          Now, the purpose of Claim 1 --

02:16:36  2          THE COURT:  Don't tell us you're going to ask a

02:16:38  3  better question, just ask a better question.

02:16:40  4          MR. HADDEN:  I'm sorry, Your Honor.

02:16:41  5          THE COURT:  If it's not a question, it's a

02:16:43  6  statement to the jury.

02:16:44  7          MR. HADDEN:  Apologize, Your Honor.

02:16:46  8  Q.  (By Mr. Hadden)  The estimating a spatial location of

02:16:49  9  said target sound signal of said received sound signal --

02:17:04 10  sorry, by said sound source localization unit in Claim 1 is

02:17:07 11  done so that the determining step can be performed using

02:17:09 12  the azimuth angle to the target sound signal.  Isn't that

02:17:13 13  correct, Dr. Zhu?

02:17:14 14  A.  Can you repeat your question?

02:17:19 15  Q.  Sure.  You need to estimate the spatial location of

02:17:22 16  said target sound signal in Claim 1 in order to calculate

02:17:28 17  the delay using an azimuth angle between said reference

02:17:33 18  axis and said -- said target sound signal.  Isn't that

02:17:37 19  correct, Dr. Zhu?

02:17:46 20  A.  I'm sorry, can I pardon you again?  Yeah.

02:17:50 21  Q.  Sure.  Let -- let me -- let me maybe try a different --

02:17:58 22  let me ask a different question.

02:18:03 23          MR. HADDEN:  Let me ask you to go to Figure 2 of

02:18:05 24  the patent, please, Mr. Berk.  And if we blow up -- there's

02:18:09 25  a box in Figure 2, 202, that says sound source localization

| | | |
|---|---|---|
| 02:18:14 | 1 | unit. |
| 02:18:15 | 2 | Q.  (By Mr. Hadden)  Do you see that, Dr. Zhu? |
| 02:18:17 | 3 | A.  I saw that. |
| 02:18:20 | 4 | Q.  And above that there's 201.  That's the array of sound |
| 02:18:25 | 5 | sensors; do you see that?  Those are the microphones that |
| 02:18:27 | 6 | we were talking about; isn't that right? |
| 02:18:29 | 7 | A.  Yes. |
| 02:18:30 | 8 | Q.  Okay.  And the arrow goes from the sound source |
| 02:18:35 | 9 | localization unit 202 to a box that says adaptive |
| 02:18:41 | 10 | beamforming unit 203.  Do you see that, Dr. Zhu? |
| 02:18:44 | 11 | A.  Yes. |
| 02:18:44 | 12 | Q.  And in this diagram, the adaptive beamforming unit |
| 02:18:49 | 13 | takes as an input, the output of the sound source |
| 02:18:55 | 14 | localization unit; isn't that right, Dr. Zhu? |
| 02:18:58 | 15 | A.  Last sentence repeat, please? |
| 02:19:01 | 16 | Q.  The adaptive beamforming unit 203 receives as an input, |
| 02:19:07 | 17 | the output of the sound source localization unit, the box |
| 02:19:16 | 18 | 202, do you -- |
| 02:19:17 | 19 | A.  It's just one of the way to implement that, those three |
| 02:19:22 | 20 | units working together, yeah. |
| 02:19:24 | 21 | Q.  But in this figure -- |
| 02:19:26 | 22 | A.  In this figure -- I'm sorry, I interrupt you.  I'm |
| 02:19:32 | 23 | sorry. |
| 02:19:32 | 24 | Q.  No, it's okay. |
| 02:19:33 | 25 | In this figure -- in this Figure 2, the output of |

02:19:41   1   the sound source localization unit 202 is provided as an

02:19:43   2   input to the adaptive beamforming unit 203; is that

02:19:46   3   correct?

02:19:46   4   A.  Oh, this arrow shows those two units are connected to

02:19:50   5   each other.

02:19:51   6   Q.  Well, the diagram shows an arrow going from sound

02:20:01   7   source localization unit 202 to adaptive beamforming unit

02:20:03   8   203; do you see that?

02:20:04   9   A.  Yes.

02:20:05   10  Q.  Doesn't that arrow indicate that the sound source

02:20:09   11  localization unit is providing information to the adaptive

02:20:13   12  beamforming unit?

02:20:13   13  A.  Yeah, in this special case, it is.

02:20:16   14  Q.  And the sound source localization unit provides that

02:20:21   15  information to the adaptive beamforming unit so it will

02:20:26   16  know the angle to the target sound source, right?

02:20:30   17  A.  In this special case, it is.

02:20:32   18  Q.  Okay.

02:20:45   19        MR. HADDEN:  Can we look at Figure 5, please,

02:20:48   20  Mr. Berk?  Can we blow that up, please?

02:21:00   21  Q.  (By Mr. Hadden)  Now, Figure 5 in your '049 patent

02:21:06   22  shows a circular microphone array.  Is that correct,

02:21:10   23  Dr. Zhu?

02:21:14   24  A.  Yes.

02:21:15   25  Q.  And the microphones are indicated by the letters M

| | | |
|---|---|---|
| 02:21:19 | 1 | around the circle.  Is that correct, Dr. Zhu? |
| 02:21:23 | 2 | A.  Yes. |
| 02:21:23 | 3 | Q.  Okay.  And the arrow that says target sound signal, |
| 02:21:38 | 4 | that's the arrow pointing to the target sound source, what |
| 02:21:47 | 5 | the microphone array is going to try to focus on to hear. |
| 02:21:51 | 6 | Isn't that correct, Dr. Zhu? |
| 02:21:52 | 7 | A.  Yeah, no matter which direction the sound is coming |
| 02:21:59 | 8 | from.  So that's not the sound I'm going to focus.  That's |
| 02:22:04 | 9 | a general indication if the sound coming from here. |
| 02:22:08 | 10 | Q.  The label is target sound signal.  Doesn't that |
| 02:22:17 | 11 | indicate that that is the sound that the array is going to |
| 02:22:20 | 12 | try to focus on? |
| 02:22:21 | 13 | A.  No.  It's how you -- because, like I said before, sound |
| 02:22:27 | 14 | coming from all directions. |
| 02:22:33 | 15 | Q.  But don't you -- |
| 02:22:35 | 16 | A.  So the formula will take the sound coming from all |
| 02:22:38 | 17 | directions.  So this formula works for sound coming from |
| 02:22:42 | 18 | all directions.  So assuming the sound coming from this |
| 02:22:45 | 19 | direction, what you can get, yeah. |
| 02:22:47 | 20 | Q.  Right.  So doesn't target sound signal, the arrow in |
| 02:22:52 | 21 | Figure 5, doesn't that indicate that that is, in this |
| 02:22:57 | 22 | figure, the arrow to the source that you want to listen to? |
| 02:23:02 | 23 | Isn't that why it's called a target sound signal? |
| 02:23:07 | 24 | A.  I don't think that's this target sound to mean, yeah, |
| 02:23:12 | 25 | it's not. |

02:23:13  1   Q.  So you don't think that the target sound is the sound

02:23:21  2   that the array is trying to listen to?

02:23:22  3   A.  Yeah, like I say, it's a general --

02:23:29  4   Q.  Well, you have some --

02:23:34  5   A.  Give me a second.

02:23:36  6   Q.  Sure.

02:23:38  7   A.  I try to rephrase.  Yeah, so, for that one, you have a

02:23:46  8   formula, you have any kind of input you can fit into it.

02:23:49  9   So before you get results, you don't know whether this

02:23:53  10  sound going to be suppressed or enhanced.  So it's -- it's

02:24:12  11  an extra step with determine.  I'm going to suppress it or

02:24:16  12  I'm going to enhance it, but that's the general inputs.

02:24:22  13  Q.  Correct.  And so the purpose of performing your

02:24:28  14  adaptive beamforming is to create a beam that will enhance

02:24:33  15  sounds coming from this target sound signal direction.

02:24:39  16  Isn't that right, Dr. Zhu?

02:24:40  17  A.  Yes.

02:24:43  18  Q.  Okay.  And -- and to do that, you start with the

02:24:50  19  direction of the target sound that you want to enhance.

02:24:55  20  Isn't that right, Dr. Zhu?

02:24:56  21  A.  Yes.

02:24:57  22  Q.  And that's shown in this Figure 5, isn't that right,

02:25:01  23  Dr. Zhu, by that arrow?

02:25:02  24  A.  That's -- this figure is example to show how to

02:25:21  25  calculate the delay -- a method to calculate the delay.  So

02:25:30  1    this figure doesn't show I want to increase the sound

02:25:33  2    coming from this direction.

02:25:36  3    Q.  Yes.  So the purpose of calculating the delays in your

02:25:42  4    patent, isn't it, Dr. Zhu, is to be able to create those

02:25:47  5    weights, $W_1$, $W_2$, et cetera, that you apply the outputs to

02:25:54  6    the different microphones in order to perform that

02:25:58  7    filter-and-sum beamforming.  Isn't that right?

02:26:08  8    A.  The purpose of the delay is to determine the parameters

02:26:12  9    we want to use to enhance the sound.

02:26:13 10    Q.  Right.  So we first find out what the direction of the

02:26:19 11    target sound you want to enhance is, and then you determine

02:26:21 12    the delays from each microphone based on the angle to that

02:26:26 13    target sound and the geometry that you showed here in

02:26:30 14    Figure 5 of the microphones, and then once you calculate

02:26:33 15    those delays, you use those to form those beamforming

02:26:38 16    weights that you use to create that enhancing profile.

02:26:42 17    Isn't that correct, Dr. Zhu?

02:26:44 18    A.  We use the delays to determine the parameters we want

02:26:57 19    to do for the beamforming.

02:26:58 20    Q.  Right.  So you first find what it is you want to listen

02:27:01 21    to, you find the angle to that target sound source, you

02:27:04 22    then calculate the delays using formulas based on what you

02:27:09 23    see here in Figure 5, and then after you've calculated

02:27:12 24    those delays, you create parameters in order to create a

02:27:18 25    beam that enhances in the direction of this arrow target

| | | |
|---|---|---|
| 02:27:24 | 1 | sound signal.  Isn't that right, Dr. Zhu? |
| 02:27:25 | 2 | A.  It's on the delay -- we don't know where the target |
| 02:27:41 | 3 | sound coming from.  We manipulate all the signals, we |
| 02:27:48 | 4 | determine where the sound coming from.  So it's not like we |
| 02:27:53 | 5 | know the target, we calculate the delay.  No, it's not this |
| 02:27:58 | 6 | procedure.  It's we don't know where the sound coming from. |
| 02:28:02 | 7 | We need to manipulate all the signals and determine where |
| 02:28:05 | 8 | the sound coming from, and then we use that to determine |
| 02:28:08 | 9 | the parameters of our beamforming. |
| 02:28:10 | 10 | Q.  So it's your testimony, Dr. Zhu, that in your patent, |
| 02:28:18 | 11 | you don't know the direction of the target sound signal |
| 02:28:20 | 12 | when you calculate the delays? |
| 02:28:23 | 13 | A.  Repeat the question. |
| 02:28:28 | 14 | Q.  Sure.  Is it your testimony that in your patent, the |
| 02:28:31 | 15 | '049 patent, you calculate the delays without knowing |
| 02:28:34 | 16 | direction of the target sound signal that you want to |
| 02:28:36 | 17 | enhance? |
| 02:28:37 | 18 | A.  Yeah, we -- we use the delay to determine where the |
| 02:28:43 | 19 | sound coming from.  This not -- we know the sound coming |
| 02:28:47 | 20 | from that direction, we determine the delay.  So the -- the |
| 02:28:50 | 21 | order is not like that. |
| 02:28:51 | 22 | Q.  Well, then let's look back at Claim 1 of your patent, |
| 02:29:00 | 23 | then, Dr. Zhu? |
| 02:29:01 | 24 | MR. HADDEN:  Can we see that again? |
| 02:29:03 | 25 | Q.  (By Mr. Hadden)  Now, when you talk about you determine |

02:29:05 1 the direction that the sound is coming from, is that done

02:29:09 2 by the sound source localization unit, Dr. Zhu?

02:29:25 3 A.  Repeat your question, please.

02:29:28 4 Q.  Sure.  You just told me that you use the delays to

02:29:32 5 determine where the sound is coming from.  Isn't that what

02:29:35 6 you said?

02:29:35 7 A.  Yes.

02:29:36 8 Q.  And is that done using the sound source localization

02:29:42 9 unit?

02:29:42 10 A.  Yeah, that delay was used both in sound source

02:29:50 11 localization and also in the beamforming.

02:29:51 12 Q.  Well, there's a delay that you measure, and that's what

02:29:54 13 you use in estimating the spatial location, the target in

02:29:57 14 the sound source localization unit.  Isn't that right,

02:29:59 15 Dr. Zhu?

02:29:59 16 A.  Repeat the last question.

02:30:01 17 Q.  There's a delay that you measure as part of that

02:30:05 18 SRP-PHAT algorithm that we talked about that is used to

02:30:09 19 determine the location of the sound source in the sound

02:30:14 20 source localization unit, right?

02:30:15 21 A.  The delay was -- the delay was not matter.  The delay

02:30:25 22 was, like, after all this calculation, you got that.  Yeah.

02:30:32 23 Q.  Well, let's be clear.  The delay that is calculated is

02:30:37 24 not used to determine the location of the target sound

02:30:42 25 source; it's used to determine the beamforming weights,

02:30:45  1  right?

02:30:45  2  A.  The delay will determine -- we used for both locate the

02:30:50  3  sound and adjusted the -- look at the parameters for the

02:30:54  4  beamforming.

02:30:56  5       MR. HADDEN:  Well, if we go back to Figure 5.  Can

02:31:01  6  we go to Figure 5 again?

02:31:11  7  Q.  (By Mr. Hadden)  Now, Figure 5 shows some delays.

02:31:15  8  Those are the tau 1 and tau 3, little t's.

02:31:22  9       MR. HADDEN:  Can we highlight one of those,

02:31:24  10  Mr. Berk, please?

02:31:25  11  A.  Yes.

02:31:26  12  Q.  (By Mr. Hadden)  Right.  Those are the delays; is that

02:31:29  13  right, Dr. Zhu?

02:31:29  14  A.  Yeah, right, those are the delay.

02:31:32  15  Q.  And to calculate those, you need first to know where

02:31:35  16  that target sound signal arrow is, don't you, Dr. Zhu?

02:31:38  17  A.  I need to know the sound signal -- I couldn't recall

02:32:01  18  the specific formula it works, but -- but you don't need

02:32:14  19  the sound...

02:32:26  20  Q.  Doesn't Figure 5 show you use this angle to the target

02:32:31  21  sound signal in order to geometrically calculate --

02:32:34  22  A.  You take --

02:32:35  23       THE COURT:  Just -- just a minute.

02:32:36  24       THE WITNESS:  Yes.

02:32:37  25       THE COURT:  We're going to talk one at a time in

02:32:39    1    here.

02:32:39    2              THE WITNESS:  Yes.

02:32:40    3              THE COURT:  I know these are technical questions,

02:32:41    4    but it's important that each of you speak one at a time.

02:32:45    5              Restate your question.

02:32:48    6              Then when he's finished, please answer.

02:32:50    7              MR. HADDEN:  Thank you, Your Honor.

02:32:50    8    Q.  (By Mr. Hadden)  So in Figure 5, to calculate those tau

02:32:54    9    delays, you need to know the angle to the target sound

02:33:00   10    signal; isn't that correct, Dr. Zhu?

02:33:01   11    A.  The formulation works like you're assuming the sounds

02:33:14   12    are coming from all directions.  That's a formulation

02:33:21   13    without input.

02:33:22   14              So before we put the device into field to test,

02:33:27   15    when we calculate the parameters, we don't know where the

02:33:35   16    sound is coming from.  We're assuming it's coming from each

02:33:39   17    directions, and we formulate location.  And when the real

02:33:46   18    sound comes in, by some calculation we know where the sound

02:33:52   19    is coming from.

02:33:53   20    Q.  But to calculate --

02:33:55   21    A.  So -- go ahead.

02:33:56   22    Q.  To calculate the delay, it's -- and we can see the

02:33:59   23    output of those calculations in Figure 6A.

02:34:02   24              MR. HADDEN:  Could you put that up next to

02:34:04   25    Figure 5, please, Mr. Berk?  You just -- yeah, just blow up

02:34:33   1   Figure 5, please, and Figure 6A, if you could.

02:34:41   2   Q.  (By Mr. Hadden)  Now, if we look at these two figures,

02:34:43   3   you understand, don't you, Dr. Zhu, that the -- Table 6A is

02:34:47   4   showing the delay for each of the microphones from that

02:34:54   5   origin that is calculated based on the geometry that is

02:35:00   6   shown in Figure 5; isn't that correct, Dr. Zhu?

02:35:03   7   A.  Yes.

02:35:07   8   Q.  Okay.  And those delay calculations depend, as we saw

02:35:12   9   when we were looking at Figure 3 and your 2009 paper, would

02:35:18   10   depend on the angle to each of the microphones.  And they

02:35:25   11   also depend on this angle, which is theta, which is the

02:35:30   12   angle from the Y axis shown in Figure 5 to the target sound

02:35:35   13   signal.  Isn't that right, Dr. Zhu?

02:35:37   14   A.  Yeah.

02:35:38   15   Q.  So to calculate this delay, you need to know direction

02:35:47   16   to the target sound signal.  That's that angle theta that

02:35:51   17   is in each of the calculations of the delay that you have

02:35:55   18   in Figure 6A.  Isn't that right, Dr. Zhu?

02:36:01   19   A.  In this way to calculate the calculation, it's more

02:36:12   20   like you -- you -- you predefine if the sound coming from

02:36:21   21   that direction.  And that's -- give you a formula, if that

02:36:27   22   sound coming from that direction.  It just to give you a

02:36:30   23   formula.  Only when the sound comes in, it can generate

02:36:36   24   output for you.

02:36:36   25   Q.  Okay.

02:36:36  1   A.  So there are formulas for all directions, and when the

02:36:44  2   real input comes in, all of this formulas will give you

02:36:48  3   some output.

02:36:51  4          Then we can determine from those output, we know,

02:36:56  5   okay, the sound is coming from this direction because

02:37:00  6   that's what give you -- largest value, least value, or some

02:37:05  7   value different from all the other outputs.  So that's why

02:37:08  8   -- how we can determine the sound coming from.  That's not

02:37:14  9   predefined.  The predefined is just the formula.

02:37:18  10         But the real -- real input comes in, all these

02:37:23  11  formulas will give outputs.

02:37:27  12  Q.  Well, you have to use --

02:37:27  13  A.  Yeah.

02:37:29  14  Q.  -- the formula to calculate the delay in Claim 1 with

02:37:34  15  respect to the received target sound signal; isn't that

02:37:40  16  right, Dr. Zhu?

02:37:41  17  A.  Yeah, you have your ways to determine how to formulate

02:37:45  18  this formula, yeah.

02:37:47  19  Q.  So --

02:37:47  20  A.  So this give you -- Figure 6A give you a special case

02:37:52  21  how you do this formula for this case.

02:37:54  22  Q.  So when you have a sound signal, you have to determine

02:37:59  23  what direction it's coming from.  And then in Claim 1,

02:38:03  24  using that direction and this formula that you have in 6A,

02:38:08  25  you calculate the delays for each of the microphones.

| | | |
|---|---|---|
| 02:38:11 | 1 | Isn't that right, Dr. Zhu? |
| 02:38:13 | 2 | A.  The 6A give you specific examples how you can formulate |
| 02:38:21 | 3 | it. |
| 02:38:22 | 4 | Q.  And that specific example, like the language that we |
| 02:38:25 | 5 | looked at in Claim 1, requires the distance from the origin |
| 02:38:31 | 6 | to the particular microphone, which is if we look at the |
| 02:38:36 | 7 | first row in 6A, that's that d, right?  D is the distance; |
| 02:38:44 | 8 | isn't that right, Dr. Zhu? |
| 02:38:45 | 9 | A.  Yes, d is distance. |
| 02:38:48 | 10 | Q.  And then there is an angle to the microphone from this |
| 02:38:53 | 11 | reference axis, which is Y in Figure 5, and that is the |
| 02:38:58 | 12 | angle phi, which is a zero with a line coming down, as we |
| 02:39:07 | 13 | see in each of the rows of the table in 6A, right?  That's |
| 02:39:08 | 14 | the predefined angle to that microphone in the array; isn't |
| 02:39:13 | 15 | that right, Dr. Zhu? |
| 02:39:15 | 16 | A.  Yes, this figure shows that. |
| 02:39:16 | 17 | Q.  Okay.  And then we saw in Figure -- in Claim 1 that |
| 02:39:24 | 18 | there was another angle that was needed, and that was the |
| 02:39:26 | 19 | angle to the received target sound signal. |
| 02:39:28 | 20 | And in Figure 6A, it's the angle theta that we see |
| 02:39:32 | 21 | here as the angle between the Y axis and the target sound |
| 02:39:36 | 22 | signal; isn't that right, Dr. Zhu? |
| 02:39:38 | 23 | A.  Can you repeat your last sentence? |
| 02:39:46 | 24 | Q.  Sure.  So the second angle that is required to |
| 02:39:50 | 25 | calculate the delay for each microphone, both in Figure 6A |

02:39:57  1  and as we saw in the language of Claim 1, is this azimuth

02:40:02  2  angle between a reference axis and the target sound signal.

02:40:07  3        And in Figure 5, that is indicated as the Greek

02:40:12  4  letter theta.  And it is this angle between the Y axis and

02:40:15  5  the target sound signal.  And we see that in each of the

02:40:19  6  rows of Table 6A where you have the calculated delay.

02:40:24  7  Isn't that right, Dr. Zhu?

02:40:25  8  A.  Yeah, people need to use those or spatial relationship

02:40:29  9  to formulate -- calculate the delay -- determines a delay,

02:40:35  10  yeah.

02:40:35  11  Q.  And that delay will be different, depending on what

02:40:38  12  angle you're looking at, at the target sound signal, right,

02:40:45  13  because it's a function of that angle theta; isn't that

02:40:49  14  right, Dr. Zhu?

02:40:49  15  A.  Yes.

02:40:50  16  Q.  Thank you.

02:40:51  17        MR. HADDEN:  And if we look at -- go to --

02:40:56  18        THE COURT:  Mr. Hadden, what's your best estimate

02:40:59  19  of your remaining cross?

02:41:00  20        MR. HADDEN:  Maybe 25 minutes, Your Honor.  But if

02:41:05  21  we can break now, that's fine, too.

02:41:08  22        THE COURT:  Well, we've been back from lunch

02:41:10  23  nearly two hours.  We're going to take a recess at this

02:41:13  24  point.

02:41:14  25        Ladies and gentlemen of the jury, if you'll close

| | | |
|---|---|---|
| 02:41:16 | 1 | your notebooks and leave them in your chairs, follow all |
| 02:41:18 | 2 | the instructions I've given you, including don't discuss |
| 02:41:21 | 3 | the case among yourselves.  We'll be back shortly and |
| 02:41:24 | 4 | continue with the Defendants' cross-examination of this |
| 02:41:25 | 5 | witness. |
| 02:41:25 | 6 | The jury is excused for recess. |
| 02:41:27 | 7 | COURT SECURITY OFFICER:  All rise. |
| 02:41:28 | 8 | (Jury out.) |
| 02:41:29 | 9 | THE COURT:  I'd like to see Mr. Hadden and |
| 02:41:59 | 10 | Mr. Dacus, Mr. Lambrianakos and Mr. Fabricant and |
| 02:42:06 | 11 | Mr. Baxter in chambers, please. |
| 02:42:17 | 12 | The Court stands in recess. |
| 02:42:19 | 13 | COURT SECURITY OFFICER:  All rise. |
| 02:42:20 | 14 | (Recess.) |
| 03:04:36 | 15 | (Jury out.) |
| 03:04:38 | 16 | COURT SECURITY OFFICER:  All rise. |
| 03:04:40 | 17 | THE COURT:  Be seated, please. |
| 03:06:32 | 18 | Mr. Hadden, are you prepared to continue with your |
| 03:06:41 | 19 | cross-examination? |
| 03:06:42 | 20 | MR. HADDEN:  I am, Your Honor. |
| 03:06:43 | 21 | THE COURT:  All right.  Let's bring in the jury, |
| 03:06:45 | 22 | please. |
| 03:06:45 | 23 | COURT SECURITY OFFICER:  All rise. |
| 03:06:46 | 24 | (Jury in.) |
| 03:06:47 | 25 | THE COURT:  Please be seated. |

03:07:15  1          We'll continue with the Defendants'

03:07:20  2  cross-examination of Dr. Zhu.

03:07:23  3          All right.  Counsel, please proceed.

03:07:26  4          MR. HADDEN:  Thank you, Your Honor.

03:07:26  5  Q.  (By Mr. Hadden)  Hello, Dr. Zhu.

03:07:28  6  A.  Hello.

03:07:29  7  Q.  Looking again at Claim 1 of your '049 patent, Dr. Zhu,

03:07:36  8  if we look at the receiving element --

03:07:41  9          MR. HADDEN:  Will you blow that up, Mr. Berk?

03:07:44  10  Q.  (By Mr. Hadden)  -- this element requires receiving

03:07:51  11  sound signals from a plurality of disparate sound sources.

03:07:55  12  Do you see that, Dr. Zhu?

03:07:57  13  A.  Yes.

03:07:57  14  Q.  And one of the things that has to be received is sound

03:08:01  15  signals from said target -- one of the things that has to

03:08:05  16  be received is sound signals from a target sound source.

03:08:11  17  Do you see that, Dr. Zhu?

03:08:13  18  A.  Yes.

03:08:14  19  Q.  Thank you.

03:08:14  20          And then in the determining step that we were

03:08:17  21  talking about earlier, that determining the delays requires

03:08:26  22  using an azimuth angle between said reference axis and said

03:08:33  23  target sound signal.

03:08:34  24          Do you see that, Dr. Zhu?

03:08:38  25          MR. HADDEN:  Can we blow that up, Mr. Berk?

03:08:42   1   A.   Just --

03:08:44   2   Q.   (By Mr. Hadden)   Just -- just a second, and he'll have

03:08:46   3   it.

03:08:50   4        So if we look at the last part of what Mr. Berk

03:08:52   5   has blown up, it requires an azimuth angle between said

03:08:56   6   reference axis and said target sound signal.  Do you see

03:09:00   7   that, Dr. Zhu?

03:09:03   8   A.   Yes.

03:09:03   9   Q.   And so to use or to calculate a delay using the angle

03:09:08   10  between said reference axis and said target sound signal,

03:09:11   11  the system has to have received that target sound signal in

03:09:16   12  the receiving step.  Isn't that right, Dr. Zhu?

03:09:19   13  A.   Yes.

03:09:23   14  Q.   Okay.

03:09:24   15       MR. HADDEN:   And then if we go on to the

03:09:28   16  performing adaptive beamforming step, if we could,

03:09:33   17  Mr. Berk.

03:09:35   18  Q.   (By Mr. Hadden)   Claim 1 then requires performing

03:09:42   19  adaptive beamforming for steering a directivity pattern of

03:09:47   20  said array of said sensors in a direction of said spatial

03:09:51   21  location of said target sound signal by said adaptive

03:09:57   22  beamforming unit.

03:09:57   23       Do you see that, Dr. Zhu?

03:09:59   24  A.   Yes.

03:09:59   25  Q.   So after the target sound signal has been received and

| | |
|---|---|
| 03:10:05 | 1 |
| 03:10:11 | 2 |
| 03:10:16 | 3 |
| 03:10:23 | 4 |
| 03:10:26 | 5 |
| 03:10:28 | 6 |
| 03:10:51 | 7 |
| 03:10:52 | 8 |
| 03:10:57 | 9 |
| 03:11:01 | 10 |
| 03:11:06 | 11 |
| 03:11:11 | 12 |
| 03:11:15 | 13 |
| 03:11:19 | 14 |
| 03:11:21 | 15 |
| 03:11:26 | 16 |
| 03:11:31 | 17 |
| 03:11:32 | 18 |
| 03:11:40 | 19 |
| 03:11:46 | 20 |
| 03:11:55 | 21 |
| 03:11:56 | 22 |
| 03:12:05 | 23 |
| 03:12:10 | 24 |
| 03:12:14 | 25 |

1  after the delays are calculated based on the angle to that

2  target sound signal, the system then has to adaptively

3  beamform to provide a steering -- to be able to steer a

4  directivity pattern in the direction of that target sound

5  signal.  Isn't that right, Dr. Zhu?

6  A.  When the sound source location -- I -- I need you

7  repeat your question, please.

8  Q.  Sure.  So after the sound signal is received and the

9  weights -- the delays are determined using the angle to

10  that target sound signal, the claim then requires

11  performing this adaptive beamforming for steering a

12  directivity pattern of said sound sensors in a direction of

13  said spatial location of the target sound signal.

14         Isn't that correct?

15  A.  Yeah.  Once some location was determined, that -- that

16  delay also used to -- yeah, put into the beamforming to

17  form the direction to that sound.

18  Q.  And the beamforming in the direction of that sound --

19  target sound signal is done by adjusting those weights,

20  those Ws we saw in the filter-and-sum formula.  Isn't that

21  right, Dr. Zhu?

22  A.  Yes, that's part of the -- adaptive beamforming has two

23  steps.  First step is fixed beamforming.  So in that step,

24  we use some precalculated filter to point to that

25  direction.  And adaptive also further suppression the

03:12:22   1   background -- the background noise.

03:12:24   2           So -- so how to say that?  We have some

03:12:50   3   precalculated filter there, and when sound source

03:12:58   4   localization -- when sound source location determined, we

03:13:03   5   further of adjusting those parameters.

03:13:04   6   Q.  Those parameters that you adjust are the weight and

03:13:08   7   multiply the outputs of the microphones as part of that

03:13:12   8   filter-and-sum equation; isn't that right, Dr. Zhu?

03:13:16   9   A.  It's not a pure sum -- as sum calculations.

03:13:25   10  Q.  Well, and the result of that is what is shown in

03:13:31   11  Figures 16 of the patent, Figures 16E, F, and it goes on

03:13:37   12  through L.  Do you see those, Dr. Zhu?

03:13:40   13          MR. HADDEN:  Can we show Figures 16E and 16F,

03:13:45   14  Mr. Berk?  There we go.  Thank you.

03:14:03   15  Q.  (By Mr. Hadden)  So Figure 16E shows one of these

03:14:08   16  directivity patterns of said array of said sound systems

03:14:14   17  pointing in a direction of a target sound signal; isn't

03:14:16   18  that right, Dr. Zhu?

03:14:19   19  A.  Yes.

03:14:20   20  Q.  Okay.  And another example of that, if the target sound

03:14:24   21  signal was in a different direction, it is 16F, right below

03:14:27   22  it?

03:14:28   23  A.  Yes.

03:14:28   24  Q.  Okay.  Thank you.

03:14:29   25          MR. HADDEN:  Can we get DTX-685, please, Mr. Berk?

03:14:44  1    Q.  (By Mr. Hadden)  Now, this is a data sheet for that

03:14:49  2    VoiceFocus conference phone that you said that you worked

03:14:51  3    on I think between 2007 and 2009.  Was that right, Dr. Zhu?

03:15:00  4    A.  Yeah, that document is in 2009.  Yeah.

03:15:06  5         MR. HADDEN:  And if we could blow up at the

03:15:08  6    bottom, Mr. Berk, the advanced DSP algorithms.

03:15:15  7    A.  Yes.

03:15:15  8    Q.  (By Mr. Hadden)  And this has a listing of these

03:15:17  9    advanced DSP algorithms, adaptive beamforming, sound source

03:15:22  10   localization, adaptive echo cancellation, and adaptive

03:15:27  11   noise reduction/speech enhancement.  Do you see that,

03:15:32  12   Dr. Zhu?

03:15:33  13   A.  Yes.

03:15:33  14   Q.  And isn't it true that you were never able to implement

03:15:36  15   those four algorithms in the VoiceFocus conference phone?

03:15:39  16   A.  Yeah, the VoiceFocus conference phone is a dummy

03:15:47  17   device.  Those -- those algorithms was implemented in a

03:15:51  18   prototype but not in a stand-alone device like a

03:15:57  19   VoiceFocus.

03:16:02  20   Q.  So it's true, isn't it, Dr. Zhu, that these four

03:16:07  21   algorithms are not implemented in the VoiceFocus conference

03:16:11  22   phone?

03:16:11  23   A.  Not in this device.  There's code implemented on that

03:16:18  24   top.

03:16:18  25        MR. HADDEN:  Now, can we go to Plaintiff's 258,

| | | |
|---|---|---|
| 03:16:21 | 1 | please, Mr. Berk? |
| 03:16:23 | 2 | Q.  (By Mr. Hadden)  So this is another version of the |
| 03:16:30 | 3 | voice conference phone data sheet that you were shown by |
| 03:16:32 | 4 | Vocalife's counsel.  Isn't that correct, Dr. Zhu? |
| 03:16:35 | 5 | A.  Yes. |
| 03:16:39 | 6 | Q.  And it has this badge for the CES award from 2011.  Do |
| 03:16:46 | 7 | you see that, Dr. Zhu? |
| 03:16:47 | 8 | A.  Yes. |
| 03:16:47 | 9 | Q.  And this device that won the award is what you just |
| 03:16:51 | 10 | referred to as a dummy device; isn't that correct, Dr. Zhu? |
| 03:16:55 | 11 | A.  It is. |
| 03:16:55 | 12 | Q.  So this device that won the award didn't do anything; |
| 03:17:00 | 13 | is that correct? |
| 03:17:00 | 14 | A.  Yeah, we planned to implement all the algorithm in the |
| 03:17:05 | 15 | stand-alone device, but we couldn't do it at this time.  It |
| 03:17:10 | 16 | only showed a lifetime on the laptop. |
| 03:17:13 | 17 | Q.  So the award was for -- was for the way the device |
| 03:17:16 | 18 | looked, because the device, in fact, didn't do anything. |
| 03:17:21 | 19 | Isn't that correct, Dr. Zhu? |
| 03:17:21 | 20 | A.  Yes, this is a design award. |
| 03:17:24 | 21 | Q.  Thank you. |
| 03:17:24 | 22 |     MR. HADDEN:  Let me ask, Mr. Berk, can you pull up |
| 03:17:33 | 23 | DTX-980?  Go to, I'm sorry, 980A, Mr. Berk.  Could we blow |
| 03:17:58 | 24 | up the I hereby -- I hereby acknowledge? |
| 03:18:08 | 25 | Q.  (By Mr. Hadden)  Now, this, Dr. Zhu, is a declaration |

03:18:20   1   that you signed in July of this year, 2020.  Is that

03:18:24   2   correct, Dr. Zhu?

03:18:24   3   A.  Yes.

03:18:25   4   Q.  Okay.  And if we look at the top of what's on the

03:18:31   5   screen, it says:  I hereby acknowledge that any willful

03:18:36   6   false statement made in this declaration is punishable

03:18:41   7   under 18 U.S.C. 1001 by fine or imprisonment of not more

03:18:47   8   than five years or both.

03:18:49   9          Do you see that, Dr. Zhu?

03:18:50  10   A.  Yes.

03:18:51  11   Q.  Did you read that before you signed this declaration?

03:18:55  12   A.  I -- I read that.

03:18:58  13   Q.  And you understood that signing a declaration under

03:19:04  14   oath and submitting it to the U.S. Government is a serious

03:19:08  15   thing, didn't you, Dr. Zhu?

03:19:10  16   A.  Yes.

03:19:10  17   Q.  Okay.  And in this declaration, it reads here --

03:19:21  18          MR. HADDEN:  Can we highlight the "I believe"?

03:19:27  19   Q.  (By Mr. Hadden)  It says here:  I believe the original

03:19:30  20   patent to be wholly or partly inoperative or invalid, the

03:19:38  21   reason described below.

03:19:39  22          And then there's a box checked "by reason of other

03:19:43  23   errors."

03:19:46  24          Do you see that?

03:19:47  25   A.  Yes.

03:19:47  1  Q.  And when you filed this declaration under oath, did you

03:19:50  2  believe that the original patent was wholly or partly

03:19:54  3  interop -- inoperative or invalid because of other errors?

03:20:00  4  A.  When -- when -- when we filed this reissue, we want to

03:20:04  5  broaden our claims, and those words are in the document as

03:20:12  6  it is.  So we -- we know that's part of the document, yeah.

03:20:18  7          MR. HADDEN:  Objection, Your Honor.  Move to

03:20:20  8  strike, non-responsive.

03:20:30  9  A.  No, I don't believe my patent is inoperative or

03:20:38  10  invalid.

03:20:38  11          THE COURT:  All right.  I'll overrule the

03:20:39  12  objection.

03:20:40  13          MR. HADDEN:  Thank you, Your Honor.

03:20:48  14  Q.  (By Mr. Hadden)  Now, if you look on this same page, it

03:21:07  15  identifies a limitation.

03:21:10  16          MR. HADDEN:  If you can highlight that, Mr. Berk.

03:21:14  17  Q.  (By Mr. Hadden)  It's on providing a microphone array

03:21:20  18  system.  Do you see that, Dr. Zhu?

03:21:23  19  A.  If you give me a second to finish reading.

03:21:26  20  Q.  Certainly.

03:21:32  21  A.  Yeah, that's a limitation.

03:21:34  22  Q.  Okay.  And you understood when you filed this

03:21:39  23  declaration under oath and you checked "by reason of other

03:21:44  24  errors," that the error was in this limitation that is

03:21:49  25  being included on the front of this declaration.  Isn't

03:21:52   1   that right, Dr. Zhu?

03:21:53   2   A.  I check this error -- first, the -- yeah, by error we

03:22:03   3   mean the claim has limitation.

03:22:09   4   Q.  Did you understand that the error that you were

03:22:13   5   pointing out to the United States Patent Office was in the

03:22:16   6   limitation language that you -- we have highlighted here

03:22:18   7   and is quoted in this declaration?

03:22:21   8   A.  Yeah, I understand that the error means the claim has

03:22:24   9   limitation.  That's my understanding.

03:22:29  10   Q.  Okay.  So you didn't understand that the language that

03:22:35  11   is quoted here under "the limitation, colon," itself

03:22:43  12   includes an error?

03:22:45  13   A.  This sentence in this quotation mark -- there's no

03:22:48  14   error in this sentence.  So --

03:22:50  15            MR. HADDEN:  Okay.  Can we go -- can we go to the

03:22:56  16   attached sheet, Mr. Berk?  Can we blow this up?

03:23:12  17   Q.  (By Mr. Hadden)  If we go -- so this is, Dr. Zhu, the

03:23:16  18   attached sheet that was attached to this declaration that

03:23:19  19   we've been discussing, to further explain the error.  Isn't

03:23:24  20   that correct, Dr. Zhu?

03:23:25  21   A.  Can you repeat your question?

03:23:28  22   Q.  Sure.  So I'm just -- the sheet that I am showing you

03:23:31  23   now --

03:23:31  24   A.  Yes.

03:23:32  25   Q.  -- this attached sheet to this declaration that is

| | | |
|---|---|---|
| 03:23:39 | 1 | further explaining to the Patent Office the error that is |
| 03:23:43 | 2 | pointed out and checked "by reason of other errors" that we |
| 03:23:49 | 3 | looked at on the front of DTX-980A? |
| 03:23:52 | 4 | A.  Yes, that's explanation to the error, yeah. |
| 03:23:56 | 5 | Q.  Okay.  So if we look at what is explained here -- |
| 03:24:01 | 6 | MR. HADDEN:  If we highlight starting in the |
| 03:24:03 | 7 | middle, Mr. Berk, where it says "it is wrong." |
| 03:24:10 | 8 | Q.  (By Mr. Hadden)  So what you told the Patent Office |
| 03:24:18 | 9 | under oath in this declaration, that it is wrong to recite |
| 03:24:23 | 10 | that the source sound localization unit, the adaptive |
| 03:24:27 | 11 | beamforming unit, and the noise reduction unit are in |
| 03:24:31 | 12 | operative communication with the array of sound sensors. |
| 03:24:35 | 13 | Do you see that? |
| 03:24:37 | 14 | MR. BAXTER:  I object, Your Honor.  He started |
| 03:24:38 | 15 | reading right in the middle of that sentence.  If he wants |
| 03:24:41 | 16 | to show it to her, he needs to start at the beginning. |
| 03:24:45 | 17 | THE COURT:  So your objection is? |
| 03:24:49 | 18 | MR. BAXTER:  It's incomplete and misleading. |
| 03:25:07 | 19 | THE COURT:  He's entitled to ask the question.  If |
| 03:25:09 | 20 | it's misleading, you can certainly address it on redirect. |
| 03:25:12 | 21 | I agree it starts in the middle of the sentence, but it's |
| 03:25:15 | 22 | his prerogative to ask the question as he chooses to. |
| 03:25:19 | 23 | It's overruled. |
| 03:25:21 | 24 | MR. BAXTER:  Thank you, Judge. |
| 03:25:23 | 25 | MR. HADDEN:  Thank you, Your Honor. |

03:25:23  1   Q.  (By Mr. Hadden)  So do you see the highlighted

03:25:25  2   language, Dr. Zhu, that says, "it is wrong to recite"?

03:25:30  3   A.  Yeah, I saw that sentence.

03:25:32  4   Q.  And what it says here that is wrong to recite, that is

03:25:39  5   the actual language of Claim 1 of the '049 patent.  Isn't

03:25:45  6   that right, Dr. Zhu?

03:25:46  7   A.  No.  First, the -- this original is based on the

03:25:58  8   original patent, not the '049.  I think it's '756, if I

03:26:04  9   remember the number correctly, the original patent.  So

03:26:09  10  this is not the reissue for '049.  It's for the original

03:26:14  11  one.

03:26:15  12  Q.  Okay.  But --

03:26:16  13  A.  Yeah.

03:26:17  14  Q.  -- let's look at the language from Claim 1 of the '049

03:26:21  15  patent.

03:26:21  16       MR. HADDEN:  Can we do that, Mr. Berk?

03:26:27  17  A.  If you read the whole sentence, you understand this --

03:26:31  18  it is wrong means limit the claim to the highlighted part.

03:26:39  19  It's wrong.  We should have broaden it.  So limit it, it's

03:26:44  20  wrong.  So if you read the whole paragraph here.

03:26:51  21  Q.  (By Mr. Hadden)  So let's look at the language that you

03:26:53  22  told the Patent Office under oath was wrong and the

03:26:59  23  language that exists in Claim 1 of the '049 patent that is

03:27:03  24  being asserted here.

03:27:08  25  A.  Yeah, by it's wrong, we mean the patent was not written

03:27:13   1   as broad as it should be, and that's a limitation.  We

03:27:21   2   should not limit our claim to that.  That is wrong.  We

03:27:25   3   should broaden it.

03:27:28   4   Q.  Now, if we look at the language in Claim 1, and it's

03:27:34   5   italicized.  It says:  Wherein said sound source

03:27:38   6   localization unit, said adaptive beamforming unit, and said

03:27:42   7   noise reduction unit are integrated into a digital signal

03:27:46   8   processor.

03:27:47   9        Do you see that?

03:27:54  10        MR. HADDEN:  I'm sorry, can we get the next chunk,

03:27:57  11   Mr. Berk, so that we match?  It says wherein -- I'm sorry.

03:28:05  12   The attachment is right, Mr. Berk.  It was just the patent

03:28:08  13   was wrong.

03:28:08  14        THE COURT:  Just a minute, Dr. Zhu.

03:28:10  15        THE WITNESS:  Yes.

03:28:11  16        THE COURT:  Once he gets it highlighted the way he

03:28:14  17   wants, I'll ask him to restate his question.

03:28:17  18        MR. HADDEN:  Thank you, Your Honor.  Sorry for the

03:28:21  19   delay.

03:28:26  20   A.  Again, as I said --

03:28:27  21        THE COURT:  Let -- let him reask the question,

03:28:30  22   please.

03:28:30  23        MR. HADDEN:  Will you highlight the wherein

03:28:32  24   clause, please, Mr. Berk, on the right-hand side?  Thank

03:28:50  25   you, Mr. Berk.

493

| | | |
|---|---|---|
| 03:28:50 | 1 | Q.  (By Mr. Hadden)  So now looking at the claim, and I'm |
| 03:28:53 | 2 | sorry for the delay, Dr. Zhu, Claim 1 of the '049 patent |
| 03:28:56 | 3 | has the language:  Wherein said sound source localization |
| 03:29:02 | 4 | unit, said adaptive beamforming unit, and said noise |
| 03:29:06 | 5 | reduction unit are in operative communication with said |
| 03:29:12 | 6 | array of sound sensors. |
| 03:29:14 | 7 | Do you see that? |
| 03:29:14 | 8 | A.  Yeah, I saw that. |
| 03:29:16 | 9 | Q.  Okay.  And if we go back to the attachment to this one |
| 03:29:19 | 10 | declaration, it says:  It is wrong to recite that the sound |
| 03:29:29 | 11 | source localization unit, the adaptive beamforming unit, |
| 03:29:31 | 12 | and the noise reduction unit are in operative communication |
| 03:29:33 | 13 | with the array of sound sensors. |
| 03:29:36 | 14 | Do you see that, Dr. Zhu? |
| 03:29:37 | 15 | A.  I saw that. |
| 03:29:38 | 16 | Q.  And you agree with me, Dr. Zhu, that is the same |
| 03:29:41 | 17 | language that is in the '049, Claim 1?  Isn't that right, |
| 03:29:46 | 18 | Dr. Zhu? |
| 03:29:47 | 19 | A.  My understanding about this issue is we want to broaden |
| 03:29:53 | 20 | our original patent, '756, and it's wrong -- |
| 03:29:58 | 21 | THE COURT:  Dr. Zhu. |
| 03:30:00 | 22 | THE WITNESS:  Yeah. |
| 03:30:00 | 23 | THE COURT:  He asked you if it was the same |
| 03:30:02 | 24 | language.  He didn't ask you for your understanding of what |
| 03:30:05 | 25 | you were trying to accomplish.  Mr. Baxter will have a |

494

| | | |
|---|---|---|
| 03:30:08 | 1 | chance to go through that with you again, if he chooses to. |
| 03:30:13 | 2 | But you need to limit your answer to the question asked. |
| 03:30:17 | 3 | THE WITNESS:  Okay. |
| 03:30:17 | 4 | THE COURT:  Is that the same language on both |
| 03:30:19 | 5 | sides of the screen? |
| 03:30:20 | 6 | THE WITNESS:  It is. |
| 03:30:23 | 7 | Q.  (By Mr. Hadden)  Thank you.  No further questions. |
| 03:30:25 | 8 | THE COURT:  You pass the witness, counsel? |
| 03:30:27 | 9 | MR. HADDEN:  I do. |
| 03:30:28 | 10 | THE COURT:  Is there redirect? |
| 03:30:30 | 11 | MR. BAXTER:  Oh, yes, Your Honor. |
| 03:30:30 | 12 | THE COURT:  Let's proceed with redirect. |
| 03:30:32 | 13 | MR. BAXTER:  Thank you. |
| 03:30:32 | 14 | REDIRECT EXAMINATION |
| 03:30:41 | 15 | BY MR. BAXTER: |
| 03:30:41 | 16 | Q.  Let's start right there, Dr. Zhu. |
| 03:30:44 | 17 | First of all, do any of the papers in Exhibit 1468 |
| 03:30:49 | 18 | where he's got the box checked "by reason of errors" and |
| 03:30:54 | 19 | has this attached sheet, does it have anything to do with |
| 03:30:57 | 20 | the patent in this case, the '049. |
| 03:30:59 | 21 | A.  The reissue is for -- based on the '756. |
| 03:31:06 | 22 | Q.  So this reissue was for a patent called the '756, which |
| 03:31:10 | 23 | is not in this case; is that right? |
| 03:31:11 | 24 | A.  Yes. |
| 03:31:16 | 25 | Q.  Okay. |

03:31:17   1   A.   Yeah.

03:31:17   2   Q.   This case is about the '049?

03:31:19   3   A.   Yeah, it is.

03:31:20   4   Q.   And none of these documents are about the '049, are

03:31:22   5   they?

03:31:22   6   A.   Yes, this is a reissue.  Yeah, it's not.  It's for

03:31:26   7   '756.

03:31:26   8   Q.   Nothing to do with the patent in this case?

03:31:28   9   A.   Yes.

03:31:29   10   Q.   All right.  Now, counsel wanted to start and did start

03:31:35   11   in the middle, and you asked him if you could start at the

03:31:40   12   beginning?

03:31:40   13        MR. BAXTER:  Can we have that up on the attached

03:31:45   14   sheet, Mr. Thompson?  There you go.  No, no.  There we go.

03:31:54   15   Q.   (By Mr. Baxter)  Can you read -- can you read the whole

03:31:56   16   sentence and explain to the jury what the whole sentence

03:31:59   17   means instead of half of it?

03:32:02   18   A.   Yes.  Since the sound source localization unit, said

03:32:07   19   adaptive beamforming unit, and said noise reduction unit

03:32:11   20   are already integrated into the digital signal processor,

03:32:17   21   it is wrong to cite that the sound source localization

03:32:22   22   unit, adaptive beamforming unit, and noise reduction unit

03:32:25   23   are in operative communications with array of sound

03:32:30   24   sensors.  Instead, the correct recitation is that the

03:32:34   25   digital signal processor -- processor is in operative

03:32:40  1   communication with array of sound sensors.

03:32:43  2        So --

03:32:43  3   Q.  Did you -- I'm sorry, finish it up.

03:32:46  4   A.  Yeah.  So my understanding about the reissue is we have

03:32:51  5   our first original -- original '756.  There was some

03:32:57  6   limitations on that.  We were entitled to broaden it.  And

03:33:01  7   we filed our first reissue to broaden it, but that's the

03:33:09  8   patent called '049.

03:33:11  9        And -- but in that reissue, we didn't address this

03:33:16  10  limitation.  So we filed another reissue to address this

03:33:22  11  limitation.  But it's wrong.  We mean we limit our claim to

03:33:32  12  this original claim, that's wrong.  We should have

03:33:39  13  broadened it.  So that's my understanding about the

03:33:41  14  process, yeah.

03:33:41  15  Q.  So you went back for a reissue, but you wanted a bigger

03:33:45  16  patent, not a smaller patent; is that right?

03:33:47  17  A.  Can you repeat your question?

03:33:49  18  Q.  Yes.  When you went back for the -- for the reissue,

03:33:52  19  you went for bigger language, a bigger claim instead of a

03:33:56  20  smaller claim?

03:33:56  21  A.  Yes.

03:33:57  22  Q.  Okay.

03:33:57  23  A.  We were entitled to do that.

03:33:59  24  Q.  All right.  Did you ever say that the '049 patent was

03:34:05  25  inoperable?

```
03:34:07   1   A.  No.
03:34:08   2   Q.  Did you ever say the '049 is invalid?
03:34:12   3   A.  No.
03:34:13   4   Q.  Did you say anything in this paper about the patent in
03:34:18   5   this case, the '049?
03:34:21   6   A.  No.
03:34:22   7   Q.  Okay.  Did you go back to the Patent Office, not to say
03:34:28   8   that your patent wasn't good, but to say I'm entitled to
03:34:32   9   something even better?
03:34:33  10   A.  Yes.
03:34:34  11   Q.  Is that what you did?
03:34:35  12   A.  Yes.
03:34:36  13   Q.  And if you read the whole sentence, you can figure out
03:34:41  14   what you're saying and not just read half of it?
03:34:44  15   A.  Yes.
03:34:45  16   Q.  Okay.  Now, I want to talk to you about the patent just
03:34:50  17   a moment, please, if I can, Dr. Zhu.
03:34:55  18        MR. BAXTER:  And if we can get up the -- the
03:34:57  19   patent.  And I want to go to Figure 3.  And -- and put up
03:35:11  20   beside it Figure 4, if you would, please.
03:35:15  21   Q.  (By Mr. Baxter)  Despite how they look, is that
03:35:26  22   basically the same figure, Doctor?
03:35:28  23   A.  Those two are different figures.
03:35:31  24   Q.  Okay.  Do they depict the same thing?
03:35:34  25   A.  No.
```

03:35:36  1   Q.  Okay.  Is Figure 3 -- would that -- and this all had to

03:35:43  2   do with your 2009 article.  Let's get the stage set, okay?

03:35:47  3   A.  Okay.

03:35:48  4   Q.  Would Figure 3 have ever, ever appeared in the 2009

03:35:53  5   article with the microphones in that array condition?

03:35:57  6   A.  No.  '09 paper is a linear array.

03:36:02  7   Q.  Did you ever have a circular array, like in Figure 3,

03:36:08  8   in the 2009 paper?

03:36:11  9   A.  No.

03:36:11  10   Q.  Okay.  If you can look at Figure 5, could that

03:36:24  11   configuration ever have existed in the 2009 paper?

03:36:28  12   A.  No.

03:36:31  13   Q.  Is that one of the embodiments of the patent, the '049?

03:36:36  14   A.  No.

03:36:37  15   Q.  Okay.  Can you tell the jury what an embodiment --

03:36:42  16   embodiment is, Doctor?

03:36:43  17   A.  Embodiment for this figure?

03:36:45  18   Q.  Well, for any figure.

03:36:46  19   A.  This embodiment shows a microphone array output in a

03:36:52  20   linear shape.

03:36:56  21   Q.  All right.  Figure 4 or Figure 5?

03:36:58  22   A.  Figure 4 -- Figure 5.

03:37:00  23   Q.  Okay.

03:37:00  24   A.  Oh, yeah, Figure 5.

03:37:04  25            MR. BAXTER:  I want to turn, if I can, to

| | | |
|---|---|---|
| 03:37:06 | 1 | Column 7, Line 33, where it says Figure 4 right down here. |
| 03:37:18 | 2 | That's it. |
| 03:37:19 | 3 | Q.  (By Mr. Baxter)   This is the explanation in the patent, |
| 03:37:22 | 4 | Doctor, about what Figure 4 is. |
| 03:37:26 | 5 | And it says:  Figure 4 exemplarily illustrates a |
| 03:37:30 | 6 | graphical representation of the filter-and-sum beamforming |
| 03:37:35 | 7 | algorithm for determining the output of the microphone |
| 03:37:39 | 8 | array 2001 [sic] having N sound sensors 301.  Consider an |
| 03:37:45 | 9 | example where the target sound signal from the target sound |
| 03:37:47 | 10 | source is at an angle theta with a normalized frequency w. |
| 03:37:51 | 11 | The microphone array configuration is arbitrary in a |
| 03:37:56 | 12 | two-dimensional plane, for example, a circular array |
| 03:38:00 | 13 | configured where the sound sensors 301, which is M theta, |
| 03:38:07 | 14 | $M_1$, $M_2$, M to the minus 1 of the microphone array are |
| 03:38:17 | 15 | arbitrarily positioned on a circle. |
| 03:38:20 | 16 | Does Figure 4 contemplate it is all linear, or it |
| 03:38:23 | 17 | was going to be in a circle? |
| 03:38:25 | 18 | A.  Figure 4 gives example on the circle. |
| 03:38:27 | 19 | Q.  Okay.  Even though it looks linear, it's really an |
| 03:38:31 | 20 | example of a circle? |
| 03:38:34 | 21 | A.  It can be any configuration. |
| 03:38:37 | 22 | Q.  Okay. |
| 03:38:38 | 23 | A.  Yeah. |
| 03:38:38 | 24 | Q.  Would that figure have ever been in your 2009 paper? |
| 03:38:42 | 25 | A.  Can you repeat your question? |

03:38:50  1   Q.  Yes, ma'am.  Would that figure have ever been an

03:38:53  2   illustration of what you were trying to do in the 2009

03:38:55  3   paper?

03:38:56  4   A.  No.

03:38:56  5   Q.  Okay.  Remind the jury once again what the 2009 paper

03:39:02  6   was all about.

03:39:03  7   A.  The 2009 paper is about linear array technology, yeah.

03:39:08  8   Q.  And it needed the voice in front of it or behind it or

03:39:12  9   where?

03:39:13  10  A.  Yeah, we need the voice coming from in front of the

03:39:16  11  microphone.

03:39:16  12  Q.  And if I were standing over here and if it was facing

03:39:20  13  towards you, it wouldn't work very well?

03:39:22  14  A.  No.

03:39:23  15  Q.  Okay.

03:39:23  16      MR. BAXTER:  Now, I want to look at the patent and

03:39:27  17  Claim 1.  We can look at Column 21.  It says Claim 1.  If

03:39:39  18  you can go down to where it says:  Receiving said sound

03:39:46  19  signal.

03:39:46  20  Q.  (By Mr. Baxter)  Now, I believe there was a discussion

03:39:47  21  with counsel about whether or not the figure -- and this

03:39:54  22  was Figure 5, I think -- had a principal sound source and

03:40:00  23  if he could determine what it was.  And you were trying to

03:40:02  24  explain to him that the patent in -- the microphones pick

03:40:07  25  up everything.  Is that right?

| | | |
|---|---|---|
| 03:40:08 | 1 | A.  Yes. |
| 03:40:08 | 2 | Q.  Okay.  Explain what receiving sound signals from a |
| 03:40:13 | 3 | plurality of disparate sound sources means. |
| 03:40:17 | 4 | A.  That means in the real application, the microphone |
| 03:40:22 | 5 | sensor pick up sound -- microphone sound sensor pick up |
| 03:40:23 | 6 | sound from all direction. |
| 03:40:26 | 7 | Q.  Okay.  The next sentence says "determining."  Now, I |
| 03:40:32 | 8 | think counsel kept using the word "calculate."  Do you |
| 03:40:36 | 9 | remember that? |
| 03:40:36 | 10 | A.  Yes. |
| 03:40:37 | 11 | Q.  Are determining and calculating the same thing? |
| 03:40:39 | 12 | A.  It's similar, but they're not. |
| 03:40:45 | 13 | Q.  Does determining require -- always require |
| 03:40:50 | 14 | calculations? |
| 03:40:51 | 15 | A.  You can formulate in different ways.  Determine, you |
| 03:40:55 | 16 | can formulate in different ways. |
| 03:40:57 | 17 | Q.  Does it require calculations in every instance? |
| 03:41:00 | 18 | A.  Not always. |
| 03:41:07 | 19 | Q.  Okay.  Does the word "calculating" appear in that claim |
| 03:41:13 | 20 | anywhere? |
| 03:41:18 | 21 | A.  No. |
| 03:41:19 | 22 | Q.  It just says "determining"? |
| 03:41:20 | 23 | A.  Yes. |
| 03:41:25 | 24 | Q.  All right. |
| 03:41:26 | 25 | MR. BAXTER:  Now, let me look at Figure 19A, if we |

03:41:29  1  could, Mr. Thompson.  A few more.  There you go.

03:41:45  2  Q.  (By Mr. Baxter)  19A, 19B, and it goes through 19F.

03:41:51  3          Does that show microphones in an array that are in

03:41:54  4  a circle?

03:41:54  5  A.  Yes, they are all different examples.

03:41:57  6  Q.  These are different embodiments?

03:41:59  7  A.  Yes.

03:41:59  8  Q.  Would these figures -- could they ever have appeared in

03:42:06  9  the 2009 article that you wrote?

03:42:08  10  A.  No.

03:42:09  11  Q.  Did the patent, the '049 patent, did it have anything

03:42:15  12  to do with the 2009 article?

03:42:20  13  A.  They are different.

03:42:21  14  Q.  Okay.  And I think counsel asked you if you looked at

03:42:27  15  somebody else's algorithms as you wrote this patent and

03:42:29  16  developed the product.  Do you remember those questions?

03:42:32  17  A.  Yes, I remember he point me to reference papers.

03:42:36  18  Q.  Did you copy anybody's algorithms to get to your

03:42:39  19  patent?

03:42:39  20  A.  No.

03:42:42  21  Q.  Did you write them all yourself?

03:42:46  22  A.  Yes.

03:42:46  23  Q.  Okay.

03:42:48  24          MR. BAXTER:  Could I get over to the desk just a

03:42:51  25  minute, Your Honor?  I forgot to pick up a...

| | | |
|---|---|---|
| 03:42:55 | 1 | THE COURT:  Certainly. |
| 03:43:17 | 2 | Q.  (By Mr. Baxter)  Now, Doctor, do you remember being |
| 03:43:19 | 3 | asked about the Brandstein book -- the textbook, the |
| 03:43:25 | 4 | Brandstein book? |
| 03:43:26 | 5 | A.  Yes. |
| 03:43:26 | 6 | Q.  Have you looked at the Brandstein book? |
| 03:43:28 | 7 | A.  Yes. |
| 03:43:29 | 8 | Q.  Okay.  Did you use the Brandstein book to develop any |
| 03:43:34 | 9 | of your ideas for the '049 patent? |
| 03:43:38 | 10 | A.  No. |
| 03:43:41 | 11 | Q.  Okay. |
| 03:43:42 | 12 | MR. BAXTER:  Can I see Plaintiff's Exhibit No. 8, |
| 03:43:45 | 13 | please? |
| 03:43:45 | 14 | Q.  (By Mr. Baxter)  This is the origin of the patents -- |
| 03:43:54 | 15 | this is a provisional patent with a date of September 24th, |
| 03:43:58 | 16 | 2010.  Do you see that? |
| 03:43:59 | 17 | A.  Yes. |
| 03:43:59 | 18 | Q.  And do you know what a provisional patent is, Doctor? |
| 03:44:02 | 19 | A.  Yes. |
| 03:44:02 | 20 | Q.  All right.  Tell the jury what it is. |
| 03:44:04 | 21 | A.  This is the date we filed our provisional, yeah. |
| 03:44:08 | 22 | Q.  Okay. |
| 03:44:09 | 23 | MR. BAXTER:  If I can look at Page 23. |
| 03:44:12 | 24 | Q.  (By Mr. Baxter)  And is this the origin of the '049 |
| 03:44:15 | 25 | patent originally? |

504

03:44:16  1   A.  Say that again, please.

03:44:19  2   Q.  Is this the start of the chain of patents that ended up

03:44:22  3   in the '049 --

03:44:23  4   A.  Yes.

03:44:25  5   Q.  -- this provisional patent?

03:44:27  6   A.  Yes, yes, yes.

03:44:29  7         MR. BAXTER:  Can I -- can --

03:44:31  8   Q.  (By Mr. Baxter)  And -- and you sent this to the Patent

03:44:34  9   Office, right?

03:44:34  10  A.  Yes.

03:44:35  11  Q.  Okay.

03:44:37  12        MR. BAXTER:  Can I have you blow up where it says

03:44:39  13  "references"?

03:44:42  14  Q.  (By Mr. Baxter)  And it's -- the second one, says:

03:44:43  15  Brandstein and Ward, Microphone Arrays, Springer, 2001.  Is

03:44:52  16  that the textbook that counsel was asking you about?

03:44:54  17  A.  Yes.

03:44:55  18  Q.  And did you reveal this to the Patent Office?  In the

03:44:57  19  very first paper you sent them, you said:  Hey, we used

03:45:03  20  this reference.  You might want to take a look at it.

03:45:06  21  A.  Okay.

03:45:06  22  Q.  And did they do that?

03:45:06  23  A.  I did.

03:45:06  24  Q.  And did they issue -- and did they issue the patent?

03:45:08  25  A.  Yes.

03:45:09   1   Q.  Even though they knew about the Brandstein reference?

03:45:14   2   A.  Yes, I only remember I give all the relevant

03:45:16   3   information to patent agent.  Yeah, I --

03:45:19   4   Q.  And apparently he notified the Patent Office about it?

03:45:22   5   A.  Yeah.

03:45:23   6          MR. BAXTER:  Okay.  Thank you.  Your Honor, that's

03:45:27   7   all I have.

03:45:28   8          THE COURT:  All right.  You pass the witness,

03:45:30   9   Mr. Baxter?

03:45:31  10          MR. BAXTER:  Yes.

03:45:31  11          THE COURT:  Is there additional cross, Mr. Hadden?

03:45:33  12          MR. HADDEN:  Just very briefly, Your Honor.

03:45:38  13          THE COURT:  Proceed with your additional

03:45:40  14   cross-examination.

03:45:41  15          MR. HADDEN:  Thank you, Your Honor.

03:45:41  16                     RECROSS-EXAMINATION

03:45:41  17   BY MR. HADDEN:

03:45:41  18   Q.  Dr. Zhu, your counsel just showed you that provisional

03:45:47  19   application.  Do you recall that?

03:45:49  20   A.  Say that again, please.

03:45:50  21   Q.  Your counsel just showed you a provisional patent

03:45:53  22   application?

03:45:54  23   A.  Yes.

03:45:55  24   Q.  Do you recall that?

03:45:56  25   A.  Yes.

506

03:45:56  1  Q.  And you understand that provisional patent applications

03:46:00  2  are not examined by examiners; do you understand that,

03:46:03  3  right?

03:46:03  4  A.  I don't understand that.

03:46:04  5  Q.  Okay.

03:46:06  6          MR. HADDEN:  Can we bring up DTX-980A and go to

03:46:11  7  the attached sheet, Mr. Berk?

03:46:15  8  Q.  (By Mr. Hadden)  Now, you understand, Dr. Zhu, that the

03:46:19  9  '049 was the first reissue for the '756 patent?

03:46:24  10  A.  Yes.

03:46:25  11  Q.  Okay.  And if we look at this attachment to the

03:46:30  12  declaration that you filed and if we look at the line

03:46:35  13  beginning:  This error was not corrected.

03:46:39  14          MR. HADDEN:  Do you see that, Mr. Berk?  Thank

03:46:41  15  you.

03:46:41  16  Q.  (By Mr. Hadden)  This error was not corrected in the

03:46:43  17  first reissued patent.  Do you see that?

03:46:45  18  A.  Yes.

03:46:45  19  Q.  So you were telling the Patent Office that the error

03:46:49  20  you were identifying here had not been corrected in the

03:46:52  21  '049 patent; isn't that correct?

03:46:52  22  A.  I just said this error means this limitation was not

03:46:59  23  corrected in the first reissue.  So by error, I mean this

03:47:05  24  limitation was not corrected.  That was the error.

03:47:11  25          MR. HADDEN:  Move to strike, non-responsive,

03:47:14  1  Your Honor.

03:47:14  2         THE COURT:  Overruled.

03:47:18  3  Q.  (By Mr. Hadden)  Now, if you look at --

03:47:27  4         MR. HADDEN:  Can we go to Page 2 of 2 of this

03:47:30  5  document, Mr. Berk, with Dr. Zhu's signature?

03:47:32  6  Q.  (By Mr. Hadden)  Is that your signature, Dr. Zhu?

03:47:38  7  A.  Yes.

03:47:41  8  Q.  And you signed this in July 22nd of this year; is that

03:47:45  9  correct?

03:47:45  10  A.  Yes.

03:47:47  11  Q.  Okay.  And when you signed that, did you understand

03:47:51  12  that when you said that the patent was inoperable or

03:47:57  13  invalid, you're signing that under oath?

03:47:59  14  A.  I saw that's the routine paper.  I don't want to argue

03:48:03  15  that.  Yeah.

03:48:05  16  Q.  Did you understand that you're signing this under oath

03:48:09  17  when you signed it in July of 2020?

03:48:12  18  A.  Yeah, I understand that.  Yeah.

03:48:14  19  Q.  Thank you.

03:48:15  20         MR. HADDEN:  No further questions.

03:48:16  21         THE COURT:  Any additional direct?

03:48:18  22         MR. BAXTER:  Yes, Your Honor.

03:48:18  23                  REDIRECT EXAMINATION

03:48:19  24  BY MR. BAXTER:

03:48:19  25  Q.  So, Dr. Zhu, the paper you signed, did it have anything

03:48:33  1  to do with the patent in this case?

03:48:36  2  A.  No.

03:48:36  3  Q.  No?

03:48:39  4       MR. BAXTER:  That's all I have, Your Honor.

03:48:40  5       THE COURT:  Additional cross?

03:48:41  6       MR. HADDEN:  No, Your Honor.

03:48:42  7       THE COURT:  All right.  Dr. Zhu, you may step

03:48:45  8  down.

03:48:45  9       MR. BAXTER:  Can she be excused, Your Honor,

03:48:47  10  and --

03:48:48  11       THE COURT:  Any objection?

03:48:49  12       MR. HADDEN:  No, Your Honor.

03:48:49  13       THE COURT:  All right.  The witness is excused.

03:48:52  14  You're free to stay; you're free to leave.

03:48:55  15       MR. BAXTER:  Thank you, Your Honor.

03:48:56  16       THE WITNESS:  Thank you, Judge.

03:49:10  17       THE COURT:  Plaintiff, call your next witness.

03:49:12  18       MR. FABRICANT:  Yes, Your Honor.

03:49:13  19       MR. LAMBRIANAKOS:  Your Honor, Plaintiff calls by

03:49:23  20  deposition Chiawei "Jerry" Wu, former advanced sourcing

03:49:28  21  commodity manager at Amazon's Lab126.

03:49:32  22       Playing time for Plaintiff is 29 minutes, 8

03:49:34  23  seconds and for Defendants, 41 seconds.

03:49:36  24       THE COURT:  Proceed with this witness by

03:49:38  25  deposition.

509

```
03:49:38   1              MR. LAMBRIANAKOS:   Thank you.
03:49:38   2          CHIAWEI "JERRY" WU, PLAINTIFF'S WITNESS
03:49:40   3             PRESENTED BY VIDEO DEPOSITION
03:49:40   4          (Videoclip played.)
03:49:44   5   Q.  Okay.  Mr. Wu, can you please state your name for the
03:49:52   6   record?
03:49:52   7   A.  Sure.  My name is Jerry Wu.  My official name is
03:49:55   8   Chiawei, C-h-i-a-w-e-i, but I go by Jerry at work.
03:50:01   9   Q.  At some time had you worked for a company called
03:50:04  10   Lab126?
03:50:04  11   A.  Yes, I did.  From 2010 to 2012.
03:50:08  12   Q.  So when you were working at Amazon between 2010 and
03:50:12  13   2012, what was your job title?
03:50:13  14   A.  Advanced sourcing commodity manager.  Advanced sourcing
03:50:17  15   commodity manager.
03:50:18  16   Q.  So it was technology sourcing; you were looking for
03:50:21  17   technologies, right?
03:50:22  18   A.  That's correct.  But some time -- I would say probably
03:50:27  19   about 70 percent time that I came from engineering and say,
03:50:27  20   hey, this product not be good.  We might want to talk to
03:50:27  21   them.  And 38 percent something -- you know, something I've
03:50:36  22   done before, and I can help in finding the suppliers.
03:50:36  23   Q.  But the technology sourcing you worked on, ultimately
03:50:40  24   evolved into the Echo project and the Echo product at
03:50:43  25   Amazon, correct?
```

03:50:44  1   A.  Some of them, yes.  But you have to be more specific

03:50:51  2   exactly what that is.  I don't understand that question

03:50:54  3   very well.

03:50:54  4   Q.  How many vendors did you meet with, when you were

03:51:00  5   working at Amazon?

03:51:01  6          ATTORNEY:  Objection.

03:51:02  7   A.  Probably at least several hundred.

03:51:05  8   Q.  So to ask you a slightly broader question.  How many

03:51:12  9   technology vendors did you initiate a dialog with, start

03:51:16  10  talking to?

03:51:16  11  A.  I don't recall, but it's going to be up in the

03:51:21  12  hundreds.

03:51:21  13  Q.  So, you know, to put that another way, it's fair to say

03:51:24  14  that, you know, one in four or one in five of the companies

03:51:31  15  that you saw at a trade show or received a solicitation

03:51:35  16  from proceeded to the NDA phase, right?

03:51:38  17  A.  Correct.

03:51:39  18          ATTORNEY:  Objection.

03:51:40  19  Q.  And at least -- there was at least some indication from

03:51:43  20  Amazon's perspective that when you went to the NDA phase,

03:51:47  21  there was some initial interest in that company, right?

03:51:49  22  A.  Yes.

03:51:50  23  Q.  Now, during that process, do you recall any of those

03:51:56  24  potential vendors telling you that they had patents

03:52:00  25  protecting their products that they were looking to sell to

03:52:04    1    Amazon?

03:52:05    2    A.   No.   Because in a sales presentation will only tell you

03:52:16    3    how that thing fits in that topic for you, how we can use

03:52:20    4    that up -- that use cases.   But no mention of patents.

03:52:23    5    Q.   No mention of any type of intellectual property, right?

03:52:27    6    A.   No.

03:52:33    7    Q.   If that would have been a presentation, you would have

03:52:36    8    remembered it, right?

03:52:37    9    A.   Correct.   Because it's such an abnormal behavior,

03:52:40   10    because I have never -- I've been doing this almost, what,

03:52:43   11    since 90 -- since 2000.   So a 20-year career.   I don't see

03:52:48   12    any patents usually mentioned in sales or technical

03:52:51   13    reviews.

03:52:53   14    Q.   They don't tell you about their patents, they don't

03:52:56   15    tell you about their patent applications?   That would have

03:52:59   16    been something different from the norm for you if a

03:53:01   17    technology vendor had told you about patents, applications,

03:53:05   18    or intellectual property covering their products, right?

03:53:08   19    A.   Correct.   Because that's very abnormal.   I haven't seen

03:53:12   20    it in my career.

03:53:16   21    Q.   Now, do you have any visibility into whether -- into

03:53:29   22    whether Amazon would investigate or would have investigated

03:53:34   23    intellectual property, after you got to that in-person

03:53:38   24    meeting phase?

03:53:39   25    A.   So from our side, only when we -- when the supplier

03:53:45    1    gets selected, we'll do our due diligence in terms of

03:53:49    2    contract identification.  I don't believe they're actually

03:53:52    3    looking into IP database for everything.  We just say that

03:53:56    4    we do -- if we do use the product, we don't get sued by it.

03:54:00    5    That's the normal process.

03:54:05    6    Q.  So just to go over again what you described as the

03:54:14    7    process, when you receive the technology presentations from

03:54:18    8    tech vendors, you would pass those on to technology people

03:54:22    9    within Amazon, right?  That's a normal part of the

03:54:24   10    in-person meeting process, right?  Hello?

03:54:28   11    A.  So we are copied on it.  Hello?  Can you hear -- I'm

03:54:42   12    sorry, my Internet connection is a little bit slow.

03:54:44   13         So, typically, how it works, after the in-person

03:54:48   14    meeting, the presentation file, if the supplier wants to

03:54:51   15    provide, it is sent to everybody on the email chain on the

03:54:55   16    meetings.  It doesn't necessarily go through me.

03:55:01   17    Q.  And just to confirm, you said that if -- if that

03:55:07   18    presentation mentioned patents, that would have been an

03:55:09   19    aberration from the norm?  That would have been something

03:55:12   20    you don't recall seeing in your 20-year career, right?

03:55:16   21    A.  Correct.  That's very, very abnormal.  I haven't seen

03:55:19   22    it.

03:55:20   23    Q.  Big red flag, big abnormal thing, right?

03:55:24   24    A.  Right.

03:55:24   25    Q.  Do you recall attending a trade show called CES in

03:55:28   1   2011?

03:55:28   2   A.   Yes.

03:55:28   3   Q.   Did you often attend the CES trade show?

03:55:36   4   A.   Yes.   Part of my job requirement.

03:55:39   5   Q.   What does CES stand for?

03:55:44   6   A.   Consumer Electronic Show.

03:55:48   7   Q.   And is that one of the places you would go to, to find

03:55:54   8   potential vendors, potential new vendors?

03:55:56   9   A.   Correct.

03:55:57   10   Q.   Were you looking for, among other things, vendors who

03:56:02   11   had won awards at those trade shows?

03:56:04   12   A.   Yes.

03:56:09   13   Q.   And you would have attended CES in 2010, as well,

03:56:14   14   right?

03:56:14   15   A.   Correct.

03:56:14   16   Q.   And 2012?

03:56:15   17   A.   Yes, I did.

03:56:16   18   Q.   So you met with the big companies in that scenario,

03:56:22   19   right?   You had meetings with the big companies?

03:56:24   20   A.   Correct.

03:56:25   21   Q.   And you would have let your -- your engineer walk the

03:56:33   22   floor and look for maybe some smaller companies with good

03:56:37   23   technology, right?

03:56:38   24   A.   Correct.   That's typically what CES was for.

03:56:44   25   Q.   Then you would follow up with those companies whose

03:56:47  1  technology you were interested in and try to arrange some

03:56:51  2  NDAs and in-person meetings, right?

03:56:54  3  A.  Correct.

03:56:55  4  Q.  So what I'm asking you about is a little more -- more

03:56:58  5  specific, which is, do you remember any of the smaller

03:57:01  6  suppliers that you would have met with or been referred to

03:57:05  7  from the CES trade show while at Amazon?

03:57:08  8  A.  The answer is probably no.  If it's not a big company,

03:57:14  9  I don't remember it.

03:57:15  10  Q.  And you would have remembered if a smaller company had

03:57:29  11  come to you and told you that you needed their patents to

03:57:32  12  work in this space, right?

03:57:34  13  A.  I would -- I would have remembered if that would be the

03:57:37  14  case.

03:57:37  15  Q.  Because that would be a big, red flag to you, right?

03:57:43  16          ATTORNEY:  Objection, form.

03:57:45  17  A.  Correct.

03:57:46  18  Q.  And do you see an email, Exhibit 2?

03:57:49  19  A.  Yeah, yeah.

03:57:50  20  Q.  Do you see the "from" line says Jerry Wu?

03:57:53  21  A.  Yes.

03:57:54  22  Q.  So you wanted -- you contacted Li Creative Technologies

03:57:57  23  and asked for a demo of their adaptive beamforming, 3D

03:58:01  24  audio, noise and echo cancellation technologies, correct?

03:58:05  25  A.  Correct.  That's what engineering probably asked me to

03:58:11   1   do, yes.

03:58:12   2   Q.   And you wanted to have a meeting and a demo, correct?

03:58:17   3   A.   If possible, yes.   That's our request.

03:58:20   4   Q.   So did you put those requirements in here, or did

03:58:28   5   someone else tell you that's what Lab126 is interested in

03:58:31   6   seeing?

03:58:32   7   A.   Engineering does.

03:58:33   8   Q.   So, to your knowledge, engineering said to you they're

03:58:37   9   interested in seeing adaptive beamforming on input, 3D

03:58:41   10  audio, noise echo cancellation, and other from Li Creative

03:58:45   11  Technologies?   That would have been given to you from

03:58:47   12  engineering, right?

03:58:48   13  A.   Correct.

03:58:48   14  Q.   So if it wasn't you that knew Li Creative Technology

03:58:59   15  may have these technologies, it must have come from

03:59:02   16  engineering.   Someone in engineering must have known that

03:59:06   17  Li Creative Technologies may have these interesting

03:59:09   18  technologies, adaptive beamforming and noise and echo

03:59:13   19  cancellation, correct?

03:59:14   20          ATTORNEY:   Objection, form.

03:59:17   21  A.   Correct.

03:59:17   22  Q.   Now, I want to ask you a little bit about the Fire

03:59:22   23  Phone.   You're familiar with that product that was

03:59:26   24  ultimately released by Amazon, right?

03:59:27   25  A.   Correct.

03:59:27  1  Q.  That product was an utter failure for Amazon, wasn't

03:59:31  2  it?

03:59:31  3  A.  Yes.  It was a failure, yes.

03:59:33  4  Q.  So you invited Dr. Li and Li Creative Technologies to

03:59:36  5  come to Amazon's secret facility to give a demo about Li

03:59:40  6  Creative Technologies' audio-processing technologies,

03:59:42  7  correct?

03:59:42  8  A.  Correct.

03:59:45  9  Q.  Well, it's what you wanted them to demonstrate, right?

03:59:49  10  You asked for this demonstration, didn't you?

03:59:51  11  A.  Yes.  By request of engineering, yes.

03:59:54  12  Q.  So the engineers want Li Creative Technology to come

03:59:59  13  into Amazon's secret facility and demonstrate Li Creative

04:00:04  14  Technologies' technology at this meeting, correct?

04:00:06  15  A.  Correct.

04:00:06  16  Q.  So, first, I'd like to ask you:  Did this confirm

04:00:13  17  that -- your understanding that the meeting between Li

04:00:18  18  Creative Technologies with Dr. Li and Amazon took place?

04:00:20  19  A.  Yes, I confirm.

04:00:27  20  Q.  So that meeting took place on October 17th, 2011,

04:00:33  21  right?

04:00:33  22  A.  It looks like it, yes.

04:00:35  23  Q.  And Dr. Li gave a presentation at that meeting, right?

04:00:42  24  A.  I guess so, from the email.  No one object to it, yes.

04:00:46  25  Q.  And Dr. Li forwarded you the presentation file after

04:00:53   1   the meeting, right?

04:00:55   2   A.  He didn't send it to me.  He sent it to everybody,

04:00:59   3   right.  That email said very clear, sent to everyone.

04:01:02   4   Q.  You were included on the email, correct?

04:01:04   5   A.  Correct, I was included on the email.

04:01:06   6   Q.  So you would have received a copy of this presentation,

04:01:09   7   right?

04:01:09   8   A.  Yes.

04:01:11   9   Q.  And Aleksandar Pance would have received a copy of the

04:01:13   10  presentation, right?

04:01:14   11  A.  Correct.  Because he's on the email on the attachment.

04:01:19   12  Q.  And Matt Holland would have received a copy of the

04:01:23   13  presentation, right?

04:01:24   14          ATTORNEY:  Objection, form.

04:01:26   15  A.  Yes.

04:01:27   16  Q.  And Sergei would have received a present -- a copy of

04:01:27   17  the presentation, right?

04:01:27   18          ATTORNEY:  Objection to form.

04:01:27   19  A.  Yeah.

04:01:27   20  Q.  And you see it's addressed to Aleks, Matt, David,

04:01:32   21  Sergei, and colleagues.  You see colleagues in there,

04:01:35   22  right?

04:01:35   23  A.  Correct.

04:01:36   24  Q.  So do you know one way or the other whether other

04:01:41   25  people would have attended that meeting?

04:01:44  1  A.   Probably.

04:01:45  2          ATTORNEY:   Objection, form.

04:01:47  3  Q.   Probably what?

04:01:48  4  A.   The answer is yes.  There were probably additional

04:01:53  5  personnel there.

04:01:54  6  Q.   Do you know how many people attended the meeting?

04:01:56  7  A.   I wouldn't know.  I wasn't there.  I -- I believe I was

04:01:59  8  traveling.

04:01:59  9  Q.   Based on your understanding of how these meetings would

04:02:03  10  happen at Amazon, do you have any understanding as to

04:02:05  11  generally how many people would attend a meeting like this?

04:02:08  12  A.   Probably, at most, seven to eight people, tops.

04:02:16  13  Q.   So if it were, you know, a more significant meeting,

04:02:21  14  perhaps you'd have more people attending, right?

04:02:23  15  A.   Correct.

04:02:24  16  Q.   And Li Creative Technologies presented on spontaneous

04:02:30  17  speech conversion, far-field speech with microphone array,

04:02:33  18  real-time online system response for both ASR and speaker

04:02:37  19  ID.  You see that?

04:02:39  20          ATTORNEY:   Objection, form.

04:02:40  21  A.   I see that, yes.

04:02:42  22  Q.   And a real-time online system response for both ASR and

04:02:50  23  speaker ID, do you know what that means?

04:02:55  24  A.   I know what speaker ID is, yes.  But beyond that, I

04:03:03  25  don't know what you're talking.  But I think that's more --

| | | |
|---|---|---|
| 04:03:07 | 1 | acting -- acting -- some kind of -- you know, reduction.  I |
| 04:03:11 | 2 | have no idea what it is. |
| 04:03:13 | 3 | Q.  But you know what speaker ID is, right? |
| 04:03:18 | 4 | A.  Yeah. |
| 04:03:18 | 5 | Q.  That wasn't used in the Fire Phone, was it? |
| 04:03:22 | 6 | A.  No, I don't believe so. |
| 04:03:24 | 7 | Q.  The Fire Phone didn't have an online system for speaker |
| 04:03:31 | 8 | ID, right? |
| 04:03:31 | 9 | A.  I don't believe so.  I -- I don't know the detail. |
| 04:03:34 | 10 | Q.  So, to your understanding, the Fire product you were |
| 04:03:41 | 11 | working on in the 2011 time frame didn't do online response |
| 04:03:44 | 12 | or speaker identification, right? |
| 04:03:48 | 13 | A.  It wasn't a for-use case. |
| 04:03:51 | 14 | Q.  Do you see the second to the last bullet point saying |
| 04:03:55 | 15 | audio search? |
| 04:03:56 | 16 | A.  Yes. |
| 04:03:56 | 17 | Q.  You see it says voice search and music search? |
| 04:04:02 | 18 | A.  Yes. |
| 04:04:02 | 19 | Q.  Now, those weren't features of the Fire Phone, were |
| 04:04:07 | 20 | they? |
| 04:04:07 | 21 | A.  This is what the salesperson trying to sell yourself. |
| 04:04:10 | 22 | Try to come up with use case. |
| 04:04:11 | 23 | Q.  I'm just asking you about Amazon's products that you're |
| 04:04:15 | 24 | aware of.  Voice search and music search were not functions |
| 04:04:19 | 25 | of the Fire Phone project, correct? |

04:04:22  1           ATTORNEY:  Objection.

04:04:23  2    A.  Correct.

04:04:24  3    Q.  But the Echo products that you know of from having seen

04:04:28  4    them, those have voice search and music search online,

04:04:33  5    correct?

04:04:33  6    A.  Yes.

04:04:33  7    Q.  But you reached out to Li Creative.  They didn't --

04:04:38  8    they didn't email you.  You saw the email.  You reached out

04:04:40  9    to Li Creative, right?

04:04:42  10   A.  Correct.

04:04:42  11   Q.  And you did that because engineers at Amazon told you

04:04:44  12   to do it, right?

04:04:46  13   A.  Correct.

04:04:46  14   Q.  And so you're testifying now that the reason they

04:04:49  15   wanted you to contact Li Creative Technologies wouldn't

04:04:52  16   have just been just because of this award in 2011, it would

04:04:57  17   have been some other reason they wanted you to contact Li

04:05:02  18   Creative Technologies, right?

04:05:02  19   A.  It's more timing.  No reason.

04:05:06  20   Q.  I'm not asking you about timing.  I'm asking you about

04:05:09  21   the reason, why you reached out to Li Creative

04:05:11  22   Technologies.  I mean, it's your testimony that it would

04:05:15  23   not have been because of or just because of this award in

04:05:18  24   2011.  It would have been some other reason why you were

04:05:21  25   instructed to contact Li Creative Technologies, correct?

04:05:24  1   A.  Correct.

04:05:28  2   Q.  Did you think that may have been because someone was

04:05:31  3   doing Internet searching or looking into these types of

04:05:34  4   companies and found something that they wanted to follow up

04:05:37  5   on, right?

04:05:39  6             ATTORNEY:   Objection to form.

04:05:40  7   A.  Yes.

04:05:42  8   Q.  And if you take a look at this page, you also see it

04:05:47  9   says a circular microphone array, right?  That's -- that's

04:05:50  10  what Li Creative Technologies is presenting here, isn't it?

04:05:53  11  A.  Yes.

04:05:53  12  Q.  So, to your knowledge, did the Fire Phone have a

04:05:57  13  circular microphone array?

04:05:58  14  A.  No.   It won't fit.

04:06:00  15  Q.  So, to your knowledge, did any Amazon product at that

04:06:04  16  time have a circular microphone array?

04:06:06  17  A.  Nope.

04:06:08  18  Q.  Back in 2012, right, you didn't have a circular

04:06:11  19  microphone array?  At 2011 time frame when Dr. Li presented

04:06:15  20  the option of having a circular microphone array, right?

04:06:19  21  A.  That's right, yes.

04:06:20  22  Q.  So just to confirm, prior to Dr. Li's presentation,

04:06:29  23  it's your testimony that Amazon didn't have any product,

04:06:33  24  anything in development that you're aware of, with a

04:06:37  25  circular microphone array, correct?

04:06:38  1  A.  That's correct.

04:06:53  2  Q.  Would you take a look at the page immediately preceding

04:06:58  3  this, Bates 16213?  Do see where it says sound source

04:07:04  4  localization?

04:07:04  5  A.  Yes.

04:07:08  6  Q.  And it's also your understanding that none of Amazon's

04:07:11  7  products in the 2011 time frame, prior to this

04:07:14  8  presentation, were doing any kind of sound source

04:07:16  9  localization, right?

04:07:17  10  A.  Correct.

04:07:18  11  Q.  And do you see where it says one of the core

04:07:21  12  technologies is acoustic signal processing?  Do you see

04:07:24  13  that that's what Li Creative Technology is saying?

04:07:27  14  A.  Yes.

04:07:27  15  Q.  And included in their core technologies, they say,

04:07:35  16  among other things, circular microphone array, right?  Do

04:07:44  17  you see that?

04:07:46  18  A.  Yes.

04:07:46  19  Q.  You have noise reduction.  Do you see that?

04:07:50  20  A.  Yes.

04:07:52  21  Q.  Echo cancellation.  Do you see that?

04:07:53  22  A.  I see that, yes.

04:07:54  23  Q.  And you see sound source localization, as well.  Do you

04:07:57  24  see that?

04:07:58  25  A.  Yes.

523

| | | |
|---|---|---|
| 04:07:58 | 1 | Q.  It's your understanding that there weren't any Amazon |
| 04:08:05 | 2 | products in 2011 that utilize all of these core |
| 04:08:09 | 3 | technologies, circular microphone array, noise reduction, |
| 04:08:13 | 4 | echo cancellation, and sound source localization, right? |
| 04:08:17 | 5 | A.  Correct.  That's because at that time I was working -- |
| 04:08:21 | 6 | called Project V, so I'm not -- I'm not aware of anything |
| 04:08:25 | 7 | else on that. |
| 04:08:25 | 8 | Q.  And above that, do you see where it says patents, 13 |
| 04:08:28 | 9 | filed, two issued?  Do you see that? |
| 04:08:30 | 10 | A.  Yes. |
| 04:08:31 | 11 | Q.  And so this is not your standard presentation, right? |
| 04:08:35 | 12 | This is not something that you -- |
| 04:08:37 | 13 | A.  I would agree.  So let me clarify that, right? |
| 04:08:43 | 14 | Patents -- it says they have patents.  They didn't give me |
| 04:08:45 | 15 | the details of the patents they have, what they called for. |
| 04:08:49 | 16 | That's not something that is -- something in the |
| 04:08:53 | 17 | short-term, but they had some kind of patent.  That's it. |
| 04:08:55 | 18 | So not in details behind it. |
| 04:08:55 | 19 | Q.  That's your testimony is, it wasn't possible to search |
| 04:08:58 | 20 | for the patents of Li Creative Technologies?  Is that what |
| 04:09:01 | 21 | you're telling me?  That's your testimony? |
| 04:09:02 | 22 | A.  First of all, there's no patent number.  There's no |
| 04:09:05 | 23 | patent claim.  It's not possible for us to do that. |
| 04:09:07 | 24 | Q.  Sir, you know you could go to the USPTO website, type |
| 04:09:12 | 25 | in Li Creative Technologies as the assignee of patents, and |

04:09:15   1   you would get the full list of Li Creative Technologies's

04:09:17   2   patents, right, sir?  You know that, don't you?

04:09:20   3   A.  That's handled by legal side.  I don't do that.

04:09:23   4   Q.  You didn't look?  You could have looked, but you did

04:09:26   5   not look, right, sir?

04:09:27   6   A.  No.  I don't have access to that.

04:09:32   7   Q.  You didn't go to the USPTO website; is that your

04:09:36   8   testimony?

04:09:36   9   A.  I did not -- I didn't look for it, yes.

04:09:38   10   Q.  You didn't look for it?

04:09:39   11   A.  Yeah.  But there's no patent mentioned here.

04:09:43   12   Q.  It says the word "patents."  It says the name of the

04:09:47   13   company?

04:09:47   14   A.  Not patent.

04:09:48   15   Q.  And you didn't look for any patents by Li Creative

04:09:51   16   Technologies?  That's your testimony, right?

04:09:52   17   A.  Correct.

04:09:53   18   Q.  So you don't look up patents if you're not going to

04:09:56   19   proceed with the supplier, correct?

04:09:57   20   A.  Basically, we had no use for it.  We won't follow up.

04:10:04   21   Q.  So that's a yes?

04:10:06   22   A.  That's not what I said.  I said there's no use.  We

04:10:09   23   would not follow up.

04:10:11   24   Q.  You're not going to look up the patents?

04:10:16   25   A.  Because we're not using it.

04:10:17   1   Q.  Aleksandar Pance worked on the Echo products, right?
04:10:20   2   He worked on Project D.  You said that.  You testified
04:10:21   3   about that.
04:10:22   4   A.  No, I didn't say that.  I said he didn't work on
04:10:25   5   Project D.  It was Chris Coley.  Every single project ever
04:10:29   6   done has its own silo, so it cannot physically even talk
04:10:34   7   with two people in the same room because they're blocked
04:10:36   8   off in different buildings, different floor, different
04:10:39   9   location.  Access controls.  Nothing was shared.
04:10:44  10        Aleks Pance -- at my time -- to the day I started
04:10:45  11   to the day I ended my employment there, was only working on
04:10:49  12   Project B, like Baker, the phone only.  Every single person
04:10:53  13   on that email chain is on Fire Phone only, because we are
04:10:58  14   not allowed to go across departments.  It was complete
04:11:02  15   blocked off from each other.
04:11:03  16        So I actually never worked on the Project D in my
04:11:08  17   time at Amazon.  It's physically not possible because it's
04:11:13  18   physically blocked off.  The suppliers meeting cannot be
04:11:16  19   shared, as well, because at that time, Amazon was so afraid
04:11:20  20   that people know that and find out different things.  It
04:11:23  21   was complete silo.
04:11:24  22        There was no cross communication between the
04:11:26  23   engineering department.  Even when we went to have
04:11:30  24   meetings, it had to be done one-by-one.  It was never
04:11:34  25   allowed to be in the same room.

526

04:11:36   1   Q.  But you worked on Project D, right?  You -- you worked

04:11:38   2   on both projects, didn't you?

04:11:40   3   A.  Correct.  But it wasn't -- I was fully function.  So

04:11:44   4   when they fully function, we start the project.  But we --

04:11:47   5   Q.  You weren't siloed, were you?

04:11:50   6   A.  I wasn't siloed because I was fully functioning.  I

04:11:55   7   wasn't in design for this.

04:11:56   8   Q.  So you just closed your eyes, did not want to know

04:11:59   9   anything about Li Creative Technologies' information that

04:12:03   10  may be relevant for Project D after you received this

04:12:07   11  presentation?

04:12:08   12  A.  Correct, correct.  Because I'm not allowed to go ahead

04:12:11   13  and share information even between projects.  So whatever

04:12:16   14  happens stay within that silo.  It doesn't go out.

04:12:22   15  Q.  So you would have received this information, and you

04:12:27   16  would have just locked it up and not told anybody about it.

04:12:30   17  That's your testimony, right?

04:12:31   18  A.  Only for the people that were disclosed on that

04:12:34   19  project.  I would not share information out.  They say

04:12:37   20  clearly -- those people in the meeting got information

04:12:39   21  directly from Li Creative, but that's only one project.

04:12:43   22       We are not allowed to send information across

04:12:46   23  project.  Every single project Amazon have specific NDA

04:12:50   24  that does not allow us to do that.  I have even different

04:12:55   25  address, different files, but I cannot cross two different

04:12:59  1  locations.

04:13:01  2  Q.  The NDA for this project, for the project of Li

04:13:05  3  Creative Technologies, that wasn't limited to the Fire

04:13:09  4  Phone, right?

04:13:10  5  A.  That a specific NDA form.

04:13:17  6  Q.  It was a standard NDA form, right?  It wasn't limited

04:13:20  7  to the Fire Phone project, right?

04:13:22  8  A.  Correct.  The people who were on that project sign a

04:13:27  9  specific project NDA.  So I have NDA for both Project A, B,

04:13:33  10  C, D.  I have for every single one of them.  I have NDA for

04:13:39  11  them across the board.  The project, three or four people

04:13:42  12  that does that.

04:13:46  13  Q.  I'm not asking about your NDA with Amazon.  I'm asking

04:13:50  14  you about the NDA Li Creative signed with Amazon.  That NDA

04:13:53  15  was not specific to the Fire Phone, correct?

04:13:57  16  A.  I don't have any details, I don't know, but most likely

04:14:03  17  it's not.

04:14:03  18  Q.  Did Lab126 have any restrictions on interactions

04:14:08  19  between the project team?

04:14:08  20  A.  Yes.

04:14:09  21        ATTORNEY:  Objection.

04:14:10  22  A.  Basically, from physical of location of office space,

04:14:13  23  they were not on the same floor.  The door was locked.  So

04:14:17  24  physically they could not access.  We were in lobby, but

04:14:21  25  people in different floor in different rooms.  The document

04:14:24  1   was complete siloed inside of cloud.  So we can only see

04:14:28  2   what project we're working on.  So everything else is

04:14:32  3   blocked.  We don't see what other is doing.  Nothing is

04:14:35  4   shared.  Each -- each person had to sign a specific NDA

04:14:41  5   specifying we cannot cross-contaminate.  So each one was

04:14:46  6   treated as silo.

04:14:49  7   Q.  All right.  You mentioned that the door was locked.

04:14:53  8   What did you mean by that?

04:14:55  9   A.  So, basically, the room would be cut in half or may be

04:14:55  10  different floor.  You could not actually work.  For

04:14:58  11  example, I was disclosed on the project, so I could go to

04:15:08  12  that floor.  Other people cannot go into that floor.  They

04:15:08  13  could not physically go into the lab or physically to the

04:15:12  14  people, because it was not done.

04:15:13  15       So, physically, different floor, different rooms

04:15:15  16  within the floor, complete silo.  Like the Project B is in

04:15:19  17  entire section on the left-hand side of the room.  The Fire

04:15:23  18  team would be on their own side of the building.  And that

04:15:26  19  would be further fabricated.

04:15:27  20  Q.  So in addition to the physical restrictions, were there

04:15:34  21  restrictions on communications or talking?

04:15:36  22  A.  Yes.

04:15:39  23       ATTORNEY:  Objection to form.  Objection to form.

04:15:41  24  Q.  What were those restrictions?

04:15:43  25  A.  Basically, every single -- so from our side, every

04:15:48  1  single project has this NDA that every single person who

04:15:52  2  work on that project needs to sign.  It was -- it was very

04:15:54  3  clear that we cannot talk to anyone who does not work on

04:15:57  4  this project.

04:15:57  5        We cannot share information, cannot share

04:15:59  6  documents.  Each project is in its own dedicated space on

04:16:05  7  the cloud.  Even my boss didn't know what I was working on

04:16:09  8  because I didn't tell him what was happening.  He only told

04:16:12  9  me because I do.  He had no idea what I was doing.

04:16:16  10  Q.  And did Lab126 have policies about using technology of

04:16:22  11  third-party suppliers from meetings it had conducted?

04:16:25  12  A.  No, unless we decide to go and proceed with the

04:16:30  13  contract and award business.

04:16:32  14  Q.  So, Mr. Wu, you testified about who could go in and out

04:16:37  15  of certain floors in Amazon's building, right?

04:16:40  16  A.  Correct.

04:16:42  17  Q.  Now, you could get into Floor B or the space for B,

04:16:47  18  right?

04:16:47  19  A.  Correct.

04:16:49  20  Q.  You also could get into the space for D, couldn't you?

04:16:53  21  A.  Correct.

04:16:54  22        ATTORNEY:  Objection, form.

04:16:54  23  Q.  But at some point in time, you were permitted by Amazon

04:16:58  24  to work on two different projects, Project B and Project D,

04:17:04  25  correct?

04:17:04  1   A.  Correct.

04:17:04  2   Q.  Now, with regard to employment agreements you had

04:17:08  3   referenced earlier, you've never seen anyone else's

04:17:11  4   employment agreement, have you?

04:17:13  5   A.  That's probably right.

04:17:15  6   Q.  Right.  So you have no idea what Mr. Pance's employment

04:17:21  7   agreement said, do you?

04:17:22  8   A.  That's probably right, no.

04:17:24  9   Q.  So it's your testimony if he was co-mingling

04:17:27  10  information for Projects B and D, he would have been doing

04:17:30  11  something illegal, right, even against the law?

04:17:34  12  A.  Based on what you're saying, yes.  We're not supposed

04:17:36  13  to do it.

04:17:36  14  Q.  You have no idea whether he used information from

04:17:39  15  Project B in his development of Project D, right?  You

04:17:45  16  wouldn't know?  You weren't there.

04:17:49  17  A.  After 2012, I don't know what happened when I left.

04:18:03  18  But prior to that, there was no cross-pollination under my

04:18:08  19  watch.  It was very clear that could not be done.

04:18:12  20  Q.  Now, you weren't at the meeting between Li Creative

04:18:15  21  Technology and Amazon, right?  You weren't at that meeting?

04:18:19  22  A.  Probably not.

04:18:19  23  Q.  You were on vacation.  You said it in your email, you

04:18:24  24  were on vacation, you were out -- our of the office.

04:18:27  25  A.  I was traveling for work.

04:18:29   1    Q.  You were traveling.  You couldn't have been at the

04:18:31   2    meeting, right?

04:18:32   3    A.  Could be.  I don't know.  I need to check my -- I mean,

04:18:34   4    I come to see -- that's a busy time in my life.  I don't

04:18:41   5    know.  It's 10 years ago.

04:18:41   6    Q.  But you don't remember the meeting?

04:18:43   7    A.  I have tons of supply meetings.  It's hard for me to

04:18:49   8    record every single one of them.

04:18:51   9    Q.  So you don't know whether anyone from Project D

04:18:55   10   attended that meeting, correct?  You just -- you just can't

04:18:58   11   tell me yes or no with certainty whether anyone from

04:19:01   12   Project D attended that meeting, right?

04:19:03   13   A.  I wasn't physically there, so I cannot tell you.  But

04:19:13   14   the email expose that, only Project B did.

04:19:22   15   Q.  And you think there were only about six or seven people

04:19:25   16   at that meeting, right?

04:19:27   17   A.  Roughly, yes.

04:19:28   18   Q.  Do you know how many people were on the Project B team?

04:19:32   19   A.  At the time, it was over a hundred.

04:19:38   20   Q.  And Project D only had about a handful, right?

04:19:47   21   A.  Less than five as of December 2011.

04:19:52   22          (Videoclip ends.)

04:19:56   23          THE COURT:  Does that complete this witness by

04:19:58   24   deposition, counsel?

04:19:59   25          MR. LAMBRIANAKOS:  Yes, Your Honor.

04:20:00  1          THE COURT:  All right.  Ladies and gentlemen,

04:20:03  2  before we proceed with the next Plaintiff's witness, we're

04:20:06  3  going to take a short recess.

04:20:08  4          If you will simply leave your notebooks closed and

04:20:11  5  in your chairs, follow all the instructions I've given you

04:20:15  6  about your conduct, including not to discuss the case with

04:20:17  7  each other, we'll try to make this relatively short,

04:20:21  8  approximately 10 minutes, and we'll be back to proceed with

04:20:24  9  the Plaintiff's next witness at that time.

04:20:25  10          With those instructions, the jury is excused for

04:20:28  11  recess.

04:20:28  12          COURT SECURITY OFFICER:  All rise.

04:20:29  13          (Jury out.)

04:20:56  14          THE COURT:  Be seated, please.

04:20:56  15          Plaintiff, who will your next witness be?

04:21:01  16          MR. FABRICANT:  Your Honor, we have additional

04:21:03  17  video depositions today.  Mr. Lambrianakos has the times of

04:21:09  18  those depositions.

04:21:10  19          THE COURT:  Tell me what those are.  I'd like to

04:21:13  20  get some idea of what we have for the rest of the day.

04:21:15  21          MR. FABRICANT:  Yes, sir.

04:21:16  22          THE COURT:  When -- when do you expect your

04:21:18  23  expert, Mr. Alexander [sic] to go on?

04:21:21  24          MR. FABRICANT:  Your Honor, in light of the time

04:21:22  25  and the deposition videos that we have, we would intend to

| | | |
|---|---|---|
| 04:21:26 | 1 | start Mr. McAlexander first thing Monday. |
| 04:21:29 | 2 | THE COURT:  All right.  Let me hear about the |
| 04:21:31 | 3 | remaining witnesses by deposition. |
| 04:21:34 | 4 | MR. LAMBRIANAKOS:  Your Honor, we have Amit |
| 04:21:37 | 5 | Chhetri for approximately 27 minutes; Mr. Wai Chu for |
| 04:21:41 | 6 | approximately 13 minutes; Mr. Carlo Murgia for |
| 04:21:49 | 7 | approximately 13 minutes; and Mr. Philip Hilmes for |
| 04:21:54 | 8 | approximately 18 minutes.  Approximately an hour and 10 |
| 04:22:00 | 9 | minutes total, Your Honor. |
| 04:22:01 | 10 | THE COURT:  I get an hour and 11.  Okay. |
| 04:22:09 | 11 | All right.  That tells me what I need to know. |
| 04:22:11 | 12 | We'll take a short recess, and then we'll return. |
| 04:22:13 | 13 | The Court stands in recess. |
| 04:22:15 | 14 | COURT SECURITY OFFICER:  All rise. |
| 04:46:29 | 15 | (Recess.) |
| 04:47:03 | 16 | (Jury out.) |
| 04:47:03 | 17 | COURT SECURITY OFFICER:  All rise. |
| 04:47:06 | 18 | THE COURT:  Be seated, please. |
| 04:47:07 | 19 | Mr. Rubino, do I understand you're going to |
| 04:47:19 | 20 | directly examine the next witness? |
| 04:47:21 | 21 | MR. RUBINO:  Yes, Your Honor. |
| 04:47:22 | 22 | THE COURT:  You may go to the podium and set up. |
| 04:47:24 | 23 | If there are binders to pass out, let's get those |
| 04:47:29 | 24 | done. |
| 04:47:29 | 25 | And in the meantime, let's bring in the jury. |

534

| | | |
|---|---|---|
| 04:47:33 | 1 | COURT SECURITY OFFICER:  All rise. |
| 04:47:34 | 2 | (Jury in.) |
| 04:48:03 | 3 | THE COURT:  Please be seated. |
| 04:48:04 | 4 | Plaintiff, call your next witness. |
| 04:48:09 | 5 | MR. RUBINO:  Your Honor, Plaintiff's next witness, |
| 04:48:13 | 6 | we call Mr. Joseph McAlexander. |
| 04:48:15 | 7 | THE COURT:  All right.  Mr. McAlexander, if you'll |
| 04:48:18 | 8 | come forward and be sworn, please. |
| 04:48:34 | 9 | COURTROOM DEPUTY:  Right here, sir. |
| 04:48:35 | 10 | (Witness sworn.) |
| 04:48:42 | 11 | THE COURT:  Please come around, sir.  Have a seat |
| 04:48:46 | 12 | here at the witness stand. |
| 04:48:58 | 13 | Mr. Rubino, you may proceed with your direct |
| 04:49:01 | 14 | examination whenever you're ready. |
| 04:49:05 | 15 | MR. RUBINO:  Thank you. |
| 04:49:05 | 16 | JOSEPH C. MCALEXANDER, III, PLAINTIFF'S WITNESS, SWORN |
| 04:49:05 | 17 | DIRECT EXAMINATION |
| 04:49:10 | 18 | BY MR. RUBINO: |
| 04:49:10 | 19 | Q.  Good afternoon.  Can you please state your name for the |
| 04:49:14 | 20 | record? |
| 04:49:14 | 21 | A.  Joseph Colby McAlexander. |
| 04:49:16 | 22 | Q.  And, Mr. McAlexander, who's retained you in this |
| 04:49:19 | 23 | matter? |
| 04:49:20 | 24 | A.  I've been retained by Fabricant on behalf of the |
| 04:49:24 | 25 | Plaintiff. |

04:49:24  1   Q.   Are you being compensated for your work in this case,

04:49:29  2   sir?

04:49:29  3   A.   Yes, I am.

04:49:29  4   Q.   How are you compensated?

04:49:31  5   A.   Compensated at the rate of $575.00 an hour.

04:49:34  6   Q.   Could you please tell us and the jury a little bit

04:49:41  7   about yourself, apart from testifying as a technical

04:49:45  8   expert?

04:49:45  9   A.   Certainly.  I live north of Dallas, about 50 miles.  My

04:49:49  10  wife and I have a small ranch there that we are state

04:49:54  11  certified to work with equine therapy and personal

04:49:57  12  development of wellness.

04:49:58  13       And apart from that, I have two sons, one who

04:50:03  14  works with me, my youngest.  My oldest son is -- as of 30

04:50:09  15  minutes ago, has retired after 25 years as a commander in

04:50:13  16  the Navy, now looking for a job.

04:50:18  17       I have been involved in the electronics industry

04:50:21  18  since 1972, after serving three years in the military as an

04:50:25  19  Army captain.

04:50:26  20       And my career basically was 1972 to 1986 as a

04:50:34  21  designer and manager of -- at Texas Instruments.

04:50:39  22       And I spent another four or five years as the vice

04:50:44  23  president of technology for a service company working on

04:50:46  24  testing and evaluation of reliability assessments,

04:50:52  25  components, processors, that type.

04:50:55   1          And around -- around 1991 to 2002, I was the

04:51:03   2    technical manager of a company working in license and

04:51:06   3    litigation with regard to patents, doing quite a bit of

04:51:08   4    forensic analysis and evaluations, competitive analyses.

04:51:13   5          And since 2002, I've been president of my own

04:51:16   6    company.  I've been working as a consultant in the

04:51:20   7    business.

04:51:21   8    Q.   Do you have any degrees?

04:51:22   9    A.   Yes, I have a Bachelor of Science in electrical

04:51:26   10   engineering.

04:51:26   11   Q.   Where did you receive your Bachelor of Science from?

04:51:31   12   A.   That was from North Carolina State University.

04:51:33   13   Q.   And in retaining you for this case, what did

04:51:41   14   Plaintiff's counsel ask you to do?

04:51:43   15   A.   Plaintiff's counsel asked me to review the '049 patent,

04:51:50   16   the prosecution history, any communication that was between

04:51:53   17   the patentee and the -- and the Patent Office.

04:51:59   18          And to also purchase and evaluate some of the

04:52:01   19   accused products and render an opinion as to the -- the

04:52:08   20   validity of the patent, as well as whether or not any of

04:52:11   21   the accused products infringe the claims.

04:52:13   22   Q.   At a very high level, what did you do -- what steps did

04:52:17   23   you take in conducting your analysis?

04:52:19   24   A.   In conducting the analysis, at a high level, I first

04:52:23   25   acquired the patent, went through the patent in its

04:52:26  1  entirety, became familiar with the claims, became aware of

04:52:30  2  some of the terms and what they might mean.  I adopted the

04:52:33  3  Court's construction for the claim terms, and then I

04:52:37  4  applied those claim terms to the products.

04:52:41  5      In terms of the products, I purchased each one of

04:52:44  6  the accused products.  I analyzed the products, not only

04:52:50  7  externally, but I took them apart.  I made sure that I

04:52:53  8  understood -- stood exactly what the structural components

04:52:58  9  were within the -- within the system itself, each one of

04:53:01  10  the accused products.

04:53:02  11      I further evaluated a number of documents that

04:53:04  12  have been produced in this case by both the Plaintiff and

04:53:07  13  the Defendant.  Did a number of website searches.

04:53:12  14      When I identified products -- components that were

04:53:15  15  inside of the com -- inside of the accused products, such

04:53:19  16  as a processor, I then acquired the data sheets on those

04:53:24  17  processors.  This is what the manufacturer of the

04:53:26  18  particular processor tells the public about how that system

04:53:29  19  operates.  That's generally what I did.

04:53:37  20      MR. RUBINO:  Could we please put up Plaintiff's 1,

04:53:41  21  please?

04:53:41  22  Q.  (By Mr. Rubino)  Do you recognize this document, sir?

04:53:43  23  A.  Yes.  This is the reissued patent, RE47,049.  I'll

04:53:49  24  refer to it as the '049 patent.

04:53:51  25  Q.  And, again, at a high level, what you were analyzing in

04:53:55  1  this patent?

04:53:56  2  A.  At a high level, I -- I reviewed the patent itself --

04:54:00  3  at a very high level, first of all, identifying the patent

04:54:03  4  number and the date that it issued, which was September

04:54:06  5  18th, 2018.

04:54:07  6      Also noted that the inventors were two inventors,

04:54:13  7  Zhu and Dr. Li.

04:54:15  8      And I also identified the assignee of the patent

04:54:19  9  was Li Creative Technologies.

04:54:19  10      I also noticed on the front page of the patents a

04:54:22  11  number of other items, such as the reissue date, and,

04:54:26  12  specifically, the provisional application filing date of

04:54:37  13  September 24th, 2010.

04:54:38  14  Q.  Would any demonstrative materials assist you in your

04:54:42  15  presentation today?

04:54:42  16  A.  Yes.  I had put together some demonstratives that I

04:54:48  17  believe will be clearly delineating what I have found in my

04:54:49  18  assessment of the case, and I believe they will help serve

04:54:52  19  the jury to walk through these, rather than doing it at a

04:54:55  20  high level.

04:54:55  21  Q.  So you -- you briefly touched on, I think, the college

04:55:03  22  degree.  But can you please state more fully your

04:55:07  23  experience and qualification to testify here today?

04:55:12  24  A.  Yes.  I started my career in the electronics business

04:55:16  25  about 48 years ago.  I have been an integrated circuit

04:55:23    1    designer.  So I have designed different types of memory

04:55:26    2    components that go into major systems both in computer

04:55:32    3    service and notebook computers.

04:55:35    4         I've designed chips that go into -- to

04:55:39    5    smartphones.  And with the -- within the construct of

04:55:45    6    integrated circuit design, I've designed such things as

04:55:50    7    detectors, sense amplifiers, address buffers for the

04:55:56    8    purposes of addressing certain features or segments of a

04:56:00    9    device, input/output profits for data collection.

04:56:06   10         I have designed voltage regulators, products that

04:56:09   11    are called level shifters that will lower the voltage or

04:56:14   12    level the voltage up when they go into different

04:56:17   13    components.  Timing -- timing circuits, delay circuits.

04:56:26   14    Most of these types of circuits go into digital signal

04:56:29   15    processors.  And so that's my design experience.

04:56:34   16         I've also designed from a forensic standpoint,

04:56:39   17    scanning microscopy and inductively coupled plasma for

04:56:43   18    chemical -- and both physical and chemical analyses of

04:56:45   19    products.

04:56:45   20         In my design of integrated circuits, I've worked

04:56:51   21    closely with the fabrication process.  In fact, managed the

04:56:55   22    quality or reliability organization for an integrated

04:56:58   23    circuit fab -- fabrication facility where the actual

04:57:02   24    creation of the circuits occur.

04:57:03   25         I have also managed for three years the back end,

04:57:06  1  which is the assembly and the test and the deliverables to

04:57:09  2  clients.

04:57:10  3          So my experience with components that go into

04:57:14  4  computer systems is all the way from initial design to

04:57:18  5  system implementation at a customer's house.

04:57:27  6  Q.  You heard some of the testimony that was said in court

04:57:30  7  today, right, sir?

04:57:31  8  A.  Yes, I have.

04:57:32  9  Q.  And you heard someone say the word "source code" at

04:57:35  10  some point, right?

04:57:36  11  A.  That's correct.

04:57:37  12  Q.  Can you speak a little bit to whether you have any

04:57:40  13  experience with source code?

04:57:41  14  A.  Yes.  Source code, as a general term, is typically used

04:57:48  15  in regards to what a particular creator of a program will

04:57:54  16  initiate on a computer.  So they have a human-readable

04:57:58  17  input using a particular type of programming language.  And

04:58:01  18  they will develop the code.  That's called source code.

04:58:05  19          Sometimes it is used to refer to the code that's

04:58:08  20  actually implemented into a component that's in a system.

04:58:15  21  Most -- most people refer to that as firmware, rather than

04:58:19  22  source code, but, in general, they're the same.

04:58:20  23          The source code that's in human-readable language

04:58:24  24  is then compiled in a -- into a different language of logic

04:58:29  25  0s and 1s -- in other words, high/low values.  But just

04:58:33  1  two -- two states, but it's compiled in a way that the

04:58:36  2  computer systems understand.

04:58:37  3          And it is these values of 0 and 1 that are then

04:58:41  4  actually programmed into the device, and that provides what

04:58:45  5  I call the instruction set by which the device operates.

04:58:50  6          So it originally starts from a human-readable

04:58:53  7  source code that's compiled into human-readable -- into

04:58:56  8  machine language, and then programmed into the device.

04:58:59  9          I've had experience in the designing and the

04:59:03  10  implementation, the programming, and I've also had a lot of

04:59:07  11  experience in actually going into an already completed

04:59:10  12  product, do what's called reverse engineering and -- and

04:59:14  13  define what the code originally was.

04:59:20  14  Q.  And so do you -- do you have any experience reading

04:59:23  15  code?

04:59:23  16  A.  Yes.  As a consultant, I have been retained by a number

04:59:29  17  of different clients for evaluation of code, comparison of

04:59:36  18  code.  Between different facilities, I've actually done a

04:59:39  19  study at one time on comparing what was considered to be

04:59:42  20  clean-room code to ensure that it actually was behind

04:59:45  21  closed doors and it was not contaminated.

04:59:48  22          And when it comes to litigation cases, I --

04:59:55  23  it's -- it's very typical to have code that's been

04:59:58  24  available -- made available that identifies how certain

05:00:01  25  components work, and I'm -- I have spent many, many cases

05:00:05  1   reading code to evaluate exactly what that code says and

05:00:07  2   how it operates.

05:00:10  3   Q.  Do you have any teaching experience, sir?

05:00:13  4   A.  I do not have academic teaching experience in a

05:00:16  5   university, but as a -- as an engineer, in three or four of

05:00:23  6   the companies that I have managed or operated in, I've

05:00:25  7   actually taught solid state physics.  I have taught -- I

05:00:31  8   have taught statistical control.  I've -- I've also taught

05:00:35  9   integrated circuit design, as well as integrated circuit

05:00:38  10  fabrication.

05:00:39  11         So -- and -- and, lastly, assembly and test.  So

05:00:42  12  I've actually instructed the internal engineers both here

05:00:45  13  and overseas in Asia on various techniques that are

05:00:50  14  required in order for them to do their job correctly.

05:00:53  15         So the -- the teaching I have done has been

05:00:55  16  internal to organizations.

05:00:57  17  Q.  Can you speak to any other experience you have serving

05:01:07  18  as an expert witness?

05:01:08  19  A.  Well, I -- I am a registered professional engineer in

05:01:13  20  electrical engineering in the State of Texas.  In terms of

05:01:16  21  professional experience, I have been retained in a number

05:01:20  22  of cases.  I've testified 50 or 60 times in court.  My

05:01:28  23  experience has covered a number of different areas,

05:01:32  24  including audio, when it comes to sound as it applies to

05:01:37  25  entertainment.

| | | |
|---|---|---|
| 05:01:38 | 1 | I've also provided testimony with regard to the |
| 05:01:44 | 2 | integration of -- of devices such as smartphones and |
| 05:01:49 | 3 | automobiles, using both Bluetooth or WiFi or hardwire |
| 05:01:56 | 4 | connection. |
| 05:01:57 | 5 | I've testified in a number of cases that go to |
| 05:01:59 | 6 | protocol for communication -- data communication both in |
| 05:02:05 | 7 | wired, as well as wireless. |
| 05:02:10 | 8 | My testimony has also been on a number of cases |
| 05:02:13 | 9 | that involve audio transmission underwater.  I represented |
| 05:02:18 | 10 | one client for underwater communication. |
| 05:02:22 | 11 | And I also worked for about 12 years with a |
| 05:02:25 | 12 | company that -- that actually designed underwater dive |
| 05:02:30 | 13 | computers, and we investigated and actually instantiated |
| 05:02:34 | 14 | the ability to do voice underwater with that, as well. |
| 05:02:38 | 15 | Q.  And do you consider -- consider yourself to be an |
| 05:02:44 | 16 | expert in any field, sir? |
| 05:02:45 | 17 | A.  Yes, certainly that involving electric and |
| 05:02:53 | 18 | electromechanical.  But more specifically, my -- my company |
| 05:02:55 | 19 | started in 1988 in designing sound systems.  And so when it |
| 05:03:03 | 20 | comes to the -- the area of -- of acoustics, I do have |
| 05:03:06 | 21 | expertise in that. |
| 05:03:12 | 22 | MR. RUBINO:  At this time, Plaintiff offers Joseph |
| 05:03:16 | 23 | C. McAlexander as an expert witness in the area of acoustic |
| 05:03:17 | 24 | systems implementations. |
| 05:03:18 | 25 | THE COURT:  Is there objection? |

05:03:19  1          MR. HADDEN:  No, Your Honor.

05:03:19  2          THE COURT:  Without objection, the Court will

05:03:22  3    recognize this witness as an expert in the designated

05:03:26  4    field.

05:03:26  5          Please continue, Mr. Rubino.

05:03:29  6    Q.  (By Mr. Rubino)  Sir, what material have you considered

05:03:34  7    in preparation for your testimony?

05:03:37  8    A.  I've considered the '049 patent, the prosecution

05:03:43  9    history -- again, the communication between the patentee

05:03:45  10   and the Patent Office.

05:03:50  11         I have considered documents that have been

05:03:51  12   produced by both the Plaintiff and the Defendant in this

05:03:55  13   matter, specifically documents pertaining to the accused

05:03:59  14   Amazon products.

05:04:03  15         I have also considered website information that is

05:04:06  16   publicly available concerning the accused products.  I have

05:04:11  17   also considered the Court's claim construction and adopted

05:04:14  18   that as I've applied it to the accused products.  I've also

05:04:19  19   looked at deposition testimony.  I've also been present

05:04:28  20   listening to the deposition transcripts being played today.

05:04:31  21         In addition to that, I have also looked at a

05:04:33  22   number of different manuals in the area of -- of acoustics,

05:04:39  23   as -- as it is in preparation for this matter.

05:04:43  24         I've also looked at source code that's been

05:04:45  25   produced in this case.  And the source code is relevant to

05:04:53   1   each one of the accused products.

05:04:54   2   Q.  So with regard to the patent, what parts of the patent

05:04:56   3   did you review?

05:04:57   4   A.  How about all of it.

05:05:00   5   Q.  Have you heard of something called the prosecution

05:05:03   6   history or file history?

05:05:04   7   A.  Yes.  I've reviewed the patent, but I've also reviewed

05:05:08   8   what I indicated as the prosecution history.  And that is

05:05:10   9   the file -- it's sometimes referred to as the file wrapper,

05:05:13   10  but it's -- it's what the Patent Office retains on file

05:05:16   11  that marks all of the communication and all the

05:05:19   12  documentation that has transpired between the patent owner

05:05:23   13  and the Patent Office.

05:05:24   14  Q.  And you've reviewed that full record?

05:05:28   15  A.  Yes, I have.

05:05:28   16  Q.  Now, regarding Amazon's products, have you looked at

05:05:38   17  any physical products?

05:05:39   18  A.  Yes, I have looked at physical products.  I actually

05:05:43   19  procured physical products, photographed them, and actually

05:05:47   20  took every one of them apart.

05:05:48   21  Q.  Aside from investigating physical products, have you

05:05:51   22  looked at Amazon documents?

05:05:53   23  A.  Yes.  Amazon produced a number of documents in this

05:05:58   24  case relevant to the particular products that have been

05:06:02   25  accused.  And so I have -- yes, I have reviewed those.

05:06:06   1   Q.   So other than the source code, what types of documents

05:06:12   2   are those, sir?

05:06:13   3   A.   The documents include emails -- you said other than

05:06:23   4   source code?

05:06:24   5   Q.   Yes, sir.

05:06:24   6   A.   Email.   There are documents that I would put in the

05:06:30   7   category of marketing material, publicly-applied or

05:06:35   8   available material, that describes the particular items

05:06:39   9   that are accused.

05:06:43   10          I've looked at website information generally,

05:06:45   11   which overviews some of the technology.   I've looked at

05:06:49   12   publications by some of the Amazon employees that are

05:06:54   13   directed specifically to some of these accused products or

05:06:58   14   the way in which they operate.

05:07:06   15   Q.   And with regard to the source code, how did you look at

05:07:11   16   that source code?

05:07:13   17   A.   The source code was produced on a stand-alone computer

05:07:16   18   in a secure area.   And it is -- it was not produced as an

05:07:23   19   executable code, but it was produced in different files,

05:07:25   20   much like when you go into Windows and you look at Explorer

05:07:29   21   and you can look at the different file structure.   And they

05:07:32   22   were produced in two separate folders because there's two

05:07:36   23   different types of code.

05:07:40   24          And so then basically you can just navigate

05:07:43   25   through the tree of the different files in those folders

547

| | | |
|---|---|---|
| 05:07:46 | 1 | and identify how it operates. |
| 05:07:51 | 2 | Q.  And so you said you looked at it on a -- on a secure |
| 05:07:55 | 3 | computer.  Can we look at it here in court? |
| 05:07:58 | 4 | A.  Could.  I would assume so. |
| 05:08:01 | 5 | Q.  So what is it going to look like if we were to take a |
| 05:08:05 | 6 | look at this code in court today? |
| 05:08:07 | 7 | A.  Well, it'd be like looking at an electronic file, |
| 05:08:12 | 8 | but -- but as a part of my evaluation, I was permitted to |
| 05:08:15 | 9 | print -- or request print of some of the files and some |
| 05:08:19 | 10 | portions of the files.  And that's what I actually operated |
| 05:08:22 | 11 | off of after I reviewed the code on the electronic version. |
| 05:08:26 | 12 | Q.  And you said you -- you looked at a ruling called a |
| 05:08:39 | 13 | claim construction ruling.  What is that, sir, at a high |
| 05:08:45 | 14 | level? |
| 05:08:45 | 15 | A.  At a high level, the -- the -- there's two steps of the |
| 05:08:48 | 16 | process of asserting a claimed invention against a product |
| 05:08:53 | 17 | to determine whether that product practices that invention. |
| 05:08:56 | 18 |       The first step is proper construction of the |
| 05:08:58 | 19 | claims, construing the claim terms.  And so certain terms |
| 05:09:02 | 20 | were construed by the -- by this Court and provided in a |
| 05:09:07 | 21 | claim construction order.  And -- and I adopted those claim |
| 05:09:11 | 22 | constructions in my analysis as I then applied it against |
| 05:09:14 | 23 | the accused products. |
| 05:09:15 | 24 | Q.  Did you apply any other legal standards in your |
| 05:09:28 | 25 | analysis? |

05:09:29  1   A.   I -- I was informed of legal standards that would be

05:09:34  2   pertinent to this matter, specifically legal standards with

05:09:38  3   regard to infringement and specifically as it -- as it

05:09:44  4   revolved around direct and indirect infringement.

05:09:46  5   Q.   So when you're analyzing these claims of infringement,

05:09:55  6   is there a perspective you're supposed to take?

05:09:58  7   A.   Yes.  Analyzing the patent claims is supposed to be

05:10:04  8   done not through the eyes of an expert, not even through

05:10:08  9   the eyes of an attorney, but to be done through the eyes of

05:10:11  10  what is termed to be a person of ordinary skill in the art.

05:10:16  11        So it's important to identify at the time of the

05:10:18  12  invention who this person is.  And based upon that, then

05:10:23  13  the evaluation in terms of the way the patent claims are

05:10:26  14  applied is through the eyes of that person.

05:10:28  15  Q.   What factors did you consider when determining who this

05:10:34  16  person of ordinary skill is?

05:10:36  17  A.   There's a number of factors I considered.  It included

05:10:39  18  the education level of people in the industry at that time

05:10:44  19  in that particular field.  Considered the sophistication of

05:10:47  20  the technology that was at issue there.

05:10:51  21        Also considered the types of problems that were

05:10:54  22  available or apparent at that time and the solutions that

05:10:57  23  people were coming up with at that time.

05:11:01  24        And, lastly, as I recall, considered the speed at

05:11:05  25  which innovations were actually taking place at that time.

05:11:07  1        So these are the primary things -- five factors I

05:11:09  2  went through.

05:11:10  3  Q.  And what's the relevant time period for this person of

05:11:15  4  skill in the art?

05:11:15  5  A.  Around September 24th, 2010, the time of the invention.

05:11:19  6  Q.  And so after analyzing these factors, have you made any

05:11:24  7  conclusion regarding who this person of ordinary skill in

05:11:29  8  the art is, what qualifications they may have?

05:11:34  9  A.  Yes.  I concluded, based upon evaluating those factors,

05:11:38  10  that the person of skill in the art -- ordinary skill in

05:11:42  11  the art at the time of the invention would be a person who

05:11:44  12  would have a Bachelor of Science degree in electrical

05:11:47  13  engineering, or equivalent, and several years of working in

05:11:49  14  the field, either implementing or designing acoustic-type

05:11:55  15  systems.

05:11:57  16  Q.  So regarding the legal standards you referred to a few

05:12:05  17  minutes ago, what is your understanding of how a party can

05:12:07  18  infringe a patent?

05:12:12  19  A.  My understanding from my tech -- it's my technical view

05:12:16  20  on this, but my understanding is anyone who makes, sells,

05:12:20  21  offers to sell, uses in the United States a patented

05:12:25  22  invention or someone who imports a patented invention is

05:12:30  23  deemed to be an infringer.

05:12:32  24  Q.  So, in your analysis, did you consider different types

05:12:48  25  of patent infringement?

| | | |
|---|---|---|
| 05:12:49 | 1 | A.  Yes, I did. |
| 05:12:50 | 2 | Q.  What types of patent infringement did you consider, |
| 05:12:52 | 3 | sir? |
| 05:12:52 | 4 | A.  I considered two types, direct infringement and |
| 05:12:57 | 5 | indirect infringement. |
| 05:12:58 | 6 | Q.  So what is your understanding of those two types of |
| 05:13:04 | 7 | infringement that you analyzed? |
| 05:13:05 | 8 | A.  Direct infringement, as I understand, is when a |
| 05:13:08 | 9 | particular entity creates a product, makes a product, |
| 05:13:17 | 10 | offers to sell a product, sells the product, uses the |
| 05:13:20 | 11 | product, or imports the product.  That person is deemed to |
| 05:13:23 | 12 | be -- that person or entity is deemed to be an infringer |
| 05:13:27 | 13 | directly if -- if by such an act each one of the |
| 05:13:32 | 14 | elements/limitations of a claim are practiced. |
| 05:13:35 | 15 | So if you -- if that person or entity practices |
| 05:13:38 | 16 | all of a claim, then that is -- that is to my understanding |
| 05:13:40 | 17 | to be a direct infringer. |
| 05:13:41 | 18 | Q.  What understanding did you apply for indirect |
| 05:13:50 | 19 | infringement? |
| 05:13:50 | 20 | A.  My understanding for indirect infringement is that |
| 05:13:53 | 21 | there has to be still a determination of a direct |
| 05:13:56 | 22 | infringer. |
| 05:13:57 | 23 | And then for indirect, it's -- it's whether a |
| 05:14:03 | 24 | particular party has induced or contributed to infringement |
| 05:14:06 | 25 | such that that other party does infringe.  So that would be |

| | | |
|---|---|---|
| 05:14:12 | 1 | indirect infringement. |
| 05:14:13 | 2 | Q.  At a high level, what were the conclusions that you |
| 05:14:19 | 3 | came to here? |
| 05:14:20 | 4 | A.  At a high level, I came to the conclusion that the end |
| 05:14:23 | 5 | user or customer of Amazon that purchases a system |
| 05:14:31 | 6 | infringes that -- infringes the asserted claims of the |
| 05:14:34 | 7 | patent in this case directly when they use that system. |
| 05:14:39 | 8 | I also came to the conclusion that Amazon |
| 05:14:44 | 9 | indirectly infringes by inducing or contributing to |
| 05:14:47 | 10 | infringement with that end user. |
| 05:14:50 | 11 | MR. RUBINO:  May we please have PTX-1? |
| 05:14:54 | 12 | Q.  (By Mr. Rubino)  Sir, can you please explain the -- to |
| 05:15:10 | 13 | the jury the parts of a U.S. patent? |
| 05:15:14 | 14 | A.  Certainly. |
| 05:15:15 | 15 | Q.  Do you have any demonstratives on this? |
| 05:15:16 | 16 | A.  I do have some demonstratives that I have produced that |
| 05:15:19 | 17 | I think would help us to navigate through this easier than |
| 05:15:28 | 18 | me drawing it on the screen. |
| 05:15:34 | 19 | So if I can step through this.  On the -- on the |
| 05:15:38 | 20 | front of the patent, sometimes referred to as the face |
| 05:15:41 | 21 | page, and in the patent, you'll notice that the -- the |
| 05:15:47 | 22 | patent number that's been assigned by the Patent Office and |
| 05:15:49 | 23 | the issue date is in the upper right corner. |
| 05:15:55 | 24 | You can also tell that in the upper left corner is |
| 05:15:58 | 25 | the name of the primary inventor. |

05:16:00   1    And then several lines down on the left side is a

05:16:03   2    section called the inventors.  And that's where the

05:16:06   3    identification of the two inventors is identified -- is

05:16:09   4    made.

05:16:10   5    And then further down in the left column, there is

05:16:16   6    a statement that's -- that tells you when the patent

05:16:18   7    application was filed and that it depends from a

05:16:22   8    provisional application called the '952 that was filed on

05:16:27   9    September 24th, 2010.  And that would be the date -- the

05:16:32   10   effective date of the patent as far as the invention is

05:16:35   11   concerned, September 24th, 2010.  So that's on the first

05:16:38   12   page.

05:16:38   13   Also on the first page is another section -- if I

05:16:43   14   can have the next slide -- that's called the abstract of

05:16:46   15   the invention.

05:16:48   16   And in the abstract of the invention, the inventor

05:16:50   17   sets forth in general terms at a high level the field and

05:16:55   18   the scope of the invention itself.  And you'll also notice

05:17:01   19   that on the first page, there are references cited.

05:17:04   20   I heard Dr. Zhu allude to this earlier, that these

05:17:10   21   are references that were either provided by the patentee or

05:17:13   22   by the examiner at the Patent Office.

05:17:15   23   And this is a list of the references that were

05:17:18   24   considered when the Patent Office was reviewing this

05:17:21   25   particular application for issuance.

05:17:23  1          Also, notice at the bottom of the abstract, it

05:17:28  2  identifies on the face page that at the back of the patent,

05:17:33  3  there will be 35 claims -- 35 separate claimed inventions,

05:17:37  4  and that there is also an indication that there are 34

05:17:41  5  drawing sheets.

05:17:42  6          So if we can go to the next slide.

05:17:44  7          This is an example of one of the drawing sheets.

05:17:48  8  This is Figure 3 out of the patent, several pages back

05:17:52  9  in -- in -- from the face page.

05:17:53 10          And this is where the inventor for a number of

05:17:55 11  different figures begins to set forth in an illustrative --

05:18:00 12  illustrative manner what the invention is about.  And these

05:18:04 13  are illustrations of the invention.  They're sometimes

05:18:07 14  called embodiments.

05:18:10 15          And -- and basically one looks at this and

05:18:12 16  understands that this is the patentee attempting to give at

05:18:15 17  least some illustration of at least one way in which the

05:18:18 18  invention can be put into practice.

05:18:24 19          So as -- as we go through the patent further in

05:18:28 20  more detail -- I'll go through later, but you'll notice

05:18:30 21  that, for instance, this particular figure is about a

05:18:34 22  microphone array.  The microphones are labeled as $M_1$, $M_0$,

05:18:38 23  $M_3$, and $M_2$.  And these are located in a circular pattern.

05:18:42 24          So the configuration is a circular array of four

05:18:46 25  microphones.

05:18:46  1           Okay.  If we go to the next slide.

05:18:53  2  Q.  Thank you, sir.

05:18:54  3           And after the drawing sheets, what comes after

05:18:57  4  that?

05:18:57  5  A.  All right.  If we can go to the next slide after the

05:19:01  6  drawing sheets.

05:19:02  7           It becomes -- we get to what's called the written

05:19:05  8  description part of the patent.  What I've highlighted here

05:19:11  9  is the detailed description of the invention.  There's also

05:19:15  10  a background section, a summary of the invention, and then

05:19:18  11  it goes into the detailed description of the invention.

05:19:20  12           This is where the inventor begins to set forth the

05:19:23  13  ground rules for his -- for his invention.  He sets -- sets

05:19:26  14  in motion what that is, generally.

05:19:30  15           You can see in this particular instance, he's

05:19:32  16  referring to one of the figures, Figure 1 in the patent.

05:19:35  17           And so when he goes to that, he is basically doing

05:19:38  18  a write-up, a written description of the -- that

05:19:42  19  corresponds with the figures.

05:19:43  20           And you'll go through the specification all the

05:19:48  21  way to Column 21, and -- and that basically -- he takes

05:19:51  22  figure-by-figure and goes through a written description

05:19:54  23  about that.

05:19:54  24           Next slide.

05:20:01  25           So at the back of the patent, we get to the next

555

05:20:04  1  section, and it's called the claims.  This is where the

05:20:07  2  inventor sets forth the actual invention, because each

05:20:13  3  claim is an invention.

05:20:16  4       And here I have with this demonstrative brought up

05:20:19  5  an expanded version of Claim 1 of the patent.  And you'll

05:20:25  6  notice that it starts at the back of the patent -- patent

05:20:29  7  specification with the words "we claim," and then it shows

05:20:33  8  Claim 1.  And we'll go through this in some detail later.

05:20:37  9       So this is the construct of the patent.  It starts

05:20:40  10  with the face page, followed by illustrations or drawings,

05:20:44  11  followed by written description, and ends with the claims.

05:20:49  12  Q.  Thank you, sir.

05:20:50  13       MR. RUBINO:  Can we call up PTX-1 again?  Claim 1,

05:21:17  14  please.  Can you zoom out, please, Mr. Thompson.  Thank

05:21:20  15  you.

05:21:20  16  Q.  (By Mr. Rubino)  Mr. McAlexander, are there different

05:21:22  17  types of claims?

05:21:23  18  A.  Yes, there are.  There are two different types of

05:21:25  19  claims, at a high level.  One is called an independent

05:21:29  20  claim and the other is called a dependent claim.

05:21:31  21  Q.  Do we have any of either of those types here?

05:21:33  22  A.  Yes, there are two patent claims that are at issue in

05:21:36  23  this particular case, Claim 1 and Claim 8.  Claim 1 is an

05:21:39  24  independent claim.  Claim 8 is a dependent claim.

05:21:43  25  Q.  And what makes a claim independent versus dependent?

05:21:49  1  A.  If I can have maybe enlarged just the preamble of

05:21:54  2  Claim 1, and then also Claim 8.

05:21:57  3       Okay.  So if we look at Claim 1, Claim 1 is an

05:22:16  4  independent claim, which means it stands on its own.  It

05:22:19  5  depends on nothing else.  And you'll see that the preamble,

05:22:21  6  the first part of that claim, reads:  A method for

05:22:25  7  enhancing a target sound signal from a plurality of sound

05:22:29  8  signals.

05:22:29  9       This is the introduction to the claim, and it

05:22:33  10 depends on nothing else.  It's called an independent claim.

05:22:36  11      However, if you look at Claim 8 below, it says:

05:22:40  12 The method of Claim 1.

05:22:44  13      So that's a dependent claim.  And when it says a

05:22:48  14 method of Claim 1, that means that for a person or an

05:22:51  15 entity to practice Claim 8, we must -- I must be able to

05:22:55  16 find everything that's in Claim 1 plus the additional

05:22:58  17 requirement of Claim 8.

05:23:00  18      So the dependent claim requires everything from

05:23:03  19 the independent claim plus the additional requirements of

05:23:06  20 the dependent claim.

05:23:08  21 Q.  Thank you, sir.

05:23:17  22      Can you provide the jury with a high-level

05:23:19  23 overview of the patented technology?

05:23:21  24 A.  Yes.  The patented technology from the reissued patent

05:23:28  25 generally is -- is deriving toward what I'll call the front

05:23:35    1    end of -- of a particular process.

05:23:38    2            In order for a system to properly exercise when

05:23:44    3    it's voice actuated, there must be some mechanism by which

05:23:50    4    it's properly and repetitively being able to understand

05:23:53    5    what is being spoken.  And so that's at the front end.

05:23:58    6            If it cannot understand what's being spoken, it's

05:24:01    7    kind of hard to obey the commands that come from that.  So

05:24:06    8    when the voice command or statement is made, you want to

05:24:08    9    make sure the system properly understands that.

05:24:10   10            So at the front end of this, it's how to make sure

05:24:14   11    that when some word is being spoken that the system is

05:24:21   12    supposed to be tuned into, that it can not only properly

05:24:26   13    hear it, but it can properly hear it every time it's

05:24:29   14    spoken.  As many times as possible.  It's not a perfect

05:24:31   15    world, but we try to be as good as we can.

05:24:35   16            That somehow the system can determine and pick out

05:24:41   17    of all the noise that's in the environment the specific

05:24:43   18    word, so have an ability to know that it is a word spoken

05:24:46   19    from a human being, as compared to just ambient noise.

05:24:51   20            For instance, if we were to be silent here, which

05:24:54   21    I've not had it happen yet in this court, but if we were

05:24:58   22    just to be silent for 10 seconds, you can hear a background

05:25:04   23    hum.  And so that's ambient noise.  It can be from an air

05:25:08   24    conditioning unit.

05:25:10   25            But we may not be able to hear because we don't

05:25:13  1  listen for it is that we have AC current that is used to

05:25:20  2  create the lights, outlets, and it's -- it runs at 60

05:25:24  3  cycles per second.  So it actually has a hum of 60 cycles

05:25:28  4  per second, and that's part of the ambient noise.

05:25:30  5       So that needs -- that noise needs to be canceled

05:25:34  6  when you are looking for -- being able to discriminate the

05:25:38  7  sound that you're looking for, the words that you're

05:25:41  8  looking for.

05:25:42  9       So part of what this invention is talking about is

05:25:44  10  how to best discriminate, pull out, retrieve the spoken

05:25:50  11  word that is -- that is -- that it's looking for.  It's

05:25:55  12  called the target signal.

05:25:56  13       And, secondly, to be able to abate the

05:26:02  14  interference, which could be coming from other factors in

05:26:06  15  the ambient condition.  Could be, as an example, there may

05:26:10  16  be three or four people talking in the room, but you really

05:26:13  17  want to listen to the specific word or command coming from

05:26:18  18  the one person.

05:26:19  19       So being able to get rid of disparate noise and

05:26:23  20  ambient noise, that's the mark of this patent, and it's

05:26:28  21  done in such a way that it can actually be applied across a

05:26:29  22  number of different products.

05:26:30  23  Q.  Why is that important, sir?  You mentioned sound

05:26:34  24  discrimination.  Why is that important?

05:26:36  25  A.  Sound discrimination is very key to this kind of a

05:26:41   1   process because I -- I put myself in as a user.  If -- if

05:26:46   2   I'm working with a system and I want to state something, I

05:26:49   3   want that system to understand it.  If the system comes

05:26:53   4   back with a response that says, huh, it's wasting my time.

05:26:58   5   I want it to be able to correctly discriminate, discern

05:27:02   6   what I am saying the first time and not have to do it again

05:27:06   7   and again and again to where it finally gets it.

05:27:10   8          Secondly, I don't want the system to misunderstand

05:27:12   9   what I'm saying and, therefore, respond in the wrong way.

05:27:16   10  So the clarity of being able to say something and have the

05:27:21   11  system pick it up is very, very vital.  And that's what

05:27:26   12  this invention was directed to.

05:27:27   13  Q.  Can you show me where this is described in the patent?

05:27:31   14         MR. RUBINO:  I think we want Demonstrative 7,

05:27:34   15  Mr. Thompson.

05:27:38   16  A.  There are several things that are discussed in the

05:27:41   17  patent.  What I'm bringing up here, this demonstrative is

05:27:44   18  from Column 1 of the patent.  And, specifically, this is

05:27:47   19  a -- this addresses the issue.

05:27:50   20         And it specifically says:  However, the paradigm

05:27:56   21  of a single microphone often does not work effectively

05:28:00   22  because the microphone picks up many ambient noise signals

05:28:04   23  in addition to the desired sound, specifically when the

05:28:08   24  distance between a user and the microphone is more than a

05:28:11   25  few inches.

05:28:12   1          Let me just elaborate on that a minute.

05:28:16   2          If you are using the voice control for your

05:28:20   3   smartphone, talking to someone or calling up to tell Siri

05:28:25   4   to go somewhere, to look for something, that's very close.

05:28:31   5   And so that's called near-field.  And very close, it's

05:28:34   6   basically the -- the microphones are tuned to something

05:28:38   7   that's very close.  So it automatically segregates out

05:28:42   8   anything that's distant.  It's a very narrow beam.

05:28:47   9          But when you are dealing with something that is

05:28:49  10   far-field, in other words, there's a distance away from the

05:28:53  11   system that's picking up the sound, the microphone, the

05:28:57  12   farther you get away, the more in the environment can

05:29:00  13   affect it.

05:29:01  14          And so in order to properly discriminate something

05:29:04  15   that's far away, there are a lot of different algorithms

05:29:08  16   and things that have to be done in order to account for

05:29:10  17   that.

05:29:11  18          So it's very important that it says the distance

05:29:14  19   between using the microphone only being a few inches,

05:29:19  20   therefore, there's a need for a microphone system that

05:29:21  21   operates under a variety of different ambient noise

05:29:24  22   conditions, and it places fewer constraints on the user

05:29:27  23   with respect to the microphone.

05:29:28  24          For example, you don't want to constrain the --

05:29:32  25   the -- the person that is using this from a distance to

05:29:35  1  only be in a specific space in the room.  You want to be

05:29:38  2  able to have that user to be able to talk to the system

05:29:41  3  from anywhere in the room and even while the user is

05:29:45  4  moving.

05:29:46  5        So this is a very, very important thing to

05:29:49  6  overcome, and this is what the invention does.

05:29:51  7  Q.  (By Mr. Rubino) At a high level, how does the invention

05:29:53  8  solve that problem?

05:29:54  9  A.  I've got another slide here on Column 2 that addresses

05:29:57  10  that directly.  It says beginning Line 5:  The method and

05:30:07  11  system disclosed herein addresses the above stated need for

05:30:10  12  enhancing the acoustics of a target sound signal.

05:30:12  13        It says:  As used herein, the term "target sound

05:30:17  14  signal" refers to a sound signal from a desired or target

05:30:22  15  sound source, for example, a person's speech that needs to

05:30:23  16  be enhanced.

05:30:24  17        So the inventor then in this next sentence says,

05:30:28  18  develops a microphone array system that comprises an array

05:30:32  19  of sound sensors.  In other words, sound sensor can be a

05:30:35  20  microphone positioned in -- in an arbitrary configuration.

05:30:44  21        And it also identifies certain other elements that

05:30:47  22  are claimed, and that's a sound source localization unit,

05:30:49  23  an adaptive beamforming unit, and a noise reduction unit.

05:30:51  24  And I'll get into those in more detail later.

05:30:55  25        But the inventor invented a mechanism that works

05:31:00  1  and cooperates with an array of microphones or sensors that

05:31:06  2  are arranged in some kind of a pattern.

05:31:09  3        And in order to do this, the invention sets --

05:31:11  4  sets forth a way in which the microphone array is arranged

05:31:14  5  in such a way that it can actually, with the signals that

05:31:17  6  it's receiving from the voice that's being spoken, can

05:31:20  7  actually determine the direction from where that sound is

05:31:25  8  coming from and be able to electronically align or steer

05:31:29  9  the microphones to better pick up that particular one

05:31:32  10  and -- and discount the noise that's from the other areas.

05:31:35  11  Q.  Sir, you mentioned some units, noise reduction,

05:31:42  12  beamforming, sound source localization.  Are those in any

05:31:44  13  claims?

05:31:45  14  A.  Yes, in fact, that is -- they are in Claim 1.

05:31:53  15        MR. RUBINO:  If we can go to the next

05:31:55  16  demonstrative, please.

05:31:57  17  Q.  (By Mr. Rubino)  Do you have a better way to look at

05:31:58  18  Claim 1 to make it a little more readable for our -- for

05:32:02  19  our purposes today?

05:32:03  20  A.  Well, I have -- I have taken exactly the words that are

05:32:06  21  shown here that are replicated for Claim 1, and I've

05:32:10  22  created a demonstrative, and I believe it's a little easier

05:32:13  23  to read.

05:32:14  24        MR. RUBINO:  Next demonstrative, please,

05:32:16  25  Mr. Thompson.

05:32:19  1   Q.  (By Mr. Rubino)  Is this the demonstrative you were
05:32:21  2   talking about, sir?
05:32:22  3   A.  Yes.  And the reason I created it this way is I wanted
05:32:25  4   to make sure as I went through the discussion of the claim
05:32:28  5   and specifically as it applies to the accused products, I
05:32:31  6   wanted to do this stepping through a claim in a smaller
05:32:33  7   basis, rather than trying to look at the claim as a whole.
05:32:36  8        So what I have done is I have arranged this with
05:32:42  9   the letters A, B, C through F.  And so what I will do as I
05:32:47  10  step through this is to go step-by-step looking at No. --
05:32:52  11  letter A and then B and so forth.
05:32:54  12  Q.  And now, earlier, sir, you said that you applied the
05:32:58  13  Court's claim constructions, right?
05:33:01  14  A.  Yes, that's correct.
05:33:04  15  Q.  And do you have a listing of those here?
05:33:06  16  A.  Yes, I do.  I've created a demonstrative with a listing
05:33:10  17  of the terms.
05:33:12  18       MR. RUBINO:  Can we see the next demonstrative,
05:33:15  19  please, Mr. Thompson?  The next demonstrative, please.
05:33:19  20  Thank you.
05:33:20  21  Q.  (By Mr. Rubino)  Can you just give -- give the jury one
05:33:27  22  example of your application of a construction?
05:33:30  23  A.  Sure.  Claim 1 -- when you go back and look at Claim 1,
05:33:38  24  it has a limitation that indicates that certain components,
05:33:41  25  such as a source -- can we go back to the claim, just bring

05:33:48  1  those out.

05:33:48  2          If we look, for instance, at -- under A,

05:33:51  3  Paragraph A, it states that the source -- starting right

05:33:56  4  here -- the source localization -- the sound source

05:34:03  5  localization unit -- might as well get all the words in

05:34:06  6  there.

05:34:07  7          The sound source localization unit, the adaptive

05:34:15  8  beamforming unit, and the noise reduction unit are

05:34:20  9  integrated into what is called a digital signal processor.

05:34:25  10          So these are three components that are part of a

05:34:27  11  digital signal processor.

05:34:28  12          Now, if we can go back to the other slide.

05:34:32  13          So the Court has provided to us a definition for

05:34:39  14  digital signal processor.  And that definition is:  A

05:34:43  15  microprocessor that is specialized for mathematical

05:34:46  16  processing of digital signals.

05:34:49  17          So what I do is I adopt that claim construction.

05:34:52  18  And so when I read digital signal processor in Claim 1, I

05:34:57  19  can substitute these words, microprocessor that is

05:35:00  20  specialized for mathematical processing of digital signals.

05:35:15  21  Q.  And did you apply that to the -- your analysis of the

05:35:18  22  accused products, sir?

05:35:18  23  A.  Yes, I did.  Any one of these claim terms that as it

05:35:21  24  applies to the claims that issued, yes, I did -- did so.

05:35:26  25  Q.  So as to the accused products, which -- which systems

05:35:30   1   did you review?

05:35:31   2   A.  I reviewed the Amazon Echo systems.  There's a number

05:35:38   3   of different products that fall within that category.

05:35:45   4   Q.  Do you have a depiction or a list you can provide of

05:35:48   5   these products?

05:35:48   6   A.  Yes.  As far as the accused products, I -- I've created

05:35:51   7   a table that identifies what the products are and a little

05:35:55   8   bit about the configuration of the products.

05:35:58   9        MR. RUBINO:  May we go to PTX-15 -- PTX- --

05:36:04  10   demonstrative 15, please.  Thank you.

05:36:05  11   A.  So what I see -- what I've listed here are the accused

05:36:09  12   products.  They're identified as the Amazon Echo.  The

05:36:14  13   names are across the top.  The pictures of them are across

05:36:17  14   the bottom.  The Echo, the Echo Dot, the Dot Kids Edition,

05:36:25  15   the Echo Plus, Echo Show, Echo Spot, Echo Studio, and Echo

05:36:31  16   Look.

05:36:31  17        So these are the products that are at issue.

05:36:35  18        As I said, I provided a picture at the bottom as

05:36:38  19   to what they look like.  And I've also identified in the

05:36:41  20   center the number of microphones that are associated with

05:36:43  21   each of these products.  And you can see that some have an

05:36:47  22   arrangement of seven mics or eight mics or four mics.

05:37:03  23   Q.  (By Mr. Rubino)  Mr. McAlexander, on the first column,

05:37:06  24   the top left under Echo, you have 1st Gen, 2nd Gen, and

05:37:14  25   3rd Gen, and then some names underneath each of those Gens.

05:37:18    1    Can you explain what that means?

05:37:19    2    A.   Yes.   The -- the internal names, as I understand, that

05:37:19    3    Amazon has ascribed to their products is what I put in

05:37:27    4    parenthesis, such as Biscuit or Donut or Doppler or Sonar,

05:37:33    5    Pancake, and so forth.

05:37:33    6            And what I've listed there is, when I refer to a

05:37:37    7    generation, the 1st Generation is the first product that

05:37:40    8    came out under that particular category called Echo.   And

05:37:44    9    then later they turned out a 2nd Generation and 3rd

05:37:48    10   Generation.   And that's generally what is shown there.

05:37:51    11   Q.   And to the right, you don't have any generation

05:37:57    12   denotations.   What does that mean?

05:37:59    13   A.   I'm sorry, to the right?

05:38:01    14   Q.   On the right side of the table, you don't have any

05:38:06    15   generation denotations?

05:38:09    16   A.   In terms of these three products?

05:38:10    17   Q.   Yes, sir.

05:38:10    18   A.   Yes.   On those three products, as I understanding, that

05:38:14    19   that's -- that is the name.   I have not observed anything

05:38:17    20   that's come out with a different generation of them.

05:38:24    21   Q.   So if we're looking at any of Amazon's documents,

05:38:28    22   what's your understanding if you see a document that says

05:38:32    23   Pancake on it?

05:38:32    24   A.   My understanding is if I see a document that says

05:38:36    25   Pancake on it, that it's referring to the 1st Generation of

05:38:41  1   the Echo Dot type.

05:38:42  2   Q.  Now, in your review earlier, you mentioned that you

05:39:00  3   looked at some marketing materials, website materials of

05:39:02  4   Amazon; is that right?

05:39:03  5   A.  Yes, that's correct.

05:39:04  6   Q.  So how does Amazon describe these products in those

05:39:07  7   materials, as you've observed?

05:39:09  8   A.  Well, I've created a couple of demonstratives to

05:39:12  9   address that.

05:39:19  10          In this first one, this is a demonstrative.  At

05:39:22  11  the bottom -- across the bottom, I've identified where the

05:39:25  12  site for this was on the web.

05:39:27  13          And, specifically, it states in this Amazon file:

05:39:32  14  Echo has seven -- Echo has seven microphones and

05:39:37  15  beamforming technology, so it can hear you from across the

05:39:40  16  room, even while music is playing.

05:39:46  17          And it goes on to say that when you want to use

05:39:49  18  Echo, just say the wake word "Alexa," and Echo responds

05:39:54  19  instantly.

05:39:54  20          And this is what I referred to earlier that the

05:39:57  21  patented inventions are directed to the front end.  It's

05:40:00  22  the speaking of the word "Alexa" and the system responding,

05:40:04  23  that alone I have found infringes the claim.

05:40:08  24  Q.  So this behavior you're speaking of with the Alexa or

05:40:12  25  with the Echo products, have you observed it yourself?

05:40:17  1  A.  Yes.  I have actually tested this with the products

05:40:22  2  that I purchased, yes.

05:40:28  3  Q.  And so you yourself have been an end user of these

05:40:32  4  products, right?

05:40:32  5  A.  I myself have been an infringer, yes.

05:40:35  6  Q.  So can you take us through what an end user would see

05:40:38  7  when using one of these Echo products?

05:40:40  8  A.  Yes, I can.  In fact, the next demonstrative I think

05:40:44  9  will help illustrate that.

05:40:45  10        A number of these products, especially the Echo,

05:40:49  11  the Echo Dot, that you'll see the circular blue ring on the

05:40:53  12  outside.  On the Echo device, that's a tall cylinder,

05:40:57  13  you'll see it on the top.  On the Echo Dot, you'll see it

05:41:01  14  on the top, as well.

05:41:02  15        And the top has some buttons on it, such as the

05:41:05  16  mute button.  You'll also note a ring of orifices or holes.

05:41:11  17  These are basically the conduit through which sound can be

05:41:14  18  carried to the microphones that sit underneath this top

05:41:17  19  inside.

05:41:18  20        But on the outside is a ring -- a blue ring.  When

05:41:22  21  you speak the word "Alexa," the Echo devices will hear

05:41:28  22  that, understand it.  And the reason that you know that it

05:41:30  23  is picking it up is because you will begin to see a -- a

05:41:34  24  blue light appear.

05:41:36  25        And then as it goes through very quickly, its

05:41:42   1   algorithms, it will determine the direction from which that

05:41:45   2   speech is coming.

05:41:46   3          And you will notice on this particular diagram at

05:41:48   4   the bottom of the diagram, the -- the blue is a lighter

05:41:52   5   blue.  The lighter blue color is -- is Amazon is Amazon's

05:41:57   6   Echo device pointing to the direction from which the sound

05:42:00   7   is coming.

05:42:01   8          So it has made a determination on where the sound

05:42:04   9   is and has steered the beams internally for the microphones

05:42:08   10  to pick up that direction.

05:42:14   11  Q.  And on the left of this demonstrative, you reference

05:42:17   12  PTX-111; is that right?

05:42:18   13  A.  That is correct.  In this document, it base -- it

05:42:22   14  derive -- it's entitled:  All Things Alexa.  And you'll see

05:42:27   15  within this document and others that all the Alexa devices

05:42:30   16  operate this way.

05:42:34   17          MR. RUBINO:  Mr. Thompson, can you please pull up

05:42:37   18  PTX-111?

05:42:39   19  Q.  (By Mr. Rubino)  So you said that the top of this

05:42:50   20  document said:  All Things Alexa?

05:42:54   21  A.  Correct.

05:42:55   22  Q.  And does that indicate anything to you about whether

05:42:57   23  this behavior is specific for any -- any Echo version from

05:43:00   24  your chart?

05:43:01   25  A.  When it says All Things Alexa, it covers all things

05:43:07  1  Alexa.  It's not directed to a particular type, and the

05:43:10  2  valuation I have done of the products would indicates and

05:43:13  3  support that this statement is correct.

05:43:14  4  Q.  And, again, this is a document you've also observed on

05:43:29  5  Amazon's website; is that right?

05:43:30  6  A.  That is correct, yes.

05:43:35  7      And if you'll notice, at the bottom of the exhibit

05:43:42  8  is the HTTPS URL for that particular document.

05:43:50  9  Q.  Now, sir, you said you had some physical products.  Can

05:43:53  10  you please tell the jury what you did with those physical

05:44:01  11  Amazon products?

05:44:03  12  A.  Yes.  Once the physical Amazon products were acquired,

05:44:06  13  I plugged them in, tested them, and then I began to take

05:44:10  14  them apart.

05:44:11  15      In fact, I photographed them first from the box,

05:44:14  16  and then out of the box, and then I took each one of them

05:44:17  17  apart and evaluated and photographed the inside so that I'd

05:44:21  18  understand where the components were located, where the

05:44:29  19  mics were located, how the mics -- microphones -- when I

05:44:31  20  used the word "mic," microphone -- how that -- the

05:44:37  21  microphone is communicated to the digital signal processor

05:44:39  22  chip.

05:44:41  23      MR. RUBINO:  Go to the next demonstrative slide,

05:44:48  24  please.

05:44:48  25  Q.  (By Mr. Rubino)  Sir, what is this a picture of?

05:44:50   1   A.   This is a picture of the Echo, which on my previous

05:44:56   2   chart, was the first column on the chart.   And I've

05:45:00   3   identified that the Echo device is one in which the

05:45:04   4   microphones that sit just below the top of the cylinder is

05:45:10   5   a seven-microphone circular array.

05:45:26   6   Q.   So other than use the device and plug it in, what else

05:45:28   7   did you do with it in your analysis?

05:45:30   8   A.   What I did, as I mentioned before, is I actually then

05:45:34   9   took the unit apart so that I could look at how it was

05:45:37   10   constructed on the inside.

05:45:39   11   Q.   And for this Echo 1st Gen, for example, what did you

05:45:45   12   observe on the inside?

05:45:46   13   A.   Well, what I observed on the inside was, first, just

05:45:50   14   under the top where the buttons were located and the light

05:45:55   15   is located, the light actually is -- is LEDs on a circuit

05:46:03   16   board.   And on that same circuit board are the microphones.

05:46:09   17   Q.   And in your testing, you said that you gave some

05:46:19   18   commands, Alexa, and then witnessed a response to those

05:46:21   19   commands; is that right?

05:46:23   20   A.   That's correct.   And the response being the light

05:46:27   21   turning on and the darker blue and light blue appearing in

05:46:37   22   the direction from which I was speaking.   And then I also

05:46:39   23   observed as I moved around, that that light would move with

05:46:41   24   me.

05:46:41   25   Q.   So apart from looking at the physical device and giving

05:46:47  1  it a voice command, how did you come to understand how

05:46:53  2  those voice commands work?

05:46:55  3  A.  Well, there was a number of documents that were

05:46:57  4  produced in this case that were produced by Amazon that go

05:47:03  5  to showing how -- how the circuits are arranged inside in

05:47:10  6  terms of -- I call it a block diagram, but it shows on a

05:47:14  7  functional basis what is connected to what.

05:47:18  8          And, also, looking at deposition testimony with

05:47:23  9  regard to this.

05:47:26  10         And, thirdly, with regard to source code

05:47:29  11  valuation.

05:47:37  12         MR. RUBINO:  Can we go to Slide 20, please?

05:47:40  13  Q.  (By Mr. Rubino)  Sir, is this one of the block diagrams

05:47:45  14  you were talking about?

05:47:46  15  A.  Yes, this is one of the block diagrams.  There are two

05:47:50  16  different sets of code types.  One is called the Doppler,

05:47:57  17  or it's -- it's an audio front end for Doppler.  And this

05:48:01  18  applies to the original Echo generation -- 1st Generation,

05:48:09  19  as well as the Pancake, which is the Dot 1st Generation.

05:48:15  20         And here if we look on the top left side, the --

05:48:19  21  the -- the information that is shown there on the diagram

05:48:21  22  is the microphone array.

05:48:22  23         So this is where the seven-microphone arrays

05:48:27  24  provide information -- provide their input into the

05:48:30  25  remainder of the computer system.

05:48:34    1           And you'll notice that it shows that it has seven

05:48:37    2    inputs.  That's -- that's one with the horizontal arrow

05:48:42    3    coming from the microphones.

05:48:44    4           It also says that it does -- it has this input

05:48:47    5    into what's called send-in, and is done at a 16,000 hertz

05:48:58    6    or 16 cycle -- 16,000 cycles per second.  So that's the

05:49:02    7    rate in which the information is extracted or inputted into

05:49:04    8    the system.

05:49:04    9           Also, you'll notice that the information for the

05:49:07   10    microphone array passes through filtration.  It goes

05:49:10   11    through a component called beamforming.

05:49:12   12           It also has another noise abatement called echo

05:49:17   13    cancellation.

05:49:18   14           It also has a block that is functionally ascribed

05:49:23   15    to voice activity detector.  So it's actually extracting

05:49:27   16    out of what is in the -- in the input from the microphones

05:49:30   17    to show that, yes, this is voice.

05:49:34   18           And, lastly, on this chart, it makes a beam

05:49:37   19    selection.  So it goes through the process of identifying

05:49:41   20    what the inputs are from the microphones, evaluating those

05:49:46   21    inputs, and from that, determining the direction from which

05:49:50   22    the sound is occurring, and then doing a beam selector to

05:49:54   23    orient and steer the beams in the direction of the sound

05:49:57   24    input.

05:49:58   25           THE COURT:  Let me interrupt at this point.

05:49:59  1        I'm aware that Mr. McAlexander has a considerable

05:50:02  2  amount of testimony yet to give, ladies and gentlemen.  And

05:50:05  3  I'm not going to keep us any later on a Friday evening.

05:50:09  4  There's not a perfect place to break this testimony, but

05:50:12  5  this is as good as any.

05:50:14  6        So, at this point, we're going to recess until

05:50:17  7  Monday morning.

05:50:20  8        Ladies and gentlemen of the jury, as you leave the

05:50:21  9  courtroom this evening, please leave your closed juror

05:50:24 10  notebooks on the table in the jury room.  Please follow all

05:50:27 11  the instructions I've given you about your conduct,

05:50:31 12  including, of course, you would expect me to remind you not

05:50:33 13  to discuss the case with anyone in any way, including the

05:50:36 14  eight of yourselves.

05:50:38 15        I'd like to have you back, in time so that we can

05:50:41 16  start promptly at 8:30 on Monday morning.  So please be

05:50:45 17  assembled and in the jury room a short time before 8:30 so

05:50:49 18  that we can begin at that time.

05:50:51 19        Please drive carefully to your homes, have a good

05:50:55 20  weekend.  And, at this time, the jury is excused for the

05:50:57 21  weekend.

05:50:58 22        COURT SECURITY OFFICER:  All rise.

05:51:24 23        (Jury out.)

05:51:25 24        THE COURT:  Be seated, please.

05:51:27 25        You may step down, Mr. McAlexander.

05:51:29   1          THE WITNESS:  Thank you.

05:51:30   2          THE COURT:  Counsel, is there anything that you're

05:51:32   3   aware of that needs to be raised with the Court before we

05:51:35   4   recess for the evening?

05:51:37   5          MS. TRUELOVE:  Nothing from the Plaintiff,

05:51:38   6   Your Honor.

05:51:38   7          MR. DACUS:  Nothing from the Defendant,

05:51:40   8   Your Honor.

05:51:40   9          THE COURT:  All right.  I'll remind you that I'll

05:51:42  10   be available Monday morning in chambers by 7:30 if there

05:51:48  11   are disputes that need to be resolved or guidance that

05:51:52  12   needs to be given.

05:51:52  13          I did not miss having to do that this morning, and

05:51:53  14   I appreciate not having to do that this morning, but we'll

05:51:53  15   see what Monday brings.

05:51:55  16          I'll also remind you to be prepared to read into

05:52:00  17   the record Monday morning the items from the list of

05:52:04  18   pre-admitted exhibits used during today's portion of the

05:52:06  19   trial, and we'll do that before I bring in the jury.

05:52:08  20          Unless there's something else, counsel, we stand

05:52:11  21   in recess until Monday morning.

05:52:13  22          COURT SECURITY OFFICER:  All rise.

05:52:15  23          (Recess.)

          24

          25

1

CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                     10/2/2020
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25