12:43:35    1              IN THE UNITED STATES DISTRICT COURT

            2              FOR THE EASTERN DISTRICT OF TEXAS

            3                     MARSHALL DIVISION

            4    VOCALIFE LLC,                    )(

            5         PLAINTIFF,                   )(    CIVIL ACTION NO.

            6                                      )(    2:19-CV-123-JRG

            7    VS.                              )(    MARSHALL, TEXAS

            8                                      )(

            9    AMAZON.COM, INC. and             )(

           10    AMAZON.COM LLC,                  )(    OCTOBER 6, 2020

           11         DEFENDANTS.                 )(    12:47 P.M.

           12                  TRANSCRIPT OF JURY TRIAL

           13                     AFTERNOON SESSION

           14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

           15           UNITED STATES CHIEF DISTRICT JUDGE

           16

           17    FOR THE PLAINTIFF:

           18    MR. ALFRED R. FABRICANT
                 MR. PETER LAMBRIANAKOS
           19    MR. VINCENT J. RUBINO, III
                 MS. AMY PARK
           20    MR. ENRIQUE ITURRALDE
                 FABRICANT LLP
           21    230 Park Avenue, 3rd Floor W.
                 New York, NY 10169
           22
                 MR. SAMUEL F. BAXTER
           23    MS. JENNIFER L. TRUELOVE
                 MCKOOL SMITH, P.C.
           24    104 East Houston Street, Suite 300
                 Marshall, TX 75670
           25

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:      Shelly Holmes, CSR, TCRR
                          Official Reporter
20                        United States District Court
                          Eastern District of Texas
21                        Marshall Division
                          100 E. Houston Street
22                        Marshall, Texas  75670
                          (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

P R O C E E D I N G S

12:47:30  1

12:47:30  2          (Jury out.)

12:47:31  3          COURT SECURITY OFFICER:  All rise.

12:47:33  4          THE COURT:  Be seated, please.

12:47:34  5          Counsel, are there any matters we need to take up

12:47:43  6  before I bring back in the jury?

12:47:45  7          MS. TRUELOVE:  Nothing from the Plaintiff,

12:47:47  8  Your Honor.

12:47:47  9          MR. DACUS:  We have one matter, Your Honor, we

12:47:49  10  need to address with the Court, and it relates to Amazon's

12:47:53  11  Motion in Limine No. 9.

12:47:54  12          THE COURT:  Go to the podium, please, Mr. Dacus.

12:47:56  13          MR. DACUS:  Thank you, Your Honor.  I apologize

12:47:57  14  for that.

12:47:58  15          Amazon's Motion in Limine No. 9, Your Honor,

12:48:01  16  relates to precluding Plaintiff from any reference to the

12:48:07  17  unavailability of any witnesses who does not testify.

12:48:12  18          In Mr. Baxter's examination he made reference to

12:48:14  19  the fact that no one would be here from the 2011 meeting,

12:48:19  20  and then in Mr. Fabricant's exam -- examination, he made

12:48:24  21  reference to the fact that Mr. Pance is not going to be

12:48:27  22  here.

12:48:27  23          I was not in the in-chambers meeting this morning,

12:48:33  24  but I understand that the Plaintiff is aware of this rule

12:48:36  25  because they specifically asked leave from the Court to

12:48:39  1  talk about the fact that Mr. Chhetri, whose notebook was

12:48:43  2  presented, they wanted the -- the right to say that he was

12:48:46  3  not going to be here, and the Court granted them leave to

12:48:51  4  do that, as I understand it.

12:48:53  5       But with respect to those other references, we

12:48:56  6  believe those are violations of the MIL.  At a minimum, we

12:48:59  7  would ask for an instruction from the Court that they stop

12:49:01  8  that.

12:49:01  9       THE COURT:  Tell me this -- tell me this,

12:49:03  10  Mr. Dacus -- and I did give Mr. Fabricant specific leave

12:49:05  11  and instructions this morning in chambers about the absence

12:49:11  12  of Mr. Chhetri as a live witness.  Tell me why you believe

12:49:17  13  this objection is timely.

12:49:18  14       These -- these witnesses and these examinations

12:49:21  15  happened hour, hour and a half ago.  You had an

12:49:24  16  opportunity -- your side had an opportunity to

12:49:27  17  cross-examine or to direct.  Why is this not something that

12:49:31  18  you asked to approach the Court while the witnesses were on

12:49:34  19  the stand, and it would be appropriate to do something

12:49:36  20  about it, instead of waiting until they're well off the

12:49:41  21  stand, everybody's had lunch, and you've had time to come

12:49:44  22  up with this?  Why is this timely?

12:49:47  23       MR. DACUS:  I'd be happy to respond to it,

12:49:49  24  Your Honor.  All I can respond is, for me personally, I

12:49:50  25  wanted to check over the lunch hour to make sure what the

12:49:53  1   limine said and to make sure that I did not mishear what

12:49:58  2   was said this morning.

12:49:59  3        So I certainly understand the Court's criticism

12:50:01  4   related to the timeliness.  And, quite honestly, our

12:50:05  5   request is primarily that we do not have this going

12:50:08  6   forward, including in closing.  So I certainly understand

12:50:10  7   the Court's criticism in that regard, and that's --

12:50:13  8        THE COURT:  Well, the MIL order is one sentence.

12:50:16  9   I have a copy at my fingertips.  I assume both sides have

12:50:21 10   copies at their fingertips.  You have the real-time

12:50:24 11   transcript of what's been asked and answered of the

12:50:26 12   witnesses.

12:50:27 13        I find that this objection is untimely, and I'll

12:50:30 14   deny and overrule the objection on that basis.

12:50:37 15        However, that does not mean that the order in

12:50:38 16   limine is not what it is.  And if there's any doubt about

12:50:41 17   where these parameters are for closing argument, I expect

12:50:44 18   to take that up and discuss it with counsel before closing

12:50:47 19   arguments are presented.

12:50:49 20        MR. DACUS:  Perfect.  Thank you very much,

12:50:51 21   Your Honor.

12:50:51 22        THE COURT:  All right.  Defendants, are you

12:50:55 23   prepared to call your next witness?

12:50:57 24        MR. HADDEN:  We are, Your Honor.

12:51:00 25        THE COURT:  And is this another deposition witness

| | | |
|---|---|---|
| 12:51:02 | 1 | or a live witness? |
| 12:51:03 | 2 | MR. HADDEN:  No, this is a live witness, |
| 12:51:05 | 3 | Professor Kiaei, our technical expert. |
| 12:51:10 | 4 | THE COURT:  All right.  Let's bring in the jury, |
| 12:51:12 | 5 | please. |
| 12:51:12 | 6 | COURT SECURITY OFFICER:  All rise. |
| 12:51:13 | 7 | (Jury in.) |
| 12:51:39 | 8 | THE COURT:  Welcome back, ladies and gentlemen. |
| 12:51:40 | 9 | Please have a seat. |
| 12:51:41 | 10 | Defendants, call your next witness. |
| 12:51:47 | 11 | MR. HADDEN:  Amazon calls Professor Kiaei. |
| 12:51:51 | 12 | THE COURT:  All right.  If you'll come forward, |
| 12:51:53 | 13 | sir, and be sworn. |
| 12:51:57 | 14 | (Witness sworn.) |
| 12:52:07 | 15 | THE COURT:  Please come around, sir, have a seat |
| 12:52:22 | 16 | on the witness stand. |
| 12:52:23 | 17 | MS. DOAN:  May I approach, Your Honor? |
| 12:52:24 | 18 | THE COURT:  You may distribute binders. |
| 12:52:42 | 19 | All right.  Counsel, you may proceed with your |
| 12:52:51 | 20 | direct examination of the witness. |
| 12:52:51 | 21 | SAYFE KIAEI, PH.D., DEFENDANTS' WITNESS, SWORN |
| 12:52:51 | 22 | DIRECT EXAMINATION |
| 12:52:53 | 23 | BY MR. LAQUER: |
| 12:52:53 | 24 | Q.  Could you please tell us your name, sir? |
| 12:52:55 | 25 | A.  Good afternoon.  My name is Sayfe Kiaei.  Sayfe is like |

978

| | | |
|---|---|---|
| 12:53:06 | 1 | safety without the T, and Kiaei rhymes with Hawaii. |
| 12:53:07 | 2 | Q.  And where do you work? |
| 12:53:08 | 3 | A.  I am a professor at Arizona State University in the |
| 12:53:14 | 4 | Department of Electrical and Computer Engineering. |
| 12:53:16 | 5 | Q.  And could you tell the jury why you are here today? |
| 12:53:20 | 6 | A.  Yes.  I am here to give my opinion about the Amazon |
| 12:53:30 | 7 | Echo devices that they do not infringe on the '049 patent. |
| 12:53:33 | 8 | Q.  And have you prepared slides to help us here in court? |
| 12:53:38 | 9 | A.  Yes, sir.  I have prepared a few slides to go through |
| 12:53:42 | 10 | my presentation.  So, if you don't mind, let's go to the |
| 12:53:47 | 11 | next one. |
| 12:53:47 | 12 | Q.  Sure.  Would you let us know what your highest level of |
| 12:53:51 | 13 | education is? |
| 12:53:52 | 14 | A.  Yes, sir.  I received my Ph.D. from Washington State |
| 12:53:56 | 15 | University in 1987 at -- in the Department of Electrical |
| 12:53:59 | 16 | Engineering. |
| 12:53:59 | 17 | Q.  And prior to your current work as a professor at the |
| 12:54:02 | 18 | Arizona State University, where did you work? |
| 12:54:04 | 19 | A.  From 1993 to 2002, I was a full-time employee at |
| 12:54:09 | 20 | Motorola in Austin, Texas.  And at the same time also I |
| 12:54:14 | 21 | was an adjunct professor at University of Texas Austin. |
| 12:54:17 | 22 | Q.  Could you briefly summarize your experience in industry |
| 12:54:21 | 23 | and working on government contracts? |
| 12:54:24 | 24 | A.  Yes, sir.  For about 10 years, as I said, I was at |
| 12:54:27 | 25 | Motorola working on radios, wireless systems, audio |

| | | |
|---|---|---|
| 12:54:30 | 1 | processing and related areas.  But also over the past 35 |
| 12:54:35 | 2 | years, I have been working on a number of research projects |
| 12:54:39 | 3 | and grants and development funded by the National Science |
| 12:54:45 | 4 | Foundations. |
| 12:54:45 | 5 | I have been working with Defense Advanced Research |
| 12:54:49 | 6 | Projects Agency, a number of projects related to audio |
| 12:54:51 | 7 | processing and signal processing.  I've also been working |
| 12:54:55 | 8 | in Department of Defense and a number of other companies |
| 12:54:58 | 9 | throughout these years. |
| 12:54:59 | 10 | Q.  And has some of your work related to microphone arrays? |
| 12:55:03 | 11 | A.  Yes, I've had a number of projects and grants related |
| 12:55:06 | 12 | to that. |
| 12:55:06 | 13 | Q.  Can you give any examples of any of your experience |
| 12:55:09 | 14 | related to digital signal processors? |
| 12:55:10 | 15 | A.  Yes, sir.  First time I got introduced to digital |
| 12:55:17 | 16 | signal processing, that was in 1981, I believe.  I took a |
| 12:55:19 | 17 | class in digital signal processing.  And then my master |
| 12:55:24 | 18 | thesis was on the development of signal processing |
| 12:55:28 | 19 | algorithms for noise reduction, and my Ph.D. |
| 12:55:31 | 20 | And then I've also been teaching classes for the |
| 12:55:34 | 21 | past 35 years at the universities, as well as when I was in |
| 12:55:37 | 22 | Motorola I taught a course within Motorola, as well, on |
| 12:55:42 | 23 | signal processing and digital signal processing. |
| 12:55:42 | 24 | Q.  So was the course specific to digital signal |
| 12:55:45 | 25 | processors? |

12:55:45  1  A.  Yes.  I actually established two courses specifically

12:55:49  2  on digital signal processing.  At the Arizona State

12:55:57  3  University now we have a course called EEE -- I believe

12:56:00  4  it's 404 -- that is specifically on developing digital

12:56:04  5  signal processors and processing using the Texas Instrument

12:56:07  6  TI3200.  And also at UT Austin I helped them with the

12:56:12  7  development of courses in that area.

12:56:13  8  Q.  Do you have experience writing and reading software

12:56:16  9  source code for audio processing?

12:56:18 10  A.  Yes, sir.  I've been doing that both in my Master's and

12:56:26 11  Ph.D. as well as in industry and also working on various

12:56:28 12  projects in various different languages, MATLAB, ADS, C,

12:56:35 13  C++, Perl, Lisp language, a number of other ones.  Some of

12:56:41 14  them outdates me and tells my age.

12:56:44 15  Q.  Are you an inventor on any patents?

12:56:46 16  A.  Yes, sir.  I have I think 9 or 10 patents.

12:56:50 17  Q.  And have you ever done any work for Amazon before?

12:56:52 18  A.  No.

12:56:53 19  Q.  How much are you being paid for your time here?

12:56:55 20  A.  $400.00 an hour.

12:56:57 21       THE COURT:  Counsel, let me interrupt just a

12:56:59 22  minute.  If both you and the witness would slow down a

12:57:01 23  little bit in your speech, that would be helpful.

12:57:04 24       MR. LAQUER:  Thank you, Your Honor.

12:57:05 25       THE COURT:  All right.

| | | |
|---|---|---|
| 12:57:06 | 1 | THE WITNESS:  Thank you, Your Honor. |
| 12:57:06 | 2 | THE COURT:  All right.  Let's proceed. |
| 12:57:08 | 3 | MR. LAQUER:  Your Honor, I offer Dr. Kiaei as an |
| 12:57:12 | 4 | expert in the areas of audio signal processing, microphone |
| 12:57:15 | 5 | arrays, audio processing, software source code, and digital |
| 12:57:19 | 6 | signal processors. |
| 12:57:19 | 7 | THE COURT:  Is there objection? |
| 12:57:20 | 8 | MR. LAMBRIANAKOS:  No objection, Your Honor. |
| 12:57:23 | 9 | THE COURT:  All right.  Then, without objection, |
| 12:57:24 | 10 | the Court will recognize this witness as an expert in those |
| 12:57:27 | 11 | designated fields. |
| 12:57:28 | 12 | Please continue. |
| 12:57:31 | 13 | Q.  (By Mr. Laquer)  Did you study how the Echo products in |
| 12:57:34 | 14 | this case work? |
| 12:57:34 | 15 | A.  Yes, sir, I did. |
| 12:57:38 | 16 | Q.  And have you studied how those different products are |
| 12:57:42 | 17 | related to each other in terms of their functionality? |
| 12:57:46 | 18 | A.  Yes, I have.  And if you don't mind, we can go to the |
| 12:57:48 | 19 | next slide. |
| 12:57:49 | 20 | And this shows the -- the various Amazon Echo |
| 12:57:58 | 21 | devices, and I have categorized them in two categories. |
| 12:58:01 | 22 | On the top, the two products you see are the |
| 12:58:05 | 23 | Echo 1 and Echo Dot 1, which was the Doppler.  And Doppler |
| 12:58:12 | 24 | was a code name that they had given for the software they |
| 12:58:15 | 25 | used in development of those products. |

12:58:18   1          And then after April of 2016, they have number of

12:58:23   2   other products that you see here, which are -- which were

12:58:28   3   also used.  The software code name for them was MPAF.

12:58:31   4   Q.  And what is the most important way to understand how

12:58:36   5   Echo works?

12:58:37   6   A.  The most important way to understand it is to look at

12:58:41   7   the source code.  I reviewed the source code for the

12:58:45   8   devices.

12:58:45   9   Q.  Do slides on the Internet determine how Echo works?

12:58:51  10   A.  No, they do not.

12:58:52  11   Q.  Does a white paper determine how Echo works?

12:58:55  12   A.  No, they do not.

12:58:57  13   Q.  Why is source code so important to understanding how

12:59:00  14   the product works?

12:59:02  15   A.  The source code are instructions given to the processor

12:59:08  16   that step-by-step tells the processor what to do at each

12:59:14  17   specific actions in a string.

12:59:18  18   Q.  And how long did you spend reviewing the Echo source

12:59:22  19   code?

12:59:22  20   A.  I spent several weeks looking at the code -- source

12:59:29  21   codes, and there are a number of different source codes and

12:59:31  22   categories, which I can explain.

12:59:33  23   Q.  Can you show us how Echo's beamforming technology

12:59:38  24   works?

12:59:38  25   A.  Yes, yes.

| | | |
|---|---|---|
| 12:59:39 | 1 | Q. Can you explain what we see here? |
| 12:59:43 | 2 | A. Yes. What we see here is the Echo device, looking at |
| 12:59:51 | 3 | it from the top. And this device that you're looking at it |
| 01:00:03 | 4 | from the top has six microphones around it and a microphone |
| 01:00:05 | 5 | in the center, as you've seen that already many times. |
| 01:00:09 | 6 | And then by proper combination of the microphone |
| 01:00:12 | 7 | signals with pre-set permanent beamforming coefficients, |
| 01:00:19 | 8 | you focus these microphones towards different directions |
| 01:00:23 | 9 | which are called the beams. |
| 01:00:24 | 10 | So we have beams now, for example, going to the |
| 01:00:27 | 11 | right and left, beams going in these different angles, as |
| 01:00:31 | 12 | you can see in these pictures. |
| 01:00:32 | 13 | Q. If we look at the slide, there are some numbers here |
| 01:00:35 | 14 | from DTX-809. |
| 01:00:38 | 15 | Can you explain what these numbers are? |
| 01:00:40 | 16 | A. These numbers are in a file called .cfg, as you can see |
| 01:00:49 | 17 | on the top of the -- the top part of the box. And that |
| 01:00:55 | 18 | simply stands for configured files. |
| 01:00:56 | 19 | These are fixed numbers, fixed parameters that you |
| 01:01:00 | 20 | put in the microprocessor or the processor that they |
| 01:01:06 | 21 | determine the coefficients, they determine how many |
| 01:01:09 | 22 | microphone it has, determines the number of beams, and all |
| 01:01:12 | 23 | the things that are fixed in the system. |
| 01:01:16 | 24 | Q. Are these then the coefficients of the device? |
| 01:01:19 | 25 | A. These are the coefficients of the beamformer |

984

| | | |
|---|---|---|
| 01:01:24 | 1 | specifically that are entered when the device is |
| 01:01:30 | 2 | manufactured in the factory. |
| 01:01:32 | 3 | Q.  We've heard some testimony that these coefficients |
| 01:01:35 | 4 | never change.  Is that consistent with your analysis of the |
| 01:01:37 | 5 | Echo source code? |
| 01:01:38 | 6 | A.  Yes, sir.  I have extensively looked at all of the |
| 01:01:42 | 7 | source codes that -- that were provided, and all of them |
| 01:01:46 | 8 | use the .config file, which from that it has that constant |
| 01:01:53 | 9 | fixed coefficients that then sets the fixed beams. |
| 01:01:56 | 10 | Q.  And are those coefficients also called the weights? |
| 01:02:03 | 11 | A.  Yes.  There are a number of terms.  We call them |
| 01:02:05 | 12 | technical -- we call them weights because they weight the |
| 01:02:09 | 13 | microphone combinations or coefficients and et cetera. |
| 01:02:13 | 14 | Q.  Do Echo's beams ever move? |
| 01:02:16 | 15 | A.  Echo beams do not move. |
| 01:02:17 | 16 | Q.  Do Echo's beams ever grow? |
| 01:02:19 | 17 | A.  Echo beams do not grow. |
| 01:02:22 | 18 | Q.  Does Echo wait until it receives sound before it |
| 01:02:26 | 19 | creates a beam? |
| 01:02:27 | 20 | A.  No, it does not.  As a matter of fact, when Echo is |
| 01:02:34 | 21 | shipped from the factory in the box, already has the |
| 01:02:37 | 22 | weights -- excuse me -- already has the weights loaded on |
| 01:02:42 | 23 | the processors. |
| 01:02:43 | 24 |     And then as soon as you bring it home and plug it |
| 01:02:48 | 25 | in, when it turns on, those arrays are fixed, and they're |

01:02:52    1    pointing specifically at the directions in the example I'm

01:02:55    2    showing on my slide.

01:02:59    3    Q.  Does this file shown here, DTX-809, show when these

01:03:06    4    coefficients were created?  And I know some of the text is

01:03:10    5    small.

01:03:10    6    A.  Oh, yes, I see that.  If you see -- I'm not very good

01:03:17    7    at using this system here, but if you look at the first

01:03:19    8    line on top, it says:  On November 27th, 2017, from Knight

01:03:29    9    AFE -- Knight is the product name, and AFE is the analog

01:03:34   10    content.

01:03:34   11    Q.  And that was before the '049 patent in this case ever

01:03:37   12    existed when it came on September of 2018, correct?

01:03:40   13    A.  Yes, sir.

01:03:45   14    Q.  How were these beamformer coefficients created?

01:03:48   15    A.  These are created in advance by the engineers of Amazon

01:03:56   16    prior to shipping the devices.

01:03:57   17    Q.  Were these created on an Echo?

01:03:59   18    A.  They were not created on Echo.

01:04:01   19    Q.  Could you explain where they were created?

01:04:04   20    A.  Yes.  These were created, as I said, in -- in advance

01:04:12   21    by the Amazon engineers using software called MATLAB that

01:04:17   22    simply simulates an environment.

01:04:19   23    Q.  Does Echo form one beam at a time or all of its beams

01:04:24   24    at the same time?

01:04:24   25    A.  Depending on the configuration that is also identified

986

| | | |
|---|---|---|
| 01:04:29 | 1 | in this config file, and the picture you see here, this one |
| 01:04:33 | 2 | has six beams.  And all of the six beams are simultaneously |
| 01:04:37 | 3 | turned on as soon as the device is plugged in, and those |
| 01:04:41 | 4 | beams are fixed.  They do not change direction. |
| 01:04:44 | 5 | Q.  Can you show us how that works? |
| 01:04:46 | 6 | A.  Yes, if you can go to the next slide. |
| 01:04:54 | 7 | So what we see here is that on the top left are |
| 01:04:58 | 8 | the seven microphones. |
| 01:05:00 | 9 | Q.  And what are those microphones having a red line going |
| 01:05:04 | 10 | into? |
| 01:05:05 | 11 | A.  So all the seven microphones that were sitting on the |
| 01:05:09 | 12 | circle on top of the Echo, they go to a box called fixed |
| 01:05:14 | 13 | beamformer, which is the software running performing fixed |
| 01:05:17 | 14 | beamforming. |
| 01:05:17 | 15 | Q.  And does that happen even before someone speaks to the |
| 01:05:22 | 16 | Echo, or does it occur after that? |
| 01:05:24 | 17 | A.  That happens as soon as you turn on the device. |
| 01:05:28 | 18 | Immediately after you turn on the device, then the |
| 01:05:30 | 19 | microphone signals are captured, and they go to this -- |
| 01:05:33 | 20 | this box in software, which is called the fixed beamformer. |
| 01:05:36 | 21 | Q.  And in this picture, is the woman speaking to the Echo? |
| 01:05:41 | 22 | A.  No.  In this picture does not, and it's only the |
| 01:05:46 | 23 | background noise. |
| 01:05:47 | 24 | Q.  Can you explain what those blue lines are at the top of |
| 01:05:51 | 25 | the -- sort of cell phone looking bars on them? |

01:05:53  1  A.  Yes, this -- I hope you like my artwork.

01:05:57  2        What I did is I put in a little cell phone signal,

01:06:00  3  which indicates the -- the signal -- the audio signal, for

01:06:08  4  example, strength in each one of the output of the arrays,

01:06:11  5  not the output of microphones, at the output of the fixed

01:06:14  6  beamformer are the arrays coming out, the beams.

01:06:17  7        So it's showing the strength of each one of the

01:06:21  8  beams.  And as you can see, when there is no signal, nobody

01:06:24  9  talking in the room, all of those are in the one bar or

01:06:28 10  very small bar.

01:06:29 11  Q.  Can you show us what happens when she speaks?

01:06:32 12  A.  Yes.  If you can go to the next slide.

01:06:35 13        What I did was a little animation here.  What I'd

01:06:38 14  like to do is -- is point out -- your attention to how the

01:06:46 15  different beams' strength are shown around the circle of --

01:06:51 16  I apologize --around the circle -- on the -- on the beams.

01:06:53 17        So on top, the top bar has only two bars.  And

01:06:55 18  that's the beam that is pointing towards the 1:00 o'clock.

01:06:58 19  And then the beam that's pointing towards 3:00 o'clock,

01:07:01 20  that only has one bar which corresponds to exactly what

01:07:05 21  shows the signal on that specific beam.

01:07:07 22        And then coming down around 5:00 o'clock, you see

01:07:10 23  the one that has two bars.  And then as we're getting

01:07:13 24  closer to the speaker, the bar that is around the 7:00

01:07:16 25  o'clock, that is -- has four bars.

988

| | | |
|---|---|---|
| 01:07:18 | 1 | And then the beam that is pointing towards the |
| 01:07:25 | 2 | speaker that says Alexa -- "Alexa," that one has four bars. |
| 01:07:31 | 3 | And then the one around 11:00 o'clock has three bars. |
| 01:07:35 | 4 | So those are corresponding to the output of the |
| 01:07:38 | 5 | fixed beamformer.  So that's number one, two, three, four, |
| 01:07:41 | 6 | five, six -- six beams formed.  Each beam has a strength |
| 01:07:46 | 7 | based on the amount of signal that is receiving, and the |
| 01:07:50 | 8 | signal strength is shown there. |
| 01:07:51 | 9 | Q.  And is it true that in some cases the strongest beam is |
| 01:07:55 | 10 | not the one pointed at the speaker? |
| 01:07:57 | 11 | A.  It is possible, yes.  There are some areas by which |
| 01:08:00 | 12 | you're in a room that your sound may be bouncing off the |
| 01:08:04 | 13 | wall, and the -- some of the beams on the other side may be |
| 01:08:07 | 14 | getting the sound or maybe there's another sound out there |
| 01:08:10 | 15 | that may be doing that.  So not necessarily all of them are |
| 01:08:14 | 16 | the same way. |
| 01:08:15 | 17 | Q.  What is the box at the top right that says beam |
| 01:08:18 | 18 | selector? |
| 01:08:18 | 19 | A.  So the beam selector, which is also implemented in the |
| 01:08:22 | 20 | source code, what it does is that it's looking at the |
| 01:08:25 | 21 | output of all of these arrays simultaneously.  It's looking |
| 01:08:31 | 22 | at all of them simultaneously and is comparing the signal |
| 01:08:35 | 23 | in all of them. |
| 01:08:36 | 24 | Technically speaking, it's looking at what you |
| 01:08:40 | 25 | call signal-to-noise ratio, but really is looking at the |

01:08:44   1   signal strength.  And then among them, it selects the one

01:08:47   2   with the strongest signal.

01:08:49   3         And as you can see here, the one that is pointing

01:08:52   4   at 9:00 o'clock, which is the Beam No. 5, is the one that's

01:08:56   5   selected.

01:08:56   6   Q.  After the beam selector selects the strongest beam, do

01:09:01   7   the other beams go away?

01:09:02   8   A.  No.  As long as Alexa -- sorry, not Alexa.  I

01:09:08   9   apologize.  Strike that.

01:09:09   10        As long as the Echo device is on, it's continually

01:09:12   11   generating these beams all the time, and they are fixed in

01:09:15   12   that fixed direction.  They're always pointing, in this

01:09:17   13   example, in this direction.  So if the speaker doesn't

01:09:20   14   speak, they're still on.

01:09:22   15   Q.  Did you hear some testimony about a light ring on the

01:09:25   16   Echo device?

01:09:27   17   A.  Yes, sir, I did.

01:09:28   18   Q.  Can you explain how the light ring relates to what we

01:09:32   19   see here?

01:09:32   20   A.  The light ring is -- is LED -- the LED.  And that LED

01:09:41   21   simply shows which one of the beams have been selected to

01:09:46   22   the output.  In this case, as you see in this example, the

01:09:51   23   beam that is at 9:00 o'clock pointing towards the speaker,

01:09:55   24   is the one that's going to turn on.

01:09:57   25   Q.  But Echo still has beams on other locations where there

990

01:10:01  1   is not a light on the light ring; is that correct?

01:10:03  2   A.   Yes.   All the beams are on.   All the beams are

01:10:07  3   operating.   Only the beam that has the strongest signal is

01:10:11  4   the one that turns on -- the LED turns on.   The LED is

01:10:16  5   simply an indication of which beam's turned on.

01:10:19  6   Q.   Did you hear Mr. Prasad's testimony about Echo sending

01:10:24  7   audio data into the Alexa Cloud?

01:10:27  8   A.   Yes, sir, I did.

01:10:28  9   Q.   Can you explain how that relates to what we see on this

01:10:32  10  picture here?

01:10:33  11  A.   So once the beam is selected, that is the beam that's

01:10:40  12  going to go out, there may be additional processing.   And

01:10:43  13  then that beam is the final beam that is sent out to the

01:10:47  14  Alexa Cloud.

01:10:50  15        And the Alexa Cloud, which is through the

01:10:54  16  Internet, accessing this massive computing in the Alexa

01:10:59  17  servers, that then captures whatever you said and processes

01:11:07  18  that and does all the different descriptions that Mr. Rohit

01:11:12  19  described this morning, as well as Mr. Phil described this

01:11:15  20  morning.

01:11:15  21  Q.   And what happens when the lady that we see in the

01:11:18  22  picture here moves while speaking to the Echo?

01:11:20  23  A.   I may -- I think I have -- I'm showing the signal on

01:11:25  24  that.

01:11:26  25        So right now we're on 1:00 o'clock, which is the

01:11:29   1   person said, "Alexa."  And Alexa recognized.  And let's say

01:11:32   2   now they're walking around, and they say:  Alexa, what is

01:11:37   3   the population of Texas?

01:11:41   4   Q.  Well, can you explain to us first what those numbers

01:11:44   5   are in the top left so we can keep an eye on those?

01:11:47   6   A.  Yes, absolutely.

01:11:49   7   Q.  What are those?

01:11:50   8   A.  Thank you, sir.  So those numbers correspond to the

01:11:53   9   coefficients of the weights that I was talking about.

01:11:55  10   These are the fixed coefficients.  These are fixed weights

01:11:59  11   that were developed by the -- by the design engineers in

01:12:03  12   Amazon before the device was shipped.

01:12:06  13          And these simply correspond how the different

01:12:08  14   microphone signals are combined to form these beams.  And

01:12:12  15   they do not change.

01:12:12  16   Q.  And why is there a purple line around one of the six

01:12:16  17   beams?

01:12:16  18   A.  So if you think about the last slide I had for a

01:12:22  19   second, among these six beams, the one, No. 1, had the

01:12:26  20   highest signal.  And the beam selector said No. 1 has the

01:12:30  21   highest signal, let's pick that.  And that signifies the

01:12:34  22   fact that the No. 1 has the highest signal.

01:12:36  23   Q.  Let's see what happens when she moves.

01:12:38  24   A.  Yes, thank you.

01:12:40  25          So she -- she says, "Alexa," and now she's moving

01:12:44  1  and saying "what is the population of Texas" as she's

01:12:47  2  walking around the room.  And as you can see now, as she's

01:12:50  3  walking around the room, she's getting closer to speaker --

01:12:53  4  sorry, not to the speaker -- to the Array No. 2, and then

01:12:56  5  to the Beam No. 3.

01:12:57  6       And as she's walking around, that Beam No. 2 has a

01:13:01  7  higher signal.  Then the Beam No. 3 is going to get the

01:13:04  8  higher signal.  And she stops there, and that indicates

01:13:07  9  that Beam No. 3 is the one with the highest, technically

01:13:11  10  speaking, signal-to-noise ratio or the highest signal

01:13:15  11  level.

01:13:15  12  Q.  Why didn't the numbers change?

01:13:17  13  A.  The coefficient numbers you mean?

01:13:22  14  Q.  Yes.

01:13:23  15  A.  Oh, okay.  I thought you were talking -- the

01:13:25  16  coefficient numbers don't change because we are not

01:13:27  17  changing the beams.  The beams are constant.  What

01:13:30  18  determines the beam's shape and directions are those

01:13:32  19  coefficients.

01:13:33  20       If those coefficients were -- were designed and

01:13:37  21  uploaded in the system during the manufacturing by the

01:13:42  22  designers -- before manufacturing the devices and they were

01:13:44  23  uploaded and shipped, they exactly stay the same.  Nothing

01:13:48  24  changes.  The coefficients do not change.

01:13:49  25  Q.  How do you know that Echo works in that way you just

01:13:55  1   described?

01:13:55  2   A.  I have studied the source code extensively, and I have

01:13:58  3   looked at a number of different files that describe the

01:14:01  4   different stages of the design and different -- different

01:14:05  5   software that are involved in the development of the Echo.

01:14:10  6   Q.  Can you explain what we see on this slide?

01:14:12  7   A.  Yes, sir.  What this -- I'm going to categorize the

01:14:16  8   files that associate with what Echo has.  There are

01:14:20  9   hundreds of files in there.

01:14:22  10         The first category is called MATLAB files.  MATLAB

01:14:26  11  files perform mathematical simulation.  It's like

01:14:30  12  calculators were fancier -- it's much more -- it's files

01:14:33  13  that they have -- they're performing simulations, and they

01:14:36  14  are not on the device.  These are done in the lab at the

01:14:44  15  Amazon -- by the Amazon engineers.  They have nothing to do

01:14:47  16  with the actual device.

01:14:48  17         So in here right now I have a couple of the files

01:14:52  18  highlighted on top that associate with the beamformation --

01:14:57  19  associate with the -- the beam coefficient of the beam

01:15:01  20  weights formations.

01:15:02  21  Q.  Let's look at the next slide.  What are configuration

01:15:06  22  files?

01:15:06  23  A.  The config files, or the configuration files, as I

01:15:09  24  said, these are the files that have the constant numbers in

01:15:12  25  them.  They have a bunch of numbers in them that these

994

01:15:17  1   numbers signify how many microphones the device has.

01:15:22  2           For example, the top one is Biscuit.  So if you

01:15:25  3   look over in the middle of the top line, it says

01:15:30  4   BiscuitAudioFrontEnd/config/AFE.cfg.

01:15:34  5           So what this is telling me is that it's a Biscuit

01:15:37  6   product.  It is an audio front end Biscuit config files.

01:15:41  7   So it has a number of parameters that are fixed.  And these

01:15:45  8   parameters are in a file called AFE.cfg -- AFE.config.

01:15:53  9           I'm going to go and look at that and see what's

01:15:56  10  inside of that and that tells me how many microphones it

01:16:00  11  has, how many beams it has, the number of parameters, what

01:16:02  12  are the coefficients for that, and I would know, huh, what

01:16:06  13  config file is doing this, what is this.

01:16:06  14  Q.  What is the Biscuit?

01:16:07  15  A.  Biscuit is one of the Echo products.  They all have

01:16:16  16  different names, Biscuit, Crumpet, Donuts, and so on.

01:16:22  17  Engineers have a creative way of naming products.

01:16:25  18  Q.  All right.  And can you explain what these file are we

01:16:26  19  see on this next slide?

01:16:28  20  A.  The next files are Echo source code.  These are the

01:16:33  21  actual files that run on the -- on the devices.  These --

01:16:36  22  these are done in real-time.  They are -- these files are

01:16:45  23  written in C++.

01:16:46  24          And as you can see on the first line, all the way

01:16:49  25  down, it says cpp, and C++ is simply a language -- the C

01:16:54  1   language that we write codes in for real-time operations of

01:16:57  2   the system.  And it's -- that one is associated with

01:17:00  3   audioFrontEnd.cpp.

01:17:01  4        And then below that, I have another file called

01:17:05  5   audioFrontEnd.h.  That is a header file.  And that header

01:17:09  6   file is simply saying what are the different, common

01:17:12  7   variables and common routines and common things between

01:17:16  8   these different files.

01:17:20  9   Q.  And are these all amongst the source code files that

01:17:22  10  you reviewed as part of your work in this case?

01:17:25  11  A.  Yes, sir.

01:17:26  12  Q.  Can you explain what the '049's method of beamforming

01:17:33  13  does?

01:17:33  14  A.  Yes.  '049 patent, and you've seen that for the past

01:17:39  15  few days in many, many different details and so on.  But I

01:17:43  16  want to, at a high level, what the '049 patent does is it

01:17:47  17  describes a series of very specific steps and the specific

01:17:50  18  things it has to do in order to perform adaptive

01:17:56  19  beamforming.

01:17:56  20  Q.  Let's look at Claim 1 of the '049 patent.

01:17:59  21       What is the importance of the patent claim as part

01:18:04  22  of your analysis in this case?

01:18:06  23  A.  Yes.  As His Honor also mentioned at the beginning, as

01:18:16  24  well as a number of what the speakers talked about, the

01:18:18  25  value of the patent, what defines exactly what the patent

01:18:21  1  does is based on the claims.  So the claim is the most

01:18:25  2  important part of the patent.  That's what we always study.

01:18:29  3          So in this case, this claim tells us what the

01:18:33  4  patent defines.

01:18:35  5  Q.  How would you describe Claim 1?

01:18:36  6  A.  I had to study Claim 1 for a while, and it's a very --

01:18:47  7  as you can see, it has a number of -- several, several

01:18:50  8  steps in here.  And you have to go through that to

01:18:53  9  understand the different steps.

01:18:55  10          So as you can see, it is -- and I've broken it up

01:19:01  11  in terms of number of substeps to help go through that.

01:19:04  12  Q.  Okay.  Did you apply the Court's claim constructions in

01:19:09  13  analyzing Claim 1 here?

01:19:10  14  A.  Absolutely, yes, sir.

01:19:13  15  Q.  Did you consider the prosecution history of the '049

01:19:15  16  patent, that is DTX-54, in forming your opinions for this

01:19:19  17  case?

01:19:20  18  A.  Yes, sir, I did.

01:19:21  19  Q.  Did you consider the prosecution history of the '756

01:19:25  20  patent, that is DTX-55, in forming your opinions in this

01:19:29  21  case?

01:19:29  22  A.  Yes, sir, I did.

01:19:31  23  Q.  Looking at the first claim here, can you explain how

01:19:38  24  the claim is organized?

01:19:40  25  A.  Yes.  As I said, I think you've heard this already

01:19:47   1   multiple times, but the claim discusses a number of steps

01:19:51   2   in here, and I have numbered those steps, and each step has

01:19:58   3   a specific things that it's asking for.

01:20:00   4   Q.   In some of the formatting that we see on the slide, is

01:20:04   5   a little different than the spacing of how the words in the

01:20:06   6   claim appear in the back of the patent itself.  Can you

01:20:09   7   explain that?

01:20:09   8   A.   Yes.  I -- I -- I changed the formatting a little bit

01:20:14   9   so that it's a bit easier to read, and I can explain it

01:20:18   10   better.  Otherwise, we'll have one column that we have to

01:20:20   11   go through, and it makes it a little bit --

01:20:23   12   Q.   In other words, it's all still the same?

01:20:28   13   A.   Absolutely the same exact content.

01:20:29   14   Q.   And is there any step in this claim that you'd like to

01:20:34   15   talk about first to explain the claim?

01:20:36   16   A.   So what I'd like to do is that, given that we've heard

01:20:40   17   the patent a few times, I'd like to go through very

01:20:44   18   specific and important things that are described in this

01:20:47   19   patent that, in my opinion, the Echo devices do not

01:20:57   20   infringe.

01:20:57   21        So let's go through Step [C], if you don't mind,

01:21:03   22   determining a delay.

01:21:06   23   Q.   Can you explain what we see here?

01:21:08   24   A.   Yes.  This is Step [C], which I call it [C], has a

01:21:12   25   number of substeps in there.  And this step has to do with

01:21:17  1  determining a delay.

01:21:19  2  Q.  And could you tell the jury what we see on the right

01:21:21  3  side of this slide?

01:21:23  4  A.  Yes.  The right side is a graphical representation that

01:21:28  5  is from the '049 patent, Figure 5, that describes --

01:21:32  6  illustrates how -- what is this delay and what is the

01:21:37  7  determination of the delay involved.

01:21:39  8  Q.  And what is highlighted in yellow right now?

01:21:41  9  A.  That's highlighted "determining a delay," and the

01:21:46  10  determining a delay -- the delay is the delay for the

01:21:50  11  microphone.

01:21:51  12        For example, as you can see in the right, we have

01:21:57  13  four microphones, microphone $M_1$, microphone $M_2$, microphone

01:22:11  14  $M_3$ and microphone $M_4$ -- sorry, from 0 -- microphone $M_0$ and

01:22:10  15  $_1$ and $_2$ and $_3$.  And the delay associated with the delay that

01:22:14  16  it takes for the sound from microphone $M_3$ to the origin of

01:22:17  17  the --

01:22:17  18  Q.  So is there a different delay for each of those

01:22:21  19  microphones?

01:22:21  20  A.  Yes.  We have tau$_3$ associated with a delay, according

01:22:26  21  to the microphone 3, and then tau$_1$ the delay associated

01:22:30  22  with the microphone 1.  Because as the sound propagates,

01:22:33  23  the sound is going to hit the different microphones at

01:22:36  24  different times.

01:22:36  25  Q.  There are a lot of words after the phrase "determining

| | | |
|---|---|---|
| 01:22:39 | 1 | a delay."  Could you explain what that means? |
| 01:22:42 | 2 | A.  Yes.  What this requires is a number of specific steps |
| 01:22:51 | 3 | that one has to go through in order -- that -- that the |
| 01:22:58 | 4 | patent requires. |
| 01:22:58 | 5 | So this patent -- this claim, this specific claim |
| 01:23:03 | 6 | requires that -- all of these different steps. |
| 01:23:07 | 7 | Q.  And can you explain what's shown in highlighted colors |
| 01:23:10 | 8 | here? |
| 01:23:10 | 9 | A.  Yes.  The highlighted colors correspond to what is in |
| 01:23:18 | 10 | the claim language and what the claim requires.  And I |
| 01:23:20 | 11 | highlighted it on the right to show that -- to find the |
| 01:23:25 | 12 | delay, what are the different parameters that we need -- |
| 01:23:28 | 13 | that the claim requires to -- to calculate or to determine. |
| 01:23:31 | 14 | Q.  So if a product is missing just one of these colored |
| 01:23:37 | 15 | items, then is using the product infringement? |
| 01:23:39 | 16 | A.  The product is using -- missing any of these, it does |
| 01:23:44 | 17 | not infringe. |
| 01:23:45 | 18 | Q.  How would you determine whether or not a product has |
| 01:23:48 | 19 | each of these items shown highlighted here? |
| 01:23:50 | 20 | A.  You have to look at the source code and see exactly how |
| 01:23:54 | 21 | the product is working and see if it is doing and |
| 01:23:58 | 22 | performing these steps or not. |
| 01:24:03 | 23 | Q.  And based on your review of the Echo source code, does |
| 01:24:07 | 24 | Echo perform these steps? |
| 01:24:08 | 25 | A.  Echo does not perform any of these steps in here. |

| | | |
|---|---|---|
| 01:24:11 | 1 | Q.  Do you recall Mr. McAlexander identifying any delay in |
| 01:24:17 | 2 | any source code of any Echo device that would satisfy this |
| 01:24:22 | 3 | claim language? |
| 01:24:22 | 4 | A.  No, sir, I do not see that. |
| 01:24:27 | 5 | Q.  Could you explain why the patent has this step for |
| 01:24:30 | 6 | determining a delay? |
| 01:24:32 | 7 | A.  Yes, sir.  Determining a delay, at a high level, it -- |
| 01:24:40 | 8 | if that delay, in terms of when the sound wave coming in, |
| 01:24:46 | 9 | it hits different microphones at different times, that |
| 01:24:49 | 10 | delay is used to form the beams. |
| 01:24:51 | 11 | That is very important, because then you can form |
| 01:24:54 | 12 | the beams in a specific direction that you want to do that. |
| 01:24:58 | 13 | So you need to know the delay in terms of when the sound is |
| 01:25:02 | 14 | coming and when it hits the different microphones. |
| 01:25:05 | 15 | Q.  And are you describing the method that is required by |
| 01:25:08 | 16 | the patent? |
| 01:25:09 | 17 | A.  Absolutely, yes, that's what the patent requires.  Yes. |
| 01:25:12 | 18 | Q.  Does Echo perform determinations to make a beam after |
| 01:25:17 | 19 | it receives sound? |
| 01:25:19 | 20 | A.  Echo does not calculate any delays, and all of the Echo |
| 01:25:28 | 21 | beams are determined before even Echo was shipped by the |
| 01:25:35 | 22 | designers at Amazon.  When Echo is shipped, the beams are |
| 01:25:39 | 23 | already formed, the beam coefficients are already |
| 01:25:42 | 24 | determined.  And when you plug it in, the beams are formed. |
| 01:25:45 | 25 | Q.  What is the table in the lower right side of this |

1001

01:25:49  1  slide?

01:25:49  2  A.  The table on the lower side is a calculation of how you

01:25:58  3  find the delay for different microphones.

01:26:04  4  Q.  Is there any other reason why the steps or the parts of

01:26:10  5  the determining a delay requirement are different than how

01:26:14  6  Echo works?

01:26:16  7  A.  Yes.

01:26:23  8  Q.  Can you explain what's highlighted?

01:26:25  9  A.  Yes.  As -- as you can see in No. 4, the delay has to

01:26:32  10  be represented in terms of number of samples, in terms of a

01:26:36  11  number, which is a number of samples of -- of that delay.

01:26:41  12  Q.  And what does the next step describe?

01:26:44  13  A.  The next step is going to be describing, as the person

01:26:49  14  is talking, how the waves are going to be doing that.  So

01:26:52  15  this next step is discussing the determination of the delay

01:26:56  16  enables beamforming.

01:26:57  17       So what we're doing here -- what -- what the

01:27:00  18  patent requires is that once you determine the delay, based

01:27:03  19  on these angles that we've been talking about, then after

01:27:10  20  the delay is determined based on number of samples, then

01:27:13  21  that enables the beamforming, then you form the beams.

01:27:16  22  Q.  Can you show that?

01:27:18  23  A.  Yes.  If you don't mind, let's go to the next slide.

01:27:21  24       So as we can see here, after -- after the speaker

01:27:29  25  speaks, the delay is determined.  Once the delay is

01:27:35  1  determined, after that, then the beam is formed.

01:27:42  2  Q.  Does Echo perform the determining a delay step required

01:27:46  3  by Claim 1?

01:27:47  4  A.  No, sir, it does not.

01:27:49  5  Q.  Is there any other step here that you'd like to discuss

01:27:52  6  next?

01:27:52  7  A.  Yes.  Next go to the next step, if you don't mind, next

01:27:57  8  slide.

01:27:58  9       So this one is an Element [E], which is

01:28:06  10  beamforming adaptive -- performing adaptive beamforming.

01:28:09  11  Q.  And did you use the Court's construction of the claim

01:28:14  12  term "adaptive beamforming" in forming your opinions here?

01:28:16  13  A.  Yes, sir, I did.

01:28:18  14  Q.  Can you explain what that construction tells us?

01:28:28  15  A.  What this construction says that -- adaptive

01:28:32  16  beamforming is a beamforming process where the directivity

01:28:36  17  pattern of the microphone array is capable of being

01:28:40  18  adaptively steered in the direction of the -- of a target

01:28:48  19  sound signal emitted by a target sound source in motion.

01:28:52  20  Q.  What is a directivity pattern?

01:28:53  21  A.  Directivity pattern is the direction that the pattern

01:28:59  22  is -- is pointing at, the pattern is going at.

01:29:02  23  Q.  Is that related to a beam?

01:29:04  24  A.  Yes.

01:29:04  25  Q.  Can you explain how?

01:29:05  1  A.  By -- by getting the coefficients from the -- from

01:29:13  2  getting the delay and the coefficients, and the

01:29:15  3  coefficients -- or the weights determine the directivity

01:29:19  4  pattern of the beam.

01:29:20  5  Q.  And so is the directivity pattern the beam?

01:29:23  6  A.  Yes.

01:29:24  7  Q.  And so we've heard a lot about different types of

01:29:30  8  adaptive beamforming.  Can you tell us what type of

01:29:32  9  adaptive beamforming this patent claim requires, based on

01:29:36  10  the language we see here?

01:29:39  11  A.  Yes.  I'll try to give a high-level description of what

01:29:43  12  this is.

01:29:43  13       So this is a -- a beamforming process that the

01:29:51  14  directivity pattern of the microphone, once you form the

01:29:53  15  beam, the direct direction that's going, is capable -- it

01:29:58  16  has the ability to, of being adaptively steered.  So you

01:30:04  17  can steer that in the direction of the target sound signal

01:30:07  18  emitted by the target sound source in motion.

01:30:10  19       So it needs to have a target sound signal,

01:30:14  20  somebody has to be there as a target sound signal speaking

01:30:17  21  and that person is moving, then this adaptive beamforming

01:30:21  22  allows to steer this beam as the target sound signal is

01:30:24  23  moving.

01:30:25  24  Q.  How many directivity patterns does an Echo with six

01:30:28  25  beams have?

1004

01:30:29  1   A.  I did not hear the last part of your question.  Please

01:30:35  2   repeat.

01:30:36  3   Q.  Absolutely.

01:30:37  4        How many directivity patterns does an Echo with

01:30:42  5   six beams have?

01:30:42  6   A.  It has permanently six beampatterns.

01:30:47  7   Q.  And are those the directivity patterns?

01:30:49  8   A.  Those are pointing at six different directions, yes.

01:30:52  9   Q.  Can you show us how the performing adaptive beamforming

01:30:55  10  for steering step works in connection with other steps in

01:30:59  11  Claim 1?

01:31:00  12  A.  Yes, I can.  If you don't mind going to --

01:31:07  13  Q.  So what do we see here?

01:31:09  14  A.  What I'm doing is only giving a high level, a few words

01:31:16  15  of each one of the number of -- Claim No. 1 that it

01:31:22  16  requires, just to illustrate what the requirements are.

01:31:24  17        So the first requirement -- what we have on the

01:31:27  18  left is Figure 16A from the patent, '049.  And on the left

01:31:36  19  what we see is that -- let's focus only on the middle of it

01:31:40  20  which has $M_1$, $M_2$, $M_3$, $M_4$.  There are eight microphones

01:31:47  21  positioned around the circle on the left.

01:31:51  22  Q.  And what is shown in the next slide here?

01:31:53  23  A.  On the right, what we have is that as the -- so I'm

01:31:58  24  going to go through each one of these steps.

01:32:00  25        So this is the first one, Part [a], was providing

01:32:05  1  a microphone array.  So we have provided that -- we have --

01:32:09  2  the -- I'm describing the patent, so I apologize.  When I

01:32:10  3  saw we, I mean I'm trying to describe the patent.

01:32:15  4  What the patent requires is that, [a], providing a

01:32:21  5  microphone array system; [b], receiving the said sound

01:32:25  6  signals, so now the speaker is talking and the said sound

01:32:26  7  signal comes in; [c], determining a delay.

01:32:28  8  And this determining a delay, you need to know

01:32:31  9  where the sound signal is coming in, because one of the

01:32:34  10  angles that you need to calculate is this azimuth angle

01:32:36  11  that we've been talking about for the past few days.  You

01:32:39  12  need to calculate that.

01:32:39  13  And to know that, you need to know where the said

01:32:43  14  sound signal is coming from.  And then from that, you

01:32:46  15  determine a delay.  Then determining a delay, it enables

01:32:51  16  beamforming.

01:32:51  17  Now you're able -- you have all the information to

01:32:54  18  enable beamforming.  And then you form the beam.

01:32:56  19  And then Part [e] is saying that you have the

01:33:02  20  ability and capability to steer the beam.  So we're -- as

01:33:05  21  the speaker is moving around, the coefficents are updated

01:33:09  22  and changed because now the delays are calculated in

01:33:12  23  real-time.  The delays are calculated in real-time based on

01:33:17  24  the new angles as the speaker is moving.

01:33:18  25  From those angles, you calculate the new

01:33:21  1  coefficients.  From the new coefficients, you form new

01:33:25  2  beams, and steer the beams in different directions as the

01:33:30  3  speaker is moving.

01:33:30  4  Q.  Do any of the Echo devices perform adaptive beamforming

01:33:34  5  for steering a directivity pattern?

01:33:35  6  A.  No, sir, they do not.  Echo devices have a fixed beam.

01:33:38  7  The beams are always fixed at the same direction all the

01:33:42  8  time.

01:33:43  9  Q.  Looking back at the, quote, claim language, can you

01:33:47  10  give us a comparison between the '049 patent's requirements

01:33:53  11  in Claim 1 and how Echo works?

01:33:55  12  A.  Yes.  If we can --

01:34:04  13  Q.  Why do we see a table with no numbers on the left?

01:34:07  14  A.  So what I have here -- before we go there -- is that I

01:34:13  15  have two columns.  On the left I have the -- what the

01:34:13  16  patent requires, and on the right I have what Echo is

01:34:16  17  actually doing.  Let's focus on the left.

01:34:18  18         Again, the same eight microphones, and I have a

01:34:21  19  table on top.  This table are the coefficients for forming

01:34:24  20  the beams.  I need those coefficients to form the beams.

01:34:27  21  Q.  And here we don't yet see anyone speaking; is that

01:34:30  22  correct?

01:34:30  23  A.  We don't see anybody speaking, so no beams are formed

01:34:34  24  and no coefficients are there.

01:34:35  25  Q.  And that's with the patent?

01:34:38  1   A.   That's what the patent requires, yes.

01:34:40  2   Q.   And, by comparison, even before someone speaks, what do

01:34:43  3   we see for Echo?

01:34:44  4   A.   So, on the right side, what you see is the Echo.  As I

01:34:49  5   mentioned already, the Echo has coefficients that are

01:34:52  6   already pre-set in the factory.  So the beams are formed.

01:34:56  7        And those beams are pointing at the specific

01:34:58  8   directions that the designer designed it at, and we add the

01:35:02  9   coefficients.  And those coefficients are pre-set, and they

01:35:04  10  are constant.  They do not change.

01:35:06  11  Q.   Can you show us what happens when someone speaks to a

01:35:10  12  device using the patent?

01:35:11  13  A.   What the patent requires is that when somebody speaks,

01:35:15  14  based on the delays, on all the steps I described already

01:35:19  15  in the previous slides, then it forms a patent [sic] and it

01:35:22  16  fills up the coefficients.

01:35:24  17        And as you can see, I want to focus a little

01:35:27  18  bit -- if you can repeat the slide again, if you don't

01:35:29  19  mind.

01:35:30  20        As you can see, as the person is moving, the

01:35:34  21  coefficients are changing.

01:35:37  22  Q.   Did you mean to say this forms a beam?

01:35:41  23  A.   Yes, forming the beam.  Yes, thank you.

01:35:44  24  Q.   Can you compare that to what we see on the right side

01:35:48  25  when someone speaks to an Echo device?

01:35:50   1   A.  When somebody speaks on the right side, the Echo beams
01:35:53   2   do not change directions.  They are at exactly the same
01:35:58   3   place they were.  They're all constantly receiving the
01:36:00   4   signal.  And the one that hears the speaker the best or has
01:36:05   5   a better signal is the one that's going to be selected.
01:36:08   6   And that's the one that's -- you can see No. 3, for
01:36:12   7   example.
01:36:12   8        And what the coefficients here -- I want to point
01:36:14   9   out again, the coefficients here do not change.  The
01:36:17  10   coefficients are not adaptive.  They are constant, and they
01:36:21  11   stay the same.
01:36:21  12   Q.  Is there a difference between beamforming and beam
01:36:26  13   selection?
01:36:27  14   A.  Excuse me.
01:36:30  15        Yes, sir, there is a significant difference
01:36:35  16   between them.  They are two different things.
01:36:37  17   Q.  Can you summarize some of the differences that we've
01:36:40  18   seen so far between the '049 patent and the Echo?
01:36:48  19   A.  Yes.  If you don't mind, let's go to the next slide.
01:36:50  20        And, again, here what I've done, on the left is
01:36:52  21   the '049 patent requirements.  This is what the claim
01:36:56  22   requires.  These are all the steps that must be done
01:36:58  23   exactly as is pointed out.
01:37:00  24        And on the right is what the Echo device does.
01:37:03  25   Q.  And, to be clear, the -- well, could you read the items

01:37:06  1   on the left under '049 patent?

01:37:08  2   A.  Yes.  On the left, what we have is that there are

01:37:12  3   four -- there are four -- this is a summary, so there are

01:37:16  4   five steps involved in there.

01:37:17  5        It receives the sound, determines a delay based on

01:37:21  6   the sound -- because if you remember, I was talking about

01:37:24  7   azimuth and all these angles, it has to determine those

01:37:28  8   angles.

01:37:28  9        Then it forms a beam based on the determination of

01:37:33  10  the delay in real-time.  Then once it has that, then it

01:37:38  11  steers that, but it only forms one beam, and that one beam

01:37:42  12  is the one that's the steering.

01:37:43  13  Q.  So given that the claim doesn't specifically describe

01:37:46  14  only having one beam, can you explain why you, with your

01:37:50  15  experience, understand that there's one beam without

01:37:53  16  selection in the '049 patent?

01:37:55  17  A.  Yes.  Because what you've done is that you have created

01:38:04  18  a -- really all the coefficients are used to specifically

01:38:07  19  create a beam that is focusing towards the speaker.  You're

01:38:12  20  not selecting them on many different beams.  You have

01:38:15  21  designed this adaptively customized coefficients for that

01:38:19  22  direction in there.  So, I mean, this --

01:38:23  23  Q.  Can you --

01:38:24  24  A.  Yes.

01:38:25  25  Q.  -- can you explain what we see on the right side for

01:38:27  1   Echo?

01:38:27  2   A.  Thank you.  On the right, what we see is that the Echo

01:38:32  3   has pre-set coefficients.  It has permanent beams.  The

01:38:38  4   beams are the same.  They're pointing all at specifically

01:38:42  5   set directions when it leaves the factory.

01:38:46  6         And when you bring it in the house and you plug it

01:38:49  7   in, it receives the sound.  The beams are already formed.

01:38:55  8   All the beams are listening constantly at six different

01:38:58  9   directions.

01:38:59  10        And if it happens that somebody speaks and says

01:39:05  11  "Alexa," the beam -- all the beams process in the list.

01:39:10  12        But the one that is closest and has the best --

01:39:12  13  not the closest -- the one that has the best

01:39:15  14  signal because -- it may not be closest -- the one that has

01:39:19  15  the best signal is going to be the one that is selected in

01:39:22  16  Step No. 4.

01:39:23  17  Q.  Are the differences between the '049 patent and the

01:39:25  18  Echo significant?

01:39:26  19  A.  They're substantially different.  They're very

01:39:28  20  different.

01:39:29  21  Q.  Did you observe Mr. McAlexander testify regarding this

01:39:34  22  Slide 44 in his presentation?

01:39:37  23  A.  Yes, sir, I did.

01:39:39  24  Q.  Did this drawing show determining a delay as required

01:39:42  25  by the '049 patent?

1011

01:39:44   1   A.   No, sir, it does not.

01:39:46   2   Q.   Did you hear testimony in this case regarding the light

01:39:50   3   ring on the top of the Echo?

01:39:52   4   A.   Yes.   I also had -- had the products tested myself.

01:39:58   5   Q.   Is a light ring a beam?

01:40:00   6   A.   The light -- the light is not a beam.   The light is

01:40:04   7   simply an LED.

01:40:05   8   Q.   Did you observe Mr. McAlexander testify regarding

01:40:09   9   Slide 45 from his presentation, as shown here?

01:40:13   10   A.   Yes, sir, I did.

01:40:14   11   Q.   Is this an accurate description of how the Echo

01:40:18   12   products perform beamforming?

01:40:20   13   A.   No, it's not.

01:40:21   14   Q.   Can you explain?

01:40:24   15   A.   Yes.   First, let's focus on the left on the little

01:40:30   16   software code that's in there, if you don't mind.

01:40:33   17        And, in there, it is a -- a few lines -- about

01:40:37   18   nine lines of a file called sdb.cpp, which is, again, one

01:40:44   19   of the files -- it's for -- really SDB stands for super

01:40:51   20   directive beamforming.   Let me slow down.   Super directive

01:40:54   21   beamforming.   And it's the source code that is run on the

01:40:56   22   device.

01:40:56   23        And this is only a few lines.   First few lines of

01:41:00   24   this file -- I remember this file.   It's a significantly

01:41:03   25   large file.   And -- and SDB::process -- this is -- this

01:41:10    1    means this is a process.  It's a soft routine, if you're

01:41:11    2    familiar with what software means.  And then it has a

01:41:13    3    number of inputs.

01:41:15    4         For example, it says AudioFramePointer.  It's

01:41:22    5    pointing to fbfIn, which is fixed beamformer input signal,

01:41:27    6    and then another -- another variable, which is at the end

01:41:29    7    of that first line, fbfOut.  And then there's a couple of

01:41:33    8    things in here.  It's just the beginning of this routine.

01:41:35    9    There is nothing about delay here.

01:41:37   10         And all it has is at No. 77, it says:  If not

01:41:42   11    bypass -- means that if I do not bypass the beamforming, do

01:41:44   12    the following.  So the real following is really what's

01:41:46   13    happening afterwards.

01:41:47   14    Q.  Did you hear Mr. McAlexander testify regarding the Fast

01:41:53   15    Fourier Transformations?

01:41:54   16    A.  Yes, sir, I did.

01:41:55   17    Q.  Does performing a Fast Fourier Transformation

01:41:59   18    inherently involve some determination of a delay to

01:42:03   19    calculate -- or, sorry, to satisfy that step in the patent

01:42:05   20    claim?

01:42:05   21    A.  I disagree.  It does not.

01:42:13   22         MR. LAQUER:  And if we could pull up PTX-386.

01:42:27   23         THE TECHNICIAN:  386?

01:42:29   24         MR. LAQUER:  Yes.  Thank you.

01:42:31   25    Q.  (By Mr. Laquer)  Do you recall Mr. McAlexander

01:42:33  1    testifying regarding PTX-386?

01:42:38  2    A.  Yes, sir.  I have a hard time reading it from here, let

01:42:42  3    alone the audience --

01:42:43  4         MR. LAQUER:  Can we expand just the top part

01:42:46  5    there?

01:42:46  6    A.  Yes, I do.

01:42:47  7    Q.  (By Mr. Laquer)  Do you know what type of a file this

01:42:49  8    is?

01:42:49  9    A.  This is a -- one of the MATLAB files that I was talking

01:42:54  10   about.  This is done by the Amazon engineers in their labs

01:43:00  11   to determine and simulate the Echo system and find some of

01:43:10  12   the coefficients.

01:43:10  13   Q.  Is it even possible for this to be run on an Echo?

01:43:13  14   A.  No.  MATLAB file does not run on an Echo.  This is

01:43:16  15   simply simulations that is done in advance and trying to

01:43:23  16   perform some simulations here.

01:43:24  17   Q.  Does anything that's done in MATLAB determine anything

01:43:28  18   based on any actual sound?

01:43:31  19   A.  Anything -- this is not run on the device itself.  So,

01:43:37  20   no, it does not.  In MATLAB, this has nothing to do with

01:43:39  21   the real voice.

01:43:41  22   Q.  But does it have -- in MATLAB, is there any use of

01:43:44  23   actual sound?

01:43:45  24   A.  No, because there is no real sound that is being

01:43:47  25   generated here.  In simulations, they generate sound here

1014

01:43:51   1   to perform the process and calculations here, but there is

01:43:55   2   no real audio signal.  And there is no target sound source.

01:43:58   3          There is none of these things that the patent

01:44:01   4   requires for any of the calculations in here.  This is all

01:44:04   5   done in the factory by the Amazon designers in advance.

01:44:08   6          MR. LAQUER:  Let's go back to the claim language

01:44:15   7   here.

01:44:16   8   Q.  (By Mr. Laquer)  Do any of the Echo devices -- sorry,

01:44:19   9   is there any other claim limitation that you would like to

01:44:22  10   discuss here in Claim 1?

01:44:24  11   A.  Yes, I do.  If you don't mind, give me a second.  Yeah,

01:44:28  12   let's go to A1 if you don't mind, please.

01:44:31  13   Q.  So we see the digital signal processor is highlighted?

01:44:34  14   A.  Yes.  Thank you.

01:44:39  15   Q.  Did you use the Court's construction of a digital

01:44:42  16   signal processor in analyzing this limitation?

01:44:43  17   A.  Yes, I did.  A digital signal processor, as constructed

01:44:46  18   by the Court, is:  The processor that is specialized for

01:44:51  19   mathematical processing of digital signals.

01:44:55  20   Q.  Is there any difference between the Echo products in

01:44:58  21   this case regarding whether or not they have a digital

01:45:02  22   signal processor?

01:45:02  23   A.  There is.  And if you go to the next slide, I can

01:45:04  24   describe that.

01:45:05  25          So if you remember a few slides ago, I -- when I

01:45:09  1  showed -- I think it was the second or third slide that I

01:45:11  2  had at the beginning of my presentation, my testimony, I

01:45:15  3  talked about the Doppler products and the MPAF products.

01:45:19  4       So the Doppler products that were first designed

01:45:22  5  and produced before April of 2016, the name of the device

01:45:30  6  is on top, as you can see.  Those are Echo and Pancake.

01:45:34  7  And they use -- the yellow is a digital signal processor.

01:45:39  8       So those two devices did -- did use a digital

01:45:45  9  signal processor.  And actually within the processor they

01:45:47  10  were using, is a DSP, or the digital signal processor,

01:45:51  11  called Texas Instrument TI3200, that I'm very familiar

01:45:57  12  with.  I've been teaching that processor for many years.

01:46:01  13  Q.  And is it your understanding that this is an internal

01:46:05  14  Amazon document?

01:46:05  15  A.  Yes, it is.  It is Amazon -- it has Amazon number at

01:46:11  16  the bottom 5158.

01:46:14  17  Q.  Why do we see CPU for some of the boxes on the right

01:46:19  18  where on that same row there is DSP on the left?

01:46:22  19  A.  So what CPU stands for -- stands for central processing

01:46:28  20  unit.  It's a general purpose processor.

01:46:32  21       So then later on, Amazon, for their projects after

01:46:32  22  April of 2016, they used general processors, and the two

01:46:37  23  that -- that they have used I've studied are the MediaTeks

01:46:43  24  and the Intel Neons.

01:46:49  25  Q.  Can you explain how Amazon's change of the type of

01:46:53   1   processor that it uses affects your analysis of this

01:47:01   2   digital signal processor requirement in Claim 1 of the

01:47:03   3   patent?

01:47:03   4   A.   So on this requirement for Claim 1, the top two

01:47:14   5   products in Doppler, in my opinion, they do meet that

01:47:16   6   requirement.   And they perform that.   They have a DSP on

01:47:19   7   their products, which is using the Texas Instrument digital

01:47:23   8   signal processor as part of that DSP.

01:47:26   9   Q.   And, to be clear, though, for those products that do

01:47:29  10   have a DSP, are there other requirements from the patent

01:47:32  11   claim that those products do not perform?

01:47:35  12   A.   Yes.

01:47:35  13   Q.   And so is every requirement of the patent claim

01:47:41  14   necessary to be performed for there to be infringement?

01:47:44  15   A.   Yes.   What I'd like to do is -- is I'll come back to --

01:47:52  16   in a couple of slides to that.   But what I'd like to do is

01:47:55  17   remind you all that there are -- there are two other claim

01:47:58  18   requirements that the Doppler products do not meet.   And we

01:48:01  19   discussed them already.

01:48:03  20        The third requirement that I'm talking about,

01:48:05  21   which is a requirement [C] and a requirement [E], so the

01:48:12  22   Doppler products do not meet that.   The Doppler products do

01:48:16  23   meet the top one, which is a digital signal processor.

01:48:19  24   Q.   So for the MPAF products, is it your opinion whether or

01:48:22  25   not those products satisfy Step 1 of Claim 1?

| | | |
|---|---|---|
| 01:48:27 | 1 | A.   That's correct.  So I'd like to put an X on that. |
| 01:48:37 | 2 | Q.   Does that X reflect -- well, can you explain whether or |
| 01:48:41 | 3 | not the MPAF products do or do not have a digital signal |
| 01:48:43 | 4 | processor? |
| 01:48:43 | 5 | A.   The MPAF products -- the MPAF products -- products do |
| 01:48:47 | 6 | not have a digital signal processor, and they do not meet |
| 01:48:50 | 7 | this claim requirement. |
| 01:48:53 | 8 | Q.   What is different about the processor of the MPAF |
| 01:48:58 | 9 | products compared to a digital signal processor as |
| 01:49:00 | 10 | construed in this case? |
| 01:49:01 | 11 | A.   Well, we are looking at the Court constructions of a |
| 01:49:08 | 12 | digital signal processor, what it means.  And my analysis |
| 01:49:10 | 13 | is based on that, and also my experience of working with |
| 01:49:16 | 14 | digital signal processors for the past 35 years.  And those |
| 01:49:20 | 15 | two are using the Intel Neon and the MediaTek processors |
| 01:49:27 | 16 | that are not digital signal processors.  Those are general |
| 01:49:30 | 17 | processors, general purpose processors or CPUs. |
| 01:49:33 | 18 | Q.   Did you hear Mr. McAlexander testify that some of the |
| 01:49:36 | 19 | accused Echo products use a MediaTek MT7658 processor? |
| 01:49:43 | 20 | A.   Can you repeat the number? |
| 01:49:45 | 21 | Q.   MT7658. |
| 01:49:50 | 22 | A.   Yes, actually, that refreshes my mind.  I did look at |
| 01:49:53 | 23 | that -- I -- I have not heard of that processor before by |
| 01:49:59 | 24 | MediaTek.  So I looked online.  Also, I looked at the |
| 01:50:02 | 25 | MediaTek data sheet itself.  I did not find that processor. |

01:50:06    1            And I Googled, and it was somewhere -- in a
01:50:09    2  Wiki -- on a couple of sites I saw there was a processor of
01:50:12    3  such.  But I could not verify what it is and on what I was
01:50:16    4  trying to do.  But I did not see it on the MediaTek
01:50:20    5  website.
01:50:20    6  Q.  Is anything that you found online, was that able to
01:50:23    7  tell you what type of performance the MT7658 has?
01:50:27    8  A.  Yes.  These were -- you know, one of those usual -- it
01:50:30    9  talked about Wi-Fi and Bluetooth processors, Wi-Fi and
01:50:35   10  Bluetooth chips.  That's all the information I could get,
01:50:38   11  and I did it again last night myself just to make sure I
01:50:42   12  didn't make any mistake.
01:50:44   13  Q.  Have you seen any evidence in this case that that
01:50:49   14  MT7658, if it does exist, is a digital signal processor?
01:50:51   15  A.  I cannot tell you.  I did not see any information on
01:50:53   16  that using the MediaTek's official website and data sheet.
01:50:59   17  Q.  Did you hear Mr. McAlexander testify that providing the
01:51:04   18  microphone array technology that is accused in the Echo
01:51:09   19  devices is about equal to the entire value of the product
01:51:16   20  as customers obtain the product?
01:51:19   21  A.  I disagree with that statement.
01:51:20   22  Q.  Can you explain why?
01:51:21   23  A.  Because at the -- as we heard this morning, and I was
01:51:30   24  here also when Mr. Prasad and Mr. Hilmes talked, and my own
01:51:39   25  information, the Echo is capturing the signal.

01:51:49  1          There is a vast large Cloud of computing.  The

01:51:57  2   Alexa is performing many, many steps, the natural

01:52:01  3   languages, artificial intelligence, the machine learning,

01:52:05  4   and so on and so forth.  This is significant.

01:52:08  5          This has been going on -- the research in these

01:52:09  6   areas have been going on for many, many many years,

01:52:13  7   starting in Bell Labs.  What they have developed is

01:52:16  8   amazing.  And that has, as also Mr. Prasad said, thousands

01:52:21  9   of people are working on it.  That is the significant part

01:52:23  10  of the Alexa system.

01:52:24  11  Q.  So in considering the total technical benefit that the

01:52:29  12  customer of an Echo device receives from the product, what

01:52:32  13  amount of the benefit is from the microphone array, if you

01:52:35  14  were to give a generous percentage?

01:52:37  15  A.  I did the analysis of that.  I looked at -- based on my

01:52:43  16  own expertise in terms of what is in there and what are the

01:52:47  17  different components, and I gave a percentage, created a

01:52:51  18  table, and looked at it, and I was being very generous, and

01:52:54  19  I gave it a 5 -- 5.5 percent.

01:52:56  20  Q.  Looking at the next slide, you can see Claim 8 listed

01:53:00  21  below Claim 1.  And Claim 8 begins with the words "the

01:53:05  22  method of Claim 1" and continues.  Do you see that?

01:53:08  23  A.  Yes, sir, I do.

01:53:09  24  Q.  For your non-infringement analysis, can you explain how

01:53:13  25  your opinion of Claim 1 affects your opinion of Claim 8?

01:53:16  1   A.  Claim 8 depends on Claim 1.  And if the Echo devices do

01:53:23  2   not perform the steps in Claim 1, they also do not infringe

01:53:30  3   the claim.

01:53:31  4   Q.  So stepping back and just speaking about what you've

01:53:34  5   explained and what you've shown us, the comparison between

01:53:37  6   the '049 patent and the way that the Echo devices work, how

01:53:45  7   significant are those differences?

01:53:46  8   A.  In my opinion, they are significantly different.  From

01:53:50  9   the time you turn them on, to all the different steps they

01:53:54  10  go through, all the different processings they do, as soon

01:53:59  11  as you turn on the Echo devices, all the beams turn on, the

01:54:04  12  microphones capturing the signal, the beams are formed, and

01:54:07  13  it's listening.

01:54:08  14         And, as I explained, the '049 patent requires all

01:54:11  15  these different steps, able to perform the beams and the

01:54:16  16  calculations needed and then perform adaptive beamforming

01:54:18  17  and steering, so...

01:54:21  18  Q.  Looking back at the slide, do any of the Echo devices

01:54:29  19  in this case infringe either Claim 1 or Claim 8 of the '049

01:54:35  20  patent?

01:54:35  21  A.  No, they do not.

01:54:38  22         MR. LAQUER:  I pass the witness.

01:54:39  23         THE COURT:  Cross-examination by the Plaintiff.

01:54:53  24         Are there binders to distribute, counsel?

01:54:56  25         MR. LAMBRIANAKOS:  Yes, Your Honor.

| | | |
|---|---|---|
| 01:54:58 | 1 | THE COURT:  Let's do that now. |
| 01:55:04 | 2 | THE WITNESS:  Your Honor, while they're getting |
| 01:55:06 | 3 | the binders, can I also get another water bottle? |
| 01:55:10 | 4 | THE COURT:  Somebody from the Defendants' table |
| 01:55:12 | 5 | will -- |
| 01:55:13 | 6 | THE WITNESS:  Thank you. |
| 01:55:13 | 7 | THE COURT:  -- bring you another water. |
| 01:55:16 | 8 | THE WITNESS:  Thank you, Your Honor. |
| 01:55:21 | 9 | Thank you, sir.  Thank you. |
| 01:55:23 | 10 | COURT SECURITY OFFICER:  Uh-huh. |
| 01:55:26 | 11 | THE COURT:  Whatever that noise was, let's don't |
| 01:55:28 | 12 | do it again. |
| 01:55:30 | 13 | All right.  Let's proceed. |
| 01:55:31 | 14 | THE WITNESS:  I apologize, Your Honor. |
| 01:55:31 | 15 | CROSS-EXAMINATION |
| 01:55:34 | 16 | BY MR. LAMBRIANAKOS: |
| 01:55:34 | 17 | Q.  Good afternoon, Dr. Kiaei. |
| 01:55:36 | 18 | A.  Good afternoon, sir. |
| 01:55:37 | 19 | Q.  Are you one of the world's leading acoustic processing |
| 01:55:41 | 20 | experts? |
| 01:55:41 | 21 | A.  I -- I have worked on acoustic and audio processing for |
| 01:55:51 | 22 | many years. |
| 01:55:51 | 23 | Q.  Do you agree with counsel's statement in openings that |
| 01:55:54 | 24 | you're one of the world's leading acoustic processing |
| 01:56:02 | 25 | experts? |

01:56:03  1  A.  Counsel was generous.  I would say that I am an expert

01:56:05  2  in this area.

01:56:05  3  Q.  But are you one of the world's leading experts in this

01:56:09  4  area of acoustic processing?

01:56:10  5  A.  I am well-known in my research work, and I'm also --

01:56:13  6  yes, I am.

01:56:14  7  Q.  You have a website, don't you, Dr. Kiaei, where you

01:56:17  8  market yourself as an expert?

01:56:18  9  A.  Yes, I do.

01:56:19  10  Q.  Is that hitechexpertwitness.com?

01:56:22  11  A.  Yes, it is.

01:56:23  12  Q.  On that website, you identify your areas of technical

01:56:30  13  expertise?

01:56:30  14  A.  Yes.  And before I go further in that, I want to

01:56:33  15  emphasize that that website, I developed myself, and I

01:56:37  16  haven't worked on it much.  So that website is still

01:56:42  17  underdeveloped.  There's many things missing in that

01:56:43  18  website.  It is my own creation.

01:56:44  19        THE COURT:  Just a minute.

01:56:45  20        Dr. Kiaei, you're here to answer the counsel's

01:56:47  21  questions.  You're not here to offer explanations that are

01:56:50  22  not called for by the questions.

01:56:52  23        If he wants to know about the status of your

01:56:55  24  website and is it complete and is it still being worked on,

01:56:58  25  he will ask that, but limit your answers to the questions

01:57:01   1   that are asked, please, sir.

01:57:03   2             THE WITNESS:  Yes, Your Honor.  Thank you.  I

01:57:04   3   will.

01:57:04   4             THE COURT:  Let's proceed, counsel.

01:57:06   5             MR. LAMBRIANAKOS:  Your Honor, can we strike the

01:57:08   6   portion of his answer following his initial response?

01:57:10   7             THE COURT:  I'll retain the answer, yes.  The rest

01:57:14   8   of it and before I go further, et cetera, I will strike as

01:57:17   9   non-responsive.

01:57:18  10             Let's proceed.

01:57:20  11   Q.  (By Mr. Lambrianakos)  And you have this website to

01:57:22  12   help you get hired as an expert witness, right?

01:57:25  13   A.  Yes, I do.

01:57:26  14   Q.  Because you enjoy this kind of work, right?

01:57:28  15   A.  Yes, I do.

01:57:29  16   Q.  And it's lucrative; you bill $400.00 an hour for your

01:57:32  17   opinions, right?

01:57:32  18   A.  Yes, I do.

01:57:34  19   Q.  Now, on that website, you list areas of technical

01:57:41  20   expertise that you believe you bring to a potential client,

01:57:45  21   right?

01:57:45  22   A.  Yes, I do.

01:57:46  23   Q.  And you say on that website that you're an expert

01:57:50  24   witness in wireless and wireline communications, right?

01:57:53  25   A.  Yes, sir.

| | | |
|---|---|---|
| 01:57:54 | 1 | Q. Integrated circuits? |
| 01:57:56 | 2 | A. Yes, sir. |
| 01:57:56 | 3 | Q. Radio frequency? |
| 01:57:58 | 4 | A. Yes, sir. |
| 01:58:00 | 5 | Q. Power management? |
| 01:58:01 | 6 | A. Yes, sir. |
| 01:58:03 | 7 | Q. Bioelectronics, right? |
| 01:58:04 | 8 | A. Yes, sir. |
| 01:58:05 | 9 | Q. You don't say that you -- you are an expert in acoustic |
| 01:58:12 | 10 | processing, do you? |
| 01:58:13 | 11 | A. I have not indicated that. |
| 01:58:15 | 12 | Q. In fact, you have a resume that you link to your |
| 01:58:19 | 13 | website, right? |
| 01:58:20 | 14 | A. Yes, sir. |
| 01:58:20 | 15 | Q. Someone can click a button and download your -- your |
| 01:58:24 | 16 | resume? |
| 01:58:25 | 17 | A. Yes, sir. |
| 01:58:25 | 18 | Q. And your resume is, of course, complete and truthful, |
| 01:58:30 | 19 | right? |
| 01:58:30 | 20 | A. Yes, sir, it is. |
| 01:58:31 | 21 | Q. You wouldn't put anything on your resume that wasn't |
| 01:58:36 | 22 | accurate, right? |
| 01:58:37 | 23 | A. Yes, sir. |
| 01:58:37 | 24 | Q. And your -- your resume lists several fields of |
| 01:58:41 | 25 | specialization right -- right at the beginning, doesn't it? |

| | | |
|---|---|---|
| 01:58:44 | 1 | A.  Yes, it does. |
| 01:58:45 | 2 | Q.  And it includes communication systems, right? |
| 01:58:48 | 3 | A.  Yes, sir. |
| 01:58:48 | 4 | Q.  Wireless and wireline communication systems? |
| 01:58:53 | 5 | A.  Yes, sir. |
| 01:58:54 | 6 | Q.  Radio frequency integrated circuits? |
| 01:58:59 | 7 | A.  Yes, sir. |
| 01:58:59 | 8 | Q.  Analog and digital integrated circuits? |
| 01:59:04 | 9 | A.  Yes, sir. |
| 01:59:04 | 10 | Q.  Sensors? |
| 01:59:05 | 11 | A.  Yes, sir. |
| 01:59:05 | 12 | Q.  Bioelectronics? |
| 01:59:07 | 13 | A.  Yes, sir. |
| 01:59:07 | 14 | Q.  And power management IC? |
| 01:59:10 | 15 | A.  Yes, sir. |
| 01:59:10 | 16 | Q.  Doesn't include acoustic processing, right? |
| 01:59:14 | 17 | A.  You're correct. |
| 01:59:18 | 18 | Q.  Your resume is, what, about 23 pages long?  But it |
| 01:59:22 | 19 | never mentions acoustic processing once, does it? |
| 01:59:25 | 20 | A.  No, it doesn't. |
| 01:59:26 | 21 | Q.  You're familiar with the standard for determining |
| 01:59:35 | 22 | patent infringement, right? |
| 01:59:36 | 23 | A.  Yes, sir. |
| 01:59:37 | 24 | Q.  The first step in the infringement analysis is to |
| 01:59:40 | 25 | understand the scope of the claims? |

01:59:43  1   A.  Yes, sir.

01:59:45  2   Q.  And you agree that the claimed invention is defined by

01:59:48  3   the words in the claims, right?

01:59:51  4   A.  Yes.  The claim -- what is claimed in the patent is

01:59:57  5   described in the body of the patent.  You have to read the

02:00:02  6   body of the patent.

02:00:04  7   Q.  But you agree that the scope of the invention is

02:00:06  8   defined by the words of the claims, not the specification,

02:00:08  9   right?

02:00:08  10  A.  That is correct, yes, as I mentioned also.

02:00:12  11       MR. LAMBRIANAKOS:  Can we have PTX-1, please?  Go

02:00:18  12  to Claim 1.

02:00:20  13       THE COURT:  Just a minute, counsel.

02:00:21  14       Mr. Baxter, if you're going to sit in the gallery,

02:00:25  15  you need a mask on, sir.  Everybody in the gallery needs a

02:00:28  16  mask on.

02:00:29  17       MR. BAXTER:  Yes, Your Honor.

02:00:31  18       THE COURT:  Let's proceed.

02:00:44  19       MR. LAMBRIANAKOS:  Put up the whole claim.

02:00:50  20  Q.  (By Mr. Lambrianakos)  So if we're going to have a

02:00:57  21  patent infringement analysis, Dr. Kiaei, you agree that the

02:01:01  22  analysis begins and ends with the words of the claims,

02:01:06  23  correct?

02:01:06  24  A.  Yes, sir.

02:01:08  25  Q.  And you understand that some of the words in this claim

| | | |
|---|---|---|
| 02:01:12 | 1 | have already been defined by the Court? |
| 02:01:17 | 2 | A.  Yes, sir, I understand that. |
| 02:01:18 | 3 | Q.  And you must apply the Court's definitions when |
| 02:01:23 | 4 | understanding the meaning of those words which have been |
| 02:01:26 | 5 | defined by the Court, correct? |
| 02:01:29 | 6 | A.  Yes, sir, I do. |
| 02:01:30 | 7 | Q.  And for the rest of the words, you apply their plain |
| 02:01:34 | 8 | meaning? |
| 02:01:35 | 9 | A.  Yes.  If they have not been defined by the Court, we -- |
| 02:01:39 | 10 | we use the plain and ordinary meaning. |
| 02:01:40 | 11 | Q.  And you'd agree that, in your non-infringement |
| 02:01:45 | 12 | analysis, you're not supposed to impose any other |
| 02:01:47 | 13 | requirements for infringement other than what the words of |
| 02:01:50 | 14 | the claim and the Court's constructions require, right? |
| 02:01:53 | 15 | A.  Yes, sir, I agree. |
| 02:01:54 | 16 | Q.  You just testified that Claim 1 of the '049 patent is |
| 02:02:10 | 17 | not infringed by the Echo products because the determining |
| 02:02:14 | 18 | a delay step is not met.  Was that your testimony? |
| 02:02:19 | 19 | A.  That is correct, sir, yes. |
| 02:02:20 | 20 | Q.  And you found that the step wasn't met because the Echo |
| 02:02:24 | 21 | product does not calculate any delays; is that right? |
| 02:02:28 | 22 | A.  That is correct, yes. |
| 02:02:36 | 23 |       MR. LAMBRIANAKOS:  If we could just zoom in on the |
| 02:02:39 | 24 | determining a delay step, please. |
| 02:02:45 | 25 | Q.  (By Mr. Lambrianakos)  Dr. Kiaei, could you just point |

02:02:48    1    to the portion of this claim in which the word

02:02:52    2    "calculating" is found?

02:02:59    3    A.  It's determining a delay.

02:03:04    4    Q.  So when you read the -- the word "determining," you're

02:03:09    5    requiring a calculation; is that right?

02:03:10    6    A.  It is determining a delay.

02:03:13    7    Q.  Yes or no, sir, when you read the word "determining,"

02:03:19    8    you are finding a requirement of calculation?

02:03:27    9    A.  If determining a delay, yes.

02:03:32   10    Q.  Now, you also said that that calculation had to happen

02:03:36   11    in real-time.  Remember that?

02:03:37   12    A.  That calculation, yes, but I was discussing that based

02:03:46   13    on the -- yes, I was discussing that based on the Echo

02:03:49   14    products.

02:03:50   15    Q.  Didn't you say, sir, that the claim -- Claim 1 of the

02:03:55   16    '049 patent requires that delay be calculated in real-time?

02:03:59   17    Wasn't that your testimony, sir?

02:04:01   18    A.  That was -- what I meant was determining a delay is --

02:04:08   19    is the requirement in there.

02:04:10   20    Q.  So it's not your testimony that this step requires that

02:04:16   21    the calculation take place in real-time?

02:04:19   22    A.  No.  This does not require -- the claim language here

02:04:23   23    does not require a determining a delay in real-time.

02:04:26   24    Q.  Is there anything in this claim that prohibits the

02:04:30   25    coefficients from being preloaded into the device for the

02:04:34  1  calculation of a delay?

02:04:44  2  A.  No, I don't see anything that prevents that, as long as

02:04:51  3  you know where the target sound source is.

02:04:54  4  Q.  So if the coefficents can be preloaded, then can't

02:05:05  5  determining a delay be simply choosing the appropriate

02:05:08  6  coefficients depending on the target sound source?

02:05:10  7  A.  If you know the target sound source, you can determine

02:05:13  8  the coefficients, yes.

02:05:13  9  Q.  Now, you submitted an expert report in this case on

02:05:22  10  June 1, 2020, that contained all your opinions regarding

02:05:28  11  non-infringement that you were going to bring to trial

02:05:30  12  today; isn't that right?

02:05:31  13  A.  Yes, sir, I did.

02:05:32  14  Q.  And you know that the only opinions that you can bring

02:05:36  15  to trial are those which you've previously disclosed in

02:05:40  16  your expert report, correct?

02:05:41  17  A.  Yes, sir, it is.

02:05:43  18  Q.  And you identified in your report all of the materials

02:05:47  19  that you considered, in coming to those opinions, right?

02:05:50  20  A.  Yes, sir, I did.

02:05:52  21  Q.  And you named all of the individuals with whom you

02:05:54  22  consulted, in determining your opinions, correct?

02:06:01  23  A.  Individuals I consulted?

02:06:03  24  Q.  Yes.

02:06:06  25  A.  Can you refresh my mind where I said that in my report?

| | | |
|---|---|---|
| 02:06:09 | 1 | Q.  I'm asking you whether or not your report identifies |
| 02:06:13 | 2 | all individuals, aside from counsel, with whom you |
| 02:06:17 | 3 | consulted, in order to determine what your opinions are and |
| 02:06:20 | 4 | which were disclosed in your report? |
| 02:06:23 | 5 | A.  No. |
| 02:06:23 | 6 | Q.  So you had conversations with individuals outside of |
| 02:06:26 | 7 | those which were identified in your Materials Considered |
| 02:06:29 | 8 | section? |
| 02:06:30 | 9 | A.  I don't believe so, no. |
| 02:06:32 | 10 | Q.  So your Materials Considered section of your report is |
| 02:06:37 | 11 | a complete listing of all of the information that you |
| 02:06:41 | 12 | relied on, in coming to your opinions, right? |
| 02:06:43 | 13 | A.  Yes, sir. |
| 02:06:44 | 14 | Q.  And if you consulted with an Amazon engineer, for |
| 02:06:50 | 15 | example, you would have listed that in your materials |
| 02:06:52 | 16 | considered, right? |
| 02:06:54 | 17 | A.  I believe so, yes.  Yes. |
| 02:06:56 | 18 | Q.  You indicated during your testimony that you found the |
| 02:07:06 | 19 | source code to be the most important information that you |
| 02:07:08 | 20 | used in determining non-infringement; is that right? |
| 02:07:10 | 21 | A.  That's correct, sir, yes. |
| 02:07:14 | 22 | MR. LAMBRIANAKOS:  Can we have DDX-5, Page 12, |
| 02:07:20 | 23 | please? |
| 02:07:20 | 24 | Q.  (By Mr. Lambrianakos)  These are the MATLAB files that |
| 02:07:25 | 25 | you said you reviewed in coming to your opinions, correct? |

02:07:28  1   A.  Yes.  This is some of the MATLAB files I looked at,

02:07:32  2   yes.

02:07:33  3   Q.  Just a sample?

02:07:34  4   A.  Yes.

02:07:34  5   Q.  Do you know who authored these files?

02:07:40  6   A.  I don't remember.  Some of them had names on them.

02:07:45  7   Some of them don't.  I don't remember.

02:07:47  8   Q.  If I told you that the top of the -- each of the first

02:07:50  9   page of all of these files but two identifies an author

02:07:57  10  Amit Chhetri, or AC, would you disagree with that?

02:08:00  11  A.  No, I don't disagree with that.  I believe you're

02:08:03  12  correct.

02:08:03  13  Q.  And you understand that Mr. Chhetri was the author of

02:08:08  14  most of these files, right?

02:08:09  15  A.  My recollection, he was one of them.  I -- I wouldn't

02:08:15  16  categorize most of them, but, yes, I've seen his name on

02:08:18  17  those.

02:08:18  18       MR. LAMBRIANAKOS:  Could we put PTX-1378-28 on the

02:08:23  19  screen?

02:08:24  20  Q.  (By Mr. Lambrianakos)  You see at the top of

02:08:30  21  PTX-1378-28 the author's identified as Amit Chhetri?

02:08:33  22  A.  Yes, that is Dr. Chhetri.

02:08:35  23  Q.  It's your understanding that Dr. Chhetri wrote the code

02:08:39  24  that's in this file?

02:08:40  25  A.  If his name is on top of it, that's my assumption, yes.

1032

02:08:46  1   Q.  Sir, you don't disagree that wherever his name or

02:08:48  2   initials appear at the top of a code file, that he's the

02:08:51  3   author, right?

02:08:53  4   A.  Can you repeat the question, please?

02:08:54  5   Q.  You don't disagree that if his name or initials appear

02:08:58  6   as author at the top of the file, that he was, in fact, the

02:09:01  7   author of that file?

02:09:02  8   A.  He is the author of this, yes.

02:09:04  9   Q.  Now, when you reviewed all the source code, you

02:09:07  10  understood that Mr. Chhetri was the author of the code.

02:09:09  11  You didn't consult with Mr. Chhetri to understand the

02:09:13  12  functionality that was set forth in those files, did you?

02:09:17  13  A.  I have never spoken to Mr. Chhetri.

02:09:20  14  Q.  So you didn't think it was important to go to the

02:09:22  15  author of the source code to get a full understanding of

02:09:26  16  the functionality of that source code?

02:09:26  17  A.  No, I did not.  I don't think that is necessary.

02:09:29  18  Q.  So sitting here today, you've never -- you've never

02:09:35  19  consulted with Mr. Chhetri regarding your opinions in this

02:09:37  20  case, right?

02:09:38  21  A.  I have not.

02:09:39  22  Q.  So you don't know whether Mr. Chhetri, the author of

02:09:42  23  this code, agrees with your conclusions regarding the

02:09:45  24  functionality in the source code?

02:09:47  25  A.  The source code is -- I have not consulted with

02:09:57  1   Mr. Chhetri at all, but understanding the source code is

02:10:01  2   for an engineer and somebody who's an expert in knowing

02:10:03  3   that.  It's pretty clear.

02:10:07  4        MR. LAMBRIANAKOS:  Move to strike that answer as

02:10:10  5   non-responsive, Your Honor.

02:10:24  6        THE COURT:  Sustained.

02:10:25  7   Q.  (By Mr. Lambrianakos)  Yes or no, sir, sitting here

02:10:27  8   today, you do not know whether Mr. Chhetri agrees with your

02:10:27  9   conclusions regarding the functionality set forth in his

02:10:33  10  source code?

02:10:33  11  A.  I do not know whether he agrees or disagrees.

02:10:46  12        MR. LAMBRIANAKOS:  Can we have the McAlexander

02:10:51  13  Presentation Slide 12, please?

02:10:56  14  Q.  (By Mr. Lambrianakos)  Dr. Kiaei, you just testified

02:10:58  15  that there were certain processors which did not meet the

02:11:01  16  Court's digital signal processor limitation.  Do you recall

02:11:04  17  that?

02:11:04  18  A.  Yes, sir, I do recall that.

02:11:06  19  Q.  And you didn't show in your presentation what the

02:11:12  20  construction was that you were applying, right?

02:11:14  21  A.  I was discussing the digital signal processor and what

02:11:20  22  the construction is, on the right.

02:11:25  23  Q.  So do you see in the first line of this table, it says:

02:11:31  24  Digital signal processor is being construed as

02:11:32  25  microprocessor that is specialized for a mathematical

| | | |
|---|---|---|
| 02:11:36 | 1 | processing of digital signals? |
| 02:11:38 | 2 | A.  Yes, sir. |
| 02:11:38 | 3 | Q.  And that's the construction you applied in this case, |
| 02:11:41 | 4 | right? |
| 02:11:41 | 5 | A.  That's the construction, as well as my own experience |
| 02:11:44 | 6 | of -- yes, it is -- it is the construction I applied, yes. |
| 02:11:48 | 7 | THE COURT:  Doctor, would you pull the microphone |
| 02:11:49 | 8 | a little closer so we can make sure we hear you? |
| 02:11:52 | 9 | THE WITNESS:  Yes, sir.  Thank you, Your Honor. |
| 02:11:56 | 10 | THE COURT:  Thank you. |
| 02:11:56 | 11 | Let's continue. |
| 02:11:58 | 12 | MR. LAMBRIANAKOS:  Can we have Slide 35 of that |
| 02:12:00 | 13 | same presentation, please? |
| 02:12:03 | 14 | Q.  (By Mr. Lambrianakos)  Dr. Kiaei, is it your |
| 02:12:05 | 15 | understanding that the MT8516 is one of the processors that |
| 02:12:10 | 16 | is used in Echo products? |
| 02:12:12 | 17 | A.  Yes, it is.  It is one of the processors that are used |
| 02:12:16 | 18 | in the MPAF devices I mentioned. |
| 02:12:20 | 19 | Q.  You see the subtitle here says:  Highly integrated, |
| 02:12:26 | 20 | application processing platform for Cloud-connected voice |
| 02:12:30 | 21 | assistant. |
| 02:12:31 | 22 | Do you see that? |
| 02:12:31 | 23 | A.  Yes, sir, I see that. |
| 02:12:32 | 24 | Q.  Are the Echo products Cloud-connected voice assistant |
| 02:12:37 | 25 | devices? |

02:12:37  1  A.  I would agree in general, yeah.

02:12:46  2  Q.  Now, the first sentence here says:  The MT8516 is an

02:12:51  3  efficient and highly integrated application processing

02:12:55  4  platform with diverse interfaces and connectivity that

02:12:59  5  focuses on audio and microphone processing.

02:13:02  6        Do you see that?

02:13:04  7  A.  Yes, I do see that.

02:13:05  8  Q.  Does that indicate to you, sir, that this processor is

02:13:08  9  specialized for processing digital signals?

02:13:12  10  A.  In terms of the Court construction of the specialized

02:13:18  11  Court construction, that is not -- that is not a digital

02:13:22  12  signal processor.

02:13:22  13        MR. LAMBRIANAKOS:  Move to strike as not

02:13:24  14  responsive, Your Honor.

02:13:28  15  A.  No, it is not.

02:13:29  16        THE COURT:  I'll overrule that objection.

02:13:32  17  Q.  (By Mr. Lambrianakos)  Do you see the second sentence

02:13:34  18  says that it is designed for Cloud-supported voice

02:13:40  19  assistant devices?

02:13:41  20  A.  Yes, sir, I see that.

02:13:43  21  Q.  Does that indicate to you that this processor is

02:13:45  22  specialized for use with Cloud-supported voice assistant

02:13:49  23  devices, such as the Echo?

02:13:50  24  A.  In general, I agree with that, yes.

02:13:53  25  Q.  And then in the second paragraph, it says:  MediaTek's

02:13:59   1   unique PowerAQ tool provides an easy GUI interface for

02:14:05   2   signal flow design and audio parameter tuning, removing the

02:14:09   3   need for an additional DSP.

02:14:11   4           Do you see that?

02:14:12   5   A.  Yes, I do.

02:14:12   6   Q.  So this tells you that the MT8516 eliminates the need

02:14:16   7   to have a chip that is specifically a digital signal

02:14:18   8   processor, correct?

02:14:19   9   A.  That's correct, yes.

02:14:21  10   Q.  You don't --

02:14:22  11   A.  This is.

02:14:23  12   Q.  You don't need a separate, discrete digital signal

02:14:25  13   processor when you have the MT8516, right?

02:14:30  14   A.  I apologize for interrupting you.

02:14:32  15           Yes, it is saying that this processor will do the

02:14:34  16   job.  You don't need to get a DSP for doing this.

02:14:44  17           MR. LAMBRIANAKOS:  If you please turn to Slide 36.

02:14:51  18   Q.  (By Mr. Lambrianakos)  You see this information on the

02:14:54  19   ARM Neon?

02:14:55  20   A.  Yes.

02:14:55  21   Q.  And the ARM Neon is included in the ARM Cortex-A

02:15:04  22   series, is it not?

02:15:04  23   A.  Yes, this is an Intel ARM Neon which is included in

02:15:09  24   there, yes.

02:15:09  25   Q.  And the MediaTek MT8516 is also a Cortex-A series chip,

02:15:17   1   right?

02:15:17   2   A.  Yes, these use -- yes, it is.

02:15:19   3   Q.  And in the first paragraph of this sheet, it says:  An

02:15:23   4   advanced SIMD, single instruction multiple data,

02:15:27   5   architecture extension for the ARM Cortex-A series and for

02:15:32   6   the Cortex-R52 and Cortex-R82 processors.

02:15:38   7          Do you see that?

02:15:38   8   A.  Yes, sir, I do.

02:15:39   9   Q.  And it says:  ARM Neon accelerates audio and video

02:15:45  10   encoding/decoding, user interface, 2D/3D graphics, or

02:15:51  11   gaming.

02:15:51  12          Right?

02:15:52  13   A.  Yes, sir.

02:15:52  14   Q.  Now, audio and video encoding and decoding, that

02:15:59  15   involves the processing of digital signals, doesn't it?

02:16:02  16   A.  Yes, it involves processing of digital signals, as any

02:16:06  17   regular processor also involves processing of digital

02:16:09  18   signals.

02:16:09  19   Q.  But the ARM Neon accelerates that processing, doesn't

02:16:13  20   it?

02:16:13  21   A.  Yes, it does.

02:16:14  22   Q.  The next paragraph says:  Neon can also accelerate

02:16:19  23   signal processing algorithms and functions to speed up

02:16:21  24   applications, such as machine or deep learning, audio and

02:16:25  25   video processing, voice or facial recognition, and computer

02:16:29  1  vision.

02:16:30  2          Do you see that?

02:16:30  3  A.  Yes, sir, I do.

02:16:33  4  Q.  So it appears the Neon is specialized for the purpose

02:16:36  5  of increasing the speed and efficiency of audio and video

02:16:40  6  processing.  Do you agree with that statement?

02:16:42  7  A.  Yes, I agree with that statement.

02:16:47  8  Q.  And the ARM Neon technology is included in the MT8516

02:16:53  9  product, right?

02:16:54  10  A.  Yes, sir.  It's included in the products under MPAF, as

02:16:57  11  I mentioned earlier.

02:16:59  12          MR. LAMBRIANAKOS:  Can we have PTX-321, please?

02:17:22  13  Can you turn to Page 3 of the document?  Right under high

02:17:25  14  level structure, can you zoom in?

02:17:29  15  Q.  (By Mr. Lambrianakos)  You see at the top there it

02:17:32  16  says:  Bishop uses Intel Cherry Trail as a DSP platform

02:17:37  17  which is the same as Knight and Hendrix?

02:17:39  18  A.  Yes, I see that, yes.

02:17:40  19  Q.  Is it your understanding that the Intel Cherry Trail

02:17:43  20  processor is used in the Echo Look and the Echo Show 1st

02:17:47  21  and 2nd Generations?

02:17:48  22  A.  Yes, it is, yes.

02:17:50  23  Q.  Now, previously, you said that the Intel Cherry Trail

02:17:54  24  is a general purpose processor, right?

02:17:57  25  A.  I guess I did not follow your last question.  Can you

| | | |
|---|---|---|
| 02:18:02 | 1 | elaborate on your last question? |
| 02:18:03 | 2 | Q.  The question about whether the Intel Cherry Trail |
| 02:18:09 | 3 | processor is in the Echo Look, Echo Show, and Echo Show 1st |
| 02:18:15 | 4 | and 2nd Generation; is that right? |
| 02:18:17 | 5 | A.  Yes, if you don't mind, repeat that. |
| 02:18:20 | 6 | Q.  Yes.  Is it your understanding that the Intel Cherry |
| 02:18:28 | 7 | Trail processor is in the Echo Look, the Echo Show 1st, and |
| 02:18:34 | 8 | Echo Show 2nd Generations? |
| 02:18:35 | 9 | A.  I believe so.  Yes, it is on the -- yes, I believe so, |
| 02:18:36 | 10 | but if you have the -- the data for these two products to |
| 02:18:41 | 11 | confirm that, that would be good to have. |
| 02:18:43 | 12 | Q.  All right.  Let's assume that for now. |
| 02:18:45 | 13 | A.  Okay.  Let's assume that you are right. |
| 02:18:46 | 14 | Q.  Do you see that in this Amazon document it states that |
| 02:18:51 | 15 | the Intel Cherry Trail is a DSP platform? |
| 02:18:53 | 16 | A.  Yes, it says that. |
| 02:18:55 | 17 | Q.  And that tells you that the Intel Cherry Trail is a |
| 02:19:00 | 18 | product that specializes in digital signal processing? |
| 02:19:07 | 19 | A.  I don't agree with that.  It says that the Intel Cherry |
| 02:19:10 | 20 | Trail is a platform for the DSP.  This is the product |
| 02:19:12 | 21 | definition -- this is what they use in their description in |
| 02:19:17 | 22 | their data sheet.  That is independent on -- for the Court |
| 02:19:27 | 23 | construction of digital signal processor issue. |
| 02:19:30 | 24 | Q.  You testified earlier that the accused Echo products do |
| 02:19:34 | 25 | not include the claimed adaptive beamformer, right? |

02:19:37  1  A.  The accused products do not perform the claims adaptive

02:19:43  2  beamforming based on the Court construction of what the

02:19:46  3  adaptive beamforming is, yes, I did.

02:19:52  4  Q.  And, in your presentation, your discussion of

02:19:56  5  beamforming in the Echo product, that was limited to the

02:19:59  6  fixed beamformer in the Echo products, correct?

02:20:04  7  A.  In the description I had, that was limited to fixed

02:20:10  8  beamformer, and the beam selected after that.

02:20:13  9  Q.  And the fixed beamformer in the Echo products, that's a

02:20:16  10  super directive beamformer, right?

02:20:19  11  A.  It performs some and multiply and some filtering

02:20:28  12  structure that we've discussed already that Mr. Phil and

02:20:33  13  others have shown.

02:20:34  14  Q.  Is that properly characterized as super directive

02:20:41  15  beamforming?

02:20:41  16  A.  The coefficients that are calculated in MATLAB, they

02:20:45  17  use super directive beamforming algorithm, but what is

02:20:49  18  implemented on the Echo products is that the sum and

02:20:53  19  product filtering operation.

02:20:55  20  Q.  Isn't it true, sir, that in characterizing the fixed

02:21:02  21  beamformer in the Echo products, that it is referred to as

02:21:07  22  a super directive beamformer?

02:21:07  23  A.  They are using the coefficients which are obtained by

02:21:13  24  using super directive beamforming as it was in the file

02:21:20  25  super directive beamforming, and those coefficients are

02:21:23   1   obtained offline.  Those coefficients then are in the

02:21:27   2   product, and they simply multiplied output of the FFT by

02:21:32   3   those coefficients.

02:21:32   4   Q.  Yes or no, sir, is --

02:21:35   5           THE COURT:  Counsel, if you think the witness is

02:21:36   6   non-responsive, don't tell him yes or no.  You raise it

02:21:39   7   with the Court.

02:21:40   8           MR. LAMBRIANAKOS:  Your Honor, I move to strike

02:21:42   9   that answer as non-responsive.

02:21:44   10           THE COURT:  I will strike the prior answer as

02:21:46   11   non-responsive.

02:21:47   12           He asked a very direct question, Professor Kiaei,

02:21:52   13   and you gave a lengthy explanation that did not answer the

02:21:54   14   question.

02:22:00   15           Mr. Laquer is going to get an opportunity to ask

02:22:02   16   more questions when Plaintiff's counsel is finished.  You

02:22:07   17   need to limit your answers to the questions asked by

02:22:10   18   Mr. Lambrianakos, and then if counsel for Amazon wants to

02:22:12   19   follow up and get a fuller explanation, he'll have that

02:22:16   20   opportunity.  And I think you understand that.

02:22:18   21           THE WITNESS:  Yes, Your Honor.

02:22:18   22           THE COURT:  This is the second time I've asked you

02:22:20   23   to limit your answers to the questions asked.  So I'm going

02:22:23   24   to insist on that, okay?

02:22:24   25           THE WITNESS:  Thank you, Your Honor.  I will.

02:22:25  1          THE COURT:  Let's proceed.

02:22:33  2   Q.  (By Mr. Lambrianakos)   Is the fixed beamformer in the

02:22:34  3   Amazon Echo products a super directive beamformer?

02:22:36  4   A.  Yes, it is.

02:22:37  5          MR. LAMBRIANAKOS:  Could you please show PTX-334?

02:22:47  6   Q.  (By Mr. Lambrianakos)   During your presentation, you

02:22:49  7   didn't address any component of any Echo product that is

02:22:52  8   termed an adaptive beamformer, correct?

02:22:54  9   A.  I did not have those, yes, sir.

02:22:56  10  Q.  You agree that all the accused Echo products except for

02:23:04  11  Echo 1st Generation and Echo Dot 1st Generation use the

02:23:10  12  MPAF code, M-P-A-F code, correct?

02:23:13  13  A.  Yes, sir, they do.

02:23:14  14  Q.  And in the MPAF code, the primary control interface is

02:23:18  15  called the audio front end, correct?

02:23:21  16  A.  Yes, sir.

02:23:21  17  Q.  And within the audio front end, there's a block called

02:23:29  18  the ABF, or adaptive beamformer block, that is included in

02:23:36  19  the source code on the accused Echo devices, correct?

02:23:38  20  A.  Yes, there is.

02:23:39  21  Q.  And that adaptive beamformer algorithm is executed when

02:23:44  22  doing automatic speech recognition when the Echo device is

02:23:47  23  not doing playback; isn't that right?

02:23:49  24  A.  Yes, sir, that is correct.

02:23:50  25  Q.  But it's your position that this adaptive beamforming

02:23:58   1   unit in the Echo devices is not the adaptive beamforming

02:24:02   2   unit of the claims; is that right?

02:24:03   3   A.  Yes, sir, that's correct.

02:24:04   4   Q.  And you say that, because in the Echo products, the

02:24:06   5   filter coefficients do not change, right?

02:24:08   6   A.  Yes, sir, because there are two different blocks here.

02:24:16   7         MR. LAMBRIANAKOS:  Can we have the Slide 14 from

02:24:19   8   Mr. McAlexander's presentation?

02:24:21   9   Q.  (By Mr. Lambrianakos)  Do you see the Court's

02:24:26   10  construction of adaptive beamforming?

02:24:28   11  A.  Yes, sir, I see that.

02:24:30   12  Q.  Can you point out where the words "filter coefficients"

02:24:36   13  appear in this construction?

02:24:37   14  A.  Nowhere.

02:24:38   15  Q.  How about "beamformer weights," is that in there?

02:24:43   16  A.  No, sir.

02:24:47   17         MR. LAMBRIANAKOS:  Now, if we could turn to the

02:24:50   18  page ending in 6042 of PTX-334.  If you could zoom in on

02:25:01   19  the -- the middle diagram.  Thank you.

02:25:05   20  Q.  (By Mr. Lambrianakos)  You see in this diagram you have

02:25:12   21  seven-microphone circular array on the left-hand side?

02:25:15   22  A.  Yes, I see that.

02:25:16   23  Q.  Then there are several boxes until you reach FBF, which

02:25:21   24  is the fixed beamformer, right?

02:25:24   25  A.  Yes, there are three boxes before you go to FBF.

| | | |
|---|---|---|
| 02:25:28 | 1 | Q.  But, finally, you get to FBF, and 12 beams are output |
| 02:25:32 | 2 | from the FBF, correct? |
| 02:25:34 | 3 | A.  Yes, sir, that's correct. |
| 02:25:40 | 4 | Q.  And then those 12 beams are fed into the ABF, correct? |
| 02:25:45 | 5 | A.  That is correct. |
| 02:25:45 | 6 | Q.  And that's the adaptive beamformer, isn't it? |
| 02:25:49 | 7 | A.  That is the adaptive beamformer that Mr. Phil also |
| 02:25:53 | 8 | explained this morning. |
| 02:25:53 | 9 | Q.  And that beamformer outputs 12 beams, doesn't it? |
| 02:25:57 | 10 | A.  Yes, sir, it outputs 12 beams. |
| 02:26:02 | 11 | Q.  Now, you've reviewed all the deposition testimony in |
| 02:26:08 | 12 | this case, right? |
| 02:26:09 | 13 | A.  Yes, I have.  There may have been some depositions I |
| 02:26:14 | 14 | have not reviewed, but I believe I've done the ones that |
| 02:26:19 | 15 | were provided to me and are in my report. |
| 02:26:20 | 16 | Q.  You, specifically, did refer to Mr. Hilmes's deposition |
| 02:26:23 | 17 | in your expert report, right? |
| 02:26:26 | 18 | A.  Yes.  I believe I did that, yes. |
| 02:26:30 | 19 | Q.  You referred to many sections of that report -- of that |
| 02:26:33 | 20 | deposition, as a matter of fact, in your report, right? |
| 02:26:35 | 21 | A.  Yes, I did.  Yeah. |
| 02:26:38 | 22 | Q.  And do you recall when Mr. Hilmes testified about the |
| 02:26:44 | 23 | adaptive beamforming unit in the MPAF?  Do you remember |
| 02:26:49 | 24 | that testimony? |
| 02:26:50 | 25 | A.  Excuse me for interrupting you. |

| | | |
|---|---|---|
| 02:26:51 | 1 | Q.  Sorry.  Go ahead. |
| 02:26:52 | 2 | A.  During his deposition? |
| 02:26:54 | 3 | Q.  Yes. |
| 02:26:55 | 4 | A.  I don't exactly recall.  There were hundreds of |
| 02:26:58 | 5 | documents I reviewed.  But if you don't mind, show it to |
| 02:27:02 | 6 | me. |
| 02:27:03 | 7 | Q.  Do you recall when he was asked this question and gave |
| 02:27:07 | 8 | this answer:  But coefficients in other blocks, like the |
| 02:27:14 | 9 | adaptive beamforming, output of the beam selector, those |
| 02:27:17 | 10 | things change, and some of them change continuously, right? |
| 02:27:20 | 11 | And Mr. Hilmes said:  The adaptive beamforming |
| 02:27:23 | 12 | block has filter coefficients that can change. |
| 02:27:27 | 13 | Do you remember that? |
| 02:27:28 | 14 | A.  Do you mind putting that page on there because I don't |
| 02:27:32 | 15 | see it? |
| 02:27:33 | 16 | Q.  I believe in your binder you have it, and we'll put it |
| 02:27:38 | 17 | up on the screen. |
| 02:27:40 | 18 | MR. LAMBRIANAKOS:  Page 73 of -- well, let's go to |
| 02:27:42 | 19 | Page 287 of the transcript.  Sorry.  If we look at the top, |
| 02:27:53 | 20 | it's the first 11 lines or so. |
| 02:28:03 | 21 | Q.  (By Mr. Lambrianakos)  You see when counsel asked a |
| 02:28:05 | 22 | question about the adaptive beamforming block in the MPAF, |
| 02:28:11 | 23 | Mr. Hilmes admitted that the adaptive beamformer has filter |
| 02:28:16 | 24 | coefficients that can change?  Do you see that? |
| 02:28:16 | 25 | A.  Yes, I can see what he said there.  Yes. |

1046

02:28:18  1    Q.  And it was your position that adaptive beamforming

02:28:21  2    requires that filter coefficients change, correct?

02:28:24  3    A.  Can you please repeat the question?

02:28:28  4    Q.  It is your understanding that to do adaptive

02:28:32  5    beamforming, according to the Court's construction, the

02:28:36  6    filter coefficients have to change, right?

02:28:37  7    A.  To perform adaptive beamforming based on the Court

02:28:42  8    construction, if you can put the Court construction there,

02:28:45  9    it has to have the ability to steer the beam in the

02:28:47  10   direction of the said sound source.

02:28:50  11   Q.  Yes, sir, no, sir, you said that in order to perform

02:28:54  12   adaptive beamforming, the filter coefficients have to

02:28:56  13   change?

02:28:56  14   A.  Yes.

02:29:00  15   Q.  Now, the Alexa system --

02:29:02  16        MR. LAMBRIANAKOS:  You can take that down.

02:29:04  17   Q.  (By Mr. Lambrianakos)  The Alexa system is not accused

02:29:06  18   of infringement in this case, right?

02:29:07  19   A.  No, sir.

02:29:10  20   Q.  The AI of Alexa is not part of an Echo device, is it?

02:29:15  21   A.  No, sir.

02:29:15  22   Q.  Speech recognition is not part of the Echo device,

02:29:20  23   right?

02:29:20  24   A.  No, sir.

02:29:21  25        MR. LAMBRIANAKOS:  Pass the witness.

02:29:22   1           THE COURT:  Cross -- redirect, I'm sorry.

02:29:25   2           THE WITNESS:  Thank you, sir.

02:29:27   3           MR. LAQUER:  Yes, Your Honor.

02:29:45   4           THE COURT:  Proceed when you're ready, Mr. Laquer.

02:29:45   5                    REDIRECT EXAMINATION

02:29:48   6   BY MR. LAQUER:

02:29:48   7   Q.  Dr. Kiaei, counsel for Plaintiffs asked you questions

02:29:52   8   about your work as an expert witness.  Do you recall that?

02:29:54   9   A.  Yes, sir.

02:29:55  10   Q.  Have you ever testified in front of a jury before?

02:29:57  11   A.  No, this is my first time.

02:29:59  12   Q.  Do you recall Vocalife's expert, Mr. McAlexander,

02:30:02  13   identifying the number of times that he has testified as a

02:30:06  14   professional expert?

02:30:06  15   A.  I don't remember the exact number, but it was -- he's

02:30:09  16   been in the court, I believe, several times.

02:30:12  17   Q.  And you teach university classes on audio signal

02:30:18  18   processing, correct?

02:30:19  19   A.  Yes, I've taught class on audio signal processing.

02:30:22  20   Q.  Does any Echo device determine any delay between any

02:30:24  21   sound sensor and an origin?

02:30:24  22   A.  No, it does not.

02:30:25  23   Q.  And were all of your opinions where you referred to

02:30:29  24   calculating, equally applicable to determining?

02:30:33  25   A.  Yes.

1048

02:30:35  1  Q.  Counsel asked you questions about whether or not

02:30:38  2  something is in real-time.  Do you recall that?

02:30:40  3  A.  Yes, I do.

02:30:41  4  Q.  Now, Claim 1 of the patent requires receiving a target

02:30:48  5  sound signal, correct?

02:30:49  6  A.  Yes.

02:30:49  7  Q.  And it also requires enabling beamforming based on a

02:30:55  8  determination of a delay, correct?

02:30:58  9  A.  That's correct.

02:30:58  10  Q.  And that determination of a delay has to be based on

02:31:02  11  the target sound signal that was received, correct?

02:31:05  12  A.  That is correct.

02:31:06  13  Q.  Is it possible to enable beamforming on sound before

02:31:09  14  that sound ever exists?

02:31:11  15         MR. LAMBRIANAKOS:  Objection, leading.

02:31:12  16         THE COURT:  Sustained.

02:31:15  17  Q.  (By Mr. Laquer)  Dr. Kiaei, could you explain what you

02:31:18  18  were referring to when you used the terminology

02:31:21  19  "real-time"?

02:31:21  20  A.  The calculation of the delay, tau, requires to know the

02:31:28  21  azimuth angle between the said target sound source and the

02:31:31  22  axis, the azimuth angle.

02:31:34  23         From that, you need -- so you need to know where

02:31:36  24  the target sound source is.  And if there is no target

02:31:40  25  sound source, no speaker around, then you won't be able to

| | | |
|---|---|---|
| 02:31:43 | 1 | calculate tau, which is the delay.  And then from delay, |
| 02:31:45 | 2 | you form the beams. |
| 02:31:46 | 3 | So this is what I was referring to. |
| 02:31:51 | 4 | Q.  Does the '049 patent specification describe beamformer |
| 02:31:56 | 5 | coefficients? |
| 02:31:57 | 6 | A.  Yes, it does.  It actually has the equations that says |
| 02:32:03 | 7 | how the beams are. |
| 02:32:04 | 8 | Q.  And do you recall -- are beamformer coefficients |
| 02:32:08 | 9 | necessary in your experience in the industry to form a |
| 02:32:11 | 10 | beam? |
| 02:32:12 | 11 | A.  That is the definition of how the beam is.  Yes, you |
| 02:32:16 | 12 | need those. |
| 02:32:17 | 13 | Q.  Have you ever heard of any beam in any audio processing |
| 02:32:21 | 14 | system that is formed without coefficients? |
| 02:32:23 | 15 | A.  Related to this topic?  No. |
| 02:32:25 | 16 | Q.  Now, have you reviewed internal Amazon documents |
| 02:32:43 | 17 | regarding the type of processors that Amazon uses? |
| 02:32:46 | 18 | A.  Yes, I have. |
| 02:32:47 | 19 | Q.  And can you explain what you understand Amazon's belief |
| 02:32:53 | 20 | to have been regarding whether or not the devices use a |
| 02:32:56 | 21 | DSP? |
| 02:32:58 | 22 | A.  Yes, I do.  As a matter of fact, Amazon have gone |
| 02:33:02 | 23 | through the process of deciding -- when they decided for |
| 02:33:06 | 24 | MediaTek and for the Intel Neon process what to do, and |
| 02:33:12 | 25 | they decided to stay away from DSP, or digital signal |

02:33:15    1    processor, because of the complexity and cost and many

02:33:18    2    other things, and they decided to choose the MediaTek and

02:33:21    3    the Neon Intel processor because they are not a DSP,

02:33:26    4    digital signal processor.  And those are also --

02:33:30    5    Q.  Based on your review of Amazon's documents, are you

02:33:32    6    confident that Amazon has always believed that its products

02:33:35    7    that have been released after April of 2016 do not use

02:33:40    8    DSPs?

02:33:40    9    A.  Yes, absolutely, sir.

02:33:42   10    Q.  Do you understand that Vocalife is accusing Amazon of

02:33:46   11    indirectly infringing the '049 patent in this case?

02:33:50   12    A.  Yes, I do.

02:33:51   13    Q.  Do you have any understanding as to whether or not that

02:33:55   14    requires Amazon to have any subjective belief regarding its

02:34:00   15    actions?

02:34:00   16         MR. LAMBRIANAKOS:  Objection, Your Honor.  This

02:34:02   17    goes beyond the scope of the cross.  Furthermore, Your

02:34:08   18    Honor, it's not in his report.

02:34:11   19         THE COURT:  Do you have a response, counsel?

02:34:14   20         MR. LAQUER:  Counsel for Vocalife was raising

02:34:17   21    digital signal processors.  This is important for --

02:34:20   22         THE COURT:  I'm not concerned about the Rule 411

02:34:24   23    objection.  I'm concerned about whether it's outside the

02:34:26   24    scope of his report.

02:34:28   25         MR. LAQUER:  His report disagreed with all of the

02:34:31  1  positions taken in Mr. McAlexander's, and those included

02:34:35  2  Mr. McAlexander's opinions regarding indirect infringement.

02:34:38  3          THE COURT:  Is it your position that his report

02:34:41  4  purports to offer and give an opinion as to the mindset of

02:34:48  5  Amazon, as your question called for?  Yes or no?

02:34:56  6          MR. LAQUER:  I'll withdraw the question,

02:34:58  7  Your Honor.

02:34:58  8          THE COURT:  Let's move on.

02:35:00  9  Q.  (By Mr. Laquer)  Have you heard anyone from Vocalife

02:35:03  10  deny the fact that Echo's beams just don't move?

02:35:07  11  A.  No.

02:35:08  12  Q.  Does that seem to even be a fact that's in dispute in

02:35:11  13  this case?

02:35:11  14  A.  No.

02:35:12  15  Q.  You were asked questions about a fixed beamformer and

02:35:17  16  whether some behavior is limited to a fixed beamformer.  Do

02:35:20  17  you recall that?

02:35:21  18  A.  Yes.

02:35:22  19  Q.  Now, do you use the term "fixed beamformer" to refer to

02:35:27  20  Echo's entire beamforming process?

02:35:30  21  A.  Yes.

02:35:30  22  Q.  And you were also asked about the term "adaptive

02:35:36  23  beamformer."  Do you recall that?

02:35:37  24  A.  Yes, sir.

02:35:38  25  Q.  And do you know whether the -- any description of any

02:35:44  1   adaptive beamformer in any Echo device is described as

02:35:48  2   actually steering a beam?

02:35:49  3   A.  No, it does not.  That actuates noise reduction.

02:35:54  4   Q.  But the adaptive beamformer in Claim 1 of the '049

02:35:58  5   patent, under the Court's construction, does that require

02:36:01  6   steering?

02:36:02  7   A.  Yes, it does.

02:36:04  8   Q.  Or at least the ability to steer, correct?

02:36:06  9   A.  Yes, the ability to steer in the direction of the said

02:36:14  10  sound signal.

02:36:15  11  Q.  Did anything that Mr. Lambrianakos asked you in any way

02:36:20  12  affect your testimony that you gave when I was taking your

02:36:24  13  direct examination?

02:36:25  14  A.  No.

02:36:27  15  Q.  And did anything that Mr. Lambrianakos asked you in any

02:36:30  16  way affect your opinion that Amazon's Echo devices, when

02:36:36  17  used, do not infringe any claim asserted here from the '049

02:36:42  18  patent?

02:36:42  19  A.  No.

02:36:43  20        MR. LAQUER:  I pass the witness.

02:36:44  21        THE COURT:  Further cross-examination?

02:36:46  22        MR. LAMBRIANAKOS:  No further cross, Your Honor.

02:36:47  23        THE COURT:  All right.  You may step down,

02:36:49  24  Dr. Kiaei.

02:36:50  25        THE WITNESS:  Thank you, sir.  Thank you,

02:36:52   1   Your Honor.

02:36:52   2           THE COURT:  Is there a desire that this witness be

02:36:59   3   excused?

02:37:00   4           MR. DACUS:  Yes, Your Honor, may he be excused?

02:37:02   5   Thank you for asking.

02:37:04   6           THE COURT:  Is there any objection?

02:37:05   7           MR. LAMBRIANAKOS:  No, Your Honor, no objection.

02:37:06   8           THE COURT:  All right.  Doctor, you're excused.

02:37:09   9   That means you're free to stay with us.  You're also free

02:37:13  10   to leave.  It's your choice.

02:37:14  11           THE WITNESS:  Thank you, Your Honor.

02:37:15  12           THE COURT:  All right.  Ladies and gentlemen,

02:37:16  13   before Defendant calls their next witness, we're going to

02:37:19  14   take a short recess.

02:37:21  15           If you'll leave your notebooks in your chairs,

02:37:23  16   follow all my instructions, and we'll be back in here

02:37:26  17   shortly to continue.

02:37:30  18           The jury is excused for recess at this time.

02:37:34  19           COURT SECURITY OFFICER:  All rise.

02:37:34  20           (Jury out.)

02:37:35  21           THE COURT:  The Court stands in recess.

02:59:31  22           (Recess.)

02:59:39  23           (Jury out.)

02:59:39  24           COURT SECURITY OFFICER:  All rise.

02:59:40  25           THE COURT:  Be seated, please.

03:02:19  1              Defendants, are you prepared to call your next

03:02:28  2    witness?

03:02:28  3              MR. RE:  We are, Your Honor.

03:02:29  4              THE COURT:  And who do you intend to call, Mr. Re?

03:02:32  5              MR. RE:  Dr. Richard Stern.

03:02:34  6              THE COURT:  All right.  Let's bring in the jury,

03:02:35  7    please.

03:02:35  8              COURT SECURITY OFFICER:  All rise.

03:02:36  9              THE COURT:  If there are binders to distribute,

03:02:38  10   let's do that now.

03:03:04  11             (Jury in.)

03:03:06  12             THE COURT:  Please be seated, ladies and

03:03:09  13   gentlemen.

03:03:09  14             Defendants, call your next witness, please.

03:03:15  15             MR. RE:  Thank you, Your Honor.

03:03:15  16             The Defendants call as our next -- next witness,

03:03:19  17   Dr. Richard Stern.

03:03:20  18             THE COURT:  Dr. Stern, if you'll come forward and

03:03:22  19   be sworn, please.

03:03:25  20             (Witness sworn.)

03:03:26  21             THE COURT:  Please come around, sir, have a seat

03:03:41  22   at the witness stand.

03:03:41  23   RICHARD M. STERN, JR., Ph.D., DEFENDANTS' WITNESS, SWORN

03:03:41  24                   DIRECT EXAMINATION

03:04:13  25   BY MR. RE:

03:04:13  1    Q.  Doctor, could you state your full name for the record,

03:04:19  2    please.

03:04:19  3            THE COURT:  Just a minute, Mr. Re.

03:04:22  4            Is the witness going to pour some water?

03:04:26  5            THE WITNESS:  I am.

03:04:27  6            THE COURT:  Let's do that, get that done.  If

03:04:27  7    you're going to spill it, I'd rather know about it at the

03:04:30  8    beginning of the examination.

03:04:33  9            THE WITNESS:  I'll do my best.  Thank you.

03:04:36  10           THE COURT:  All right.  Now let's proceed.

03:04:37  11           MR. RE:  Thank you, Your Honor.

03:04:38  12   Q.  (By Mr. Re)  Dr. Stern, please state your full name for

03:04:41  13   the record, please.

03:04:42  14   A.  Richard Stern.

03:04:43  15   Q.  And what is your profession, Dr. Stern?

03:04:46  16   A.  I am a professor of electrical engineering at

03:04:52  17   Carnegie-Mellon University.

03:04:52  18   Q.  And where is Carnegie-Mellon?

03:04:54  19   A.  In Pittsburgh, Pennsylvania.

03:04:56  20   Q.  And how did you become involved in this case?

03:04:58  21   A.  I was asked by Amazon to review the '049 patent and

03:05:03  22   related material and comment on the validity of the patent.

03:05:08  23   Q.  Okay.  And can you describe your educational background

03:05:13  24   for the jury, please?

03:05:14  25   A.  Yes.  I graduated from the Massachusetts Institute of

03:05:18  1  Technology, that's MIT, in 1970 with a Bachelor's in

03:05:24  2  Electrical Engineering and Computer Science.

03:05:26  3       I had a -- I then went to California, received a

03:05:31  4  Master's in Electrical Engineering from University of

03:05:35  5  California Berkeley.

03:05:35  6       Then I returned to MIT, where I worked on the rest

03:05:42  7  of my graduate work, worked on my doctoral research, and

03:05:46  8  finished my work for the Ph.D. in December 1976 and

03:05:50  9  receiving the degree in 1977.

03:05:52  10  Q.  And did you prepare a thesis to get your doctorate?

03:05:55  11  A.  Yes, yes, yes.

03:05:56  12  Q.  And what exactly was your doctoral thesis on?

03:05:59  13  A.  Well, believe it or not, it was on sound source

03:06:04  14  localization as practiced by humans.

03:06:05  15  Q.  Okay.  What year did you complete your thesis?

03:06:07  16  A.  I finished in December of '76.

03:06:10  17  Q.  And have you been a professor ever since?

03:06:12  18  A.  Well, ever since.  I started in January '77, and I've

03:06:17  19  been at Carnegie-Mellon ever since.

03:06:19  20  Q.  And what are some of the classes that you teach at

03:06:22  21  Carnegie-Mellon University?

03:06:22  22  A.  I've done a number of things, communications, I've

03:06:26  23  taught acoustics.  But over the last several decades, I've

03:06:30  24  been responsible for the signal processing sequence.  There

03:06:33  25  are three courses in the sequence.  Currently I'm teaching

03:06:36  1   the third of them, and it includes topics of adaptive

03:06:42  2   signal processing, adaptive arrays, noise reduction, sound

03:06:45  3   source localization.

03:06:45  4   Q.  And what do you focus your -- do you -- do you -- do

03:06:50  5   you do any research?

03:06:51  6   A.  Yes, we do.

03:06:52  7   Q.  And what is your research on?

03:06:54  8   A.  I continued to work on auditory perception, but most of

03:07:01  9   my work is signal processing for speech recognition and

03:07:04  10  related technologies.  My group develops algorithms that

03:07:09  11  enable speech recognition systems to maintain good

03:07:11  12  performance in difficult acoustical environments, such as

03:07:15  13  noise, reverberation, et cetera.

03:07:17  14  Q.  And have you received any honors or awards for your

03:07:20  15  work?

03:07:20  16  A.  Well, there have been a number.  For example, I'm a

03:07:23  17  fellow of the Institute of Electrical and Electronics

03:07:27  18  Engineers, that's the IEEE.  That's the major professional

03:07:30  19  society for electrical engineers.

03:07:33  20        I'm also a fellow of the International Speech

03:07:39  21  Communication Association and the Acoustical Society of

03:07:41  22  America.

03:07:41  23        I'm one of very few individuals who are fellows in

03:07:45  24  those three societies.

03:07:46  25  Q.  And have you published papers in these fields?

03:07:49   1   A.  Yes, large numbers of papers.

03:07:50   2   Q.  And I noticed you created some slides, and I'm going to

03:07:53   3   show you one.

03:07:54   4        Why did you select these two to put on a slide?

03:07:57   5   A.  Well, these are two of the papers that we -- my group

03:08:00   6   has published before the invention that led to the -- the

03:08:08   7   '049 patent.

03:08:08   8        The paper on the left is on subband

03:08:13   9   likelihood-maximizing beamforming for speech recognition in

03:08:18  10   reverberant environments.  And that was from I'd say

03:08:21  11   2007-2008.  Can't read the fine print.

03:08:22  12        The paper on the right-hand side was a conference

03:08:24  13   paper.  It was -- I was an invited keynote speaker for the

03:08:28  14   microphone array workshop that's run annually by the Signal

03:08:32  15   Processing Society of the IEEE.  This particular one I

03:08:35  16   think was in 2008 in Taranto, Italy.

03:08:39  17   Q.  So do you have experience working with microphone

03:08:42  18   arrays?

03:08:42  19   A.  Yes.

03:08:43  20   Q.  Tell me about that.

03:08:45  21   A.  Well, we use microphone arrays extensively for a number

03:08:51  22   of things that we do.  It's not the only technology.

03:08:54  23        THE COURT:  Dr. Stern, would you slow down just a

03:08:58  24   little, please.

03:08:58  25        THE WITNESS:  Of course.  I'm sorry, Your Honor.

03:08:58   1          THE COURT:  That's all right.  Continue.
03:09:00   2   A.  Yes, we use microphone arrays, among other
03:09:04   3   technologies, in our work in improving speech recognition
03:09:07   4   accuracy.
03:09:08   5   Q.  (By Mr. Re)  And you mentioned that your doctorate
03:09:12   6   dealt with sound source localization.  Do you have
03:09:13   7   experience with that, as well?
03:09:15   8   A.  Yes.  In both by humans and by machines.
03:09:18   9   Q.  And how about do you have any experience with adaptive
03:09:22   10  beamforming?
03:09:22   11  A.  Yes.  That's enabling technology for many of the things
03:09:27   12  that we do to improve signals in noisy environments.
03:09:32   13  Q.  And have you ever served as an expert of any kind for
03:09:37   14  my client, Amazon, before this case?
03:09:39   15  A.  No.
03:09:39   16  Q.  And do you have any financial interest whatsoever in
03:09:41   17  the outcome of this litigation?
03:09:43   18  A.  No.
03:09:43   19  Q.  And are you being paid for your time to assist us in
03:09:46   20  this case?
03:09:46   21  A.  Yes, I am.
03:09:47   22  Q.  At what rate?
03:09:48   23  A.  $500.00 per hour.
03:09:53   24          MR. RE:  Your Honor, at this time Amazon offers
03:09:55   25  Dr. Stern as an expert in the fields of audio signal

03:10:00  1  processing and microphone arrays.

03:10:03  2  　　　　　THE COURT:  Is there objection?

03:10:04  3  　　　　　MR. RUBINO:  No objection, Your Honor.

03:10:05  4  　　　　　THE COURT:  Then, without objection, the Court

03:10:07  5  will recognize this witness as an expert in those

03:10:10  6  designated fields.

03:10:10  7  　　　　　Please continue.

03:10:12  8  Q.  (By Mr. Re)  Just very briefly, tell me what was your

03:10:14  9  assignment in this case?

03:10:14  10  A.  Well, as I mentioned earlier, I was asked to provide

03:10:18  11  opinions about the validity of the '049 patent.

03:10:21  12  Q.  And what did you have -- briefly, what did you have to

03:10:24  13  look at, in order to determine the validity of the '049

03:10:30  14  patent?

03:10:30  15  A.  Well, I looked at the patent itself, I looked at the

03:10:35  16  file history for the patent, I looked at multiple sources

03:10:39  17  of prior art, and those were the primary references.

03:10:44  18  Q.  Let me just slow down just for a moment.  I want to

03:10:47  19  explore what you mean by the phrase "prior art."

03:10:50  20  　　　　　What exactly do you mean by prior art?

03:10:54  21  A.  Could you move that to the right so I can see it

03:11:08  22  better?  I assume that you want me to see it.

03:11:13  23  Q.  How is that?

03:11:15  24  　　　　　THE COURT:  Mr. Re, why don't you move it out to

03:11:18  25  the front edge of the podium.  That way not only the

| | | |
|---|---|---|
| 03:11:21 | 1 | witness but the jury can probably see it. |
| 03:11:23 | 2 | And -- and you'll need to turn it more so that the |
| 03:11:29 | 3 | witness can see it. |
| 03:11:30 | 4 | THE WITNESS:  Yeah, that's great. |
| 03:11:32 | 5 | THE COURT:  And, Dr. Stern, you have leave to |
| 03:11:33 | 6 | stand if you need to, if there's any part of it, as he |
| 03:11:36 | 7 | might write toward the bottom, that you need to see. |
| 03:11:39 | 8 | THE WITNESS:  Thank you.  Thank you very much. |
| 03:11:40 | 9 | THE COURT:  All right.  Let's continue. |
| 03:11:41 | 10 | Q.  (By Mr. Re)  Okay.  Prior art, am I saying it right? |
| 03:11:45 | 11 | A.  Yes. |
| 03:11:45 | 12 | Q.  So I understand that -- the patent issued in what year; |
| 03:11:49 | 13 | do you remember? |
| 03:11:49 | 14 | A.  September 24th -- no, the patent issued in 2018. |
| 03:11:57 | 15 | Q.  Now, does prior art bear any relationship to the issue |
| 03:12:02 | 16 | date of the patent? |
| 03:12:03 | 17 | A.  No, no.  By law, prior art is defined to be the art |
| 03:12:10 | 18 | that was published, disclosed, or otherwise available at |
| 03:12:14 | 19 | the time of the invention itself, which corresponds to the |
| 03:12:20 | 20 | filing date of the patent. |
| 03:12:22 | 21 | Q.  Do you remember the year the application was filed? |
| 03:12:30 | 22 | A.  Yes, it was September 24th, 2010. |
| 03:12:34 | 23 | Q.  So are you looking at any information that may have |
| 03:12:40 | 24 | occurred or published in this period? |
| 03:12:42 | 25 | A.  Anything that happened after 2010 is irrelevant to my |

| | | |
|---|---|---|
| 03:12:47 | 1 | testimony. |
| 03:12:48 | 2 | Q.  Including the 2011 meeting, that would have no bearing, |
| 03:12:51 | 3 | right? |
| 03:12:51 | 4 | A.  Nothing to do with my testimony. |
| 03:12:53 | 5 | Q.  And does prior art vary depending who the litigants are |
| 03:12:57 | 6 | and whether they've met each other before? |
| 03:12:59 | 7 | A.  No. |
| 03:12:59 | 8 | Q.  And how far back do you have to go in order to use |
| 03:13:02 | 9 | something as prior art? |
| 03:13:05 | 10 | A.  It just has to have been disclosed or published at the |
| 03:13:10 | 11 | time the invention was filed, 2010. |
| 03:13:12 | 12 | Q.  And the invention you said was 2010, is what you're |
| 03:13:15 | 13 | using? |
| 03:13:15 | 14 | A.  2010. |
| 03:13:16 | 15 | Q.  And so is everything we're discussing earlier than |
| 03:13:19 | 16 | 2010? |
| 03:13:20 | 17 | A.  Everything we are discussing is much earlier than 2010. |
| 03:13:24 | 18 | Q.  Way more than a year? |
| 03:13:25 | 19 | A.  More than a year. |
| 03:13:27 | 20 | Q.  Okay.  And when you're looking at this prior art, for |
| 03:13:35 | 21 | what purpose are you reading the prior art? |
| 03:13:39 | 22 | A.  The reason why the prior art is important is very |
| 03:13:43 | 23 | simple.  According to the law, a claim of a patent is |
| 03:13:48 | 24 | invalid if a person of ordinary skill of the art would find |
| 03:13:54 | 25 | the material of the claim obvious, given the prior art as |

03:14:00   1   of the filing -- as of the time of the invention.

03:14:03   2   Q.  And does the law require that any individual actually

03:14:07   3   possess -- physically possess all the prior art?

03:14:10   4   A.  No.

03:14:10   5   Q.  What does the law do with respect to somebody of

03:14:14   6   ordinary skill in the art?

03:14:17   7   A.  The person of the ord -- a person of ordinary skill in

03:14:22   8   the art, and this is a term of art, is presumed to be aware

03:14:26   9   of all of the prior art at the time of the invention.

03:14:31  10   Q.  So it doesn't matter where it's published, for example?

03:14:35  11   A.  No.

03:14:35  12   Q.  It could be a foreign piece of prior art, for example?

03:14:38  13   A.  Absolutely.

03:14:39  14   Q.  Now, tell me exactly, when you say a person of ordinary

03:14:50  15   skill in the art, who exactly is that?

03:14:53  16   A.  Well, this is a hypothetical person.  And we have a

03:14:57  17   definition for that.  And we agree with the construction

03:15:01  18   that had been proposed.  And that hypothetical person is

03:15:07  19   presumed to have all of the art that is in the public at

03:15:15  20   his or her disposal.

03:15:17  21   Q.  Very good.  When you say we agree with the construction

03:15:19  22   that's been proposed, what exactly did you mean by that

03:15:23  23   statement?  It was a little unclear.

03:15:26  24   A.  Well, the other side proposed that a person of ordinary

03:15:29  25   skill in the art for this particular discussion would be

03:15:33   1   somebody who either had a Bachelor's in Electrical

03:15:37   2   Engineering, Computer Science, plus three or so years of

03:15:40   3   relevant industry experience, or a person with a Master's

03:15:43   4   degree in Electrical Engineering, Computer Science from a

03:15:46   5   relevant discipline.

03:15:47   6   Q.   And so --

03:15:48   7   A.   We agree with that.

03:15:49   8   Q.   Okay.  With Mr. McAlexander's definition?

03:15:51   9   A.   That's correct.

03:15:52   10   Q.   Okay.  And what exactly was the state of the art

03:15:58   11   concerning microphone arrays right before the time of the

03:16:01   12   filing of this application?

03:16:03   13   A.   Well, by early 2010, there had already been a great

03:16:08   14   deal -- there had been a great deal of work already done in

03:16:11   15   microphone arrays.  We've been -- in our own group, we've

03:16:15   16   been doing it since the late '80s and going to meetings

03:16:19   17   regularly since the mid-'90s.

03:16:21   18        Many -- all of the technologies that have been

03:16:24   19   disclosed in the '049 patent were already out there in the

03:16:28   20   art, both individually and also used in combination.

03:16:31   21   Q.   And have you been here for the entirety of this trial?

03:16:34   22   A.   Yes, I have.

03:16:35   23   Q.   And were you here when Dr. Li was the first witness --

03:16:40   24   talking with me as the first witness of this trial?

03:16:41   25   A.   Yes, I was.

| | | |
|---|---|---|
| 03:16:43 | 1 | Q.  And do you remember when Dr. Li and I were going |
| 03:16:46 | 2 | through his core technologies in the document that he sent |
| 03:16:51 | 3 | Amazon back in 2011? |
| 03:16:53 | 4 | A.  Yes, yes, yes. |
| 03:16:55 | 5 | Q.  And do you remember when I was writing down and taking |
| 03:16:59 | 6 | notes during Dr. Li's testimony? |
| 03:17:02 | 7 | A.  Yes. |
| 03:17:02 | 8 | Q.  And do you agree with the statements that I've written |
| 03:17:07 | 9 | on the board in response to Dr. Li's testimony? |
| 03:17:09 | 10 | A.  Yes, I do. |
| 03:17:10 | 11 | Q.  And so you agree that microphone arrays were well-known |
| 03:17:14 | 12 | by September of 2010, right? |
| 03:17:16 | 13 | A.  Yes, they were. |
| 03:17:17 | 14 | Q.  In any configuration, linear or circular, right? |
| 03:17:20 | 15 | A.  That is correct. |
| 03:17:20 | 16 | Q.  And in these microphone array systems, you agree that |
| 03:17:24 | 17 | it was well-known to include noise reduction algorithms, |
| 03:17:28 | 18 | echo cancellation, right? |
| 03:17:29 | 19 | A.  Those were commonly done. |
| 03:17:30 | 20 | MR. RUBINO:  Objection.  Objection. |
| 03:17:31 | 21 | THE COURT:  State your objection. |
| 03:17:33 | 22 | MR. RUBINO:  Leading, Your Honor. |
| 03:17:34 | 23 | THE COURT:  Sustained. |
| 03:17:35 | 24 | Q.  (By Mr. Re)  Would you kindly go through this board and |
| 03:17:38 | 25 | express your opinion as to the accuracy of this board that |

03:17:43  1    I constructed with Dr. Li?

03:17:46  2         THE COURT:  And, Mr. Re, if you'd make sure that

03:17:50  3    the witness has finished the answer before you start the

03:17:52  4    next question.

03:17:53  5         MR. RE:  I shall.

03:17:54  6         THE COURT:  Just a little -- just a little break

03:17:56  7    between the questions and the answers would be helpful.

03:17:58  8         MR. RE:  I'm sorry, Your Honor.

03:17:59  9         THE COURT:  All right.  Please proceed, Dr. Stern.

03:18:00  10   A.  Looking at the core technologies listed on the board, I

03:18:06  11   see microphone arrays in multiple configurations, noise

03:18:11  12   reduction, echo cancellation, sound source localization,

03:18:16  13   adaptive beamforming, and digital signal processing, all of

03:18:21  14   these were disclosed in the public art, published widely,

03:18:27  15   discussed.  They existed at the time of the invention.  I

03:18:29  16   agree with Dr. Li in that respect.

03:18:42  17   Q.  (By Mr. Re)  Let's talk a minute about digital signal

03:18:48  18   processors.  How do you know for sure that digital signal

03:18:50  19   processors were well-known in the art well before 2010?

03:18:52  20   A.  Well, there were many publications of them --

03:18:57  21   presentations by Texas Instruments, Motorola, trade

03:19:01  22   magazine -- trade -- at trade meetings and so forth.

03:19:06  23        As an example, what you see on the screen is an

03:19:09  24   article from Computerworld from March 2001.  The title --

03:19:15  25   Computerworld is a major trade magazine in the computer

03:19:19  1   industry.  And this is an article about Digital Signal

03:19:25  2   Processors, and you can see the text states -- that's the

03:19:27  3   part that's circled in red -- DSPs are widely used for

03:19:30  4   processing audio, and a bunch of other stuff.

03:19:31  5   Q.  Now, let's go back to the circular array.  And were

03:19:37  6   circular arrays well-known well before 2010?

03:19:39  7   A.  Yes, they were.

03:19:40  8   Q.  And you -- and you prepared a slide.  I wonder if you

03:19:47  9   can just briefly describe what is shown on this Slide 6.5?

03:19:52  10  A.  This is a slide depicting a circular microphone array.

03:19:57  11  It is a figure in a paper by an author I'll refer to as

03:20:03  12  Dmochowski.  It was published in the IEEE Transactions on

03:20:05  13  Audio in spring of 2007.

03:20:08  14       And we'll be talking about it a little bit later,

03:20:11  15  but you can see that the microphones are configured in a

03:20:14  16  circular array in 2007.

03:20:15  17  Q.  Okay.  Now, let's move on.

03:20:18  18       What claims are at issue in this case?

03:20:20  19  A.  Claim 1 and Claim 8.

03:20:23  20  Q.  And have you formed an opinion about the validity or

03:20:26  21  invalidity of Claims 1 and 8?

03:20:29  22  A.  Yes, I have.

03:20:30  23  Q.  And what is your opinion?

03:20:34  24  A.  My opinion is that the claims -- Claims 1 and Claim 8

03:20:38  25  are invalid.

03:20:40   1   Q.  Why do you believe that Claims 1 and 8 are invalid?

03:20:44   2   A.  Well, this part of the case is very simple.  The law

03:20:49   3   dictates that a claim in a patent is invalid if a person of

03:20:54   4   ordinary skill in the art would have found the text, the

03:20:59   5   teachings, the description of the claim obvious based on

03:21:03   6   the prior art that was available at the time of invention.

03:21:09   7   Q.  Okay.

03:21:11   8          MR. RE:  Your Honor, if I may approach to hand the

03:21:14   9   witness a physical item?

03:21:16  10          THE COURT:  You may approach the witness.

03:21:18  11   Q.  (By Mr. Re)  I'm going to hand you what's been marked

03:21:20  12   Defendants' Exhibit 49P.

03:21:26  13          THE WITNESS:  Thank you.

03:21:28  14          MR. RE:  Mr. Berk, if you can call up Exhibit 49.

03:21:33  15   Q.  (By Mr. Re)  Could you identify for the record what I

03:21:38  16   just handed to you as Defendants' Exhibit 49P?

03:21:43  17   A.  Yes.  This is my copy -- my personal copy of the

03:21:47  18   Brandstein reference.

03:21:49  19   Q.  And we know it's your personal copy --

03:21:52  20   A.  Well, I checked and my name is inside.

03:21:55  21   Q.  And that, in fact, if you look on your screen, is the

03:21:57  22   book.  Is that your handwriting?

03:22:00  23   A.  It is.

03:22:01  24   Q.  When did you first obtain a copy of Dr. Brandstein's

03:22:07  25   book on Microphone Arrays?

03:22:09   1   A.   I purchased that copy of the book some time between

03:22:14   2   2001 and 2003, and I've had it in my possession continually

03:22:18   3   ever since.

03:22:18   4   Q.   And is the Brandstein textbook well-known in the

03:22:25   5   industry?

03:22:25   6   A.   Yes.  Even 20 years later, it remains perhaps the best

03:22:32   7   known book on microphone arrays in the industry.

03:22:33   8   Q.   And can you explain briefly how that book is organized?

03:22:37   9   A.   So the book is a collection of chapters written by

03:22:43  10   different specialists in different subportions of the

03:22:46  11   field.

03:22:46  12        But the important thing about this book is it was

03:22:51  13   curated by the authors -- I'm sorry, by the editors,

03:22:55  14   Brandstein and Ward, to provide a unified whole.  It's a

03:23:01  15   single production.  We look at -- we look at all the

03:23:03  16   chapters interchangeably, and we can rely on the editor's

03:23:07  17   statement in the preference -- in preface:  In putting this

03:23:13  18   book together, our goal was to provide for the first time a

03:23:16  19   single -- a single, complete reference on microphone

03:23:20  20   arrays.  It's a single reference.

03:23:22  21   Q.   And do you use this textbook in your own research and

03:23:26  22   scholarship?

03:23:29  23   A.   Regularly and frequently, all parts of it.

03:23:31  24   Q.   I'd now like to take the ladies and gentlemen of the

03:23:33  25   jury through your analysis of Claim 1.

03:23:35  1          And I understand you have prepared some slides to
03:23:38  2   assist your explanation; is that right?
03:23:40  3   A.  That's correct.
03:23:48  4          So --
03:23:49  5   Q.  There's no question yet.
03:23:54  6   A.  No question.  Sorry.
03:23:55  7   Q.  I want to take you to the introductory language of
03:23:55  8   Claim 1 that's highlighted on the screen.  Do you see that?
03:23:55  9   A.  I do.
03:24:04  10  Q.  And, in fact, I want to ask you:  Does Brandstein teach
03:24:07  11  methods for enhancing a target sound signal from a
03:24:10  12  plurality of sound signals?
03:24:12  13  A.  Yes, he does.
03:24:13  14  Q.  And, first, tell me what do you mean by -- what does it
03:24:16  15  mean by the word "plurality"?
03:24:17  16  A.  A plurality means just simply more than one.
03:24:21  17  Q.  And how do you know that Dr. Stern fully discloses
03:24:29  18  methods for enhancing a target sound signal from a
03:24:32  19  plurality of sound signals?
03:24:34  20  A.  You mean Brandstein?
03:24:37  21  Q.  Oh, I'm sorry, Dr. Brandstein.
03:24:39  22  A.  Yes.  Well, enhancement of target sound signals is the
03:24:46  23  major focus of the book, but you can see again in the
03:24:52  24  preface that the -- Part 1, which is the entire first part
03:24:56  25  of the book, concerns the problem of enhancing the speech

03:25:01   1   signal acquired from an array of microphones.

03:25:03   2        And you can see that text goes on to say:  The

03:25:07   3   other secondary goal is to suppress the background noise,

03:25:09   4   interfering sources, and the effects of room reverberation.

03:25:15   5   Q.  No question that the introductory language is --

03:25:18   6   A.  No.  It -- Brandstein --

03:25:20   7        THE COURT:  Just -- just a minute.  Let him finish

03:25:22   8   the question before you start with the answer, please.

03:25:25   9        Again, gentlemen, let's have a little bit of space

03:25:28   10  between questions and answers.  That way the jury will

03:25:31   11  follow this testimony better.  And that's why we're all

03:25:33   12  here, so the jury follows the testimony.

03:25:35   13       All right.  Let's continue, Mr. Re.

03:25:37   14  Q.  (By Mr. Re)  Do you have any doubt that the Brandstein

03:25:39   15  textbook explains the method highlighted on my slide?

03:25:42   16  A.  No, I do not.

03:25:44   17  Q.  Let's go to the next group of words in Claim 1.

03:25:56   18       And does the Brandstein textbook teach, and I

03:25:59   19  quote, a microphone array system comprising an array of

03:26:04   20  sound sensors in a linear, circular, or other

03:26:07   21  configuration?

03:26:08   22  A.  Yes, it does.

03:26:09   23  Q.  And how do you know?

03:26:10   24  A.  Well, for example, Figure 5.13, which we see here,

03:26:20   25  shows a microphone array.  Those are the four dots

| | | |
|---|---|---|
| 03:26:23 | 1 | highlighted in yellow.  They happen to be in a linear |
| 03:26:27 | 2 | configuration in this -- in this figure.  And this is just |
| 03:26:29 | 3 | an example of an array of sound sensors.  In this case, in |
| 03:26:33 | 4 | a linear configuration, but other configurations are found |
| 03:26:37 | 5 | elsewhere. |
| 03:26:38 | 6 | So Brandstein does teach providing a microphone |
| 03:26:45 | 7 | array system comprising an array of sound sensors |
| 03:26:47 | 8 | positioned in linear, circular, or other configuration. |
| 03:26:50 | 9 | Q.  Thank you. |
| 03:26:51 | 10 | If we move to the next group of words:  A sound |
| 03:27:00 | 11 | source localization unit.  Does Dr. Brandstein's textbook |
| 03:27:04 | 12 | explain and teach that item? |
| 03:27:05 | 13 | A.  Yes, it does. |
| 03:27:06 | 14 | Q.  How do you know? |
| 03:27:07 | 15 | A.  Well, among other places, all of Chapter 8 is concerned |
| 03:27:12 | 16 | with the localization of sound -- in this case, in |
| 03:27:17 | 17 | reverberant rooms.  That's what's taught.  So the text does |
| 03:27:19 | 18 | teach sound -- how to develop sound source localization |
| 03:27:23 | 19 | units. |
| 03:27:24 | 20 | Q.  What exactly is a unit? |
| 03:27:25 | 21 | A.  Well, a unit is fancy lawyer talk for a thing that does |
| 03:27:33 | 22 | sound source localization. |
| 03:27:35 | 23 | Q.  And does Brandstein disclose things that do sound |
| 03:27:39 | 24 | source localization? |
| 03:27:39 | 25 | A.  Yes, it does. |

03:27:40  1  Q.  How do you know?

03:27:46  2  A.  Well, for example, in the section cited, we're looking

03:27:49  3  at descriptions of three different algorithms that

03:27:52  4  accomplish sound source localization.

03:27:53  5       The first is time delay of arrival.  The second is

03:27:57  6  SRP for steered response power.  And the third is steered

03:28:04  7  response power, SRP-PHAT.  That's steered response power

03:28:07  8  using the phase transform, which, in fact, is the specific

03:28:13  9  method that's cited in the specification of the '049

03:28:14  10 patent.

03:28:14  11 Q.  So each of those are different kinds of sound source

03:28:18  12 localization units?

03:28:18  13 A.  Yes, they are.  And, collectively, they demonstrate

03:28:22  14 that Brandstein discloses sound source localization units.

03:28:26  15 Q.  Okay.  Let's go to the next group of words.  And the

03:28:34  16 next group of words is, and I quote, an adaptive

03:28:39  17 beamforming unit.

03:28:39  18      Does the Brandstein textbook disclose and teach an

03:28:43  19 adaptive beamforming unit?

03:28:44  20 A.  Yes, it does.

03:28:45  21 Q.  And how do you know?

03:28:46  22 A.  Well, adaptive beamforming units are found in a number

03:28:51  23 of parts of the text.  Here, for example, the beginning of

03:28:55  24 Section 5.2, we see a large discussion on adaptive

03:29:00  25 beamformers.

1074

03:29:00   1          I read:  A beamformer which adaptively forms its
03:29:04   2   directivity pattern is called an adaptive beamforming --
03:29:07   3   beamformer, rather, and it simultaneously performs beam
03:29:12   4   steering, which refers to pointing the beam in the
03:29:15   5   direction of interest, presumably the desired sound source,
03:29:20   6   and null steering, which means suppressing signals coming
03:29:25   7   from other directions.
03:29:26   8          So Brandstein does disclose the existence and the
03:29:30   9   utility of adaptive beamforming units.
03:29:32  10   Q.  Let's move to the next group of words.
03:29:35  11          Does Brandstein disclose a noise reduction unit?
03:29:41  12   A.  Yes, it does.
03:29:43  13   Q.  And how do you know?
03:29:45  14   A.  Well, again, noise reduction units are discussed in
03:29:49  15   multiple sections of the text, but an easy example is
03:29:55  16   Chapter 3, which, in its entirety, is developed -- is
03:29:59  17   devoted to post-filtering techniques.  As we can see from
03:30:02  18   the abstract, in the context of microphone arrays, the term
03:30:05  19   post-filtering denotes the post-processing of the array
03:30:09  20   output by a single-channel noise suppression filter.
03:30:13  21          In this context, noise suppression filter refers
03:30:16  22   to something that reduces the level of noise, and hence,
03:30:19  23   Brandstein discloses the use of noise reduction units.
03:30:21  24   Q.  Okay.  I now want to ask you about the next group of
03:30:28  25   words.

03:30:30  1        Does Brandstein teach that the sound source

03:30:35  2   localization unit, adaptive beamforming unit, and the noise

03:30:39  3   reduction unit are integrated into a digital signal

03:30:43  4   processor, as set forth in the middle of [A] of Claim 1?

03:30:52  5   A.  Yes, it does.

03:30:54  6   Q.  And how do you know that?

03:30:55  7   A.  Well, there are multiple locations throughout the text

03:30:58  8   where DSPs are referred to.  But, for example, in the

03:31:02  9   latter section, future directions in microphone array

03:31:07  10  processing which discusses implementation, applications, we

03:31:07  11  see really the casual -- we see the text.

03:31:11  12        Today we have affordable DSPs that allow us to

03:31:15  13  implement all but the most complex schemes cheaply in

03:31:21  14  digital signal processing technology in real-time.

03:31:23  15        So a person of ordinary skill in the art would

03:31:25  16  realize that the natural way to implement in an efficient

03:31:30  17  fashion sound source localization, the adaptive

03:31:34  18  beamforming, and the noise reduction would be through the

03:31:35  19  use of digital signal processors.

03:31:40  20        In fact, at that time, it would have been very

03:31:42  21  difficult to do all that without the DSP chips.

03:31:44  22  Q.  And, in fact, this is in the section of the book

03:31:50  23  entitled Lessons from the Past?

03:31:53  24  A.  No, Lessons from the Future.

03:31:59  25  Q.  No, 18.1; do you see that?

03:32:02  1   A.  Oh, Lessons from the Past, yes.  I have to read the

03:32:05  2   fine print.

03:32:06  3   Q.  So you're confident that those words are expressly

03:32:08  4   taught by Brandstein?

03:32:09  5   A.  Yes, yes, clearly they are.

03:32:11  6   Q.  Let's move on to the next group of words.  I want to

03:32:21  7   ask you, does Dr. Brandstein also teach or suggest that the

03:32:28  8   sound source localization unit, the adaptive beamforming

03:32:28  9   unit, and the noise reduction unit are in operative

03:32:44 10   communication with said array of sound sensors?

03:32:44 11   A.  Yes, it does.

03:32:46 12   Q.  You smiled.  Why is that?

03:32:48 13   A.  Well, this is an easy one.

03:32:49 14   Q.  Why is this an easy one?

03:32:50 15   A.  Let's take a look at the exemplary figure.

03:32:54 16        We see in the upper left-hand corner, those

03:32:56 17   circles are microphones.  Those are the microphones in the

03:32:59 18   microphone array.  The outputs of the microphone go into

03:33:03 19   the fixed beamformer, and then down below the blocking

03:33:06 20   matrix and the adaptive filter, they accomplish the

03:33:11 21   beamforming, beamsteering, and noise reduction in this

03:33:15 22   case.

03:33:16 23        And this really is a very simple clause.  What

03:33:18 24   operative communication means here is that the subsequent

03:33:21 25   blocks are connected to the microphone array.  And if they

03:33:27  1  weren't connected, the device simply wouldn't work.  This

03:33:29  2  is very, very obvious, and just common sense.

03:33:32  3  Q.  I'd like to move on to the next major step in Claim 1

03:33:42  4  of the '049 patent.

03:33:43  5        This is the step about receiving the sound

03:33:47  6  signals.  Do you see that?

03:33:49  7  A.  Yes.

03:33:49  8  Q.  And I'll read it into the record.

03:33:51  9        Does Brandstein teach:  Receiving said sound

03:33:56  10  signals from a plurality of disparate sound sources by said

03:34:02  11  sound sensors, wherein said received sound signals comprise

03:34:06  12  said target sound signal from a target sound source among

03:34:11  13  said disparate sound sources, and ambient noise signals.

03:34:24  14        Do you see that?

03:34:24  15  A.  Yes, I do.

03:34:25  16  Q.  All right.  I see you've underlined some words.  And

03:34:29  17  I'd like to ask you, how do you know whether Dr. Brandstein

03:34:33  18  teaches all the words of Step [B]?

03:34:37  19  A.  Well, this is a lot of words, but it's -- it's really a

03:34:39  20  very simple concept.  What Paragraph [B] is saying is that

03:34:44  21  your multiple sound sensors, that is the microphone array,

03:34:48  22  are receiving all the sounds that are coming in.  And those

03:34:51  23  sounds include the sounds that you want to be attending to,

03:34:54  24  in this case the target source, which in the example on the

03:34:59  25  figure of 5.13 is the speech.

03:35:01  1        And also along with it you receive a bunch of

03:35:05  2    stuff that you don't want to be paying attention to,

03:35:08  3    interference, indicated as white noise here.  It could be

03:35:11  4    the AC hum or the air conditioners that Mr. McAlexander

03:35:14  5    referred to in his own discussion.  And the impact of the

03:35:19  6    reflective board is to create reverberate components, which

03:35:24  7    also degrades speech recognition accuracy.

03:35:26  8        In fact, nowadays that's even a more difficult

03:35:29  9    problem than the additive noise.

03:35:31  10        So what this figure teaches, along with many other

03:35:34  11   examples throughout the book, is that the microphones in

03:35:36  12   the array receive multiple sound sources, including some

03:35:42  13   that you want, speech in this case, and some that you don't

03:35:45  14   want, the noise and the reverberate components.  Hence, the

03:35:50  15   book teaches the reception of those sound signals,

03:35:52  16   Paragraph [B].

03:35:52  17   Q.  Let's move on to big Paragraph [C], the determining a

03:35:56  18   delay.

03:35:57  19        Now, I first want to ask you, is it clear to you

03:36:00  20   from reading this claim that Step [B] must come before

03:36:08  21   Step [C]?

03:36:09  22   A.  Yes.

03:36:09  23   Q.  How do you know?

03:36:11  24   A.  As we've heard, we cannot determine the delay without

03:36:14  25   receiving the sound in the first place.  [B] must come

03:36:16  1   before [C].

03:36:24  2   Q.  Now, does Dr. Brandstein's book teach this determining

03:36:29  3   a delay step, which is Step [6] shown on the slide?

03:36:32  4   A.  Yes, it does.

03:36:33  5   Q.  And how do you know?

03:36:34  6   A.  Well, for example, this equation, which is from the

03:36:41  7   second chapter in Brandstein, discloses the most robust,

03:36:44  8   most general way of representing -- or of calculating the

03:36:48  9   time delay -- excuse me, determining the time delay from

03:36:54  10  the information at hand.  And this is a discussion that

03:36:57  11  calculates delay in three dimensions.

03:37:01  12  Q.  And how does that compare with the formulas shown in

03:37:06  13  the '049 patent?

03:37:07  14  A.  Well, looking just a little bit ahead before the

03:37:10  15  highlighted text, if we were to go for the clause in -- in

03:37:15  16  which addresses two dimensions, if you reduce -- you can

03:37:19  17  get to two dimensions by setting the angle theta, which is

03:37:23  18  the third dimension in the elevation.  You set that to 90

03:37:26  19  degrees.  And that causes the third term to become 0, with

03:37:31  20  a linear array.  The second term becomes 0.  And in this

03:37:34  21  equation black reduces to the equation in red, which is the

03:37:39  22  two-dimensional linear array.

03:37:42  23        And that equation is identical to the equation

03:37:43  24  that's part of the specification of the '049 patent for

03:37:45  25  determining the delay when the target sound source that

03:37:49  1   emits the said target sound signal is in a two-dimensional

03:37:55  2   plane.

03:37:55  3          So the information of Brandstein could be reduced

03:37:57  4   by any person of ordinary skill in the art to the

03:38:00  5   two-dimensional equation that's specifically stated.  The

03:38:04  6   equation is more general, but it's the same equation.

03:38:08  7   Q.  Would virtually anybody understand that who is of skill

03:38:13  8   in the art?

03:38:13  9   A.  A person of ordinary skill in the art would understand

03:38:14  10  that.

03:38:15  11  Q.  Now, if I understand, the red is not in Brandstein, but

03:38:27  12  that was done by you to explain?

03:38:29  13  A.  The red in -- is a simplification of the equation that

03:38:33  14  was done in Brandstein, simply by reducing from three

03:38:38  15  dimensions to two dimensions so that I could compare

03:38:42  16  directly the teachings of Brandstein to the specific

03:38:44  17  language in the claim in the specification of the patent.

03:38:47  18  Q.  And when you look at the patent, how do you know the

03:38:51  19  equation was already taught by Dr. Brandstein in his

03:38:55  20  textbook?

03:38:56  21  A.  Well, we can see the equation on the right side derived

03:38:59  22  from the equation of Brandstein is identical to the

03:39:02  23  equation in the patent.  The only difference is that the

03:39:06  24  patent uses the variable d for distance instead of l for

03:39:13  25  length.  That's like calling me Rich instead of Richard.

03:39:18  1   It doesn't change anything.  It's just a different label.

03:39:22  2   Q.  Let's go to the next group of words, all in this

03:39:25  3   Limitation [C] where it explains:  Wherein said delay is

03:39:30  4   represented in terms of number of samples.

03:39:33  5        Do you see that?

03:39:34  6   A.  Yes, I do.

03:39:35  7   Q.  And is that taught in Brandstein?

03:39:39  8   A.  Yes, it is.  You can see that because the variable

03:39:44  9   highlighted on the right side, f, that stands for sampling

03:39:49  10  frequency.  And that converts the time in seconds to the

03:39:54  11  time in number of samples.

03:39:55  12       So we can see that Brandstein discloses the text

03:39:58  13  in the patent, wherein said delay is represented in terms

03:40:02  14  of number of samples.

03:40:03  15  Q.  Thank you.

03:40:04  16       Now I want to keep going with this Limitation [C].

03:40:11  17  A.  Okay.

03:40:11  18  Q.  And the next group of words is -- concludes with:  And

03:40:18  19  wherein said determination of said delay enables

03:40:22  20  beamforming for said array of sound sensors in a plurality

03:40:28  21  of configurations.

03:40:33  22  A.  Yes.

03:40:33  23  Q.  First thing I have to ask you is what -- what's with

03:40:37  24  all these saids?  Why is there so many saids?

03:40:44  25  A.  That's one of my favorite legal words.  Said means

03:40:47  1  "the" in legalese.  So what that's telling me is

03:40:54  2  determination of the delay enables beamforming for the

03:41:00  3  array of sound sensors in a plurality of configurations.

03:41:02  4       And as we can see on the right-hand side, this is

03:41:03  5  really also disclosed by the teachings of the Brandstein

03:41:04  6  book:  Delay-and-sum beamformers apply time shifts to

03:41:10  7  compensate for the propagation delays in the arrival of the

03:41:16  8  source signal at each microphone.

03:41:18  9       And what that means for this discussion is that

03:41:18  10  once you know what the delays are, then you can point the

03:41:21  11  beam in any direction you want.  You need the delays to

03:41:25  12  point the beam.  You don't need the delays to make the

03:41:29  13  beam, but you need the delays to point the beam in a

03:41:32  14  different direction.

03:41:33  15  Q.  So are you confident that Dr. Brandstein's book renders

03:41:36  16  the entire delay step obvious to one of ordinary skill in

03:41:39  17  the art, well before the filing of the '049 patent?

03:41:43  18  A.  That is correct.  I do.  And you can see the microphone

03:41:48  19  array below is a different configuration, sort of randomly

03:41:53  20  arranged on the wall.  The equation is very general.

03:41:56  21  Q.  So the same equation could be used no matter where you

03:41:59  22  put the arrays?

03:42:00  23  A.  Or whatever configuration the microphones of the array

03:42:03  24  might be in.

03:42:04  25  Q.  And when we say microphones and sound sensors, what's

03:42:08   1   the difference?

03:42:09   2   A.  In this context, none.

03:42:12   3   Q.  Let's move to the next step, Step [D].

03:42:30   4          Now, I want to ask you if Dr. Brandstein once

03:42:32   5   again discloses or teaches, quote, estimating a spatial

03:42:36   6   location of target sound signal from said received sound

03:42:41   7   signals by said sound source localization unit.

03:42:44   8          It's quite a mouthful?

03:42:46   9   A.  Yes.

03:42:47  10   Q.  Does Dr. Brandstein teach that?

03:42:50  11   A.  Yes.

03:42:50  12   Q.  And how do you know that?

03:42:54  13   A.  Well, we see the text here.  The beamformer may be used

03:42:59  14   as a means for source localization by steering the array to

03:43:05  15   specific spatial points of interest in some fashion and

03:43:08  16   evaluating the output signal, typically its power.

03:43:11  17          This is part of the chapter that is entirely

03:43:15  18   devoted to sound source localization.  And, from that, I

03:43:19  19   conclude that, yes, Brandstein does teach a spatial

03:43:21  20   location of said target sound signal from the received

03:43:26  21   sound signals.

03:43:27  22   Q.  Okay.  Look let's look at the next group of words.

03:43:31  23   Limitation [E], and this has had quite a bit of discussion.

03:43:37  24          It's:  Performing adaptive beamforming for

03:43:40  25   steering a directivity pattern of said array of said sound

03:43:45  1  sensors in a direction of said spatial location of said

03:43:52  2  target sound signal by said adaptive beamforming unit,

03:43:56  3  wherein said adaptive beamforming unit enhances said target

03:44:02  4  sound signal and partially suppresses said ambient noise

03:44:08  5  signals.

03:44:09  6       Did I read that correctly?

03:44:10  7  A.  Yes.

03:44:11  8  Q.  Does the Brandstein book explain and disclose or teach

03:44:18  9  all the words of Step [E] of Claim 1?

03:44:22  10  A.  Yes, it does, although the words are in different

03:44:25  11  order.  Again, we're only concerned with things that

03:44:29  12  happened before 2010, so I'll not make comments about the

03:44:37  13  Echo.

03:44:39  14       But Brandstein discusses adaptive filters

03:44:43  15  extensively.  One very clear spot where this happens is in

03:44:46  16  Section 5.2, Adaptive Beamformers.  And you can see the

03:44:53  17  text includes a beamformer which adaptively forms its

03:44:56  18  directivity pattern is called an adaptive beamforming --

03:45:00  19  beamformer.

03:45:00  20       It simultaneously performs beam steering, which is

03:45:05  21  pointing the beam in the direction you want the beam to go.

03:45:07  22  And null steering, as I said before, pointing directions of

03:45:11  23  attenuated response in the direction that you don't want to

03:45:12  24  have a response from, presumably the interfering sources.

03:45:16  25       So, yes, Brandstein does teach the performance of

03:45:20  1  adaptive beamforming, fulfilling the specification in

03:45:25  2  Subparagraph [E] of Claim 1.

03:45:26  3  Q.  Now, I think I heard you say the word "Echo."  Is

03:45:29  4  that -- you just misspoke?

03:45:31  5  A.  I -- I admittedly misspoke.  I shouldn't have said

03:45:33  6  anything about it.  I'm only talking about things before

03:45:34  7  2010.

03:45:34  8  Q.  Correct.  And since Echo didn't exist before 2010, the

03:45:39  9  Echo is not part of this analysis at all, right?

03:45:41  10  A.  No, it was not.

03:45:41  11  Q.  Let's move to the last step of the method claim of

03:45:51  12  Claim 1.  It's Limitation [F], or Step [F], where it

03:46:02  13  states:  Suppressing said ambient noise signals by said

03:46:08  14  noise reduction unit for further enhancing said target

03:46:11  15  sound signal.  Do you see that?

03:46:12  16  A.  Yes, I do.

03:46:12  17  Q.  Did I read it correctly?

03:46:14  18  A.  I believe you did.

03:46:15  19  Q.  Does the Brandstein book, which I have in my hand,

03:46:19  20  Exhibit 71P and your 49P, does that book expressly teach

03:46:23  21  that Step [F]?

03:46:32  22  A.  Yes, it does.

03:46:34  23  Q.  And how do you know that?

03:46:35  24  A.  Well, again, noise suppression is scattered throughout

03:46:38  25  the book, but Chapter 3 is devoted exclusively to

03:46:42  1   post-filtering techniques.  And as you can see in the
03:46:43  2   context of microphone array, the term "post-filtering"
03:46:48  3   denotes the post-processing of the array output, in this
03:46:48  4   case, by a single channel noise suppression filter.
03:46:52  5         As you heard me say before, noise suppression
03:46:55  6   means getting rid of the noise.  If you get rid of the
03:46:57  7   noise, you enhance the sound signal --
03:47:00  8   Q.  So --
03:47:01  9   A.  -- it teaches.
03:47:04  10  Q.  Thank you.
03:47:04  11        So, in summary, is it your opinion that
03:47:11  12  Dr. Brandstein's book renders all of the limitations in
03:47:14  13  Claim 1 obvious.
03:47:15  14  A.  Yes.
03:47:18  15  Q.  And what's the impact of that conclusion?
03:47:21  16  A.  The impact of the conclusion is, as I stated before, if
03:47:25  17  all of the subparts of Claim 1 are obvious by virtue of
03:47:36  18  prior -- prior art existing at the time of the invention.
03:47:39  19        And this book was published in 2001.  The
03:47:41  20  invention was filed in 2010.  Nine years prior.  This is
03:47:47  21  old.  If we have prior art that makes the claims obvious,
03:47:51  22  then the patent is invalid.
03:47:55  23  Q.  Now, did the Patent Office -- patent examiner, when
03:48:03  24  examining the '049 application, at any time have this book
03:48:10  25  by Dr. Brandstein?

03:48:11  1    A.  No.

03:48:14  2    Q.  And how do you know that?

03:48:15  3    A.  Well, by law, the patent examiners are required to

03:48:20  4    disclose all of the sources that they used -- or he or she

03:48:29  5    used in making the judgment about whether patents should be

03:48:34  6    issued.  And that shows in the list of references cited.

03:48:37  7        And in the case of the '049 patent, all of the

03:48:40  8    references cited were prior patents.  This is a book, so

03:48:44  9    it's clear that Brandstein was not considered by the patent

03:48:47  10   examiner in making a decision about whether to issue the

03:48:50  11   patent, either the '049 or the previous patent.

03:48:55  12   Q.  So no books or articles cited?

03:49:04  13   A.  No books or articles cited.  Only other patents.

03:49:08  14   Q.  Foreign or domestic, it looks like, right?

03:49:11  15   A.  Yes.

03:49:11  16   Q.  But no literature of any kind?

03:49:14  17   A.  No literature.

03:49:15  18   Q.  Let's go back to Limitation [C].

03:49:22  19       Is Brandstein the only prior art reference that

03:49:27  20   discloses and teaches the determining a delay step of

03:49:33  21   Limitation [C]?

03:49:34  22   A.  No, it is not.

03:49:35  23   Q.  And which reference has already been discussed in this

03:49:39  24   trial showing all of the limitations of this claim -- of

03:49:43  25   Limitation [C]?

03:49:44   1   A.  Well, among others, we heard on Friday, I believe, from

03:49:50   2   Dr. Zhu -- quite possibly from Dr. Li -- that the paper

03:49:54   3   that Dr. Li presented in the ICASSP 2009 in Taiwan, which

03:50:00   4   is shown up here on the screen, disclosed the same method

03:50:03   5   of determining the delay that was cited in the '049 patent.

03:50:05   6   Q.  Now, can an inventor's own publication be used to

03:50:11   7   invalidate the same inventor's later-filed application?

03:50:16   8   A.  Absolutely.  It's totally legitimate prior art.

03:50:19   9   Q.  And why is it legitimate prior art?

03:50:21  10   A.  Because it was published more than a year before the

03:50:24  11   filing date of the patent.  In this case, the ICASSP

03:50:28  12   meeting is always in the spring.  I don't know the exact

03:50:31  13   month, but it would be April through June.  And the filing

03:50:34  14   date for the patent, that would have been 2009.  And the

03:50:37  15   filing date for patent was September 2010.

03:50:43  16   Q.  So since no patent was filed within a year of the

03:50:45  17   disclosure of the Li article, who owns the technology

03:50:49  18   discussed in the Li paper?

03:50:51  19   A.  We all own it.  The public owns it.  It's prior art.

03:50:56  20   Q.  Are there other articles or prior art that also

03:51:05  21   discloses all of the limitations set forth in Step [C] of

03:51:10  22   Claim 1?

03:51:11  23   A.  There are.  In fact, there are multiple other articles,

03:51:14  24   but time is short.  So I'd like to only cite one more.

03:51:19  25   Q.  And that is Defendants' Exhibit 51 on the screen?

03:51:23  1  A.  Right.  That's the paper by Dmochowski and co-authors

03:51:27  2  that I mentioned earlier.  You can see the date of the

03:51:33  3  journal article was May 20 -- 2007.

03:51:39  4         And the title begins Direction of Arrival

03:51:42  5  Estimation.  Direction of arrival estimation is another set

03:51:47  6  of words that indicates sound source localization.

03:51:49  7  Q.  And what exactly is this article about, briefly?

03:51:52  8  A.  It's about sound source localization, including how to

03:51:54  9  determine the delays used to perform sound source

03:52:02  10  localization in exactly the same way proposed by the '049

03:52:04  11  patent.

03:52:04  12  Q.  And would someone know to use the information in this

03:52:09  13  Dmochowski article with the things taught in the Brandstein

03:52:13  14  book?

03:52:14  15  A.  He certainly would.  Among other things, the Brandstein

03:52:17  16  book is one of the citations in the Dmochowski article.

03:52:25  17  This Reference 10 here is, in fact, the same Chapter 8 that

03:52:29  18  I've been mentioning on sound source localization in the

03:52:31  19  Brandstein book.

03:52:31  20         And a person of ordinary skill in the art would

03:52:33  21  turn to the Brandstein book, which was by then well-known

03:52:37  22  as the primary reference in microphone array, for

03:52:42  23  information on all of the other technologies disclosed.

03:52:45  24  Q.  And how do you know that the Dmochowski reference --

03:52:49  25  and I don't know if I'm pronouncing it right, but

03:52:52  1   Dmochowski is good as any, Exhibit 51, how do you know it

03:52:56  2   teaches all of the words set forth in Limitation or

03:53:01  3   Step [C] of Claim 1?

03:53:03  4   A.  Well, we can compare the text of Claim 1 to the

03:53:07  5   teachings of disclosures in Dmochowski.  What we're looking

03:53:09  6   at is a figure from Dmochowski.  The previous slide showed

03:53:12  7   the figure in its place in the reference.  There it is in

03:53:15  8   the upper right-hand corner.

03:53:17  9           And now let's look at the text of the patent.

03:53:21  10          First, I call to your attention that the

03:53:24  11  microphones, as I mentioned before, are in a circular

03:53:26  12  array.  Those are the yellow dots now.

03:53:30  13          So we talk -- shall I continue?  Okay.

03:53:35  14          Determining a delay between each sound source --

03:53:40  15  I'm sorry, each of said sound sensors and an origin of said

03:53:43  16  array of said sound sensors.  The -- the origin there is in

03:53:47  17  green in the diagram.  Continuing.

03:53:49  18  Q.  Okay.

03:53:50  19  A.  As a function --

03:53:51  20  Q.  So let's -- so now let's get to as a function.  So

03:53:56  21  you're confident that the determining a delay between each

03:54:01  22  of said sound sensors and an origin of said array of said

03:54:05  23  sound sensors, that's what we just discussed, right?

03:54:08  24  A.  Right.

03:54:09  25  Q.  And now I want to go to the next part, and we're

03:54:11  1  talking about this function, this as a function of.

03:54:13  2  A.  It's a function of distance.  So we have to look to see

03:54:17  3  that all of the parameters mentioned are included in the

03:54:20  4  teachings of the article.  The distance here is indicated

03:54:22  5  by the line that's highlighted in blue or turquoise.

03:54:27  6       Shall I continue?

03:54:27  7  Q.  No, wait for another question.

03:54:30  8  A.  Okay.

03:54:30  9  Q.  And do we know whether it has the next group of words,

03:54:39  10  a predefined angle --

03:54:40  11  A.  I -- I -- I'm sorry, I haven't finished the last group

03:54:44  12  of words.

03:54:44  13  Q.  Okay.

03:54:45  14  A.  I was waiting for the question.

03:54:47  15  Q.  Okay.

03:54:47  16  A.  As a function of distance between each of the said

03:54:51  17  sound source sens -- sensors and the origin, and that's the

03:54:53  18  part in the center.

03:54:54  19       Now, go ahead, please.

03:54:56  20  Q.  Okay.  Thank you.  I'm sorry.

03:54:57  21       Does the figure also show a predefined angle

03:55:02  22  between each of said sound sensors and a reference axis?

03:55:07  23  A.  Yes, it does.  We can see the reference axis is the

03:55:11  24  horizontal line that's highlighted in red.  The predefined

03:55:15  25  angle, the other side of the angle is the line that goes

03:55:19   1   from the center of the circle through the big black dot.

03:55:24   2   That angle is delineated by the Greek variable C, which

03:55:32   3   looks a little like a pitch fork, and it's the outer edge

03:55:37   4   of that wedge in yellow.

03:55:38   5   Q.  I see some more Greek letters.  I'm going to go to the

03:55:43   6   next group of words.  An azimuth angle, it's been discussed

03:55:47   7   a lot in this trial.  Does it also show an azimuth angle

03:55:50   8   between said reference axis and said target sound signal?

03:55:54   9   A.  Yes, it does show that.  In this case, the target sound

03:56:03  10   signal is shown as coming in from the upper right-hand

03:56:03  11   corner.  The path that the signal travels along is

03:56:09  12   indicated by the line in purple.  And the angle between the

03:56:12  13   reference axis, which is in red, and the direction of

03:56:13  14   arrival of the sound source, which is in purple, is

03:56:16  15   indicated by that variable theta, which looks like an oval

03:56:21  16   with a horizontal line through it.  And it is the outer

03:56:25  17   edge of the current wedge that's highlighted in yellow.

03:56:28  18   Q.  So theta is a larger angle than the pitch fork?  That's

03:56:33  19   what it looks like?

03:56:34  20   A.  Yes.  And -- and for this particular direction of

03:56:36  21   arrival.  It could be smaller in other cases.

03:56:38  22   Q.  Now, I notice there's an equation at the top of the

03:56:41  23   figure.  What is that equation?

03:56:43  24   A.  So that's the equation for determining the time delay.

03:56:48  25   Q.  And does it have all of the variables or letters that

03:56:52   1   we just discussed from Limitation [C]?

03:56:54   2   A.   It does.

03:56:59   3   Q.   The next group of words is:  When said target sound

03:57:07   4   source that emits said target sound signal is in a

03:57:10   5   two-dimensional plane.

03:57:12   6   A.   Yes.

03:57:12   7   Q.   Is that clearly shown in the Dmochowski article?

03:57:18   8   A.   Yes, it is.  A two-dimensional plane is just a surface

03:57:21   9   like this.  There's nothing coming in and out of the plane,

03:57:24  10   either in the depiction or in -- or in the calculation, so

03:57:27  11   this is two dimensions.

03:57:28  12   Q.   And does the Dmochowski article explain or teach to

03:57:34  13   calculate the delay in a representation or number of

03:57:37  14   samples?

03:57:38  15   A.   As it happens, the equation in this figure is expressed

03:57:43  16   in the number -- in terms of the number of seconds.  But to

03:57:46  17   convert from seconds to samples, is very easily done by

03:57:49  18   multiplying by the sampling frequency.

03:57:51  19        The system designer builds the sampling frequency

03:57:54  20   once into the design of the system, and we all use samples

03:57:58  21   and seconds interchangeably.  Any -- we teach this to all

03:58:02  22   of our sophomores in electrical engineering program.

03:58:09  23   Q.   Okay.  And so now we're going to go to the next group

03:58:11  24   of words again.  And this is the final clause that says:

03:58:15  25   And wherein said determination of said delay enables

03:58:21   1   beamforming for said array of sound sensors in a plurality

03:58:25   2   of configurations.

03:58:28   3   A.   Yes.

03:58:28   4   Q.   Does the Dmochowski article teach or disclose that

03:58:33   5   group of words?

03:58:34   6   A.   Yes.  Well, it says that the delays steer the

03:58:39   7   beamformer to the desired direction of arrival while the

03:58:42   8   beamformer weights -- those are the w's -- shape the beam

03:58:47   9   accordingly.

03:58:47  10        As far as the plurality of configurations is

03:58:49  11   concerned, as I've stated before, the equation does not

03:58:54  12   care where the sensors actually are.  You just have to do

03:58:58  13   those measurements of the angles, and the proper delays

03:59:03  14   will come from the equation.

03:59:05  15   Q.   Now, would a person of ordinary skill in the art, prior

03:59:12  16   to the filing of the patent in 2010, would that person have

03:59:15  17   been motivated or know to combine the teachings of the

03:59:19  18   Dmochowski article with the adaptive beamformers discussed

03:59:22  19   in the book Microphone Arrays by Dr. Brandstein?

03:59:26  20   A.   Well, yes.  Even if we just include the determination

03:59:30  21   of the delay portion of the paper itself, and there's a lot

03:59:33  22   more information in there, the reader -- a person of

03:59:36  23   ordinary skill in the art reading the paper would be

03:59:40  24   motivated to turn to Brandstein for additional information

03:59:44  25   about all of the other microphone arrays -- microphone

03:59:50  1  array technologies that are disclosed in Brandstein because

03:59:51  2  the paper itself points to Brandstein for further

03:59:55  3  information.

03:59:56  4  Q.  So have you drawn any conclusions on whether or not it

03:59:59  5  would have been obvious to one of skill in the art to know

04:00:03  6  about or use the device or the method of Claim 1 in view of

04:00:08  7  Dmochowski and the Brandstein book?

04:00:10  8  A.  Yes.  A person of ordinary skill in the art would find

04:00:15  9  at least Paragraph [C] of Claim 1 obvious based on the

04:00:19  10  teachings of the patent.  So I -- I would put a second

04:00:23  11  check next to that one.  In fact, I'd put a third check,

04:00:27  12  given the material of Li.

04:00:29  13        So, collectively, I've -- my opinion is that the

04:00:32  14  patent is invalid, because as I indicated before, a person

04:00:35  15  of ordinary skill in the art would find in the paragraphs,

04:00:39  16  the teachings, the materials in the claims, obvious from

04:00:44  17  the material in the prior art that was issued at the time

04:00:49  18  of the filing date of the patent.

04:00:50  19  Q.  And did I hear you say you could put a third check?

04:00:53  20  A.  Yes, that would be the Li article.

04:00:55  21  Q.  So are you suggesting that the Li article with

04:01:00  22  Brandstein, would also render the claimed invention

04:01:04  23  obvious?

04:01:04  24  A.  That is correct.

04:01:05  25  Q.  Now, I'm going to ask you, for the record, did the

1096

| | | |
|---|---|---|
| 04:01:08 | 1 | patent examiner consider or have access to the Dmochowski |
| 04:01:12 | 2 | article when reviewing the '049 application at any time? |
| 04:01:17 | 3 | A.  Very clearly, no. |
| 04:01:18 | 4 | Q.  And how do you know that? |
| 04:01:20 | 5 | A.  We know that, because, once again, the patent |
| 04:01:25 | 6 | examiner's required to disclose the references cited, taken |
| 04:01:28 | 7 | into consideration, and no journal article is in that list. |
| 04:01:31 | 8 | So clearly, the Dmochowski article being -- being a journal |
| 04:01:36 | 9 | article was not considered. |
| 04:01:38 | 10 | Q.  Okay.  You realize there's more than one claim asserted |
| 04:01:41 | 11 | in this case, right? |
| 04:01:41 | 12 | A.  Yes. |
| 04:01:42 | 13 | Q.  And do you know what claim that is? |
| 04:01:43 | 14 | A.  Claim 8. |
| 04:01:44 | 15 | Q.  Could you briefly tell us, first of all, that Claim 8 |
| 04:01:49 | 16 | is shown on the screen, right? |
| 04:01:51 | 17 | A.  Yes. |
| 04:01:51 | 18 | Q.  And it begins with the words "the method of Claim 1," |
| 04:01:57 | 19 | right? |
| 04:01:57 | 20 | A.  Yes. |
| 04:01:58 | 21 | Q.  Could you just kindly tell us the significance of those |
| 04:02:03 | 22 | introductory words of Claim 8? |
| 04:02:04 | 23 | A.  You mean the method of Claim 1? |
| 04:02:05 | 24 | Q.  Oh, sorry, method of Claim 1 in Claim 8. |
| 04:02:08 | 25 | A.  Yes. |

04:02:09  1  Q.  Right.  What does that mean?

04:02:11  2  A.  So that means that Claim 8 starts by assuming that we

04:02:14  3  use everything that was part of Claim 1.

04:02:17  4  Q.  And did you review the validity of Claim 8 when

04:02:24  5  combined with Claim 1?

04:02:25  6  A.  Yes, I did.

04:02:26  7  Q.  And what did you conclude with respect to the validity

04:02:30  8  of Claim 8?

04:02:31  9  A.  Well, again, I concluded that Claim 8 is invalid

04:02:36  10  because it is -- it would be obvious to a person of

04:02:40  11  ordinary skill in the art to implement Claim 8, given the

04:02:45  12  teachings of Brandstein combined with Dmochowski combined

04:02:48  13  with a third reference, which I identify as Abutalebi.

04:02:53  14  Q.  Could you just briefly explain, briefly, what is

04:02:56  15  Claim 8 about?  What is it attempting to cover?

04:03:00  16  A.  Sure.  What Claim 8 is all about is the idea that you

04:03:03  17  can improve the performance of your system by taking the

04:03:06  18  signal coming in, breaking it up into multiple subbands --

04:03:11  19  that means dividing the signal according to frequency

04:03:11  20  components, lower frequencies in one channel, high

04:03:17  21  frequencies in another channel, and so forth, medium

04:03:18  22  frequencies in the third, multiple subbands, processing

04:03:21  23  each of the subbands independently, separately, in

04:03:25  24  parallel, and then putting the whole thing back together

04:03:27  25  when you're all done.

| | | |
|---|---|---|
| 04:03:28 | 1 | Q. And is that an obvious step? |
| 04:03:32 | 2 | A. Well, it's -- it's obvious given Abutalebi on top of |
| 04:03:36 | 3 | Dmochowski and -- and Brandstein. |
| 04:03:38 | 4 | Q. Okay. What is Abutalebi? |
| 04:03:40 | 5 | A. So Abutalebi is a patent application. I understand the |
| 04:03:45 | 6 | patent eventually issued from that, but I did not study |
| 04:03:49 | 7 | anything more than the application. |
| 04:03:50 | 8 | The publication date was April 15th, 2004, well |
| 04:03:56 | 9 | before -- much older than the file date of the '049 patent. |
| 04:03:59 | 10 | And it describes a method and system for processing subband |
| 04:04:05 | 11 | signals using adaptive filtering. |
| 04:04:07 | 12 | Q. Now, because of the publication date, it's undisputed |
| 04:04:11 | 13 | that this is also prior art, right? |
| 04:04:12 | 14 | A. Yes. Yes. And, in fact, the filing date is going to |
| 04:04:16 | 15 | be even before the publication date. |
| 04:04:18 | 16 | Q. But it's the publication date that makes it prior art, |
| 04:04:21 | 17 | right? |
| 04:04:21 | 18 | A. Yes. |
| 04:04:22 | 19 | Q. Okay. Let's go to that Claim 8. |
| 04:04:26 | 20 | And I'd like to ask you, with respect to the green |
| 04:04:30 | 21 | language that I've highlighted on the screen, does |
| 04:04:33 | 22 | Abutalebi disclose a noise reduction unit that performs |
| 04:04:38 | 23 | noise reduction in a plurality of frequency subbands? |
| 04:04:43 | 24 | A. Yes. This system depicts -- shows what I just |
| 04:04:48 | 25 | described. You can see the signal coming in, which is x of |

04:04:55  1  n on the left-hand side.  It's separated into parallel

04:05:00  2  channels that are indicated by the red lines.  The red

04:05:03  3  lines undergo the APB, adaptive processing block, that's

04:05:03  4  followed by the NAPB, which is non-adaptive processing

04:05:09  5  block.

04:05:09  6        And if we look at the text in green above that,

04:05:11  7  that further elaborates on what the non-adaptive processing

04:05:15  8  block is, and it states:  It's a single-microphone Wiener

04:05:20  9  filter used to eliminate the residual uncorrelated noise.

04:05:25  10        Now, Wiener filter is exactly the kind of noise

04:05:29  11  reduction unit that is specified in the specification of

04:05:31  12  the '049 patent.  So this indicates that the figure

04:05:35  13  indicates that wherein said noise reduction unit performs

04:05:40  14  noise reduction, and that's the green box, in a plurality

04:05:43  15  of frequency subbands, and those are the parallel red

04:05:45  16  lines.

04:05:45  17  Q.  I mean, this -- this sounds like pretty complicated

04:05:48  18  stuff to me.  But who's this stuff written for?

04:05:52  19  A.  It's written just for a person of ordinary skill in the

04:05:55  20  art, as we mutually defined it earlier.

04:05:58  21  Q.  Okay.  There's additional language in Claim 8, and I'd

04:06:03  22  like to read into the record, and can you explain how the

04:06:06  23  Abutalebi reference discloses and teaches:  Wherein said

04:06:12  24  frequency subbands are employed by an analysis filterbank

04:06:16  25  of said adaptive beamforming unit for subband adaptive

04:06:22  1   beamforming?

04:06:22  2   A.   Okay.   So that part of the text is actually very

04:06:25  3   simple.   That's just the part of the text that says you

04:06:27  4   take the signal coming in, you break it up into different

04:06:31  5   frequency components.   And you can see in the chart those

04:06:36  6   blocks in yellow.   Those are the filters that separate the

04:06:39  7   high frequencies from the low frequencies.   And you can see

04:06:42  8   on top it's even labeled analysis filterbank, which is the

04:06:46  9   exact same text that we see:   Are employed by an analysis

04:06:50  10  filterbank of said adaptive beamforming unit for subband

04:06:54  11  adaptive beamforming.

04:06:55  12          The correspondence is very exact, very literal.

04:06:58  13  There's no doubt.   Beyond obvious for me.

04:07:01  14  Q.   And have you drawn a conclusion with respect to the

04:07:05  15  validity or invalidity of Claim 8?

04:07:07  16  A.   Yes.   For the reasons that I've described, that Claim 8

04:07:10  17  is obvious based on the teachings of Abutalebi and in

04:07:14  18  conjunction with Brandstein and Ward.   Actually, Claim 8 is

04:07:18  19  just Abutalebi by itself, I believe.

04:07:21  20  Q.   But since it's a dependent claim on Claim 1?

04:07:24  21  A.   Yes, thank you, counselor, for clarifying that.   Since

04:07:28  22  it's a dependent claim on Claim 1, we need to also include

04:07:32  23  at least Brandstein or, alternatively, Brandstein and Ward

04:07:36  24  or Brandstein and Li.

04:07:38  25  Q.   And would someone of ordinary skill in the art have

04:07:41  1  been motivated to combine these references like you did,

04:07:44  2  the Abutalebi with Brandstein and Dmochowski?

04:07:49  3  A.  Well, of course, Abutalebi only talks about the subband

04:07:53  4  processing.  You need the rest of the references to --

04:07:55  5  to -- to teach how to perform the rest of the adaptive

04:08:00  6  filtering and the other technologies described.

04:08:03  7  Q.  Now, you said earlier that the Patent Office didn't

04:08:05  8  have any literature, remember?

04:08:06  9  A.  That's correct.

04:08:07  10  Q.  And the Patent Office didn't have Brandstein or

04:08:10  11  Dmochowski because that's literature, right?

04:08:13  12  A.  That's also correct.

04:08:15  13  Q.  But this time we're talking about a patent publication

04:08:19  14  with Abutalebi, right?

04:08:21  15  A.  That's right.

04:08:21  16  Q.  And did the Patent Office have the Abutalebi patent or

04:08:26  17  publication when it allowed the '049 patent or at any time

04:08:29  18  before that time?

04:08:29  19  A.  No, it did not.

04:08:30  20  Q.  And how do you know that?

04:08:32  21  A.  Well, it's the same test.  You look at the list of

04:08:35  22  references cited.  This time we have to look a tiny bit

04:08:39  23  more -- more closely.  But when we look at the list of

04:08:43  24  references cited, none of those items on the list are the

04:08:47  25  Abutalebi reference.

04:08:48  1   Q.   So none of the -- none of the prior art we discussed

04:08:56  2   today was before the Patent Office?

04:08:57  3   A.   That's correct.

04:08:58  4   Q.   And did you review the prior art that the Patent Office

04:09:02  5   did have?

04:09:02  6   A.   Yes, I did.

04:09:06  7         MR. RE:   And, for the record, the Abutalebi

04:09:07  8   publication is Defendants' Exhibit 46.

04:09:13  9   A.   Oh, thank you.

04:09:15  10  Q.   (By Mr. Re)   And how does the prior art that we've been

04:09:17  11  discussing today compare, relative to the prior art that

04:09:21  12  the Patent Office did have?

04:09:22  13  A.   Well, the prior art that we're discussing today is very

04:09:29  14  important, because my reading of the file history tells me

04:09:32  15  that the '049 patent, or actually more exactly the patent

04:09:36  16  that preceded it, was issued specifically because it taught

04:09:42  17  the determination of the delay step, the implication being

04:09:45  18  that without the determination of the delay step, the

04:09:49  19  patent would not have issued in the first place.

04:09:51  20        So I conclude from that that the material in

04:09:56  21  Brandstein is very important, the material in Dmochowski is

04:10:01  22  very important, and without that, the patent would not have

04:10:04  23  been issued.

04:10:04  24  Q.   So let me get this straight, you don't really think the

04:10:07  25  Patent Office just simply made a mistake, do you?

| | | |
|---|---|---|
| 04:10:10 | 1 | A.  No, no.  They're -- nobody's perfect.  The presumption |
| 04:10:13 | 2 | is that the patent is correct.  They work from the |
| 04:10:17 | 3 | available information that they look at, and it's simply -- |
| 04:10:21 | 4 | I think they simply didn't search widely enough. |
| 04:10:25 | 5 | Q.  And so they just didn't have the information whenever |
| 04:10:27 | 6 | they examined either the '049 or its predecessor |
| 04:10:33 | 7 | surrendered '756 patent? |
| 04:10:35 | 8 | A.  Right.  My guess is the normal thing to do is just to |
| 04:10:39 | 9 | look at other patents. |
| 04:10:40 | 10 | MR. RE:  I'll pass the witness. |
| 04:10:42 | 11 | Thank you very much, Dr. Stern. |
| 04:10:44 | 12 | THE WITNESS:  You're welcome. |
| 04:10:45 | 13 | THE COURT:  All right.  Before we proceed with |
| 04:10:47 | 14 | Plaintiff's cross-examination of this witness, we're going |
| 04:10:49 | 15 | to take a brief recess, ladies and gentlemen. |
| 04:10:51 | 16 | If you'll simply close your notebooks, leave them |
| 04:10:55 | 17 | in your chairs, follow all the instructions I've given you, |
| 04:10:58 | 18 | including not to discuss the case among yourselves.  We'll |
| 04:11:01 | 19 | be back here -- I'm going to try to keep this as a short |
| 04:11:06 | 20 | recess -- we'll be back here shortly to continue. |
| 04:11:12 | 21 | The jury is excused for recess. |
| 04:11:15 | 22 | COURT SECURITY OFFICER:  All rise. |
| 04:11:17 | 23 | THE WITNESS:  Your Honor, may I step down, as |
| 04:11:19 | 24 | well? |
| 04:11:20 | 25 | THE COURT:  When the jury leaves.  Just stay where |

04:11:25  1  you are.

04:11:25  2          (Jury out.)

04:11:25  3          THE COURT:  Mr. Rubino, are you going to use this

04:11:32  4  demonstrative during your cross-examination?

04:11:35  5          MR. RUBINO:  No, I'm not going to, Your Honor.

04:11:36  6          THE COURT:  All right.  During a recess, let's

04:11:38  7  take it down and put it back.

04:11:40  8          The Court stands in recess.

04:11:41  9          COURT SECURITY OFFICER:  All rise.

04:23:05  10         (Recess.)

04:23:06  11         (Jury out.)

04:23:06  12         COURT SECURITY OFFICER:  All rise.

04:23:10  13         THE COURT:  Be seated, please.

04:24:44  14         Mr. Rubino, if you'd like to go to the podium and

04:24:49  15  prepare for cross-examination.

04:24:50  16         Are there binders that the Plaintiff has to

04:24:52  17  distribute?  Let's do that now, please.

04:25:22  18         Mr. Mixon, if you'd bring in the jury, please.

04:25:26  19         COURT SECURITY OFFICER:  All rise.

04:25:29  20         THE WITNESS:  Thank you.

04:25:32  21         (Jury in.)

04:25:36  22         THE COURT:  Please be seated.

04:26:03  23         All right.  Ladies and gentlemen, we'll now

04:26:05  24  proceed with cross-examination of the witness by

04:26:09  25  the Plaintiff.

```
04:26:09   1            Mr. Rubino, you may proceed.
04:26:09   2            MR. RUBINO:  Thank you.
04:26:09   3                      CROSS-EXAMINATION
04:26:14   4   BY MR. RUBINO:
04:26:14   5   Q.  Good afternoon, Dr. Stern.
04:26:15   6   A.  Good afternoon.
04:26:16   7   Q.  Dr. Stern, have you ever heard of something called a
04:26:19   8   super directive beamformer?
04:26:21   9   A.  Yes.
04:26:21  10   Q.  And you've also seen that referred to as SD-BF, right?
04:26:27  11   A.  Yes.
04:26:27  12   Q.  And did you hear Dr. Kiaei -- Kiaei --
04:26:30  13   A.  Kiaei.
04:26:30  14   Q.  Kiaei, thank you -- present earlier about how Amazon
04:26:35  15   uses a super directive beamformer?  You heard that, right?
04:26:37  16   A.  Yes.
04:26:38  17   Q.  And you entered an expert report in this case, right?
04:26:43  18   A.  Yes.
04:26:43  19   Q.  And in your expert report, you said that a super
04:26:49  20   directive beamformer is an adaptive beamformer, right?
04:26:51  21   A.  I'd have to check.
04:26:57  22   Q.  Would you be surprised if you said those words, sir?
04:27:01  23   A.  Probably not.
04:27:02  24   Q.  So you think you said that a super directive beamformer
04:27:04  25   is an adaptive beamformer, right?
```

04:27:06  1   A.  I might have said that, but it would have been wrong.

04:27:09  2   So...

04:27:10  3   Q.  So you think you may have said it, but now you're

04:27:17  4   saying you were wrong in your expert report; is that your

04:27:19  5   testimony?

04:27:19  6   A.  It's possible.  I'd have to check to see if I said it.

04:27:25  7          MR. RUBINO:  Could we please put up Dr. Stern's

04:27:28  8   expert report at Paragraph 89, please, Page 49?

04:27:41  9   Q.  (By Mr. Rubino)  Dr. Stern, do you see --

04:27:43  10          MR. RUBINO:  And can we enlarge Paragraph 89,

04:27:45  11   please?  Thank you, Mr. Thompson.

04:27:48  12   Q.  (By Mr. Rubino)  Do you see where you say:  The SD-BF

04:27:51  13   is an adaptive beamforming unit?

04:27:55  14          Do you see that, sir?

04:27:56  15   A.  I see that, but -- okay.  Now I understand.  The Court

04:28:01  16   construed a particular definition of adaptive beamforming

04:28:04  17   unit, which I had forgotten, in answering the previous

04:28:08  18   questions.

04:28:09  19          What the super directive beamformer -- well, let's

04:28:11  20   leave it at that.  You can ask further if you wish.

04:28:15  21   Q.  So you made this statement, right, sir, that the super

04:28:19  22   directive beamformer is an adaptive beamforming unit,

04:28:21  23   right, sir?

04:28:22  24   A.  Yes.

04:28:22  25   Q.  And you applied the Court's construction both in your

| 04:28:25 | 1 | infringement -- in your invalidity analysis, right? |
| 04:28:25 | 2 | A.   Yes. |
| 04:28:29 | 3 | Q.   You applied the Court's construction? |
| 04:28:29 | 4 | A.   Yes. |
| 04:28:30 | 5 | Q.   And so, in your opinion, applying the Court's |
| 04:28:32 | 6 | construction, a super directive beamformer is an adaptive |
| 04:28:35 | 7 | beamformer, right, sir? |
| 04:28:36 | 8 | A.   Yes. |
| 04:28:36 | 9 | Q.   And you heard Dr. Kiaei say Amazon uses a super |
| 04:28:40 | 10 | directive beamformer, right, sir? |
| 04:28:41 | 11 | A.   Yes. |
| 04:28:44 | 12 | Q.   In the opinions you just spoke about a few minutes |
| 04:28:56 | 13 | earlier, you spoke of something called obviousness, right, |
| 04:28:59 | 14 | sir? |
| 04:28:59 | 15 | A.   Yes. |
| 04:28:59 | 16 | Q.   Have you ever heard of a concept called anticipation? |
| 04:29:01 | 17 | A.   Yes. |
| 04:29:03 | 18 | Q.   And you know that anticipation in patent law is |
| 04:29:06 | 19 | different from obviousness, right, sir? |
| 04:29:08 | 20 | A.   Yes. |
| 04:29:09 | 21 | Q.   And anticipation is where you find all of the |
| 04:29:12 | 22 | limitations of a particular claim in one reference, right, |
| 04:29:15 | 23 | sir? |
| 04:29:15 | 24 | A.   Yes. |
| 04:29:15 | 25 | Q.   And you don't render any opinions today -- you have not |

04:29:19   1   rendered any opinions about anticipation, right, sir?

04:29:22   2   A.  That is correct.

04:29:24   3   Q.  So it is not your opinion that any reference that

04:29:28   4   you've discussed today teaches every single element of the

04:29:33   5   claims asserted here, right, sir?

04:29:35   6   A.  That is correct.

04:29:36   7   Q.  And regarding the Brandstein reference, you still have

04:29:50   8   that on your desk -- on the podium with you, right, sir?

04:29:54   9   A.  I do.

04:29:54   10  Q.  And you know that, in order to meet the limitations of

04:29:57   11  Claim 1, you would have to have a sound source localization

04:30:01   12  unit, an adaptive beamforming unit, a noise reduction unit,

04:30:07   13  all in a single digital signal processor, correct?

04:30:10   14  A.  Yes.

04:30:11   15  Q.  And you didn't find anywhere in that book where all

04:30:19   16  three of those units were integrated into a single digital

04:30:28   17  signal processor, right, sir?

04:30:28   18  A.  That's correct.

04:30:30   19  Q.  In fact, you didn't find that in any of the references

04:30:30   20  that you looked and that you presented on today, correct,

04:30:33   21  sir?

04:30:33   22  A.  That's correct, yes.

04:30:33   23  Q.  So it wasn't in Li -- the Li article that you looked

04:30:37   24  at, right?

04:30:37   25  A.  Correct.

| | | |
|---|---|---|
| 04:30:38 | 1 | Q.  Wasn't in Abutalebi, right? |
| 04:30:40 | 2 | A.  Correct. |
| 04:30:41 | 3 | Q.  Wasn't in Dmochowski? |
| 04:30:42 | 4 | A.  Neither there. |
| 04:30:42 | 5 | Q.  And it wasn't in Brandstein? |
| 04:30:45 | 6 | A.  Correct. |
| 04:30:45 | 7 | Q.  So anything you have to provide on that is based on |
| 04:30:49 | 8 | just your opinions looking at the references today, right? |
| 04:30:54 | 9 | A.  That's correct. |
| 04:30:58 | 10 | Q.  And that was the digital signal processor limitation, |
| 04:31:03 | 11 | right, sir? |
| 04:31:04 | 12 | A.  That is correct. |
| 04:31:05 | 13 | Q.  And you heard -- you heard all the testimony in this |
| 04:31:09 | 14 | case, right? |
| 04:31:10 | 15 | A.  I did. |
| 04:31:11 | 16 | Q.  And you heard Dr. Zhu talk about how it took her two |
| 04:31:15 | 17 | years to develop this technology and get it all into a |
| 04:31:18 | 18 | digital signal processor, right? |
| 04:31:19 | 19 | A.  I did. |
| 04:31:19 | 20 | Q.  And you heard how it took Amazon four years to get |
| 04:31:23 | 21 | everything to work, right? |
| 04:31:25 | 22 | A.  Yes. |
| 04:31:25 | 23 | Q.  And now it's your testimony that it would have been so |
| 04:31:30 | 24 | simple to put all this stuff together into a digital signal |
| 04:31:33 | 25 | processor; is that what you're saying today? |

04:31:35  1    A.  Absolutely.

04:31:35  2    Q.  So it's all based on what you think about a digital

04:31:40  3    signal processor, right?

04:31:41  4    A.  Yes.

04:31:41  5    Q.  But you yourself, sir, you're not a hardware expert,

04:31:46  6    are you?

04:31:46  7    A.  That's correct.

04:31:49  8    Q.  You don't have any direct experience in computer

04:31:52  9    hardware, right?

04:31:53  10   A.  Yes -- I mean, yes, that's correct.

04:31:57  11   Q.  You're not familiar with the concept of a

04:32:00  12   microprocessor data sheet, right?

04:32:01  13   A.  That's not true.

04:32:03  14   Q.  Did you learn about it at your deposition, sir?

04:32:07  15   A.  I've seen that before.

04:32:09  16   Q.  So is it your testimony that you didn't say at your

04:32:13  17   deposition in this case that you were not familiar with the

04:32:16  18   concept of a microprocessor data sheet; is that what you're

04:32:20  19   saying?

04:32:20  20   A.  In the context of the question that was framed at the

04:32:23  21   deposition, yes.

04:32:23  22   Q.  So, at your deposition, you did say that you're not

04:32:28  23   familiar with the concept of a microprocessor data sheet,

04:32:32  24   right?

04:32:32  25   A.  That is correct.

04:32:34  1   Q.  And also it's not within your purview to look at

04:32:38  2   architecture of processors, right?

04:32:41  3   A.  Also correct.

04:32:42  4   Q.  You never designed an instruction set?

04:32:47  5   A.  Correct.

04:32:47  6   Q.  You don't normally come across processor instruction

04:32:50  7   sets for digital signal processors in your research, right?

04:32:55  8   A.  That's correct.

04:32:55  9   Q.  And, in fact, you said at your deposition that you try

04:32:57  10  to avoid it, right?

04:32:59  11  A.  Also true.

04:32:59  12  Q.  So you're not really a processor expert, are you?

04:33:03  13  A.  Absolutely correct.

04:33:04  14  Q.  With regard to the Brandstein reference, again, the

04:33:18  15  book you still have in front of you, you've referred to

04:33:20  16  that whole thing as Brandstein, right?

04:33:24  17  A.  That's right.

04:33:24  18  Q.  But you know that you've relied on multiple chapters of

04:33:28  19  that book in your analysis, right?

04:33:30  20  A.  I've made that clear, yes.

04:33:31  21  Q.  And you've relied on Chapter 3, right?

04:33:35  22  A.  Yes.

04:33:35  23  Q.  Chapter 5?

04:33:37  24  A.  Yes.

04:33:37  25  Q.  Chapter 8?

1112

| 04:33:39 | 1 | A. Yes. |

04:33:39   1   A.   Yes.

04:33:40   2   Q.   Spanning hundreds of pages of that book, right?

04:33:42   3   A.   It's a small book, but, yes.

04:33:45   4   Q.   It's 400 pages, right, sir?

04:33:46   5   A.   Close to 400.

04:33:52   6   Q.   And you also know that those chapters aren't written by

04:34:04   7   Dr. Brandstein, right?

04:34:04   8   A.   I had already pointed that out.

04:34:06   9   Q.   So Chapter 3 wasn't authored by Dr. Brandstein; it was

04:34:09   10   authored by somebody else, right?

04:34:11   11   A.   Correct, they were all authored by specialists chosen

04:34:15   12   and selected for their speciality.

04:34:15   13   Q.   But not Dr. Brandstein?

04:34:16   14   A.   Correct.

04:34:17   15   Q.   Neither was Chapter 8 that was written by a different

04:34:20   16   set of people -- different from Chapter 3, right?

04:34:20   17   A.   Correct, from Brandstein's group.

04:34:23   18   Q.   But not Dr. Brandstein?

04:34:25   19   A.   Correct.

04:34:28   20   Q.   You said from Brandstein's group?

04:34:34   21   A.   Yes.

04:34:37   22        MR. RUBINO:   Can we put up DTX-49 at 102, please?

04:34:48   23   Q.   (By Mr. Rubino)   Chapter 5 was written by -- looks like

04:34:53   24   two Japanese people out of NEC; isn't that right?

04:34:58   25   A.   That's true.   I was referring to Chapter 8, which is

1113

04:35:00   1   what the question was about.

04:35:01   2   Q.  Chapter 5 doesn't come from Brandstein's group, does

04:35:04   3   it?

04:35:05   4   A.  Correct.

04:35:05   5   Q.  Chapter 3 doesn't come from Brandstein's group, does

04:35:08   6   it?

04:35:08   7   A.  Correct.

04:35:15   8           MR. RUBINO:  If we could please have that same

04:35:22   9   exhibit at Page -- Chapter 12 -- or 18 -- Chapter 18, Page

04:35:36   10   386.  Forward two pages, please.  There we go.  Thank you.

04:35:52   11   Q.  (By Mr. Rubino)  Now, Dr. Stern, you referenced this

04:35:55   12   page earlier, right?

04:35:56   13   A.  Yes, I did.

04:35:56   14   Q.  And you said you wanted to look at the fine print,

04:35:59   15   right?

04:35:59   16   A.  The fine print was Section 8.1, yes -- 18.1.

04:36:05   17           MR. RUBINO:  Can we move up a little bit, please,

04:36:07   18   Mr. Thompson?  Thank you.  Can you please highlight the

04:36:12   19   first four lines of that passage?

04:36:15   20   Q.  (By Mr. Rubino)  Dr. Stern, now, this says the

04:36:22   21   culmination of the Brandstein book, that:  After 20 years

04:36:25   22   of active research, however, we cannot claim that

04:36:28   23   microphone array processing has had the success that many

04:36:31   24   of us hoped for.  And many will wonder when the great

04:36:36   25   breakthrough in microphone array processing will finally

| | | |
|---|---|---|
| 04:36:39 | 1 | come, if ever. |
| 04:36:41 | 2 | You see that, right? |
| 04:36:41 | 3 | A.  I do. |
| 04:36:42 | 4 | Q.  And so you know that at the time of this book, no one |
| 04:36:45 | 5 | had put all these elements together, right? |
| 04:36:48 | 6 | A.  That's correct. |
| 04:36:48 | 7 | Q.  And that you can't point to anyone prior to 2010 who, |
| 04:36:54 | 8 | if ever, put any of these elements all together into the |
| 04:36:57 | 9 | claim of the patent, right, sir? |
| 04:36:59 | 10 | A.  That's not correct. |
| 04:37:00 | 11 | Q.  You can't point to any single reference that you've |
| 04:37:04 | 12 | identified today where someone has put together all the |
| 04:37:08 | 13 | elements into Claim 1 of the patent, right, sir? |
| 04:37:11 | 14 | A.  That's correct.  But outside of the context of the |
| 04:37:17 | 15 | report -- |
| 04:37:18 | 16 | MR. RUBINO:  Move to strike the remainder, |
| 04:37:20 | 17 | Your Honor. |
| 04:37:20 | 18 | THE COURT:  I'll sustain the objection that the |
| 04:37:23 | 19 | answer is non-responsive after "that's correct."  And I'll |
| 04:37:26 | 20 | strike that portion of the answer after "that's correct." |
| 04:37:29 | 21 | MR. RUBINO:  Pass the witness. |
| 04:37:30 | 22 | THE COURT:  All right.  Redirect, Mr. Re? |
| 04:37:39 | 23 | I'll take it as a yes since you've gone back to |
| 04:37:42 | 24 | the podium. |
| 04:37:43 | 25 | MR. RE:  Yes, Your Honor, I'm sorry. |

04:37:44   1          THE COURT:  That's all right.

04:37:44   2          MR. RE:  I'm still concentrating.

04:37:46   3          THE COURT:  Please continue.  Don't quit

04:37:49   4   concentrating.

04:37:51   5          MR. RE:  Okay.  If I may use the ELMO.

04:37:51   6                   REDIRECT EXAMINATION

04:37:54   7   BY MR. RE:

04:37:54   8   Q.  You were -- your cross-examination began with this

04:38:10   9   discussion, and counsel showed you only the words at the

04:38:13  10   top of Paragraph 89.  Do you remember that?

04:38:15  11   A.  Yes.

04:38:15  12   Q.  And what were you discussing in Paragraph 89 where

04:38:19  13   counsel didn't show you what's below it?

04:38:22  14   A.  Well, counsel was asking about super directive

04:38:30  15   beamforming, and I had stated -- may I go on?

04:38:33  16   Q.  Yes, if you're going to explain.

04:38:35  17   A.  Yes.  The question was, is the super directive

04:38:38  18   beamformer adaptive?  And I had said, no.  A super

04:38:41  19   directive beamformer is a type of fixed beamformer.

04:38:44  20          However, in this particular application, it was

04:38:46  21   made adaptive within the context of a definition by the

04:38:50  22   Court by the inclusion of steering delays at the inputs to

04:38:55  23   the elements of the super directive beamformer.

04:38:56  24          So the construction was adaptive, but the super

04:39:00  25   directive beamformer in and of itself is fixed.

04:39:02    1    Q.  And how do you know that from looking at the figure

04:39:05    2    that you're showing on the ELMO?  It's Figure 3 in

04:39:09    3    Paragraph 89 of your report.

04:39:10    4    A.  You can see -- let me find them.

04:39:15    5    Q.  Go to the microphone if you can.

04:39:18    6    A.  I need to review this because this -- give me a second.

04:39:22    7    Q.  First of all, what reference are you discussing in the

04:39:25    8    expert report?

04:39:26    9    A.  So -- so I'm discussing a reference called Saric.

04:39:28   10    Q.  And your opinion today did not in any way -- in any way

04:39:33   11    rely on Saric; isn't that right?

04:39:35   12    A.  That is correct.

04:39:35   13    Q.  And, in fact, your -- your conclusions were about

04:39:44   14    Dmochowski showing Limitation [C], right?

04:39:47   15    A.  That is correct.

04:39:48   16    Q.  The Li paper --

04:39:49   17            THE COURT:  Just a minute, counsel.

04:39:51   18            Do you have an objection?

04:39:52   19            MR. RUBINO:  Objection, leading, Your Honor.

04:39:54   20            THE COURT:  Sustained as to leading.

04:39:57   21            Restate your question in a non-leading form.

04:40:01   22    Q.  (By Mr. Re)  Can you just give me your conclusions and

04:40:04   23    explain whether any of your conclusions rely in any way on

04:40:07   24    the Saric reference?

04:40:08   25    A.  My conclusion was that Claims 1 -- Claims 1 and 8 of

04:40:13  1   the '049 patent were invalid based on the prior art.  Those

04:40:15  2   conclusions were rendered independently of the Saric

04:40:18  3   reference, although the Saric reference was a number -- a

04:40:24  4   larger number of references that were in the report.

04:40:26  5   Q.  But we elected not to present that in this case, right?

04:40:29  6   A.  That is correct.

04:40:29  7   Q.  And so the elected references for trial were

04:40:34  8   Brandstein, right?

04:40:34  9   A.  Yes.

04:40:34  10  Q.  Dmochowski?

04:40:36  11  A.  Yes.

04:40:37  12  Q.  Li, as well, right?

04:40:39  13  A.  Yes.

04:40:39  14  Q.  And did you have an opinion about Li and whether the

04:40:43  15  patent would have issued had the examiner had Li?

04:40:46  16  A.  If the examiner had Li, the patent would not have

04:40:49  17  issued.

04:40:50  18  Q.  And if the examiner had Brandstein or Dmochowski or

04:40:54  19  even Abutalebi in combination, would the examiner have

04:41:00  20  allowed the claims?

04:41:01  21  A.  If the examiner had any of those prior art, the patent

04:41:03  22  would not have issued.

04:41:04  23  Q.  And that opinion in no way relied upon the Saric

04:41:08  24  reference which counsel was asking you in

04:41:11  25  cross-examination, right?

1118

04:41:12  1   A.   That is correct.

04:41:13  2   Q.   Now, counsel also gave the impression, I thought, that

04:41:18  3   someone put it together.  Did you hear that?

04:41:20  4   A.   I sure did.

04:41:22  5   Q.   What -- what did you interpret counsel was thinking or

04:41:25  6   conveying about someone finally putting it together in

04:41:29  7   2010?

04:41:29  8   A.   Well, keep in mind the Brandstein book was written in

04:41:33  9   2001, between 2001 and 2010, there was a great deal of

04:41:40  10  continued activity in microphone arrays.  And the

04:41:44  11  technology became much more viable and successful.  The

04:41:49  12  Microsoft Xbox is an example.

04:41:52  13  Q.   Now, did Dr. Li and his group in any way have any

04:42:00  14  success that you know of pertaining to the claimed

04:42:02  15  inventions?

04:42:03  16  A.   To be honest, I don't know.  I -- I can't make a

04:42:06  17  statement about that.  I just don't know.

04:42:07  18  Q.   Right.  And, in fact, you considered what we call

04:42:09  19  secondary considerations; do you remember that?

04:42:12  20  A.   I did.

04:42:12  21  Q.   And you considered what we call nexus; do you remember

04:42:15  22  that?

04:42:15  23  A.   Yes.

04:42:16  24  Q.   And did you find any -- any real-world facts that have

04:42:22  25  any connection with respect to the invention that could in

04:42:26  1  any way be termed success?

04:42:29  2          MR. RUBINO:  Objection, Your Honor.

04:42:30  3          THE COURT:  State your objection.

04:42:31  4          MR. RUBINO:  Both leading and beyond the scope of

04:42:33  5  cross.

04:42:33  6          THE COURT:  I'll sustain as to leading.

04:42:37  7  Q.  (By Mr. Re)  Did you understand at all what counsel was

04:42:39  8  referring to by there was no success yet?

04:42:44  9  A.  I think that I should take counsel literally as stated

04:42:49  10  in early 2001, the -- what matters is whether the

04:42:53  11  technologies were known.  Whether they were successful or

04:42:56  12  not, is immaterial to the consideration of whether the

04:42:58  13  patent is valid.

04:43:01  14  Q.  Do you know of anyone who was successful with the Li

04:43:07  15  invention?

04:43:08  16  A.  I don't know.

04:43:09  17  Q.  Counsel also asked you about we had no teaching about

04:43:18  18  putting the units in the DSP.  Do you remember that?

04:43:21  19  A.  I do.

04:43:24  20          MR. RE:  And let's call up what I put up DDX-14

04:43:40  21  from the presentation.  I believe it was the Brandstein

04:43:42  22  book.

04:43:42  23  Q.  (By Mr. Re)  And do you see where I read into the

04:43:46  24  record:  The language wherein the three units are in the

04:43:50  25  digital signal processor?

04:43:50    1    A.  Yes.

04:43:50    2    Q.  And you highlighted a portion from the Brandstein book,

04:43:53    3    right?

04:43:53    4    A.  I did.

04:43:54    5    Q.  Please explain to the ladies and gentlemen of the jury

04:43:57    6    why this is an express teaching with regard to the

04:44:00    7    highlighted language?

04:44:01    8    A.  Well, the Brandstein book tells us that we have the

04:44:04    9    DSPs that allow us to implement everything in the DSP

04:44:09   10    technology in real-time.  That's -- that's what the text

04:44:12   11    states.

04:44:12   12    Q.  In fact, it says:  We have affordable DSPs that allow

04:44:18   13    us to implement all but --

04:44:20   14    A.  The most complex schemes.

04:44:22   15           THE COURT:  Gentlemen, you're going to talk one at

04:44:24   16    a time in this courtroom.  I've made that clear.  There's

04:44:26   17    no reason you can't do that.

04:44:28   18           THE WITNESS:  I apologize, Your Honor.

04:44:29   19           THE COURT:  One at a time.

04:44:30   20           Continue, counsel.

04:44:33   21    Q.  (By Mr. Re)  I just want it clear in the record what

04:44:35   22    Brandstein says.

04:44:37   23           Today we have affordable DSPs that allow us to

04:44:40   24    implement all but the most complex schemes cheaply in a

04:44:48   25    digital signal processing technology in real-time.

04:44:51  1         Do you see that?

04:44:51  2  A.  I do.

04:44:52  3  Q.  And does that suggest to one of ordinary skill in the

04:44:54  4  art to put various units of all kinds in a DSP?

04:44:58  5  A.  That's what the text teaches.

04:45:01  6         MR. RE:  I'll pass the witness, Your Honor.  Thank

04:45:03  7  you.

04:45:03  8         THE COURT:  Additional cross-examination?

04:45:06  9         MR. RUBINO:  Yes, Your Honor.

04:45:06  10                    RECROSS-EXAMINATION

04:45:18  11  BY MR. RUBINO:

04:45:18  12  Q.  Dr. Stern?

04:45:24  13  A.  Yes.

04:45:24  14  Q.  You didn't reference an Xbox in your analysis today,

04:45:29  15  did you?

04:45:29  16  A.  That was just a comment.

04:45:31  17  Q.  And that's not one of the references you combined?

04:45:34  18  A.  No.

04:45:34  19  Q.  You just made that up just now, right?

04:45:37  20  A.  I didn't make it up, but it's not part of the

04:45:39  21  testimony.  But it's -- it's not legally part of the

04:45:42  22  testimony.  It's not part of the report.

04:45:45  23  Q.  So the references that you did combine --

04:45:48  24  A.  Yes.

04:45:48  25  Q.  -- were only Brandstein, Li, Abutalebi --

| | | |
|---|---|---|
| 04:45:53 | 1 | A.  Dmochowski. |
| 04:45:54 | 2 | Q.  And Dmochowski, right? |
| 04:45:55 | 3 | A.  Correct, correct. |
| 04:45:57 | 4 | Q.  Those are the references -- that's the world of items |
| 04:45:58 | 5 | you're looking at for your motivation, right? |
| 04:46:02 | 6 | A.  That's correct. |
| 04:46:02 | 7 | MR. RUBINO:  Pass the witness, Your Honor. |
| 04:46:03 | 8 | THE COURT:  Further direct? |
| 04:46:04 | 9 | MR. RE:  Nothing further, Your Honor.  Thank you. |
| 04:46:06 | 10 | THE COURT:  All right.  Dr. Stern, you may step |
| 04:46:08 | 11 | down. |
| 04:46:08 | 12 | THE WITNESS:  Thank you, Your Honor. |
| 04:46:09 | 13 | THE COURT:  Mr. Re, does the Defendant desire this |
| 04:46:18 | 14 | witness to be excused? |
| 04:46:19 | 15 | MR. RE:  Yes, we do, Your Honor. |
| 04:46:21 | 16 | THE COURT:  Is there objection? |
| 04:46:22 | 17 | MR. RUBINO:  No, Your Honor. |
| 04:46:23 | 18 | THE COURT:  Dr. Stern, you are excused. |
| 04:46:25 | 19 | THE WITNESS:  Thank you. |
| 04:46:26 | 20 | THE COURT:  That means, sir, you're free to leave |
| 04:46:28 | 21 | us; you're free to stay.  It's your call. |
| 04:46:30 | 22 | THE WITNESS:  I'll stay for now. |
| 04:46:32 | 23 | THE COURT:  All right.  Defendant, call your next |
| 04:46:33 | 24 | witness. |
| 04:46:34 | 25 | MR. DACUS:  Thank you, Your Honor.  We call Dan |

| | | |
|--|--|--|
| 04:46:37 | 1 | McGavock, and we have some binders to pass out, if we may |
| 04:46:41 | 2 | approach, Your Honor. |
| 04:46:42 | 3 | THE COURT:  All right.  Mr. McGavock, if you'll |
| 04:46:47 | 4 | come forward and be sworn. |
| 04:47:01 | 5 | (Witness sworn.) |
| 04:47:01 | 6 | THE COURT:  Please come around, sir, have a seat |
| 04:47:04 | 7 | at the witness stand. |
| 04:47:32 | 8 | All right.  Mr. Dacus, you may proceed. |
| 04:47:34 | 9 | MR. DACUS:  Thank you, Your Honor. |
| 04:47:34 | 10 | DANIEL M. MCGAVOCK, DEFENDANTS' WITNESS, SWORN |
| 04:47:34 | 11 | DIRECT EXAMINATION |
| 04:47:35 | 12 | BY MR. DACUS: |
| 04:47:35 | 13 | Q.  Mr. McGavock, would you introduce yourself to the jury, |
| 04:47:41 | 14 | please, sir? |
| 04:47:43 | 15 | A.  Yes, my name is Dan McGavock.  I'm from a suburb in |
| 04:47:47 | 16 | Chicago.  I'm married.  I've been married for 33 years.  I |
| 04:47:51 | 17 | have a son and a daughter, ages 25 and 26. |
| 04:47:54 | 18 | Q.  And where do you work, Mr. McGavock? |
| 04:47:57 | 19 | A.  I work at an international consulting firm.  It's |
| 04:48:01 | 20 | called Charles River Associates.  And we specialize in |
| 04:48:05 | 21 | financial and economic analysis, and I'm the -- I run the |
| 04:48:10 | 22 | entire intellectual property practice for Charles River |
| 04:48:15 | 23 | Associates. |
| 04:48:15 | 24 | Q.  And do you have a particular expertise, Mr. McGavock, |
| 04:48:18 | 25 | that brings you here to testify in this case? |

04:48:20   1   A.   Yes.   I basically specialize in the valuation of

04:48:23   2   intellectual property rights in every context.   And so I do

04:48:28   3   it in litigation, such as cases like this where I'm trying

04:48:31   4   to determine a reasonable royalty, and I also determine the

04:48:36   5   value of patents in the context outside of litigation, for

04:48:40   6   example, helping companies license their technology.

04:48:42   7            THE COURT:   Mr. McGavock, it's fine if you want to

04:48:44   8   turn toward the jury when you give some of your answers,

04:48:47   9   but you're turning away from the microphone.   However you

04:48:51  10   want to give your answers, just make sure that you're

04:48:54  11   heard, sir.

04:48:54  12            THE WITNESS:   Thank you.

04:48:54  13            THE COURT:   All right, counsel.   Continue.

04:48:58  14            MR. DACUS:   Thank you, Your Honor.

04:48:59  15   Q.   (By Mr. Dacus)   Can you explain to the jury,

04:49:01  16   Mr. McGavock, what -- what it is your role is in this

04:49:05  17   particular case, what it is that you were asked to do?

04:49:07  18   A.   I was asked to assess the opinions of Mr. Ratliff, the

04:49:11  19   damages expert for Vocalife, and to comment on -- on his

04:49:19  20   analysis and opinions.

04:49:20  21            I was also asked to provide my own independent

04:49:23  22   opinion on what I deemed to be a reasonable royalty.

04:49:27  23   Q.   What if this jury finds that this patent is not used or

04:49:31  24   not infringed by Amazon, what are the damages?

04:49:35  25   A.   The damages would be zero.

```
04:49:36    1    Q.  Okay.  And what if this jury were to find that the '049
04:49:40    2    patent is, in fact, invalid, what would the damages be?
04:49:44    3    A.  The damages would be zero.
04:49:46    4    Q.  So, with all due respect to you and Mr. Ratliff, if the
04:49:52    5    jury finds either that the patent is invalid or that it's
04:49:54    6    not infringed, they could just disregard your testimony?
04:49:57    7    A.  Yes.
04:49:58    8    Q.  Can you explain to the jury, sir, what your educational
04:50:06    9    background is, please, sir?
04:50:07   10    A.  Yes.  I have a Bachelor of Science degree in accounting
04:50:12   11    from Indiana University.  I'm also a certified public
04:50:17   12    accountant.  I've been certified for over 35 years now.
04:50:20   13    And I'm also a certified licensing professional.  It's kind
04:50:22   14    of a unique certification, and it recognizes my expertise
04:50:25   15    specifically in the licensing of intellectual property,
04:50:28   16    such as patent rights.
04:50:29   17    Q.  And can you give the jury, sir, a high-level
04:50:33   18    description of what you've done in your professional life
04:50:36   19    outside of your -- your academic education background?
04:50:39   20    A.  Yes.  So I've been with Charles River Associates
04:50:45   21    effectively for 32 years.  I've been consulting in
04:50:48   22    intellectual property for 35 years, but 32 of those have
04:50:51   23    been at Charles River Associates.
04:50:56   24            And we have 22 offices throughout the world,
04:50:58   25    including Dallas and College Station, Texas.  And I run the
```

04:51:02  1   intellectual property practice, and we focus on determining

04:51:04  2   damages, valuing intellectual property rights, strategy,

04:51:08  3   and transactions.

04:51:09  4         I was also invited to teach a -- a graduate level

04:51:14  5   college course on the valuation of intellectual property

04:51:17  6   rights at Northwestern University.

04:51:19  7         And then very early in my career, before I got

04:51:22  8   into consulting, I was a staff auditor with the U.S.

04:51:26  9   Government -- Government Accountability Office.  It's sort

04:51:29  10  of the FBI of accounting.  What we did is evaluate fraud,

04:51:34  11  waste, and abuse in government programs.  And I was a staff

04:51:36  12  auditor there.

04:51:37  13  Q.  Do you have any organizational affiliations that you

04:51:42  14  think are particularly relevant to the work that you're

04:51:44  15  doing in this case, Mr. McGavock?

04:51:47  16  A.  Yes.  I've been recognized as a world -- a leading IP

04:51:55  17  strategist, as well as a leading economic expert in patent

04:51:59  18  litigation.  So that's the first two designations there.

04:52:03  19  And both of those designations are based on nominations

04:52:06  20  from people in the industry that -- that know me or have

04:52:11  21  worked with me.

04:52:12  22        And the last point there is the Licensing

04:52:19  23  Executive Society.  It's this very large professional group

04:52:22  24  that's dedicated to the licensing of intellectual property.

04:52:25  25  And I -- I've been a very active member since 1988, and I

04:52:29  1  was chairman of the valuation committee, which was focused

04:52:33  2  on teaching licensing -- licensing executives how to value

04:52:36  3  intellectual property rights when they're negotiating

04:52:38  4  patent licenses.

04:52:39  5  Q.  Give the jury, if you would, sir, some indication of

04:52:42  6  the number of assignments or engagements that you've had

04:52:46  7  related to valuing intellectual property and patent rights

04:52:50  8  over the course of your 35 years.

04:52:51  9  A.  It's been well over 500 assignments, and I would say

04:52:56  10  over 300 of those assignments specifically dealt with the

04:53:01  11  valuation of patent rights.

04:53:02  12  Q.  And can you give the jury some indication of the

04:53:07  13  companies, organizations, individuals that you've worked

04:53:11  14  for over the course of that 35 years?

04:53:12  15  A.  Yes.  I've worked with government agencies, I've worked

04:53:16  16  with high-tech companies, low-tech companies.  I've worked

04:53:21  17  with small companies, such as Vocalife, in valuing and

04:53:24  18  helping them develop commercialization plans.  So it's a

04:53:26  19  very wide -- wide variety of companies.

04:53:27  20  Q.  Have you testified in court before?

04:53:29  21  A.  Yes.

04:53:30  22  Q.  Many times?

04:53:31  23  A.  Yes, about 30 times.

04:53:33  24  Q.  Okay.  And do you have experience in negotiating

04:53:35  25  licenses outside of a -- of a lawsuit or litigation

1128

04:53:39   1   context -- what I'll call the real world?

04:53:41   2   A.   Yes.   I've -- I've been -- that's a very important part

04:53:45   3   of my career.   Throughout my career, I've served as

04:53:49   4   financial advisors to parties in license negotiation.   And

04:53:51   5   I've also been the lead negotiator in a patent license

04:53:55   6   negotiation.

04:53:55   7   Q.   And is your firm being compensated or paid for the work

04:54:00   8   that you've done in this case, sir?

04:54:02   9   A.   Yes.

04:54:02   10   Q.   Is your payment in any way based on or contingent on

04:54:06   11   the outcome or result of this case?

04:54:08   12   A.   No.

04:54:10   13        MR. DACUS:   At this time, Your Honor, I would

04:54:11   14   offer Mr. McGavock as an expert in accounting, economic

04:54:16   15   damages analysis, and the valuation of intellectual

04:54:18   16   property, including patents.

04:54:20   17        THE COURT:   Is there objection?

04:54:21   18        MR. LAMBRIANAKOS:   No objection, Your Honor.

04:54:23   19        THE COURT:   Without objection, the Court will

04:54:24   20   recognize this witness as an expert in those designated

04:54:27   21   fields.

04:54:27   22        Please continue.

04:54:28   23        MR. DACUS:   Thank you, Your Honor.

04:54:37   24   Q.   (By Mr. Dacus)   Now, before we dig into the work that

04:54:39   25   you did, Mr. McGavock, can you tell the jury the type of

04:54:41   1   information that you looked at, at a high level, in order
04:54:44   2   to perform your work in this case?
04:54:46   3   A.   Yes.   I reviewed the '049 patent.   I reviewed the
04:54:49   4   original '756 patent.   I reviewed thousands of documents,
04:54:52   5   business records that were produced primarily by Amazon, as
04:54:56   6   well as -- as Vocalife.   I reviewed deposition testimony.
04:54:59   7   We performed some independent research on certain issues,
04:55:02   8   which we'll talk about.   And then I also interviewed
04:55:07   9   several individuals at Amazon as we performed our work.
04:55:10  10   Q.   Have you been at the trial of this case each day?
04:55:13  11   A.   Yes.
04:55:14  12   Q.   At a high level, if you would, explain to the jury
04:55:21  13   from -- at least from your standpoint, what it is that you
04:55:24  14   and the jury are attempting to do in order to value or
04:55:28  15   determine a reasonable royalty if the jury should -- should
04:55:32  16   reach the damages part of this case?
04:55:33  17   A.   Okay.   Basically, what we're trying to do is -- is
04:55:39  18   isolate the value of the '049 patent and solely the '049
04:55:47  19   patent, and provide information that would be useful to the
04:55:50  20   negotiators in a hypothetical negotiation.   So I'm looking
04:55:53  21   for reliable indicators of value that they're directly tied
04:55:59  22   to the patented invention.
04:56:02  23   Q.   And I want to pause.   Is it important that you tie the
04:56:06  24   damages to the specific patented -- alleged patented
04:56:09  25   invention or feature?

04:56:10   1   A.  Yes, it's very important, especially in cases like this

04:56:13   2   when you have a multi-feature device and a very complex

04:56:19   3   ecosystem that goes along with that device.  So it's very

04:56:22   4   important to try to isolate the value associated with the

04:56:28   5   '049 patent.

04:56:28   6   Q.  Now, you were here yesterday for Mr. Ratliff's

04:56:31   7   testimony, and, of course, you knew before that about this

04:56:33   8   concept of DEV, downstream economic value, correct?

04:56:37   9   A.  Yes.

04:56:39  10   Q.  And can you tell us, at a high level -- or tell the

04:56:44  11   jury, at a high level, whether or not you think it is an

04:56:47  12   appropriate methodology for folks in the business you're --

04:56:50  13   that you're in and for what the jury is doing with respect

04:56:53  14   to valuing this patent to use this DEV as -- in the

04:57:01  15   calculation of damages?

04:57:03  16   A.  Yes, I do not think it's a reliable basis.  It comes

04:57:08  17   nowhere close to isolating the value of the '049 patent.

04:57:14  18   And DEV, by definition, the vast majority of value in DEV

04:57:23  19   is based on purchases that customers make through their

04:57:27  20   computer, through their smartphone, or tablets.  They're --

04:57:32  21   they're not voice purchases.  They're not using the

04:57:35  22   microphone array to make those purchases.  So that's --

04:57:37  23   that's one big problem.

04:57:38  24   Q.  Can -- can I -- can I pause you right there?  So what

04:57:45  25   we -- what you're showing on the screen here are computers

04:57:48  1  and tablets and phones, the purchases of which are included

04:57:53  2  in this DEV calculation; is that true?

04:57:55  3  A.  That's correct.  Purchases are made through those

04:57:57  4  devices.

04:57:58  5  Q.  And is it true that none of these devices are in --

04:58:03  6  accused of infringement in this case?

04:58:04  7  A.  That's correct.

04:58:06  8  Q.  Now, is there an additional problem with using this DEV

04:58:10  9  that Mr. Ratliff told the jury about yesterday?

04:58:13  10  A.  Yes.  The -- the actual profits -- I mean, I think

04:58:18  11  Mr. Ratliff called them derivative sales, but they -- they

04:58:20  12  relate to products that have nothing to do with the

04:58:24  13  patented invention, things like dog food, barbecue

04:58:29  14  utensils, fishing lures, et cetera.  So the -- the products

04:58:37  15  that represent the values in DEV are very far removed --

04:58:41  16  are not related to the patent at all.

04:58:43  17  Q.  And so that we're clear -- I mean, we could have put

04:58:45  18  any product on the right side of the screen.  These are --

04:58:48  19  these are just products that people can buy from

04:58:51  20  Amazon.com, correct?

04:58:51  21  A.  That's correct.

04:58:52  22  Q.  And, again, these are -- the DEV includes profits on

04:58:59  23  the sale of these products, none of which are accused of

04:59:02  24  infringement, correct?

04:59:02  25  A.  That's correct.  And I think there are -- I think there

04:59:05  1   are millions of products available on Amazon.com through

04:59:09  2   these devices.  So you can purchase just about anything.

04:59:16  3   Q.  So can you just explain to the jury, at a high level,

04:59:19  4   just -- just so we're all clear, as to whether or not you

04:59:21  5   think the DEV is an appropriate measure here?  And, if not,

04:59:25  6   why not?

04:59:25  7   A.  Again, it's -- it captures value for methods that are

04:59:33  8   unrelated to microphones.  And the majority of the value is

04:59:36  9   associated with that.  And it also relates to products that

04:59:40  10  are unrelated to the patent.

04:59:41  11          And the other thing I wanted to point out right

04:59:43  12  now is that DEV is, by definition, a forecast.  It's --

04:59:48  13  it's not an actual profit number.  And I'll go into more

04:59:52  14  detail on that as we go through the --

04:59:55  15  Q.  And let's do that.  Is it okay to start talking about

04:59:58  16  some of the details of this DEV calculation and -- and why

05:00:01  17  you think it is not a reliable starting point for the

05:00:05  18  valuation of a royalty in this case?

05:00:07  19  A.  Yes.  And I've got four topics here, so I'd like to

05:00:12  20  just go through each one individually.

05:00:13  21  Q.  Okay.

05:00:13  22  A.  So, first of all, based on the data available in this

05:00:17  23  case, I concluded that DEV estimates do not show any value

05:00:25  24  attributable to the '049 patent.

05:00:26  25  Q.  And is there some evidence in this case to support that

05:00:29  1   conclusion?

05:00:29  2   A.  Yes.  We have a comparison of a product that doesn't

05:00:37  3   use the patent, so it's the Amazon Tap which has a

05:00:44  4   hands-free mode, so it doesn't have a microphone array.  It

05:00:47  5   has one microphone.  And I'm comparing that to the accused

05:00:51  6   Echo products which operate in hands-free mode with

05:00:51  7   microphone arrays.

05:00:52  8        So what I saw in the data that was relied upon by

05:00:56  9   Mr. Ratliff was the ability to compare the DEV for a

05:01:02  10  product that uses the patent, compared to products -- or a

05:01:06  11  product that does not use the patent.

05:01:10  12       MR. DACUS:  Let me pause here.  Your Honor, under

05:01:12  13  the Court's procedures, I think we are about to get into

05:01:15  14  information that the parties have agreed the courtroom

05:01:17  15  should be sealed.  So I would ask that the Court please

05:01:20  16  seal the courtroom at this time.

05:01:21  17       THE COURT:  All right.  Based on counsel's request

05:01:23  18  and pursuant to the Court's standing order on protecting

05:01:26  19  proprietary and confidential information, the Court will

05:01:29  20  order the courtroom sealed at this time.

05:01:32  21       And I'll direct that all persons present and not

05:01:37  22  subject to the protective order in this case excuse

05:01:41  23  themselves and remain outside the courtroom until the

05:01:43  24  courtroom is unsealed and reopened.

05:01:46  25       (Courtroom sealed.)

| | | |
|---|---|---|
| 05:01:46 | 1 | (This portion of the transcript is sealed |
| 05:01:46 | 2 | and filed under separate cover as |
| 05:19:09 | 3 | Sealed Portion No. 3.) |
| 05:19:09 | 4 | (Courtroom unsealed.) |
| 05:19:09 | 5 | THE COURT:  This also unseals this remaining |
| 05:19:11 | 6 | portion of the record. |
| 05:19:12 | 7 | MR. DACUS:  Thank you, Your Honor. |
| 05:19:14 | 8 | THE COURT:  All right.  Counsel, you may continue. |
| 05:19:25 | 9 | MR. DACUS:  Thank you, Your Honor. |
| 05:19:25 | 10 | Q.  (By Mr. Dacus)  So I interrupted you, Mr. McGavock, and |
| 05:19:25 | 11 | I apologize.  But you were telling us that one of the |
| 05:19:26 | 12 | things that Mr. Ratliff failed to do, in addition to the |
| 05:19:27 | 13 | things we've already talked about, is he failed to use the |
| 05:19:30 | 14 | operating profit to measure the downstream impact, correct? |
| 05:19:34 | 15 | A.  That's correct.  So -- |
| 05:19:35 | 16 | Q.  So explain that to the jury what you're talking about. |
| 05:19:37 | 17 | A.  Well, he just left out other costs.  So his -- the DEV |
| 05:19:41 | 18 | is based on future projections of sales of all -- all those |
| 05:19:45 | 19 | types of goods, but he did not consider significant costs |
| 05:19:48 | 20 | associated with selling those goods.  The trucks, the |
| 05:19:54 | 21 | warehouses, the fulfillment centers, the cost of |
| 05:19:58 | 22 | maintaining the Amazon.com website.  So those are |
| 05:20:01 | 23 | completely left out of his calculation, despite the fact |
| 05:20:05 | 24 | he's projecting into the future. |
| 05:20:06 | 25 | Q.  Were you here yesterday -- do you remember Mr. Ratliff |

05:20:10   1   saying that he used this thing called contribution profit?

05:20:14   2   Do you remember that?

05:20:19   3   A.   That's right.

05:20:20   4   Q.   And are you saying that contribution profit does not

05:20:23   5   include all of the expenses that he should have included

05:20:23   6   that Amazon incurs?

05:20:24   7   A.   That's correct.

05:20:24   8   Q.   Were you also here when Mr. Caruccio from Amazon

05:20:27   9   testified by video deposition?

05:20:32  10   A.   Yes.

05:20:33  11   Q.   Do you remember him giving that long list of expenses

05:20:35  12   that Amazon incurs?

05:20:36  13   A.   Yes.

05:20:36  14   Q.   And are those the expenses -- are you including all of

05:20:39  15   the list of the expenses that Mr. Caruccio identified?

05:20:41  16   A.   Yes, I'm trying to capture all of those.

05:20:45  17   Q.   And is it -- am I understanding you to say that

05:20:47  18   Mr. Ratliff did not include all of those expenses?

05:20:50  19   A.   That's correct.  He did not go beyond the contribution

05:20:54  20   profit, which is a short-run variable profit, and doesn't

05:20:57  21   consider long-run operating cost.

05:21:00  22   Q.   And did you do a calculation -- if, in fact, you use

05:21:02  23   all the expenses or include them in the calculation that

05:21:05  24   you should, did you do a calculation to determine what

05:21:07  25   the -- the royalty rate should be?

05:21:10  1   A.  Yes.  If you account for those costs, the royalty rate

05:21:15  2   would be cut in half, so it would go from $1.32 to 66

05:21:22  3   cents.

05:21:22  4   Q.  Did you find any other evidence in the record that

05:21:24  5   Mr. Ratliff overstated his damages calculation?

05:21:27  6   A.  Yes.  He failed to adjust for multiple Echo devices in

05:21:35  7   a home.  So he does a per unit DEV calculation.  And if a

05:21:39  8   family buys two Echo units, he's -- he's assuming the DEV

05:21:44  9   value would just double for that household; that their

05:21:48  10  purchases would go up.  But Amazon does an adjustment.

05:21:51  11  Q.  Let me pause you there for a second.

05:21:54  12          MR. DACUS:  Can -- Mr. Berk, can we pull up

05:21:57  13  DTX-81, please, sir, again?  And can you go to Page 7 and

05:22:07  14  Lines 233 through 237, please, sir?

05:22:11  15  Q.  (By Mr. Dacus)  Do you remember yesterday when I asked

05:22:18  16  Mr. Ratliff if he had accounted for this aggregation

05:22:21  17  factor?  Do you remember that?

05:22:22  18  A.  Yes.

05:22:22  19  Q.  And this document -- this is the same Exhibit 81 that

05:22:26  20  you relied on, and, candidly, he relied on also, correct?

05:22:30  21  A.  Correct.

05:22:30  22  Q.  And you -- do you remember that what Mr. Ratliff said

05:22:32  23  is his assumption was that this aggregation factor had

05:22:36  24  already been taken into account in the calculation of DEV?

05:22:41  25  Do you remember him saying that?

| | | |
|---|---|---|
| 05:22:42 | 1 | A.  Yes. |
| 05:22:42 | 2 | Q.  Is -- is that accurate in your mind -- in your opinion? |
| 05:22:45 | 3 | A.  No, it's inaccurate. |
| 05:22:47 | 4 | Q.  And tell the jury why. |
| 05:22:48 | 5 | A.  If it had been done, it would have been called ADEV, |
| 05:22:56 | 6 | A-D-E-V, adjusted DEV.  That's the term they use.  But I |
| 05:22:59 | 7 | read this document, and the first thing I asked the person |
| 05:23:02 | 8 | that prepared the very document Mr. Ratliff relied on is |
| 05:23:04 | 9 | did you -- does this document have an aggregated adjustment |
| 05:23:09 | 10 | in it, and it does not.  So, Mr. Ratliff, again, is |
| 05:23:11 | 11 | mistaken. |
| 05:23:12 | 12 | Q.  Is that significant -- and I might point you to |
| 05:23:15 | 13 | Line 236 and what the result of failing to account for this |
| 05:23:20 | 14 | aggregation factor, whether or not it overstates or |
| 05:23:24 | 15 | understates DEV.  Do you have any opinion on that? |
| 05:23:27 | 16 | A.  It overstates DEV if you do not make the aggregation |
| 05:23:31 | 17 | adjustment.  It's basically double counting downstream |
| 05:23:34 | 18 | sales. |
| 05:23:34 | 19 | Q.  And did you -- |
| 05:23:36 | 20 |         MR. DACUS:  If we can go back to the slides, |
| 05:23:38 | 21 | please, Mr. Berk. |
| 05:23:39 | 22 | Q.  (By Mr. Dacus)  Did you actually sit down and do a |
| 05:23:44 | 23 | mathematical calculation of the effect of failing -- of |
| 05:23:48 | 24 | Mr. Ratliff's failure to include this aggregation factor in |
| 05:23:52 | 25 | his calculation? |

1138

05:23:53   1   A.   Yes.

05:23:53   2   Q.   And -- and what did that show you?

05:23:55   3   A.   It adjusts his royalty rate by -- it reduces it by 35

05:24:00   4   percent.   That's the aggregation factor used by Amazon.

05:24:03   5   It's a 35 percent downward adjustment.   So his $1.32

05:24:09   6   royalty rate goes down to 86 cents per unit.

05:24:11   7   Q.   And what -- what if we were to make both of those

05:24:16   8   adjustments, the operating profit adjustment and the

05:24:18   9   adjustment for the failure to include this aggregation

05:24:21   10  factor, what -- what would the resulting royalty rate be?

05:24:23   11  A.   43 cents per unit.

05:24:28   12  Q.   And -- and what we're doing here, we're using --

05:24:31   13  although you disagree with the use of DEV, what you've done

05:24:33   14  in -- in this calculation is assumed that DEV is

05:24:38   15  appropriate.   But under that assumption, even if it was a

05:24:45   16  correct methodology, Mr. Ratliff needed to correctly use

05:24:48   17  DEV, and he did not?

05:24:50   18  A.   That's correct.   And this is -- this is separate from

05:24:52   19  the other issue of not deducting the losses on the devices.

05:24:55   20  These are just other issues.

05:24:58   21  Q.   Okay.   Did you find other evidence -- and what -- what

05:25:00   22  I might do before we talk about this one --

05:25:03   23         MR. DACUS:   Mr. Berk, can you pull up Slide 31

05:25:06   24  from Mr. Ratliff's presentation, please, sir?

05:25:09   25  Q.   (By Mr. Dacus)   Do you recognize this as what

05:25:21  1   Mr. Ratliff showed the jury yesterday, Mr. McGavock?

05:25:23  2   A.   Yes.

05:25:23  3   Q.   Do you see there that 6.7 percent related to device

05:25:28  4   contribution apportionment Echo sales channel?

05:25:32  5   A.   Yes.

05:25:32  6   Q.   Do you agree with that methodology or number that

05:25:38  7   Mr. Ratliff used?

05:25:41  8   A.   I -- I don't understand the logic, and I don't agree

05:25:45  9   with the way he calculated it.

05:25:47  10  Q.   Before we talk about the details of the calculation, I

05:25:50  11  want you to give the jury some sense, as someone who's done

05:25:55  12  this for 35 years, whether or not you've ever seen

05:25:59  13  anyone -- and I mean, ever anyone in your area of expertise

05:26:04  14  use an advertising expense in this manner for

05:26:10  15  apportionment?

05:26:10  16  A.   I have never seen anything like this in my entire

05:26:13  17  career.  First of all, he's assuming that there are no

05:26:16  18  marketing expenses for the Echo devices, which is -- which

05:26:19  19  is wrong.  But then what he's doing is he's saying that the

05:26:21  20  other marketing expenses, the 6.7 percent, is completely

05:26:26  21  unrelated to the Echo device.  But he's using that to

05:26:29  22  allocate value to the device.  And if you're going to use

05:26:36  23  that kind of a cost-based adjustment, sort of a cost

05:26:40  24  allocation, there's a better way to do it.

05:26:43  25  Q.   And did -- if we were to assume his methodology was

| | | |
|---|---|---|
| 05:26:47 | 1 | correct and use it, did you go through the steps to |
| 05:26:51 | 2 | correctly assess what -- what portion of advertising |
| 05:26:55 | 3 | expense should be included in the calculation? |
| 05:26:57 | 4 | A.  Well, I did an alternative calculation where I looked |
| 05:27:01 | 5 | to determine the contribution of the Echo device compared |
| 05:27:05 | 6 | to other things that he talked about, such as fulfillment |
| 05:27:09 | 7 | cost and everything else.  I looked at the -- the actual |
| 05:27:13 | 8 | expenses incurred on the Echo device, as compared to |
| 05:27:18 | 9 | overall expenses, and I came up with a different |
| 05:27:21 | 10 | apportionment factor. |
| 05:27:21 | 11 | Q.  And if you include the apportionment factor based on |
| 05:27:26 | 12 | the expenses you described, what would the adjusted royalty |
| 05:27:30 | 13 | rate be? |
| 05:27:30 | 14 | A.  So his apportionment factor would go from 6.7 percent |
| 05:27:34 | 15 | down to .9 percent.  And so if you applied the .9 percent |
| 05:27:41 | 16 | in -- in his calculation, his royalty rate would go from |
| 05:27:46 | 17 | $1.32 to 18 cents per unit. |
| 05:27:48 | 18 | Q.  And then, finally, do you remember that 40 to 50 |
| 05:27:51 | 19 | percent technical apportionment that Mr. Ratliff had on his |
| 05:27:55 | 20 | pyramid chart?  Do you agree with -- with that technical |
| 05:28:00 | 21 | apportionment? |
| 05:28:00 | 22 | A.  No, he simply applied a 50 percent apportionment |
| 05:28:06 | 23 | factor -- actually, I think in this one, it's the 40 |
| 05:28:09 | 24 | percent.  And in my expert report, I discuss a much more |
| 05:28:14 | 25 | structured and rigorous apportionment approach that was |

05:28:17   1   provided by Dr. Kiaei.

05:28:19   2   Q.  Did you hear Dr. Kiaei testify about the actual

05:28:23   3   apportionment that he believes is more appropriate for this

05:28:26   4   microphone array as it relates to the Echo and the Alexa

05:28:30   5   devices?

05:28:31   6   A.  Yes, I was very -- I -- I studied what he had done in

05:28:34   7   his expert report.  So I'm very familiar with the structure

05:28:37   8   he used, and it's very similar to what I've done in the

05:28:40   9   past.

05:28:43   10  Q.  Okay.  This hypothetical negotiation that Mr. Ratliff

05:28:48   11  explained yesterday, do you agree that's the proper

05:28:50   12  construct or structure through which the jury should view

05:28:55   13  their determination of a reasonable royalty?

05:28:57   14  A.  Yes.

05:28:58   15  Q.  And, basically, that means you've got Amazon at one

05:29:02   16  side of the table and Vocalife at the other side of the

05:29:07   17  table negotiating a valid -- a reasonable value for a

05:29:12   18  royalty on this patent, correct?

05:29:14   19  A.  That's right.

05:29:14   20  Q.  And like Mr. Ratliff, do you agree that there are

05:29:17   21  several factors that the law and the Court requires you to

05:29:20   22  look at?

05:29:21   23  A.  Yes.

05:29:21   24  Q.  And did you do that in this case?

05:29:23   25  A.  Yes, they're called the Georgia-Pacific factors.  I

05:29:26   1   considered all of the factors, and I have some differences

05:29:32   2   of opinion with Mr. Ratliff on those.

05:29:34   3   Q.  And, in looking at those factors, is there one in

05:29:38   4   particular that is of significance that you believe the

05:29:41   5   jury should take into account in this case?  And, if so,

05:29:46   6   what is it?

05:29:46   7   A.  Well, there's -- there's a few of the factors that

05:29:49   8   relate to what others have paid for similar intellectual

05:29:57   9   property rights.  Georgia-Pacific 15, the very last factor,

05:30:01  10   specifically says what amount a patent owner would be

05:30:06  11   willing to accept.  And so I looked for evidence in the

05:30:10  12   record of what Dr. Li would be willing to accept.

05:30:16  13   Q.  Is this a little bit like house shop -- have you ever

05:30:21  14   bought a house, Mr. McGavock?

05:30:22  15   A.  Yes.

05:30:23  16   Q.  So when you buy a house, do you look to see if that

05:30:23  17   particular house has ever sold, or sold in the recent past,

05:30:24  18   and do you also look at other houses in the neighborhood to

05:30:27  19   see what they sell for?

05:30:29  20   A.  That's right.  In the valuation world, we call it the

05:30:32  21   market approach.  You're looking at comparable transactions

05:30:35  22   or comparable indications of value.

05:30:37  23   Q.  Is that one of the things that you understand the

05:30:40  24   Georgia-Pacific factors require you to do?

05:30:41  25   A.  Yes.  I think several of the -- at least three of the

05:30:44  1   factors touch on that concept.

05:30:45  2   Q.  Is there evidence in this case of what Vocalife, for

05:30:50  3   example, or Dr. Li would have accepted for the technology

05:30:52  4   that's at issue in this case?

05:30:53  5   A.  Yes.  He offered to sell the original '756 patent to

05:30:59  6   Google for $700,00000.

05:31:04  7          MR. DACUS:  And, Your Honor, may I have leave to

05:31:06  8   grab a board?

05:31:06  9          THE COURT:  You may.

05:31:09  10         MR. DACUS:  Thank you, Your Honor.

05:31:32  11  Q.  (By Mr. Dacus)  And so tell the jury, if you would,

05:31:33  12  Mr. McGavock, why you think it's significant as to Dr. Li

05:31:39  13  offering to sell this '756 patent to Google for $700,000.00

05:31:42  14  with respect to the calculation of royalties in this case?

05:31:45  15  A.  Well, it's -- it covers a similar property, a similar

05:31:52  16  patent.  It involves Dr. Li, the patent owner, and so it

05:31:57  17  provides a very strong indication of what Dr. Li would

05:31:59  18  accept for selling or licensing the rights to his

05:32:09  19  invention.

05:32:09  20  Q.  And so we heard some testimony earlier in the case

05:32:12  21  about the fact that the '756 patent is very different from

05:32:16  22  the '049.  Were you here for that testimony?

05:32:18  23  A.  Yes.

05:32:18  24  Q.  And so that is a consideration here, right, because

05:32:21  25  what was offering to be sold is the '756, correct?

05:32:24  1   A.  Correct.  So when you're -- when you're comparing

05:32:27  2   properties, like comparing different houses, you want to

05:32:30  3   make sure they have -- you know, they're in the same

05:32:34  4   neighborhood, the same number of rooms.  So I did compare,

05:32:37  5   I did look at the two patents.

05:32:39  6   Q.  And so what I -- what I put up here, sir, is this is

05:32:42  7   the Claim 1 of the '049 patent; do you understand that?

05:32:45  8   A.  Yes.

05:32:46  9   Q.  And you understand from your work in this case that the

05:32:49  10  only difference between the '049 Claim and the '756 are

05:32:55  11  these words that are italicized; is that fair?

05:32:59  12          THE COURT:  Just a minute.

05:33:01  13          MR. LAMBRIANAKOS:  Objection, Your Honor.  This

05:33:03  14  discussion is beyond the scope of his report.

05:33:04  15          THE COURT:  Do you have a response, counsel?

05:33:06  16          MR. DACUS:  Certainly this particular board was

05:33:12  17  not in his report, Your Honor, but the comparison of the

05:33:16  18  '756 and the '049 and the comparability with respect to the

05:33:22  19  Google offer were.

05:33:23  20          THE COURT:  Well, I can't imagine a damages expert

05:33:26  21  who would have the claim language in their report.

05:33:29  22          MR. DACUS:  I do agree with that, Your Honor.  I

05:33:30  23  do not dispute that, that the claim language was not in

05:33:32  24  there.

05:33:33  25          THE COURT:  Well, by the same token, I would

05:33:37  1  assume that the offer or evidence that's been brought

05:33:46  2  forward about Google would relate to the patent-in-suit and

05:33:50  3  its predecessor.  If you'll -- if you'll address that topic

05:33:54  4  in a manner outside of the claim language itself --

05:33:58  5          MR. DACUS:  I'd be happy to do that.

05:34:00  6          THE COURT:  -- I think that probably will resolve

05:34:04  7  the problem.

05:34:04  8          MR. DACUS:  I'll be happy to do that.

05:34:06  9          THE COURT:  Why don't you rephrase without that

05:34:08  10  board up.

05:34:08  11          MR. DACUS:  I'll be happy to do it.

05:34:10  12          THE COURT:  And then, counsel, if you still

05:34:11  13  believe it's objectionable, reurge your objection at that

05:34:15  14  time.

05:34:15  15  Q.  (By Mr. Dacus)  So Mr. McGavock, for purposes of what

05:34:15  16  we're doing here, of determining whether or not this offer

05:34:17  17  is something that the jury should consider as significant

05:34:19  18  evidence of the value of the '049, do you consider that a

05:34:22  19  comparable or similar technology, just like you would in

05:34:29  20  house shopping and looking at a comparable or similar

05:34:32  21  house?

05:34:32  22  A.  Yes --

05:34:32  23  Q.  And tell the jury why.

05:34:34  24  A.  -- as well as in valuing patents.

05:34:38  25          The '756 patent is the original invention.  The

1146

05:34:41  1   '049 is a re -- a reissue patent of that invention, so

05:34:46  2   there's substantial overlap.  And they're almost identical.

05:34:51  3   I read both patents.  And I actually looked very closely at

05:34:54  4   how Dr. Li thought of his technology in terms of market

05:34:59  5   applications.

05:35:01  6          At that time, in both patents, he viewed the

05:35:06  7   invention as relating to smartphones, tablets, and other

05:35:12  8   devices, much -- a much bigger potential market than just

05:35:19  9   smart speakers.

05:35:19  10  Q.  And have you seen any evidence in this case that at the

05:35:22  11  time Dr. Li offered to sell the patent to Google for

05:35:30  12  $700,000.00, that he actually at least claims that he

05:35:32  13  believed Amazon was infringing?

05:35:33  14  A.  Yeah, he was -- I listened to his testimony in the

05:35:37  15  courtroom, I read his deposition, so I understand that he

05:35:40  16  was aware at that time that he felt Amazon had launched a

05:35:45  17  product that was infringing.

05:35:50  18  Q.  So even with allegedly the subjective thought that

05:35:54  19  Dr. Li says he had, that he thought Amazon was infringing

05:35:56  20  before the offer to Google, he was still willing to sell

05:35:59  21  his patent for $700,000.00; is that correct?

05:36:02  22  A.  That's correct.

05:36:02  23  Q.  And is that a piece of evidence you think the jury

05:36:05  24  should consider in their determination of value of this

05:36:07  25  patent if they should get that far?

05:36:09   1   A.   Yes, I think that's highly relevant.   Google was a

05:36:13   2   major technology company at the time.   Dr. Li, both at the

05:36:16   3   time -- at that time, as well as of the '049 reissue, felt

05:36:22   4   that both inventions covered a very broad market.   And so I

05:36:26   5   think, in my view, from a valuation expert standpoint, this

05:36:29   6   is a very strong indication of value.

05:36:34   7   Q.   You know, sir, that a -- a license -- or a royalty can

05:36:40   8   be paid in two different forms, correct?

05:36:43   9   A.   Generally speaking, yes.   There are probably more than

05:36:46   10  that.

05:36:46   11  Q.   And -- and what are the two forms?

05:36:49   12  A.   It could be a lump sum royalty or a running royalty,

05:36:53   13  which is a -- a rate applied to some unit of measure, like

05:36:58   14  device sales.

05:36:58   15  Q.   And if the Court in this case asks this jury to ask a

05:37:02   16  question about whether or not their award is based on a

05:37:06   17  lump sum or a running royalty, have you seen evidence in

05:37:09   18  this case as to what these two parties would have likely

05:37:13   19  negotiated?

05:37:13   20  A.   Yes.   I think there would be, based on my review of the

05:37:18   21  record, sort of an agreement -- or an agreement on this

05:37:23   22  issue.   Dr. Li had already offered to sell the invention

05:37:29   23  for a lump sum amount of $700,000.00.   And then we heard

05:37:35   24  Amazon has a policy of -- a general policy of negotiating

05:37:39   25  lump sum agreements.

05:37:40  1  Q.  You were here when Scott Hayden from Amazon testified

05:37:43  2  by video deposition, were you?

05:37:46  3  A.  Yes.

05:37:46  4  Q.  And is this his trial -- trial testimony by video

05:37:52  5  deposition that he gave, that we have on the screen,

05:37:55  6  related to the policy?

05:37:56  7  A.  That's correct.  He said the expectation of the policy

05:37:58  8  is to do a one-time, lump sum fixed payment.

05:38:02  9  Q.  In addition to that, Amazon has produced other licenses

05:38:06  10  that it has entered into with other companies in this case,

05:38:10  11  correct?

05:38:10  12  A.  That's correct.

05:38:10  13  Q.  And did you review those?

05:38:11  14  A.  Yes, I reviewed all of those licenses.

05:38:13  15  Q.  And about how many were there?

05:38:15  16  A.  I think between 10 and 12, something like that.

05:38:19  17  Q.  And can you give the jury some indication as to whether

05:38:21  18  or not those licenses were, in fact, lump sums?

05:38:25  19  A.  The vast majority were lump sums.  There was only one

05:38:30  20  agreement that would be a true or pure running royalty

05:38:34  21  agreement.

05:38:34  22  Q.  So the evidence related to this lump sum versus running

05:38:38  23  royalty is Dr. Li offered a lump sum payment, correct, to

05:38:44  24  Google?

05:38:45  25  A.  Yes.

05:38:45   1   Q.   Amazon's policy is to have a lump sum, correct?

05:38:48   2   A.   Yes.

05:38:48   3   Q.   And indeed the Amazon licenses that have been produced,

05:38:52   4   with the exception of one, which is a running royalty, the

05:38:55   5   rest of them either have a cap and/or a lump sum, correct?

05:38:59   6   A.   That's correct.  And the one that was a running

05:39:01   7   royalty, that was for an entire portfolio of patents that

05:39:05   8   related to a standard -- the MPEG standard for playing

05:39:12   9   music.

05:39:13  10   Q.   I'd like to in the last few minutes, Mr. McGavock, to

05:39:16  11   put some numbers, if you would, to this reasonable royalty

05:39:20  12   calculation that you did using the actual sales numbers

05:39:25  13   from the Echo.  Can you walk us through that, please, sir?

05:39:27  14   A.   Yes.  So I rely upon -- I don't remember the exhibit

05:39:33  15   number, but there was a document --

05:39:35  16   Q.   It is DTX-418; does that sound correct?

05:39:39  17   A.   That sounds familiar.

05:39:41  18   Q.   Now, go ahead, I apologize.

05:39:43  19   A.   And I -- I added up all of the revenues for actual

05:39:50  20   voice purchases during that time period.  I projected for

05:39:52  21   earlier years, as well, and brought the numbers forward.

05:39:55  22         So I cover I think a six -- about a six-year

05:39:58  23   period, a little over a six-year period of actual voice

05:40:04  24   purchases.  I applied Amazon's operating margins to those

05:40:09  25   voice purchase revenues, to come up with an average

05:40:10  1   operating profit per unit of 12 -- roughly 13 cents.

05:40:19  2   Q.  And did you also utilize the technical apportionment.

05:40:24  3   As opposed to the 40 or 50 percent that Mr. Ratliff used,

05:40:25  4   did you use -- utilize the technical apportionment that you

05:40:30  5   believe is more appropriate?

05:40:31  6   A.  That's correct.

05:40:31  7   Q.  And did you come to a royalty per unit based on those

05:40:34  8   numbers?

05:40:35  9   A.  That's correct.  So if you multiply the roughly 13

05:40:38  10  cents by the five and a half cents, you get the result

05:40:41  11  there, which is .0071 per device.

05:40:45  12  Q.  And since that was per device, do you need to know the

05:40:48  13  accused units, that is the number of Echos that were sold,

05:40:52  14  in order to calculate the royalty?

05:40:55  15  A.  Yes.

05:40:56  16  Q.  And what's that number?

05:40:57  17  A.  It's 18,947,013 units.

05:41:01  18  Q.  And that would result in a royalty of what?

05:41:03  19  A.  134,524.

05:41:07  20  Q.  So --

05:41:08  21  A.  And I should point out, my number -- my number of units

05:41:11  22  is a little lower than Mr. Ratliff's.  His is roughly

05:41:15  23  19 million because he made an error in his projection.  He

05:41:20  24  actually includes non-accused sales in his projection.

05:41:23  25  Q.  Can you give the jury what your final conclusions are,

05:41:26   1   sir, to the extent they reach the damages question, what
05:41:29   2   you think a reasonable royalty would be in this case?
05:41:32   3   A.  Yes.  I think a reasonable royalty would be no more
05:41:37   4   than $700,000.00, and I think somewhere in this range would
05:41:40   5   be reasonable.
05:41:41   6        I think the -- the data points that I have used so
05:41:44   7   that the Google offer and the actual voice purchase data
05:41:48   8   provide the most reliable and credible way to value the
05:41:56   9   '049 invention separately from everything else.
05:41:58  10   Q.  And the 134,000, that's derived from using the actual
05:42:04  11   purchases made through the Echo device?
05:42:06  12   A.  That's correct.
05:42:07  13   Q.  And would -- is it your opinion that this should be
05:42:11  14   awarded as a running royalty or as a lump sum?
05:42:13  15   A.  I think a lump sum would be appropriate, based on the
05:42:16  16   evidence in the case.
05:42:18  17        MR. DACUS:  That's all I have, Your Honor.  I pass
05:42:19  18   the witness.
05:42:20  19        THE COURT:  All right.  Ladies and gentlemen,
05:42:22  20   we're going to take advantage of this opportunity to recess
05:42:26  21   for the day.  We're not going to start the
05:42:28  22   cross-examination this late in the afternoon.  We'll begin
05:42:31  23   in the morning with the Plaintiff's cross-examination of
05:42:35  24   Mr. McGavock.
05:42:37  25        As you prepare to leave the courthouse, if you

05:42:39  1  will make sure you take your juror notebooks to the jury

05:42:42  2  room and leave them closed on the jury room table

05:42:46  3  overnight.

05:42:46  4      Please travel safely to your homes.  I'd like you

05:42:49  5  back, as you were this morning, and I want to compliment

05:42:53  6  you on being timely.  I'd like you back so that we can

05:42:57  7  begin as close to 8:30 as possible.  So if you'll be

05:43:01  8  assembled in the jury room before 8:30.  Please travel

05:43:04  9  safely to your homes.

05:43:05  10      Please remember all the instructions I've given

05:43:07  11  you, including not to discuss this case or anything about

05:43:10  12  it with anyone, including yourselves.

05:43:13  13      With that, ladies and gentlemen of the jury,

05:43:17  14  you're excused until tomorrow morning.

05:43:21  15      COURT SECURITY OFFICER:  All rise.

05:43:26  16      (Jury out.)

05:43:27  17      THE COURT:  Be seated, please.

05:43:44  18      Mr. McGavock, you can step down.

05:43:47  19      THE WITNESS:  Thank you.

05:43:49  20      THE COURT:  Counsel, for your information,

05:43:51  21  according to the Court's records, Plaintiff has 1 hour and

05:43:57  22  25 minutes remaining.  Defendant has 1 hour and 36 minutes

05:44:00  23  remaining.

05:44:01  24      I've received your jointly submitted and updated

05:44:06  25  final jury instructions and verdict.  I'll be going over

05:44:09   1   that.

05:44:11   2          It's my intention to finish the evidence some time

05:44:17   3   around noon tomorrow.  And after an appropriate lunch

05:44:22   4   break, it's my intention to, having sent the jury home,

05:44:27   5   take up motions either party would care to offer under

05:44:33   6   Rule 50(a).

05:44:33   7          Having heard arguments and ruled on those, I would

05:44:36   8   then next to propose to conduct an informal charge

05:44:41   9   conference in chambers to review the recently-updated and

05:44:45  10   jointly submitted proposed final jury instructions and

05:44:50  11   verdict form.

05:44:51  12          And having a fulsome discussion with parties

05:44:53  13   and -- counsel, rather, in an informal and robust setting,

05:44:58  14   I'll take all of that input into account and generate what

05:45:02  15   I believe to be the appropriate final jury instruction and

05:45:06  16   verdict form for submission to the jury.  I'll provide you

05:45:08  17   with copies to review and consider.

05:45:11  18          And then I'll conduct a formal charge conference

05:45:13  19   on the record where either party may offer such objections

05:45:17  20   to that document or those documents as they believe the

05:45:22  21   interest of their clients require.

05:45:23  22          Those of you that will be presenting closing

05:45:28  23   arguments, you are not required to be present tomorrow

05:45:31  24   afternoon while these matters are taken up.  You may use

05:45:34  25   that time to prepare for your closing arguments.  You're

05:45:38   1   certainly welcome, if you choose to participate, but
05:45:40   2   there's no shortage of lawyers on either side of this case.
05:45:43   3        So, as long as these other matters are adequately
05:45:46   4   staffed, those of you that will present closing arguments
05:45:48   5   are not required to be here.
05:45:52   6        Particularly with regard to the informal charge
05:45:54   7   conference, I would invite all counsel who are present to
05:45:58   8   be present and participate in that.  There's quite a few
05:46:03   9   lawyers that have warmed a bench most of this trial and not
05:46:06   10  had an opportunity to participate.  And their input,
05:46:10   11  suggestions, and arguments are more than welcome to be
05:46:12   12  included in that informal charge conference.
05:46:15   13       With regard to motion practice under Rule 50(a),
05:46:18   14  if you want to file something for me to consider in
05:46:21   15  writing, you need to file it before tomorrow morning.
05:46:24   16       I do not intend this to be a lengthy process where
05:46:30   17  I hear long, drawn-out arguments.  I want to identify the
05:46:36   18  issues that will be addressed in the parties' motions.
05:46:40   19       It's common that there are diametrically opposed
05:46:44   20  motions under Rule 50(a) for such topics as infringement
05:46:47   21  versus non-infringement.  And I'll, in all likelihood, hear
05:46:51   22  those competing arguments concurrently.
05:46:55   23       But it's my intention to -- to get to the heart of
05:46:59   24  the matter, hear the arguments, references to the
05:47:01   25  applicable evidence, which I have heard throughout the

05:47:03  1  trial, and then I can give you a ruling.

05:47:07  2        If you want to present more of a briefing format

05:47:10  3  rather than a concise oral argument, put it in writing and

05:47:14  4  file it overnight.

05:47:17  5        Are there questions from either party at this

05:47:18  6  juncture before we recess for the evening?

05:47:22  7        MS. TRUELOVE:  Just to be clear, Your Honor,

05:47:24  8  your -- your intention is to have the informal charge

05:47:27  9  conference.  And then the Court will provide us with its

05:47:29  10  charge tomorrow afternoon, and then we will come back and

05:47:32  11  put objections on the record tomorrow?

05:47:34  12        THE COURT:  I intend to finish the formal charge

05:47:37  13  conference tomorrow so that Thursday morning we can begin

05:47:41  14  with the jury and my final instructions, your closing

05:47:44  15  arguments, and then they can retire and deliberate on the

05:47:47  16  verdict.

05:47:48  17        So counsel that will be presenting closing

05:47:51  18  arguments do not need to worry about being prepared to go

05:47:56  19  forward with those on Wednesday.  It will be first thing

05:48:00  20  Thursday morning.

05:48:00  21        MS. TRUELOVE:  That's all I have, Your Honor.

05:48:02  22        THE COURT:  Do -- do the parties know at this

05:48:04  23  juncture who is going to be presenting their closing

05:48:06  24  arguments?

05:48:08  25        MS. TRUELOVE:  I believe we do, yes, Your Honor.

05:48:10  1  Mr. Fabricant.

05:48:12  2          THE COURT:  All right.

05:48:13  3          MR. FABRICANT:  Yes, Your Honor, I will for the

05:48:14  4  Plaintiff, Your Honor.

05:48:15  5          THE COURT:  First and second Plaintiff's argument?

05:48:17  6          MR. FABRICANT:  Yes, Your Honor.

05:48:17  7          THE COURT:  Mr. Dacus, do the Defendants have --

05:48:20  8  have they made that decision?

05:48:21  9          MR. DACUS:  I don't know definitively, but likely

05:48:24  10  Mr. Hadden and I will split it, Your Honor.

05:48:27  11          THE COURT:  All right.

05:48:27  12          MR. DACUS:  And, Your Honor, I do have a question

05:48:29  13  with respect to 50(a), if I could.

05:48:29  14          THE COURT:  Yes.

05:48:31  15          MR. DACUS:  The Court said file something by

05:48:32  16  morning.  I'm a little concerned about that because --

05:48:35  17          THE COURT:  Midnight tonight.

05:48:37  18          MR. DACUS:  By midnight tonight?  Even -- even

05:48:37  19  without the evidence being closed, you would like our 50(a)

05:48:42  20  motions?  My question was, can we wait --

05:48:44  21          THE COURT:  I'm not going to stop and have a

05:48:47  22  multi-hour delay after the rebuttal case closes before I

05:48:50  23  take up the 50(a) motions.

05:48:52  24          MR. DACUS:  Understood completely, Your Honor.  So

05:48:54  25  my question was -- and, obviously, the Court can say no --

| | | |
|---|---|---|
| 05:48:57 | 1 | is can we file it as soon as evidence closes -- |
| 05:49:00 | 2 | THE COURT:  Well, if you want me to have an |
| 05:49:01 | 3 | opportunity to read it -- what I'm trying to do is to avoid |
| 05:49:04 | 4 | a delay in the process.  You're usually the one that asks |
| 05:49:07 | 5 | for the right to file something in writing, Mr. Dacus. |
| 05:49:10 | 6 | You've done that before.  I'm trying to accommodate your |
| 05:49:13 | 7 | preferences, but I'm not going to delay the process. |
| 05:49:17 | 8 | Otherwise, I'll just simply say, give me a concise oral |
| 05:49:21 | 9 | argument from the podium, and we'll let that suffice. |
| 05:49:24 | 10 | MR. DACUS:  How about if we file something before |
| 05:49:26 | 11 | midnight tonight, Your Honor; will that work? |
| 05:49:28 | 12 | THE COURT:  If you file it before midnight, I'll |
| 05:49:31 | 13 | have an opportunity to look at it. |
| 05:49:33 | 14 | MR. DACUS:  Thank you very much for that |
| 05:49:34 | 15 | opportunity. |
| 05:49:34 | 16 | MR. HADDEN:  Thank you. |
| 05:49:34 | 17 | THE COURT:  Anything from anybody else? |
| 05:49:37 | 18 | MS. TRUELOVE:  No, Your Honor. |
| 05:49:38 | 19 | THE COURT:  If not, we stand in recess until |
| 05:49:41 | 20 | tomorrow morning. |
| 05:49:42 | 21 | COURT SECURITY OFFICER:  All rise. |
| | 22 | (Recess.) |
| | 23 | |
| | 24 | |
| | 25 | |

1                           CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                    10/6/2020
      SHELLY HOLMES, CSR, TCRR               Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25