```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4   VOCALIFE LLC,                )(

 5       PLAINTIFF,               )(    CIVIL ACTION NO.

 6                                )(    2:19-CV-123-JRG

 7   VS.                          )(    MARSHALL, TEXAS

 8                                )(

 9   AMAZON.COM, INC. and         )(

10   AMAZON.COM LLC,              )(    OCTOBER 7, 2020

11       DEFENDANTS.              )(    8:28 A.M.

12                   TRANSCRIPT OF JURY TRIAL

13                      MORNING SESSION

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15            UNITED STATES CHIEF DISTRICT JUDGE

16

17   FOR THE PLAINTIFF:

18   MR. ALFRED R. FABRICANT
     MR. PETER LAMBRIANAKOS
19   MR. VINCENT J. RUBINO, III
     MS. AMY PARK
20   MR. ENRIQUE ITURRALDE
     FABRICANT LLP
21   230 Park Avenue, 3rd Floor W.
     New York, NY 10169
22
     MR. SAMUEL F. BAXTER
23   MS. JENNIFER L. TRUELOVE
     MCKOOL SMITH, P.C.
24   104 East Houston Street, Suite 300
     Marshall, TX 75670
25
```

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:      Shelly Holmes, CSR, TCRR
                          Official Reporter
20                        United States District Court
                          Eastern District of Texas
21                        Marshall Division
                          100 E. Houston Street
22                        Marshall, Texas  75670
                          (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

<pre>
                          P R O C E E D I N G S
08:26:53   1
08:26:53   2        (Jury out.)
08:26:53   3        COURT SECURITY OFFICER:  All rise.
08:26:56   4        THE COURT:  Be seated, please.
08:28:51   5        Are the parties prepared to read into the record
08:28:53   6   those items from the list of pre-admitted exhibits used
08:28:56   7   during yesterday's portion of the trial?
08:28:59   8        MS. FABRICANT:  Yes, Your Honor.
08:29:00   9        MR. AKIN:  Yes, Your Honor.
08:29:01  10        THE COURT:  All right.  Please proceed.
08:29:03  11        MS. FABRICANT:  Good morning, Your Honor.
08:29:14  12   Samantha Fabricant for Plaintiff Vocalife.
08:29:17  13        THE COURT:  Good morning, please proceed.
08:29:19  14        MS. FABRICANT:  The following exhibits were used
08:29:21  15   on October 6th, 2020, and are being moved into evidence:
08:29:26  16   PTX-96 and PTX-334.
08:29:28  17        THE COURT:  All right.  Is there objection to that
08:29:33  18   rendition by the Defendants?
08:29:35  19        MR. AKIN:  No objection.
08:29:37  20        THE COURT:  Do Defendants have a similar rendition
08:29:39  21   to offer into the record?
08:29:40  22        MR. AKIN:  Yes, Your Honor.  Kyle Akin on behalf
08:29:43  23   of Amazon.  Amazon moves the following exhibits into
08:29:46  24   evidence that were used yesterday, Tuesday, October 6th:
08:29:49  25   DTX-27, DTX-27P, DTX-46, DTX-49P, DTX-54, DTX-55, DTX-71,
</pre>

08:30:04   1   DTX-181, DTX-342, DTX-491, DTX-809, DTX-1018.

08:30:21   2        MS. FABRICANT:  No objection, Your Honor.

08:30:22   3        THE COURT:  All right.  Without objection from the

08:30:24   4   Defendant [sic], those are noted in the record.

08:30:27   5        We left off yesterday, counsel, with Mr. McGavock

08:30:30   6   on the stand.  I believe Plaintiff was about to

08:30:33   7   cross-examine.

08:30:33   8        Mr. Lambrianakos, you may go to the podium and

08:30:37   9   prepare.

08:30:37   10       Are there any binders to distribute with regard to

08:30:42   11   the cross-examination?

08:30:43   12       MR. LAMBRIANAKOS:  Yes, Your Honor.

08:30:44   13       THE COURT:  Then let's distribute them.

08:30:45   14       Mr. McGavock, if you'd return to the witness

08:30:51   15   stand.  I remind you you remain under oath.

08:30:56   16       Let's go off the record for just a minute.

08:31:14   17       (Off-the-record discussion.)

08:31:15   18       THE COURT:  All right.  We're back on the record.

08:31:23   19       Let's bring in the jury, please.

08:31:25   20       COURT SECURITY OFFICER:  All rise.

08:31:26   21       (Jury in.)

08:31:27   22       THE COURT:  Good morning, ladies and gentlemen.

08:31:53   23   Thank you for being on time.  Please be seated.

08:31:54   24       As you'll recall when we ended the day yesterday,

08:32:00   25   Mr. Dan McGavock was on the witness stand as an expert

| | | |
|---|---|---|
| 08:32:04 | 1 | witness for the Defendants.  The direct examination had |
| 08:32:07 | 2 | been completed, and we'll now proceed with |
| 08:32:09 | 3 | cross-examination of the witness by the Plaintiff. |
| 08:32:11 | 4 | You may proceed, Mr. Lambrianakos. |
| 08:32:14 | 5 | MR. LAMBRIANAKOS:  Thank you, Your Honor. |
| 08:32:14 | 6 | DANIEL M. MCGAVOCK, DEFENDANTS' WITNESS, PREVIOUSLY SWORN |
| 08:32:14 | 7 | CROSS-EXAMINATION |
| 08:32:15 | 8 | BY MR. LAMBRIANAKOS: |
| 08:32:15 | 9 | Q.  Good morning, Mr. McGavock. |
| 08:32:19 | 10 | A.  Good morning. |
| 08:32:19 | 11 | Q.  You recall that yesterday you gave some testimony |
| 08:32:22 | 12 | regarding the device DEV? |
| 08:32:23 | 13 | A.  Yes. |
| 08:32:24 | 14 | Q.  You said that DEV was not the correct royalty base |
| 08:32:28 | 15 | because DEV does not account for the losses in the Echo |
| 08:32:32 | 16 | devices themselves, right? |
| 08:32:33 | 17 | A.  Yes. |
| 08:32:33 | 18 | Q.  You also showed a graphic stating that after the loss |
| 08:32:39 | 19 | on the Echo devices is subtracted from the DEV, the total |
| 08:32:46 | 20 | profit per unit for the Echo devices was about $2.00 per |
| 08:32:49 | 21 | unit? |
| 08:32:49 | 22 | A.  Yes. |
| 08:32:49 | 23 | Q.  When you criticized Mr. Ratliff's use of DEV, you |
| 08:32:56 | 24 | referred to DTX-81, right? |
| 08:32:58 | 25 | A.  I believe so. |

1164

| | | |
|---|---|---|
| 08:32:58 | 1 | MR. LAMBRIANAKOS:  Can we put DTX-81 up, please? |
| 08:33:02 | 2 | A.  Yes. |
| 08:33:03 | 3 | MR. LAMBRIANAKOS:  Can we go to Lines 179 through |
| 08:33:07 | 4 | 186? |
| 08:33:09 | 5 | Q.  (By Mr. Lambrianakos)  This is the portion of the |
| 08:33:14 | 6 | device -- of the document that you referred to, right? |
| 08:33:16 | 7 | A.  Yes. |
| 08:33:16 | 8 | Q.  You noted that the LTV, which is lifetime value, |
| 08:33:24 | 9 | includes PPU, which is profit per unit, right? |
| 08:33:31 | 10 | A.  Correct, on the device. |
| 08:33:32 | 11 | Q.  Correct.  You'd agree that if the profit per unit is |
| 08:33:36 | 12 | negative, then LTV would take into account the loss on the |
| 08:33:41 | 13 | device, right? |
| 08:33:42 | 14 | A.  That's correct.  LTV would. |
| 08:33:45 | 15 | Q.  And you agree that if Amazon loses a lot of money when |
| 08:33:49 | 16 | it sells an Echo device, that LTV number for an Echo device |
| 08:33:55 | 17 | would be quite low, right? |
| 08:33:56 | 18 | A.  It depends.  It's a combination of DEV plus PPU. |
| 08:34:03 | 19 | Q.  So LTV would at least be less than DEV if the profit |
| 08:34:09 | 20 | per unit is negative, correct? |
| 08:34:10 | 21 | A.  Correct. |
| 08:34:11 | 22 | Q.  Now, looking at the next number, which is LTV-LF? |
| 08:34:16 | 23 | A.  Yes. |
| 08:34:16 | 24 | Q.  Is that lifetime value less fixed costs? |
| 08:34:20 | 25 | A.  Correct. |

08:34:20  1   Q.  So LTV-LF takes into account both the loss on the sale

08:34:24  2   of the device, if there is one, and the fixed costs

08:34:27  3   allocated to the device, right?

08:34:29  4   A.  That's correct.  I'm not sure -- not necessarily

08:34:36  5   allocated.  They would be direct-based cost.

08:34:39  6   Q.  Yesterday, you mentioned that the DEV of the Echo Dot

08:34:43  7   was $43.89; do you remember that?

08:34:45  8   A.  That sounds familiar.

08:34:50  9        MR. LAMBRIANAKOS:  I'd like PTX-1311 up, please.

08:34:54  10  Thank you.

08:34:55  11  Q.  (By Mr. Lambrianakos)  Do you recall this document

08:34:58  12  yesterday, sir?

08:34:59  13  A.  No.

08:35:08  14  Q.  Is this one of the documents that was distributed with

08:35:11  15  your testimony?

08:35:11  16  A.  I -- I believe so.  I think it was in the binder.

08:35:13  17  Q.  Do you see that this refers to the program metrics for

08:35:17  18  the -- the Biscuit?

08:35:18  19  A.  Yes.

08:35:19  20  Q.  And the Biscuit, is that the Echo Dot?

08:35:23  21  A.  I believe so.

08:35:30  22        MR. LAMBRIANAKOS:  Can we turn to Page Amazon

08:35:36  23  0136362?

08:35:38  24  Q.  (By Mr. Lambrianakos)  Do you see at this page at the

08:35:43  25  top it refers to program metrics for the Biscuit?

08:35:48  1   A.  Yes, yes.

08:35:49  2   Q.  And on the right-hand column, it refers to the 49.99

08:35:55  3   MSRP/Target BOM?

08:35:59  4   A.  Yes.

08:35:59  5   Q.  BOM, that's bill of materials?

08:36:02  6   A.  That's my understanding.

08:36:04  7   Q.  So that would include the cost of the device elements,

08:36:06  8   the components of it?

08:36:08  9   A.  I believe so, yes.

08:36:14  10  Q.  Now --

08:36:14  11  A.  So 49.99 is the price of the unit.  Bill of materials

08:36:20  12  would be the cost.

08:36:21  13         MR. LAMBRIANAKOS:  If we go down to Line 45.

08:36:23  14  Q.  (By Mr. Lambrianakos)  Do you see here it points to the

08:36:29  15  device LTV-LF at the midpoint for DSI?

08:36:34  16  A.  Yes.

08:36:35  17  Q.  And DSI, that's one of the building blocks of the DEV,

08:36:39  18  right?

08:36:39  19  A.  Yes.

08:36:39  20  Q.  And it says that the LTV-LF for the Echo Dot at the

08:36:47  21  MSRP of 49.99 with the target BOM is $54.20.  Do you see

08:36:54  22  that?

08:36:54  23  A.  Yes.

08:36:54  24  Q.  And that number is a little over $4.00 higher than the

08:36:59  25  DEV of the Echo Dot; is that right?

08:37:01  1   A.  It's -- it's an incorrect comparison.  The 54.2 is --

08:37:05  2   is in total dollars.  It's not a per unit number.  If you

08:37:14  3   walk through the document, it's not a per unit number.

08:37:17  4            MR. LAMBRIANAKOS:  Your Honor, move to strike that

08:37:19  5   answer as non-responsive.

08:37:20  6            THE COURT:  Sustained.  The question was:  And

08:37:23  7   that number is a little over $4.00 higher.  That's not the

08:37:27  8   answer you gave at all, Mr. McGavock.  You need to limit

08:37:31  9   your answers to the questions asked.

08:37:32  10           As you know, Mr. Dacus will get a chance to ask

08:37:36  11  follow-up questions once Mr. Lambrianakos is finished with

08:37:39  12  his examination.

08:37:41  13           THE WITNESS:  Thank you.

08:37:41  14           THE COURT:  All right.  Restate your question or

08:37:43  15  move on, counsel.

08:37:44  16  Q.  (By Mr. Lambrianakos)  So you agree that the LTV-LF for

08:37:48  17  this -- for the Echo Dot at 49.99 MSRP and the target BOM

08:37:55  18  is $54.20 -- is $4.23 higher than the DEV of the Echo Dot?

08:38:01  19  A.  No.

08:38:09  20  Q.  Yesterday you criticized the use of DEV because it

08:38:14  21  includes sales of non-patented products, such as dog food

08:38:16  22  and barbecue utensils?

08:38:19  23  A.  Yes.

08:38:19  24  Q.  You testified yesterday that you used merchandise sales

08:38:20  25  figures for the Echo devices as your starting point for a

08:38:22  1   reasonable royalty, right?

08:38:24  2   A.  Yes, physical product sales.

08:38:28  3   Q.  Do those physical product sales potentially include

08:38:31  4   things like dog food and barbecue utensils?

08:38:34  5   A.  Yes, that's my understanding.

08:38:36  6   Q.  You also said the DEV metric that Mr. Ratliff relied on

08:38:41  7   includes sales from devices other than Echo products,

08:38:44  8   right?

08:38:44  9   A.  Yes.

08:38:45  10  Q.  You didn't show the jury any documents to support that

08:38:48  11  testimony, did you?

08:38:50  12  A.  I don't recall.

08:38:52  13  Q.  You didn't cite -- you didn't cite any deposition

08:38:55  14  testimony from any Amazon witness to support that, did you?

08:38:57  15  A.  To support what?

08:38:59  16  Q.  To support your statement that the DEV metric includes

08:39:04  17  sales from devices other than Echo products?

08:39:06  18  A.  It's in my -- in detail in my expert report.  It --

08:39:11  19  it's based on discussions I had with Amazon personnel.

08:39:16  20  It's my understanding of how DEV is computed.  So I think

08:39:20  21  it's inherent in all the documents I reviewed and the work

08:39:23  22  I did.

08:39:23  23       MR. LAMBRIANAKOS:  Move to strike that answer as

08:39:25  24  non-responsive, Your Honor.

08:39:26  25       THE COURT:  Overruled.

08:39:33   1    Q.   (By Mr. Lambrianakos)   You didn't cite to any testimony

08:39:37   2    from a deposition during your testimony yesterday that

08:39:39   3    supports your proposition that the DEV metric that

08:39:42   4    Mr. Ratliff relies on includes sales from devices other

08:39:45   5    than Echo products, did you?

08:39:46   6    A.   No, I didn't need to.   It's clear in the documents.

08:39:49   7    Q.   But you didn't cite to any documents during your

08:39:53   8    testimony yesterday that supported that proposition, did

08:39:54   9    you?

08:39:55   10   A.   That's correct.

08:39:57   11   Q.   You testified about the Echo Tap yesterday?

08:40:01   12   A.   Yes.

08:40:01   13   Q.   You testified that the Echo Tap was a good point of

08:40:04   14   comparison to the accused products, even though it had only

08:40:06   15   one microphone?

08:40:07   16   A.   Yes.

08:40:07   17   Q.   When you testified about that, you didn't mention that

08:40:12   18   the word "error rate" on the Tap device was between 5 and 9

08:40:18   19   percent higher on the Tap than on devices with seven

08:40:21   20   microphones, correct?

08:40:22   21   A.   Correct.

08:40:22   22   Q.   Now, the word "error rate" goes to mistakes that the

08:40:26   23   product makes when understanding the user's speech, right?

08:40:29   24   A.   That's my understanding.

08:40:30   25   Q.   You didn't mention that the Tap was discontinued in

1170

| | | |
|---|---|---|
| 08:40:33 | 1 | 2018 after only about a year and a half of sales, right? |
| 08:40:37 | 2 | A.  It sold for about $70 million in sales during those two |
| 08:40:40 | 3 | years. |
| 08:40:41 | 4 | Q.  So you didn't mention that the Tap was discontinued |
| 08:40:44 | 5 | after only one and a half years of sales, correct? |
| 08:40:46 | 6 | A.  No, but it was sold during the entire DEV period that |
| 08:40:50 | 7 | Mr. Ratliff relies upon.  So during that period, it was one |
| 08:40:53 | 8 | of the top sellers.  It was 70 million in sales. |
| 08:40:58 | 9 | Q.  The Amazon Tap had 70 million in sales; that's your |
| 08:41:02 | 10 | testimony? |
| 08:41:02 | 11 | A.  Yes. |
| 08:41:02 | 12 | Q.  So you disagree with the proposition that during the |
| 08:41:05 | 13 | 2017 to 2018 time frame for which Amazon provided DEV |
| 08:41:08 | 14 | figures, there were only about 256,000 Amazon Taps sold? |
| 08:41:12 | 15 | A.  I think there were two -- that sounds about right.  I |
| 08:41:15 | 16 | think overall there were 700,000 Amazon Tap units sold. |
| 08:41:19 | 17 | Q.  Yesterday, you testified that the Google offer was |
| 08:41:25 | 18 | relevant to the hypothetical negotiation in this case? |
| 08:41:28 | 19 | A.  Yes. |
| 08:41:28 | 20 | Q.  And as part of your discussion of the -- the |
| 08:41:34 | 21 | Georgia-Pacific factors, you said that Factor No. 7 weighed |
| 08:41:39 | 22 | in favor of Vocalife, right? |
| 08:41:44 | 23 | A.  Yes, I believe so. |
| 08:41:45 | 24 | Q.  And that is the factor that goes to the duration of the |
| 08:41:48 | 25 | patent? |

1171

08:41:49  1  A.  I believe so.

08:41:54  2  Q.  What's your understanding of the expiration date of the

08:41:57  3  patent in this case?

08:41:58  4  A.  2031.

08:41:59  5  Q.  Now, the hypothetical negotiation looks at what a

08:42:03  6  willing licensor and licensee would have agreed to, to

08:42:07  7  license the patent-in-suit; isn't that right?

08:42:09  8  A.  That's correct.

08:42:10  9  Q.  So you must have a willing licensor and licensee to

08:42:13  10  begin with, correct?

08:42:14  11  A.  Correct.

08:42:14  12  Q.  The licensor is the one who owns the patent, right?

08:42:18  13  A.  Yes.

08:42:18  14  Q.  The licensee is the one who wants to license the

08:42:22  15  patent?

08:42:22  16  A.  Correct.

08:42:23  17  Q.  The licensee wants to license the patent so he can

08:42:24  18  manufacture and sell a product that uses the patented

08:42:25  19  invention, right?

08:42:26  20  A.  That could be one reason.

08:42:30  21  Q.  Now, when you discuss the standard for Georgia-Pacific

08:42:33  22  15 in your report, you said that the licensee seeks to

08:42:37  23  license the product so that he can manufacture and sell the

08:42:40  24  product that uses the patented invention, didn't you?

08:42:42  25  A.  I'd have to refer to my report, but that sounds fair to

08:42:48   1   me.

08:42:48   2   Q.  So you'd agree that in the hypothetical negotiation,

08:42:54   3   they seek to settle on an amount which a prudent licensee

08:42:58   4   who desired as a business proposition to obtain a license

08:43:01   5   to manufacture and sell a particular article embodying the

08:43:06   6   patented invention, would have been willing to pay as a

08:43:08   7   royalty.  Do you remember that?

08:43:10   8   A.  Yes.  That's part of Georgia-Pacific 15.

08:43:13   9   Q.  So you agree that the licensee is licensing the patent

08:43:17  10   in order to manufacture and sell the product, right?

08:43:21  11   A.  Well, in this case, the licensee is the -- Amazon is

08:43:28  12   licensing for the right to use the '049 patent.

08:43:34  13   Q.  Now, both the licensor and licensee in this

08:43:40  14   hypothetical negotiation have to believe that the patent is

08:43:42  15   valid, right?

08:43:43  16   A.  Correct, that's an assumption.

08:43:45  17   Q.  And it's required as an assumption in the hypothetical

08:43:48  18   negotiation that both parties agree that the patent is

08:43:50  19   infringed, right?

08:43:51  20   A.  That's correct, that's an assumption.

08:43:55  21   Q.  And in the hypothetical negotiation, the assumption is

08:43:58  22   that the licensee knows that he has to license the patent

08:44:01  23   because his activities infringe the patent, right?

08:44:04  24   A.  It's an assumption that the accused products or methods

08:44:12  25   would be covered by the -- the patent-in-suit, so it's an

1173

08:44:15  1   assumption.

08:44:16  2   Q.  You understand that the Google offer that you mentioned

08:44:18  3   yesterday was made in 2015, right?

08:44:20  4   A.  Yes.

08:44:20  5   Q.  And that offer was made with respect to the '756

08:44:24  6   patent, right?

08:44:24  7   A.  Correct.  The original patent that led to the reissued

08:44:29  8   '049 patent.

08:44:29  9   Q.  You believe that this offer is relevant to the

08:44:31  10  hypothetical negotiation that would occur between Dr. Li

08:44:33  11  and Amazon?

08:44:34  12  A.  Yes.

08:44:35  13  Q.  And the hypothetical negotiation with Amazon would have

08:44:39  14  taken place three years later, in 2018, right?

08:44:42  15  A.  Correct.  Any time up to that date.

08:44:45  16  Q.  And at that negotiation, the '049 patent would have

08:44:49  17  been discussed, right?

08:44:50  18  A.  That's correct.

08:44:51  19  Q.  Now, on your report, you didn't analyze the differences

08:44:54  20  between the '049 patent and the '756 patent, did you?

08:44:58  21  A.  I did.  I did analyze.  I reviewed both patents in

08:45:05  22  connection with preparing my report.

08:45:06  23  Q.  And, in your report, the text of the report, you -- it

08:45:10  24  contains no analysis about the difference between the

08:45:13  25  patent claims that would have affected the relative value

1174

| | | |
|---|---|---|
| 08:45:15 | 1 | of the '756 patent versus the '049 patent, right? |
| 08:45:18 | 2 | A.  I didn't do a claim-by-claim analysis, but I read both |
| 08:45:21 | 3 | patents, and they're nearly identical. |
| 08:45:23 | 4 | Q.  And nothing in your report indicates what the results |
| 08:45:27 | 5 | of your analysis was in terms of the claims of those |
| 08:45:29 | 6 | patents, right? |
| 08:45:30 | 7 | A.  Not in terms of the claims but in terms of what I |
| 08:45:32 | 8 | understood Dr. Li to believe his invention covered, and |
| 08:45:36 | 9 | it's basically the same thing between the two patents. |
| 08:45:38 | 10 | Q.  And you didn't cite to any evidence of what Dr. Li |
| 08:45:44 | 11 | thought his patent covered, in your report, did you? |
| 08:45:47 | 12 | A.  Yes, I did. |
| 08:45:48 | 13 | Q.  You didn't cite to any testimony of Dr. Li in which he |
| 08:45:48 | 14 | explained the differences between the '756 patent claims |
| 08:45:53 | 15 | and the '049 patent claims, did you? |
| 08:45:53 | 16 | A.  His patents explicitly explained what he believed his |
| 08:45:57 | 17 | invention to cover.  That's what he represented to the U.S. |
| 08:46:00 | 18 | Patent and Trademark Office. |
| 08:46:00 | 19 | Q.  And in your report itself, it contains no written |
| 08:46:03 | 20 | explanation or analysis of what the differences were |
| 08:46:05 | 21 | between the claims of the '756 patent and the claims of the |
| 08:46:10 | 22 | '049 patent; isn't that true, sir? |
| 08:46:11 | 23 | A.  No, I didn't do a claim-by-claim analysis.  I looked at |
| 08:46:14 | 24 | it from a valuation perspective.  From a valuation |
| 08:46:19 | 25 | perspective, they're identical, particularly in terms of |

1175

08:46:23   1   what he viewed the market to be for his technology.

08:46:28   2   Q.  So you believe that two patents that have different

08:46:30   3   claims and different claim scope had exactly the same

08:46:33   4   value; is that your testimony?

08:46:34   5   A.  Not exactly.  But I didn't do a claim-by-claim

08:46:37   6   analysis.  But it's my understanding that the -- there are

08:46:41   7   very minor differences.  But that's outside of my area of

08:46:44   8   expertise.

08:46:45   9   Q.  And nowhere in your report did you account for the

08:46:49  10   differences, that you just admitted there are, between the

08:46:53  11   '756 patent claims and the '049 patent claims, right?

08:46:56  12   A.  Well, I did in my report cite Dr. Kiaei, and I

08:47:00  13   understand that he concluded that ultimately there were

08:47:02  14   some claims narrowed in the '049 patent.  So I -- in my

08:47:08  15   view, the patents cover the same thing from a valuation

08:47:12  16   standpoint.

08:47:12  17   Q.  So when that --

08:47:14  18   A.  I believe Dr. Li was intending to broaden his claims of

08:47:17  19   the '049 patent, but I think ultimately that didn't occur.

08:47:21  20   So I think it's a very strong benchmark for -- for the

08:47:24  21   hypothetical negotiation.

08:47:25  22   Q.  So you think that you can compare the value of the '756

08:47:30  23   patent to the '049 patent without having any understanding

08:47:34  24   or any analysis written in your report that discusses the

08:47:37  25   differences in the patent scope, right?

08:47:39  1   A.  Well, I did mention in my report that it's my

08:47:42  2   understanding the claims ultimately were narrowed, and I

08:47:47  3   discussed the other elements of the patents that were very

08:47:49  4   similar --

08:47:50  5   Q.  So if it's true --

08:47:52  6   A.  -- which is pretty much the entire -- the entire

08:47:55  7   patents.  If you look at the -- the abstract, the claims

08:47:59  8   themselves, the background of the invention, they're

08:48:03  9   identical.

08:48:03  10  Q.  So tell us, what was the narrowing amendment in the

08:48:09  11  '049 patent?

08:48:09  12  A.  I don't know.

08:48:11  13  Q.  So you understand it was narrowed because you were told

08:48:14  14  that it was narrowed?

08:48:14  15  A.  Yes, I -- I rely on technical experts for those sorts

08:48:18  16  of opinions.

08:48:19  17  Q.  And you think that a narrower claim has the same value

08:48:22  18  as the claim that was -- that preceded it?

08:48:24  19  A.  No, theoretically, it would have a downward adjustment,

08:48:28  20  but I didn't make any downward adjustment.  So I -- I -- I

08:48:31  21  mentioned in my report, and I understood that the claims

08:48:33  22  were -- some claims may have been ultimately narrowed, but

08:48:37  23  I did not make the downward adjustment.  So in that regard,

08:48:40  24  I conservatively kept -- kept the number the same.

08:48:44  25  Q.  And if you're wrong that the claim was narrowed, if the

08:48:48  1  claim was, in fact, broadened, then your analysis would be

08:48:52  2  incorrect, wouldn't it?

08:48:53  3  A.  I don't believe, so because there are -- there are many

08:48:55  4  other reasons as to why that number is high.  There are

08:48:58  5  many other factors.  It -- it transfers title to the

08:49:03  6  patented invention, which is much broader than the

08:49:09  7  non-exclusive license in the hypothetical negotiation.

08:49:11  8  Q.  So you agree, then, that in your report, you did not

08:49:18  9  make an adjustment to the value of the '049 patent versus

08:49:21  10  the '756 patent based on your understanding of the scope of

08:49:26  11  the claims of the '049 patent relative to the '756 patent?

08:49:30  12  A.  That's correct, and I didn't make the other adjustments

08:49:32  13  that we -- suggest a lower number than $700,000.00.

08:49:42  14  Q.  Now, you're aware that the '756 patent was surrendered

08:49:45  15  to the Patent Office, correct?

08:49:46  16  A.  That's my understanding.

08:49:47  17  Q.  And it was replaced with the '049 patent?

08:49:49  18  A.  The '049 is the reissue patent, correct.

08:49:51  19  Q.  And you didn't adjust in your royalty analysis for the

08:49:54  20  fact that the '756 patent was surrendered by Dr. Li, right?

08:49:57  21  A.  It doesn't -- that doesn't require an adjustment.

08:50:00  22  Q.  You don't think it matters that that '756 patent was

08:50:03  23  willingly surrendered to the Patent Office in order to

08:50:06  24  obtain the '049 patent?

08:50:07  25  A.  No.  At the time Dr. Li made the offer, he assumed his

08:50:17  1   patent was valid.

08:50:17  2          THE COURT:  Mr. McGavock, you answered no.  That's

08:50:21  3   a complete answer to the question.  I'm going to remind you

08:50:23  4   again, limit your answers to the questions asked, sir.  Do

08:50:27  5   you understand?

08:50:27  6          THE WITNESS:  Yes.  Thank you.

08:50:28  7          THE COURT:  Will you do that?

08:50:29  8          THE WITNESS:  Yes.

08:50:30  9          THE COURT:  Let's proceed, counsel.

08:50:33  10  Q.  (By Mr. Lambrianakos)  In order to have a valid

08:50:36  11  hypothetical negotiation, both parties have to believe that

08:50:38  12  the patent is infringed, correct?

08:50:40  13  A.  Yes, that's the assumption.

08:50:41  14  Q.  You've presented no evidence that Google was infringing

08:50:44  15  the '756 patent in 2015 when the offer was made, correct?

08:50:46  16  A.  That's correct.

08:50:46  17  Q.  Google did not have a voice assisted smart-speaker in

08:50:50  18  2015, did it?

08:50:51  19  A.  No.

08:50:52  20  Q.  Dr. Li knew that Google was not infringing in 2015,

08:50:56  21  right?

08:50:56  22  A.  I don't know that.

08:50:58  23  Q.  So you're not aware of whether the potential patent

08:51:03  24  owner/licensor knew of the infringement of the licensee at

08:51:09  25  the time that the offer was made, which you believe is

1179

08:51:11  1  relevant to the hypothetical negotiation, correct?

08:51:12  2  A.  No, I only knew what I read in the patent, which

08:51:16  3  suggested that this patent would cover many things that

08:51:19  4  Google was doing at the time.

08:51:20  5  Q.  Your analysis of the patent was it would cover things

08:51:27  6  that Google was doing at the time; is that what you said?

08:51:30  7  A.  Yeah.  Particular -- their position in the smartphone

08:51:33  8  market with the Android operating system.

08:51:38  9  Q.  So what evidence did you have of adaptive beamforming

08:51:40  10  being performed by Google in 2015?

08:51:43  11  A.  Nothing specific to Google.  But, in 2012, Apple

08:51:46  12  announced the iPhone 5, which included beamforming and

08:51:53  13  noise cancellation technology in their -- in their iPhone.

08:51:56  14  And they're a direct competitor with Google in that space.

08:51:56  15  Q.  So if Apple was using adaptive beamforming in 2012 or

08:52:02  16  it was using some kind of sound technology in 2012, that

08:52:05  17  led you to believe that Google was infringing in 2015?

08:52:10  18  A.  No.  It would just suggest there's value to the

08:52:12  19  invention -- to Google's business model.

08:52:15  20  Q.  Now, the hypothetical negotiation doesn't ask whether

08:52:20  21  the licensee believes the patent has value to its business

08:52:23  22  model; it asks whether it needs to license the patent in

08:52:28  23  order to practice that patent -- that patent to manufacture

08:52:30  24  and sell the product.  Right?

08:52:31  25  A.  Generally speaking, yes, but it's a -- it's a valuation

08:52:35  1  question.  We're trying to value the patent.

08:52:37  2  Q.  And you're trying to value the patent based on the

08:52:40  3  licensee's need to license it to avoid patent infringement;

08:52:40  4  isn't that right?

08:52:45  5  A.  Well, the -- the hypothetical negotiation assumes the

08:52:47  6  patent is valid and infringed.

08:52:49  7  Q.  And you agree that in 2015, Google wasn't infringing?

08:52:54  8  A.  I would generally agree with that.  I don't know for

08:52:59  9  sure.

08:53:00  10  Q.  In 2018, at the time the hypothetical negotiation took

08:53:09  11  place, we assume that Amazon's sales of millions of Echo

08:53:14  12  products per year infringe, right?

08:53:18  13  A.  Can you repeat the question?

08:53:19  14  Q.  By 2018, at the time of the hypothetical negotiation,

08:53:23  15  we assume that Amazon's sales of millions of Echo products

08:53:27  16  per year infringe, right?

08:53:29  17  A.  Yes.

08:53:30  18  Q.  And we assume Dr. Li knew Amazon was selling millions

08:53:33  19  of infringing products per year, right?

08:53:37  20  A.  Dr. Li was not selling million -- millions of units of

08:53:42  21  products.

08:53:42  22  Q.  Excuse me.  We assume that Dr. Li knew that Amazon was

08:53:45  23  selling millions of infringing units per year, right?

08:53:51  24  A.  Yes.

08:53:51  25  Q.  And that Amazon knew that it needed a license?

08:53:54   1   A.   The assumption is that they would need a license to

08:53:56   2   practice the patented invention.

08:53:57   3   Q.   Now back to the Google offer.   You presented no

08:54:00   4   evidence in your report that Dr. Li believed that the '756

08:54:03   5   patent was valid, right?

08:54:04   6   A.   No.

08:54:07   7   Q.   And you did -- you have no information about what

08:54:11   8   Google believed about the value of the '75 -- the

08:54:15   9   validity -- strike that.

08:54:16   10          And you had no information about what Google

08:54:18   11   believed about the validity of the '756 patent, right?

08:54:20   12   A.   That's correct.

08:54:20   13   Q.   So sitting here today, for all you know, Google

08:54:23   14   believed the '756 patent was invalid, right?

08:54:24   15   A.   That's possible.

08:54:25   16   Q.   And, for all you know, Dr. Li believed the same thing,

08:54:25   17   don't you?

08:54:29   18   A.   I doubt that.

08:54:31   19   Q.   Sitting here today, you -- you believe you have

08:54:34   20   information about what Dr. Li believed in 2015?

08:54:37   21   A.   I can't imagine an owner of a company who's involved

08:54:42   22   with licensing would make an offer --

08:54:45   23          THE COURT:   Mr. McGavock, he didn't ask you to

08:54:47   24   speculate.   He asked you if you had information about

08:54:49   25   Dr. Li's state of mind.   Now, answer the question.

08:54:51   1              THE WITNESS:   Thank you.

08:54:52   2   A.   Can you repeat the question?

08:54:55   3   Q.   (By Mr. Lambrianakos)   You have no information, sitting

08:54:56   4   here today, about whether Dr. Li believed that the '756

08:55:00   5   patent was valid?

08:55:02   6   A.   That's generally correct.

08:55:06   7   Q.   You didn't present any -- any evidence in your direct

08:55:10   8   testimony that Google believed that the '756 patent was

08:55:12   9   valid, right?

08:55:13  10   A.   That's correct.

08:55:13  11   Q.   The hypothetical negotiation assumes a negotiation

08:55:21  12   between a willing licensor and licensee, right?

08:55:24  13   A.   That's correct.

08:55:24  14   Q.   The Google offer did not result in a negotiation, did

08:55:28  15   it?

08:55:29  16   A.   No.

08:55:29  17   Q.   Now, you're aware of Dr. Li's testimony that he didn't

08:55:34  18   understand the Google offer to be an offer to sell all of

08:55:36  19   his rights in the '756 patent, right?

08:55:41  20   A.   That was his testimony.

08:55:43  21   Q.   And the hypothetical negotiation assumes that the

08:55:46  22   parties understand the terms of the deal that they're

08:55:48  23   negotiating, doesn't it?

08:55:49  24   A.   Yes.

08:55:55  25   Q.   Regarding the Google patent purchase promotion, that

08:55:59  1  program lasted for about two months, right?

08:56:01  2  A.  Yes.

08:56:01  3  Q.  You reviewed the documents described in the program,

08:56:06  4  right?

08:56:06  5  A.  Yes.

08:56:06  6  Q.  And you're familiar with the terms of the PPP?

08:56:09  7  A.  Yes.

08:56:10  8  Q.  And you know why Google started the promotion, right?

08:56:13  9  A.  Not the specifics, but it was a publicly known program.

08:56:20 10  Q.  And so you're familiar with the reasons that Google set

08:56:22 11  forth for the program, right?

08:56:24 12  A.  I recall reading some of the reasons, yes.

08:56:26 13  Q.  Google didn't say that the purpose of the patent

08:56:29 14  purchase promotion was to buy patents covering technology

08:56:33 15  that its products were using, right?

08:56:35 16  A.  I don't -- I don't recall the specific language, but

08:56:38 17  they were looking to buy any patents that would be relevant

08:56:40 18  to their -- to their business.

08:56:42 19  Q.  So you don't recall one way or another whether Google

08:56:46 20  said that the purpose of the patent purchase promotion was

08:56:49 21  to buy patents covering technology that its products were

08:56:52 22  using?

08:56:53 23  A.  Well, I think they were looking to buy any patents that

08:56:56 24  might be relevant to their -- their general space, Google's

08:56:59 25  general business space.

08:57:00  1   Q.  So did Google specifically say in its documents that

08:57:07  2   the reason it was going to purchase patents or was looking

08:57:10  3   to buy patents through this promotion was to obtain patents

08:57:13  4   that cover the products that it was using at the time?

08:57:15  5   A.  I don't recall seeing anything that specific.

08:57:19  6   Q.  Do you recall seeing documents and studying documents

08:57:21  7   so that you could fully understand the terms of the patent

08:57:24  8   purchase promotion?

08:57:26  9   A.  Yes.

08:57:26  10  Q.  And yet that would be important for you to speculate --

08:57:29  11  excuse me -- withdraw that.

08:57:30  12        That would be important for you to be able to

08:57:33  13  provide an opinion about whether the Google offer was

08:57:35  14  relevant to the hypothetical negotiation?

08:57:37  15  A.  Yes.

08:57:38  16  Q.  And if the Google documents said that Google was buying

08:57:42  17  patents that it believed would cover its activities at the

08:57:45  18  time, that would be an important piece of proof for you in

08:57:47  19  your hypothetical negotiation analysis, right?

08:57:49  20  A.  I don't think it would make a difference in my ultimate

08:57:53  21  opinion, based on the -- the nature of the program.  They

08:57:57  22  were open to buy any -- any patents.

08:57:59  23  Q.  The nature of the program, you mentioned, right?

08:58:03  24  A.  Yes.

08:58:04  25  Q.  Didn't Google say that the patent purchase promotion

08:58:07  1  was just an experiment?

08:58:08  2  A.  Yes.

08:58:08  3  Q.  And you're basing your hypothetical negotiation in a

08:58:12  4  real-life patent case, on an experiment, isn't that right,

08:58:17  5  sir?

08:58:17  6  A.  The natural offer to a large tech company, which they

08:58:20  7  refer to in some documents as an experiment.

08:58:22  8  Q.  So you agree, then, that the patent purchase promotion

08:58:25  9  was just an experiment, right?

08:58:26  10  A.  That's what they referred to it, but they ended up

08:58:29  11  acquiring thousands of patents.

08:58:35  12          MR. LAMBRIANAKOS:  No further questions.  I pass

08:58:37  13  the witness.

08:58:37  14          THE COURT:  You pass the witness?

08:58:40  15          Is there redirect, Mr. Dacus?

08:58:44  16          MR. DACUS:  Yes, Your Honor, please.

08:58:47  17          THE COURT:  You may proceed.

08:58:49  18          MR. DACUS:  Mr. Berk, may we pull up PTX-1311,

08:58:58  19  please, sir?  And can you go to the Bates stamp number

08:59:17  20  ending in 362, please?

08:59:17  21                  REDIRECT EXAMINATION

08:59:20  22  BY MR. DACUS:

08:59:20  23  Q.  Mr. McGavock, you remember this is the Amazon document

08:59:31  24  that Mr. Lambrianakos was just asking you about as it

08:59:34  25  related to the DEV calculation, correct?

08:59:36  1    A.  Yes.

08:59:36  2    Q.  And you remember, sir, that during Mr. Ratliff's

08:59:38  3    testimony on behalf of Vocalife, he agreed that the

08:59:45  4    calculation for the determination of a royalty should

08:59:50  5    include the loss on the sale of the actual Echo device,

08:59:54  6    correct?

08:59:54  7    A.  That's correct.

08:59:55  8    Q.  He -- he believed his DEV calculation included it; you

08:59:59  9    remember that?

08:59:59  10   A.  Yes.

09:00:00  11   Q.  You disagree with that, correct?

09:00:02  12   A.  Correct.

09:00:02  13   Q.  And if I understood Mr. Lambrianakos, he was attempting

09:00:07  14   to use this document to show that, in fact, the lifetime

09:00:13  15   value of an Echo device per unit was -- was not a loss.

09:00:17  16   And so that's what I want to talk to you about.  Is that

09:00:20  17   okay?

09:00:21  18   A.  Yes.

09:00:23  19        MR. DACUS:  So if you go to Line 28, Mr. Berk, can

09:00:27  20   you highlight Line 28?

09:00:29  21   Q.  (By Mr. Dacus)  What does that say, sir, on Line 28?

09:00:32  22   A.  Total program financials in millions.

09:00:36  23   Q.  And is that parentheses where it says "in millions," is

09:00:43  24   that an important point for reading this Amazon document?

09:00:46  25   A.  Yes.

09:00:46   1              MR. DACUS:  Okay.  If you'll go back out,

09:00:49   2   Mr. Berk.  And if you will highlight Line 45, please.

09:00:57   3   Q.  (By Mr. Dacus)  This is the line that Mr. Lambrianakos

09:00:59   4   was trying to get you to agree that that 54.2 was $54.20

09:01:08   5   per device.  Do you remember that question?

09:01:10   6   A.  Yes.

09:01:10   7   Q.  Do you agree with that?

09:01:12   8   A.  No.

09:01:12   9   Q.  Why not?

09:01:13  10   A.  Because it's -- it's clear from the document that that

09:01:16  11   number represents 54 million dollars -- 200,000.00 dollars,

09:01:22  12   so 54.2 million.

09:01:24  13   Q.  So to the extent that Mr. Lambrianakos was attempting

09:01:28  14   to leave this jury with the impression that that 54.2 is a

09:01:32  15   per unit number; is that accurate or inaccurate?

09:01:35  16   A.  It's inaccurate.

09:01:37  17   Q.  Okay.

09:01:37  18              MR. DACUS:  If you'll pull that down, Mr. Berk,

09:01:40  19   not the document -- just the highlighted portion.  If

09:01:45  20   you'll go up to I think it's Line 6, please, sir.

09:01:50  21   Q.  (By Mr. Dacus)  Now, do you see what Line 6 says, sir?

09:01:53  22   A.  Yes.

09:01:53  23   Q.  What does it say?

09:01:54  24   A.  Per unit economics.

09:01:56  25   Q.  So this document indeed does include per unit

09:01:59   1   information that Mr. Lambrianakos was attempting to convey

09:02:02   2   to the jury, correct?

09:02:03   3   A.  Yes.

09:02:03   4        MR. DACUS:  If you'll pull that down, Mr. Berk,

09:02:05   5   not the document but just the highlighted portion.  And if

09:02:08   6   you will highlight Line 23, please.

09:02:17   7   Q.  (By Mr. Dacus)  Do you see what Line 23 says with

09:02:19   8   respect to a per unit long-term value for an Echo, sir?

09:02:23   9   A.  Yes.

09:02:23   10  Q.  What does it say?

09:02:24   11  A.  That it's between negative $10.00 per unit and negative

09:02:29   12  $6.00 per unit.

09:02:30   13  Q.  How do you know it's negative?

09:02:32   14  A.  Because of the -- the brackets.

09:02:34   15  Q.  So those brackets indicate to financial people that

09:02:38   16  that's actually a negative rather than a positive?

09:02:40   17  A.  Yes.

09:02:41   18  Q.  So rather than, as Mr. Lambrianakos said, the per unit

09:02:47   19  profit being $54.20, it is instead actually a $10.00 loss?

09:02:52   20  A.  That's correct.

09:02:53   21  Q.  Does that support what you told the jury yesterday

09:02:56   22  afternoon?

09:02:56   23  A.  Yes.

09:02:57   24        MR. DACUS:  We can pull that down, Mr. Berk.

09:03:04   25  Q.  (By Mr. Dacus)  As a general proposition, sir, are you

09:03:06  1  confident that this DEV, downstream economic value, DEV

09:03:11  2  that Mr. Ratliff used, does not include the loss per unit?

09:03:15  3  A.  Yes, I'm a hundred percent confident he does not

09:03:19  4  include the loss per unit.

09:03:20  5  Q.  And as support for that, have you interviewed employees

09:03:23  6  at Amazon?

09:03:23  7  A.  Yes.

09:03:24  8  Q.  Multiple ones?

09:03:25  9  A.  Multiple employees, including the financial analyst or

09:03:30 10  economist that actually prepared the DEV document that

09:03:34 11  Mr. Ratliff relied upon.

09:03:35 12  Q.  Did you hear Mr. Prasad's testimony from Amazon here

09:03:39 13  where he said that the DEV, downstream economic value, does

09:03:42 14  not include the loss per Echo unit?

09:03:45 15  A.  Yes.

09:03:46 16  Q.  And we -- you also reviewed DTX-81, which is the

09:03:49 17  definitions that Amazon uses, including for DEV, correct?

09:03:54 18  A.  That's correct.

09:03:54 19  Q.  All -- all of that information leads you to conclude

09:03:57 20  that DEV does not include the loss per unit?

09:04:00 21  A.  Yes.

09:04:01 22  Q.  With respect to this Google offer that Dr. Li made, is

09:04:12 23  it still your opinion that this $700,000.00 number is a

09:04:16 24  significant data point that this jury should consider if

09:04:19 25  they get to the issue of damages?

1190

09:04:21    1    A.   Yes.

09:04:22    2    Q.   And is it your conclusion, sir, that, although that

09:04:24    3    offer related to the '756 patent, that the '756 and the

09:04:31    4    '049 that's at issue here are similar such that, just like

09:04:36    5    if you're house shopping, the jury should consider the

09:04:40    6    $700,000.00 offer?

09:04:42    7    A.   Yes.

09:04:43    8    Q.   And we talked about this house-shopping analogy

09:04:50    9    yesterday.  Is that applicable to the comparison of the

09:04:54   10    '756 and the '049?  And, if so, how?  Can you tell the

09:04:57   11    jury?

09:04:57   12    A.   Yes.  It's very similar houses in the same

09:05:04   13    neighborhood.  They have basically the same number of

09:05:07   14    rooms.  So the two patents are nearly identical.  It covers

09:05:10   15    the same -- the same broad invention concept.

09:05:14   16    Q.   The -- in your financial world, generally would people

09:05:22   17    pay more to buy a patent than they would to simply license

09:05:25   18    it?

09:05:25   19    A.   Yes.

09:05:30   20    Q.   So --

09:05:30   21    A.   Absolutely.

09:05:31   22    Q.   So this -- this jury is here to determine only what

09:05:35   23    Amazon should pay to license the patent, correct?

09:05:39   24    A.   That's correct.

09:05:40   25    Q.   Dr. Li's offer to Google was actually to sell the

1191

09:05:43  1  entirety of the patent, correct?

09:05:44  2  A.  Yes, it was to sell, transfer title, and the license

09:05:49  3  would simply just be, as Mr. Ratliff suggested, a rental --

09:05:53  4  a rental payment for use.

09:05:55  5  Q.  So when Mr. Lambrianakos was asking you if you made any

09:05:59  6  adjustments and you said no, were you to make adjustments

09:06:02  7  to that $700,000.00, you would actually need to lower it;

09:06:10  8  is that correct?

09:06:10  9  A.  That's correct.

09:06:10  10  Q.  In other words, if we were looking at a pure license

09:06:12  11  like this jury is going to determine, you would actually

09:06:15  12  need to lower that $700,000.00 number; is that fair?

09:06:20  13  A.  Yes.

09:06:20  14  Q.  Now, do you remember the questions from

09:06:21  15  Mr. Lambrianakos about whether or not Dr. Li knew what he

09:06:27  16  was doing when he was making this offer to Google?

09:06:29  17  A.  Yes.

09:06:29  18  Q.  I think you said you've seen some evidence to indicate

09:06:34  19  that he knew exactly what he was doing in selling the

09:06:36  20  patent, correct?

09:06:37  21  A.  Yes.

09:06:38  22       MR. DACUS:  Ms. Lockhart, may I have the document

09:06:41  23  camera, please?

09:06:43  24  Q.  (By Mr. Dacus)  I'm going to show you what's previously

09:06:55  25  marked in this case as DTX-1.

1192

09:06:59   1          Do you remember seeing this document, sir?

09:07:01   2   A.   Yes.

09:07:01   3   Q.   And this is Dr. Li's offer to Google to sell the

09:07:10   4   patent, correct?

09:07:11   5   A.   Correct.

09:07:12   6   Q.   And there's a part of this that we haven't talked about

09:07:15   7   specifically.

09:07:16   8          Do you see right here what Dr. Li said when he

09:07:20   9   submitted this form?  And, if so, can you tell the jury

09:07:23   10   what he said?

09:07:23   11   A.   He -- he said he accepted -- or the word is "accept."

09:07:31   12   Q.   Okay.

09:07:31   13   A.   And there are specific terms that he accepted.

09:07:35   14   Q.   Okay.  So the specific terms that Dr. Li accepted, I'm

09:07:47   15   going to show you here.

09:07:48   16          Have you -- have you seen this document before,

09:07:52   17   sir, entitled:  Patent Offer Submission?

09:07:55   18   A.   Yes.

09:07:55   19   Q.   You've seen that in the course of your work in this

09:07:58   20   lawsuit?

09:07:58   21   A.   Yes.

09:07:58   22   Q.   And if we go down here to Paragraph 6, is it your

09:08:05   23   understanding, sir, that -- that these are the terms that

09:08:08   24   Dr. Li was accepting when he submitted this offer to

09:08:11   25   Google?

1193

| | | |
|---|---|---|
| 09:08:11 | 1 | A.  Yes. |
| 09:08:12 | 2 | Q.  And I'll admit to you, sir, that while you were |
| 09:08:17 | 3 | testifying, I put some brackets around some language.  Do |
| 09:08:20 | 4 | you see that -- those brackets? |
| 09:08:21 | 5 | A.  Yes. |
| 09:08:21 | 6 | Q.  Can you read that to the jury, please, sir? |
| 09:08:24 | 7 | A.  It says:  You agree that you will sell us the submitted |
| 09:08:28 | 8 | patent for that amount with no additional consideration |
| 09:08:31 | 9 | beyond such amount required by us.  Such purchase |
| 09:08:35 | 10 | contemplates the full and complete transfer of all right, |
| 09:08:39 | 11 | title, and interest in and to the submitted patents, by you |
| 09:08:44 | 12 | to us.  You agree to be bound to the terms as indicated in |
| 09:08:48 | 13 | the patent purchase agreement linked to from this website, |
| 09:08:55 | 14 | insert URL here. |
| 09:08:57 | 15 | Q.  Is that pretty clear to you, sir, that whoever read |
| 09:08:59 | 16 | this knew that they were selling their patent to Google? |
| 09:09:02 | 17 | A.  Yes. |
| 09:09:03 | 18 | Q.  And, indeed, sir, if we look at the second page of this |
| 09:09:06 | 19 | form, do you see down at the bottom where it says "click |
| 09:09:13 | 20 | here to accept"? |
| 09:09:16 | 21 | A.  Yes. |
| 09:09:16 | 22 | Q.  Is it your understanding that you had to click that |
| 09:09:19 | 23 | button, and that's what led to the word "accept" being |
| 09:09:22 | 24 | written in that form that we just looked at that was DTX-1? |
| 09:09:24 | 25 | A.  Yes. |

1194

| | | |
|---|---|---|
| 09:09:24 | 1 | Q.  So, in other words, your understanding is that Dr. Li |
| 09:09:26 | 2 | would have had to read this submission form, including |
| 09:09:30 | 3 | Paragraph 6, click accept, and then he would have submitted |
| 09:09:34 | 4 | his offer to Google? |
| 09:09:35 | 5 | A.  That's my understanding. |
| 09:09:36 | 6 | Q.  For 700,000, correct? |
| 09:09:39 | 7 | A.  Correct. |
| 09:09:39 | 8 | Q.  And what Google said in this document is, whatever you |
| 09:09:42 | 9 | tell us that you're going to sell it to us for, we consider |
| 09:09:46 | 10 | that binding, correct? |
| 09:09:47 | 11 | A.  Yes. |
| 09:09:52 | 12 | MR. DACUS:  That's all the questions I have, |
| 09:09:55 | 13 | Your Honor.  I pass the witness. |
| 09:09:56 | 14 | THE COURT:  Further cross-examination? |
| 09:09:58 | 15 | MR. LAMBRIANAKOS:  Yes, Your Honor. |
| 09:09:58 | 16 | THE COURT:  Please proceed. |
| 09:09:58 | 17 | RECROSS-EXAMINATION |
| 09:10:18 | 18 | BY MR. LAMBRIANAKOS: |
| 09:10:18 | 19 | Q.  Mr. McGavock, you haven't seen a signed or approved |
| 09:10:21 | 20 | agreement for Mr. Li -- Dr. Li to sell his patent to |
| 09:10:25 | 21 | Google, have you? |
| 09:10:25 | 22 | A.  No. |
| 09:10:26 | 23 | Q.  You haven't brought a document here today that |
| 09:10:28 | 24 | indicates that the form that Mr. Dacus just showed you was |
| 09:10:32 | 25 | ever executed by Dr. Li? |

1195

| | | |
|---|---|---|
| 09:10:35 | 1 | A.  It's my understanding that he accepted the terms |
| 09:10:41 | 2 | through the website. |
| 09:10:43 | 3 | Q.  Did you show a document to the jury that shows that he |
| 09:10:48 | 4 | accepted any specific terms of an agreement with Google? |
| 09:10:53 | 5 | A.  Not outside of what I just discussed. |
| 09:10:56 | 6 | Q.  So what you just discussed was a form which was not |
| 09:10:58 | 7 | completed, correct? |
| 09:11:00 | 8 | A.  Correct. |
| 09:11:01 | 9 | Q.  Mr. Dacus showed you a form which had blank entries in |
| 09:11:05 | 10 | every single box, right? |
| 09:11:07 | 11 | A.  Correct. |
| 09:11:10 | 12 | Q.  And you have no proof that Dr. Li ever executed the |
| 09:11:15 | 13 | specific form that Mr. Dacus put in front of you? |
| 09:11:18 | 14 | A.  I disagree.  That -- that was the form that Google |
| 09:11:21 | 15 | used, and I have the accepted order -- Google form that I |
| 09:11:27 | 16 | was shown. |
| 09:11:28 | 17 | Q.  Did Google present any evidence at trial as to the form |
| 09:11:31 | 18 | that it used at the particular time that Dr. Li executed |
| 09:11:34 | 19 | it? |
| 09:11:36 | 20 | A.  It was public -- all publicly available. |
| 09:11:40 | 21 |        MR. LAMBRIANAKOS:  Move to strike that as not |
| 09:11:43 | 22 | responsive, Your Honor. |
| 09:11:44 | 23 |        THE COURT:  Sustained. |
| 09:11:44 | 24 |        The question was:  Did Google present any |
| 09:11:49 | 25 | evidence? |

1196

09:11:52   1   A.   Specific to Dr. Li?

09:11:54   2   Q.   (By Mr. Lambrianakos)   Yes.

09:11:55   3   A.   I -- I believe there was correspondence, yes.

09:12:02   4   Q.   That correspondence was presented to the jury to

09:12:04   5   review; is that your testimony?

09:12:05   6   A.   I believe there was a rejection of the offer.

09:12:10   7   Q.   Was there any evidence that the specific form that

09:12:15   8   Mr. Dacus showed, which was not completed and had all of

09:12:18   9   its boxes and dots empty, was executed by Dr. Li?

09:12:22  10   A.   Not outside of what we just talked about.

09:12:26  11   Q.   Could you show us a signed form by Dr. Li that -- where

09:12:30  12   he signs and agrees to the terms that Mr. Dacus showed you?

09:12:33  13   A.   No.

09:12:34  14   Q.   Wouldn't you agree that if Dr. Li believed that Google

09:12:44  15   was infringing its patent and Google believed that it was

09:12:47  16   infringing Dr. Li's patent, that the offer would have been

09:12:52  17   much higher?

09:12:53  18   A.   No.

09:12:54  19   Q.   You think that the hypothetical negotiation that you're

09:12:57  20   applying this to would, in fact, not result in a higher

09:13:01  21   royalty if Dr. Li believed that Google was infringing?

09:13:08  22   A.   At the -- the answer is no, and there's reasons.

09:13:12  23   Q.   So you believe that whether or not there's infringement

09:13:14  24   is not relevant to your analysis of the hypothetical

09:13:18  25   negotiation for Google, correct?

09:13:19   1   A.  No, I didn't say that.

09:13:21   2   Q.  But you said that -- that if Google thought it was

09:13:24   3   infringing and Dr. Li thought that Google was infringing,

09:13:28   4   it would not upwardly adjust the -- the hypothetical

09:13:32   5   negotiation value of that offer, right?

09:13:33   6   A.  No, in my opinion, it would not affect how reasonable

09:13:37   7   negotiators would look at that offer in the hypothetical

09:13:40   8   negotiation.

09:13:40   9   Q.  Because the fact of infringement or non-infringement

09:13:43   10  wouldn't have been relevant to the -- the people that

09:13:45   11  you're talking about who would be analyzing it, right?

09:13:48   12  A.  It could be relevant, but in this case, I don't think

09:13:51   13  it's relevant for adjusting the value.

09:13:55   14          MR. LAMBRIANAKOS:  No further questions.

09:13:55   15          THE COURT:  You pass the witness, counsel?

09:13:58   16          MR. LAMBRIANAKOS:  Yes, Your Honor.  Apologies.

09:14:00   17          THE COURT:  Is there additional direct, Mr. Dacus?

09:14:03   18          MR. DACUS:  Just one question, Your Honor.

09:14:07   19          THE COURT:  I can count to one.

09:14:09   20          MR. DACUS:  Yes, sir.  I know you can.

09:14:11   21          May I have the ELMO, Ms. Lockhart?

09:14:11   22                      REDIRECT EXAMINATION

09:14:15   23  BY MR. DACUS:

09:14:15   24  Q.  I'm showing you, sir, what has been marked as DTX-41 in

09:14:19   25  the case.  Is that the rejection letter from Google that

1198

| | | |
|---|---|---|
| 09:14:22 | 1 | you were just referencing with Mr. Lambrianakos? |
| 09:14:24 | 2 | A.  Yes. |
| 09:14:27 | 3 | MR. DACUS:  That's all I have, Your Honor.  I pass |
| 09:14:29 | 4 | the witness.  Thank you. |
| 09:14:30 | 5 | THE COURT:  Further cross-examination? |
| 09:14:31 | 6 | MR. LAMBRIANAKOS:  Nothing further. |
| 09:14:33 | 7 | THE COURT:  You may step -- step down, |
| 09:14:35 | 8 | Mr. McGavock. |
| 09:14:40 | 9 | Mr. Dacus, does Defendant wish this witness to be |
| 09:14:42 | 10 | excused? |
| 09:14:43 | 11 | MR. DACUS:  If he -- if he can please be excused, |
| 09:14:49 | 12 | Your Honor. |
| 09:14:49 | 13 | THE COURT:  Is there any objection from the |
| 09:14:50 | 14 | Plaintiff? |
| 09:14:51 | 15 | MR. LAMBRIANAKOS:  No, Your Honor. |
| 09:14:51 | 16 | THE COURT:  The witness is excused. |
| 09:14:53 | 17 | Defendants, call your next witness. |
| 09:14:56 | 18 | MR. DACUS:  At this time, Your Honor, Amazon rests |
| 09:14:58 | 19 | its case. |
| 09:14:59 | 20 | THE COURT:  All right.  Ladies and gentlemen, the |
| 09:15:01 | 21 | Defendants have now rested their case-in-chief. |
| 09:15:04 | 22 | Does Plaintiff have a rebuttal case to put on or |
| 09:15:07 | 23 | rebuttal witnesses to call? |
| 09:15:09 | 24 | MR. LAMBRIANAKOS:  Yes, Your Honor. |
| 09:15:10 | 25 | THE COURT:  Let's proceed with the Plaintiff's |

1199

| | | |
|---|---|---|
| 09:15:12 | 1 | rebuttal case. |
| 09:15:13 | 2 | Plaintiff, call your first rebuttal witness. |
| 09:15:15 | 3 | MR. LAMBRIANAKOS:  Plaintiff recalls Joseph |
| 09:15:17 | 4 | McAlexander. |
| 09:15:17 | 5 | THE COURT:  All right.  Mr. McAlexander, if you'll |
| 09:15:22 | 6 | return to the witness stand, sir.  And let me remind you, |
| 09:15:25 | 7 | you remain under oath. |
| 09:15:42 | 8 | All right.  Counsel, you may proceed. |
| 09:15:47 | 9 | MR. LAMBRIANAKOS:  Thank you, Your Honor. |
| 09:15:47 | 10 | JOSEPH C. MCALEXANDER, III, PLAINTIFF'S WITNESS, |
| 09:15:47 | 11 | PREVIOUSLY SWORN |
| 09:15:47 | 12 | DIRECT EXAMINATION |
| 09:15:47 | 13 | BY MR. LAMBRIANAKOS: |
| 09:15:47 | 14 | Q.  Good morning, Mr. McAlexander. |
| 09:15:49 | 15 | A.  Good morning. |
| 09:15:50 | 16 | Q.  Aside from offering your opinions on infringement in |
| 09:15:54 | 17 | this case, what else have you been asked to do? |
| 09:15:55 | 18 | A.  I was asked also to offer opinions with regard to the |
| 09:15:59 | 19 | validity of Claims 1 and 8 of the '049 patent. |
| 09:16:02 | 20 | Q.  Did you prepare any slides to assist you in presenting |
| 09:16:07 | 21 | your testimony to the jury? |
| 09:16:08 | 22 | A.  Yes.  Just like my presentation on Monday, I believe |
| 09:16:11 | 23 | some demonstratives will help move the matter along a bit. |
| 09:16:18 | 24 | MR. LAMBRIANAKOS:  Next slide, please. |
| 09:16:21 | 25 | Q.  (By Mr. Lambrianakos)  What is your understanding |

1200

09:16:23  1   regarding the presumption of validity of a patent?

09:16:25  2   A.  My understanding is that the '049 patent or any patent

09:16:30  3   is to be presumed valid.

09:16:32  4   Q.  And what is your understanding of the burden of proof

09:16:37  5   in a case involving invalidity?

09:16:38  6   A.  If there is any representation of the potential

09:16:45  7   invalidity of a patent, then the evidence that is there and

09:16:48  8   is presented must support what I understand to be the clear

09:16:51  9   and convincing evidence standard.

09:16:52  10  Q.  How is Amazon challenging the asserted claims of the

09:16:57  11  '049 patent?

09:16:57  12  A.  Well, there's several ways that invalidity can be

09:17:01  13  challenged.  One is based upon anticipation.  Another one

09:17:05  14  is based on obviousness.

09:17:06  15       My understanding and what I listened with the

09:17:09  16  testimony of Dr. Stern yesterday is that he does not argue

09:17:13  17  any -- any argument as far as prior art anticipating the

09:17:17  18  '049 patent, only obviousness.

09:17:18  19  Q.  What do you regard as the major inventive features of

09:17:29  20  the '049 patent?

09:17:29  21  A.  In looking at the patent, of course, the patent claim

09:17:34  22  as a whole is the invention.  Claim 1 is an invention.

09:17:38  23  Claim 8 is an invention.

09:17:40  24       When I look at the construct of the claims, there

09:17:43  25  are at least several features that are new and not obvious.

1201

09:17:47   1          The first, which I talked about on Monday, was

09:17:50   2     that it's new and inventive for including three specific

09:17:55   3     types of identified units or modules in a single digital

09:18:00   4     signal processor.

09:18:02   5          The particular modules that are claimed are the

09:18:05   6     sound source localization unit, the adaptive beamforming

09:18:08   7     unit, and the noise reduction unit.

09:18:13   8          And also with regard to the '049 patent, Claim 1,

09:18:16   9     I've also identified the enabling of the adaptive

09:18:22  10     beamforming for more than one configuration -- in other

09:18:24  11     words, a plurality of sensors.

09:18:27  12          MR. LAMBRIANAKOS:  Next slide, please.

09:18:32  13     Q.  (By Mr. Lambrianakos)  What do you regard as the

09:18:34  14     inventive features of the -- of Claim 8 of the patent?

09:18:36  15     A.  Claim 8, as you may recall, is a dependent claim.  So

09:18:40  16     it requires all of the limitations of Claim 1.  But Claim 8

09:18:43  17     adds one additional feature, and that is the subband

09:18:47  18     adaptive beamforming aspect.

09:18:49  19          MR. LAMBRIANAKOS:  Next slide.

09:18:51  20     Q.  (By Mr. Lambrianakos)  Which claims are being

09:18:54  21     challenged by Amazon?

09:18:55  22     A.  Claims 1 and Claim 8 are being challenged by Amazon.

09:19:01  23     Q.  And which prior art references are being asserted by

09:19:04  24     Amazon?

09:19:04  25     A.  In the demonstrative that I have in front of us now,

09:19:07  1  I've identified the art, the articles that I believe were

09:19:11  2  represented by Dr. Stern.

09:19:15  3       For Claim 1, he presented an obviousness argument

09:19:18  4  based upon the articles that are included in the

09:19:23  5  Burnstein -- Brandstein reference.  He also included in the

09:19:26  6  combination of the articles in Brandstein with Dmochowski.

09:19:31  7  And for Claim 8, he utilized the same two articles,

09:19:35  8  Brandstein -- the articles within the textbook of

09:19:39  9  Brandstein and the article of Dmochowski with -- with a

09:19:46  10  third document which is identified as Abutalebi.

09:19:49  11       And then also with regard to Claim 1, there was at

09:19:51  12  least some representation of a combination of Brandstein

09:19:55  13  with Li.

09:19:56  14  Q.  Does Amazon argue that any one reference anticipates

09:20:02  15  the claims of the '049 patent?

09:20:03  16  A.  No, they do not argue any anticipation at all.

09:20:06  17  Q.  Can you explain the difference between anticipation and

09:20:09  18  obviousness?

09:20:10  19  A.  Yes.  Generally, anticipation is that if you find a

09:20:17  20  particular single document or -- or product that

09:20:20  21  incorporates all of what's required by a claim, then that

09:20:23  22  document is said to anticipate the claimed invention.

09:20:28  23       Obviousness is not in one document itself, but

09:20:32  24  it -- it is a combination of documents that together show

09:20:37  25  the subject matter of the claim.

| | | |
|---|---|---|
| 09:20:38 | 1 | Q.  What was the conclusion of your obviousness analysis? |
| 09:20:42 | 2 | A.  My conclusion of the obviousness analysis that was |
| 09:20:47 | 3 | presented was that Claim 1 is valid and Claim 8 is valid. |
| 09:20:53 | 4 | Both claims of the '049 patent are valid. |
| 09:20:55 | 5 | MR. LAMBRIANAKOS:  Next slide. |
| 09:20:58 | 6 | Q.  (By Mr. Lambrianakos)  What is shown in the highlighted |
| 09:21:00 | 7 | portions of this slide? |
| 09:21:01 | 8 | A.  The highlighted portion of the slide identifies the |
| 09:21:06 | 9 | references that I'm going to discuss first, and these were |
| 09:21:10 | 10 | references that -- that were relied upon for potentially |
| 09:21:17 | 11 | allegedly rendering Claim 1 invalid based on obviousness, |
| 09:21:21 | 12 | and that was the Brandstein, and the combination of |
| 09:21:28 | 13 | Brandstein with Dmochowski. |
| 09:21:28 | 14 | Q.  Were you here for Dr. Stern's testimony yesterday? |
| 09:21:32 | 15 | A.  Yes, I was. |
| 09:21:32 | 16 | Q.  What did he say about the Brandstein reference? |
| 09:21:34 | 17 | A.  He indicated the Brandstein reference was -- was a |
| 09:21:40 | 18 | textbook, and it was a combination or a compilation of |
| 09:21:44 | 19 | different articles from -- and each one of the articles was |
| 09:21:46 | 20 | by a different set of authors, and they address different |
| 09:21:50 | 21 | subject matter. |
| 09:21:50 | 22 | Q.  What did Dr. Stern conclude about whether the |
| 09:21:57 | 23 | Brandstein article or the Brandstein book discloses every |
| 09:22:00 | 24 | element of either Claim 1 or Claim 8? |
| 09:22:02 | 25 | A.  My recall for -- from his testimony is Dr. Stern |

1204

09:22:07    1    indicated that the Bran -- Brandstein reference did not

09:22:11    2    include all of what is required by either Claim 1 or

09:22:14    3    Claim 8.

09:22:18    4         MR. LAMBRIANAKOS:  Next slide.

09:22:21    5    Q.  (By Mr. Lambrianakos)  Do you believe the claims are

09:22:27    6    valid over the Brandstein combination?

09:22:29    7    A.  Yes, I do.

09:22:31    8    Q.  What are your reasons?

09:22:32    9    A.  My reasons include at least the two points that I've

09:22:41   10    identified on this slide.

09:22:42   11         First, Dr. Stern, upon multiple questions,

09:22:49   12    represented that he concluded that none of the articles in

09:22:55   13    the Bran -- Brandstein reference combined, taught the

09:22:59   14    digital signal processor that included the sound source

09:23:02   15    localization unit, the adaptive beamforming unit, and the

09:23:06   16    noise proc -- noise reduction unit.  So he admitted that

09:23:12   17    there was no finding of a DSP that is -- a digital signal

09:23:17   18    processor that is required by Claim 1 and Claim 8.

09:23:20   19         And, also, the -- the information with regard to

09:23:25   20    the sound sensors, the array of sound sensors in a

09:23:34   21    plurality of configurations, there was no evidence that

09:23:36   22    supported that.

09:23:41   23         MR. LAMBRIANAKOS:  Next slide.

09:23:41   24    Q.  (By Mr. Lambrianakos)  Which portions of the Brandstein

09:23:42   25    textbook did you understand Dr. Stern to rely on for the

09:23:46  1   purposes of his obviousness analysis?

09:23:47  2   A.  Well, I summarized on this particular demonstrative,

09:23:53  3   there were six references or articles within the Brandstein

09:23:55  4   textbook that Dr. Stern relied upon.  And I've identified

09:24:01  5   those as Chapters 1, 2, 3, 5, 8, and 18.  And you can see

09:24:08  6   that each one of those chapters are separate articles, and

09:24:11  7   they have separate topics.

09:24:13  8         For instance, the first one is constant

09:24:19  9   directivity beamforming, and that was authored by Ward.

09:24:21  10        The second is superdirective microphone arrays

09:24:25  11  authored by Bitzer.

09:24:27  12        Third article was post-filtering techniques

09:24:31  13  authored by Simmer.

09:24:32  14        The fourth was a robust adaptive beamforming

09:24:37  15  article authored by Hoshuyama.

09:24:42  16        The fifth was entitled Robust Localization in

09:24:50  17  Reverberant Rooms authored by DiBiase.

09:24:53  18        And the last was future programs in microphone

09:24:56  19  array processing by Campernolle.

09:25:01  20  Q.  For invalidity purposes, did you find reasons to

09:25:02  21  combine or not to combine these references?

09:25:03  22  A.  I found multiple reasons not to combine the references.

09:25:03  23  And my understanding is you have to have some reason to

09:25:08  24  look at disparate art and figure out a way in which it is

09:25:09  25  combined.

| | | |
|---|---|---|
| 09:25:10 | 1 | The combination has to be done through the eyes of |
| 09:25:13 | 2 | the ordinarily skilled artisan at the time of the |
| 09:25:23 | 3 | invention, which means that the person of skill in the art |
| 09:25:25 | 4 | at the time of the invention, which at this time was in the |
| 09:25:28 | 5 | year of 2010.  The claim did not exist yet. |
| 09:25:30 | 6 | So the person who's looking for this art does not |
| 09:25:32 | 7 | know what the claim requires.  It has to come from some |
| 09:25:36 | 8 | reason for this combination to be put together, in order to |
| 09:25:42 | 9 | come out with -- with what the claimed invention would |
| 09:25:45 | 10 | require when the claim was known. |
| 09:25:46 | 11 | So I'm looking for reasons.  And what I do is I |
| 09:25:49 | 12 | look at, is there anything in the teaching or the |
| 09:25:54 | 13 | understanding of any one of these articles that causes me |
| 09:25:58 | 14 | to want to go look at and combine the other? |
| 09:26:00 | 15 | And the unfortunate thing for this is the answer |
| 09:26:05 | 16 | is no.  Because many of these articles are directed to |
| 09:26:08 | 17 | theoretical concepts, they're experimentations.  And, in |
| 09:26:11 | 18 | fact, there are numerous places within the articles that |
| 09:26:13 | 19 | state that -- that -- these are problems that they have |
| 09:26:16 | 20 | that they still don't have solutions for. |
| 09:26:19 | 21 | And I've represented on the right side of this |
| 09:26:22 | 22 | page some extracts that came out of, as I recall, |
| 09:26:25 | 23 | Chapters 17 and 18 of the -- of the Brandstein textbook. |
| 09:26:34 | 24 | And you'll note that within the text of these |
| 09:26:37 | 25 | particular articles, statements that I've highlighted, |

09:26:40  1  number one, a simple example shows how this problem was

09:26:43  2  actually an extremely difficult one to solve.

09:26:46  3         Another one states:  Admitted weaknesses to

09:26:50  4  proposed solutions are similar to the ones that we have

09:26:54  5  been struggling with for a long time.  Generally speaking,

09:26:57  6  we may say that many proposed solutions add to our

09:26:59  7  understanding but lack of robustness in order to make a

09:27:02  8  bright future for themselves.

09:27:04  9         And the third one I've highlighted, states:  The

09:27:10  10  problem is actually even worse.  We have assumed that the

09:27:13  11  beamforming gain of the microphone array is optimum.  For

09:27:16  12  an isotropic noise field, this gain is practically

09:27:20  13  impossible to realize for arrays greater than three

09:27:23  14  elements.

09:27:23  15         So when I go look at the construct of the articles

09:27:27  16  themselves, they're -- these are future.  These are looking

09:27:30  17  at things that may happen, and recognizing a consistent

09:27:35  18  listing of problems that are there.  Having problems that

09:27:39  19  you do not have solutions to, is very, very distinctly

09:27:42  20  different from having reasons to combine.

09:27:44  21         MR. LAMBRIANAKOS:  Next slide, please.

09:27:48  22  Q.  (By Mr. Lambrianakos)  What did Dr. Stern conclude

09:27:50  23  regarding the digital signal processor limitation?

09:27:52  24  A.  Dr. Stern testified yesterday that none of the

09:27:57  25  references that he relies on has the claimed digital signal

09:28:02  1   processor.

09:28:02  2        And in order to invalidate any one of these

09:28:05  3   claims, the documents have to -- have to cover the fact

09:28:09  4   that they do teach and have the digital signal processor.

09:28:11  5   Q.  Do you agree with his admission on that?

09:28:14  6   A.  I agree with his admission.  None of the articles do

09:28:17  7   have and do show the digital signal processor with all

09:28:20  8   three units included.

09:28:22  9        MR. LAMBRIANAKOS:  Next slide.

09:28:23  10  Q.  (By Mr. Lambrianakos)  So did Dr. Stern show that the

09:28:26  11  combination of references he relied on to meet the claimed

09:28:33  12  digital signal processor limitation do, in fact, disclose

09:28:35  13  the first element that you have analyzed here?

09:28:39  14  A.  First element I've analyzed would be in agreement with

09:28:43  15  Dr. Stern that the digital signal processor limitation is

09:28:46  16  not found in any of the references in combination.

09:28:50  17  Q.  What is the next limitation you wish to address?

09:28:53  18  A.  That is the limitation of the -- it's directed to the

09:28:57  19  array of sound sensors in a plurality of configurations.

09:29:01  20  Q.  What have you concluded about the obviousness

09:29:03  21  references that Dr. Stern identified to support his

09:29:07  22  assertion that this element is disclosed in the prior art?

09:29:11  23  A.  Well, this is an example of what I addressed earlier,

09:29:14  24  when your -- you're combining things that do not work

09:29:21  25  together.

09:29:23   1          For instance, an article that is disclosed by

09:29:29   2   DiBiase in Chapter 8 contemplates a random distribution of

09:29:38   3   microphones.

09:29:38   4          If you look at the other paper that Dr. Stern

09:29:41   5   relies on, which is Chapter 2, this is on superdirective

09:29:45   6   microphone arrays.  And, specifically, this one is directed

09:29:49   7   to supplying location parameters.  It's hard to place

09:29:54   8   location parameters into something which is randomly

09:29:58   9   distributed.  Those are not combinable.

09:30:01  10          This third item that I showed was Dmochowski,

09:30:03  11   which dealt with the circular array.  Once again, when you

09:30:05  12   have a circular array, you have known criteria.  You

09:30:05  13   don't have -- have known layout or geo -- geometric

09:30:14  14   positions.  It's hard to combine that with something that's

09:30:17  15   randomly distributed.

09:30:18  16          So I see this concatenation of documents put

09:30:21  17   together, but they really are disparate documents, and

09:30:24  18   they're not combinable.

09:30:25  19   Q.  So what is your conclusion regarding Claim 1 as to its

09:30:29  20   validity, based on a combination with the Brandstein

09:30:32  21   article and also the Brandstein articles with Dmochowski?

09:30:34  22   A.  I find that this limitation is also missing from the

09:30:37  23   combination of articles.

09:30:39  24          MR. LAMBRIANAKOS:  Next slide.

09:30:40  25   Q.  (By Mr. Lambrianakos)  Which combination of references

1210

| | | |
|---|---|---|
| 09:30:46 | 1 | does Dr. Stern rely on to apply to Claim 8? |
| 09:30:50 | 2 | A.  He relied on the same two documents, the Brandstein -- |
| 09:30:55 | 3 | Brandstein collection of articles, the Dmochowski article. |
| 09:30:59 | 4 | And if we can go back to that slide. |
| 09:31:01 | 5 | And he also for Claim 8 relied on Abutalebi. |
| 09:31:06 | 6 | Q.  What does Claim 8 require? |
| 09:31:08 | 7 | A.  Claim 8 is directed to the com -- Claim 1 having all of |
| 09:31:14 | 8 | the -- all of what's required by Claim 1. |
| 09:31:17 | 9 | And it adds:  Wherein said noise reduction unit |
| 09:31:19 | 10 | performs noise reduction in a plurality of frequency |
| 09:31:23 | 11 | subbands, wherein said frequency subbands are employed by |
| 09:31:28 | 12 | an analysis filterbank of said adaptive beamforming unit |
| 09:31:32 | 13 | for subband adaptive beamforming. |
| 09:31:33 | 14 | So what this adds is a limitation that's directed |
| 09:31:36 | 15 | to subband beamforming. |
| 09:31:40 | 16 | Q.  What is your opinion regarding the validity of Claim 8? |
| 09:31:43 | 17 | A.  My opinion is Claim 8 is valid. |
| 09:31:49 | 18 | Q.  What does Dr. Stern say about the articles in the |
| 09:31:53 | 19 | Brandstein textbook? |
| 09:31:54 | 20 | A.  Well, I identify first that, just as I mentioned |
| 09:32:02 | 21 | before, Dr. Stern admitted that none of the combination of |
| 09:32:05 | 22 | articles and papers and patents, none of them show the |
| 09:32:08 | 23 | three-unit digital signal processor that is required by |
| 09:32:14 | 24 | Claim 1. |
| 09:32:14 | 25 | Secondly, the combination with Abutalebi, |

09:32:20  1   Abutalebi is only discussing noise cancellation, and it

09:32:25  2   does not describe any beamforming or localization.  And

09:32:31  3   it's hard -- and no reason to combine.

09:32:33  4        And, also, when I look at -- at this combination

09:32:36  5   of references, it, to me, is -- it speaks of combining

09:32:41  6   references based on what I call 20/20 hindsight, which is

09:32:46  7   impermissible.

09:32:47  8        If you recall, I mentioned earlier that the

09:32:53  9   combination of references must be through the eyes of the

09:32:56  10  ordinarily skilled artisan at the time of the invention

09:33:00  11  before the claim even exists.

09:33:03  12       So what I discern from Dr. Stern's testimony when

09:33:08  13  he was asked about his process, he indicated he reviewed,

09:33:11  14  understood the patent, he had access to and looked at the

09:33:14  15  prosecution history, the file wrapper around the patent.

09:33:18  16  So he had knowledge of what the claim was.

09:33:20  17       What he did was, then he grabbed ahold of his

09:33:24  18  book, which he has on his desk, he held it up, the

09:33:28  19  Brandstein textbook, which an expert has.  And so from his

09:33:33  20  expert opinion with knowledge of what the claim required,

09:33:39  21  he then went through and combined different articles from

09:33:43  22  the Brandstein reference and other papers and patents, to

09:33:46  23  come out with this -- with this representation.

09:33:48  24       Unfortunately, that's 20/20 hindsight.  It's

09:33:54  25  impermissible.  You have to, as an expert, take off the

09:33:56  1    robe of being an expert and look at this from the skilled

09:33:59  2    artisan's standpoint as of 2010.

09:34:02  3          And I do not believe he did that.  And that's one

09:34:03  4    of the reasons that I represent that it's -- it was

09:34:07  5    combined based on impermissible hindsight.

09:34:12  6    Q.  So what is your conclusion regarding the validity of

09:34:14  7    Claim 8?

09:34:15  8    A.  I believe that none of the references that Dr. Stern

09:34:19  9    presented invalidate Claim 8.  My -- my response is Claim 8

09:34:23  10   is valid.

09:34:23  11   Q.  Does Dr. Stern argue that the Li article discloses the

09:34:32  12   elements of the -- of Claim 1?

09:34:34  13   A.  No, he did not.  I was here for his testimony

09:34:37  14   yesterday.

09:34:37  15         He made a passing reference of Li in combination

09:34:41  16   with Brandstein, but he provided no supporting evidence

09:34:44  17   that I saw in -- to render an opinion on that.

09:34:46  18   Q.  So what is your ultimate conclusion regarding the

09:34:49  19   validity of Claims 1 and 8 of the '049 patent?

09:34:51  20   A.  My ultimate conclusions, Claims 1 and 8 are valid.

09:34:58  21   Q.  Now, with respect to secondary considerations of

09:35:02  22   non-obviousness, did you consider any of those?

09:35:04  23   A.  Yes, sir, I did.

09:35:04  24   Q.  Please tell the jury what secondary considerations of

09:35:07  25   non-obviousness are.

| | | |
|---|---|---|
| 09:35:10 | 1 | A.  One of the criteria for a -- my understanding for a |
| 09:35:13 | 2 | proof of obviousness, is that when you combine articles and |
| 09:35:19 | 3 | papers for the -- for the purposes of an obviousness |
| 09:35:22 | 4 | argument, you should -- you must consider what's called |
| 09:35:25 | 5 | secondary considerations of non-obviousness. |
| 09:35:27 | 6 | Are there other factors that you can consider that |
| 09:35:29 | 7 | would say, look, these -- these are non-obvious?  And there |
| 09:35:34 | 8 | are a number of different factors.  I listed, as I recall, |
| 09:35:38 | 9 | 10 in my expert report. |
| 09:35:39 | 10 | But there are several factors that -- that I |
| 09:35:42 | 11 | consider are important for consideration for an obviousness |
| 09:35:45 | 12 | evaluation. |
| 09:35:46 | 13 | Q.  And which was the primary secondary consideration that |
| 09:35:52 | 14 | you felt was relevant to this? |
| 09:35:53 | 15 | A.  Well, I noted several, one being commercial success. |
| 09:35:57 | 16 | The allege -- the products which I have identified on |
| 09:36:01 | 17 | Monday, the Echo products that infringe, clearly, they've |
| 09:36:04 | 18 | been commercially successful.  And successful -- being |
| 09:36:07 | 19 | commercially successful is one of those factors for |
| 09:36:11 | 20 | consideration of non-obviousness. |
| 09:36:14 | 21 | Q.  Did Dr. Stern consider any secondary considerations of |
| 09:36:18 | 22 | non-obviousness in his presentation? |
| 09:36:20 | 23 | A.  Not that I recall, no. |
| 09:36:21 | 24 | Q.  So what did you conclude at the end of your entire |
| 09:36:25 | 25 | analysis regarding the validity of the Claims 1 and 8 of |

| | | |
|---|---|---|
| 09:36:30 | 1 | the '049 patent? |
| 09:36:31 | 2 | A.  I conclude that Claims 1 and 8 are valid. |
| 09:36:34 | 3 | MR. LAMBRIANAKOS:  Pass the witness, Your Honor. |
| 09:36:35 | 4 | THE COURT:  Cross-examination? |
| 09:36:36 | 5 | MR. HADDEN:  Yes, Your Honor. |
| 09:36:45 | 6 | MR. LAQUER:  May I approach? |
| 09:36:46 | 7 | THE COURT:  You may distribute binders. |
| 09:37:19 | 8 | All right.  Mr. Hadden, you may proceed with |
| 09:37:22 | 9 | cross-examination. |
| 09:37:22 | 10 | MR. HADDEN:  Thank you, Your Honor. |
| 09:37:22 | 11 | CROSS-EXAMINATION |
| 09:37:24 | 12 | BY MR. HADDEN: |
| 09:37:24 | 13 | Q.  You agree that Dr. Stern is an expert in microphone |
| 09:37:28 | 14 | arrays, correct? |
| 09:37:29 | 15 | A.  Yes, I believe he's been proffered and accepted by this |
| 09:37:33 | 16 | Court. |
| 09:37:33 | 17 | Q.  And you agree that Dr. Stern is an expert in adaptive |
| 09:37:37 | 18 | beamforming, correct? |
| 09:37:39 | 19 | A.  Yes. |
| 09:37:39 | 20 | Q.  And you agree that Dr. Stern is an expert in sound |
| 09:37:45 | 21 | source localization, correct? |
| 09:37:45 | 22 | A.  I believe that's correct, yes. |
| 09:37:47 | 23 | Q.  And it's a fact that none of the prior art that |
| 09:37:52 | 24 | Dr. Stern discussed yesterday is considered by the Patent |
| 09:37:57 | 25 | Office when it allowed the '049 patent, correct? |

09:38:02  1    A.  I would agree that it's not considered, as you

09:38:07  2    understand.  It was before the Patent Office.  Several

09:38:10  3    were.

09:38:11  4            MR. HADDEN:  Move to strike as non-responsive,

09:38:21  5    Your Honor.

09:38:21  6            THE COURT:  The portion of the answer that says "I

09:38:23  7    would agree that it's not considered, as you understand" is

09:38:26  8    responsive.  The remainder is non-responsive.  I'll strike

09:38:30  9    the remainder of the answer.

09:38:32  10           MR. HADDEN:  Thank you, Your Honor.

09:38:32  11           THE COURT:  Let's proceed.

09:38:33  12   Q.  (By Mr. Hadden)  And it's a fact that the Brandstein

09:38:38  13   book was not considered by the Patent Office when it

09:38:41  14   allowed the '049 patent, correct?

09:38:42  15   A.  I agree.

09:38:47  16   Q.  And it's a fact that the Li article from 2009 was not

09:38:50  17   considered by the Patent Office when it allowed the '049

09:38:54  18   patent, correct?

09:38:54  19   A.  Agree.

09:38:55  20   Q.  And it's a fact that Dmochowski was not considered by

09:39:02  21   the Patent Office when it allowed the '049 patent, correct?

09:39:05  22   A.  Agreed.

09:39:05  23   Q.  And it's a fact that Abutalebi was not before and

09:39:11  24   considered by the Patent Office when it allowed the '049

09:39:13  25   patent, correct?

09:39:14  1   A.  Agreed.

09:39:15  2   Q.  And there was some testimony from Dr. Zhu regarding the

09:39:23  3   provisional application.  Do you recall that testimony,

09:39:28  4   Mr. McAlexander?

09:39:28  5   A.  Yes, I do.

09:39:29  6   Q.  And a provisional application is called provisional

09:39:35  7   because it's a placeholder until the real application is

09:39:37  8   filed; isn't that correct?

09:39:39  9   A.  Yes, that's correct.

09:39:39  10  Q.  And the provisional application is not examined by the

09:39:44  11  Patent Office, correct?

09:39:45  12  A.  That's correct, as I understand it.

09:39:47  13  Q.  And it's only the real application that the applicant

09:39:51  14  files later that is examined by the Patent Office, right?

09:39:55  15  A.  I believe that's correct, yes.

09:39:56  16  Q.  And it's a fact that when Dr. Li filed his real

09:40:02  17  application, he removed any reference to the Brandstein

09:40:07  18  book; isn't that correct?

09:40:08  19  A.  It was not present in the filed application.

09:40:16  20  Q.  And you agree, don't you, Mr. McAlexander, that a

09:40:18  21  patent can be invalid because it's obvious, right?

09:40:20  22  A.  It can be, yes.

09:40:23  23       MR. HADDEN:  Can we see Paragraph 44 from

09:40:30  24  Mr. McAlexander's invalidity report?

09:40:31  25  Q.  (By Mr. Hadden)  And you prepared and provided a report

09:40:34  1  in this case that included all of your opinions regarding

09:40:37  2  validity, correct?

09:40:38  3  A.  Correct.

09:40:38  4  Q.  And if we look in your report here at Paragraph 44 --

09:40:42  5       MR. HADDEN:  And can we highlight, Mr. Berk, the

09:40:44  6  sentence that begins "I understand"?  It's the second

09:40:48  7  sentence -- I'm sorry, the next one.  Oh, sorry, one more

09:40:57  8  down.  I apologize.  Next sentence.

09:41:00  9       THE COURT:  There are about six sentences that

09:41:02  10  begin with "I understand."

09:41:03  11       MR. HADDEN:  I know.  I have realized that.  Thank

09:41:09  12  you, Your Honor.

09:41:09  13  Q.  (By Mr. Hadden)  There's a sentence here where you

09:41:14  14  wrote in your report:  I understand that the Supreme Court

09:41:16  15  specifically cautioned against granting patents that claim

09:41:19  16  nothing more than combinations of known elements driven by

09:41:25  17  non-innovative factors such as market demands.

09:41:28  18       Do you see that?

09:41:29  19  A.  Yes, I do.

09:41:29  20  Q.  And you put that statement in your report, correct?

09:41:32  21  A.  Yes, I did.

09:41:33  22  Q.  Okay.

09:41:33  23       MR. HADDEN:  And if we go to the next sentence,

09:41:35  24  please, Mr. Berk.

09:41:43  25  Q.  (By Mr. Hadden)  In this sentence you wrote in your

09:41:45   1   report:  I understand it also stressed the need for caution

09:41:50   2   before upholding the validity of patents that are merely

09:41:55   3   combinations of elements found in the prior art.

09:41:57   4         Do you see that?

09:41:58   5   A.  Yes, I do.

09:41:59   6   Q.  And the "it" in that statement is referring to the

09:42:03   7   Supreme Court of the United States, correct?

09:42:05   8   A.  Yes, that's correct.

09:42:14   9         MR. HADDEN:  Can we go to Paragraph 48, please,

09:42:17   10   Mr. Berk?

09:42:20   11   Q.  (By Mr. Hadden)  And this is also a paragraph from your

09:42:22   12   validity report in this case, correct?

09:42:25   13   A.  Yes, that's correct.

09:42:26   14   Q.  You state here:  I understand that an obviousness

09:42:30   15   evaluation can also be based on a combination of multiple

09:42:38   16   prior art references.

09:42:39   17         Do you see that?

09:42:40   18   A.  Yes, I do.

09:42:40   19   Q.  And that's a true statement, isn't it?

09:42:43   20   A.  Yes.

09:42:43   21   Q.  And then you continue and say:  The prior art

09:42:47   22   references themselves may provide a suggestion, motivation,

09:42:49   23   or reason to combine, but --

09:42:51   24         MR. HADDEN:  Will you highlight the clause after

09:42:54   25   "but," please, Mr. Berk?

09:42:58  1   Q.  (By Mr. Hadden)  But other times the nexus linking two

09:43:01  2   or more prior art references is simple common sense.

09:43:04  3          Do you see that?

09:43:05  4   A.  Yes, I do.

09:43:06  5   Q.  And that's a true statement, too, isn't it,

09:43:11  6   Mr. McAlexander?

09:43:12  7   A.  Yes.

09:43:13  8   Q.  And let's go to Paragraph 52 of your report.

09:43:17  9          MR. HADDEN:  Paragraph 52, please, Mr. Berk.

09:43:19  10  Thank you.  If you go to the sentence that begins "I

09:43:28  11  further understand."  It begins on the next page -- yeah,

09:43:59  12  can we get the last sentence there?  Had the wrong

09:44:20  13  paragraph.  There you go.  Thank you.  Thank you, Mr. Berk.

09:44:22  14  I found the right paragraph.

09:44:24  15  Q.  (By Mr. Hadden)  Do you see where -- this is, again, a

09:44:27  16  paragraph from your invalidity report, isn't it, sir?

09:44:29  17  A.  Yes, that's correct.

09:44:30  18  Q.  And here you state:  I further understand that a

09:44:33  19  reference may be said to teach --

09:44:36  20         MR. HADDEN:  No, wrong paragraph.  Let's take that

09:44:40  21  down, Mr. Berk.

09:44:41  22         Can we put up Stern Demonstrative 6.26, please,

09:44:46  23  Mr. Berk?

09:45:25  24  Q.  (By Mr. Hadden)  You were here yesterday when Dr. Stern

09:45:27  25  testified, correct, Mr. McAlexander?

| | | |
|---|---|---|
| 09:45:28 | 1 | A.  Yes, I was. |
| 09:45:29 | 2 | Q.  And you heard his analysis where he went through the |
| 09:45:32 | 3 | Brandstein book and identified where all of these elements |
| 09:45:37 | 4 | of Claim 1 were described and taught.  Do you recall that? |
| 09:45:41 | 5 | A.  Yes, I do. |
| 09:45:42 | 6 | Q.  And you don't dispute that the Brandstein book |
| 09:45:49 | 7 | describes and teaches sound source localization, do you? |
| 09:45:51 | 8 | A.  There is an article on that, yes. |
| 09:45:53 | 9 | Q.  And you don't dispute that the Brandstein book |
| 09:45:58 | 10 | describes adaptive beamforming, correct? |
| 09:46:02 | 11 | A.  Yes, there's also articles on that. |
| 09:46:04 | 12 | Q.  And you don't dispute that the Brandstein book |
| 09:46:07 | 13 | describes noise reduction, correct? |
| 09:46:09 | 14 | A.  No, I don't dispute that either. |
| 09:46:11 | 15 | Q.  And you also don't dispute that the Brandstein book |
| 09:46:13 | 16 | describes this receiving Step [B], correct? |
| 09:46:19 | 17 | A.  No, I don't dispute that either. |
| 09:46:21 | 18 | Q.  And you don't dispute that the Brandstein book |
| 09:46:26 | 19 | describes the determining a delay Step [C], correct? |
| 09:46:29 | 20 | A.  Among the articles, I don't dispute that either. |
| 09:46:32 | 21 | Q.  And you don't dispute that the Brandstein book |
| 09:46:42 | 22 | describes the estimating a spatial location, Element [D], |
| 09:46:46 | 23 | correct? |
| 09:46:46 | 24 | A.  In one of the articles it does discuss that. |
| 09:46:48 | 25 | Q.  And you don't dispute that the Brandstein book |

1221

| | | |
|---|---|---|
| 09:46:54 | 1 | describes Element [E], performing adaptive beamforming, |
| 09:47:01 | 2 | correct? |
| 09:47:01 | 3 | A.  There are articles in that textbook that also discuss |
| 09:47:06 | 4 | adaptive beamforming. |
| 09:47:06 | 5 | Q.  And you don't dispute that the Brandstein book |
| 09:47:09 | 6 | describes Element [F], suppressing said ambient noise |
| 09:47:19 | 7 | signals, correct? |
| 09:47:20 | 8 | A.  There are articles on that, as well. |
| 09:47:24 | 9 | Q.  Okay.  And this book -- it is described in the book |
| 09:47:27 | 10 | itself -- |
| 09:47:27 | 11 | MR. HADDEN:  And if we can go to DTX-49.5, please, |
| 09:47:31 | 12 | Mr. Berk, and if we can blow up that first sentence. |
| 09:47:44 | 13 | Q.  (By Mr. Hadden)  Now, the Brandstein book itself |
| 09:47:49 | 14 | describes itself as a single complete reference of |
| 09:47:53 | 15 | microphone arrays, correct? |
| 09:47:56 | 16 | A.  That is what it states, yes. |
| 09:47:58 | 17 | Q.  Okay.  And your dispute or your beef with this book is |
| 09:48:02 | 18 | that it has multiple chapters; isn't that right? |
| 09:48:07 | 19 | A.  No. |
| 09:48:07 | 20 | Q.  Your disagreement with Dr. Stern is whether or not this |
| 09:48:15 | 21 | book is a book, a single reference, or whether, you say, |
| 09:48:21 | 22 | it's a collection of disparate articles.  Correct? |
| 09:48:29 | 23 | A.  That -- my representation it is a book with disparate |
| 09:48:36 | 24 | articles, which is consistent with the obviousness position |
| 09:48:38 | 25 | of Dr. Stern. |

09:48:39  1   Q.   Now, if you -- this book has a table of contents,

09:48:45  2   doesn't it?

09:48:46  3   A.   Yes, sir.

09:48:46  4          MR. HADDEN:   Can we go to the table of contents of

09:48:51  5   Brandstein, please?   And if we could blow it up.   Can we

09:48:59  6   blow it up, Mr. Berk?

09:49:01  7   Q.   (By Mr. Hadden)   Now, the table of contents identifies

09:49:07  8   chapters and describes what the chapters cover, correct?

09:49:11  9   A.   Yes, that's correct.

09:49:11  10  Q.   So we have Chapter 1 on Constant Directivity

09:49:19  11  Beamforming; do you see that?

09:49:21  12  A.   Yes, I do.

09:49:22  13  Q.   It has chapters within that that explain the different

09:49:26  14  features and descriptions of that technology, correct?

09:49:29  15  A.   Yes, that's correct.

09:49:29  16  Q.   And then there's a next chapter that talks about

09:49:33  17  Superdirective Microphone Arrays.   Do you see that?

09:49:38  18  A.   Yes, I do.

09:49:38  19  Q.   And it has subchapters that describe in detail where to

09:49:42  20  find information about the details of superdirective

09:49:44  21  microphone arrays, correct?

09:49:45  22  A.   It has further details, yes.

09:49:47  23  Q.   Okay.   And is it your testimony that a person of

09:49:52  24  ordinary skill in the art wouldn't be able to read this

09:49:54  25  table of contents and find the information that Dr. Stern

09:50:03  1  provided to the jury yesterday?

09:50:05  2  A.  I do not dispute that a person of skill in the art can

09:50:08  3  read a textbook, look at the table of contents, and

09:50:11  4  determine what is in that book, yes.

09:50:14  5  Q.  Now, you don't dispute --

09:50:16  6      MR. HADDEN:  And if we could go to Stern

09:50:31  7  Demonstrative 6.33, please.

09:50:33  8  Q.  (By Mr. Hadden)  Now, you don't dispute that Dmochowski

09:50:36  9  describes the determining a delay Limitation [C], as

09:50:39  10  explained by Dr. Stern yesterday, do you, Mr. McAlexander?

09:50:41  11  A.  I don't dispute his representation.  But, again, I'll

09:50:47  12  leave it at that.

09:50:47  13      MR. HADDEN:  And if we can go to Stern

09:50:50  14  Demonstrative 6.47, please, Mr. Berk.

09:50:56  15  Q.  (By Mr. Hadden)  Now, you don't dispute that Abutalebi

09:51:00  16  discloses this additional requirement in Claim 8, as

09:51:05  17  explained by Dr. Stern yesterday, do you, Mr. McAlexander?

09:51:08  18  A.  I don't dispute the representation of the Wiener

09:51:15  19  filter.

09:51:15  20  Q.  Now, we talked some about digital signal processors,

09:51:21  21  correct?

09:51:21  22  A.  Yes.

09:51:21  23  Q.  Now, digital signal processors, or DSPs, have been

09:51:27  24  around for decades, haven't they, Mr. McAlexander?

09:51:29  25  A.  Yes, digital signal processing has been around for

| | | |
|---|---|---|
| 09:51:37 | 1 | decades. |
| 09:51:37 | 2 | Q.  And digital signal processors, as the name implies, are |
| 09:51:43 | 3 | processors -- processors that were developed and designed |
| 09:51:46 | 4 | to process digital signals quickly, correct? |
| 09:51:49 | 5 | A.  I think your general characterization is partly |
| 09:51:52 | 6 | correct.  Again, have to go by the Court's claim |
| 09:51:54 | 7 | construction for digital signal processor. |
| 09:51:56 | 8 | Q.  And processing audio signals requires processing |
| 09:52:05 | 9 | digital signals in a way that needs to be done quickly; |
| 09:52:09 | 10 | isn't that correct, Mr. McAlexander? |
| 09:52:11 | 11 | A.  State that again, please. |
| 09:52:12 | 12 | Q.  When you're processing audio signals, it is useful to |
| 09:52:18 | 13 | process those digital signals quickly? |
| 09:52:20 | 14 | A.  That can be one of the constructs. |
| 09:52:23 | 15 |         MR. HADDEN:  And could we see Stern |
| 09:52:27 | 16 | Demonstrative 6.6, please, Mr. Berk? |
| 09:52:29 | 17 | Q.  (By Mr. Hadden)  And it was known at the time, before |
| 09:52:37 | 18 | these patents -- in fact, this article from Computerworld, |
| 09:52:41 | 19 | that Dr. Stern talked about, is almost 10 years before |
| 09:52:50 | 20 | Dr. Li filed his patent application, right? |
| 09:52:54 | 21 | A.  That's correct. |
| 09:52:54 | 22 | Q.  And it was known at least 10 years before Dr. Li's |
| 09:52:57 | 23 | patent application, that DSPs -- or digital -- digital |
| 09:53:00 | 24 | signal processors, are widely used for processing audio; |
| 09:53:00 | 25 | isn't that right? |

09:53:05  1   A.  The general statement is correct, yes.

09:53:08  2           MR. HADDEN:  And if we could now look at the

09:53:13  3   Court's claim construction, please, Mr. Berk, of digital

09:53:16  4   signal processor.  Thank you.

09:53:25  5   Q.  (By Mr. Hadden)  So the Court, as you indicated, has

09:53:28  6   construed this term as:  A microprocessor that is

09:53:31  7   specialized for mathematical processing of digital signals.

09:53:36  8           Do you see that?

09:53:36  9   A.  Yes, I see that.

09:53:37  10  Q.  Now, if a person of skill in the art, 10 years after

09:53:43  11  that Computerworld article that we just looked at, wanted

09:53:47  12  to process some digital signals mathematically, wouldn't it

09:53:50  13  make sense for them to use a microprocessor that is

09:53:53  14  specialized for that purpose?

09:53:55  15  A.  Yes, I would agree with that.

09:53:56  16  Q.  Okay.  And when you are processing digital signals --

09:54:04  17  digital audio signals, wouldn't it be obvious for a person

09:54:07  18  of skill in the art to want to use a microprocessor that is

09:54:12  19  designed specifically for that purpose?

09:54:15  20  A.  The general concept is correct, yes.

09:54:19  21  Q.  Right.  And isn't that exactly what Brandstein says?

09:54:23  22          MR. HADDEN:  Can we look at DTX-49 at Page 392,

09:54:27  23  please, Mr. Berk?

09:54:36  24          THE TECHNICIAN:  What page?

09:54:39  25          MR. HADDEN:  I'm sorry.  0392, Mr. Berk.  If we

09:54:50   1   could blow up the text that reads "today we have affordable
09:54:56   2   DSPs."  Thank you.  Right -- right there.  Got it.  Thank
09:55:17   3   you.  Thank you, Mr. Berk.
09:55:18   4   Q.  (By Mr. Hadden)  Now, as Professor Stern indicated
09:55:22   5   yesterday, Brandstein book itself says:  Today we have
09:55:30   6   affordable DSPs that allow us to implement all but the most
09:55:35   7   complex schemes cheaply in digital signal processing
09:55:39   8   technology in real-time.
09:55:41   9        Do you see that?
09:55:42  10   A.  Yes, I see that.
09:55:43  11   Q.  And just to be clear, the "today" that's referenced in
09:55:48  12   this book is 10 years before Dr. Li filed his patent
09:55:52  13   application, correct?
09:55:52  14   A.  Yes, that's correct.
09:55:53  15   Q.  So if 10 years before Dr. Li's patent application it
09:56:00  16   was known that DSPs would allow us to implement all but the
09:56:05  17   most complex schemes cheaply, wouldn't it have been even
09:56:09  18   more obvious 10 years later in 2010 to use a DSP to
09:56:14  19   implement these audio processing algorithms that are
09:56:18  20   described in Professor Brandstein's book?
09:56:21  21   A.  No, not based upon all the words in that paragraph.
09:56:24  22   Q.  Well, let's look at another example.
09:56:28  23        MR. HADDEN:  Can we see DTX-33, please, Mr. Berk?
09:56:34  24   Can we blow up the system description?
09:56:38  25   Q.  (By Mr. Hadden)  So DTX-33 is that Li article from 2009

09:56:43   1   that was also not considered by the Patent Office, right?

09:56:46   2   A.   Yes, that is correct.

09:56:47   3   Q.   And, in this figure, it shows a DSP, right?

09:56:50   4   A.   It does.

09:56:51   5   Q.   And that DSP performs beamforming and noise reduction,

09:56:58   6   correct?

09:56:58   7   A.   That's correct.  Two of the three requirements.

09:57:00   8   Q.   Right.  And this was public information that was

09:57:04   9   published by Dr. Li and Manli Zhu before they filed -- more

09:57:10   10   than a year before they filed -- filed their patent,

09:57:13   11   correct?

09:57:13   12   A.   That is correct.

09:57:14   13   Q.   So it's your testimony -- and -- strike that.

09:57:18   14         Just to be clear, when we're talking about a DSP

09:57:22   15   that includes these different units, the beamforming, the

09:57:25   16   noise reduction, the sound source localization, what that

09:57:30   17   really means is that the software, the algorithms to

09:57:35   18   perform those various functions are being executed by a

09:57:38   19   processor that is designed to perform those types of

09:57:42   20   mathematical calculations.  Correct?

09:57:45   21   A.   That's correct.  It's a combination of the software and

09:57:48   22   the hardware to perform that.

09:57:49   23   Q.   So it's your testimony that even though Brandstein says

09:57:56   24   we have DSPs 10 years before the patent, and we should use

09:58:01   25   those to perform these types of algorithms, and Dr. Li in

| | | |
|---|---|---|
| 09:58:07 | 1 | his own published paper indicates using a DSP to do |
| 09:58:10 | 2 | beamforming and noise reduction, it's your conclusion that |
| 09:58:14 | 3 | it would not have been obvious to one of skill in the art |
| 09:58:18 | 4 | to use the same specialized processor to perform sound |
| 09:58:26 | 5 | source localization? |
| 09:58:26 | 6 | A.  No, it's not mentioned in the Li article.  It's not -- |
| 09:58:29 | 7 | not shown in the Brandstein articles. |
| 09:58:32 | 8 | Q.  But my question was, wouldn't it have been obvious to a |
| 09:58:36 | 9 | person who was designing this system knowing that all they |
| 09:58:39 | 10 | need is a processor that is specialized to perform the |
| 09:58:43 | 11 | types of calculations they're trying to perform, wouldn't |
| 09:58:46 | 12 | it be obvious to have all of the software, including the |
| 09:58:53 | 13 | sound source localizer, the beamformer, and the noise |
| 09:58:59 | 14 | reduction software, all be run on that specialized |
| 09:59:00 | 15 | software? |
| 09:59:00 | 16 | A.  No, sir, that's not obvious. |
| 09:59:02 | 17 | Q.  Okay. |
| 09:59:03 | 18 | MR. HADDEN:  I pass the witness. |
| 09:59:04 | 19 | THE COURT:  Redirect? |
| 09:59:17 | 20 | MR. LAMBRIANAKOS:  Yes, Your Honor. |
| 09:59:17 | 21 | REDIRECT EXAMINATION |
| 09:59:18 | 22 | BY MR. LAMBRIANAKOS: |
| 09:59:18 | 23 | Q.  Mr. Hadden was discussing the Brandstein book, right? |
| 09:59:26 | 24 | A.  Yes. |
| 09:59:27 | 25 | Q.  Was the Brandstein book authored by Mr. Brandstein? |

1229

09:59:32  1    A.   No.

09:59:33  2    Q.   Who were the authors of the Brandstein book?

09:59:36  3    A.   Each one of the articles or chapters was authored by a

09:59:40  4    different author for different reasons.  And what

09:59:43  5    Mr. Brandstein -- Dr. Brandstein did is he brought a

09:59:49  6    collection of these different articles and thoughts

09:59:50  7    together, many of which were experimental and many of which

09:59:53  8    were thoughts about what they could do in the future.

09:59:55  9         But even in the document that he just presented a

09:59:59  10   minute ago, he did not carry forward and show the rest of

10:00:02  11   it, which shows there was weaknesses.  And these weaknesses

10:00:08  12   have been around for many years, and we still don't have

10:00:10  13   them solved.

10:00:11  14   Q.   And you've opined that the DSP with the three units

10:00:17  15   that were discussed, is not disclosed or suggested anywhere

10:00:21  16   in the Brandstein book; is that right?

10:00:21  17   A.   No, the -- the claimed digital signal processor use,

10:00:25  18   using the Court's construction, but requiring the unit --

10:00:29  19   the three units, the sound source localization, noise

10:00:31  20   reduction, and adaptive beamforming, does not appear and is

10:00:35  21   not suggested, not reasonably shown anywhere in the

10:00:39  22   Brandstein articles, and, in fact, is even missing eight

10:00:44  23   years later in the Li paper where he only had beamforming

10:00:48  24   and had noise reduction.  But even their source -- sound

10:00:53  25   source localization was not part of what he was

1230

10:00:55   1   representing.

10:00:55   2   Q.  And what was Dr. Stern's opinion on that very issue?

10:00:57   3   A.  Dr. Stern admitted yesterday that none of the

10:01:02   4   references he used had the claimed -- or showed the claimed

10:01:08   5   digital signal processor.  And I agree with that statement,

10:01:11   6   agree with his testimony.

10:01:12   7   Q.  Recall that Mr. Hadden showed you the -- the Brandstein

10:01:16   8   book, DTX-49?

10:01:18   9   A.  Yes.

10:01:20   10          MR. LAMBRIANAKOS:  Can we have DTX-49, please?

10:01:23   11   Can we go to Page 392 of the exhibit?

10:01:26   12   Q.  (By Mr. Lambrianakos)  This was the page that

10:01:28   13   Mr. Hadden showed you, right?

10:01:29   14   A.  Yes, that's correct.

10:01:30   15   Q.  And he -- he highlighted some language?

10:01:31   16   A.  That is correct.

10:01:32   17   Q.  And he -- he brought you to the sentence that said

10:01:37   18   "today we have affordable DSPs," et cetera?

10:01:41   19   A.  Yes.

10:01:41   20   Q.  And what does the next sentence say?

10:01:43   21   A.  It says:  But this in itself was not enough.  And, in

10:01:51   22   fact, further down it says:  Admitted weaknesses to

10:01:55   23   proposed solutions are similar to the ones that we have

10:01:58   24   been struggling with for a long time.

10:02:01   25   Q.  And moving up the page a bit, what does the first

| | | |
|---|---|---|
| 10:02:05 | 1 | sentence of this paragraph tell you? |
| 10:02:06 | 2 | A.  After 20 years of active research, however, we cannot |
| 10:02:10 | 3 | claim that microphone array processing has had the success |
| 10:02:13 | 4 | many of us hoped for, and many will wonder when the great |
| 10:02:17 | 5 | breakthrough in microphone array processing will finally |
| 10:02:20 | 6 | come, if ever. |
| 10:02:22 | 7 | MR. LAMBRIANAKOS:  Pass the witness. |
| 10:02:23 | 8 | THE COURT:  Further cross-examination? |
| 10:02:29 | 9 | MR. HADDEN:  Just one question, Your Honor. |
| 10:02:29 | 10 | RECROSS-EXAMINATION |
| 10:02:39 | 11 | BY MR. HADDEN: |
| 10:02:39 | 12 | Q.  That paragraph that we were just looking for was from |
| 10:02:43 | 13 | 2001, right, Mr. McAlexander? |
| 10:02:46 | 14 | A.  Yes.  Yes, that's correct. |
| 10:02:47 | 15 | Q.  And you mentioned some commercial success.  It's a |
| 10:02:53 | 16 | fact, isn't it, Mr. McAlexander, that Professor Li has not |
| 10:02:59 | 17 | had any commercial success? |
| 10:03:00 | 18 | A.  I would say that's correct.  I didn't represent that. |
| 10:03:06 | 19 | MR. HADDEN:  Thank you. |
| 10:03:06 | 20 | THE COURT:  You pass the witness? |
| 10:03:07 | 21 | MR. HADDEN:  Pass the witness.  Sorry, Your Honor. |
| 10:03:10 | 22 | MR. LAMBRIANAKOS:  Nothing further, Your Honor. |
| 10:03:12 | 23 | THE COURT:  Any redirect? |
| 10:03:13 | 24 | MR. LAMBRIANAKOS:  No, Your Honor. |
| 10:03:13 | 25 | THE COURT:  All right.  You may step down, |

1232

| | | |
|---|---|---|
| 10:03:15 | 1 | Mr. McAlexander. |
| 10:03:16 | 2 | THE WITNESS:  Thank you, sir. |
| 10:03:17 | 3 | THE COURT:  You're quite welcome. |
| 10:03:19 | 4 | Plaintiff, call your next rebuttal witness. |
| 10:03:22 | 5 | MR. LAMBRIANAKOS:  No further witnesses, |
| 10:03:23 | 6 | Your Honor. |
| 10:03:23 | 7 | THE COURT:  Does the Plaintiff rest its rebuttal |
| 10:03:25 | 8 | case? |
| 10:03:26 | 9 | MR. LAMBRIANAKOS:  Yes, Your Honor, Plaintiff |
| 10:03:27 | 10 | rests. |
| 10:03:27 | 11 | THE COURT:  All right.  Ladies and gentlemen of |
| 10:03:32 | 12 | the jury, this means you have now heard all the evidence in |
| 10:03:36 | 13 | this case. |
| 10:03:39 | 14 | There are several things that the Court's required |
| 10:03:41 | 15 | to take up with counsel that will be taken up and |
| 10:03:47 | 16 | considered outside of your presence.  It's a part of every |
| 10:03:51 | 17 | trial. |
| 10:03:51 | 18 | That means at 10:00 o'clock in the morning, I'm |
| 10:03:55 | 19 | about to release you for the rest of the day.  And what you |
| 10:03:59 | 20 | do with the rest of the day is strictly up to you.  But I |
| 10:04:03 | 21 | want you back tomorrow morning at 8:30, just as we did |
| 10:04:06 | 22 | today. |
| 10:04:07 | 23 | My -- my plan is that those matters that I'm |
| 10:04:11 | 24 | required under the rules of the Court to take up with |
| 10:04:14 | 25 | counsel can all be completed this afternoon.  In fact, I |

10:04:17   1   expect we'll probably be here close to the regular time

10:04:20   2   that we've recessed for the day during the trial.

10:04:23   3            But, nonetheless, it's my hope that those matters

10:04:26   4   can be completed so that in the morning when you return, I

10:04:32   5   can begin the day by giving you my final instructions on

10:04:35   6   the law that you're to apply in this case, followed by

10:04:39   7   closing arguments from the Plaintiff and the Defendants,

10:04:42   8   after which I will then instruct you to retire to the jury

10:04:45   9   room and deliberate on your verdict.

10:04:47   10           So that is what the schedule looks like it will

10:04:51   11  be.  I'm going to ask you as you leave this morning, to

10:04:57   12  take your notebooks and leave them closed on the table in

10:04:59   13  the jury room.

10:05:01   14           I'm going to remind you, ladies and gentlemen, one

10:05:03   15  more time, do not discuss anything about this case with

10:05:07   16  anyone in any way.  We are -- we are getting close to the

10:05:12   17  end.  It would be an absolute travesty if any of you were

10:05:15   18  to violate my instructions and jeopardize everything that's

10:05:19   19  been done up until now.

10:05:22   20           So, please, follow all the instructions I've given

10:05:25   21  you about your conduct during the trial, including, of

10:05:28   22  course, not to discuss or communicate about the case with

10:05:30   23  anyone, including the eight of yourselves.

10:05:32   24           And with that, ladies and gentlemen, I will see

10:05:34   25  you in the morning.  You're excused for the remainder of

| | | |
|---|---|---|
| 10:05:36 | 1 | the day. |
| 10:05:37 | 2 | COURT SECURITY OFFICER:  All rise. |
| 10:05:41 | 3 | (Jury out.) |
| 10:05:42 | 4 | THE COURT:  Please be seated. |
| 10:06:03 | 5 | Mr. McGavock, if you're going to remain in the |
| 10:06:12 | 6 | gallery, you need to wear a mask, sir.  I sent somebody out |
| 10:06:17 | 7 | yesterday, so I'm trying to be consistent across the board |
| 10:06:20 | 8 | for everyone's well-being. |
| 10:06:21 | 9 | Also, Plaintiffs -- or, Plaintiff, I have seen and |
| 10:06:30 | 10 | heard no evidence on Claim 3.  I assume you have |
| 10:06:35 | 11 | effectively dropped Claim 3 from your case, even though the |
| 10:06:38 | 12 | last filing on the record in this case indicates Claims 1, |
| 10:06:44 | 13 | 3, and 8 would be the asserted claims for trial. |
| 10:06:46 | 14 | I need to clean up the record at this point.  What |
| 10:06:50 | 15 | is Plaintiff's posture on Claim 3? |
| 10:06:54 | 16 | MR. FABRICANT:  Yes, Your Honor.  We had advised |
| 10:06:56 | 17 | defense counsel prior to the commencement of the trial, and |
| 10:07:00 | 18 | I believe we advised the Court, that Claim 3 would be |
| 10:07:03 | 19 | withdrawn and was not being asserted in this -- in this |
| 10:07:05 | 20 | case. |
| 10:07:05 | 21 | THE COURT:  Well, if you advised the Court, the |
| 10:07:09 | 22 | message didn't get to me, and you certainly didn't do it in |
| 10:07:12 | 23 | writing.  But we not have it on the record.  And having |
| 10:07:13 | 24 | advised opposing counsel before the trial started that you |
| 10:07:16 | 25 | were dropping Claim 3, I'll consider that we've been to |

| | | |
|---|---|---|
| 10:07:20 | 1 | trial on Claims 1 and 8 only and not Claim 3. |
| 10:07:23 | 2 | MR. FABRICANT:  Yes, Your Honor. |
| 10:07:24 | 3 | THE COURT:  Thank you. |
| 10:07:24 | 4 | Counsel, we're going to recess at this point until |
| 10:07:44 | 5 | 12:00 noon.  At noon, I will reconvene and take up any |
| 10:07:48 | 6 | motions under Rule 50(a) that either party cares to offer. |
| 10:07:54 | 7 | As I indicated yesterday, I will then proceed, |
| 10:07:57 | 8 | after that's completed, to hold an informal charge |
| 10:08:00 | 9 | conference, followed by a formal charge conference.  And |
| 10:08:03 | 10 | we'll take all steps necessary this afternoon so that, as I |
| 10:08:08 | 11 | just told the jury, we can be prepared and ready to begin |
| 10:08:10 | 12 | tomorrow morning with my final instructions to the jury and |
| 10:08:14 | 13 | then your closing arguments. |
| 10:08:15 | 14 | As I mentioned yesterday, those of you that will |
| 10:08:19 | 15 | be involved in presenting closing arguments tomorrow are |
| 10:08:22 | 16 | not required to be present this afternoon, as long as those |
| 10:08:25 | 17 | issues are fully staffed by your trial teams. |
| 10:08:28 | 18 | Yesterday, we had a conversation in chambers with |
| 10:08:41 | 19 | regard to the Defendants' issue of inequitable conduct. |
| 10:08:46 | 20 | There has been some discussion back and forth since then, |
| 10:08:51 | 21 | none of it completely clear. |
| 10:08:52 | 22 | I'd like a recitation from both sides now as to |
| 10:08:57 | 23 | what you anticipate each side will be bringing forward with |
| 10:09:00 | 24 | regard to the inequitable conduct claim that will be |
| 10:09:03 | 25 | presented in a bench trial to the Court. |

```
10:09:06   1          Let me hear from Defendant first.
10:09:09   2          MS. DOAN:  Yes, Your Honor.  May I take the
10:09:12   3   podium?
10:09:13   4          THE COURT:  Please from the podium, Ms. Doan.
10:09:16   5          MS. DOAN:  Your Honor, we'd like to have two -- we
10:09:19   6   advised the Plaintiff last night we have two witnesses.
10:09:22   7   We're crossing Dr. Peter Li briefly, and then we'd like to
10:09:28   8   present Mr. Nick Godici.
10:09:29   9          We do have deposition testimony from the
10:09:31  10   prosecuting attorney, Your Honor.  We can play it for you,
10:09:35  11   if you wish, or we can submit it in writing.  It's at the
10:09:37  12   Court's pleasure.
10:09:39  13          THE COURT:  If you submit that testimony in
10:09:41  14   writing, what do you anticipate the length of your live
10:09:45  15   testimony to be?
10:09:46  16          MS. DOAN:  We expect it to be approximately an
10:09:48  17   hour, Your Honor.
10:09:49  18          THE COURT:  All right.  In light of that, what can
10:09:52  19   I expect from the Plaintiff with regard to the inequitable
10:09:54  20   conduct issue?  Obviously, the Court's trying to determine
10:09:56  21   when and how to schedule this.
10:09:58  22          MR. FABRICANT:  Well, it's obviously the
10:10:00  23   Defendants' burden by clear and convincing evidence, so
10:10:04  24   some of our projection will depend on the presentation
10:10:06  25   that's made.  It might go anywhere from no defense at all,
```

| 10:10:10 | 1 | depending on the presentation and the strength of the |
| 10:10:13 | 2 | presentation, to I would estimate cross-examining Dr. Li, |
| 10:10:19 | 3 | if he's presented by the defense as a witness, |
| 10:10:22 | 4 | cross-examining the patent law expert for a brief period of |
| 10:10:25 | 5 | time.  We would also like counter-designate -- we'd like |
| 10:10:28 | 6 | the ability, obviously, to make counter-designations to the |
| 10:10:33 | 7 | submitted deposition testimony. |
| 10:10:33 | 8 | If the Plaintiff -- if the Defense's |
| 10:10:36 | 9 | presentation -- live presentation is approximately an hour, |
| 10:10:39 | 10 | as -- as we have been advised, then I would expect ours |
| 10:10:43 | 11 | would be no more than approximately 30 to 40 minutes, |
| 10:10:47 | 12 | Your Honor. |
| 10:10:47 | 13 | THE COURT:  All right.  Well, I see no reason to |
| 10:10:50 | 14 | play the deposition testimony to me.  I think the Court can |
| 10:10:53 | 15 | adequately review the transcripts or the portions of the |
| 10:10:56 | 16 | transcripts that the parties wish to offer. |
| 10:10:59 | 17 | So with regard to any deposition witnesses, I'll |
| 10:11:01 | 18 | take submissions and counter-submissions from the |
| 10:11:05 | 19 | transcripts from the parties.  And we'll limit the actual |
| 10:11:10 | 20 | live presentation to Dr. Li and the expert -- I've |
| 10:11:16 | 21 | forgotten his name. |
| 10:11:18 | 22 | MS. DOAN:  Nicholas Godici, Your Honor. |
| 10:11:20 | 23 | THE COURT:  Mr. Godici. |
| 10:11:21 | 24 | With that, counsel, I would anticipate that with |
| 10:11:27 | 25 | my final instructions and closing, the case will get to the |

| | | |
|---|---|---|
| 10:11:31 | 1 | jury sometime before, but probably not a great deal before, |
| 10:11:36 | 2 | lunch tomorrow. |
| 10:11:38 | 3 | And with that in mind, it would be my plan, as I |
| 10:11:41 | 4 | sit here now -- subject to change, but as I sit here now, |
| 10:11:45 | 5 | it would be my plan after the lunch break tomorrow to put |
| 10:11:47 | 6 | on the inequitable conduct portion of the trial as a bench |
| 10:11:51 | 7 | trial. |
| 10:11:51 | 8 | MS. DOAN:  Yes, Your Honor. |
| 10:11:53 | 9 | THE COURT:  All right.  So prepare your -- prepare |
| 10:11:54 | 10 | yourselves accordingly. |
| 10:11:56 | 11 | MS. DOAN:  We will, Your Honor. |
| 10:11:57 | 12 | One further clarification.  Would you like -- some |
| 10:12:00 | 13 | of the trial testimony that's been offered this week also |
| 10:12:03 | 14 | affects the inequitable conduct trial portion, as well. |
| 10:12:06 | 15 | Would you like us to submit that portion in writing or -- |
| 10:12:09 | 16 | THE COURT:  I've certainly heard it and been |
| 10:12:13 | 17 | exposed to it throughout the trial.  I would simply suggest |
| 10:12:15 | 18 | you reference that in your argument.  There'll be a final |
| 10:12:19 | 19 | argument at the end of the -- |
| 10:12:21 | 20 | MS. DOAN:  Yes, Your Honor. |
| 10:12:22 | 21 | THE COURT:  -- inequitable conduct.  If there's |
| 10:12:25 | 22 | something in your argument that I think the Court would |
| 10:12:29 | 23 | benefit from by having it submitted in writing, as opposed |
| 10:12:29 | 24 | to just refreshing the Court's recollection about what was |
| 10:12:33 | 25 | said during the jury trial, I'll ask for it. |

10:12:35   1            MS. DOAN:  Thank you, Your Honor.

10:12:36   2            MR. FABRICANT:  Your Honor, do the Court's

10:12:39   3   purported rules with respect to the exchange of exhibits

10:12:43   4   and demonstratives apply?

10:12:45   5            THE COURT:  Absolutely.  I don't want any

10:12:47   6   surprises tomorrow.

10:12:48   7            MR. FABRICANT:  Thank you.

10:12:48   8            THE COURT:  All right.  Is there anything further

10:12:50   9   from either Plaintiff or Defendant before we recess for

10:12:53  10   lunch?

10:12:53  11            MR. FABRICANT:  Nothing from the Plaintiff.

10:12:55  12            MR. DACUS:  Nothing from Amazon, Judge.

10:12:59  13            THE COURT:  We stand in recess until noon.

10:13:02  14            COURT SECURITY OFFICER:  All rise.

          15            (Recess.)

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes _____          10/7/2020
       SHELLY HOLMES, CSR, TCRR                Date
10     OFFICIAL REPORTER
       State of Texas No.: 7804
11     Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25