```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   VOCALIFE LLC,                  )(

 5        PLAINTIFF,                )(    CIVIL ACTION NO.

 6                                  )(    2:19-CV-123-JRG

 7   VS.                            )(    MARSHALL, TEXAS

 8                                  )(

 9   AMAZON.COM, INC. and           )(

10   AMAZON.COM LLC,                )(    OCTOBER 8, 2020

11        DEFENDANTS.               )(    8:29 A.M.

12                   TRANSCRIPT OF JURY TRIAL

13                      MORNING SESSION

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15           UNITED STATES CHIEF DISTRICT JUDGE

16

17   FOR THE PLAINTIFF:

18   MR. ALFRED R. FABRICANT
     MR. PETER LAMBRIANAKOS
19   MR. VINCENT J. RUBINO, III
     MS. AMY PARK
20   MR. ENRIQUE ITURRALDE
     FABRICANT LLP
21   230 Park Avenue, 3rd Floor W.
     New York, NY 10169
22
     MR. SAMUEL F. BAXTER
23   MS. JENNIFER L. TRUELOVE
     MCKOOL SMITH, P.C.
24   104 East Houston Street, Suite 300
     Marshall, TX 75670
25
```

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:     Shelly Holmes, CSR, TCRR
                         Official Reporter
20                       United States District Court
                         Eastern District of Texas
21                       Marshall Division
                         100 E. Houston Street
22                       Marshall, Texas  75670
                         (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

1288

```
08:29:35   1                    P R O C E E D I N G S
08:29:35   2              (Jury out.)
08:29:37   3              COURT SECURITY OFFICER:  All rise.
08:29:56   4              THE COURT:  Be seated, please.
08:30:52   5              Counsel, before I bring the jury in, tell me who
08:31:52   6   is going to present closing arguments for each side, how
08:31:57   7   you want your time accounted for, and what, if any,
08:32:01   8   warnings do you want on your time.
08:32:04   9              Let me hear from Plaintiff first.
08:32:05  10              MR. FABRICANT:  Good morning, Your Honor.
08:32:07  11              THE COURT:  Good morning.
08:32:07  12              MR. FABRICANT:  For our closing argument,
08:32:11  13   Your Honor, Jennifer Truelove will begin the closing
08:32:13  14   argument, and I will follow Jennifer Truelove.  We want to
08:32:18  15   split our time 20 minutes for the initial closing and 20
08:32:25  16   minutes for the rebuttal closing.
08:32:27  17              THE COURT:  And how do you and Ms. Truelove hope
08:32:30  18   to divide the first 20 minutes?
08:32:31  19              MR. FABRICANT:  I think the best estimate is
08:32:33  20   approximately 10 minutes or so for Ms. Truelove of the
08:32:35  21   first 20 minutes, Your Honor.
08:32:36  22              THE COURT:  Does Ms. Truelove want a warning at
08:32:40  23   any point, or are you going to take what's left of the
08:32:42  24   first 20 whenever she stops?
08:32:42  25              MS. TRUELOVE:  I think that's what will happen,
```

08:32:46  1   Your Honor.  I don't need a warning from the Court.

08:32:46  2           THE COURT:  Okay.

08:32:47  3           MR. FABRICANT:  Your Honor, if I could have a

08:32:48  4   warning at three minutes of the first 20?

08:32:51  5           THE COURT:  When 17 have been used?

08:32:52  6           MR. FABRICANT:  Yes.

08:32:53  7           THE COURT:  I will do that.  And then on the

08:32:57  8   second closing you'll do the entirety of it?

08:33:01  9           MR. FABRICANT:  I will, Your Honor.  If I can have

08:33:03 10   a warning at five minutes and two minutes.

08:33:06 11           THE COURT:  All right.  Mr. Fabricant.

08:33:07 12           MR. FABRICANT:  Thank you, Your Honor.

08:33:08 13           THE COURT:  Thank you.

08:33:08 14           Mr. Hadden, what's the Defendants' plan in this

08:33:13 15   regard?

08:33:13 16           MR. HADDEN:  Yes, Your Honor.  I'll be splitting

08:33:16 17   with Mr. Dacus.  I'll do approximately the first 25 to 30

08:33:22 18   minutes, if I could get a warning with 15 minutes left.  15

08:33:27 19   minutes before the end, Your Honor.

08:33:29 20           THE COURT:  All right.  15 minutes left.  That

08:33:31 21   means, out of 40 minutes total, when 25 have been used?

08:33:36 22           MR. HADDEN:  Yes, Your Honor.  Thank you.

08:33:37 23           THE COURT:  And then whenever you stop, Mr. Dacus

08:33:39 24   will finish with whatever you leave him?

08:33:41 25           MR. HADDEN:  Correct, Your Honor.

1290

08:33:43  1         THE COURT:  Mr. Dacus, regardless of what amount

08:33:45  2  of time that might be, what kind of warning, if any, do you

08:33:50  3  want?

08:33:51  4         MR. DACUS:  If you would just tell me when I have

08:33:54  5  two minutes, please, Your Honor, I'd appreciate it.

08:33:58  6         THE COURT:  Two minutes remaining.

08:33:58  7         MR. DACUS:  Thank you, Your Honor.

08:33:59  8         MR. HADDEN:  Thank you, Your Honor.

08:34:00  9         THE COURT:  Thank you, counsel.

08:34:00 10         Ladies and gentlemen, before I bring in the jury,

08:34:06 11  we have quite a few people in the courtroom.  Many of you

08:34:10 12  are associated with one side or the other of the case and

08:34:12 13  have invested time and work and resources in the trial

08:34:16 14  process.

08:34:21 15         I want to say to everybody present that the Court

08:34:25 16  considers its final instructions to the jury and counsels'

08:34:27 17  closing arguments to be the most serious part of a very

08:34:30 18  serious process.

08:34:31 19         Consequently, I don't want any conduct from anyone

08:34:35 20  that might disrupt or interrupt either my instructions to

08:34:39 21  the jury or counsel's closing arguments.

08:34:43 22         I don't want papers being shuffled.  I don't want

08:34:46 23  people leaning over and whispering to each other.  To the

08:34:52 24  extent it's possible, any getting up and leaving and coming

08:34:56 25  back in through the doors of the courtroom should be

08:34:59  1   avoided.

08:34:59  2        Please do everything you can possibly do to be as

08:35:02  3   respectful as possible and conduct yourselves in a way that

08:35:05  4   will avoid any interruptions or disruptions in the process.

08:35:09  5        As I say, I don't want anything that would take

08:35:12  6   away from the jury's ability to focus intently on my

08:35:17  7   instructions and counsel's closing arguments.

08:35:19  8        All right.  Is there anything from either

08:35:21  9   Plaintiff or Defendant before we bring in the jury?

08:35:23  10        MS. TRUELOVE:  One thing, Your Honor.  We intend

08:35:25  11   to use a couple of boards during closing arguments.  And

08:35:29  12   we've kind of previewed with defense counsel where we would

08:35:33  13   like to put easels, but I certainly want to run that by the

08:35:38  14   Court and make sure you don't disapprove with what our

08:35:40  15   intention is.

08:35:41  16        We'd like to use two easels total; one there in

08:35:44  17   the well where we've been using them throughout the trial,

08:35:47  18   and we thought we would put other -- one other back here,

08:35:51  19   and just wanted to confirm with the Court that that would

08:35:53  20   be okay.

08:35:53  21        THE COURT:  And you intend to have boards or

08:35:58  22   demonstratives up on both easels at the same time?

08:36:01  23        MS. TRUELOVE:  That's correct, Your Honor, and

08:36:02  24   interchanging some as -- as Mr. Fabricant goes throughout

08:36:05  25   his closing argument.

1292

| | | |
|---|---|---|
| 08:36:07 | 1 | THE COURT:  Okay.  And will members of the trial |
| 08:36:15 | 2 | team put up and take down the boards, or will the arguing |
| 08:36:19 | 3 | attorney be walking across the courtroom with a board in |
| 08:36:22 | 4 | hand trying to put it on the easel? |
| 08:36:24 | 5 | MS. TRUELOVE:  We've got Mr. Lambrianakos and |
| 08:36:26 | 6 | Mr. Rubino handling the boards, trying to do that as least |
| 08:36:30 | 7 | disruptive as possible. |
| 08:36:31 | 8 | THE COURT:  Will this occur in the Plaintiff's |
| 08:36:34 | 9 | first or second or in both closings? |
| 08:36:37 | 10 | MS. TRUELOVE:  I think both, Your Honor, yes. |
| 08:36:38 | 11 | THE COURT:  All right.  And how soon into |
| 08:36:42 | 12 | Plaintiff's first closing argument do you expect to be |
| 08:36:43 | 13 | using one or both easels? |
| 08:36:45 | 14 | MS. TRUELOVE:  I don't intend to use them during |
| 08:36:47 | 15 | my remarks at all.  So they'll be used when Mr. Fabricant |
| 08:36:51 | 16 | starts going through the evidence. |
| 08:36:53 | 17 | MR. FABRICANT:  Your Honor, we have a total of |
| 08:36:54 | 18 | five boards.  Two would be used in the first 20 minutes. |
| 08:36:58 | 19 | And then in the final 20 minutes, we have two that would |
| 08:37:02 | 20 | come up.  And then at the very, very end, one last board. |
| 08:37:05 | 21 | THE COURT:  All right.  And this has been |
| 08:37:08 | 22 | previewed with Mr. Dacus and Defendants?  You all -- you |
| 08:37:12 | 23 | have an idea, Mr. Dacus, of what they're proposing to do? |
| 08:37:16 | 24 | MR. DACUS:  I have an idea of where they're |
| 08:37:19 | 25 | proposing to put the easels.  I have not seen the boards, |

1293

08:37:22  1   but I have an idea of where they intend to put the easels.

08:37:22  2   And we have no objection to where they intend to place

08:37:28  3   them, Your Honor.  I would ask that they take the boards

08:37:31  4   down once they conclude.

08:37:32  5          THE COURT:  That is my typical practice for both

08:37:36  6   sides.

08:37:36  7          Often I will wait to see if opposing counsel is

08:37:39  8   going to use the other side's demonstrative as part of

08:37:42  9   their cross-examination, but we won't have that in closing.

08:37:45  10         So whenever you conclude with your first or your

08:37:51  11  final closing arguments, Plaintiff, you need to make sure

08:37:54  12  that the boards are taken down.

08:37:56  13         MR. FABRICANT:  Yes, Your Honor.

08:37:57  14         THE COURT:  And I would suggest you go ahead and

08:37:59  15  set up the second easel, put it where you want it so that

08:38:02  16  we don't have that disruption going on while the jury is in

08:38:07  17  the courtroom.

08:38:08  18         Let's go ahead and do that, and that way I can

08:38:11  19  actually see where you intend to put these aids.

08:38:38  20         If it's the least little bit mechanical, it's

08:38:43  21  better to get it done before the jury comes in.

08:39:03  22         And, also, while that's being done, counsel, let

08:39:07  23  me suggest to you that your IT people keep everything

08:39:11  24  hooked up and in place after the jury retires to

08:39:15  25  deliberate.  We'll have a break, and then I'll begin the

1294

08:39:20    1    bench portion of the trial.

08:39:22    2         And I have had occurrences where it was necessary

08:39:26    3    to bring the jury back into the courtroom to show them

08:39:29    4    something, and, of course, the IT people had shut

08:39:32    5    everything down and moved it out of the courtroom.  And

08:39:33    6    then we had to reconnect it and delay the process.

08:39:37    7         And so until you and I talk about it, keep your IT

08:39:43    8    stuff where it is, okay?

08:39:47    9         MR. RUBINO:  Your Honor, if we may take the boards

08:39:49   10    out of the crinkly paper?

08:39:51   11         THE COURT:  Yes.

08:39:51   12         MR. DACUS:  Your Honor, may I ask a question?

08:39:53   13         THE COURT:  Yes, sir.

08:39:54   14         MR. DACUS:  I'm just concerned the way this is

08:39:56   15    faced that I won't be able to see it.  And Mr. Hadden, once

08:40:00   16    they place the board, can we position ourselves so that we

08:40:03   17    can see it?

08:40:03   18         THE COURT:  I think you're entitled to see what

08:40:06   19    they're going to use, Defendants.  I just hope we can do it

08:40:09   20    in a way that we don't have a circus going on in here with

08:40:16   21    people walking all around the room.

08:40:19   22         MR. DACUS:  Understood, Your Honor.

08:40:20   23         THE COURT:  Probably the best approach, Mr. Dacus,

08:40:24   24    is this vacant chair between Mr. Hilmes and Mr. Re, if you

08:40:29   25    could pull that back a little bit.  Whoever is going to be

08:40:34   1   doing closing, from that posture, you ought to be able to

08:40:38   2   see both boards.

08:40:39   3           MR. DACUS:  Thank you, Your Honor.

08:40:40   4           THE COURT:  But, certainly, I want to accommodate

08:40:44   5   each side to see what the other one uses.

08:40:46   6           MR. DACUS:  Thank you very much.

08:40:51   7           THE COURT:  Yes, I'm very glad we got that done in

08:40:58   8   advance.

08:41:10   9           Just so I'll be sure and know, Mr. Dacus, will

08:41:13  10   Defendant be using any boards or easels or anything like

08:41:16  11   that during closing?

08:41:18  12           MR. HADDEN:  No, Your Honor.

08:41:19  13           MR. DACUS:  No, Your Honor.

08:41:20  14           THE COURT:  Okay.  All right.  Is there anything

08:41:51  15   else from either Plaintiff or Defendant before I bring in

08:41:54  16   the jury?

08:41:54  17           MS. TRUELOVE:  Nothing from Plaintiff, Your Honor.

08:41:55  18           MR. DACUS:  Nothing from Amazon, Your Honor.

08:41:57  19           THE COURT:  All right.  Mr. Mixon, if you'd bring

08:42:02  20   in the jury, please.

08:42:04  21           COURT SECURITY OFFICER:  All rise.

08:42:05  22           (Jury in.)

08:42:05  23           THE COURT:  Welcome back, ladies and gentlemen.

08:42:36  24   Please be seated.

08:42:36  25           Ladies and gentlemen of the jury, you have now

08:42:47  1   heard the evidence in this case, and I'll now instruct you

08:42:52  2   on the law that you must apply.

08:42:54  3          Before I go any further, let me mention that each

08:42:58  4   of you are going to have your own printed copy of these

08:43:01  5   instructions that I'm about to give you orally.  If you'd

08:43:04  6   like to take notes, you're welcome to.  But because you'll

08:43:07  7   each have your own written copy, you may choose merely to

08:43:10  8   listen and not take notes.  I leave that up to you.

08:43:14  9          It's your duty to follow the law as I give it to

08:43:17  10  you.  On the other hand, ladies and gentlemen, and as I've

08:43:21  11  said previously, you, the jury, are the sole judges of the

08:43:26  12  facts in this case.

08:43:27  13         Do not consider any statement that I have made

08:43:30  14  over the course of the trial or might make in these

08:43:33  15  instructions as an indication to you that I have any

08:43:37  16  opinion about the facts in this case.

08:43:40  17         You're about to hear closing arguments for the

08:43:46  18  attorneys for the parties.  Statements and arguments of the

08:43:50  19  attorneys, I remind you, are not evidence, and they are not

08:43:54  20  instructions on the law.  They're intended only to assist

08:43:58  21  the jury in understanding the evidence and the parties'

08:44:02  22  competing contentions.

08:44:03  23         A verdict form has been prepared for you, and

08:44:08  24  you're to take this to the jury room with you and consider

08:44:13  25  it as a part of your deliberations.

08:44:15  1          And when you've reached a unanimous decision as to

08:44:19  2   the verdict, you're to have your foreperson fill in the

08:44:23  3   blanks reflecting your unanimous answers to those

08:44:26  4   questions, sign it, date it, and then advise the Court

08:44:30  5   Security Officer that you have reached a verdict.

08:44:31  6          Answer each question in the verdict form from the

08:44:37  7   facts as you find them to be.  Do not decide who you think

08:44:42  8   should win the case, ladies and gentlemen, and then answer

08:44:44  9   the questions to achieve or reach that result.

08:44:49  10          Again, your answers to the questions and your

08:44:52  11   verdict in this case must be unanimous.

08:44:54  12          You are to consider these instructions that I'm

08:44:59  13   giving you as a whole, and you should not read or consider

08:45:02  14   any single instruction in isolation but consider them

08:45:07  15   collectively.

08:45:07  16          In determining whether any fact has been proven in

08:45:11  17   this case, you may, unless otherwise instructed, consider

08:45:15  18   the testimony of all the witnesses, regardless of who

08:45:19  19   called them, and you may consider the effect of all the

08:45:22  20   exhibits received and admitted into evidence and used over

08:45:26  21   the course of the trial, regardless of who may have

08:45:30  22   produced or presented them.

08:45:31  23          You the -- you, the jury, are the sole judges of

08:45:37  24   the credibility and believability of each and every witness

08:45:42  25   and the weight and effect to be given to all the evidence

08:45:44   1   in this case.

08:45:46   2          Now, during the course of the trial, you may have

08:45:50   3   been shown documents with some portions redacted.  In those

08:45:55   4   situations, if that occurred, you should not speculate

08:45:58   5   about what may have been redacted or why.  Those redactions

08:46:03   6   were approved by the Court prior to when the trial began.

08:46:07   7          And as I've told you previously, ladies and

08:46:09   8   gentlemen, the attorneys in this case are acting as

08:46:12   9   advocates for the competing parties and the parties'

08:46:16  10   competing claims.  And they have a duty to raise objections

08:46:21  11   when they believe evidence is offered that should not be

08:46:24  12   admitted under the rules of the Court.

08:46:27  13          In those cases, when the Court has sustained an

08:46:31  14   objection to a question addressed to a witness, you are to

08:46:34  15   disregard the question entirely, and you may not draw any

08:46:37  16   inferences from its wording or speculate about what the

08:46:42  17   witness would have said if the Court had permitted them to

08:46:46  18   answer the question.

08:46:47  19          However, on the other hand, if the Court overruled

08:46:51  20   an objection, then you're to treat the question and the

08:46:55  21   answer just as if no objection had been made, like any

08:46:59  22   other question and answer.

08:47:01  23          Now, at various times during the trial, it was

08:47:07  24   necessary for the Court to talk to the lawyers outside of

08:47:09  25   your presence and hearing when you were in the jury room.

08:47:14   1    This happens during trials because there are things that

08:47:17   2    sometimes arise that do not involve the jury.

08:47:22   3            You should not speculate, ladies and gentlemen,

08:47:24   4    about anything that was said between Court and counsel

08:47:27   5    outside of your hearing and outside of your presence.

08:47:31   6            The evidence that you are to consider consists of

08:47:35   7    the testimony of the witnesses, the documents and other

08:47:40   8    exhibits admitted into evidence, and any fair inferences or

08:47:45   9    reasonable conclusions you may draw from the facts and

08:47:48   10   circumstances that have been proven.

08:47:50   11           Now, there are two types of evidence that you may

08:47:56   12   consider to properly find the truth of the facts in this

08:48:02   13   case.

08:48:02   14           One is the direct evidence, such as the testimony

08:48:05   15   of an eyewitness.  The other is indirect, or circumstantial

08:48:08   16   evidence.  That is, proof of a chain of circumstances that

08:48:12   17   indicates the existence or the non-existence of certain

08:48:16   18   other facts.

08:48:16   19           As a general rule, you should know that the law

08:48:19   20   makes no distinction between direct or circumstantial

08:48:23   21   evidence, but simply requires that you, the jury, find the

08:48:27   22   facts based on the evidence presented, both direct and

08:48:31   23   circumstantial.

08:48:32   24           The parties may have stipulated to some facts in

08:48:37   25   this case, and when lawyers for both sides stipulate or

08:48:41  1  agree as to the existence of a fact, you must, unless

08:48:44  2  otherwise instructed, accept that stipulation as evidence

08:48:47  3  and regard the fact as proven.

08:48:49  4          Certain testimony in this case was presented to

08:48:55  5  you during this trial through depositions.  A deposition is

08:48:59  6  the sworn, recorded answers to questions asked of a witness

08:49:03  7  in advance of the trial.

08:49:05  8          If a witness cannot be present to personally

08:49:08  9  testify from the court -- from the courtroom, then the

08:49:13  10  witness's testimony may be presented under oath in the form

08:49:16  11  of a deposition.

08:49:17  12          And as I told you earlier, before the trial began,

08:49:21  13  the attorneys representing the parties in this case

08:49:24  14  questioned these deposition witnesses under oath.  At that

08:49:27  15  time, the witness was sworn, a court reporter was present,

08:49:32  16  questions were asked by counsel, and the answers of the

08:49:35  17  witness were recorded.

08:49:36  18          Both sides have then had the opportunity to

08:49:42  19  contribute portions of that sworn testimony from those

08:49:45  20  depositions to be played to you during the course of this

08:49:47  21  trial in open court.

08:49:49  22          Deposition testimony, ladies and gentlemen, is

08:49:51  23  entitled to the same consideration by the jury as testimony

08:49:57  24  given by a witness who appeared in person and testified

08:50:00  25  from the witness stand.

08:50:01  1          Therefore, you should judge the credibility and

08:50:05  2    the importance of deposition testimony to the best of your

08:50:09  3    ability, just as if the witness had appeared in open court

08:50:13  4    and testified from the witness stand.

08:50:15  5          Now, while you should consider only the evidence

08:50:19  6    that's been presented in this case, you should also

08:50:22  7    understand, ladies and gentlemen, that you are permitted to

08:50:25  8    draw such reasonable inferences from the testimony and the

08:50:30  9    exhibits as you feel are justified in the light of common

08:50:35  10   experience.

08:50:37  11         In other words, you may make deductions and reach

08:50:39  12   conclusions that reason and common sense lead you to draw

08:50:46  13   from the facts that have been established by the testimony

08:50:49  14   and the evidence in this case.

08:50:50  15         However, you should not base your decisions on any

08:50:55  16   evidence not presented by the parties in open court during

08:50:59  17   the course of the trial.

08:51:00  18         In deciding the facts in this case, you may have

08:51:05  19   to decide which testimony to believe and which testimony

08:51:09  20   not to believe.  You alone are to determine the questions

08:51:13  21   of credibility or truthfulness of the witnesses.

08:51:18  22         In weighing the testimony of the witnesses, you

08:51:21  23   may consider the witness's manner and demeanor on the

08:51:24  24   witness stand, any feelings or interest they may have in

08:51:28  25   the case, any prejudice or bias about the case that the

08:51:32  1  witness may have, and you may consider the consistency or

08:51:36  2  inconsistency of their testimony, considered in the light

08:51:40  3  of the circumstances.

08:51:40  4      Has the witness been contradicted by other

08:51:48  5  evidence?  Has he or she made statements at other times and

08:51:52  6  places contrary to what they said on the witness stand?

08:51:56  7  You must give the testimony of each witness the amount of

08:51:58  8  credibility that you think it deserves.

08:52:02  9      You must also keep in mind, ladies and gentlemen,

08:52:05  10  that a simple mistake does not mean that a witness is not

08:52:09  11  telling the truth.  You must consider whether any

08:52:14  12  misstatement was an intentional falsehood or a simple lapse

08:52:18  13  in memory and what significance should be attached to that

08:52:25  14  testimony.

08:52:25  15      Now, unless I instruct you otherwise, you may

08:52:28  16  properly determine that the testimony of a single witness

08:52:31  17  is sufficient to prove any fact, even if a greater number

08:52:34  18  of witnesses may have testified to the contrary, if after

08:52:38  19  considering all of the evidence you believe that single

08:52:40  20  witness.

08:52:45  21      When knowledge of a technical subject may be

08:52:48  22  helpful to you, the jury, a person who has special training

08:52:52  23  or experience in that technical field -- we call them an

08:52:55  24  expert witness -- is permitted to state to you his or her

08:52:59  25  opinions on those technical matters.

08:53:03  1        However, ladies and gentlemen, you are not

08:53:04  2   required to accept those opinions.  And as with any other

08:53:07  3   witness, it's solely up to you to decide who you believe

08:53:10  4   and who you don't believe and whether or not you want to

08:53:12  5   rely on their testimony.

08:53:16  6        Now, certain exhibits have been shown to you

08:53:18  7   during the course of the trial that were illustrations.  We

08:53:21  8   call these types of illustration -- we call these types of

08:53:26  9   exhibits demonstrative exhibits.  And they're often

08:53:29  10  referred to, by shorthand, simply as demonstratives.

08:53:32  11        Demonstrative exhibits are a party's description,

08:53:38  12  drawing, picture, or model to describe something involved

08:53:42  13  in the trial.

08:53:42  14        If your memory of the evidence differs from the

08:53:45  15  demonstratives, then you should rely on your memory.

08:53:50  16        Demonstratives, which are sometimes called jury

08:53:52  17  aids, demonstratives, ladies and gentlemen, are not

08:53:55  18  evidence themselves, but the witness's testimony during

08:54:00  19  which the demonstrative was used is evidence.

08:54:04  20        Now, while demonstratives may be helpful in

08:54:06  21  determining the issues, the demonstratives of both parties

08:54:12  22  are not evidence, and they are not proof of any facts.

08:54:15  23  These demonstratives, ladies and gentlemen, will not be

08:54:18  24  available to you to consider during your deliberations.

08:54:21  25        Now, in any legal action, facts must be proven by

08:54:27  1  a required amount of evidence known as the burden of proof.

08:54:32  2  The burden of proof in this case is on the Plaintiff for

08:54:36  3  some issues, and it's on the Defendants for other issues.

08:54:40  4         There are two burdens proof that you may apply in

08:54:45  5  this case.  One is the preponderance of the evidence, and

08:54:48  6  the other is clear and convincing evidence.

08:54:53  7         The Plaintiff in this case, Vocalife, who

08:54:56  8  you've -- excuse me, who you've heard referred to simply as

08:55:00  9  Vocalife, or the Plaintiff, over the course of the trial,

08:55:03  10  has the burden of proving patent infringement by a

08:55:06  11  preponderance of the evidence.

08:55:09  12         Vocalife also has the burden of proving willful

08:55:13  13  patent infringement by a preponderance of the evidence.

08:55:18  14         And Vocalife has the burden of proving damages for

08:55:20  15  any patent infringement by a preponderance of the evidence.

08:55:23  16         Let me remind you, a preponderance of the evidence

08:55:28  17  means evidence that persuades you, the jury, that a claim

08:55:31  18  is more probably true than not true.  Sometimes this is

08:55:36  19  talked about as being the greater weight and degree of

08:55:40  20  credible testimony.

08:55:41  21         Now, the Defendants in this case, Amazon.com,

08:55:45  22  Inc., and Amazon.com, LLC, who you've heard referred to

08:55:50  23  collectively throughout the case as just Amazon, or as

08:55:53  24  Defendants, they have the burden of proof of proving patent

08:55:58  25  invalidity by clear and convincing evidence.

08:56:03  1       Clear and convincing evidence, ladies and
08:56:04  2   gentlemen, means evidence that produces in your mind an
08:56:08  3   abiding conviction that the truth of the parties' factual
08:56:13  4   contentions are highly probable.
08:56:16  5       And, although proof to an absolute certainty is
08:56:19  6   not required, the clear and convincing evidence standard
08:56:22  7   requires a greater degree of persuasion than is necessary
08:56:28  8   for the preponderance of the evidence standard.
08:56:30  9       Now, as I've told you previously, neither of these
08:56:34 10   two burdens of proof should be confused with the burden of
08:56:38 11   proof known as beyond a reasonable doubt.  That burden of
08:56:43 12   proof is the burden of proof applied in criminal cases, not
08:56:46 13   in a civil case like this.
08:56:49 14       You should not confuse clear and convincing
08:56:51 15   evidence with beyond a reasonable doubt.  It's not as high
08:56:57 16   as beyond a reasonable doubt, but it is higher than a
08:57:01 17   preponderance of the evidence.
08:57:02 18       Now, in determining whether any fact has been
08:57:06 19   proven by a preponderance of the evidence or by clear and
08:57:09 20   convincing evidence, you may, unless otherwise instructed,
08:57:14 21   consider the stipulations of the parties, the testimony of
08:57:17 22   all the witnesses, regardless of who called them, and all
08:57:20 23   the exhibits received and admitted into evidence over the
08:57:25 24   course of the trial, regardless of who produced them or
08:57:27 25   presented them.

08:57:28   1          Now, as -- as I did at the beginning of the case,
08:57:32   2   I'll give you a summary of each side's contentions, and
08:57:35   3   I'll provide you with detailed instructions on what each
08:57:39   4   side must prove to win on each of its contentions.
08:57:43   5          As I previously told you, this is an action for
08:57:47   6   patent infringement.  This case concerns one United States
08:57:52   7   patent, which is United States Patent No. RE47,049, which
08:57:57   8   you've heard referred to repeatedly throughout the trial as
08:58:00   9   the '049 patent.  You've also heard that referred to as the
08:58:07  10   asserted patent.  Sometimes it's called the patent-in-suit.
08:58:09  11          Now, I'll refer to this as the patent-in-suit or
08:58:16  12   the asserted patent or as the '049 patent throughout the
08:58:17  13   remainder of these instructions.
08:58:21  14          The Plaintiff, Vocalife, has alleged that certain
08:58:23  15   of the Defendants', Amazon's, products indirectly infringe
08:58:28  16   claims of the asserted patent.  Vocalife seeks money
08:58:33  17   damages from Amazon for inducing infringement of certain
08:58:37  18   claims of the '049 patent by selling the Echo products and
08:58:41  19   instructing customers to use them in a manner that Vocalife
08:58:46  20   argues infringes the patent's asserted method claims.  And,
08:58:53  21   as I said, Vocalife contends that Amazon has induced its
08:58:57  22   customers to infringe these claims.
08:58:58  23          The claims-in-suit, the asserted claims, are
08:59:02  24   Claims 1 and 8 of the '049 patent.  And these claims, as
08:59:10  25   I've just mentioned, are sometimes called the asserted

08:59:12   1   claims.

08:59:12   2          Now, the Plaintiff, Vocalife, alleges that the use

08:59:15   3   of the following products infringe the asserted claims.

08:59:21   4          They are:  Amazon Echo 1st Generation, Amazon Echo

08:59:27   5   2nd Generation, Amazon Echo 3rd Generation, Amazon Echo Dot

08:59:34   6   1st Generation, Amazon Echo Dot 2nd Generation, Amazon Echo

08:59:41   7   Dot 3rd Generation, Amazon Echo Dot Kids Edition 1st

08:59:48   8   Generation, Amazon Echo Dot Kids Edition 2nd Generation,

08:59:53   9   Amazon Echo Look, Amazon Echo Show 1st Generation, Amazon

09:00:01  10   Echo Show 2nd Generation, Amazon Echo Spot, Amazon --

09:00:06  11   Amazon Echo Plus 1st Generation, Amazon Echo Plus 2nd

09:00:12  12   Generation, and Amazon Echo Studio.

09:00:15  13          These products are sometimes referred to, for

09:00:18  14   shorthand and collectively, as the accused products.

09:00:22  15          The Plaintiff, Vocalife, contends that the use of

09:00:28  16   the accused product infringes Claims 1 and 8 of the '049

09:00:32  17   patent.

09:00:33  18          And Vocalife also alleges that Amazon's

09:00:35  19   infringement is and has been willful.

09:00:39  20          Vocalife seeks money damages in the form of a

09:00:44  21   reasonable royalty for the alleged infringement of the

09:00:47  22   Defendants.

09:00:48  23          The Defendants, Amazon, denies that the use of the

09:00:52  24   accused products infringe the asserted claims of the

09:00:57  25   asserted patent.

09:00:58  1          Amazon further denies that it willfully infringed
09:01:02  2  any claim of the asserted patent.
09:01:06  3          Amazon also contends that each of the asserted
09:01:09  4  claims of the '049 patent are invalid, for separate and
09:01:14  5  distinct reasons.
09:01:15  6          Invalidity, ladies and gentlemen, is a defense to
09:01:19  7  infringement.  And, remember, invalidity and infringement
09:01:23  8  are separate and distinct issues.
09:01:27  9          Your job is to decide whether any of the asserted
09:01:31  10  claims of the '049 patent have been infringed and when --
09:01:35  11  and when -- excuse me, and whether any of the asserted
09:01:41  12  claims of the '049 patent are invalid.
09:01:44  13          Also, Amazon denies that it owes Vocalife any
09:01:49  14  damages in this case.
09:01:50  15          Now, it's your job, members of the jury, to decide
09:01:54  16  whether Vocalife has proven that Amazon has infringed any
09:01:58  17  of the asserted claims of the asserted patent and whether
09:02:02  18  that infringement was will -- willful.
09:02:05  19          You must also decide whether Vocalife has proven
09:02:08  20  that any of the asserted claims -- excuse me, you must also
09:02:16  21  decide whether Amazon has proven that any of the asserted
09:02:19  22  claims of the '049 patent are invalid.
09:02:22  23          Now, if you decide that any of the asserted claims
09:02:26  24  have been infringed and are not invalid, then you will need
09:02:32  25  to decide what amount of money damages, if any, are to be

09:02:36    1    awarded to Vocalife to compensate it for that infringement.

09:02:41    2            Now, before you can decide many of the issues in

09:02:47    3    this case, you need to understand the role of the patent

09:02:50    4    claims.

09:02:50    5            The claims of a patent are those numbered

09:02:52    6    sentences at the end of the patent.  Each of you have had a

09:02:55    7    complete copy of the '049 patent in your notebooks

09:02:59    8    throughout this trial.

09:03:00    9            The patent claims at issue, as I've said, are

09:03:04   10    Claims 1 and 8, and they begin on Column 21 at Line 27 of

09:03:10   11    the patent.

09:03:10   12            The claims define the patent owner's rights under

09:03:14   13    the law.  The claims are important because it is the words

09:03:17   14    of the claims themselves that define what the patent

09:03:21   15    covers.

09:03:22   16            The figures in the text and the remainder of the

09:03:28   17    text and the rest of the patent are intended to provide a

09:03:32   18    description or examples of the invention, and they provide

09:03:35   19    a context for the claims.

09:03:37   20            But, ladies and gentlemen, it is the claims

09:03:39   21    themselves that define the breadth of the patent's

09:03:44   22    coverage.

09:03:44   23            Each claim is effectively treated as if it were

09:03:47   24    its own separate patent.  And each claim may cover more or

09:03:51   25    may cover less than any other claim.  Therefore, what a

09:03:54  1  patent covers collectively or as a whole depends on what

09:03:57  2  each of its claims covers.

09:04:01  3        You first need to understand what each claim

09:04:07  4  covers in order to decide whether or not there is

09:04:09  5  infringement of that claim and -- and to decide whether or

09:04:12  6  not the claim is invalid.

09:04:13  7        The first step is to understand the meaning of the

09:04:16  8  words used in the patent claim.  Now, as the law says, it

09:04:23  9  is my role to define the terms of the claims, but it is

09:04:26 10  your role to apply my definitions to the issues that you're

09:04:29 11  asked to decide in this case.

09:04:31 12        We call those definitions that the Court provides

09:04:35 13  to the jury claim constructions.  These claim terms and my

09:04:40 14  definitions, my claim constructions, are included in a

09:04:44 15  chart in your juror notebooks.  And you've had them since

09:04:47 16  the beginning of the trial.

09:04:49 17        You must accept my definitions of those words and

09:04:52 18  phrases in the claims as being correct.  It's your job to

09:04:57 19  take these definitions and apply them to the issues that

09:05:00 20  you are deciding, including both the issues of infringement

09:05:04 21  and invalidity.

09:05:05 22        For any claim language that I have not construed,

09:05:11 23  you're to use the plain and ordinary meaning of those terms

09:05:15 24  in the context of the patent-in-suit as understood by a

09:05:19 25  person of ordinary skill in the art, which is to say in the

09:05:23  1   field of the technology of the patent as of September the

09:05:28  2   24th, 2010.

09:05:30  3        I'll now explain to you what a claim -- how a

09:05:36  4   claim defines what it covers.

09:05:38  5        A claim sets forth in words a set of requirements.

09:05:43  6   Each claim sets forth its requirements in a single

09:05:47  7   sentence.  If the use of a product satisfies each of these

09:05:51  8   requirements in that sentence, then it is covered by and

09:05:56  9   infringes that claim.

09:05:57  10       There can be several claims in a patent, as you

09:06:01  11  know, and a claim -- one claim may be narrower or broader

09:06:06  12  than another claim by setting forth more or fewer

09:06:14  13  requirements.

09:06:14  14       The coverage of a patent is determined and

09:06:16  15  assessed on a claim-by-claim basis.

09:06:18  16       Now, in patent law, the requirements of a claim

09:06:20  17  are often referred to as the claim elements.  They're

09:06:23  18  sometimes called the claim limitations.

09:06:25  19       When the use of a product meets all the

09:06:28  20  requirements of a claim, the claim is said to cover that

09:06:31  21  use, and that use is said to fall within the scope of that

09:06:35  22  claim.

09:06:39  23       In other words, a claim covers the use of a

09:06:40  24  product where each of the claim elements or limitations is

09:06:43  25  performed.

09:06:45   1            If a product, as used, is missing even one

09:06:50   2    limitation or one element of a claim, that use is not

09:06:53   3    covered by that claim.  And if the use is not covered by

09:06:56   4    the claim, that use does not infringe that claim.

09:07:00   5            Now, this case, ladies and gentlemen, involves two

09:07:04   6    types of patent claims, independent claims and dependent

09:07:07   7    claims.  In this case, Claim 1 of the '049 patent is an

09:07:13   8    independent claim, and Claim 8 of the '049 patent is a

09:07:18   9    dependent claim.

09:07:19   10           An independent claim does not refer to any other

09:07:23   11   claim in the patent.  An independent claim sets forth all

09:07:27   12   the requirements that must be met in order to be covered by

09:07:30   13   the claim.  It's not necessary to look to any other claim

09:07:35   14   in a patent to determine what an independent claim covers.

09:07:41   15           However, on the other hand, a dependent claim does

09:07:44   16   not by itself recite all the requirements of the claim but

09:07:49   17   refers to another claim or claims for some of its

09:07:52   18   requirements.  In this way, the dependent claim depends

09:07:56   19   from another claim.

09:07:59   20           The law considers a dependent claim to incorporate

09:08:04   21   all the requirements of the claim or claims to which it

09:08:07   22   refers, or as we sometimes say, from which it depends, as

09:08:13   23   well as the additional claims and requirements set forth in

09:08:20   24   the -- in the dependent claim itself.

09:08:21   25           To determine what a dependent covers -- a

09:08:29   1   dependent claim covers, ladies and gentlemen, it's

09:08:30   2   necessary to look at both the dependent claim and any other

09:08:34   3   claim to which it refers or from which it depends.

09:08:37   4        A product that meets all the requirements of both

09:08:40   5   the dependent claim and the claim from which it refers is

09:08:43   6   covered by that dependent claim.

09:08:48   7        In order to find infringement of a dependent

09:08:51   8   claim, you must consider all the limitations of both the

09:08:55   9   dependent claim and the other claim from which it depends.

09:08:58  10        If you decide that the claim from which the

09:09:00  11   dependent claim depends has not been infringed, then the

09:09:05  12   dependent claim cannot have been infringed.

09:09:13  13        If you decide that a claim from which the

09:09:15  14   dependent claim depends has been infringed, you must then

09:09:19  15   separately determine whether the additional requirements of

09:09:23  16   the dependent claim have also been met.  If the additional

09:09:28  17   requirements have been met, then the dependent claim has

09:09:30  18   been infringed.

09:09:30  19        Certain claims of the asserted patent use the word

09:09:36  20   "comprising."  Comprising means including or containing.

09:09:41  21        When the word "comprising" is used, a product that

09:09:45  22   includes all the limitations or elements of the claim, as

09:09:48  23   well as additional elements, is covered by the claim.

09:09:55  24        For example, if you take a claim that covers the

09:09:57  25   invention of a table, if the claim recites a table

09:10:00   1   comprising a tabletop, four legs, and nails that hold the

09:10:04   2   legs to the tabletop, the claim will cover any table that

09:10:07   3   contains these structures, even if that table also contains

09:10:12   4   other structures, such as leaves that would go in the

09:10:16   5   tabletop to expand it or wheels that would go on the ends

09:10:19   6   of the legs.

09:10:20   7          Now, that's a simple example using the word

09:10:24   8   "comprising" and what it means.  But, remember, in other

09:10:28   9   words, it can have other features in addition to those that

09:10:31  10   are covered by the patent.

09:10:32  11          If the use of a product, ladies and gentlemen, is

09:10:36  12   missing even one element or limitation of a claim, it does

09:10:42  13   not meet all the requirements of that claim, and it is not

09:10:45  14   covered by that claim.  And if the -- if the use of a

09:10:48  15   product is not covered by the claim, it does not infringe

09:10:52  16   the claim.

09:10:54  17          I'll now instruct you on infringement in a little

09:10:58  18   greater detail than I have before.

09:11:01  19          If a person makes, uses, sells, or offers for sale

09:11:05  20   within the United States or imports into the United States

09:11:10  21   what is covered by a patent claim without the patent

09:11:13  22   owner's permission, that person is said to infringe the

09:11:17  23   patent.

09:11:18  24          In this case, Vocalife alleges that Amazon,

09:11:22  25   together with Amazon's customers, infringe the asserted

09:11:27  1  claims of Vocalife's '049 patent by using the accused

09:11:31  2  products.

09:11:33  3      In reaching your decision on infringement, keep in

09:11:37  4  mind that only the claims of a patent can be infringed.

09:11:41  5  You must compare each of the asserted claims, as I have

09:11:46  6  defined them for you, to the accused products use -- as

09:11:49  7  used, and determine whether or not there is infringement.

09:11:54  8      You should not compare the accused products, as

09:11:57  9  used, with any specific example set out in the patent with

09:12:03  10  Vocalife's commercial product or with the prior art in

09:12:06  11  reaching your decision on infringement.

09:12:07  12      Remember, the only correct comparison is -- is

09:12:12  13  between the accused products, as used, and the language of

09:12:17  14  the claims themselves, applying all the definitions of the

09:12:21  15  claim language that the Court has given you.

09:12:27  16      You must reach your decision as to whether or not

09:12:30  17  each asserted claim is infringed based on my instructions

09:12:34  18  about the meaning and scope of the claims, the legal

09:12:37  19  requirements for infringement, and the evidence presented

09:12:38  20  to you over the course of the trial.

09:12:43  21      Infringement, ladies and gentlemen, is assessed or

09:12:45  22  determined on a claim-by-claim basis.  Therefore, there may

09:12:49  23  be infringement of one claim but no infringement as to

09:12:52  24  another claim.

09:12:56  25      I'll now instruct you on how to decide whether or

09:12:58  1   not Vocalife has proven that Amazon has infringed any of

09:13:02  2   the asserted claims of the patent-in-suit.

09:13:06  3        The Plaintiff, Vocalife, alleges that the

09:13:09  4   Defendants, Amazon, has infringed indirectly -- has

09:13:14  5   indirectly infringed, I should say, by inducing its

09:13:18  6   customers to infringe the '049 patent.

09:13:23  7        To prove induced infringement, one of the facts,

09:13:26  8   among others, that Vocalife must prove by a preponderance

09:13:30  9   of the evidence is that Amazon's customers directly

09:13:33  10  infringe the asserted claims.

09:13:36  11       A patent can be directly infringed even if the

09:13:40  12  alleged direct infringer did not have knowledge of the

09:13:44  13  patent and without the direct infringer knowing that what

09:13:48  14  it was doing is infringement of the claim.

09:13:50  15       A patent may also be directly infringed even

09:13:55  16  though the accused direct infringer believes in good faith

09:13:59  17  that what it is doing is not infringement of the patent.

09:14:03  18       Infringement does not require proof that any party

09:14:07  19  copied its product or method from the asserted claims.

09:14:13  20       In order to prove direct infringement, the

09:14:15  21  Plaintiff, Vocalife, must prove by a preponderance of the

09:14:19  22  evidence that -- that Amazon's customers used the invention

09:14:23  23  defined in the asserted claims of the '049 patent in a way

09:14:29  24  that meets each of the elements of those claims.  You must

09:14:34  25  compare the use of the accused products which -- with each

09:14:38    1    and every one of the requirements of a claim to determine

09:14:42    2    whether all the requirements of that claim are met.

09:14:46    3            A claim requirement is met if it is practiced by

09:14:49    4    Amazon's customers using the accused Amazon products, just

09:14:55    5    as it is described in the claim language, either as I've

09:14:59    6    explained it to you, or if I did not explain it to you, as

09:15:02    7    it would be understood -- understood by one of ordinary

09:15:06    8    skill in the art.

09:15:06    9            If the use of any accused product omits any

09:15:11    10   requirement recited in a claim, then such use does not

09:15:15    11   directly infringe that particular claim.

09:15:20    12           You must determine separately for each asserted

09:15:23    13   claim, ladies and gentlemen, whether Amazon has infringed

09:15:26    14   the '049 patent.

09:15:28    15           There is one exception to this rule.  If you find

09:15:31    16   that an independent claim from which other claims depend is

09:15:36    17   not infringed, there cannot be infringement of any

09:15:42    18   dependent claim that refers directly to that independent

09:15:47    19   claim.

09:15:48    20           Therefore, if you find that Amazon does not induce

09:15:51    21   infringement of Claim 1, then Amazon cannot induce

09:15:56    22   infringement of Claim 8.

09:15:58    23           On the other hand, if you find that an independent

09:16:02    24   claim has been infringed, you must still decide separately

09:16:07    25   whether the use by Amazon's customers meets the additional

09:16:10   1   requirements of the claim which depends from that

09:16:14   2   independent claim, that is, whether the claim has also been

09:16:18   3   infringed.

09:16:19   4        The same use of Amazon's products may satisfy more

09:16:23   5   than one element of a claim.  The act of encouraging or

09:16:29   6   inducing others to infringe a patent is called inducing

09:16:34   7   infringement, which is a form of indirect infringement.

09:16:37   8        Vocalife alleges that Amazon is liable for

09:16:42   9   indirect infringement by actively inducing Amazon's

09:16:46   10   customers to directly infringe the asserted claims of the

09:16:51   11   asserted patent.

09:16:53   12        You must determine whether there has been

09:16:56   13   inducement on a claim-by-claim basis.

09:16:59   14        Amazon is liable for inducement of infringement if

09:17:03   15   Vocalife proves by a preponderance of the evidence that:

09:17:08   16        (1) Acts are actually carried out by Amazon's

09:17:11   17   customers making, using, or selling the accused products,

09:17:16   18   and those acts directly infringe that claim;

09:17:18   19        (2) Amazon took action during the time the

09:17:24   20   asserted patent was in force intending to cause the

09:17:28   21   infringing acts by Amazon's customers; and

09:17:30   22        (3) Amazon, (a) was aware of the asserted patent

09:17:36   23   and knew that the acts, if taken by its customers, would

09:17:40   24   infringe the patent, or, (b), were willfully blind to the

09:17:47   25   fact that by engaging in those acts, its customers would

09:17:52  1    commit infringement of that patent.

09:17:56  2            To prove willful blindness, Vocalife must prove by

09:17:58  3    a preponderance of the evidence that:

09:18:02  4            (1) Amazon subjectively -- subjectively believed

09:18:07  5    there was a high probability that Amazon's customers were

09:18:10  6    directly infringing the asserted claims by engaging in acts

09:18:14  7    induced by Amazon; and

09:18:17  8            (2) that Amazon took deliberate steps to avoid

09:18:20  9    confirming that high probability.

09:18:22  10           It's not sufficient for Vocalife to show that

09:18:25  11   Amazon knew of a substantial risk of infringement by its

09:18:30  12   customers or that Amazon should have known of that risk.

09:18:33  13           Vocalife must prove by a preponderance of the

09:18:38  14   evidence that Amazon knew of the substantial risk and took

09:18:41  15   deliberate acts to avoid confirming that risk.

09:18:47  16           If you find that it is more likely than not that

09:18:51  17   Amazon actively induced infringement of a valid claim of

09:18:54  18   the '049 patent, then you must decide whether or not

09:19:01  19   Amazon's infringement was willful.

09:19:03  20           To show that Amazon's infringement was willful,

09:19:06  21   Vocalife, the Plaintiff, must prove by a preponderance of

09:19:09  22   the evidence that Amazon knew of the '049 patent and

09:19:12  23   intentionally infringed at least one asserted claim of that

09:19:16  24   patent.

09:19:16  25           For example, you may consider whether Amazon's

09:19:20  1  behavior was malicious, wanton, deliberate, consciously

09:19:25  2  wrongful, flagrant, or in bad faith.

09:19:29  3        However, you may not find that Amazon's

09:19:31  4  infringement was willful, merely because you have found

09:19:34  5  that Amazon knew about the patent without more.

09:19:38  6        In determining whether Vocalife has proven that

09:19:42  7  Amazon's infringement was willful, you must consider all of

09:19:46  8  the circumstances and assess Amazon's knowledge at the time

09:19:50  9  the alleged wrongful conduct occurred.

09:19:52  10        I'll now instruct you on the rules that you must

09:19:57  11  follow in deciding whether or not Amazon has proven that

09:20:01  12  the asserted claims of the asserted patent are invalid.

09:20:03  13        Amazon must prove by clear and convincing evidence

09:20:09  14  that each asserted claim is invalid.

09:20:12  15        The law presumes, ladies and gentlemen, in the

09:20:17  16  absence of clear and convincing evidence to the contrary,

09:20:19  17  that the United States Patent and Trademark Office acted

09:20:23  18  correctly in issuing a United States patent.

09:20:28  19        However, that presumption of validity can be

09:20:31  20  overcome if clear and convincing evidence is presented in

09:20:35  21  court that proves the patent is invalid.

09:20:37  22        Therefore, you, the jury, must determine whether

09:20:43  23  Amazon has proven Vocalife's claims are invalid.

09:20:49  24        Keep in mind that everyone has the right to use

09:20:51  25  existing knowledge and principles.  A patent cannot remove

09:20:55  1    from the public the ability to use what was known or

09:20:58  2    obvious before the invention was made or patent protection

09:21:02  3    was sought.

09:21:03  4         Amazon, the Defendant, contends that all the

09:21:09  5    asserted claims in this case are invalid for three separate

09:21:11  6    reasons.  Those reasons are:

09:21:14  7         (1) the claimed inventions would have been obvious

09:21:17  8    to a person of ordinary skill in the field in view of the

09:21:22  9    prior art;

09:21:23  10        (2) the claimed inventions lack utility because

09:21:28  11   the claimed methods are inoperative; and

09:21:31  12        (3) the claimed inventions are not what the

09:21:34  13   inventors regard as their inventions.

09:21:37  14        I'll now instruct you on how to decide whether or

09:21:42  15   not Amazon has proven that the claims of the '049 patent

09:21:44  16   are invalid.

09:21:44  17        Prior art, ladies and gentlemen, refers to

09:21:49  18   information available to those of ordinary skill in a field

09:21:53  19   before the date of the claimed invention and may include

09:21:58  20   items that were publicly known or that have been used or

09:22:01  21   offered for sale or written references, such as

09:22:05  22   publications of patents -- publications or patents that

09:22:09  23   disclose the claimed invention or elements of the claimed

09:22:12  24   invention.

09:22:13  25        To be prior art, the item or reference must have

09:22:18   1   been made, known, used, published, or patented before the

09:22:24   2   filing date of the provisional patent application of the

09:22:29   3   '049 patent, which date is September the 24th, 2010.

09:22:31   4        In order for someone to be entitled to a patent,

09:22:36   5   the claimed invention must not be obvious over the prior

09:22:40   6   art.  In other words, prior art is considered in

09:22:45   7   determining whether the asserted claims of the '049 patent

09:22:49   8   are obvious.

09:22:50   9        For purposes of this case, the date of invention

09:22:54   10   is September the 24th, 2010.

09:22:57   11        As I've previously explained, to obtain a patent,

09:23:03   12   you must first file an application with the United States

09:23:06   13   Patent and Trademark Office.  And you've heard that agency

09:23:09   14   abbreviated throughout the trial and referred to simply as

09:23:12   15   the PTO.

09:23:12   16        The process of obtaining a patent is called patent

09:23:18   17   prosecution.  The application is submitted to the PTO, and

09:23:22   18   it includes within it what is called a specification.

09:23:26   19        The specification is required to contain a written

09:23:30   20   description of the claimed invention telling what the

09:23:33   21   invention is, how it works, how to make it, and how to use

09:23:37   22   it.

09:23:37   23        You may have heard evidence of prior art that the

09:23:43   24   Patent Office may or may not have evaluated.  The fact that

09:23:46   25   any particular reference was or was not considered by the

1323

```
09:23:50   1   Patent Office does not change Amazon's burden of proof.
09:23:56   2            However, in making your decision whether Amazon
09:23:58   3   has met its burden of proof by clear and convincing
09:24:00   4   evidence as to a particular patent claim, you may take into
09:24:05   5   account the fact that the prior art was not considered by
09:24:10   6   the Patent Office.
09:24:11   7            Prior art differing from the prior art considered
09:24:15   8   by the Patent Office may, but does not always, carry more
09:24:19   9   weight than the prior art that was considered by the Patent
09:24:22  10   Office.
09:24:23  11            Again, the ultimate responsibility for deciding
09:24:27  12   whether the claims of the patent are valid is up to you,
09:24:30  13   ladies and gentlemen -- ladies and gentlemen, as the
09:24:34  14   members of this jury.
09:24:35  15            Like infringement, invalidity is determined on a
09:24:42  16   claim-by-claim basis.  In making your determination as to
09:24:45  17   invalidity, you should consider each of the asserted claims
09:24:48  18   separately.
09:24:49  19            If one claim of a patent is invalid, this does not
09:24:52  20   mean that any other claim is necessarily invalid.  Claims
09:24:57  21   are construed the same way for determining infringement as
09:25:00  22   for determining invalidity.
09:25:03  23            Now, Amazon contends that the asserted claims of
09:25:08  24   the '049 patent are invalid as being obvious.  Even though
09:25:12  25   an invention may not have been identically disclosed or
```

09:25:16  1  described before it was made by an inventor, in order to be

09:25:19  2  patentable, the invention also must not have been obvious

09:25:26  3  to a person of ordinary skill in the field of the

09:25:29  4  technology of the patent at the time the invention was

09:25:32  5  made, or before -- before the filing date of the patent.

09:25:36  6       Amazon is required to establish that a patent

09:25:41  7  claim is invalid by showing by clear and convincing

09:25:44  8  evidence that the claimed invention would have been obvious

09:25:49  9  to persons having ordinary skill in the art at the time the

09:25:54  10  invention was made or the patent was filed in the field of

09:25:58  11  the invention.

09:25:58  12       In determining whether a claimed invention is

09:26:05  13  obvious, you must consider the level of ordinary skill in

09:26:09  14  the field of the invention that someone would have had at

09:26:14  15  the time the invention was made or the patent was filed,

09:26:18  16  the scope and content of the prior art, any differences

09:26:22  17  between the prior art and the claimed invention, and the

09:26:25  18  ordinary knowledge of the person of ordinary skill at the

09:26:29  19  time of the invention.

09:26:29  20       Keep in mind, ladies and gentlemen, that the

09:26:40  21  existence of each and every element of the claimed

09:26:44  22  invention in the prior art does not necessarily prove

09:26:48  23  obviousness.  Most, if not all, inventions rely on building

09:26:55  24  blocks of prior art.

09:26:56  25       In considering whether a claimed invention is

09:26:58  1  obvious, you may, but are not required to, find obviousness
09:27:04  2  if you find at the time of the claimed invention or the
09:27:07  3  patent's filing date, there was a reason that would have
09:27:09  4  prompted a person having ordinary skill in the field of the
09:27:14  5  invention to combine the known elements in a way the
09:27:17  6  claimed invention does, taking into account such factors
09:27:22  7  as:
09:27:22  8      (1) Whether the claimed invention was merely the
09:27:26  9  predictable result of using prior art elements according to
09:27:29 10  their known function;
09:27:31 11      (2) whether the claimed invention provides an
09:27:34 12  obvious solution to a known problem in the relevant field;
09:27:38 13      (3) whether the prior art teaches or suggests the
09:27:44 14  desirability of combining elements in the claimed
09:27:48 15  invention, such as where there is a motivation to combine;
09:27:51 16      (4) whether the prior art teaches away from
09:27:55 17  combining elements in the claimed invention;
09:27:57 18      (5) whether it would have been obvious to try the
09:28:02 19  combinations of elements in the claimed invention, such as
09:28:06 20  where there is a design incentive or market pressure to
09:28:09 21  solve a problem, and there are a finite number of
09:28:13 22  identified predictable solutions, although obvious to try
09:28:17 23  is not sufficient in unpredictable technologies; and
09:28:23 24      (6) whether the change resulted more from design
09:28:29 25  incentives or market forces.

| | | |
|---|---|---|
| 09:28:30 | 1 | To find that prior art rendered the invention |
| 09:28:33 | 2 | obvious, you must find that it provided a reasonable |
| 09:28:38 | 3 | expectation of success. |
| 09:28:39 | 4 | In determining whether the claimed invention was |
| 09:28:42 | 5 | obvious, consider each claim separately.  Do not use |
| 09:28:45 | 6 | hindsight, ladies and gentlemen. |
| 09:28:49 | 7 | In other words, you should not consider what a |
| 09:28:51 | 8 | person of ordinary skill in the art would know today or |
| 09:28:57 | 9 | what has been learned from the teaching of the asserted |
| 09:29:00 | 10 | patent. |
| 09:29:00 | 11 | In determining whether the claimed invention was |
| 09:29:02 | 12 | obvious, consider each claim separately, but understand |
| 09:29:07 | 13 | that if a dependent claim is obvious, then the claims from |
| 09:29:11 | 14 | which it depends are necessarily obvious, as well.  Obvious |
| 09:29:16 | 15 | to try is not sufficient in unpredictable technologies. |
| 09:29:23 | 16 | Amazon must show that one of ordinary skill in the |
| 09:29:26 | 17 | art would actually recognize the benefit of combining prior |
| 09:29:30 | 18 | art references to achieve the claimed invention. |
| 09:29:34 | 19 | You must find that a person of ordinary skill |
| 09:29:38 | 20 | would have considered it reasonably likely that the |
| 09:29:41 | 21 | combination would work for its intended purpose. |
| 09:29:45 | 22 | However, the mere hope of a combination -- excuse |
| 09:29:49 | 23 | me, the mere hope that a combination might succeed is not |
| 09:29:53 | 24 | sufficient. |
| 09:29:54 | 25 | In deciding obviousness, you must avoid using |

09:29:58  1  hindsight, as I've said; that is, you should not consider

09:30:02  2  what is known today or what was learned from the teachings

09:30:04  3  of the patent.

09:30:06  4      You should not use the patent as a roadmap for

09:30:09  5  selecting and combining elements of prior art.  You must

09:30:13  6  put yourself -- self in the place of a person of ordinary

09:30:19  7  skill in the art as of September the 24th, 2010.

09:30:22  8      Now, several times in these instructions I've

09:30:28  9  referred to a person of ordinary skill in the field of the

09:30:32  10  invention.  It's up to you, ladies and gentlemen, to

09:30:34  11  determine the level of ordinary skill in the field of the

09:30:37  12  invention.

09:30:38  13      In deciding what the level of ordinary skill is,

09:30:43  14  you should consider all the evidence introduced at trial,

09:30:48  15  including:

09:30:49  16      (1) the levels of education and experience of the

09:30:53  17  inventors and other persons working in the field;

09:30:56  18      (2) the types of problems encountered in the

09:30:59  19  field;

09:31:00  20      (3) prior art solutions to those problems;

09:31:03  21      (4) the rapidity with which innovations are made;

09:31:11  22  and

09:31:12  23      (5) the sophistication of the technology.

09:31:15  24      A person of ordinary skill in the art is a

09:31:17  25  hypothetical person who is presumed to be aware of all the

09:31:23   1   relevant prior art at the time of the claimed invention.

09:31:26   2        Amazon contends that the asserted claims of the

09:31:32   3   '049 patent are invalid because they are inoperative and,

09:31:37   4   therefore, lack utility.  Amazon bears the burden of

09:31:41   5   establishing that the inventions lack utility by clear and

09:31:44   6   convincing evidence.

09:31:45   7        A claimed invention lacks utility and is invalid

09:31:51   8   if it contains a limitation that is impossible to meet or

09:31:55   9   does not work.  If the asserted claims of the '049 patent

09:32:00  10   recite a way of accomplishing an unattainable result or

09:32:05  11   recite a nonsensical method of operation, then the claims

09:32:10  12   are invalid for lacking utility because the invention, as

09:32:13  13   claimed, is inoperative.

09:32:15  14        Amazon also contends that the asserted claims of

09:32:20  15   the '049 patent are invalid for failure to claim the

09:32:25  16   subject matter that the inventors regard as their

09:32:28  17   invention.

09:32:30  18        Amazon bears the burden of establishing by clear

09:32:33  19   and convincing evidence that the patent is invalid under

09:32:38  20   this requirement.

09:32:38  21        Our patent laws require patent claims to

09:32:43  22   particularly point out and distinctively claim the subject

09:32:47  23   matter which the inventor regards as the invention.

09:32:50  24        If the asserted claims of the '049 patent do not

09:32:54  25   particularly point out and distinctly claim the subject

1329

09:32:57  1  matter which the inventors regard as -- as their invention,

09:33:02  2  then the asserted claims are invalid.

09:33:03  3          If you find that Vocalife has proven that Amazon

09:33:10  4  has infringed any of the asserted claims and if you find

09:33:14  5  that Amazon has failed to show that the asserted claims are

09:33:21  6  invalid, you must then consider the proper amount of

09:33:25  7  damages, if any, to award to Vocalife.

09:33:26  8          I'll now instruct you about the measure of

09:33:30  9  damages.  However, ladies and gentlemen, by instructing you

09:33:35  10  on damages, I'm not suggesting which party should win this

09:33:38  11  case on any issue.

09:33:39  12          If you find that Amazon has not infringed any of

09:33:44  13  the asserted claims or that all of the asserted claims are

09:33:49  14  invalid, then Vocalife is not entitled to any damages.

09:33:52  15          If you award damages, they must be adequate to

09:33:58  16  compensate Vocalife for any infringement of the asserted

09:34:02  17  claims you may find.

09:34:04  18          You must not award Vocalife more damages than are

09:34:08  19  adequate to compensate for the infringement, nor should you

09:34:12  20  include any additional amount for the purpose of punishing

09:34:16  21  Amazon.

09:34:17  22          The patent laws specifically provide that damages

09:34:20  23  for infringement may not be less than a reasonable royalty.

09:34:26  24          Now, Vocalife has the burden to establish the

09:34:29  25  amount of its damages by a preponderance of the evidence.

09:34:34  1          In other words, you should award only those

09:34:36  2    damages that Vocalife establishes -- establishes that it,

09:34:40  3    more likely than not, suffered as a result of Amazon's

09:34:44  4    infringement of the asserted claims.

09:34:45  5          While Vocalife is not required to prove the amount

09:34:50  6    of its damages with mathematical precision, it must prove

09:34:54  7    them with reasonable certainty.

09:34:57  8          Vocalife is not entitled to damages that are

09:35:00  9    remote or speculative.  If damages are awarded, the damage

09:35:04  10   period is to begin as of April the 16th, 2019.

09:35:10  11         Now, there are different types of damages that

09:35:14  12   Vocalife may be entitled to recover.  In this case,

09:35:18  13   Vocalife seeks damages in the form of a reasonable royalty.

09:35:22  14         A reasonable royalty, ladies and gentlemen of the

09:35:28  15   jury, is the amount of royalty payment that a patentholder

09:35:32  16   and the alleged infringer would have agreed to in a

09:35:38  17   hypothetical negotiation taking place at a time immediately

09:35:42  18   prior to when the infringement first began.

09:35:44  19         You've heard references throughout the trial for

09:35:47  20   whether Vocalife should be entitled to a running royalty or

09:35:50  21   a lump-sum royalty.  If you find that Vocalife is entitled

09:35:55  22   to damages, you must decide whether the parties would have

09:35:59  23   agreed to a running royalty or a fully paid-up lump-sum

09:36:03  24   royalty at the time of the hypothetical negotiation.

09:36:06  25         A running royalty is a fee paid for the right to

09:36:10   1  use the patent that is paid for each unit of the infringing

09:36:16   2  products that have been sold.

09:36:19   3          A running royalty can be based on the revenue from

09:36:21   4  or the volume of the sales of licensed products.  If there

09:36:26   5  are additional units sold in the future, any damages for

09:36:29   6  these sales will not be addressed by you.

09:36:33   7          If you decide that a running royalty is

09:36:35   8  appropriate, then the damages you award, if any, should

09:36:37   9  reflect the total amount necessary to compensate Vocalife

09:36:42  10  for Amazon's past infringement.

09:36:44  11          However, a lump-sum royalty is when the infringer

09:36:50  12  pays a single price for a license covering both past and

09:36:54  13  future infringing sales.  If you decide that a lump sum is

09:37:00  14  appropriate in this case, then the damages you award, if

09:37:04  15  any, should reflect the total amount necessary to

09:37:07  16  compensate Vocalife for Amazon's past and future

09:37:10  17  infringement.

09:37:11  18          In determining the reasonable royalty, you should

09:37:15  19  consider all the facts known and available to the parties

09:37:19  20  at the time the infringement began.  Some of the kinds of

09:37:24  21  factors that you may consider in making your determination

09:37:27  22  are:

09:37:28  23          (1) the royalties received by the patentee for

09:37:32  24  licensing of the patent-in-suit proving or tending to prove

09:37:36  25  an established royalty;

09:37:37  1          (2) the rates paid by the licensee for the use of
09:37:43  2    other patents comparable to the patent-in-suit;
09:37:45  3          (3) the nature and scope of the license as
09:37:49  4    exclusive or non-exclusive or as restricted or
09:37:53  5    non-restricted in terms of territory or with respect to the
09:37:56  6    parties to whom the manufactured products may be sold;
09:38:00  7          (4) whether the patent owner had an established
09:38:06  8    policy of granting licenses or retaining the patented
09:38:09  9    invention as an exclusive right, or whether the patent
09:38:13  10   owner had a policy of granting licenses under special
09:38:17  11   conditions designed to preserve its monopoly;
09:38:21  12         (5) the nature of the commercial relationship
09:38:24  13   between the patent owner and the licensee, such as whether
09:38:27  14   they are competitors or whether their relationship was that
09:38:31  15   of an inventor and a promoter;
09:38:33  16         (6) the effect of selling the patented specialty
09:38:39  17   in promoting sales of other products of the licensee, the
09:38:43  18   existing value of the invention to the licensor as a
09:38:46  19   generator of sales of his non-patented items, and the
09:38:49  20   extent of such derivative or convoyed sales;
09:38:52  21         (7) the duration of the patent and the term of the
09:38:59  22   license;
09:38:59  23         (8) the established profitability of the product
09:39:05  24   made under the patent, its commercial success, and its
09:39:09  25   current popularity attributable to the patent;

09:39:12   1          (9) the utility and advantages of the patented

09:39:16   2   invention -- invention over the old modes or devices, if

09:39:21   3   any, that had been used for achieving similar results;

09:39:25   4          (10) the nature of the patented invention, the

09:39:29   5   character of the commercial embodiment of it as owned and

09:39:32   6   produced by the licensor, and the benefits to those who

09:39:36   7   have used the invention;

09:39:37   8          (11) the extent to which the infringer has made

09:39:43   9   use of the invention and any evidence probative of the

09:39:45  10   value of that use;

09:39:46  11          (12) the portion of the profit or of the selling

09:39:52  12   price -- price that may be necessary -- excuse me -- that

09:39:56  13   may be customary in the particular business or in

09:39:58  14   comparable business to allow for the use of the invention

09:40:01  15   or analogous inventions;

09:40:02  16          (13) the portion of the realizable profit that

09:40:09  17   should be credited to the invention, as distinguished from

09:40:12  18   non-patented elements, the manufacturing process, business

09:40:17  19   risks, or significant features or improvements added by the

09:40:21  20   infringer;

09:40:21  21          (14) the opinion and testimony of qualified

09:40:25  22   experts; and

09:40:28  23          (15) the amount that a licensor, such as the

09:40:31  24   patentee, and a licensee, such as the infringer, would have

09:40:37  25   agreed upon at the time the infringement began if both

09:40:41  1  sides had been reasonably and voluntarily trying to reach

09:40:44  2  an agreement; that is, the amount which a prudent licensee

09:40:48  3  who desired as a business proposition to obtain a license

09:40:51  4  to manufacture and sell a particular article embodying the

09:40:55  5  patented invention would have been willing to pay as a

09:40:59  6  royalty and yet be able to make a reasonable profit and

09:41:04  7  which amount would have been acceptable to a prudent

09:41:07  8  patentee who was willing to grant a license.

09:41:09  9       Now, ladies and gentlemen, no one of these factors

09:41:16  10  is dispositive, and you can and you should consider the

09:41:19  11  evidence that's been presented to you in this case on each

09:41:22  12  of these factors.  You may also consider any other factors

09:41:27  13  which in your mind would have increased or decreased the

09:41:31  14  royalty the alleged infringer would have been willing to

09:41:34  15  pay and the patent owner would have been willing to accept

09:41:38  16  acting as normally prudent business people.

09:41:40  17       The final factor establishes a framework which you

09:41:45  18  should use in determining a reasonable royalty, that is,

09:41:49  19  the payment that would have resulted from a negotiation

09:41:53  20  between the patentholder and the infringer taking place at

09:41:57  21  a time prior to when the infringement began.

09:41:59  22       You've heard throughout this trial references to

09:42:06  23  whether the reasonable royalty should be a running royalty

09:42:08  24  or a lump sum.

09:42:09  25       If you find that Vocalife is entitled to damages,

09:42:13  1  you must decide whether the parties would have agreed to a

09:42:16  2  running royalty or a fully paid-up lump-sum royalty at the

09:42:22  3  time of the hypothetical negotiation.

09:42:26  4       In considering this hypothetical negotiation, you

09:42:29  5  should focus on what the expectations of the patentholder

09:42:33  6  and the alleged infringer would have been had they entered

09:42:37  7  into an agreement at that time and had they acted

09:42:44  8  reasonably in their negotiations.

09:42:45  9       In determining this, you must assume that both

09:42:48  10  parties believed the asserted claims were valid and

09:42:51  11  infringed and that both parties were willing to enter into

09:42:54  12  an agreement.

09:42:56  13       The reasonable royalty that you determine must be

09:42:59  14  a royalty that would have resulted from the hypothetical

09:43:03  15  negotiation and not simply a royalty that either party

09:43:06  16  would have preferred.

09:43:07  17       The law requires that any damages awarded to

09:43:14  18  Vocalife correspond to the value of the alleged inventions

09:43:17  19  within the accused products as distinct from other

09:43:21  20  unpatented features of the accused products and other

09:43:26  21  factors, such as marketing or advertising or Amazon's size

09:43:30  22  or market position.

09:43:32  23       This is particularly true where the accused

09:43:35  24  products have multiple features and multiple components not

09:43:39  25  covered by the patent or where the accused products work in

09:43:43   1   conjunction with other non-patented items.

09:43:47   2        Therefore, the amount you find as damages must be

09:43:49   3   based on the valuable -- the value attributable to the

09:43:54   4   patented technology alone.

09:43:56   5        In determining a reasonable royalty, ladies and

09:44:01   6   gentlemen, you may also consider evidence concerning the

09:44:04   7   availability and cost of acceptable non-infringing

09:44:11   8   substitutes to the patented invention.

09:44:14   9        An acceptable substitute must be a method that

09:44:18  10   does not infringe the patent.

09:44:19  11        Now, with these instructions, we'll proceed to

09:44:21  12   hear closing arguments from the attorneys at this time.

09:44:24  13        Plaintiff, you may now present your first closing

09:44:30  14   argument to the jury.

09:44:31  15        MS. TRUELOVE:  May it please the Court.

09:44:44  16        THE COURT:  Please proceed.

09:44:45  17        MS. TRUELOVE:  Counsel.

09:44:47  18        Ladies and gentlemen of the jury, I'd like to

09:44:49  19   begin by thanking you sincerely for your time, the time

09:44:54  20   away from your lives spent here with us over these last

09:44:59  21   five days, particularly under these very different

09:45:03  22   circumstances that we're all dealing with right now.  So

09:45:06  23   sincerely we say thank you.  We can't do this without you

09:45:10  24   here and without your participation.

09:45:12  25        Also, you know, on behalf of Dr. Li and my -- my

09:45:17   1   colleague Mr. Fabricant and the attorneys with his firm --

09:45:20   2   you know, over the years I have had many opportunities to

09:45:23   3   work with them.  And I hope that you found exactly what

09:45:26   4   I've found over the years is that they come in, they --

09:45:30   5   they present you with a case, they do a good job of it, and

09:45:33   6   we -- we appreciate that, as well.

09:45:35   7        I want to begin by talking with you a little bit

09:45:38   8   about some of the things that we talked about last week,

09:45:41   9   when I had an opportunity to visit with you during voir

09:45:44  10   dire.  And one of the first things I want to talk about is

09:45:48  11   these Scales of Justice.

09:45:49  12        And His Honor just took an hour going through the

09:45:54  13   charge, that you're going to get to take back with you.

09:45:57  14   And you heard him talk about the burdens of proof.

09:45:59  15        And just to be clear and make sure you understand,

09:46:01  16   the burden of proof that we have, that the Plaintiff,

09:46:04  17   Vocalife, has had in this case is preponderance of the

09:46:09  18   evidence.  And we showed you this back in voir dire to try

09:46:12  19   and illustrate a little bit about what we're talking about.

09:46:14  20        And what the Judge told you today is that you all

09:46:17  21   are the sole judges about what weight to give to the

09:46:23  22   evidence that you heard in the case.

09:46:24  23        And the evidence that you heard came from the

09:46:26  24   witness stand through testimony of witnesses sworn under

09:46:30  25   oath, deposition testimony, video testimony, again, of

09:46:35  1  witnesses under oath, and documents that were shown to you

09:46:37  2  and brought to you throughout the trial.  And you all get

09:46:40  3  to decide how much weight to give to that testimony and

09:46:44  4  that evidence.

09:46:46  5        And at the end of the day, what our obligation

09:46:50  6  was, was to bring you evidence and prove by a preponderance

09:46:53  7  of the evidence that Amazon has infringed the '049 patent.

09:46:58  8        So a preponderance of the evidence that they

09:47:00  9  infringe, also by a preponderance of the evidence that they

09:47:02  10  willfully infringe the '049 patent.

09:47:06  11        And, finally, it was our burden to prove by a

09:47:09  12  preponderance of the evidence that we're entitled to

09:47:13  13  damages, no less than a reasonable royalty in this case.

09:47:15  14        And we believe we've done that.  And Mr. Fabricant

09:47:18  15  is going to talk to you in just a few minutes about what

09:47:21  16  that evidence is.

09:47:22  17        Now, the other standard that you heard His Honor

09:47:26  18  talk about and talk about at length is this clear and

09:47:28  19  convincing.  That's not our burden.  That's Amazon's

09:47:31  20  burden.  And that has to do with the validity of the '049

09:47:34  21  patent.

09:47:36  22        Amazon came in here, and their goal and what

09:47:39  23  they're trying to show you is that the patent is invalid.

09:47:43  24        So make a mental note to yourself or take your

09:47:46  25  notebook when you go back in there and flip to the page

09:47:50    1   with Dr. Stern, remember him, the expert witness that they

09:47:54    2   brought in, and write up there clear and convincing,

09:47:57    3   because that's the burden of proof that he's being held to.

09:47:59    4        And the reason why Amazon is being held to that

09:48:04    5   higher standard, why they have to bring a greater weight of

09:48:07    6   the evidence to prove invalidity of this patent is because

09:48:10    7   there's a presumption that the patent is valid.

09:48:14    8        It's been prosecuted, it's been presented to the

09:48:17    9   Patent Office, and there is that presumption, and they have

09:48:20   10   to overcome it.  And that's why that standard is higher.

09:48:23   11        Now, I want to talk to you about something that I

09:48:27   12   didn't really talk to you about during voir dire, and I --

09:48:31   13   I find, I don't usually take the time to do this, because,

09:48:35   14   in my experience over the years that -- that I've done jury

09:48:39   15   trials, and particularly here in East Texas, is that our

09:48:42   16   jurors in East Texas are really, really good judges of

09:48:47   17   character.

09:48:47   18        One of your jobs and one of the first things that

09:48:50   19   His Honor told you when he read you that charge, is that

09:48:53   20   you are the sole judges of the credibility of the

09:48:56   21   witnesses.  You alone.

09:48:58   22        And what does that mean?  He told you, you get to

09:49:01   23   use your common sense.  And you evaluate everything that

09:49:06   24   you heard from the witness stand and everything that you

09:49:09   25   heard through deposition testimony.

09:49:11   1          And, in this case, you heard testimony from two
09:49:14   2   different types of witnesses, right?  You heard testimony
09:49:16   3   from fact witnesses, people who came and just told you what
09:49:20   4   they knew.  And then you heard testimony from expert
09:49:23   5   witnesses.
09:49:26   6          And expert witnesses were those individuals that
09:49:28   7   came up to talk to you about the technical aspects of the
09:49:31   8   case, about the damages.
09:49:33   9          And here's the thing about expert witnesses -- and
09:49:38  10   what -- and what His Honor told you in the charge, which is
09:49:41  11   that you're not required to accept that opinion.  Just
09:49:44  12   because someone comes on the stand and cloaks themselves in
09:49:48  13   this cover of I'm an expert, doesn't mean you have to throw
09:49:52  14   your common sense out the door.  It doesn't mean that you
09:49:56  15   have to accept any or part of their testimony.
09:49:57  16          And so I want to kind of use an example of what
09:50:00  17   I'm talking about as far as judging credibility, thinking
09:50:05  18   about the witnesses that you heard from, and I want to
09:50:08  19   speak a little bit about Dr. Zhu.
09:50:10  20          Remember her?  She was the second witness in the
09:50:12  21   case.  She told you that she was born and raised in China,
09:50:16  22   got her Bachelor's and her Master's degree in China.  She
09:50:20  23   told you -- obviously, English is her second -- second
09:50:24  24   language.
09:50:25  25          She traveled to this country to come get her Ph.D.

09:50:29   1   speaking very little English, having a grasp for the

09:50:32   2   written word and writing the word, but really not speaking

09:50:35   3   it well.  And she learned that by watching television.

09:50:37   4        She is one of the inventors in this case.  You

09:50:41   5   heard her tell you that.  And she went and worked for, at

09:50:45   6   the time, Dr. -- Dr. Li's company, Li Creative.  And she

09:50:49   7   worked -- she worked on this invention for years before she

09:50:54   8   came up with it.  And she came here, and she told you about

09:50:57   9   all that.

09:50:58   10       And -- and what I want you to think about is

09:51:01   11  really and truly the encourage that that had to take for

09:51:04   12  her to come here.  She's an inventor.  She doesn't own the

09:51:08   13  patent.

09:51:10   14       You heard no testimony about any financial

09:51:13   15  windfall she's going to get if you find that Amazon

09:51:16   16  infringes the patent and determine that they should have to

09:51:19   17  pay for their use of the '049 patent.

09:51:22   18       She subjected herself to cross-examination.

09:51:32   19  Why -- why would anyone do that?  Because it's her

09:51:35   20  invention.  It's part of her life's work.

09:51:38   21       She no longer works for Mr. -- for Dr. Li's

09:51:42   22  company.  She's working at a different company.  She left

09:51:45   23  her kids back in Newport -- New City, New York, and

09:51:51   24  traveled here.  That's courage.

09:51:53   25       And you're able and entitled to look at her

09:51:57   1   testimony and evaluate it and determine that it is, in

09:52:01   2   fact, credible.

09:52:03   3        And I want you to ask yourself when you're -- when

09:52:06   4   you're looking at all the witnesses in the case and what

09:52:08   5   they testified to, and particularly Dr. Zhu in coming here

09:52:11   6   and subjecting herself to cross-examination, remember --

09:52:15   7   remember what she was cross-examined about?

09:52:18   8        They put her declaration up there on a patent

09:52:21   9   that's not at issue in this case, and they -- and they

09:52:25  10   tried to get her to fold.  By what?  Reminding her,

09:52:28  11   threatening her, she could go to prison for five years for

09:52:33  12   coming here and giving her testimony?

09:52:35  13        I was raised -- and there's a phrase that I heard

09:52:39  14   over and over again growing up as I struggled with -- with

09:52:42  15   dealing with certain people, and my mother would always

09:52:45  16   say:  Courage is fire; bullying is smoke.

09:52:52  17        And that's your job in this case.  You -- you are

09:52:56  18   the smoke detectors.

09:52:57  19        So, as you hear the argument today,

09:53:00  20   Mr. Fabricant -- I'm about to yield the podium to him and

09:53:03  21   let him come up and talk to you -- he's going to speak to

09:53:05  22   you for a few more minutes.  And then the Defendants are

09:53:08  23   going to get up and talk to you and tell you their take on

09:53:11  24   the case.  And then Mr. Fabricant will have an opportunity,

09:53:15  25   because it is our burden to prove to you infringement in

09:53:17  1   this case, to get back up and speak to you for just -- for

09:53:22  2   just a little bit longer before you go and deliberate.

09:53:25  3          And what I want you to do is use your common

09:53:28  4   sense, evaluate the -- the evidence, and -- and determine

09:53:32  5   where that smoke is.

09:53:34  6          Thank you.

09:53:50  7          MR. FABRICANT:  Good morning, members of the jury.

09:53:52  8   It's been -- it's been an honor to present our case to each

09:53:57  9   of you and to have the privilege of presenting a case to

09:53:59  10  this Court in East Texas.

09:54:01  11         I do believe this case is all about credibility.

09:54:06  12  And I'm going to touch upon some of the things that I'm

09:54:09  13  sure you'll remember from the testimony, most importantly.

09:54:14  14         So we do have the burden of proof on infringement.

09:54:16  15  And our case was essentially proven through Joe McAlexander

09:54:23  16  from Richardson, Texas, who put the claims up and walked

09:54:26  17  through the claims, and pointed out in detail how each and

09:54:30  18  every element of these claims was met, both for Claim 1 and

09:54:35  19  Claim 8.

09:54:36  20         And Mr. McAlexander made clear that the patent was

09:54:43  21  infringed when the user plugged the device into the wall

09:54:47  22  and spoke the wake word.  As soon as the user speaks the

09:54:51  23  wake word, the device performs all of the steps that are

09:54:55  24  claimed in Claim 1 and are claimed in Claim 8.

09:55:01  25         I don't think there's any dispute in this case

09:55:03   1   that Amazon intentionally sells those products to its

09:55:06   2   customers.  I don't think there's any dispute in this case

09:55:08   3   that Amazon expects and intends the customers to use the

09:55:11   4   Echo devices.

09:55:12   5        And, in fact, as I'm sure you'll remember from the

09:55:16   6   Amazon witnesses, they want engagement.  They want millions

09:55:20   7   of customers to use the Echo devices to create tremendous

09:55:23   8   business for Amazon.  When they buy music, when they buy

09:55:27   9   videos, when they buy dog food, whatever it is, it doesn't

09:55:31  10   matter, they want a new way of doing business in the United

09:55:36  11   States where you use that Echo device.

09:55:38  12        The other thing that we learned, which was

09:55:40  13   critical -- this is about the microphone array that sits on

09:55:42  14   top of that device, without which there would be no Echo.

09:55:47  15   And without the Echo, there would be no Alexa.

09:55:50  16        Amazon spent this entire case trying to get the

09:55:53  17   jury to believe that Alexa, that beautiful graphic they

09:55:59  18   had, that beautiful movie they had, that thing up in the

09:56:03  19   Cloud, is the Echo.  That's not the Echo.  The Echo is the

09:56:06  20   device.  And Dr. Li and Dr. Zhu created the ability for

09:56:11  21   that device to work.

09:56:12  22        Now, let's talk about credibility.  You'll

09:56:16  23   remember -- most memorable to me was Dr. Kiaei, who was

09:56:22  24   their technical expert.  You have to believe what Dr. Kiaei

09:56:27  25   told you because that's the man who says they don't

```
09:56:30    1   infringe.
09:56:31    2          And the first thing he did was he took the witness
09:56:34    3   stand.  And Mr. Lambrianakos, my partner, was up here.  And
09:56:38    4   during opening, Amazon's counsel told the jury and the
09:56:40    5   Court that Dr. Kiaei was one of the world's foremost
09:56:46    6   experts on audio processing.
09:56:47    7          And we did a little digging, and we found out on
09:56:52    8   the Internet that this man has a website called
09:56:57    9   Hitechexpertwitness.com.  And when we looked at the
09:57:00   10   website, he didn't even list audio processing as any one of
09:57:05   11   his 10 areas of expertise.
09:57:07   12          And then we found his 25-page resume attached to
09:57:12   13   his website where you can go and hire him and pay him lots
09:57:15   14   of money.  And nowhere in those 25 pages were the words
09:57:18   15   "audio processing" even mentioned.
09:57:20   16          Now, I'm sure Amazon didn't know that.  I'm sure
09:57:23   17   when Amazon represented to the jury at the opening that
09:57:26   18   this is one of the world's foremost experts, that they
09:57:30   19   believed that.  We were surprised to find that out.
09:57:32   20          But then we asked him, and we gave him an
09:57:35   21   opportunity to say, well, no, I have experience, but that's
09:57:38   22   really not where I'm an expert.  And he admitted on the
09:57:42   23   stand, yes, I am an expert.  I am one of the world's
09:57:45   24   foremost experts.  Right away, you have to say to yourself,
09:57:51   25   is this a credible person?
```

09:57:55  1          And then, equally important, the other way that

09:58:01  2   Amazon has denied infringement here is through Mr. Hilmes,

09:58:05  3   who sat throughout the trial at the counsel table.

09:58:11  4          He wrote an article in 2018, along with six other

09:58:14  5   Amazon engineers.  Every author was an Amazon engineer who

09:58:19  6   worked at Lab126 on the Echo devices, every one of them.

09:58:22  7   And they wrote this article.  And it wasn't just any

09:58:26  8   article.  It was an article submitted to the scientific

09:58:30  9   community called a peer-review.

09:58:31  10          And Mr. Hilmes admitted, it has to be accurate, it

09:58:33  11  has -- it's going to be examined.  This is the scientific

09:58:37  12  community.  Their reputations are at stake.

09:58:39  13          Well, I strongly recommend that you take that

09:58:43  14  exhibit back to the jury room because that one article

09:58:48  15  written in 2018 sets forth every single element of the

09:58:55  16  Claims 1 and 8 that are being practiced here.

09:58:58  17          And here's the key.  It was written in 2018 before

09:59:03  18  there was any lawsuit, before there was any concept that

09:59:07  19  there would be a lawsuit here and a trial.  It was written

09:59:11  20  at a time when these seven Amazon engineers were telling

09:59:15  21  the truth about how their device worked.

09:59:17  22          And, please, when you read that article, you will

09:59:21  23  see it expressly says, this is how the Echo device works.

09:59:25  24          And now Mr. Hilmes comes into the courtroom, and

09:59:30  25  he denied from the witness stand that the Echo works as the

09:59:34  1  article describes.  And he expressly said from the stand

09:59:38  2  that the article is incorrect, that those items are not in

09:59:42  3  the Echo devices, that that's not how it works.  That's

09:59:46  4  number two.

09:59:46  5       Number three, perhaps most troubling, is Amazon

09:59:53  6  had another technical expert, Dr. Stern.  He was here for

09:59:57  7  invalidity.  He was not here for infringement.  He was the

10:00:00  8  second expert.

10:00:03  9       And you may recall that from the witness stand,

10:00:06  10  Dr. Stern, who is an expert in audio processing, who does

10:00:09  11  teach that subject at Carnegie-Mellon University, a fine

10:00:13  12  university, he admitted from the stand that the type of

10:00:20  13  beamforming, super directive beamforming that Amazon uses,

10:00:28  14  is adaptive beamforming.  Directly contradicting Dr. Kiaei.

10:00:36  15  Directly contradicting Mr. Hilmes.

10:00:38  16       And you can see from his face on the witness

10:00:40  17  stand, he said:  I want to take it back.  He said:  But I

10:00:43  18  can't take it back because of this Court's construction of

10:00:46  19  what adaptive beamforming means.

10:00:47  20       And, therefore, you have some very strong evidence

10:00:52  21  of inconsistent statements, of problems with credibility,

10:00:57  22  issues that when you deliberate back into the jury room,

10:01:01  23  you should take into consideration.

10:01:03  24       Dr. Zhu and Dr. Li spent years working on this

10:01:08  25  invention.

10:01:09  1          THE COURT:  17 minutes have been used.

10:01:10  2          MR. FABRICANT:  Thank you, Your Honor.

10:01:11  3          And I think the one thing that should be clear is

10:01:17  4  that Amazon has presented this case that there's a

10:01:22  5  textbook.  And in that textbook, you can find 400 pages

10:01:27  6  about different subject matters, different articles.

10:01:33  7          If it was so easy, why did it take the Amazon

10:01:37  8  engineers with the Brandstein textbook in hand such

10:01:40  9  difficulty to come up with a device that worked?  If it was

10:01:45  10 so easy, why did it take Dr. Li and Dr. Zhu -- this is

10:01:49  11 very, very complex technology.

10:01:52  12         When you look at some of the documents in the jury

10:01:54  13 room, you'll see that it looks like it's language from a

10:01:56  14 foreign planet, these algorithms, these mathematical

10:02:00  15 calculations.  And this is extremely difficult technology.

10:02:04  16 It was not obvious.  It was not easy.  It was not known.

10:02:08  17         And I believe that the evidence will -- will show

10:02:19  18 and persuade you, again, when you go back to the article

10:02:23  19 that the seven engineers of Amazon wrote back in 2018, that

10:02:30  20 each and every element of the Claim 1 and 8 are present.

10:02:33  21         There were other documents which were introduced

10:02:35  22 into evidence at trial.  There was the -- the block

10:02:44  23 diagram, which was, again, written years before the

10:02:47  24 lawsuit.  No lawsuit.  No reason why Amazon would

10:02:54  25 incorrectly set forth a block diagram which specifically

| | | |
|---|---|---|
| 10:02:57 | 1 | teaches adaptive beamforming, which the Defendants to this |
| 10:03:02 | 2 | minute deny exist in their products. |
| 10:03:04 | 3 | And here on the left is the testimony of Dr. Stern |
| 10:03:09 | 4 | admitting from the witness stand that the directive |
| 10:03:14 | 5 | beamforming is adaptive beamforming, adaptive beamforming. |
| 10:03:18 | 6 | And he was asked, and you heard Dr. Kiaei say: |
| 10:03:26 | 7 | Amazon uses a super directive beamformer, right, sir? |
| 10:03:30 | 8 | Yes. |
| 10:03:31 | 9 | That means Dr. Kiaei, if you believe Dr. Stern, |
| 10:03:34 | 10 | the real expert, is infringing on that element. |
| 10:03:35 | 11 | So how can you believe Dr. Kiaei with the rest of |
| 10:03:38 | 12 | his testimony with anything he had to say when it came to |
| 10:03:41 | 13 | the other subject matters. |
| 10:03:43 | 14 | Dr. Kiaei took the witness stand and said a |
| 10:03:46 | 15 | digital signal processor, that was a computer chip, and we |
| 10:03:51 | 16 | put up the tear sheets to show you the Intel chip and the |
| 10:03:56 | 17 | MediaTek chip.  He actually stood -- sat in the witness |
| 10:04:00 | 18 | chair and said that's not a digital signal processor, and |
| 10:04:03 | 19 | we put up the documents that said this is a digital signal |
| 10:04:05 | 20 | processor. |
| 10:04:05 | 21 | But yet he on the witness stand refused to admit |
| 10:04:09 | 22 | it was a digital signal processor. |
| 10:04:10 | 23 | And so I believe when the credibility of the |
| 10:04:18 | 24 | Amazon technical experts is examined and compared with the |
| 10:04:25 | 25 | testimony of the Amazon fact witnesses, we have presented a |

```
10:04:28   1   very strong case, beyond the preponderance of the evidence.
10:04:32   2   Remember, a preponderance of the evidence means ever so
10:04:36   3   slightly the Scales of Justice tip, ever so slightly.
10:04:40   4            I will return after the opening -- after the
10:04:44   5   opening -- closing argument of the Defendants and complete
10:04:48   6   my -- my closing remarks.
10:04:52   7            Thank you very much.
10:05:09   8            THE COURT:  All right.  At this time, we'll hear
10:05:11   9   closing arguments from the Defendants.
10:05:22  10            Mr. Hadden, you may proceed when you're ready.
10:05:25  11            MR. HADDEN:  Thank you, Your Honor.
10:05:26  12            Good morning.  And thank you.  Thank you for your
10:05:30  13   service, thank you for your time, and thank you for your
10:05:33  14   attention.  I appreciate it.  The folks at Amazon
10:05:37  15   appreciate it.
10:05:37  16            When this case started, Mr. Dacus told you that
10:05:42  17   this case was important to Amazon.  This case is important.
10:05:46  18   It's important because Amazon engineers, like Mr. Hilmes,
10:05:52  19   like Mr. Prasad, like Dr. Chhetri, they worked very hard
10:06:01  20   for years to develop something truly remarkable, the Echo
10:06:06  21   and Alexa.
10:06:06  22            Before the Echo, there was no such thing as a
10:06:11  23   smart-speaker.  Before the Echo, there was no device that
10:06:16  24   did that very difficult far-field speech recognition
10:06:22  25   process that Mr. Prasad talked about.  There was no device
```

10:06:26   1   that could hear you speaking in a crowded, noisy room at

10:06:32   2   any time from any location and wake up and then understand

10:06:36   3   what you said and do what you asked.

10:06:40   4          And, in fact, as Mr. Prasad explained, at the time

10:06:48   5   they started, it didn't even seem like a solvable problem

10:06:52   6   to most of the members of his team.

10:06:55   7          But with hard work, Mr. Hilmes and Mr. Prasad and

10:06:58   8   literally hundreds and hundreds of other engineers and

10:07:01   9   scientists at Amazon solved that problem, and they made it

10:07:05  10   work.

10:07:06  11          And when you work that hard and that long on

10:07:11  12   something that difficult and you succeed and then you have

10:07:15  13   someone falsely claim that they did it first and that you

10:07:20  14   took their solution, that's unfair.  And that's why Amazon

10:07:25  15   is here.

10:07:26  16          Amazon is here to defend Mr. Hilmes, Mr. Prasad,

10:07:30  17   and all of their colleagues at Amazon who did invent the

10:07:34  18   Echo and did invent Alexa.

10:07:37  19          Now, this is a patent case.  And, as you heard,

10:07:45  20   determining issues of infringement and invalidity, you're

10:07:49  21   going to have to look closely at the details of those

10:07:52  22   claims, Claim 1, and the detailed language, and determine

10:07:58  23   whether it really matches up to how an Echo operates and

10:08:02  24   whether it matches up to descriptions of what was known

10:08:06  25   before this patent, like that textbook from Dr. Brandstein.

10:08:12  1    That is what you're going to be asked to do.

10:08:14  2          Now, in Vocalife's opening, and I think we're

10:08:18  3    going to hear more of it in the rest of their closing,

10:08:22  4    Vocalife told a story, a different story.  And that story

10:08:26  5    really has nothing to do with analyzing the claims and

10:08:31  6    determining how an Echo works and what Dr. Brandstein's

10:08:37  7    book described.  That story and whether it was true is

10:08:43  8    important.  It's important to assess the credibility and

10:08:47  9    believability of Vocalife's patent claims in this case.

10:08:51  10          So let's look at the evidence and the facts.

10:08:55  11          And we can do that starting with a timeline.  And

10:08:59  12    this timeline starts in 2001 when Professor Brandstein

10:09:04  13    published his book on microphone arrays.

10:09:07  14          And we can jump forward in this timeline, then, to

10:09:10  15    2011, when Dr. Chhetri, who's working at Amazon designing

10:09:18  16    the microphone arrays and signal processing algorithms for

10:09:22  17    the product that became the Echo.

10:09:25  18          And we have his notebook, and you saw it.  It's

10:09:28  19    Defendants' 27.  And in it, he noted, and this is in

10:09:35  20    February of 2011, that he had been studying

10:09:39  21    Mr. Brandstein's textbook, as well as other technical

10:09:41  22    papers in the field.

10:09:42  23          And, of course, that's what scientists do.  They

10:09:44  24    learn from what others have done in the past, and they try

10:09:47  25    to advance it.  They try to add to it, and that's what he

```
10:09:50   1   was doing.
10:09:50   2          And what he did was he decided the best way to
10:09:57   3   solve the problem he was working on was to adapt this super
10:10:02   4   directive fixed beam beamformer that was described in
10:10:07   5   Chapter 2 of Mr. Brandstein's textbook.
10:10:09   6          And the other thing that he decided at that point
10:10:13   7   was that it would work well in a circular array of
10:10:16   8   microphones.  And that's what you see in the little diagram
10:10:19   9   at the top.  It looks like a hexagon.  But that's because
10:10:22  10   he was showing there would be six microphones equally
10:10:26  11   placed around the circle and one in the middle.
10:10:29  12          And, of course, that is the design that ultimately
10:10:32  13   became and was used in the Echo.
10:10:33  14          And, as Mr. Hilmes testified, that same basic
10:10:35  15   design, that same basic fixed beam super directive
10:10:42  16   beamformer algorithm are what underlie all of the Echo
10:10:45  17   products since.  Some of the products added more
10:10:48  18   microphones or fewer microphones, but they all worked
10:10:52  19   essentially in that same way.
10:10:54  20          Now, if we skip forward to December 2012,
10:11:00  21   Mr. Hilmes joins Amazon.  And he joins Amazon as the head
10:11:04  22   of the group that Dr. Chhetri was working in, the head of
10:11:08  23   the group developing the audio technology for the Echo
10:11:11  24   device.
10:11:12  25          And he and his team at Amazon came to fruition and
```

10:11:18   1   create a problem -- create a product based on the ideas

10:11:22   2   Mr. Chhetri -- Dr. Chhetri had back in February of 2011.

10:11:26   3          And then if we skip forward a few months later,

10:11:29   4   Mr. Prasad, who you heard from, joined Amazon, as well.

10:11:32   5          And he was working on the other part of that

10:11:37   6   Echo/Alexa combination, the brain in the cloud, the part of

10:11:43   7   Alexa, the machine learning, deep neural net that allow

10:11:48   8   Alexa to understand the words you speak from the sounds

10:11:50   9   that the Echo sends up to it and then to understand the

10:11:54  10   meaning of those words and what your intent is, what you

10:11:58  11   would like Alexa to do.

10:12:00  12          Again, that was an incredibly difficult problem.

10:12:03  13   These were cutting-edge issues in machine learning and

10:12:06  14   artificial intelligence, as well as audio processing.  But

10:12:10  15   working together, Mr. Hilmes and Mr. Prasad and their teams

10:12:14  16   solved it.  They solved the problem.

10:12:16  17          And they made a device, the Echo, and it was a

10:12:20  18   truly remarkable device.  For the first time, the Echo and

10:12:27  19   Alexa brought cutting-edge, artificial intelligence

10:12:35  20   technology into the homes of millions of people.  And it

10:12:37  21   allowed them to be entertained, to be informed, and to

10:12:39  22   perform thousands of tasks with a convenience that was

10:12:43  23   never available before.

10:12:45  24          And those engineers, including Mr. Hilmes and

10:12:48  25   Mr. Prasad and hundreds and hundreds of others at Amazon,

1355

| | |
|---|---|
| 10:12:53 | 1 |
| 10:12:56 | 2 |
| 10:12:58 | 3 |

10:12:53   1   were very proud of what they accomplished.  You heard

10:12:56   2   Mr. Prasad say that it was the accomplishment of his

10:12:58   3   lifetime.

10:13:00   4            Now, let's look at another timeline.  This

10:13:07   5   timeline begins around January of 2011 when Dr. Li and

10:13:11   6   Dr. Zhu were trying to build the conference phone called

10:13:15   7   the VoiceFocus, using adaptive beam technology.

10:13:20   8            And in 2011 they went to the Consumer Electronics

10:13:29   9   Show with their device, but the device didn't work.

10:13:32   10            As Dr. Zhu testified, it was a dummy device.  It

10:13:36   11   didn't do anything.

10:13:36   12            And you heard Mr. Fabricant in the opening talk

10:13:40   13   about what a wonderful device this was and how it won this

10:13:44   14   award.  But as Dr. Zhu acknowledged the only award it won

10:13:52   15   was for how it looked because it didn't work.  In fact, up

10:13:54   16   until the time she left Dr. Li's company, they could never

10:13:55   17   get their conference phone with adaptive beamforming to

10:13:57   18   work.

10:13:58   19            So then in October 2011, Dr. Li meets with some

10:14:07   20   engineers at Amazon who were working on the Fire Phone.

10:14:12   21            Now, as you heard from Mr. Hilmes and you heard

10:14:15   22   from Mr. Holland, these meetings are utterly routine at

10:14:19   23   Amazon.  Amazon is involved in a wide range of

10:14:25   24   technologies.  And other technology companies literally

10:14:28   25   line up to try to work with them, to provide components and

10:14:32  1  technology to Amazon products.

10:14:35  2        So they had this meeting, and we have the notes

10:14:40  3  from Amazon contemporaneous with this meeting.  And what

10:14:45  4  did they find?  They found that they were not impressed

10:14:49  5  with Dr. Li's company.

10:14:51  6        And probably, most importantly, we saw the video

10:14:54  7  testimony of Mr. Holland.  And Mr. Holland is a key witness

10:14:59  8  here because he is the only person at that meeting who has

10:15:04  9  no stake in this case.  He has no dog in this fight.  He

10:15:08 10  quit working at Amazon years ago.  He's at a new company.

10:15:11 11  But he testified, and he described what he remembered.

10:15:15 12        And what he remembered was:  The demonstration,

10:15:19 13  from my memory, did not go very well.  From my memory, it

10:15:22 14  did not demonstrate any capabilities that would have been

10:15:25 15  beneficial to us.

10:15:26 16        So then we go forward a couple of years, and

10:15:30 17  Dr. Li comes back to Amazon trying to get a job.  And he

10:15:35 18  has phone interviews, first with Mr. Prasad.

10:15:39 19        Mr. Prasad indicated in the notes that he wrote

10:15:43 20  during that interview at the time that he was not inclined,

10:15:51 21  that Dr. Li did not appear to have the capabilities and the

10:15:57 22  expertise in machine learning and artificial intelligence

10:16:01 23  that he was looking for.

10:16:02 24        In fact, he got the sense that Dr. Li was more

10:16:04 25  interested in trying to sell his company than he was

10:16:08   1   joining a team to build a new product.

10:16:10   2        We also have the phone interview with Mr. Hilmes.

10:16:14   3   Mr. Hilmes was someone more positive about Dr. Li than

10:16:19   4   Mr. Prasad was.  But, again, he indicated at the time

10:16:24   5   during the interview while he was speaking with Dr. Li, he

10:16:29   6   says:  I spent most of my time asking him technical

10:16:33   7   questions about beamforming and AEC.  And he did not do

10:16:36   8   very well with several of these questions.

10:16:39   9        So, again, there was no follow-up.  Dr. Li was not

10:16:42  10   a fit for Amazon, and he didn't get a job there.

10:16:45  11        Then we go forward to 2014, and Dr. Li and Dr. Zhu

10:16:51  12   were among hundreds of folks in the tech community around

10:17:00  13   New York, and they were invited to this launch event for

10:17:05  14   the Echo, and they came and they saw it.

10:17:07  15        And then six months later or so, Vocalife and

10:17:10  16   Dr. Li tried to sell the patent that they got reissued into

10:17:14  17   the patent in this case.  As Mr. Dacus will show you, the

10:17:18  18   differences between that patent and the patent in this case

10:17:21  19   are miniscule.  And he tried to sell that patent to Google

10:17:27  20   for $700,000.00.  And Google said, no, thank you.

10:17:30  21        And this is the form where he submitted his offer

10:17:36  22   to sell the patent for $700,000.00, the patent outright,

10:17:42  23   not just the license.  And Google said, no, thanks.

10:17:45  24        So then, finally, in September of 2018, Vocalife

10:17:51  25   got the patent -- the '049 patent reissued that they are

10:17:56  1   asserting in this case.

10:18:00  2           Then, in November of 2018, Vocalife and Dr. Li

10:18:07  3   were working on a product.  And the product was not a

10:18:12  4   smart-speaker like an Echo.  It was just a circular

10:18:16  5   microphone array.

10:18:18  6           So this is interesting.  This is the document,

10:18:22  7   their industrial design concept.  And you can see they

10:18:25  8   marked it confidential.  But if you look inside, what it

10:18:31  9   says is:  See Amazon Echo for reference.

10:18:34  10          So in 2018, Dr. Li was trying to copy, at least

10:18:37  11  the look of the Amazon Echo, for use in his own product.

10:18:41  12          And that product did not succeed, as

10:18:49  13  Mr. McAlexander testified.  Dr. Li has had no commercial

10:18:55  14  success.

10:18:55  15          Then, finally, in April of 2019, Dr. Li and

10:18:59  16  Vocalife filed this lawsuit.  Now, if you just look at this

10:19:01  17  timeline, there's almost five years after Amazon launched

10:19:09  18  the Echo.

10:19:10  19          Now, this is a slide that Mr. Fabricant put up in

10:19:15  20  his opening in this case, and he put it up to suggest that

10:19:21  21  Amazon has some practice of meeting with companies, small

10:19:24  22  companies like Dr. Li's, and then taking their technology.

10:19:29  23          But we know the truth now.  We heard the testimony

10:19:31  24  from Mr. Prasad.  And what did he say -- this -- this slide

10:19:36  25  mentions two companies, Yap and Nuance.  And what did

| | | |
|---|---|---|
| 10:19:41 | 1 | Mr. Prasad say? |
| 10:19:42 | 2 | Did you take Yap's technology? |
| 10:19:44 | 3 | No.  In fact, Amazon bought the entire company. |
| 10:19:48 | 4 | With Nuance, did Amazon steal Nuance's technology? |
| 10:19:54 | 5 | No.  Amazon licensed Nuance's technology. |
| 10:19:59 | 6 | So when Amazon meets with companies who actually |
| 10:20:02 | 7 | have valuable, useful technology, technology that would be |
| 10:20:09 | 8 | useful in Amazon's product or services, Amazon pays for it. |
| 10:20:14 | 9 | That's what Dr. -- Mr. Prasad testified to. |
| 10:20:18 | 10 | And, in fact, Dr. Li shopped his technology and |
| 10:20:21 | 11 | his patents not just to Amazon and Google, but to all these |
| 10:20:23 | 12 | other companies.  There were 20 companies.  And not a |
| 10:20:26 | 13 | single one of them found it was worth paying for. |
| 10:20:35 | 14 | So now let's look at the patent and those claims |
| 10:20:37 | 15 | we have to look at.  And if we start with -- and as |
| 10:20:41 | 16 | Your Honor -- as Judge Gilstrap instructed you, there are |
| 10:20:44 | 17 | only two claims at issue in this case.  One is Claim 1, |
| 10:20:48 | 18 | which is an independent claim, and then there's Claim 8, |
| 10:20:50 | 19 | the dependent claim. |
| 10:20:52 | 20 | And there's a lot of words and there's a lot of |
| 10:20:55 | 21 | details in these claims, and we're going to have to go |
| 10:20:57 | 22 | through them, and you're going to have to analyze them. |
| 10:21:00 | 23 | Bu,t at a high level, there is a simple |
| 10:21:03 | 24 | distinction between what this patent does and what this |
| 10:21:07 | 25 | patent requires and what Echos do.  And it involves the way |

10:21:11   1   that these beams, you've heard about, are formed and when

10:21:16   2   they're formed.

10:21:17   3         And the difference is that in the '049 patent, the

10:21:19   4   beams don't get formed -- the beam, rather, until the

10:21:23   5   device has located a target sound source, that is, somebody

10:21:29   6   or something that it wants to listen to.

10:21:31   7         And at that point, it creates a beam in the

10:21:34   8   direction of that target sound source.  And then the beam

10:21:40   9   is steered to follow that sound source if it moves.  That's

10:21:46  10   what the patent requires.

10:21:47  11         But the Echo doesn't do that.  The Echo has fixed

10:21:52  12   beams.  When you plug an Echo in, these beams come to life,

10:21:55  13   and they are always the same, and they never move.  In

10:22:01  14   fact, they're preprogrammed in the factory.

10:22:03  15         And we see when we look at the claim language,

10:22:07  16   there are a few places where this difference stands out.

10:22:12  17   And one of them is in this determining a delay limitation

10:22:15  18   that we talked about.

10:22:17  19         And, as Mr. Hilmes explained, when the Echo is

10:22:23  20   processing audio, there's no delay that is calculated

10:22:28  21   between each microphone and an origin of the array, as the

10:22:33  22   claim required.

10:22:34  23         The Echo doesn't do it because it doesn't need to

10:22:36  24   do it because it has these fixed beams that are already

10:22:40  25   preformed.  They don't depend on any determination of a

1361

10:22:46  1  delay.  They don't have to depend on an angle to target.

10:22:52  2        And Dr. Kiaei found the same, after studying the

10:22:56  3  source code in the Echo products.  And that's the only way

10:22:59  4  you can definitively determine what the product does.  You

10:23:02  5  have to read the computer code.  And he spent weeks doing

10:23:05  6  it.  And he confirmed that Mr. Hilmes was right, the beams

10:23:13  7  do not change.  They're fixed.

10:23:16  8        So, for that reason, at least this piece of the

10:23:22  9  claim, as you heard, will not -- does not match what the

10:23:25 10  Echo does.

10:23:25 11        And there's another similar element that requires

10:23:27 12  explicitly the steering of the beam to follow the user.

10:23:30 13  And we saw the patent required this.  It requires that

10:23:33 14  you -- the device form a beam, and then follow the user by

10:23:40 15  changing those weight coefficients you heard about based on

10:23:43 16  the direction the user is at any point in time.

10:23:47 17        And, again, as Mr. Hilmes testified, the Echo

10:23:50 18  doesn't do that.  The beams are always in the same places

10:23:54 19  pointing in the same directions.  Different beams get

10:23:57 20  selected depending on which one is the strongest, but the

10:24:02 21  beams never change.  They're programmed in the factory.

10:24:10 22  You can't -- the expert confirmed.

10:24:17 23        So those two elements at least are not used by

10:24:18 24  Echos when they're used by customers.  So for that reason,

10:24:18 25  there can be no infringement in this case because Claim 8

1362

10:24:21   1   depends from this claim.  And, as the Court instructed, if

10:24:25   2   the dependent -- if the independent claim is not met, the

10:24:29   3   dependent claim can't be met.

10:24:31   4        Now, I think it's useful to understand why

10:24:36   5   Mr. Hilmes and Amazon built the Echo the way they did.

10:24:40   6   And, just to be clear, on this paper that Mr. Fabricant

10:24:44   7   talked about, that was a research paper.  That was

10:24:46   8   explaining different ways that this can be done.

10:24:53   9        And there's no dispute that Amazon has tried what

10:24:55  10   the patent requires.  It has experimented with that

10:24:59  11   adaptive beamforming, beam steering approach.  Amazon's

10:25:05  12   tried it in its laboratories, but it has never used it in

10:25:09  13   an Echo.  And it doesn't use it, for a couple of reasons.

10:25:14  14        The first one that Mr. Hilmes described was

10:25:18  15   because the Echo needs to instantly be able to hear and

10:25:22  16   recognize that wake word, "Alexa," and wherever it comes

10:25:26  17   from, the Echo works better by having these pre-set beams

10:25:30  18   because they're always on when the device is on, and

10:25:32  19   they're always capable of catching that wake word without

10:25:35  20   having to first locate where the person is who's talking.

10:25:39  21        The other reason, Mr. Hilmes explained, was to do

10:25:43  22   what the patent requires.  We first have to find the

10:25:48  23   source, and then do these complicated calculations to form

10:25:52  24   a beam.  That takes a lot of computing power on the device.

10:25:57  25   And Amazon wanted to make the Echo affordable.  They didn't

10:26:00    1    want to put that expensive of a processor in the device.

10:26:04    2          And, finally, as Mr. Hilmes and Mr. Prasad

10:26:10    3    explained, there's a tight connection between the Echo and

10:26:12    4    that machine learning in the -- in the Cloud, because those

10:26:17    5    algorithms in the Cloud, those artificial neural networks,

10:26:25    6    they're all trained using audio sound that is sent up from

10:26:30    7    actual Echo devices.  And so all of that training has been

10:26:33    8    done with these fixed beams.

10:26:35    9          And, as Mr. Hilmes and Mr. Prasad explained, if

10:26:38   10    the beam suddenly changed or moved, a lot of that training

10:26:42   11    would then be mismatched.  It would be lost.  And the

10:26:46   12    speech recognition performance would degrade.  It would not

10:26:49   13    work as well.

10:26:50   14          So what's what Amazon -- that is why Amazon does

10:26:55   15    what it does, and why it does something different than what

10:26:58   16    this patent requires.

10:26:59   17          Now, when we look at what Vocalife's expert used

10:27:01   18    to try to show that the Echo does what the claim requires,

10:27:06   19    he didn't show you any source code where these delays were

10:27:10   20    actually calculated or he didn't show even any actual

10:27:15   21    delays.  What he showed you was this kind of cartoon

10:27:18   22    character from an Amazon presentation.

10:27:22   23          But this cartoon did not depict or approve all of

10:27:28   24    the requirements of that claim.  Maybe more importantly,

10:27:30   25    this cartoon doesn't even describe the Echo.

10:27:33  1        As Mr. McAlexander admitted, this presentation

10:27:40  2   that he took this slide from was not about the Echo at all.

10:27:43  3   It was about another service that Amazon offers for

10:27:46  4   developers of other products to build their own devices

10:27:50  5   that can communicate with Alexa.

10:27:52  6        And Mr. Hilmes confirmed this slide describes

10:27:59  7   nothing about how the Echo works.

10:28:00  8        Now, this is a very important point.  This is a

10:28:06  9   very unusual case.  In this case, Vocalife has no claim

10:28:13  10  that Amazon itself directly infringes this patent.  The

10:28:16  11  only claim in this case against Amazon is that Amazon

10:28:21  12  actively induces its customers to infringe.

10:28:25  13       And, as the Court noted and pointed out in the

10:28:32  14  instructions, to prove active inducement, Vocalife doesn't

10:28:37  15  only have to prove that the Echo device when it's used does

10:28:40  16  everything in the claim, Vocalife has to prove that Amazon

10:28:45  17  knew that by using an Echo, its customers would infringe

10:28:49  18  this patent, or Amazon -- or Vocalife would have to show

10:28:55  19  that Amazon subjectively believed it was highly likely that

10:29:00  20  its customers infringe and avoided confirming that fact.

10:29:05  21       Now, you have heard no evidence in this case on

10:29:09  22  this issue.  Vocalife has presented no evidence that Amazon

10:29:14  23  knew the Echo device infringed or that it was --

10:29:18  24  subjectively believed it was highly likely and then tried

10:29:23  25  to avoid that issue.

10:29:24  1        But this is part of Vocalife's burden of proof.

10:29:29  2   If they do not prove this, you cannot find that Amazon

10:29:32  3   infringes.

10:29:32  4        And the only evidence we have, actually, on this

10:29:36  5   issue was the testimony from Mr. Hilmes.

10:29:39  6        Now, Mr. Hilmes testified that as soon as this

10:29:43  7   lawsuit was filed, because he was the head of Amazon's

10:29:50  8   audio technology group, he read the patent, and he analyzed

10:29:55  9   the patent.  And he concluded that Amazon did not use what

10:30:01 10   the patent required because it used those fixed beams that

10:30:05 11   we talked about and not the adaptive steer beams the patent

10:30:11 12   requires.

10:30:12 13        So this is the sole evidence of what Amazon

10:30:14 14   believed when this case was filed.

10:30:17 15        So if we just stop here, even if you ignore the

10:30:22 16   details of how the Echo works and whether it matches up

10:30:25 17   with that claim or not, to find that Amazon infringes in

10:30:29 18   this case, you would have to find that Mr. Hilmes lied to

10:30:34 19   you on the witness stand about what he believed after

10:30:39 20   reading this patent.

10:30:40 21        THE COURT:  25 minutes have been used.

10:30:42 22        MR. HADDEN:  Thank you, Your Honor.

10:30:42 23        That is the only way that you can find that Amazon

10:30:45 24   infringes.

10:30:46 25        So when you get to that verdict form, the evidence

10:30:53  1   we think shows that you have to check "no" on Question 1.

10:30:57  2          Now, let me talk quickly about validity.  There

10:31:02  3   are few things that are undisputed about validity in this

10:31:06  4   case.

10:31:07  5          The first is that all of these concepts from the

10:31:09  6   patent, all these technologies that Mr. Fabricant talked

10:31:14  7   about in his opening were known.  Dr. Li admitted on the

10:31:17  8   stand they were known.  Dr. Zhu admitted they were known.

10:31:21  9   Dr. Stern showed that they were known.

10:31:22  10          The other thing that is undisputed is that the

10:31:26  11   Brandstein textbook on microphone arrays was never

10:31:29  12   considered by the Patent Office.

10:31:34  13          What is also undisputed is that when Dr. Li went

10:31:37  14   from converting his provisional patent to an actual patent

10:31:41  15   that the Patent Office would look at, he removed all the

10:31:44  16   references to the Brandstein book.

10:31:46  17          What is also undisputed is that even

10:31:55  18   Mr. McAlexander agreed that everything in Claim 1 is in the

10:31:57  19   Brandstein book.  The only thing he disputed was whether

10:32:01  20   those three audio algorithms, the sound source location

10:32:07  21   unit, the adaptive beamforming, and noise reduction would

10:32:11  22   all -- would have been obvious to all run on the same

10:32:14  23   digital signal processor.  That is clearly the case.

10:32:17  24          The Brandstein book itself describes using a

10:32:20  25   digital signal processor.  This Computerworld article 10

```
10:32:25   1   years before the patent talked about using a digital signal
10:32:29   2   processor.
10:32:29   3          Dr. Li's own article shows the beamforming and
10:32:32   4   noise reduction being used on a single digital processor.
10:32:40   5          Then there's a simple question:  If you have a
10:32:41   6   digital signal processor which is specially built to
10:32:43   7   perform these types of calculations, why would you not do
10:32:47   8   them all on that digital signal processor?
10:32:48   9          And, essentially, Mr. McAlexander said:  Yeah, I
10:32:51  10   would agree, you would.
10:32:52  11          The only other issue that Mr. McAlexander noted
10:32:55  12   with this book is it has a bunch of chapters and a table of
10:33:04  13   contents, and you would have to look at different chapters.
10:33:07  14          But there's nothing in the patent law that says a
10:33:12  15   book can't have chapters.  And the notion that a person of
10:33:15  16   ordinary skill would not know how to read the table of
10:33:18  17   contents, is just not credible.
10:33:18  18          The last issue is Claim 8.  And, again, it's
10:33:20  19   undisputed between the experts that this Abutalebi patent
10:33:25  20   describes exactly the added feature in Claim 8.
10:33:37  21          MR. DACUS:  Good morning.  I want to spend just
10:33:39  22   the last few minutes we have here on a couple of topics.
10:33:43  23          And the first topic I want to briefly touch on
10:33:47  24   are -- are the damages -- or the amount of money that
10:33:49  25   Vocalife seeks from Amazon.
```

| | | |
|---|---|---|
| 10:33:51 | 1 | And, as you might imagine, it pains me to talk |
| 10:33:54 | 2 | about damages and the amount of money because Amazon |
| 10:33:57 | 3 | certainly believes that they don't owe these folks anything |
| 10:34:00 | 4 | at all, not one dime. |
| 10:34:02 | 5 | But, as I told you at the beginning of this case, |
| 10:34:04 | 6 | if you -- if you listen closely to Plaintiff's request for |
| 10:34:11 | 7 | money and the method or the process they go through to |
| 10:34:14 | 8 | reach and ask for ultimately $30 million, it tells you a |
| 10:34:18 | 9 | lot about what cases are really about.  And it tells you a |
| 10:34:23 | 10 | lot about the credibility or believability, not only of the |
| 10:34:26 | 11 | damage claim, but other parts of their case. |
| 10:34:28 | 12 | And I certainly think that's true in this case, |
| 10:34:34 | 13 | and here's why. |
| 10:34:34 | 14 | The Judge just gave you these jury instructions. |
| 10:34:37 | 15 | And what he said -- and you can look at them when you go |
| 10:34:40 | 16 | back there.  It's on Page 24 and 25, if you want to look at |
| 10:34:44 | 17 | it. |
| 10:34:45 | 18 | He says:  The law requires that any damages |
| 10:34:47 | 19 | awarded to Vocalife correspond to the value of the alleged |
| 10:34:49 | 20 | inventions within the accused products -- within the Echo. |
| 10:34:55 | 21 | Therefore, the amount you find as damages must be based on |
| 10:34:58 | 22 | the value attributable to the patented technology alone. |
| 10:35:03 | 23 | Those are very important instructions.  And |
| 10:35:08 | 24 | instruct -- they are instructions, they are the law that |
| 10:35:11 | 25 | Vocalife and their expert completely violated. |

10:35:14  1          You heard it from the witness stand.  Vocalife and

10:35:18  2   their expert used this concept, downstream economic value,

10:35:23  3   DEV, that's the profits on the sale of Amazon products that

10:35:28  4   occur through not only the Echo but computers, tablets, and

10:35:35  5   phones.  Those things don't have these microphone arrays in

10:35:38  6   them.  Those things don't involve the patent.

10:35:41  7          The Court just told you, you can only value what's

10:35:45  8   in the accused product, the Echo.  Yet they included

10:35:48  9   additional products.

10:35:49  10          Furthermore, they included sales of things like

10:35:53  11   dog food, towels, whatever you buy on Amazon.com, the

10:35:58  12   profits of those that have nothing to do with the

10:36:02  13   microphone arrays that are accused of infringement in the

10:36:05  14   '049 patent.

10:36:06  15          And they use that -- you remember this

10:36:10  16   calculation.  They use that, that $57.36 as the entire

10:36:16  17   basis of their calculation and request for this

10:36:18  18   $30 million.  And the Court's instruction says you cannot

10:36:21  19   do that.

10:36:21  20          Now, there were other problems.  You heard all of

10:36:28  21   this testimony in the last two days, so I'm not going to

10:36:31  22   belabor it because I'm confident you remember it.  But

10:36:34  23   there were other problems with Mr. Ratliff on behalf of

10:36:39  24   Vocalife's use of this DEV.

10:36:40  25          For one thing, it's a projection or an estimate.

10:36:44   1   And he failed to use the actual information that Amazon

10:36:46   2   produced in this case.

10:36:47   3          Amazon produced the actual profits related to

10:36:52   4   sales of Amazon products that go through the Echo device.

10:36:54   5   And that's what the Court has just told you in your

10:36:56   6   instruction that you must limit your damages to.

10:36:58   7          And when you use those actual sales through the

10:37:02   8   Echo device, rather than $57.00, the number is actually

10:37:09   9   13 cents.  And you may say, well, that seems like a low

10:37:14  10   number, and you'd be right.

10:37:15  11          But the reason is, because for the most part,

10:37:18  12   consumers, who buy an Echo device, don't order on

10:37:22  13   Amazon.com through the Echo.  They do it through their

10:37:24  14   computer, through their phone, or through all sorts of

10:37:29  15   other ways.  But people just don't use these Echos, for the

10:37:32  16   most part, to order other Amazon devices -- I mean,

10:37:35  17   other -- other Amazon products.

10:37:37  18          Now, there's a whole list of reasons that we went

10:37:40  19   through with Mr. Ratliff that Mr. McGavock explained as to

10:37:44  20   why this DEV calculation was wrong.

10:37:47  21          You remember Mr. Ratliff admitted that he thought

10:37:49  22   it included the actual loss on the sale of the Echo

10:37:53  23   product.  And you know from the evidence now that it does

10:37:55  24   not, and that's -- that's a significant issue.

10:37:57  25          He failed to use or include all of the expenses

| | |
|---|---|
| 10:38:03 | 1 |
| 10:38:06 | 2 |
| 10:38:12 | 3 |
| 10:38:16 | 4 |
| 10:38:18 | 5 |
| 10:38:19 | 6 |
| 10:38:23 | 7 |
| 10:38:26 | 8 |
| 10:38:30 | 9 |
| 10:38:34 | 10 |
| 10:38:35 | 11 |
| 10:38:43 | 12 |
| 10:38:45 | 13 |
| 10:38:48 | 14 |
| 10:38:52 | 15 |
| 10:38:55 | 16 |
| 10:38:58 | 17 |
| 10:39:02 | 18 |
| 10:39:06 | 19 |
| 10:39:10 | 20 |
| 10:39:14 | 21 |
| 10:39:17 | 22 |
| 10:39:21 | 23 |
| 10:39:24 | 24 |
| 10:39:27 | 25 |

1 and properly calculate the profit.  He failed to adjust for
2 the fact that there are multiple Echos in some houses, this
3 aggregation factor -- remember Mr. Ratliff said:  I thought
4 that was included in the DEV.  You know from the evidence
5 now it was not.
6        He used this Echo sales channel apportionment,
7 which is the 6.7 percent that he included in his
8 calculation that you heard Mr. McGavock say he's never seen
9 anyone in 35 years use anything like that.
10        And the list goes on and on.
11        In the end, you know why he overstated all those
12 different components.  I mean, it's -- it's clear why he
13 did that.  There's only one way that you can get to this
14 very large number that they want from Amazon in this case.
15        Ultimately, Mr. McGavock did a calculation that
16 was based on the actual purchases that were made through
17 the Echo device, which is what the Court's told you you
18 should be looking at.  He calculated that royalty per unit,
19 he multiplied it by the number of Echos that have been
20 sold, which is the 19 million -- just under 19 million, and
21 the total royalty is $134,000.00.
22        Now, Mr. McGavock also explained to you that
23 should be the royalty.  If you reach damages in this case,
24 that should be the royalty that you find.
25        But he also gave you another data point.  And he

10:39:30   1   said, look, if you're contemplating this hypothetical
10:39:35   2   negotiation that occurred between Dr. Li and Amazon, we
10:39:37   3   already know what one party, Dr. Li, would have accepted
10:39:40   4   for this patent, because he made an offer to Google to not
10:39:46   5   only license it -- all you're considering is a license --
10:39:48   6   but to sell the whole kit and caboodle to Google for
10:39:52   7   $700,000.00.
10:39:53   8       And don't be fooled when they tell you -- and I'm
10:39:57   9   sure they will here in a second -- that, oh, the '049
10:40:01  10   patent that you're considering is different from the '756.
10:40:03  11       When you go into that jury room, pull open the
10:40:07  12   '049, look at Claim 1.  There are some italicized words in
10:40:10  13   there.  Those italicized words are words that were added to
10:40:14  14   the '049 that were not in the '756.  Look how many there
10:40:20  15   are.  There are very few.  All the rest of that is exactly
10:40:23  16   the same.
10:40:24  17       And, as Mr. McGavock said, the '049 and the '756
10:40:28  18   that Dr. Li agreed to sell are exactly the same for
10:40:32  19   valuation purposes, exactly the same.  You can look at it
10:40:36  20   for yourself, and you'll see 98 percent of it is exactly
10:40:39  21   the same.
10:40:39  22       So, in the end, if you reach this issue of
10:40:47  23   damages, the calculation based on the actual profits of
10:40:50  24   sales through Echo devices, the royalties should be
10:40:52  25   $134,000.00.  And you should -- if you think it should be a

10:40:56   1   little more than that, you should always have this ceiling

10:40:58   2   of $700,000.00 because that's what we know Dr. Li had

10:41:03   3   agreed to accept for the sale of this very same technology.

10:41:08   4            And, as the Judge said, you're going to have a

10:41:11   5   question on whether or not that's a lump sum or a running

10:41:14   6   royalty.  And you should check lump sum because all the

10:41:18   7   evidence in this case points to that.

10:41:20   8            Dr. Li offered to sell his patent for a lump sum.

10:41:24   9   Amazon's policy, as you heard from the witness stand, is to

10:41:28  10   only license as a lump sum.  And, indeed, Amazon produced

10:41:32  11   its licenses in this case, and 11 of those 12 are lump sum.

10:41:38  12   The only exception being where they licensed this entire

10:41:43  13   giant pool of patents on a running royalty basis.

10:41:46  14            So all of the evidence leads you to conclude that

10:41:52  15   indeed this damage amount, if you reach that, should be a

10:41:56  16   lump sum.

10:41:56  17            Now, let -- let me end up here.  When -- when we

10:42:02  18   started this case, and what Mr. Hadden told you is, Amazon

10:42:07  19   wouldn't be here unless they believed this case was

10:42:10  20   important to our patent system, to our jury system, and,

10:42:15  21   frankly, to our way of doing business.

10:42:20  22            And the -- the specific facts of this case are --

10:42:25  23   I'll be diplomatic -- troubling to Amazon.  Because what

10:42:30  24   happens far too often in sort of the world we live in today

10:42:34  25   is that companies like Amazon, companies who had very

10:42:39   1   humble beginnings in a small garage of a house with two

10:42:43   2   computers and who have worked hard, who have hired the best

10:42:46   3   and brightest engineers and scientists in the country, who

10:42:50   4   have believed in the philosophy of putting their company

10:42:55   5   first, and who have achieved some small success, often

10:43:00   6   become a target.  And often they become a target of

10:43:03   7   lawsuits.  And often they become a target of lawsuits by

10:43:06   8   folks who haven't quite achieved what they wanted to in the

10:43:10   9   marketplace, and they're trying to achieve that and get

10:43:14  10   money in the courthouse.  And that's not how it ought to

10:43:19  11   work.

10:43:19  12        I -- I know you remember that several times the

10:43:21  13   Plaintiffs have put up slides in the course of this

10:43:25  14   lawsuit, and the title of them has been American Dream.

10:43:30  15        THE COURT:  Two minutes remaining.

10:43:31  16        MR. DACUS:  Thank you, Your Honor.

10:43:32  17        And I thought to myself when I saw those slides,

10:43:35  18   the American dream ought not be filing lawsuits against

10:43:40  19   companies who have worked hard to be successful.  Indeed,

10:43:44  20   that's not the American dream, nor should it be.

10:43:47  21        But, thankfully, under our Constitution, folks

10:43:52  22   like Amazon can come to the courthouse, they can defend

10:43:55  23   themselves, they can put the facts and evidence in front of

10:43:57  24   you, and they can let a jury determine whether or not this

10:44:00  25   kind of stuff ought to stop.

10:44:04  1          And that's why Amazon is here, because this kind

10:44:07  2   of stuff needs to stop, and it needs to stop here.  Amazon

10:44:13  3   can't stop it.  Only a jury can stop it.  That's why we ask

10:44:17  4   you to help us.

10:44:19  5          In just a few minutes, you're going to go, retire,

10:44:23  6   you're going to get all these questions on the verdict form

10:44:27  7   from the Judge.  And Amazon looks very forward to receiving

10:44:32  8   your verdict.

10:44:33  9          I want to end by saying, on behalf of the men and

10:44:36  10  women who work at Amazon, a very sincere thank you.  And I

10:44:36  11  want to be clear, that "thank you" is not conditional on

10:44:41  12  how you answer these questions; it's not.  All Amazon ever

10:44:42  13  wanted was an opportunity to defend itself, present the

10:44:48  14  facts to you, and let the chips fall where they may.  And

10:44:51  15  they -- they would not have that opportunity without you,

10:44:54  16  and we're very much appreciative of it.

10:44:56  17         Now, these folks are going to get to stand up and

10:44:59  18  talk again.  We're not going to get to say a word.  I'm

10:45:02  19  going to have to depend on you.  I don't know what they're

10:45:06  20  going to say.  But I'm going to have to depend on you that

10:45:10  21  no matter what they say, you will go back in your mind and

10:45:13  22  search the evidence to determine whether or not what they

10:45:15  23  say in the next 10 minutes is accurate or not.

10:45:17  24         Thank you very much.

10:45:18  25         Thank you, Your Honor.

```
10:45:20   1            THE COURT:  All right.  Plaintiff may now present
10:45:21   2    its final closing argument.
10:45:23   3            MR. FABRICANT:  Thank you, Your Honor.
10:45:33   4            Members of the jury, I just want to revisit some
10:45:36   5    facts for a moment, because I had a hard time believing
10:45:39   6    what I just heard.  We heard about 12 or 15 minutes of, the
10:45:42   7    Echo devices do not have this adaptive beamforming, they
10:45:45   8    don't understand why we're saying that it does, why don't
10:45:53   9    they look at the source code.
10:45:54  10            If we could bring up Slide No. 9 in the
10:45:57  11    presentation?
10:45:58  12            This is code which Mr. McAlexander showed you and
10:46:02  13    testified about from the witness stand.  This is Amazon
10:46:06  14    code, AdaptiveBeamFormer code.
10:46:13  15            Can you please go to Slide 16 of the presentation?
10:46:18  16            This is the block diagram from Amazon's Echo
10:46:21  17    devices that was prepared years before the lawsuit.
10:46:24  18            Can you please go to Slide No. 17?
10:46:28  19            This is the testimony of Mr. Hilmes with respect
10:46:31  20    to that block diagram where he admits they practice
10:46:35  21    adaptive beamforming, and yet their counsel just argued to
10:46:38  22    you that it's not in the Echo devices.  It's preposterous.
10:46:44  23            Very important.  Again, credibility.  This is all
10:46:50  24    about credibility.  We both hired experts.  They came into
10:46:54  25    this courtroom.  They told you for their representative
```

10:46:58  1    clients what they wanted you to hear.

10:47:00  2          Very important, they brought in, if you remember,

10:47:06  3    Mr. Hilmes brought in four months of the critical

10:47:09  4    engineer's notebook from February of 2011 to June of 2011,

10:47:13  5    the notebook of Mr. Chhetri who was the author of the

10:47:17  6    source code.

10:47:18  7          And I asked him on the witness stand:  Why didn't

10:47:22  8    you bring in the rest of the notebook?  Why didn't you

10:47:25  9    bring in the critical months?  How about bringing in the

10:47:30  10   months September, October, November of 2011, the same year

10:47:33  11   when Dr. Li went to Amazon.

10:47:34  12         These notes, if you look at the notebook which is

10:47:37  13   in evidence, they're hundreds of pages.  They're detailed

10:47:41  14   to the minute.  We would have had everything you needed to

10:47:44  15   know, everything you needed to know in that notebook.

10:47:46  16         And I asked him:  Wouldn't it have been helpful

10:47:48  17   for the jury to be able to see?

10:47:50  18         I don't know.

10:47:52  19         You didn't bring it with you, though?

10:47:54  20         No, I didn't.

10:47:56  21         So you're not able to testify about it?

10:48:00  22         No, I'm not.

10:48:01  23         Mr. Hilmes, who didn't even work at the company in

10:48:05  24   2011, think about that.  All he had to do was bring the

10:48:07  25   notebook and say, jury, here it is.  Nothing in there.

10:48:09    1          I suggest to you, and you can draw inferences --
10:48:12    2   as the Court advised you in your instructions -- you can
10:48:16    3   infer that because they didn't bring the notebook for the
10:48:18    4   critical days, including the days surrounding the meeting,
10:48:22    5   they said very positive things about the meeting.  They
10:48:24    6   said this is exactly what we need, adaptive beamforming.
10:48:28    7   But the notes aren't here, so you can't see them.
10:48:30    8          We've heard so much about the Brandstein book.
10:48:32    9   And I think the critical part of the Brandstein book is the
10:48:36   10   sentence which we've put on the board.  At the very end --
10:48:39   11   this is the conclusion of the man who brought together all
10:48:42   12   of these articles, the conclusion with all of these
10:48:47   13   chapters, that after 20 years of active research, we cannot
10:48:50   14   claim that microphone array processing has had the success
10:48:53   15   many of us had hoped for.  And many will wonder when the
10:48:59   16   great breakthrough in microphone array processing will
10:49:04   17   finally come, if ever.
10:49:06   18          Well, ladies and gentlemen, we have the front end
10:49:08   19   of the device that is Echo, which has made hundreds of
10:49:12   20   millions of dollars, has sold 19 million units just between
10:49:16   21   the day the complaint was filed in 2019 and today.  And our
10:49:20   22   patent runs until 2031.  2031.  There's no dispute about
10:49:26   23   that.
10:49:27   24          And yet they put a damages expert from a very
10:49:31   25   fancy company in Chicago, on the witness stand, and he

| 10:49:34 | 1 | actually told this jury that you should award 7/10ths of a |
| 10:49:42 | 2 | penny -- 7/10ths of one penny, lump sum, for that entire |
| 10:49:48 | 3 | period of time, and that they don't make any money, that |
| 10:49:51 | 4 | they lose money, and that maybe they'll make $2.00 a unit |
| 10:49:54 | 5 | over the next five years.  Do you believe that?  Who would |
| 10:49:54 | 6 | believe that?  Who in their right minds would believe that? |
| 10:50:00 | 7 | Now, our expert looked at their own documents, |
| 10:50:03 | 8 | which said:  It's not about making money on the sale of the |
| 10:50:05 | 9 | product.  We're not going to make money on that $39.00 |
| 10:50:09 | 10 | thing.  It's like when you buy a printer, the money is not |
| 10:50:13 | 11 | in the printer.  The money is in the toner cartridges that |
| 10:50:17 | 12 | you have to buy forever, forever, forever.  Very expensive. |
| 10:50:20 | 13 | That's what this is about.  They give you that |
| 10:50:22 | 14 | Echo.  They don't care, because they know every time you |
| 10:50:24 | 15 | make a sale, they get a piece of the action.  That's what |
| 10:50:27 | 16 | this is about. |
| 10:50:28 | 17 | And this man who came from China, who got his |
| 10:50:31 | 18 | Ph.D. in Rhode Island, and Dr. Zhu, who came from China |
| 10:50:41 | 19 | and got her Ph.D. at Ohio State University -- the Ohio |
| 10:50:44 | 20 | State University, these are people who made this possible |
| 10:50:46 | 21 | for Amazon.  This is the lives of -- of Dr. Li, his -- his |
| 10:50:49 | 22 | lifelong accomplishment.  This was the accomplishment of |
| 10:50:52 | 23 | Dr. Zhu. |
| 10:50:54 | 24 | For Amazon, this is another patent case.  They're |
| 10:50:57 | 25 | a big giant company, billions of dollars.  Another patent |

10:51:02   1   case.

10:51:02   2          You saw how many lawyers they had in this room for

10:51:06   3   the last 10 days -- five days.  I've never seen so many

10:51:10   4   lawyer representatives for a client in my 40 years of

10:51:13   5   practicing law.

10:51:13   6          And you heard the question to Prasad --

10:51:19   7   Mr. Prasad:  Did you listen to the testimony of Jeff Bezos

10:51:23   8   before Congress a couple of months ago where he admitted

10:51:27   9   mistakes have been made with respect to meeting with small

10:51:29  10   companies and taking their technology?  Mistakes have been

10:51:33  11   made.

10:51:36  12          And all we, the Plaintiff, are asking for is a

10:51:39  13   reasonable royalty.  Reasonable.  And you've heard the

10:51:42  14   evidence about what we believe is reasonable.  You've heard

10:51:46  15   the evidence about what they believe is reasonable.

10:51:49  16          But let me speak for a moment about that Google

10:51:52  17   offer that they want you to consider as a cap on a

10:51:56  18   reasonable royalty.

10:51:57  19          Many facts are not in dispute.  That was a

10:52:00  20   proposal on the '756 patent, and the '756 patent is a

10:52:07  21   different patent.  And when you open it up, as Mr. Dacus

10:52:09  22   suggests you do, and you look, you know what added that key

10:52:12  23   element of putting it all on a digital signal processor.

10:52:16  24   That wasn't in the '756.  That's critical.

10:52:21  25          Number one, different patent.

```
10:52:23   1        Number two, they couldn't show you the document or
10:52:25   2   any document that Dr. Li ever signed saying, I agree to
10:52:30   3   sell, here are the terms.  You know why they couldn't do
10:52:35   4   that?  Because it does not exist.  Don't you think if they
10:52:39   5   had a contract of sale or even a proposal for a contract of
10:52:43   6   sale, they would have shown it to you?  Of course, they
10:52:46   7   would have.
10:52:47   8        Also critical, what else didn't Amazon tell you?
10:52:50   9   They said the most important thing about determining
10:52:52  10   infringement is source code.  The source code tells you
10:52:55  11   everything, everything.
10:52:59  12        Where is the source code?  Why didn't they show
10:53:01  13   you the source code?  They showed you a couple of snippets
10:53:04  14   and said:  It's not in there.
10:53:06  15        It's their source code.  They could have done
10:53:08  16   anything they wanted to to show it to you, to explain it to
10:53:12  17   you, to prove it to you.  They did none of that.
10:53:15  18        So, with respect to these exhibits, I think the
10:53:23  19   fact they didn't bring the notebook which would have told
10:53:26  20   us exactly what happened during the critical time is very
10:53:29  21   important.  I believe the statements of Mr. Brandstein are
10:53:34  22   critical.
10:53:34  23        Now, think about this in terms of a -- of a
10:53:36  24   child's 5th grade mathematical textbook.  It has a chapter
10:53:42  25   on addition.  It has a chapter on subtraction.  It has a
```

10:53:42   1   chapter on multiplication.

10:53:48   2          Do you mean that someone can take that, because it

10:53:48   3   does teach addition and subtraction and multiplication --

10:53:52   4   can take that and create a mathematical formula just

10:53:54   5   because they know?  I couldn't do it myself with addition

10:53:58   6   and subtraction and multiplication.

10:54:01   7          This is a highly, highly complex technology.  And

10:54:06   8   not one of those articles in that book, if you -- if you

10:54:09   9   care to look at it, not one of them, as Dr. Stern admitted,

10:54:13  10   not one of them has all of the elements of the claim

10:54:15  11   together, not one of them.

10:54:16  12          And so they would suggest -- you look at

10:54:19  13   Chapter 10, you look at Chapter 15, you look at math and

10:54:23  14   division and addition and subtraction, somehow you'll

10:54:26  15   figure it out.

10:54:28  16          Let me suggest to you the following:  Why in the

10:54:31  17   notebook with the months that they did give you is

10:54:34  18   Mr. Chhetri, the engineer, who's referring right in the

10:54:37  19   notebook to Brandstein, and he says:  This is all

10:54:40  20   theoretical stuff.  Here it is.  It's all theoretical

10:54:45  21   stuff.  And yet on the right you can see highlighted, he's

10:54:48  22   referring to Brandstein.

10:54:50  23          And then on the next slide, Mr. Chhetri, who's the

10:54:54  24   author of all their source code, says:  I need ideas with

10:54:57  25   respect to adaptive beamforming.  And this is in the spring

10:55:03  1    and summer of '11.

10:55:06  2         And you know what happens two months later?  They

10:55:08  3    invite Dr. Li to come in, and they ask him to show us

10:55:14  4    adaptive beamforming, because Mr. Chhetri, the key author,

10:55:18  5    the key engineer of everything, can't figure it out.

10:55:21  6         So they want to say they invented it.  Keep in

10:55:25  7    mind the date is September 24, 2010.  They don't claim they

10:55:29  8    invented anything between September 24, 2010, prior to

10:55:33  9    that.  They didn't show you any device that Amazon has,

10:55:37  10   that has ever sold that predates September 24, 2010.

10:55:41  11        They didn't show you any device anywhere in the

10:55:44  12   world that anybody sold prior to September 24, 2010.  They

10:55:49  13   didn't show you any Amazon patent that they are saying

10:55:52  14   demonstrates a prior invention, prior to September 24,

10:55:57  15   2010.

10:55:57  16        Remember, you have to put yourself in the seat of

10:56:00  17   an individual sitting back in September of 2010.  And, as

10:56:05  18   Mr. McAlexander said, I thought very, very nicely:

10:56:08  19   Dr. Stern is a Ph.D., and he's sitting in 2020, and he's

10:56:13  20   got the Brandstein book in his desk for the last 20 years,

10:56:17  21   and he's looking in hindsight about what Brandstein

10:56:21  22   teaches.

10:56:22  23        I want to speak for a moment about willfulness.

10:56:25  24   Just to be clear, this jury does not have to find that the

10:56:29  25   patent was willfully infringed to find infringement and to

| | | |
|---|---|---|
| 10:56:32 | 1 | award damages.  That's not required.  Infringement and |
| 10:56:38 | 2 | willful infringement are two different things. |
| 10:56:39 | 3 | So we ask you to find infringement by a |
| 10:56:42 | 4 | preponderance of the evidence, but we also ask you to find |
| 10:56:46 | 5 | willful infringement. |
| 10:56:47 | 6 | And why?  It's a very important message that you |
| 10:56:51 | 7 | communicate to Amazon.com, that you believe not only they |
| 10:56:56 | 8 | infringe and that they should pay a reasonable royalty, but |
| 10:57:00 | 9 | that you believe their conduct was egregious and |
| 10:57:04 | 10 | inappropriate. |
| 10:57:04 | 11 | Now, why is that so?  Now, you've heard all the |
| 10:57:06 | 12 | evidence.  I laid it out all in my opening.  We know that |
| 10:57:10 | 13 | Dr. Li was invited to come to Amazon.  We know he was asked |
| 10:57:13 | 14 | to present the specific technologies.  We know that he was |
| 10:57:17 | 15 | told by Wei Li.  And here are the technologies he was asked |
| 10:57:20 | 16 | to present, adaptive beamforming, echo noise cancellation, |
| 10:57:24 | 17 | the very heart of the Echo devices. |
| 10:57:26 | 18 | We know that Wei Li wrote Dr. Li and said:  My |
| 10:57:30 | 19 | whole team is very interested.  I think the words are quite |
| 10:57:33 | 20 | interested.  Wei Li was on the -- was on the Echo Doppler |
| 10:57:37 | 21 | team.  There's no dispute that Dr. Li came in.  There's no |
| 10:57:40 | 22 | dispute in writing in his presentation he told them about |
| 10:57:44 | 23 | his patents. |
| 10:57:46 | 24 | And then they don't do business.  That's fine. |
| 10:57:48 | 25 | But they never told Dr. Li they were working on an Echo |

1385

10:57:52  1  device.  They never told Dr. Li they were working on this

10:57:56  2  invention.

10:57:56  3       And then, of course, we know the end of the story.

10:57:59  4  In 2014, he goes with Dr. Zhu to the big event in New York

10:58:03  5  City, he sees the invention, and he writes -- he writes

10:58:06  6  Mr. Prasad.

10:58:06  7       Now, this is the other thing I think you have to

10:58:08  8  ask yourself about credibility.  He writes Mr. Prasad.

10:58:13  9  Prasad gets the letter from Amazon.  He can't say, oh, I

10:58:19  10  never got it from Dr. Li, because Dr. Li sent it to Amazon,

10:58:20  11  and it's confirmed in the exhibit.

10:58:22  12       What does Mr. Prasad say?  I have no recollection

10:58:24  13  of this.  I have no recollection of meeting him at the --

10:58:28  14  at the event.  I have no recollection of getting the

10:58:30  15  letter.  Oh, and, by the way, I have no recollection of

10:58:33  16  ever having talked to him before, even though we showed you

10:58:36  17  from the witness stand that he had done a co-proposal, a

10:58:41  18  joint proposal with Dr. Li in 2012 to the United States

10:58:46  19  Government together.  So he doesn't remember anything.  So

10:58:50  20  can you really believe him?  That's Mr. Prasad.

10:58:54  21       And what do we know from the testimony in this

10:58:56  22  case?  We know that at the time Dr. Li came to Amazon,

10:59:01  23  Lab126, they had a Group C.  That was that Shimmer project,

10:59:08  24  an utter failure.  And they scrambled around, and they

10:59:11  25  moved the engineers from C to D and B.

1386

```
10:59:15   1          We know they had a Group B, which was the Fire
10:59:18   2   Phone project.  An utter failure.  An utter failure.  They
10:59:22   3   closed that down.
10:59:23   4          C was a failure.  B was a failure.  They're
10:59:28   5   scrambling around.  Now all they've got left is Echo.
10:59:31   6          Can you imagine the pressure that all of these
10:59:34   7   people must have been under?  Can you imagine the pressure
10:59:34   8   the engineers must have been under?
10:59:35   9          So they started inviting in all the companies.
10:59:37  10   How do we do beamforming?  How do we do Echo cancellation?
10:59:42  11   Why couldn't they figure it out from Dr. Brandstein?  But
10:59:46  12   they couldn't.
10:59:47  13          So they bring Dr. Li in, and what do they get?
10:59:50  14   They get the biggest success they've ever had in the
10:59:53  15   history of the company.  And they want to pay Dr. Li
10:59:57  16   7/10ths of one penny -- 7/10ths of one penny.  You know how
11:00:05  17   much money Amazon's stock is worth?
11:00:07  18          I find it unconscionable -- these are my opinions.
11:00:10  19   I find it unconscionable.  I find it unreasonable.
11:00:11  20          You heard every witness in this case say they have
11:00:14  21   a corporate policy.  What's the corporate policy?  That if
11:00:20  22   they invite someone in and that person says we have a
11:00:22  23   patent, you close your eyes.
11:00:24  24          Here's the testimony.  On the left is Aleksandar
11:00:26  25   Pance.  He's the guy that was at Apple, who met Dr. Li at
```

1387

```
11:00:32   1   Apple, who liked it so much that when he went to Amazon a
11:00:36   2   year later, he invited him back again.  And he says it's
11:00:39   3   the corporate policy -- he's the head guy now on Echo.
11:00:41   4          THE COURT:  Five minutes remaining.
11:00:42   5          MR. FABRICANT:  Thank you, Your Honor.
11:00:42   6          The head guy on Echo Alexa.  And he says:  It's
11:00:47   7   the corporate policy that we don't look at patents.  Even
11:00:50   8   if you tell us about them, we don't look at them, we don't
11:00:54   9   read them, we don't do anything.
11:00:56  10          And when I asked Mr. Hilmes from the witness
11:00:58  11   stand, you agree with your boss, don't you?  Yes, I do.
11:01:02  12          Think about this, they're inviting in these small
11:01:08  13   technology companies because they can't figure it out.
11:01:11  14          Dr. Li and others come in.  They make their
11:01:13  15   presentations.  By the way, Dr. Li under a confidentiality
11:01:18  16   agreement which says, we agree, we promise that if we use
11:01:22  17   your technology, it will only be in a business deal with
11:01:26  18   you.  Look at Paragraph 3 of the NDA.  If we use your
11:01:29  19   technology, it will only be in a business deal with you.
11:01:31  20   Well, they used it.
11:01:32  21          And so what I would suggest to the members of the
11:01:42  22   jury is that their conduct was egregious.  The corporate
11:01:46  23   policy is outrageous.  They can have that policy, but then
11:01:48  24   don't invite people in, take their technology, promise this
11:01:50  25   in a confidentiality agreement, and then kick them to the
```

```
11:01:52   1   side.
11:01:53   2          This is outrageous, willful blindness, deliberate,
11:02:00   3   intentional, mean-spirited.  Not the kind of thing that
11:02:04   4   happens here in the Eastern District of Texas, I can tell
11:02:06   5   you that.  That's not how the people are here.  I know
11:02:10   6   that.  I've spent a lot of time here.
11:02:12   7          I'd like to put one more board up.
11:02:25   8          So here's the jury form that you will receive in
11:02:29   9   just a few moments.  This is only my argument.  You don't
11:02:32  10   have to listen to me.  But I'm hoping you'll reach these
11:02:32  11   conclusions on your own.
11:02:35  12          Have any of the claims been infringed by Amazon?
11:02:38  13   Yes, they have.
11:02:39  14          Are either of the claims invalid?  Have they
11:02:42  15   proved by a clear and convincing evidence -- clear and
11:02:44  16   convincing, a strong conviction in your heart, have they
11:02:47  17   proven that?  No.  No to 1.  No to 8.
11:02:53  18          Have we proven by a preponderance of the evidence
11:02:54  19   that Amazon willfully infringed?  I think we really did,
11:02:57  20   and I think you need to tell Mr. Bezos that.
11:03:01  21          And damages.  We suggest a royalty, not for the
11:03:08  22   next 11 years, a reasonable royalty from the time they
11:03:12  23   started through today, in the amount of $1.65 a unit, based
11:03:19  24   on our expert's testimony, which amounts to a total of
11:03:24  25   $31 million.
```

11:03:25   1          Is that a lot of money?  It is to me.  I'm sure it

11:03:29   2   is to everybody in this courtroom, except them.

11:03:31   3          Thank you very much.  Thank you.

11:03:33   4          THE COURT:  All right.  Ladies and gentlemen,

11:03:47   5   you've now heard closing arguments from counsel for both of

11:03:52   6   the parties.

11:03:53   7          I'd like to provide you with a few final

11:03:55   8   instructions before you begin your deliberations.

11:03:57   9          You must perform your duty as jurors without bias

11:04:00  10   or prejudice as to any party.  The law does not permit you

11:04:05  11   to be controlled by sympathy, prejudice, or public opinion.

11:04:10  12          All parties expect that you will carefully and

11:04:12  13   impartially consider all the evidence and follow the law as

11:04:18  14   I have given it to you, and reach a just verdict,

11:04:21  15   regardless of the consequences.

11:04:23  16          Answer each question in the verdict form based on

11:04:27  17   the facts as you find them to be, follow -- following the

11:04:31  18   instructions that the Court has given you on the law.

11:04:35  19          Again, do not decide who you think should win this

11:04:37  20   case and answer the questions accordingly.

11:04:41  21          Let me remind you one more time, your answers to

11:04:45  22   those questions and your verdict in this case must be

11:04:47  23   unanimous.

11:04:48  24          You should consider and decide this case as a

11:04:52  25   dispute between persons of equal standing in the community,

11:04:56    1    equal worth, and holding the same or similar stations in

11:04:59    2    life.  This is true in patent cases between corporations,

11:05:04    3    partnerships, individuals, and all business entities.

11:05:07    4         A patent owner is entitled to protect his rights

11:05:13    5    under the laws of the United States, and this includes

11:05:15    6    bringing a suit in a United States District Court alleging

11:05:18    7    infringement and seeking money damages.

11:05:20    8         The law recognizes no distinction among types of

11:05:25    9    parties.  All corporations, partnerships, and other

11:05:30   10    business organizations stand equal before the law,

11:05:33   11    regardless of their size and regardless who owns them, and

11:05:36   12    they are to be treated as equals.

11:05:38   13         Now, when you retire to the jury room to

11:05:42   14    deliberate on your verdict, as I've said, you'll each have

11:05:44   15    a -- your own copy of this final jury instruction that I'm

11:05:48   16    giving you orally to have in written form.

11:05:52   17         If during your deliberations you desire to review

11:05:55   18    any of the exhibits that the Court has admitted into

11:05:59   19    evidence over the course of the trial, then you should

11:06:01   20    advise me by sending me a written note signed by your

11:06:06   21    foreperson and requesting specific exhibits.  And you

11:06:11   22    should deliver that note to the Court Security Officer, who

11:06:13   23    will bring it to me, and I will then send those exhibits to

11:06:16   24    you.

11:06:17   25         Once you retire, you should first select your

11:06:20   1   foreperson and then conduct your deliberations.

11:06:23   2        If you recess during your deliberations, then you

11:06:27   3   should follow all the instructions that the Court's given

11:06:29   4   you about your conduct during the trial.

11:06:36   5        After you reach a verdict, your foreperson is to

11:06:38   6   fill in your unanimous answers to the questions in the

11:06:42   7   verdict form, date it, and sign it.

11:06:45   8        You are not to reveal your answers on any question

11:06:53   9   until you have been discharged by me, unless I direct

11:06:56   10   otherwise.  And you must never disclose to anyone, not even

11:06:59   11   to me, your numerical division on any question.

11:07:02   12        Any notes that you've taken over the course of the

11:07:06   13   trial, ladies and gentlemen, are aids to your memory only.

11:07:10   14   If your memory should differ from your notes, then you

11:07:13   15   should rely on your memory and not your notes.

11:07:17   16        A juror who has not taken notes should rely on his

11:07:21   17   or her own independent recollection of the evidence and

11:07:23   18   should not be unduly influenced by the notes of other

11:07:28   19   jurors.

11:07:29   20        Notes are not entitled to any greater weight than

11:07:31   21   the recollection or impression of each juror about the

11:07:34   22   testimony.

11:07:34   23        If during your deliberations you want to

11:07:42   24   communicate with me at any time, you should give a message

11:07:46   25   or a question in writing to the Court Security Officer

| | |
|---|---|
| 11:07:48 | 1 |
| 11:07:50 | 2 |
| 11:07:53 | 3 |
| 11:07:58 | 4 |
| 11:08:00 | 5 |
| 11:08:03 | 6 |
| 11:08:10 | 7 |
| 11:08:11 | 8 |
| 11:08:14 | 9 |
| 11:08:17 | 10 |
| 11:08:19 | 11 |
| 11:08:20 | 12 |
| 11:08:23 | 13 |
| 11:08:27 | 14 |
| 11:08:33 | 15 |
| 11:08:37 | 16 |
| 11:08:41 | 17 |
| 11:08:45 | 18 |
| 11:08:45 | 19 |
| 11:08:52 | 20 |
| 11:08:55 | 21 |
| 11:08:56 | 22 |
| 11:08:56 | 23 |
| 11:09:12 | 24 |
| 11:09:27 | 25 |

signed by your foreperson.  The Court Security Officer will bring it to me, and I will respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.

I will always first disclose to the attorneys in the case your question or your message and my response before I respond to you.

After you have reached a verdict and I have discharged you as jurors, I want you to understand that you are not required to talk with anyone about your service in this case.

But, at that time, you will be totally free to discuss your service in this case as you may choose.  It is 100 percent at that time up to you, ladies and gentlemen.

I'll now hand eight copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to the jury in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room and deliberate.  We await your verdict.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Counsel, awaiting either a note or a question from the jury or the return of a verdict, we stand

11:09:31    1    in recess.

11:09:35    2            (Recess.)

            3                     CERTIFICATION

            4

            5        I HEREBY CERTIFY that the foregoing is a true and

            6    correct transcript from the stenographic notes of the

            7    proceedings in the above-entitled matter to the best of my

            8    ability.

            9

           10

           11    /S/ Shelly Holmes _____        10/8/2020
                 SHELLY HOLMES, CSR, TCRR             Date
           12    OFFICIAL REPORTER
                 State of Texas No.: 7804
           13    Expiration Date: 12/31/2020

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25