11:52:26

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   VOCALIFE LLC,                  )(

 5        PLAINTIFF,                )(    CIVIL ACTION NO.

 6                                  )(    2:19-CV-123-JRG

 7   VS.                            )(    MARSHALL, TEXAS

 8                                  )(

 9   AMAZON.COM, INC. and           )(

10   AMAZON.COM LLC,                )(    OCTOBER 8, 2020

11        DEFENDANTS.               )(    12:12 P.M.

12          TRANSCRIPT OF JURY TRIAL AND BENCH TRIAL

13                    AFTERNOON SESSION

14        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

15             UNITED STATES CHIEF DISTRICT JUDGE

16

17   FOR THE PLAINTIFF:

18   MR. ALFRED R. FABRICANT
     MR. PETER LAMBRIANAKOS
19   MR. VINCENT J. RUBINO, III
     MS. AMY PARK
20   MR. ENRIQUE ITURRALDE
     FABRICANT LLP
21   230 Park Avenue, 3rd Floor W.
     New York, NY 10169
22
     MR. SAMUEL F. BAXTER
23   MS. JENNIFER L. TRUELOVE
     MCKOOL SMITH, P.C.
24   104 East Houston Street, Suite 300
     Marshall, TX 75670
25
```

```
 1   FOR THE DEFENDANTS:

 2   MR. JOSEPH R. RE
     ALAN G. LAQUER
 3   KENDALL M. LOEBBAKA
     JOSHUA J. STOWELL
 4   KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, Fourteenth Floor
 5   Irvine, CA 92614

 6   MR. COLIN B. HEIDEMAN
     KNOBBE, MARTENS, OLSON & BEAR, LLP
 7   925 Fourth Avenue, Suite 2500
     Seattle, WA 98104
 8
     MS. JENNIFER H. DOAN
 9   MR. JOSHUA R. THANE
     MR. KYLE R. AKIN
10   HALTOM & DOAN
     6500 Summerhill Road, Suite 100
11   Texarkana, TX 75503

12   MR. J. DAVID HADDEN
     MR. RAVI RANGANATH
13   MR. THOMAS JOHN FOX
     FENWICK & WEST LLP
14   801 California Street
     Mountain View, CA 94041
15
     MR. DERON R. DACUS
16   THE DACUS FIRM, PC
     821 ESE Loop 323, Suite 430
17   Tyler, TX 75701

18

19   COURT REPORTER:     Shelly Holmes, CSR, TCRR
                         Official Reporter
20                       United States District Court
                         Eastern District of Texas
21                       Marshall Division
                         100 E. Houston Street
22                       Marshall, Texas  75670
                         (903) 923-7464
23

24   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
25
```

```
12:12:34   1                   P R O C E E D I N G S

12:12:34   2               (Jury out.)

12:12:36   3               (Jury trial.)

12:12:36   4               COURT SECURITY OFFICER:  All rise.

12:12:40   5               THE COURT:  Be seated, please.

12:12:55   6               Counsel, we have received a note from the jury.

12:13:00   7               I'll read it to you, and it reads as follows:

12:13:08   8               Can we see the code evidence, question mark?

12:13:12   9    Thanks, Elizabeth Edwards.

12:13:15   10              Who I recall to be Juror No. 2.

12:13:18   11              I'll mark the note with a No. 1 in the upper

12:13:21   12   right-hand corner for identification, and I'll hand the

12:13:25   13   original note to the courtroom deputy.

12:13:26   14              Counsel, you can either discuss among yourselves

12:13:29   15   what you think the code evidence should be, and if we can

12:13:32   16   agree on a set of exhibits, I'll send them back.  Or I'm

12:13:36   17   happy to send the jury another note, and ask them to be

12:13:39   18   more specific about what they're asking for, although I'm

12:13:42   19   not particularly sure what we might get in response to

12:13:46   20   that.  I'm open to suggestions.

12:13:55   21              MR. FABRICANT:  I don't remember a lot of code

12:13:57   22   evidence in the record.

12:14:04   23              I don't remember a lot of exhibits with source

12:14:08   24   code.

12:14:08   25              THE COURT:  Well, before we all start talking at
```

```
12:14:11   1   one time, let's go off the record.

12:14:14   2            (Off-the-record discussion.)

12:19:38   3            THE COURT:  All right.  Let's go back on the

12:19:40   4   record.

12:19:40   5            Counsel have met and conferred off the record with

12:19:44   6   regard to an appropriate response to the jury's note.

12:19:47   7   There seems to be an indication that there may be agreement

12:19:50   8   between the parties as to how best to respond.  I'm happy

12:19:53   9   to hear from either or both sides on this.

12:19:53  10            MR. FABRICANT:  Your Honor, we propose Plaintiff's

12:19:56  11   Exhibit 1378 and Plaintiff's Exhibit 386.

12:19:59  12            And I believe defense counsel has agreed.

12:20:02  13            THE COURT:  Give me those again, Mr. Fabricant.

12:20:05  14            MR. FABRICANT:  Yes, Your Honor.  1378.

12:20:08  15            THE COURT:  Plaintiff or Defendant?

12:20:09  16            MR. FABRICANT:  Plaintiff.  Plaintiff 1378 and

12:20:14  17   Plaintiff 386.

12:20:19  18            THE COURT:  All right.  Mr. Hadden, Mr. Re, do you

12:20:25  19   all agree with that?

12:20:27  20            MR. LAQUER:  Defendants agree, Your Honor.

12:22:00  21            THE COURT:  All right.  You all have a seat then.

12:22:02  22            Counsel, here's a written version of my intended

12:22:04  23   response based on what you just told me.

12:22:06  24            Members of the jury, in response to your note

12:22:08  25   asking for, quote, code evidence, close quote, I am sending
```

| | | |
|---|---|---|
| 12:22:13 | 1 | you the following exhibits:  PTX-1378 and PTX-386.  Signed |
| 12:22:21 | 2 | by me. |
| 12:22:21 | 3 | And we will attach those two Plaintiff's exhibits |
| 12:22:24 | 4 | to this response. |
| 12:22:25 | 5 | Does Plaintiff have any objection to me sending |
| 12:22:30 | 6 | this response and those exhibits to the jury? |
| 12:22:33 | 7 | MR. FABRICANT:  No objection, Your Honor. |
| 12:22:34 | 8 | THE COURT:  Any objection from Defendant? |
| 12:22:35 | 9 | MR. DACUS:  No, Your Honor.  Thank you. |
| 12:22:37 | 10 | THE COURT:  Then I'll sign the original written |
| 12:22:40 | 11 | response. |
| 12:22:40 | 12 | Ms. Lockhart, do you have those two exhibits? |
| 12:22:43 | 13 | COURTROOM DEPUTY:  No, I haven't pulled them yet. |
| 12:22:45 | 14 | THE COURT:  Let's get those two exhibits, please. |
| 12:23:52 | 15 | All right.  I have those two physical exhibits.  I |
| 12:23:56 | 16 | have the printed and signed responsive note. |
| 12:23:58 | 17 | I will hand all of this to the Court Security |
| 12:24:00 | 18 | Officer and direct him to deliver it to the jury. |
| 12:24:02 | 19 | All right.  Counsel, pending either another note |
| 12:24:11 | 20 | from the jury or the return of a verdict, we stand in |
| 12:24:13 | 21 | recess. |
| 12:24:14 | 22 | I intend to start the bench trial in approximately |
| 12:24:18 | 23 | 30 minutes, at 1:00 o'clock. |
| 12:24:20 | 24 | We stand in recess. |
| 12:24:22 | 25 | COURT SECURITY OFFICER:  All rise. |

| | | |
|---|---|---|
| 12:24:23 | 1 | (Recess.) |
| 12:31:38 | 2 | (Jury trial.) |
| 12:31:38 | 3 | (Jury out.) |
| 12:41:11 | 4 | COURT SECURITY OFFICER:  All rise. |
| 12:41:12 | 5 | THE COURT:  Be seated, please. |
| 01:00:54 | 6 | Counsel, we have received a second note from the |
| 01:00:58 | 7 | jury. |
| 01:00:59 | 8 | I will read it to you, and I'll mark it for |
| 01:01:04 | 9 | identification and hand it to the courtroom deputy. |
| 01:01:06 | 10 | The second note reads as follows:  Can we please |
| 01:01:10 | 11 | see the Abutalebi patent, question mark?  Thank you, |
| 01:01:21 | 12 | Elizabeth Edwards. |
| 01:01:22 | 13 | I'll mark that for identification with a 2 in the |
| 01:01:25 | 14 | upper right-hand corner and hand it to the courtroom |
| 01:01:27 | 15 | deputy. |
| 01:01:28 | 16 | It appears to me, counsel, that what they're |
| 01:01:35 | 17 | requesting is DTX-46, which is the patent application |
| 01:01:39 | 18 | publication for this gentleman, whose last name I won't |
| 01:01:46 | 19 | pronounce very well, so I won't try. |
| 01:01:49 | 20 | I have a prepared response to send to the jury |
| 01:01:51 | 21 | with the actual exhibit, which reads as follows:  Response |
| 01:01:56 | 22 | to Jury Note No. 2.  Members of the jury, in response to |
| 01:02:00 | 23 | your second note, I am sending you DTX-46. |
| 01:02:04 | 24 | Is there any objection to that written response, |
| 01:02:07 | 25 | together with the identified exhibit, being sent to the |

01:02:10   1   jury from the Plaintiff?

01:02:12   2           MR. FABRICANT:  No objection, Your Honor.

01:02:14   3           THE COURT:  Defendant?

01:02:15   4           MR. DACUS:  No, Your Honor.

01:02:17   5           THE COURT:  I'll hand the signed note and the

01:02:21   6   exhibit itself to the courtroom deputy, and direct him to

01:02:24   7   deliver it to the jury in the jury room.

01:02:27   8           And since it is 1:00 o'clock, counsel,

01:02:32   9   understanding that we may be interrupted with additional

01:02:35  10   notes or a possible verdict by the jury, I see no reason

01:02:38  11   not to go ahead and start the bench trial regarding

01:02:40  12   Amazon's defense of inequitable conduct.

01:02:42  13           I am going to hold you to the time estimates you

01:02:50  14   gave me earlier, so I'm expecting this should take no more

01:02:55  15   than an hour and a half.

01:02:56  16           So, with that, Mr. Re, let me hear from you on

01:03:01  17   behalf of the Defendants.

01:03:02  18           (Bench trial.)

01:03:02  19           MR. RE:  Thank you, Your Honor.  Mr. Re for the

01:03:02  20   Amazon Defendants.

01:03:02  21           Amazon calls as its first witness on this bench

01:03:05  22   trial on the subject of inequitable conduct Dr. Peter Li.

01:03:08  23           THE COURT:  All right.  Dr. Li, if you'll return

01:03:11  24   to the witness stand.  I remind you that you remain under

01:03:16  25   oath from your earlier testimony in this trial.  If you'll

01:03:22   1   just have a seat on the witness stand.

01:03:24   2          And, counsel, the Court's belief is that this

01:03:31   3   witness is being called adversely, and the calling party

01:03:35   4   should have the right to lead the witness.

01:03:37   5          MR. RE:  Thank you, Your Honor.

01:03:37   6      <u>QI "PETER" LI, DEFENDANTS' WITNESS, PREVIOUSLY SWORN</u>

01:03:37   7                     <u>DIRECT EXAMINATION</u>

01:03:38   8   BY MR. RE:

01:03:38   9   Q.  Good afternoon, Dr. Li.

01:03:44  10   A.  Good afternoon.

01:03:44  11   Q.  We have a binder for you, should you want to see any

01:03:50  12   original document.

01:04:25  13          Are you ready to begin?

01:04:27  14   A.  Yes.

01:04:28  15   Q.  Okay.  When I was examining you last week, you and I

01:04:35  16   discussed some patent applications that you filed back in

01:04:38  17   2005 and 2006.  Do you remember that?

01:04:42  18   A.  Yes.

01:04:43  19   Q.  And we talked about how those three applications

01:04:48  20   disclose, for example, microphone arrays; do you remember

01:04:51  21   that?

01:04:51  22   A.  Yes.

01:04:52  23   Q.  And those applications disclose microphone arrays with

01:04:58  24   adaptive beamformers, noise reduction, and DSPs, right?

01:05:05  25   A.  I don't remember exactly.

| | | |
|---|---|---|
| 01:05:06 | 1 | Q.  Well, let's -- let's start with one. |
| 01:05:09 | 2 | MR. RE:  Let's take a look at DTX-956, I believe |
| 01:05:12 | 3 | it's Figure 2. |
| 01:05:22 | 4 | Q.  (By Mr. Re)  Do you recall this figure?  I believe I |
| 01:05:24 | 5 | showed it to you during the jury trial? |
| 01:05:26 | 6 | A.  I can see that. |
| 01:05:27 | 7 | Q.  And do you see how it discloses a DSP right in the |
| 01:05:31 | 8 | center? |
| 01:05:31 | 9 | A.  Yes. |
| 01:05:33 | 10 | Q.  Do you recall this application? |
| 01:05:37 | 11 | A.  I saw that. |
| 01:05:41 | 12 | Q.  Do you see how this was published back in March of |
| 01:05:45 | 13 | 2007? |
| 01:05:45 | 14 | A.  Yes. |
| 01:05:48 | 15 | Q.  And do you recall how your applications also disclose |
| 01:05:56 | 16 | an adaptive beamformer? |
| 01:05:57 | 17 | A.  Can you point out? |
| 01:05:59 | 18 | Q.  Let's show you DTX-955, Figure 6C. |
| 01:06:09 | 19 | Do you recall these figures I showed during the |
| 01:06:12 | 20 | jury trial? |
| 01:06:13 | 21 | A.  Yes. |
| 01:06:14 | 22 | Q.  And, for example, I think during the jury trial, I |
| 01:06:18 | 23 | emphasized Figure 6C.  Do you see that? |
| 01:06:21 | 24 | A.  Yes. |
| 01:06:21 | 25 | Q.  Any doubt in your mind that that is showing an adaptive |

01:06:26  1  beamformer on two sides of two different linear arrays?

01:06:29  2  A.  This figure cannot prove this is using adaptive

01:06:34  3  beamforming.

01:06:34  4  Q.  My question is, is it -- does it show an adaptive

01:06:40  5  beamformer shown with two linear arrays?

01:06:43  6  A.  It's a two linear array, yes.

01:06:47  7  Q.  Yes.  And these applications that we discussed, it was

01:06:50  8  three of them that we discussed during the jury trial, way

01:06:53  9  before you filed your 2010 provisional, right?

01:06:55 10  A.  Yes.

01:06:55 11  Q.  And they were all published well before you filed your

01:07:01 12  2010 provisional, right?

01:07:03 13  A.  Yes.

01:07:04 14  Q.  And these applications were filed by an attorney named

01:07:09 15  Kayo Lu; is that right?  Did I pronounce it right?

01:07:16 16  A.  Yes.

01:07:16 17  Q.  How do I pronounce his name?

01:07:19 18  A.  Lu.

01:07:19 19  Q.  Lu.  And you remember Mr. Lu, right?

01:07:22 20  A.  Yes.

01:07:23 21  Q.  And you ultimately fired Mr. Lu, didn't you, as your

01:07:32 22  patent attorney?

01:07:33 23  A.  Yes.

01:07:33 24  Q.  And you fired him, in part at least, because he did not

01:07:37 25  keep you informed of the patent prosecution with the Patent

1404

01:07:43  1  Office, right?

01:07:44  2  A.  Right.

01:07:44  3  Q.  And, in fact, you had to at one time filed a petition

01:07:50  4  to revive one of these abandoned patent applications,

01:07:53  5  right?

01:07:53  6  A.  I don't remember.

01:07:59  7  Q.  Let's -- let's show it to refresh your recollection.

01:08:04  8          MR. RE:  It's DTX-957.

01:08:15  9  Q.  (By Mr. Re)  And do you see how this was -- do you

01:08:18  10  recognize this document?

01:08:18  11  A.  I know this document is regard -- regarding to -- to

01:08:29  12  that patent application.

01:08:29  13  Q.  Yes.  And you filed what I would call a petition to

01:08:34  14  revive an abandoned application; isn't that right?

01:08:38  15  A.  Yes.

01:08:39  16  Q.  And, in it, you explained some of the troubles you were

01:08:42  17  having with your patent attorney, right?  And you can look

01:08:47  18  at the original if you'd like.

01:08:49  19  A.  I don't remember detail of this documentation.

01:08:53  20  Q.  But do you remember explaining to the Patent Office

01:08:58  21  that your lawyer was doing a poor job for the money you

01:09:01  22  were paying him because he was not keeping you informed

01:09:06  23  with the information to and from the Patent Office, right?

01:09:09  24  A.  Yes.

01:09:10  25  Q.  And you ended up hiring the law firm -- by June of

01:09:15  1  2009, you hired the law firm of Kenyon & Kenyon; is that

01:09:19  2  right?

01:09:19  3  A.  Yes.

01:09:23  4  Q.  And, by 2010, all three of these applications that you

01:09:27  5  prosecuted with Mr. Lu had been abandoned, though they were

01:09:34  6  all published, right?

01:09:35  7  A.  Right.

01:09:35  8  Q.  And after you hired Kenyon & Kenyon, you then hired

01:09:40  9  Mr. Tankha; isn't that right?

01:09:42  10  A.  Yes.

01:09:42  11  Q.  And do you recall hiring Mr. Tankha?

01:09:44  12  A.  Yes.

01:09:47  13  Q.  And when you hired Mr. Tankha, did you know that he had

01:09:52  14  been accused in public filings of committing acts of

01:09:54  15  inequitable conduct?

01:09:55  16  A.  No.

01:09:57  17  Q.  To this day, are you aware of the fact that allegations

01:10:01  18  have been made against Mr. Tankha for acts of inequitable

01:10:07  19  conduct?

01:10:07  20  A.  No -- I don't know.

01:10:10  21  Q.  Do you know what is inequitable conduct?  Do you have

01:10:13  22  any understanding?

01:10:14  23  A.  I have no knowledge of that.

01:10:16  24  Q.  I'd like to show you Exhibit DTX-857 -- I mean, 852, in

01:10:26  25  particular.  And, particularly, I'd like to show you

```
01:10:32   1   Page 6, Paragraph 46 of this document.
01:10:46   2          Were you aware of the fact that in this litigation
01:10:49   3   of Exhibit 852, that Mr. Ashok Tankha was alleged to have
01:10:58   4   committed inequitable conduct and/or unclean hands by
01:11:01   5   making material misrepresentations and by withholding
01:11:04   6   material information with the intent to deceive the USPTO
01:11:09   7   during prosecution of what is referred to here as the '303
01:11:16   8   application and/or each of the continuing applications
01:11:18   9   claiming priority to the '303 application, including
01:11:22   10  another patent, the '698 patent?
01:11:26   11         Were you aware of any of this?
01:11:28   12  A.  Could you explain?
01:11:29   13  Q.  Were you aware of any of these allegations that were
01:11:33   14  made against your lawyer, Mr. Tankha, at any time?
01:11:36   15  A.  No.
01:11:39   16  Q.  So this is the first time you've heard of this?
01:11:42   17  A.  Right.
01:11:43   18  Q.  Okay.  And you know -- and you've had lots of patent
01:11:48   19  applications.  Do you have any idea of how many patent
01:11:52   20  applications you think you've filed in your lifetime at the
01:11:55   21  United States Patent and Trademark Office?
01:11:56   22         THE COURT:  Slow down, Mr. Re.
01:12:00   23  Q.  (By Mr. Re)  Do you -- do you know how many
01:12:02   24  applications you think you've filed in the Patent Office,
01:12:04   25  just approximately?
```

| | | |
|---|---|---|
| 01:12:04 | 1 | A.  I know I filed many patent applications. |
| 01:12:07 | 2 | Q.  Right.  And you're familiar with different kinds of |
| 01:12:11 | 3 | patents, right? |
| 01:12:11 | 4 | A.  Could you repeat? |
| 01:12:12 | 5 | Q.  You're familiar with the different types of patents |
| 01:12:15 | 6 | that the Patent Office gives, right? |
| 01:12:17 | 7 | A.  Yes. |
| 01:12:17 | 8 | Q.  And, for example, when you visited Amazon, you had two |
| 01:12:24 | 9 | patents when you visited, right? |
| 01:12:25 | 10 | A.  Correct. |
| 01:12:26 | 11 | Q.  And, remember, those were design patents only, right? |
| 01:12:28 | 12 | A.  Yes. |
| 01:12:29 | 13 | Q.  And so -- and then you had 13 other pending patents, |
| 01:12:35 | 14 | you represented, to Amazon at the 2011 meeting, right? |
| 01:12:38 | 15 | A.  Yes. |
| 01:12:38 | 16 | Q.  And this was almost 10 years ago, so you -- you're a |
| 01:12:44 | 17 | pretty experienced patent filer, aren't you? |
| 01:12:50 | 18 | A.  I filed patents. |
| 01:12:52 | 19 | Q.  But lots of them of them, right? |
| 01:12:56 | 20 | A.  What's the definition of a lot?  How many is a lot? |
| 01:12:58 | 21 | Q.  Dozens? |
| 01:12:59 | 22 | A.  Yes. |
| 01:13:00 | 23 | Q.  Okay.  And you're still filing -- to this day, you're |
| 01:13:04 | 24 | still filing reissue -- reissue applications, you're still |
| 01:13:07 | 25 | amending claims, and signing many, many documents before |

01:13:09   1   the USPTO, right?

01:13:10   2   A.   What's a number of many, many?

01:13:13   3   Q.   Dozens, right?

01:13:14   4   A.   Dozens?

01:13:17   5   Q.   Dozens, like dozens, meaning --

01:13:21   6   A.   Dozens.

01:13:22   7   Q.   -- many 12's?  Yes.  Okay.  Many -- just -- the number

01:13:28   8   is really not that important.  I just want to show --

01:13:30   9   A.   Could you repeat your question?

01:13:32  10   Q.   Yes.  So you have filed many papers with the Patent

01:13:39  11   Office where you sign your name?  Do you recall that?

01:13:41  12   A.   Yes.

01:13:41  13   Q.   And we saw some of those during the jury trial, right?

01:13:44  14   A.   Yes.

01:13:44  15   Q.   And so -- and you also know from signing these

01:13:50  16   documents that there are consequences for not being

01:13:52  17   truthful and honest, right?

01:13:54  18   A.   What's the meaning of consequences?

01:13:57  19   Q.   I think we heard about even imprisonment in this case

01:14:02  20   for misleading or false statements to the Patent Office.

01:14:05  21   Are you aware of that?

01:14:06  22   A.   I never try to mislead the Patent Office.

01:14:14  23   Q.   Okay.  I wasn't suggesting that.  You're familiar with

01:14:17  24   the importance of not misleading the Patent Office, right?

01:14:20  25   A.   Yes, that's important.

01:14:21   1   Q.   Very important, right?

01:14:22   2   A.   Yes.

01:14:23   3   Q.   And you knew when you filed for the -- what became the

01:14:29   4   '756 patent and the '049, when you filed those

01:14:32   5   applications, you knew that you had a duty to disclose

01:14:37   6   information which is material to patentability, right?

01:14:40   7   A.   Yes.

01:14:44   8   Q.   Yes.  And, in fact, you signed inventor declarations to

01:14:48   9   that effect, right?

01:14:49  10   A.   Yes.

01:14:55  11   Q.   And you signed declarations with regard to the '756 and

01:14:59  12   '049 applications that specifically alert you to the duty

01:15:02  13   to disclose all material information to patentability,

01:15:08  14   right?

01:15:08  15   A.   I signed all required document.

01:15:11  16   Q.   Well, let's take a look at the required document for

01:15:14  17   the conversion of your provisional application to make it a

01:15:18  18   real application, right?  I'm going to show you.

01:15:22  19        MR. RE:   Let's show PTX-4.176.

01:15:33  20   Q.   (By Mr. Re)   And if we could just go to where your

01:15:36  21   acknowledgement statement is -- down the page.

01:15:39  22        MR. RE:   And there it is.  Stop where it says "I

01:15:44  23   acknowledge."

01:15:44  24   Q.   (By Mr. Re)   And do you realize that when you sign

01:15:46  25   these forms, that you acknowledge the duty to disclose

| | | |
|---|---|---|
| 01:15:50 | 1 | information which is material to patentability as |
| 01:15:53 | 2 | defined -- as defined by 37 CFR 1.56?  Do you see that? |
| 01:15:59 | 3 | A.  Yes. |
| 01:16:00 | 4 | Q.  And you understood that you had this duty when you |
| 01:16:12 | 5 | signed this document, which is Exhibit 4.176, right?  You |
| 01:16:19 | 6 | knew that, right? |
| 01:16:19 | 7 | A.  Referring to patent application? |
| 01:16:21 | 8 | Q.  Yeah, this -- this one in particular.  This is the oath |
| 01:16:24 | 9 | you signed to file -- to actually file the '756 patent |
| 01:16:29 | 10 | application in 2011, right? |
| 01:16:33 | 11 | A.  I think so.  You didn't show me -- you only show me |
| 01:16:38 | 12 | part of that.  I didn't see the title. |
| 01:16:39 | 13 | Q.  Okay.  You have a book, if you want to see the |
| 01:16:43 | 14 | original, but we'll show you the top. |
| 01:16:45 | 15 | MR. RE:  Mr. Berk, can we just blow up the top of |
| 01:16:51 | 16 | this document? |
| 01:16:51 | 17 | A.  Okay.  I saw the title marked declaration. |
| 01:16:55 | 18 | Q.  (By Mr. Re)  And you see the declaration you're making |
| 01:16:58 | 19 | along with your co-inventor Manli Zhu? |
| 01:17:00 | 20 | A.  Yes. |
| 01:17:01 | 21 | Q.  And you're aware of this oath because you have signed |
| 01:17:03 | 22 | this oath many, many times with respect to each and every |
| 01:17:06 | 23 | one of the patent applications where you are a named |
| 01:17:09 | 24 | inventor, correct? |
| 01:17:10 | 25 | A.  If we show application, we sign this, yes. |

1411

01:17:14   1   Q.   And you're aware of the significance of this oath,

01:17:18   2   aren't you?

01:17:18   3   A.   Could -- could you repeat?

01:17:29   4   Q.   You're aware of the significance, the importance of

01:17:32   5   this oath?

01:17:33   6   A.   Yes.

01:17:38   7   Q.   Okay.  And you understood when you signed the oath on

01:17:40   8   these applications, that a reference that discloses the

01:17:43   9   limitations of your claims should be disclosed to the

01:17:51  10   Patent Office, right?

01:17:51  11   A.   Yes.

01:17:52  12   Q.   And you realized you had that obligation when you filed

01:17:58  13   for your reissue application, which became the '049 patent,

01:18:01  14   correct?

01:18:01  15   A.   Yes.

01:18:02  16   Q.   And when you filed applications, did you ever tell your

01:18:08  17   patent lawyer about your earlier patent applications which

01:18:11  18   had all been rejected but published by the Patent Office?

01:18:20  19   A.   I don't remember, but --

01:18:25  20   Q.   You don't remember?

01:18:26  21   A.   Let me finish.

01:18:28  22        I have a personal website, list all the patents

01:18:36  23   and the references, published paper, and the book.  And he

01:18:41  24   has the access to that -- to my personal website for all

01:18:45  25   the information.

01:18:47   1   Q.  And so you -- did you expect your lawyer to go on your

01:18:52   2   website, to go through all your listings and your

01:18:55   3   references, in order for him to find out what he should

01:18:59   4   determine is material to your claimed inventions?

01:19:02   5   A.  Just -- just website -- just a part of the source of

01:19:06   6   references.  We also gave everything we believe that's

01:19:11   7   related to the patent application to our patent attorney.

01:19:16   8   Q.  I understand.  But what I'm getting at is did you

01:19:20   9   expect your patent lawyer to go on your website to learn

01:19:23   10   for himself what he should disclose?

01:19:25   11   A.  We may refer him -- for example, instead of an email

01:19:36   12   document which is too long, we may refer our patent

01:19:42   13   attorney to follow the document or reference from the

01:19:46   14   web -- website, since that would be easier.

01:19:49   15   Q.  And do you have any recollection of giving to your

01:19:54   16   patent lawyer any of the published patent applications that

01:19:59   17   you had previously filed but were rejected by the Patent

01:20:02   18   Office and in the public domain?

01:20:04   19   A.  I don't remember.

01:20:06   20   Q.  Do you have any recollection of telling your patent

01:20:10   21   lawyer, oh, go look on my website for additional materials,

01:20:15   22   and you decide what to disclose?

01:20:17   23   A.  We submit everything to our patent attorney.  It's up

01:20:24   24   to him.

01:20:25   25   Q.  Okay.  And you do see, particularly from this trial and

01:20:29   1   from looking at your '049 patent, that your prior patent

01:20:34   2   applications and publications that we discussed during this

01:20:38   3   trial, none of them were disclosed to the Patent Office?

01:20:41   4   You know that, right?

01:20:42   5   A.   Again, it's up to our patent attorney to decide which

01:20:49   6   one -- which reference to submit to the Patent Office.

01:20:53   7   Q.   But you -- my question is, do you know, sitting here

01:20:56   8   today, and have you confirmed in your own mind, that none

01:21:00   9   of those patent applications had been disclosed to the

01:21:03  10   Patent Office?

01:21:05  11   A.   I don't have the patent particularly in front of me.

01:21:15  12   That's many pages of documentation.   Maybe not.   But, you

01:21:23  13   know, you want to find out now?

01:21:25  14   Q.   No --

01:21:26  15   A.   I can take a look -- I can take a look at '049 patent

01:21:30  16   and give you answer.

01:21:32  17   Q.   You could tell if your applications were disclosed by

01:21:35  18   just looking at the '049?

01:21:36  19   A.   I -- okay.   I submit everything we think is related to

01:21:45  20   our patent attorney.

01:21:47  21   Q.   I understand that's your testimony.

01:21:49  22        What I'm trying to figure out, as you sit here

01:21:55  23   today, do you have any belief whatsoever that any of those

01:22:00  24   publications, which were abandoned patent applications,

01:22:02  25   were disclosed in either the '756 or '049 patents?

01:22:04   1   A.  I don't remember.

01:22:07   2   Q.  Okay.  Okay.

01:22:07   3   A.  I remember I -- we did submit everything.

01:22:10   4   Q.  Well, you keep saying you submitted everything.  But

01:22:14   5   your testimony is you might have given them to your patent

01:22:17   6   lawyer, but you don't know what he disclosed?

01:22:19   7   A.  Right.  We submit everything to our patent attorney,

01:22:25   8   and he made the decision.

01:22:26   9   Q.  And when you say "we," I just want to make sure we're

01:22:30  10   clear on what people we're talking about.  Who are the "we"

01:22:33  11   in that sentence you just gave?

01:22:34  12   A.  I, Dr. Manli Zhu.

01:22:39  13   Q.  And were you and Dr. Zhu the only sources of

01:22:42  14   information to Mr. Tankha?

01:22:47  15   A.  I don't remember how many people from my company submit

01:22:59  16   references to our patent attorneys.

01:23:04  17   Q.  So you don't recall if it's anyone else, other than you

01:23:07  18   and Dr. Zhu?

01:23:09  19   A.  It's possible other people also submitted references to

01:23:16  20   our patent attorney.

01:23:17  21   Q.  But do you have any recollection of anyone else

01:23:20  22   actually doing so?

01:23:21  23   A.  I don't remember who did that, but it's very possible

01:23:28  24   there are other people do that.

01:23:30  25   Q.  Now, you -- you testified and you recall filing the

| | | |
|---|---|---|
| 01:23:35 | 1 | provisional in this case that was filed in 2010?  Do you |
| 01:23:41 | 2 | recall that? |
| 01:23:42 | 3 | A.  Yes. |
| 01:23:43 | 4 | Q.  And Mr. Tankha prepared your 2010 provisional, right? |
| 01:23:59 | 5 | A.  I don't remember who submitted the provisional. |
| 01:24:12 | 6 | Q.  My question was, do you -- and I think you testified |
| 01:24:15 | 7 | already that Mr. Tankha prepared that provisional |
| 01:24:19 | 8 | application, right? |
| 01:24:23 | 9 | A.  You know, I don't remember since sometime we submit a |
| 01:24:30 | 10 | provisional by ourselves, sometime through our patent |
| 01:24:33 | 11 | attorney. |
| 01:24:34 | 12 | Q.  But didn't you testify in front of the jury that this |
| 01:24:38 | 13 | original provisional was prepared by your attorney?  Do you |
| 01:24:42 | 14 | remember that? |
| 01:24:49 | 15 | A.  If I said that then, yeah. |
| 01:25:04 | 16 | Q.  Well, you did, didn't you? |
| 01:25:05 | 17 | A.  I don't recall. |
| 01:25:09 | 18 | Q.  And you -- |
| 01:25:13 | 19 | A.  Specifically, you know, for this specific question |
| 01:25:15 | 20 | you're asking me. |
| 01:25:16 | 21 | Q.  And -- and you recall that you approved the filing of |
| 01:25:23 | 22 | the provisional application, right? |
| 01:25:24 | 23 | A.  I have to sign that. |
| 01:25:26 | 24 | Q.  And you -- and you listed some references at the end of |
| 01:25:33 | 25 | the provisional application, right? |

01:25:35  1    A.  Yes.

01:25:37  2    Q.  And one of those references you listed in your 2010

01:25:41  3    provisional was the 2001 Brandstein textbook, right?

01:25:48  4    A.  Yes.

01:25:49  5    Q.  And you must have believed back then that the

01:25:55  6    Brandstein textbook was relevant; that's why you cited it

01:26:00  7    at the end of your provisional.  Right?

01:26:02  8    A.  That's what I believe is a reference.

01:26:09  9    Q.  And you also stated during this jury trial that it's

01:26:13  10   pretty clear that your attorney used Brandstein when he

01:26:16  11   prepared your provisional patent application, right?

01:26:23  12   A.  He didn't tell me this.  I don't remember.  You know,

01:26:28  13   he was -- say it this way, how he prepared our patent

01:26:33  14   application, it is his job, right?

01:26:37  15   Q.  Yes.  But during this trial, I asked you this

01:26:42  16   question -- just tell me if I read it right.

01:26:45  17        Does this make it a little more clear to you that

01:26:48  18   the author of the patent application did, in fact, open and

01:26:54  19   use the Brandstein book when the application was written?

01:26:59  20        And you said:  Yes.

01:27:02  21        So --

01:27:03  22   A.  Okay.  From my study, the other -- at the time you

01:27:10  23   asked me the question, that author could be Dr. Manli Zhu.

01:27:16  24   Q.  And did you give the Brandstein book to your patent

01:27:20  25   attorney?

01:27:20   1   A.  I don't remember exactly.  I believe we gave everything

01:27:26   2   to our patent attorney.

01:27:28   3   Q.  But you have no recollection of giving your patent

01:27:32   4   attorney the Brandstein book, right?

01:27:33   5   A.  I don't remember.

01:27:34   6   Q.  And do you know that in this case, we have exchanged

01:27:40   7   documents concerning your patent prosecution?

01:27:43   8   A.  I believe so.

01:27:46   9   Q.  And do you know we were given emails when you would

01:27:56  10   transmit references to Mr. Tankha; do you know that?

01:27:58  11   A.  I think that's up to our attorney what kind of

01:28:04  12   information to give to you.

01:28:06  13   Q.  But I'm asking about what you gave the attorney.  You

01:28:09  14   have no record or recollection of giving the attorney the

01:28:14  15   Brandstein book at any time, do you?

01:28:16  16   A.  I don't remember.

01:28:17  17   Q.  And, in fact --

01:28:19  18        THE COURT:  Wait a minute, are we talking about

01:28:20  19   the patent prosecution attorney, or are we talking about

01:28:23  20   the trial attorney that's here today?

01:28:25  21        MR. RE:  Thank you.

01:28:26  22   Q.  (By Mr. Re)  We're talking about Mr. Tankha, the patent

01:28:27  23   prosecution attorney, right?

01:28:29  24   A.  Okay.

01:28:29  25   Q.  And you have no recollection of giving the Brandstein

| | | |
|---|---|---|
| 01:28:33 | 1 | book to Mr. Tankha? |
| 01:28:39 | 2 | A.   Remember what you said, we gave the reference in our |
| 01:28:45 | 3 | provisional?  And when he filed official patent |
| 01:28:54 | 4 | application, he must use the provisional, right? |
| 01:29:00 | 5 | Q.   So you know that your patent lawyer used the |
| 01:29:04 | 6 | provisional when writing your real, official patent |
| 01:29:08 | 7 | application, right? |
| 01:29:10 | 8 | A.   Based on my comments. |
| 01:29:14 | 9 | Q.   And you know, as you sit here today, that the |
| 01:29:18 | 10 | Brandstein book was not, in fact, given to the Patent |
| 01:29:20 | 11 | Office during the prosecution of either the '756 patent or |
| 01:29:24 | 12 | the '049 patent, right? |
| 01:29:28 | 13 | A.   Again, it's our patent attorney's decision. |
| 01:29:31 | 14 | Q.   And your patent attorney must have removed, removed the |
| 01:29:36 | 15 | information concerning Brandstein when he filed the |
| 01:29:39 | 16 | official patent application, even though he had Brandstein |
| 01:29:45 | 17 | in the provisional, right? |
| 01:29:48 | 18 | A.   What he did is his job. |
| 01:29:55 | 19 | Q.   I now want to move on to your article. |
| 01:29:57 | 20 | And you also know that you and Dr. Zhu published |
| 01:30:03 | 21 | an article in 2009, right?  We talked about it during the |
| 01:30:09 | 22 | trial? |
| 01:30:09 | 23 | A.   Yes. |
| 01:30:10 | 24 | Q.   And, in fact -- we can call it up -- it's DTX-14, |
| 01:30:19 | 25 | right?  And at the end of your article, do you see how you |

01:30:22   1   have --

01:30:22   2   A.   Okay.

01:30:23   3   Q.   You remember this?

01:30:23   4   A.   Yeah, this sounds right.

01:30:25   5   Q.   Okay.  And let's go to your list of references listed

01:30:28   6   in your 2009 article; do you see that?

01:30:33   7   A.   Yes.

01:30:34   8   Q.   And do you see what you listed as Reference No. 4?

01:30:38   9   A.   Yes.

01:30:47   10   Q.   And you listed the book Brandstein and Ward, Microphone

01:30:55   11   Arrays, Springer, 2001.  That's the whole book you're

01:30:58   12   citing, right?

01:30:59   13   A.   Yes.

01:30:59   14   Q.   And you gave the Li -- this Li article, and you knew --

01:31:04   15   now, you knew about Brandstein, obviously, before 2009,

01:31:07   16   right?

01:31:07   17   A.   Could you pull up the reference number?

01:31:15   18   Q.   Reference No. 4, doesn't this establish that you and

01:31:19   19   Dr. Zhu knew about the Brandstein award book before you

01:31:21   20   published this article in April of 2009, right?

01:31:23   21   A.   We knew about that book.

01:31:25   22   Q.   Yes.  But you gave this article to your patent lawyer,

01:31:29   23   didn't you?

01:31:32   24   A.   We gave everything.

01:31:33   25   Q.   I'm asking about the article.  Do you know that you

01:31:39  1  gave this article, your Li and Zhu article, to Mr. Tankha?

01:31:44  2  A.  Yes, as we remember, we gave everything.

01:31:48  3  Q.  And you did not give this article to your patent lawyer

01:31:52  4  until February of 2013; isn't that right?

01:31:58  5  A.  It's up to him.

01:32:00  6          MR. RE:  Let's show a new exhibit, Your Honor.

01:32:03  7          DTX-32, this has not been yet used in the trial.

01:32:08  8  I move it into evidence.

01:32:11  9  Q.  (By Mr. Re)  Do you recall in any of your preparation

01:32:14  10  DTX-32?

01:32:15  11  A.  Uh-huh.

01:32:20  12          THE COURT:  Dr. Li.

01:32:23  13  A.  That's my email.

01:32:25  14          THE COURT:  You're going to have to answer

01:32:29  15  verbally.

01:32:30  16          THE WITNESS:  I just -- I was reading.

01:32:31  17  A.  Yes.

01:32:32  18  Q.  (By Mr. Re)  When was the last time you saw this

01:32:34  19  exhibit?

01:32:34  20  A.  This email?

01:32:35  21  Q.  Yes.

01:32:35  22  A.  I don't remember when I saw that --

01:32:37  23  Q.  Okay.

01:32:37  24  A.  -- last time.  But that looks like it's my email.

01:32:43  25  Q.  It is your email, right?

1421

01:32:45  1   A.  Yes.

01:32:45  2   Q.  And this is the cover email where you sent to your

01:32:47  3   patent lawyer your Li and Zhu article on February 16th,

01:32:54  4   2013, right?

01:32:56  5   A.  Yes.

01:32:59  6            MR. RE:  And, in fact, if we can show DTX-33, the

01:33:03  7   attachment to DTX-32.

01:33:05  8   Q.  (By Mr. Re)  Do you recognize DTX-33?

01:33:10  9   A.  Yes.

01:33:10  10  Q.  And this is the article that was attached to your

01:33:13  11  email, right?

01:33:13  12  A.  Yes.

01:33:17  13  Q.  And -- and you testified during this trial that this

01:33:19  14  article discloses microphone arrays and DSP, right?

01:33:22  15  A.  Yes.

01:33:25  16  Q.  And you testified during this trial this article

01:33:28  17  discloses a beamforming unit and a noise reduction unit

01:33:30  18  implemented in the DSP, right?

01:33:32  19  A.  Yes.

01:33:38  20  Q.  And you obviously sent this to your lawyer because you

01:33:41  21  thought it was relevant to the prosecution of your patent,

01:33:47  22  right?

01:33:47  23  A.  Yes.

01:33:47  24  Q.  And you expected your patent --

01:33:49  25  A.  Hold on.

| | | |
|---|---|---|
| 01:33:50 | 1 | THE COURT:  Just a minute. |
| 01:33:52 | 2 | Let me make a suggestion, Mr. Re.  Given Dr. Li's |
| 01:33:57 | 3 | clear challenges with the English language, if you could |
| 01:34:01 | 4 | make sure you pause so that he has -- he apparently has |
| 01:34:10 | 5 | some answers that take a little extra time to get out, and |
| 01:34:15 | 6 | you've moved on to the middle of the next question, and it |
| 01:34:17 | 7 | gets confusing. |
| 01:34:18 | 8 | If we could make sure there's a break, so in case |
| 01:34:21 | 9 | with his communication struggles, he has more of an answer |
| 01:34:27 | 10 | that immediately comes out, we can get it all in the |
| 01:34:31 | 11 | record.  Can we do that? |
| 01:34:32 | 12 | MR. RE:  Yes, we can. |
| 01:34:33 | 13 | THE COURT:  Okay.  Thank you. |
| 01:34:35 | 14 | A.  Could you repeat your question? |
| 01:34:38 | 15 | Q.  (By Mr. Re)  Yes.  And you thought that this article |
| 01:34:41 | 16 | had relevance to your patent application, and that's why |
| 01:34:47 | 17 | you sent it to your patent lawyer in February of 2013, |
| 01:34:53 | 18 | right? |
| 01:34:53 | 19 | A.  In term of contents, this article is different than our |
| 01:35:00 | 20 | '049 patent.  The term of microphone array, they both talk |
| 01:35:05 | 21 | about microphone array. |
| 01:35:05 | 22 | Q.  So you gave it to your patent lawyer hoping he would |
| 01:35:12 | 23 | submit it presumably on the '756, right? |
| 01:35:15 | 24 | A.  Again, it's our patent attorney's decision. |
| 01:35:17 | 25 | Q.  Right.  And you gave the decision to him for him to |

1423

| | | |
|---|---|---|
| 01:35:22 | 1 | decide whether or not to disclose it, right? |
| 01:35:24 | 2 | A.  Right.  I'm not an attorney. |
| 01:35:29 | 3 | Q.  And did you know that your attorney was telling the |
| 01:35:36 | 4 | Patent Office that the '756 application should be allowed |
| 01:35:40 | 5 | because the prior art does not disclose the delay |
| 01:35:44 | 6 | limitation we've been talking about so much in this trial? |
| 01:35:47 | 7 | A.  Could you repeat your question? |
| 01:35:52 | 8 | Q.  Did you know in this time frame, 2013 when the '756 was |
| 01:36:00 | 9 | being -- when we say "prosecuted," do you know that word, |
| 01:36:05 | 10 | "prosecuted"? |
| 01:36:08 | 11 | A.  Which year? |
| 01:36:18 | 12 | Q.  2013.  The patent issued October 2014, right? |
| 01:36:18 | 13 | A.  Yeah. |
| 01:36:20 | 14 | Q.  So your attorney was arguing why you should get a |
| 01:36:22 | 15 | patent.  You know that, right? |
| 01:36:24 | 16 | A.  Yeah. |
| 01:36:25 | 17 | Q.  And you know that your attorney was filing papers |
| 01:36:28 | 18 | making representations to the Patent Office why you deserve |
| 01:36:31 | 19 | a patent.  You know that, right? |
| 01:36:33 | 20 | A.  I don't remember detail, but he must submit some Office |
| 01:36:45 | 21 | Actions. |
| 01:36:45 | 22 | Q.  And you were communicating with your lawyer throughout |
| 01:36:49 | 23 | the prosecution of your patents, right? |
| 01:36:56 | 24 | A.  We may. |
| 01:36:59 | 25 | Q.  Yes. |

1424

01:37:01   1          MR. RE:  And, in fact, in this case, I'd like to

01:37:02   2  offer as an exhibit, Exhibit DTX-834, which is the

01:37:08   3  privilege log from this matter.

01:37:19   4  Q.  (By Mr. Re)  Do you know what the privilege log is?

01:37:29   5  A.  Which log?

01:37:31   6          MR. RE:  If we can turn some pages of Exhibit 834.

01:37:34   7  Q.  (By Mr. Re)  Do you see how this is listing all of the

01:37:39   8  communications you were having with Mr. Tankha throughout

01:37:42   9  the prosecution of your patents?  Do you understand that?

01:37:47  10  A.  That's the first time I see this table.

01:37:51  11  Q.  And you do recall getting communications from your

01:37:56  12  patent lawyer throughout the prosecution of your patent

01:38:00  13  applications, right?

01:38:02  14  A.  Yes.  We have -- we had communications.

01:38:05  15  Q.  Yes.  And you -- you were very sensitive to that,

01:38:10  16  because you fired your last patent lawyer who was not

01:38:13  17  communicating with you regularly, which led to your

01:38:16  18  abandoned patent applications earlier, right?

01:38:18  19  A.  The reason I fired the last attorney because he did not

01:38:26  20  forward the Patent Office, Office Action document to me.

01:38:32  21  Q.  Right.  But this lawyer, Mr. Tankha, seems to do a very

01:38:36  22  good job at sending you the communications from the Patent

01:38:40  23  Office to you and Dr. Zhu and Craig Adams, right?

01:38:46  24  A.  He did.

01:38:48  25  Q.  Yes.

1425

| | | |
|---|---|---|
| 01:38:58 | 1 | MR. RE:  I have no further questions, Your Honor. |
| 01:39:02 | 2 | Thank you. |
| 01:39:02 | 3 | THE COURT:  Cross-examination? |
| 01:39:10 | 4 | MR. FABRICANT:  May I proceed, Your Honor? |
| 01:39:12 | 5 | THE COURT:  You may. |
| 01:39:12 | 6 | CROSS-EXAMINATION |
| 01:39:14 | 7 | BY MR. FABRICANT: |
| 01:39:14 | 8 | Q.  Good afternoon, Dr. Li. |
| 01:39:18 | 9 | A.  Hi.  Good afternoon. |
| 01:39:19 | 10 | Q.  You were shown a redacted email a few minutes ago dated |
| 01:39:27 | 11 | 2013, in which there was a reference to your 2009 article? |
| 01:39:31 | 12 | A.  Yes. |
| 01:39:32 | 13 | Q.  As you sit here today, do you know whether you had |
| 01:39:35 | 14 | forwarded that article to him previously, in prior years? |
| 01:39:40 | 15 | A.  You know, I believe we submit everything, including |
| 01:39:46 | 16 | article, to our patent attorneys.  And the email showed |
| 01:39:51 | 17 | that one, we may send again. |
| 01:39:56 | 18 | Q.  The article from 2009 that you co-authored with |
| 01:40:02 | 19 | Dr. Zhu -- |
| 01:40:02 | 20 | A.  Yes. |
| 01:40:03 | 21 | Q.  -- with respect to that article, does that article, as |
| 01:40:07 | 22 | you authored it, disclose adaptive beamforming, Dr. Li? |
| 01:40:13 | 23 | A.  In the article, there's no adaptive beamforming. |
| 01:40:21 | 24 | There's no sound source localization. |
| 01:40:24 | 25 | Q.  And you were asked about delay.  Is the type of delay |

01:40:27  1   referenced in your article different because it's a fixed

01:40:32  2   beam rather than an adaptive beam?

01:40:38  3         MR. RE:  Leading, Your Honor.

01:40:43  4   A.  Okay.

01:40:44  5         THE COURT:  Just a minute, Dr. Li.

01:40:45  6         It is technically leading, but this is before the

01:40:48  7   Court.  And given the challenges this witness has with

01:40:53  8   English as a spoken language, I'm going to allow some

01:40:56  9   latitude.

01:40:57 10         MR. FABRICANT:  Thank you.

01:41:02 11         THE COURT:  Rephrase your question, Mr. Fabricant.

01:41:04 12         MR. FABRICANT:  Yes, I will.  Yes, I will,

01:41:07 13   Your Honor.

01:41:07 14   Q.  (By Mr. Fabricant)  Can you tell the Court how the type

01:41:10 15   of delay, which is set forth in your article with respect

01:41:14 16   to the CrispMic I, compares to the type of delay

01:41:19 17   calculations regarding your '049 invention?

01:41:22 18   A.  That's different.  The first one is a fixed

01:41:27 19   beamforming.  The second one is adaptive beamforming.

01:41:29 20   Q.  And is the way of the delay determined different

01:41:32 21   because of the different type of beamformers?

01:41:35 22   A.  That's right.

01:41:35 23   Q.  In the patent that issued from the '049, the actual

01:41:47 24   patent -- and I think it's PTX-1 -- do you know whether the

01:41:55 25   provisional application which led to the '756, which led to

1427

| | | |
|---|---|---|
| 01:42:03 | 1 | the '042 [sic], is in the '049 patent incorporated by |
| 01:42:10 | 2 | reference in the file history as part of the public record? |
| 01:42:13 | 3 | Do you know that? |
| 01:42:14 | 4 | A.  Yes. |
| 01:42:15 | 5 | Q.  And is it? |
| 01:42:15 | 6 | A.  It means that the provisional -- I saw that provisional |
| 01:42:20 | 7 | application number and the time. |
| 01:42:22 | 8 | Q.  My question to you is, if someone in the public looks |
| 01:42:25 | 9 | at the file history -- |
| 01:42:26 | 10 | A.  Yes. |
| 01:42:27 | 11 | Q.  -- of the '049, they will see the provisional, and they |
| 01:42:31 | 12 | will see the reference to the Brandstein book, will they |
| 01:42:35 | 13 | not? |
| 01:42:35 | 14 | A.  I don't think the public can see the provisional, |
| 01:42:38 | 15 | right? |
| 01:42:38 | 16 | Q.  No, I'm asking you about the '049. |
| 01:42:40 | 17 | A.  Yeah. |
| 01:42:41 | 18 | Q.  Which incorporates by reference the provisional, which |
| 01:42:45 | 19 | is in the whole file wrapper, which is available to the |
| 01:42:47 | 20 | public today.  Anyone reading that can see that there was a |
| 01:42:49 | 21 | reference to the Brandstein book, could they not? |
| 01:42:51 | 22 | A.  Yes. |
| 01:42:52 | 23 | MR. RE:  Leading, Your Honor. |
| 01:43:00 | 24 | THE COURT:  I'll allow that question, but |
| 01:43:02 | 25 | Mr. Fabricant, when I said some latitude, I didn't mean |

01:43:06  1  unlimited latitude.

01:43:07  2           MR. FABRICANT:  Yes, Your Honor.

01:43:08  3           THE COURT:  Let's proceed.

01:43:09  4  Q.  (By Mr. Fabricant)  I'll rephrase it for you, Doctor.

01:43:13  5           Do you know one way or the other, if you pull the

01:43:15  6  entire file wrapper today of the '049, whether you find the

01:43:18  7  provisional application in the file history?

01:43:23  8  A.  People should be able to see that.

01:43:28  9           MR. FABRICANT:  No further questions.  I pass the

01:43:30  10  witness, Your Honor.

01:43:30  11           THE COURT:  Redirect?

01:43:30  12                    REDIRECT EXAMINATION

01:43:32  13  BY MR. RE:

01:43:32  14  Q.  You -- you paid attention throughout this trial, didn't

01:43:38  15  you?  Did you pay attention?

01:43:40  16  A.  Yes.

01:43:40  17  Q.  And you listened to the questions and answers that were

01:43:42  18  given to Dr. Zhu?

01:43:52  19  A.  Yes.

01:43:53  20  Q.  And you don't disagree with anything Dr. Zhu said about

01:43:56  21  the Li and Zhu article, do you?

01:43:59  22  A.  Dr. Zhu said many things.

01:44:01  23  Q.  Do you recall Dr. Zhu agreeing that the delay

01:44:05  24  calculation -- I believe she was answering questions of

01:44:07  25  Mr. Hadden -- that the delay calculation in the article is

01:44:11   1   the same one that's set forth in Limitation 1[C] of

01:44:16   2   Claim 1?

01:44:19   3   A.   Okay.

01:44:19   4   Q.   Do you recall that?

01:44:20   5   A.   I -- I don't recall what Dr. Zhu said.  But if it's

01:44:27   6   calculate delay for the linear array.  And you remember

01:44:32   7   said in '049, also talk about linear array, fixed

01:44:38   8   beamforming.  If linear array, fixed beamforming the -- the

01:44:43   9   way to calculate a delay could be the same.

01:44:46   10   Q.   And that's what Dr. Zhu said about the delay

01:44:48   11   limitation, right?

01:44:52   12   A.   I don't remember exactly what Dr. Zhu said.  I just

01:44:56   13   tell you my understanding of that terminology.

01:45:01   14   Q.   And you also understand that your '756 and your '049,

01:45:06   15   both of those also claimed a linear array, right?

01:45:14   16   A.   A linear array, so one of the arrays in '049 patent.

01:45:18   17   Q.   In the claim, right?  It can be circular, linear, or

01:45:23   18   any other configuration, right?

01:45:25   19   A.   You are right.

01:45:26   20   Q.   Thank you very much, Dr. Li.  It's been a pleasure.

01:45:29   21            THE COURT:  I gather you pass the witness, Mr. Re?

01:45:32   22            MR. RE:  I pass the witness.

01:45:33   23            THE COURT:  Do you have further cross,

01:45:35   24   Mr. Fabricant?

01:45:35   25            MR. FABRICANT:  No further cross, Your Honor.

```
01:45:37   1              THE COURT:  All right.  You may step down, Dr. Li.

01:45:40   2              Mr. Re, call your next witness.

01:45:44   3              MS. DOAN:  Your Honor, Amazon calls Mr. Nicholas

01:45:49   4    Godici.

01:45:49   5              THE COURT:  All right.  If you'll come forward,

01:45:52   6    sir, and be sworn.

01:46:04   7              (Witness sworn.)

01:46:05   8              THE COURT:  Please come around, have a seat on the

01:46:14   9    witness stand.

01:46:15   10             Ms. Doan, you may proceed.

01:46:43   11             MS. DOAN:  Thank you, Your Honor.

01:46:43   12             NICHOLAS GODICI, DEFENDANTS' WITNESS, SWORN

01:46:43   13                       DIRECT EXAMINATION

01:46:44   14   BY MS. DOAN:

01:46:44   15   Q.  Mr. Godici, could you please introduce yourself to

01:46:49   16   Judge Gilstrap?

01:46:49   17   A.  Yes.  My name is Nicholas Godici.

01:46:51   18   Q.  And have you previously worked for the Patent and

01:46:53   19   Trademark Office?

01:46:53   20   A.  Yes, I did.  I worked for the Patent and Trademark

01:46:55   21   Office for 33 years.

01:46:56   22   Q.  Are you the former Commissioner of Patents?

01:46:59   23   A.  Yes, I am.

01:46:59   24   Q.  Can you tell us a little bit about yourself, please,

01:47:02   25   sir?
```

01:47:02  1  A.  Sure.  I started at the Patent Office 1972.  That ages

01:47:08  2  me, I guess.  And I started out as a patent examiner,

01:47:11  3  worked my way up through the ranks as an assistant patent

01:47:17  4  examiner, primary patent examiner, first line supervisor,

01:47:21  5  up through the chain of -- of management at the Patent

01:47:24  6  Office.  And I was appointed the Commissioner For Patents

01:47:27  7  in the year 2000.

01:47:28  8  Q.  That same year, did you also serve as the Acting

01:47:32  9  Undersecretary of Commerce?

01:47:33  10  A.  I did.  I did.  There was the transition between the

01:47:38  11  Clinton and Bush Administration.  I was the career official

01:47:42  12  at the Patent Office that was left in charge for about a

01:47:45  13  year until the new undersecretary was nominated by the

01:47:49  14  President and -- and confirmed by the Senate.

01:47:52  15  Q.  And how long did you serve as the Commissioner of

01:47:54  16  Patents, sir?

01:47:55  17  A.  I was Commissioner for Patents for five years, from

01:47:59  18  2000 to 2005.

01:48:00  19  Q.  And did you prepare an expert report in this case?

01:48:03  20  A.  I did, yes.

01:48:04  21  Q.  What materials have you reviewed in this case, sir?

01:48:07  22  A.  Well, I reviewed the -- the file history, obviously, of

01:48:11  23  the -- of the patent-in-suit, of the '049, of the -- of the

01:48:13  24  '756.  I reviewed the provisional application.  I reviewed

01:48:17  25  the deposition testimony of the two inventors, Dr. Zhu,

01:48:23  1  Dr. Li.  And I reviewed the deposition testimony of the

01:48:30  2  attorney that prosecuted the application, Mr. Tankha.  And

01:48:34  3  whatever other documents that I may have cited in my expert

01:48:37  4  report.

01:48:38  5  Q.  Did you also review -- were you here for the entire

01:48:41  6  trial, sir?

01:48:42  7  A.  Yes, I was.

01:48:42  8  Q.  And did you hear the testimony of Dr. Stern?

01:48:45  9  A.  I -- I did, yes.

01:48:46  10  Q.  And had you previously spoken to him about the -- his

01:48:50  11  opinions before you prepared your expert report?

01:48:52  12  A.  Yes.  As I recall, we spoke more than once on the

01:48:56  13  telephone.  And we were preparing expert reports that were

01:49:00  14  due, I believe, on the same day.  So I didn't have a chance

01:49:04  15  to review his final report, but we spoke about his reports,

01:49:07  16  yes.

01:49:07  17  Q.  All right.  Now, I want to talk a little bit about the

01:49:11  18  duty of candor.  And I know that Judge Gilstrap is very

01:49:14  19  familiar with the duty of candor and the duty of

01:49:17  20  disclosure.  So I want to focus this conversation on how it

01:49:20  21  applies to this particular claim that we have for

01:49:23  22  inequitable conduct against Dr. Li, Dr. Zhu, and Ashok

01:49:27  23  Tankha.  Okay?

01:49:27  24  A.  Okay.

01:49:28  25  Q.  All right.  So, tell us, on the duty of candor and duty

01:49:32  1  of disclosure, does it apply to information that you may

01:49:36  2  have but failed to disclose?

01:49:38  3  A.  Exactly.  That's the -- that's the point of the -- of

01:49:41  4  the duty of disclosure.  The applicants and the applicant's

01:49:45  5  representative are obligated to disclose to the Patent

01:49:50  6  Office information that they know is material to the

01:49:53  7  patentability of the claims of the patent application under

01:49:56  8  review.

01:49:57  9  Q.  Even if that material cuts against the patentholder?

01:50:01  10  A.  Sure.  I mean, that -- that's the whole concept here.

01:50:03  11  The idea is you give us everything.  The -- the most

01:50:06  12  important is the most important.

01:50:08  13       So you give us that information so that the Patent

01:50:12  14  Office and the patent examiner has the most relevant and

01:50:15  15  material information before they make the final decision on

01:50:18  16  whether or not to issue the patent.

01:50:19  17       So that -- you know, that's kind of the bargain.

01:50:22  18  This -- you know, the Patent Office is issuing a patent

01:50:25  19  that's valuable.  It's a 20-year -- 20-year protection on

01:50:29  20  the invention.

01:50:30  21       But, in exchange, the -- the applicant has the

01:50:33  22  obligation to tell the Patent Office about all the

01:50:35  23  information that's relevant and material to the examination

01:50:39  24  process.

01:50:39  25  Q.  If the -- if the patent attorney -- the prosecuting

01:50:43  1  attorney or the patent applicant has information in their

01:50:46  2  possession that they know discloses a certain element of

01:50:50  3  the claim and yet argues to the Patent Office that that

01:50:55  4  element is not shown in the prior art, would that be a

01:50:57  5  violation of the duty of candor?

01:51:00  6  A.  Absolutely.  That -- that's very important to the

01:51:02  7  office.  If you know about information relative to a

01:51:05  8  particular limitation of the claim, yes.

01:51:07  9  Q.  With respect to false statements or making false

01:51:12  10  declarations to the Patent Office, would that also be a

01:51:16  11  violation of the duty of candor?

01:51:20  12  A.  Sure.  If -- if you make a -- a false statement or a

01:51:21  13  declaration to the Patent Office -- and by declaration I

01:51:23  14  assume it's under the penalty of perjury -- if -- if that's

01:51:27  15  a false statement, then there are consequences.  And

01:51:30  16  that -- that would have to be disclosed to the Patent

01:51:32  17  Office that you made a false statement.  You shouldn't make

01:51:34  18  false statements.  You can't make false statements.

01:51:37  19  Q.  What is the consequence of violating the duty of

01:51:40  20  candor?

01:51:40  21  A.  Well, if you violate the duty of candor, and there's --

01:51:43  22  there's the possibility of the finding of inequitable

01:51:45  23  conduct if there's intent to deceive.  If there's a finding

01:51:52  24  of inequitable conduct, a patent can be held unenforceable,

01:51:55  25  the entire patent, all of the claims in the patent are held

01:52:00  1  unenforceable.

01:52:00  2  Q.  What is the difference between the violation of a duty
01:52:04  3  of candor and inequitable conduct?

01:52:04  4  A.  Well, inequitable conduct, you have to -- you have to
01:52:06  5  show two things.  You have to show that the information
01:52:09  6  that was not submitted to the Patent Office was material.

01:52:13  7        I understand it's the "but for" materiality test,
01:52:17  8  and you have to show and prove that there was intent to
01:52:20  9  deceive the Patent Office by not submitting that material
01:52:22  10  information.

01:52:27  11  Q.  Okay.  So here under 37 CFR 1.56, Section B,
01:52:34  12  Subsection 2, I think we've talked about this.  If it
01:52:35  13  refutes or is inconsistent with the position that applicant
01:52:37  14  takes in argument to the Patent Office for asserting an
01:52:40  15  argument of patentability, that would be a violation of the
01:52:43  16  duty of candor?

01:52:43  17  A.  Exactly.  You can't -- you can't take a position and --
01:52:48  18  and state that such and such is -- is information that's --
01:52:52  19  that carries patentable weight but not disclose the fact
01:52:56  20  that you might have information that that was prior art,
01:52:58  21  yes.

01:52:59  22  Q.  And, here, the duty of candor and the obligation to be
01:53:05  23  candid with the Patent Office is owed by not only Dr. Li
01:53:09  24  and Dr. Zhu but also by their patent attorney --
01:53:12  25  prosecuting attorney, Ashok Tankha?

01:53:16  1   A.  Yes.

01:53:16  2          THE COURT:  Just a moment.

01:53:17  3          MR. FABRICANT:  I realize it's a trial to the

01:53:19  4   bench, however, these are very leading questions,

01:53:23  5   Your Honor, to an expert witness.

01:53:24  6          THE COURT:  Well, it is before the Court.  I

01:53:31  7   certainly don't want counsel effectively testifying, but

01:53:35  8   I'm going to allow both sides some latitude beyond what I

01:53:40  9   would if this were before a jury, for no other reason than

01:53:43  10  to move the process forward.

01:53:44  11         MR. FABRICANT:  Thank you.

01:53:45  12         THE COURT:  Please proceed, Ms. Doan.

01:53:47  13         MS. DOAN:  Thank you, Your Honor.

01:53:49  14  Q.  (By Ms. Doan)  With respect to the opinion of the

01:53:50  15  intent to deceive for a finding of inequitable conduct, who

01:53:55  16  makes that finding?

01:53:56  17  A.  Well, in this case, Judge Gilstrap will make that

01:54:00  18  decision.  That's not up to the expert to -- to -- to reach

01:54:04  19  the ultimate conclusion of whether or not there's

01:54:07  20  inequitable conduct.  This is -- this is the Judge's

01:54:09  21  decision to make.

01:54:10  22  Q.  Should you give an opinion?

01:54:11  23  A.  I have an opinion, but I -- I understand that I have

01:54:17  24  not given an opinion, and I don't believe that it's the

01:54:20  25  expert's position to -- to make an opinion on the ultimate

01:54:25  1  conclusion of whether or not there's inequitable conduct.

01:54:27  2  Q.  So why are you here today?

01:54:29  3  A.  Well, I'm here to -- to walk through some of the facts

01:54:32  4  that are relevant to making that final decision that

01:54:38  5  Judge Gilstrap will have to make, by explaining the

01:54:40  6  prosecution history and what was and wasn't disclosed to

01:54:43  7  the Patent Office.

01:54:43  8  Q.  Have you broken your testimony up into four sections

01:54:47  9  for the Court today?

01:54:48  10  A.  I have, yes.  And you'll see the four here on these

01:54:52  11  bullets.

01:54:52  12  Q.  And the first one is the relationship and the

01:54:55  13  prosecution history of the '756 and the '049 patents?

01:54:57  14  A.  Exactly.  I wanted to just lay out that there are three

01:54:59  15  applications in this sequence and explain them.

01:55:02  16  Q.  Okay.  And the second point is the failure to disclose

01:55:05  17  the Li article in both the '756 and the '049 patents?

01:55:07  18  A.  Exactly.  That -- the last three are the allegations of

01:55:10  19  inequitable conduct that I'd like to talk about and lay out

01:55:14  20  facts relative to those allegations.

01:55:17  21        It's the failure to disclose the Li article, it's

01:55:19  22  the failure to disclose the Brandstein book, and it's also

01:55:21  23  the -- the fact that there were declarations in the

01:55:25  24  reissue, the '049 -- that resulted in the '049 patent that

01:55:29  25  were false declarations.

1438

01:55:29  1   Q.  Now, in the trial itself, we talked about some false

01:55:34  2   declarations with respect to the '623 patent application.

01:55:39  3   Is this the same false declarations you're talking about

01:55:42  4   here today, sir?

01:55:42  5   A.  No, these are -- these are declarations that were filed

01:55:46  6   in the '049 patent, and ultimately resulted in the issuance

01:55:51  7   of the '049 patent.

01:55:53  8   Q.  All right.  Let's start with the first bullet there,

01:55:55  9   the relationship to the '756 and the '049.  Have you

01:55:58  10  prepared some slides for us to go through here today?

01:56:01  11  A.  Yes.

01:56:01  12  Q.  All right.  So on the provisional application, which I

01:56:03  13  believe is DTX-15 --

01:56:05  14         THE COURT:  Ms. Doan, you know what I'm going to

01:56:07  15  do.  I'm going to ask you to slow down.

01:56:10  16         MS. DOAN:  Yes, sir.  Yes, Your Honor.  I will

01:56:12  17  slow down.

01:56:13  18         THE COURT:  Please.

01:56:15  19  Q.  (By Ms. Doan)  With respect to the provisional

01:56:16  20  application, DTX-15, we heard yesterday that that

01:56:19  21  application is not reviewed by the Patent Office and with

01:56:24  22  respect to -- I'm looking at the '756 patent application or

01:56:27  23  the '049 reissued patent application; is that right?

01:56:32  24  A.  Yes.  I don't know if I got that entire question.  So

01:56:35  25  maybe you can repeat it.

01:56:38   1       But what we're seeing here is the provisional

01:56:40   2   application, which is the first in the sequence of these

01:56:42   3   three applications that was filed, and then it's been

01:56:45   4   referred to as the real application or the -- or the real

01:56:48   5   patent application.  The Patent Office would call it the

01:56:51   6   non-provisional patent application.  But it's the -- it's

01:56:54   7   the patent application that is then examined and can mature

01:56:58   8   to a -- to a patent.

01:57:00   9   Q.  Okay.  So I want to make sure that I've got that right.

01:57:03  10   With respect to the provisional application, DTX-15, that

01:57:05  11   was filed on September 24th, 2010, is that provisional

01:57:12  12   application part of the file wrapper of the '756 patent or

01:57:15  13   the '049 patent?

01:57:16  14   A.  No, it's not part of the file wrapper.  And I'm not

01:57:20  15   sure -- you know, in the old days, we actually had file

01:57:24  16   wrappers.  We had the paper copy.  But now it's more

01:57:28  17   electronic.  But they have different serial numbers, they

01:57:31  18   have different identification.

01:57:32  19       So when the examiner is forwarded the -- the

01:57:35  20   application, for example, the non-provisional or the real

01:57:38  21   application to examine, the -- the provisional application

01:57:41  22   is not embedded inside of that.  It's a separate document

01:57:44  23   that's -- that's -- that's in the -- that's in the archives

01:57:48  24   of the Patent Office database.

01:57:51  25   Q.  Do you know whether the provisional application,

01:57:54  1  DTX-15, was reviewed by the patent examiner who examined

01:57:58  2  the '756 patent application?

01:58:01  3  A.  Well, there was no indication that it was reviewed, no.

01:58:04  4  And -- and, normally, a provisional application would not

01:58:08  5  be reviewed by the patent examiner.

01:58:11  6       The only time that you would actually look at the

01:58:14  7  provisional application is if -- is when there is a

01:58:17  8  question of whether or not the effective filing date of the

01:58:19  9  provisional application is important.  And you only look at

01:58:23 10  that if there's an intervening prior art reference.

01:58:26 11       In this case, all the prior art that was disclosed

01:58:31 12  by the applicants or found by the Patent Office was well

01:58:35 13  before the provisional date.  So there was no question

01:58:37 14  about whether or not it was prior art.

01:58:39 15       So, based on my experience, the examiner would

01:58:41 16  have no reason to -- to review the provisional application

01:58:45 17  when examining the -- the '756.

01:58:48 18  Q.  In your review of the provisional application, DTX-15,

01:58:53 19  was there an information disclosure statement, or an IDS,

01:58:58 20  that was filed with the provisional application?

01:59:01 21  A.  No, there was no IDS that was filed in the provisional

01:59:06 22  application, no.

01:59:06 23  Q.  So even if a reference is cited and is listed in the

01:59:10 24  provisional application, was -- from your review of the

01:59:13 25  file, was there any type of references or prior art

| | | |
|---|---|---|
| 01:59:18 | 1 | submitted with the provisional application? |
| 01:59:20 | 2 | A.  No, there's no I -- you don't file an IDS with a |
| 01:59:26 | 3 | provisional application. |
| 01:59:26 | 4 | Q.  So, with respect to the '756 patent, which is PTX-2, |
| 01:59:31 | 5 | we've heard testimony in the trial that that has been a |
| 01:59:35 | 6 | surrendered patent? |
| 01:59:37 | 7 | A.  Yes, by virtue of the fact that the reissue application |
| 01:59:41 | 8 | that followed it issued, yes. |
| 01:59:43 | 9 | Q.  Can the '756 patent, the surrendered patent, still be |
| 01:59:47 | 10 | subject to inequitable conduct? |
| 01:59:48 | 11 | A.  Yes.  It could be found that -- that it was obtained |
| 01:59:52 | 12 | through inequitable conduct, and if that's the case, it |
| 01:59:58 | 13 | could be found that that patent should never have issued. |
| 02:00:01 | 14 | And if that's the case, then the '049 wouldn't exist.  You |
| 02:00:05 | 15 | wouldn't be able to reissue a patent that shouldn't have |
| 02:00:08 | 16 | been issued in the first place. |
| 02:00:10 | 17 | Q.  So, if inequitable conduct is found with respect to the |
| 02:00:12 | 18 | application of the '756 patent, then that could affect |
| 02:00:17 | 19 | every other patent that it's related to? |
| 02:00:20 | 20 | A.  It can affect the downstream, the later -- the later |
| 02:00:24 | 21 | patents and patent application, it can infect them.  In |
| 02:00:30 | 22 | other words, the act that occurred, if it's found to be |
| 02:00:32 | 23 | inequitable conduct in the '756, can infect the downstream |
| 02:00:36 | 24 | patents, obviously because they wouldn't be there or they |
| 02:00:40 | 25 | wouldn't exist, or at least exist in that form, had the -- |

02:00:44  1  had the information that was not given to the Patent Office

02:00:47  2  and not considered by the Patent Office in the underlying

02:00:53  3  '756, you know, if that was given and there was a

02:00:55  4  rejection, there would have either been an abandonment or a

02:00:58  5  substantial change in that patent.

02:01:00  6  Q.  Have the opinions that -- or the opinions and your

02:01:03  7  review of the '756 patent and the '049 patent in this case,

02:01:08  8  have you considered the facts with respect to the duty of

02:01:12  9  candor and the facts that support or don't support

02:01:14  10  inequitable conduct with respect to both patents?

02:01:16  11  A.  I'm not sure I got that.  Could --

02:01:20  12  Q.  Sure, I'm so sorry --

02:01:22  13  A.  Could --

02:01:26  14  Q.  Yes.  From your opinions in your expert report, do they

02:01:31  15  just rely upon the '756 patent, or do you give opinions

02:01:34  16  with respect to the '756 patent and the '049 patent?

02:01:35  17  A.  Both, both patents.

02:01:36  18  Q.  All right.  Let's look at the '756 patent.

02:01:38  19          We'll just -- the prosecution history of the '756

02:01:43  20  patent is DTX-55.  Have you reviewed the entire file

02:01:48  21  history for the '756 patent application?

02:01:50  22  A.  Yes, yes, I have.

02:01:51  23  Q.  And what are we looking at here, DDX-8.8?

02:01:55  24  A.  This is simply, at the time of the filing of the '756

02:01:59  25  application, there was an IDS submitted by the applicants

02:02:03   1   or the applicants' representative, Mr. Tankha, and these

02:02:09   2   are the -- these are the five references that were

02:02:10   3   submitted to the Patent Office to be reviewed when they

02:02:14   4   examined the '756 application.

02:02:15   5   Q.  Okay.  So I've got a board over here with the

02:02:18   6   prosecution of the '756 patent.  Can you see that, sir?

02:02:20   7   A.  Yes, I can see it.

02:02:24   8   Q.  And would the information disclosure statement, or the

02:02:29   9   IDS, be submitted with the patent application itself?

02:02:33  10   A.  It was in this case, yes.

02:02:35  11   Q.  All right.  And then you see there's five references?

02:02:37  12   A.  Yes.

02:02:37  13   Q.  Were there multiple information disclosure statements

02:02:40  14   submitted with respect to the prosecution of the '756

02:02:42  15   patent application?

02:02:43  16   A.  No, there was only one.  This is it.  These are the

02:02:46  17   only references that were submitted by the applicant to the

02:02:49  18   Patent Office.

02:02:49  19   Q.  Were there additional information disclosure statements

02:02:53  20   submitted with respect to the '049 application?

02:02:55  21   A.  No, there weren't.  There weren't any.  So, obviously,

02:02:58  22   in examination of the '049, they had these five references

02:03:02  23   that were in the '756, but there were no additional

02:03:04  24   references submitted at any point in time.

02:03:06  25   Q.  And that's listed in DTX-55.84; is that right, sir?

1444

02:03:11  1   A.  What's listed, excuse me?

02:03:13  2   Q.  That's okay.  The information disclosure statement that

02:03:15  3   we're looking at in front of you on the screen, can that be

02:03:18  4   found in DTX-55.84?

02:03:20  5   A.  Yes.

02:03:22  6   Q.  So after the patent was applied for, there was an

02:03:27  7   Office Action; is that right?

02:03:28  8   A.  Yes.

02:03:28  9   Q.  All right.  And what happened in that Office Action?

02:03:30  10  A.  The Patent Office rejected all the claims of the

02:03:33  11  original '756 application on prior art.  As I recall, there

02:03:38  12  was an obviousness rejection of those claims based on two

02:03:41  13  references, Kim and Chol reference.

02:03:46  14  Q.  And then what happened?

02:03:47  15  A.  Then the applicant responded.  And this is -- this,

02:03:50  16  what we're seeing here, is the amendment that was submitted

02:03:52  17  by Mr. Tankha to the Patent Office after the rejection of

02:03:58  18  the -- the initial rejection of the claims.

02:04:00  19  Q.  And in his applicant's  response, did he amend Claim 1

02:04:05  20  of the '756 patent?

02:04:07  21  A.  He amended Claim 1 and Claim 11.  So, in other words,

02:04:10  22  the two independent claims in the application were amended.

02:04:12  23  And you can see what's in yellow and highlighted here is

02:04:15  24  the additional information -- or additional limitation that

02:04:22  25  was added to both of those claims.  And it's the limitation

02:04:25   1   that we've been calling the "determining a delay"

02:04:28   2   limitation, sometimes referred to as Limitation [C].  But

02:04:32   3   it's the limitation determining a delay, and you can see

02:04:35   4   that limitation right here.

02:04:37   5   Q.  All right.  So this applicant's response appears to be

02:04:40   6   filed May 9th of 2014; is that right?

02:04:43   7   A.  Yes.

02:04:44   8   Q.  And it's found at DTX-55.145 through 146?

02:04:48   9   A.  Yes.

02:04:48   10  Q.  Now, we heard testimony from Dr. Li that he gave the Li

02:04:56   11  article to his lawyer in 2013, just then.  Did you hear

02:05:00   12  that testimony?

02:05:01   13  A.  Yes.

02:05:04   14  Q.  If Mr. Tankha had the Li article which disclosed

02:05:08   15  determining -- determining a delay, and that information

02:05:10   16  was material, would that be considered in determining

02:05:16   17  whether inequitable conduct was held here or whether the

02:05:19   18  duty of candor was breached?

02:05:19   19  A.  Yes, it would.  Yes.

02:05:21   20  Q.  All right.  Let's look at the applicant's response.

02:05:28   21  This is by Mr. Tankha, as well?

02:05:30   22  A.  Right.  So this goes with the amendment that we just

02:05:32   23  saw.  So, in other words, Mr. Tankha amends the claim and

02:05:38   24  adds the determining a delay feature to the claim, that

02:05:42   25  limitation.  And then this is the argument that he -- that

| 02:05:44 | 1 | he submits to the Patent Office in relation to that |

02:05:44  1  he submits to the Patent Office in relation to that

02:05:48  2  amendment.

02:05:50  3       And -- and what he's saying is that the prior

02:05:52  4  art -- in this case, the prior art that was used to reject

02:05:54  5  one of the references was Chol, as I mentioned.  He's

02:05:58  6  saying that the prior art does not show this determining

02:06:02  7  the delay limitation, and, therefore, the Patent Office

02:06:06  8  should allow this claim.

02:06:10  9  Q.  So, if the only issue with respect to -- he -- if the

02:06:14  10  patent prosecutor has the determining a delay limitation

02:06:17  11  with him in an article and then argues to the Patent Office

02:06:21  12  that it's not shown in the prior art, would that be

02:06:24  13  something for Judge Gilstrap to consider in determining

02:06:30  14  inequitable conduct?

02:06:30  15  A.  Absolutely.  I mean, if -- if you're making an argument

02:06:34  16  that this is the patentable feature and you're actually --

02:06:39  17  and saying that's it's not shown in the prior art but you

02:06:40  18  have information that it is part of the prior art, you must

02:06:44  19  tell the Patent Office about that.  And that is information

02:06:46  20  that -- that should and could be considered by

02:06:50  21  Judge Gilstrap.

02:06:51  22  Q.  In the patent applicant's response that was filed in

02:06:54  23  May of 2014, was a subsequent IDS prepared or filed at that

02:07:00  24  time?

02:07:00  25  A.  No.  My recollection there were no other IDSs.  There

02:07:04  1  were -- no other references were submitted to the Patent

02:07:07  2  Office.

02:07:07  3  Q.  All right.  And then what happened?

02:07:09  4  A.  Well, then the examiner allowed the '756 application.

02:07:13  5  And when an examiner allows an application, there's

02:07:16  6  normally what's called a reasons for allowance.

02:07:19  7        So this is -- to make the record clear, to make

02:07:22  8  the prosecution history clear, the examiner states the

02:07:25  9  reason they're allowing -- he -- he or she is allowing the

02:07:29 10  application.

02:07:30 11        And what you see here in yellow is the reason.

02:07:32 12  And the examiner says:  Neither Kim nor Chol teaches the

02:07:37 13  method of improving sound quality by combining various

02:07:42 14  units, such as the sound source localization unit, adaptive

02:07:48 15  beamforming unit, and noise reduction unit, where in the

02:07:51 16  arbitrary configuration of the microphone array is

02:07:53 17  determined by the delays, predefined angle, reference axis,

02:08:00 18  and azimuth angle, et cetera.

02:08:01 19        And -- and it's important -- the last sentence is

02:08:03 20  also important:  So it is agreed that the prior art of

02:08:06 21  record does not teach the amended independent claims.

02:08:14 22        Well, the amended independent claim, the only

02:08:17 23  amendment in it is that determining the delay limitation

02:08:19 24  that we saw earlier when he filed the amendment.

02:08:22 25  Q.  So, in sum, for the '756 patent prosecution, the claims

02:08:25   1   were rejected.  And then there's a determining a delay

02:08:34   2   amendment.  And then the Patent Office allowed the patent

02:08:37   3   to issue based upon the amendment of determining a delay.

02:08:39   4   Is that right?

02:08:39   5   A.  That's right.  That's about as clear as it gets in

02:08:42   6   terms of tracking exactly the rationale and reasons and

02:08:45   7   arguments of -- of patentability.

02:08:47   8        In other words, the amendment went in, there's an

02:08:50   9   argument that this carries the weight for patentability,

02:08:53   10  the examiner agrees, and issues the patent.

02:08:58   11  Q.  All right.  Now, you're aware here, sir, that Amazon is

02:09:01   12  alleging that Vocalife committed inequitable conduct before

02:09:04   13  the Patent Office, correct?

02:09:05   14  A.  I'm aware of that, yes.

02:09:06   15  Q.  All right.  And we're alleging that, specifically with

02:09:09   16  respect to Manli Zhu, Dr. Peter Li, and Ashok Tankha, the

02:09:14   17  patent prosecutor?

02:09:16   18  A.  Correct, correct, they all had the duty of candor, duty

02:09:20   19  of disclosure.

02:09:21   20  Q.  And did you find three -- what are the grounds that

02:09:22   21  Amazon alleges establish inequitable conduct during the

02:09:26   22  prosecution of the '756 patent and the '049 patent?

02:09:28   23  A.  Well, the allegations are -- the grounds are, number

02:09:32   24  one, the Li article that -- that has been discussed

02:09:36   25  extensively, that was never submitted to the Patent Office.

02:09:38  1   That wasn't submitted in -- in either the '756 or the '049.

02:09:41  2   Q.  Let's talk about that next.

02:09:42  3   A.  Okay.

02:09:43  4   Q.  So the '756 patent issues.  Are you -- are you

02:09:49  5   familiar, sir, with DTX-14, the Li article?

02:09:51  6   A.  Yes.  I've seen it, yes.

02:09:53  7   Q.  And you know that we've been discussing this 2009 Li

02:09:58  8   article all week?

02:09:59  9   A.  Yes.

02:09:59  10  Q.  Remind us what Dr. Manli Zhu said about the Li article

02:10:03  11  disclosing the determining a delay statement.

02:10:05  12  A.  This is from her trial testimony a few days ago.  I was

02:10:10  13  here to witness it.

02:10:11  14         But she said -- so the question was:  So -- and to

02:10:18  15  be clear, you describe linear microphone arrays, as well as

02:10:22  16  circular microphone arrays, in the '049 patent, right,

02:10:25  17  Dr. Zhu?

02:10:25  18         And she said:  Yes, they are two special cases for

02:10:30  19  my invention.

02:10:31  20         And then it went on to -- to the question -- the

02:10:35  21  next question is:  So for the case of linear microphone

02:10:39  22  array, you show the same formula for calculating the delay

02:10:42  23  in your 2009 article -- that's the Li article -- as you do

02:10:47  24  in Figure 6B from your '049 patent, don't you, Dr. Zhu?

02:10:52  25         And she said:  Yes.

02:10:53  1   Q.  And you're aware that the '049 patent covers not only

02:10:57  2   the circular array, that I think we tried in the trial this

02:11:00  3   week, but also the linear array?

02:11:03  4   A.  Correct.  The -- the patent is broad enough to -- to

02:11:06  5   incorporate or to encompass both linear and circular

02:11:10  6   arrays.

02:11:10  7   Q.  If the patent examiner had an article which disclosed

02:11:15  8   the formula for determining a delay in a linear array,

02:11:21  9   should it also have been -- should that have been given to

02:11:23  10  the Patent Office in determining the patentability of the

02:11:27  11  '756 and the '049 patents?

02:11:29  12  A.  Sure.  The -- the linear array is -- is -- is equally

02:11:33  13  as important as the circular array, because the -- the

02:11:36  14  claim -- the applicants claimed both types of arrays.

02:11:40  15          So if you have information with respect to the

02:11:41  16  linear array that the determining the delay calculation was

02:11:46  17  known, then that's important information.

02:11:48  18  Q.  And you were in court the day that we covered --

02:11:54  19          MS. DOAN:  I think this is not advancing.  Can you

02:11:59  20  advance for me, please, Mr. Berk?

02:12:01  21  Q.  (By Ms. Doan)  Yes.  The relationship of the '756 and

02:12:04  22  '049, the Li article disclosed a certain formula for

02:12:08  23  determining a delay.  Are you familiar with that?

02:12:09  24  A.  Yes.

02:12:10  25  Q.  And you're familiar -- do you see also when Dr. Zhu was

02:12:13  1   questioned about this same formula, was -- was specifically

02:12:17  2   disclosed in the '756 patent and the '049 reissue?

02:12:20  3   A.  Yes.  And -- and as highlighted here, my understanding

02:12:25  4   is that in the 180-degree configuration, which would be the

02:12:31  5   linear configuration, the -- the formulas are the same.

02:12:36  6   Q.  And are you -- are you giving an opinion about

02:12:41  7   materiality of the Li article here today?

02:12:43  8   A.  No, I'm not the technical expert on materiality.

02:12:48  9   I'm -- I'm laying out the -- what I've seen as the evidence

02:12:51  10  by others with respect to materiality.

02:12:53  11  Q.  And are you relying upon the testimony of Dr. Stern?

02:12:57  12  A.  Yes.

02:12:57  13  Q.  And what did Dr. Stern say during this trial, sir?

02:13:01  14  A.  Well, he -- he talked about the Li article, and he

02:13:04  15  says:  Which reference has already been discussed in this

02:13:07  16  trial -- this is a question -- showing all the limitations

02:13:10  17  of this -- of this claim -- of Limitation [C]?

02:13:14  18        In other words, remember, Limitation [C] is what's

02:13:19  19  sometimes referred to as determining a delay limitation.

02:13:21  20        He says:  Well, among others, we heard on Friday,

02:13:26  21  I believe from Dr. Soo -- quite possibly from Dr. Li --

02:13:30  22  that paper that Dr. Li presented at the ICASSP -- the

02:13:34  23  I-C-A-S-S-P Conference in 2009 in Taiwan -- Taiwan, which

02:13:38  24  is shown up here on the screen, disclosed the same method

02:13:41  25  of determining the delay that was cited in the '049 patent.

02:13:45  1  Q.  In your discussions with Dr. Stern before you submitted

02:13:48  2  your expert report, did he give you an opinion with respect

02:13:51  3  to materiality?

02:13:52  4  A.  Yes.

02:13:53  5  Q.  And what was that?

02:13:53  6  A.  Oh, he -- he told me that -- that the Li article

02:13:59  7  disclosed the determining the delay feature that was in the

02:14:04  8  '049 patent claims.

02:14:04  9  Q.  Now, you -- in your review of the file history, the Li

02:14:08  10  article was not submitted in the '756 or the '049 patent,

02:14:11  11  the file histories, right?

02:14:13  12  A.  It was not submitted, no.

02:14:14  13  Q.  After we file -- after the Plaintiff filed this

02:14:20  14  lawsuit, Vocalife, you're aware that we made a claim for

02:14:22  15  inequitable conduct, right?

02:14:24  16  A.  Correct.

02:14:24  17  Q.  And in the '623 patent application file, are you aware

02:14:29  18  as to whether the Li article was -- was submitted in that

02:14:32  19  file by Vocalife?

02:14:34  20  A.  It was.  So just to explain, the '623 patent was

02:14:42  21  referred to in trial as the second reissue patent

02:14:45  22  application.  And after this litigation started,

02:14:48  23  sometimes -- sometime at the beginning of this calendar

02:14:51  24  year, the Li article was submitted in that second reissue

02:14:54  25  application.

02:14:55  1   Q.  And what happened?

02:14:58  2   A.  The Patent Office used the Li article to reject the

02:15:00  3   claims in that particular application.

02:15:02  4   Q.  So would that also be an indication of materiality, as

02:15:07  5   well?

02:15:07  6   A.  It could be, yes.  I mean, obviously, the - there's --

02:15:11  7   there's slight -- there's differences to the claims.  But

02:15:14  8   if you look at what the Patent Office said with respect to

02:15:16  9   what's taught in the Li article, my review of the file

02:15:20  10  history looked -- looked as if they're -- they're stating

02:15:23  11  that it teaches the determining the delay feature.

02:15:25  12  Q.  And the '623 file history could be found at Exhibit

02:15:30  13  No. 980, I believe; is that right?

02:15:35  14  A.  I'm sure you're correct, but I don't know that.

02:15:37  15  Q.  All right.  Ultimately, did -- were those claims

02:15:41  16  allowed in the '623 patent?

02:15:42  17  A.  The '623 patent application was just recently allowed,

02:15:46  18  within the last month or two, I think, yes.

02:15:48  19  Q.  And how could that patent be allowed if, indeed, the Li

02:15:54  20  article is but-for material?

02:15:55  21  A.  Well, number one, as I said, the claims -- the claims

02:16:01  22  were different.  Obviously, you're -- you're not going to

02:16:03  23  have the same claims in a -- in a second reissue as you

02:16:06  24  have in the first reissue, so there -- there are different

02:16:06  25  limitations in those claims.

02:16:09  1        And the second thing, I did review the reasons for

02:16:12  2   allowance that the Patent Office stated recently in -- in

02:16:15  3   the '623.  And they -- and they stated that there were --

02:16:19  4   and also the arguments that were made by the applicant.

02:16:21  5   And they're arguing different elements that -- that were

02:16:24  6   patentable.

02:16:28  7        So, in other words, they didn't argue that --

02:16:30  8   that -- that -- Li article didn't show the determining the

02:16:33  9   delay limitation, but argued -- and that's [C] -- they

02:16:40  10  argued that the Li article didn't show, for example, [D] or

02:16:45  11  [E] or [F] limitation in the claim, so they argued

02:16:48  12  different limitations for patentability.

02:16:48  13  Q.  So the second reissue issued based on other elements of

02:16:52  14  the claim?

02:16:52  15  A.  It's allowed.  I'm not sure it's issued yet, but it's

02:16:55  16  allowed based on other elements.  Arguments that other

02:16:59  17  elements carry the weight for patentability.

02:17:00  18  Q.  Now, we've heard testimony in trial that obviously

02:17:04  19  Dr. Li and Dr. Zhu knew about the article they wrote in

02:17:08  20  2009.

02:17:08  21       Have you also had an opportunity to read the

02:17:11  22  deposition testimony of Ashok Tankha, the prosecuting

02:17:14  23  attorney?

02:17:14  24  A.  Yes, I have.

02:17:15  25  Q.  And did he also admit that he had the Li article during

02:17:18   1    the prosecution of the '756 patent?

02:17:21   2    A.  Yes, it's my understanding that he had the Li article,

02:17:24   3    yes.

02:17:25   4    Q.  All right.  So I think this line of questioning is

02:17:27   5    about the '049 patent.  But we've heard through Mr. --

02:17:32   6    through Dr. Li that he gave him -- sorry -- that Dr. Li

02:17:37   7    gave Mr. Tankha a copy of the Li article in 2013, right?

02:17:42   8    A.  Yes.

02:17:45   9    Q.  And now I'm looking at Slide DD -- DDX-8.18, which is

02:17:49   10   the testimony from Ashok Tankha.  And does he sit here and

02:17:52   11   disclose also if he had it in the '049 filed patent while

02:17:57   12   it was being -- the '049 patent was also being applied for?

02:18:00   13   A.  Yes, he had the Li article.  Yes, he had -- when the

02:18:04   14   '049 was being prosecuted, yes.

02:18:06   15   Q.  And he admitted that he did not give the Li article to

02:18:09   16   the Patent Office with respect to the prosecution of the

02:18:16   17   '049 filed patent, did he?

02:18:18   18   A.  That's right, he admitted that he did not give it to

02:18:20   19   the Patent Office.

02:18:21   20   Q.  And he admits that, there at the bottom, that he did

02:18:23   21   not give it, even though the 2009 conference paper

02:18:26   22   discloses a formula for determining a delay.  Right?

02:18:28   23   A.  Yeah.  If you look at the line of questioning, that's

02:18:31   24   exactly what happened.  He's first -- he's first asked,

02:18:35   25   does the paper -- in other words, in the Office Action

02:18:38   1   response you relied on -- so he amended the claim, and he's

02:18:41   2   telling -- he's answering that he relied on that

02:18:44   3   determining a delay feature at -- to carry the weight for

02:18:49   4   patentability.

02:18:50   5          And he says:  Yes.

02:18:53   6          And then he says you -- and he's asked:  You

02:18:55   7   didn't disclose the conference paper to the patent

02:18:57   8   examiner?

02:18:58   9          And he says:  No, not in this particular

02:19:00  10   application.

02:19:01  11          And he says:  You had a copy of it?

02:19:03  12          He says:  Yes, I had a copy of it.

02:19:05  13          And he says -- and then he's asked:  Even though

02:19:06  14   the 2009 conference paper discloses a formula for

02:19:10  15   determining a delay, right, you still didn't submit it to

02:19:13  16   the Patent Office?

02:19:15  17          And he says:  Yes.

02:19:18  18          MS. DOAN:  Your Honor, at this time we have

02:19:20  19   deposition testimony from Ashok Tankha to be submitted with

02:19:24  20   this record.  Would you like me to submit it by exhibit or

02:19:29  21   just receive the deposition testimony?

02:19:29  22          THE COURT:  I think you ought to designate it as

02:19:32  23   an exhibit and submit it that way.

02:19:34  24          MS. DOAN:  We'll do that, Your Honor.  We also

02:19:36  25   have deposition testimony -- testimony of Manli Zhu, in

02:19:38  1  addition to her trial testimony.

02:19:39  2          THE COURT:  Then submit it in the same way.

02:19:43  3          MS. DOAN:  Thank you, Your Honor.

02:19:44  4  Q.  (By Ms. Doan)  All right.  So, Mr. Godici, with respect

02:19:46  5  to the finding of intent to deceive with respect to the

02:19:50  6  withholding of the Li article in the '756 and the '049

02:19:53  7  patent application, what type of facts would be relevant to

02:19:57  8  Judge Gilstrap's determination of whether the applicants,

02:20:01  9  Dr. Li or Dr. Zhu or Mr. Tankha, had an intent to deceive

02:20:06  10 the Patent Office by withholding the Patent Office -- by

02:20:09  11 withholding the Li article?  Apologies.

02:20:11  12 A.  Well, I prepared a list of those, and we can -- we can

02:20:14  13 run down through that list that will appear on this slide.

02:20:18  14         But, first of all, both the inventors and

02:20:22  15 Mr. Tankha knew that Claim 1 was amended to include that

02:20:25  16 determining a delay limitation.  And we've talked about

02:20:27  17 that.

02:20:27  18         So that was the amendment to supposedly carry the

02:20:30  19 patentability of the '756 application.

02:20:38  20 Q.  And is that what Dr. Li was just testifying about that

02:20:40  21 he made sure that his lawyers gave him all the filings from

02:20:44  22 the Patent Office and correspondence?

02:20:45  23 A.  Exactly.  He was questioned by -- by Mr. Re, and he

02:20:49  24 said that -- he said that certain previous attorneys were

02:20:57  25 not doing that for him, so he wanted to make sure he had an

02:21:01  1  attorney that would keep him up-to-date and give him that

02:21:05  2  information.

02:21:05  3  Q.  And that was the privilege log that Mr. Re covered with

02:21:08  4  Dr. Li with respect to the certain entries where they were

02:21:11  5  indeed shown to be transmitted to Dr. Li?

02:21:11  6  A.  That's my understanding, yes.

02:21:13  7  Q.  All right.  What's the second basis, sir?

02:21:16  8  A.  Well, just basically did they know about the -- the

02:21:20  9  reasons for allowance that the examiner put in the Office

02:21:23  10  Action.  In other words, not only did they know that the

02:21:25  11  amendment was submitted, but they also know that the

02:21:27  12  examiner accepted that amendment, accepted the arguments,

02:21:30  13  and stated this is the reason we're allowing that patent

02:21:33  14  application.

02:21:33  15  Q.  And another -- another -- another fact to consider?

02:21:38  16  A.  Obviously, they knew of the article.  They were the

02:21:41  17  authors of the article, the Li article.

02:21:42  18  Q.  And that's DTX-14?

02:21:46  19  A.  And then the question is, whether they knew that it

02:21:49  20  included the determining a delay limitation.  And then

02:21:53  21  we -- we saw that Dr. Zhu had testified that it does,

02:21:57  22  especially when -- when it's in a linear array rather than

02:22:01  23  a circular array.

02:22:03  24       So they were aware and -- and -- and Tankha, their

02:22:09  25  attorney, Mr. Tankha, was also aware that -- in his

02:22:12   1   testimony, he stated that the determining a delay

02:22:14   2   limitation was in the Li article.

02:22:17   3   Q.   And --

02:22:18   4   A.   The formulas.

02:22:19   5   Q.   And you reviewed Manli Zhu's deposition testimony

02:22:21   6   before you heard her testify in trial, right?

02:22:25   7   A.   Yeah, she testified before trial, yes.

02:22:27   8   Q.   Has her testimony always been consistent with respect

02:22:30   9   to she knew the Li article disclosed the determining a

02:22:34  10   delay step that was disclosed in the '756 and the '049

02:22:38  11   patents?

02:22:38  12   A.   I believe her testimony is consistent, yes.

02:22:41  13   Q.   All right.   Then the next -- the next item you would

02:22:44  14   consider?

02:22:45  15   A.   Well, again, we've heard the testimony that -- that the

02:22:48  16   Li article was -- was sent by Dr. Li to Mr. Tankha, and --

02:22:55  17   and we saw the letter or the email -- that -- redacted

02:22:58  18   email that -- that Mr. Re disclosed today.   So, yes, I see

02:23:02  19   that information.

02:23:03  20   Q.   Is there another basis, sir?

02:23:06  21   A.   Well, we -- again, Mr. Li was questioned about the

02:23:12  22   declarations that are required by -- by the Patent Office,

02:23:16  23   all applicants that file for a patent application.

02:23:19  24        And so both inventors, Dr. Li and Dr. Zhu, signed

02:23:26  25   those declarations indicating and acknowledging that they

1460

02:23:29  1   knew about the duty of disclosure to the Patent Office in

02:23:35  2   the prosecution of their patent application.

02:23:36  3   Q.  All right.  Then, finally, did Mr. Tankha have a duty

02:23:39  4   to disclose the material prior art in the prosecution of

02:23:43  5   the '756 and the '049 patents?

02:23:44  6   A.  Yes, he did.  Remember, Rule 56 requires both the

02:23:48  7   applicants and the attorney prosecuting, they both -- they

02:23:52  8   all have the -- the duty -- the candor and duty of

02:23:55  9   disclosure.

02:23:55  10  Q.  And from what you have reviewed, that would also

02:23:58  11  include the Li article, material prior art?

02:24:00  12  A.  Yes.

02:24:01  13  Q.  All right.  Now, let's set aside the failure to

02:24:03  14  disclose the Li article, and let's look at the failure to

02:24:06  15  disclose the Brandstein book with respect to the

02:24:08  16  prosecution of the '756 and '049 patents, okay?

02:24:11  17  A.  Okay.

02:24:11  18  Q.  All right.  We've talked about the Brandstein book all

02:24:14  19  week.  I believe it's DTX-49?

02:24:16  20  A.  Correct.

02:24:16  21  Q.  All right.  And what did Dr. Stern tell us about the

02:24:20  22  Brandstein book and what it disclosed with respect to the

02:24:22  23  various elements?

02:24:24  24  A.  Well, when Dr. Stern was -- was testifying, I remember

02:24:26  25  that there was this -- this demonstrative up on -- up on

02:24:30  1   the board.  And as -- as Mr. Re went through the various

02:24:34  2   limitations of the claim of the '049, he checked them off

02:24:39  3   with green checks in terms of -- of Dr. Stern's testimony

02:24:43  4   that they were -- they were obvious or taught by, included

02:24:47  5   in the Brandstein book.

02:24:49  6        THE COURT:  I don't mean to interrupt, but I

02:24:51  7   remember Dr. Stern's testimony thoroughly.  There's no need

02:24:54  8   to go through it again.  If you want to pick out a specific

02:24:57  9   point that you think is probative, please do that.

02:24:59  10       MS. DOAN:  We'll do that, Your Honor.

02:25:01  11  Q.  (By Ms. Doan)  With respect to -- did he say that

02:25:04  12  determining a delay was disclosed in the Brandstein book?

02:25:06  13  A.  Yes.

02:25:06  14  Q.  In addition, the Plaintiff's expert, Mr. McAlexander,

02:25:11  15  did he also admit that the Brandstein book describes a

02:25:16  16  determining a delay, Step [C], in Claim 1?

02:25:18  17  A.  Yes, he did.  You can see the simple question and

02:25:22  18  answer here.

02:25:22  19  Q.  Now, the '049 patent also had the DSP article -- DSP

02:25:28  20  limitation, as well, added; do you remember that?

02:25:33  21  A.  Correct.  That was one of the additions that -- that

02:25:37  22  were amended into the '049 patent application, yes.

02:25:40  23  Q.  And did Dr. Stern give an opinion with respect to

02:25:43  24  whether the Brandstein book taught the -- the sound source

02:25:50  25  localization unit, the adaptive beamforming unit, and the

| | | |
|---|---|---|
| 02:25:52 | 1 | noise reduction unit were integrated into the digital |
| 02:25:55 | 2 | signal processor? |
| 02:25:55 | 3 | A.  Yes, he did.  And he stated that the Brandstein book |
| 02:25:58 | 4 | does disclose that. |
| 02:25:59 | 5 | Q.  And did he show us where in the Brandstein book that |
| 02:26:03 | 6 | was specifically disclosed? |
| 02:26:04 | 7 | A.  Yes, he did.  And we see the highlights here, and we |
| 02:26:07 | 8 | see the -- the excerpt from the Brandstein book that he |
| 02:26:12 | 9 | relied on to indicate that the DSP are incorporating |
| 02:26:16 | 10 | those -- those elements on to the DSP would -- would be |
| 02:26:19 | 11 | known or obvious. |
| 02:26:21 | 12 | Q.  And they can be found at DTX-49.0392; is that right? |
| 02:26:27 | 13 | A.  Yes. |
| 02:26:28 | 14 |         THE COURT:  Just a minute, Mr. Dacus, you need to |
| 02:26:31 | 15 | have a mask on, sir. |
| 02:26:33 | 16 |         MR. DACUS:  My apologies to the Court, Your Honor. |
| 02:26:35 | 17 |         THE COURT:  No problem. |
| 02:26:37 | 18 |         Please continue. |
| 02:26:38 | 19 | Q.  (By Ms. Doan)  And we know that Dr. Li and Dr. Zhu knew |
| 02:26:41 | 20 | about Brandstein, Mr. Godici, because they referenced |
| 02:26:45 | 21 | Godici at the end of the Li article, the 2009 Li article; |
| 02:26:50 | 22 | is that right? |
| 02:26:50 | 23 | A.  They referenced Brandstein, not Godici. |
| 02:26:52 | 24 | Q.  Oh, I'm sorry.  Did I misspeak?  I'm so sorry. |
| 02:26:55 | 25 | A.  Yes.  As -- as we've heard several times now, the Li |

02:27:00  1   article listed several references, documents.  And one of

02:27:04  2   them was the Brandstein book, yes.

02:27:06  3   Q.  All right.  Now, in your report, you show how the

02:27:13  4   Brandstein textbook -- you go through pages and pages of

02:27:17  5   how the textbook is incorporated into the 2010 provisional

02:27:21  6   application; is that right?

02:27:22  7   A.  Right.  In my report, I line up a chart or a table, and

02:27:25  8   we show the wording, the actual wording that's in the

02:27:30  9   Brandstein book, and then the similar, if not identical,

02:27:32  10  wording that -- that's in the provisional application.

02:27:35  11  Q.  So the Brandstein textbook would be -- since portions

02:27:40  12  were copied from the Brandstein textbook into the 2010

02:27:45  13  provisional application, would that indicate to you that it

02:27:46  14  would be important to the provisional application?

02:27:51  15  A.  Certainly it would be important to the provisional

02:27:54  16  application if, in fact, features or portions of -- of --

02:27:58  17  of the Brandstein book end up in the claims as part of the

02:28:02  18  important information in the claims of the patent, yes.

02:28:04  19  Q.  And then here's some more -- for the portions of the

02:28:09  20  Brandstein book that were copied into the provisional

02:28:11  21  application, and with respect to Page 70 -- Page 170 from

02:28:16  22  the Brandstein textbook and Page 171 were copied over into

02:28:21  23  Page 7 of the 2010 provisional application, do you see

02:28:24  24  that?

02:28:25  25  A.  Correct.  I think -- I think the point I was making in

02:28:27   1    my expert report is they obviously had the Brandstein

02:28:30   2    book -- or whoever wrote the provisional application had

02:28:33   3    the Brandstein book as -- as a reference.  I think that

02:28:35   4    was -- has been established.

02:28:37   5    Q.  And then you were in court yesterday when

02:28:40   6    Mr. McAlexander said that he had -- he agreed that the

02:28:45   7    Brandstein textbook was removed from the '756 patent

02:28:54   8    application.  Do you recall that?

02:28:55   9    A.  I think I recall his -- his -- his testimony, yes.

02:28:58   10          MS. DOAN:  Do you have that slide, Mr. Berk?

02:29:24   11   Q.  (By Ms. Doan)  Okay.  Where Mr. McAlexander said -- is

02:29:28   12   questioned -- and I believe it was by Mr. Hadden:  And it's

02:29:33   13   a fact the Brandstein book was not considered by the Patent

02:29:35   14   Office when it allowed the '049 patent?  Agree?

02:29:40   15          And he says:  I agree.

02:29:42   16   A.  Yes, I see that.

02:29:43   17   Q.  And then he was also questioned:  And it's a fact that

02:29:44   18   when Dr. Li filed his real application, he removed any

02:29:47   19   reference to the Brandstein book; isn't that correct?

02:29:49   20          And then Mr. McAlexander said:  It was not present

02:29:52   21   in the filed application.

02:29:54   22          Is that correct?

02:29:57   23   A.  That's correct.

02:29:58   24   Q.  All right.  So what factors should Judge Gilstrap

02:30:03   25   consider with respect to his finding -- what types of facts

02:30:05   1   should he consider with respect to determination of whether

02:30:06   2   the applicants, Dr. Li and Dr. Zhu and Mr. Tankha, had an

02:30:11   3   intent to deceive the Patent Office by withholding the

02:30:15   4   Brandstein textbook?

02:30:15   5   A.   Okay.   I've prepared a -- a demonstrative here with

02:30:21   6   bullets like I did with the Li article, but this one

02:30:24   7   referencing the -- the Brandstein -- the Brandstein

02:30:26   8   textbook.

02:30:27   9        And, clearly, the -- the -- Dr. Li and Dr. Zhu

02:30:30   10  were aware of the Brandstein book.   I mean, they had

02:30:32   11  mentioned it in their article.   So they -- they knew about

02:30:35   12  the Brandstein book.   We -- we know that.

02:30:39   13  Q.   And they also -- they also listed it in their

02:30:41   14  provisional application?

02:30:42   15  A.   Yes, they did.

02:30:43   16  Q.   But it was removed in the '756 -- the application for

02:30:47   17  the '756 patent; is that correct?

02:30:49   18  A.   Exactly.   So the -- to -- to explain again, at the end

02:30:52   19  of the provisional application, there was a list of

02:30:54   20  references that were used or cited to, with respect to the

02:30:58   21  provisional application, but when the non-provisional

02:31:03   22  application, what we'll call the real application, was

02:31:06   23  filed at the Patent Office, that listing didn't appear

02:31:10   24  in -- in that application.   So it -- it was removed.

02:31:13   25  Q.   And we saw that it was not submitted on -- the

02:31:16   1   Brandstein book was not submitted on an IDS on either the

02:31:20   2   '756 or the '049 patents, correct?

02:31:21   3   A.   That's correct.   It was -- it was not submitted during

02:31:23   4   the prosecution in an IDS, no.

02:31:27   5   Q.   And it's not listed on the face of either patent; is

02:31:30   6   that right?

02:31:30   7   A.   That's correct.

02:31:30   8   Q.   All right.   What's next -- what other facts?

02:31:34   9   A.   Well, again, we just -- we just looked at the fact that

02:31:37  10   there were portions of the Brandstein book that -- that

02:31:39  11   appear to be similar, if not identical in -- in the

02:31:42  12   provisional application.

02:31:50  13        The next bullet is -- is what we just talked about

02:31:53  14   is terms of removing the reference to the Brandstein book

02:31:55  15   when they actually filed the patent application that was

02:31:58  16   examined by the -- by the Patent Office.

02:31:59  17   Q.   All right.   And did Drs. Li and Zhu also submit

02:32:04  18   declarations acknowledging their duty to disclose material

02:32:07  19   prior art in the prosecution of both the '756 and '049

02:32:10  20   patents?

02:32:10  21   A.   Sure.   The declarations that -- that are required of

02:32:13  22   all inventors include acknowledgement of the duty of

02:32:16  23   disclosure.   So they -- and they did sign those

02:32:19  24   declarations.

02:32:20  25   Q.   And then when Mr. Tankha had the duty of disclosure

02:32:25 1   already as a patent lawyer -- before the patent bar?

02:32:28 2   A.  Yes.

02:32:28 3   Q.  All right.  If Judge Gilstrap found that there was a

02:32:30 4   specific intent to deceive the Patent Office by not

02:32:34 5   submitting the Li article or the Brandstein book during

02:32:36 6   either the prosecution of the '756 or the '049 patents,

02:32:40 7   would that be supported by the facts in this case?

02:32:43 8   A.  I believe that it would be, yes.

02:32:45 9   Q.  All right.  I'm going to turn to your last issue you're

02:32:48 10  speaking about today, the false declarations in the '049

02:32:52 11  patent.  Is that okay?

02:32:57 12  A.  Yes.

02:33:02 13        MS. DOAN:  Mr Heideman, can you help me with this

02:33:07 14  board, please?  Yes, you can just put it on top.  That's

02:33:11 15  fine.

02:33:11 16  Q.  (By Ms. Doan)  Now, the final subject -- the next

02:33:14 17  allegation of inequitable conduct is for the false reissue

02:33:17 18  declaration submitted to the Patent Office in the '049

02:33:20 19  patent application, correct?

02:33:21 20  A.  Yes.

02:33:23 21  Q.  It's totally separate than the failure to submit the Li

02:33:27 22  article and the Brandstein book, right?

02:33:28 23  A.  Yes, this is a third allegation.

02:33:29 24  Q.  Why is this important?

02:33:30 25  A.  Well, the -- the declaration that's filed in a

02:33:33  1  reissue -- reissue application is -- is very important.
02:33:36  2  The -- the -- there's very specific rules with respect to
02:33:40  3  what has to be disclosed in the declaration of a reissue
02:33:43  4  application.
02:33:44  5       A reissue application is to correct an error in
02:33:48  6  the underlying original app -- patent.  And so you have to
02:33:53  7  delineate very specifically what that error was and how
02:33:57  8  you're correcting it.  And it has to be done in the
02:34:01  9  declaration that's signed by the applicants.
02:34:03  10       So it -- there are very specific instructions and
02:34:07  11  requirements for those reissue declarations.
02:34:13  12  Q.  Okay.  If inequitable conduct was committed in the '756
02:34:19  13  patent, can it be cured by just filing a reissue patent?
02:34:23  14  A.  No.  No, it cannot.
02:34:24  15  Q.  All right.  So let's look at the filing of the '049
02:34:29  16  application.  Can you tell us what happened with respect to
02:34:31  17  the declarations that were filed on the -- with the patent
02:34:33  18  application on 10/14/16?  Can you see that?
02:34:37  19  A.  Yes, I can -- I can see it.
02:34:40  20       Yes, there was -- there was a reissue declaration
02:34:42  21  that was filed with the application when it was filed.
02:34:45  22  There are two pages.  This is -- this is the first page.
02:34:48  23  You can see it was -- it was submitted or -- or signed by
02:34:54  24  Inventor -- Inventor Li.  And there's the duty of -- of
02:34:59  25  perjury here with respect to -- respect to this

02:35:03  1  declaration.

02:35:03  2          But the important part are there -- there are two

02:35:06  3  blocks checked here.  The first block is that by -- and

02:35:12  4  this is -- this is delineating the reasons for filing the

02:35:16  5  reissue application, what are the errors that are being

02:35:18  6  corrected?

02:35:20  7          And the first one is:  By reason of the patentee

02:35:23  8  claiming more or less than he had a right to claim in the

02:35:27  9  patent.

02:35:27  10         What that means to the patent examiner and the

02:35:31  11  Patent Office is that the scope of that claim is either too

02:35:34  12  narrow and I want to broaden it, or too broad and I have to

02:35:37  13  narrow it because of prior art.  So there's going to be a

02:35:40  14  change in the scope of the claims, and that's a trigger to

02:35:42  15  the -- the Patent Office to -- to be aware of that.

02:35:47  16         And then it's also possible to correct other

02:35:49  17  errors that don't have to do with the scope of the claim.

02:35:51  18  Q.  With respect to -- you said it's -- it's here -- signed

02:35:55  19  under the penalty of perjury.  Why is that important for

02:35:58  20  the inventors -- or the applicants to know that you're

02:36:01  21  signing under the penalty of perjury?

02:36:04  22  A.  Well, I -- I guess it's just to explain how important

02:36:07  23  it is to -- to be truthful and honest with the Patent

02:36:11  24  Office when you're -- when you're, you know, submitting

02:36:12  25  this declaration.

1470

02:36:13  1    Q.  All right.  And you also see that there -- on the next

02:36:18  2    page, it appears to be actually signed by Qi Li, which is

02:36:22  3    Peter Li; is that right?

02:36:23  4    A.  Correct, yes.

02:36:25  5    Q.  And above that there's a reissue Application

02:36:28  6    Declaration By The Assignee.  Do you see that?

02:36:33  7    A.  Yeah, the -- this is actually part of the -- the first

02:36:33  8    page and I think the second page of that same declaration.

02:36:34  9         And you can see that -- that clearly, that there's

02:36:36  10   a statement here:  This is a broadening reissue.

02:36:38  11        So this lines up with the checking of that block

02:36:41  12   that -- that stated that one of the errors is that the

02:36:46  13   applicant is -- is correcting, is that was -- that the

02:36:48  14   subject matter was more or less than -- than -- than what

02:36:51  15   he was entitled to.

02:36:53  16        And it indicates that if the -- if you look at the

02:36:57  17   sentence above:  If the reissue is a broadening reissue, a

02:37:01  18   claim that the applicant seeks to broaden must be

02:37:05  19   identified and the box must be checked.

02:37:07  20        So there's an indication -- and that's the form.

02:37:11  21   There's an indication that you have to tell us if you're

02:37:13  22   broadening a claim -- you have to tell us you're broadening

02:37:17  23   the claim, you have to tell us which claim you're

02:37:21  24   broadening -- us, meaning the Patent Office -- and --

02:37:26  25   and -- and explain that clearly to the patent examiner.

02:37:28  1   Q.  So with respect to this direction, the box was checked,

02:37:30  2   right --

02:37:30  3   A.  Yes.

02:37:30  4   Q.  -- as before?  But was there a specific claim that was

02:37:32  5   identified?

02:37:32  6   A.  No, there wasn't.  So, obviously, the -- the -- well,

02:37:35  7   not obviously, but I'll explain, that the Patent Office

02:37:38  8   rejected this declaration -- rejected the claims under the

02:37:42  9   statute, 251, the reissue statute, rejected the claims for

02:37:48  10  the reason that this was an improper reissued declaration

02:37:52  11  because it didn't specify which claim was being -- being

02:37:55  12  broadened and how it was being broadened.

02:37:57  13  Q.  Okay.  And, just for the record, the '049 patent file

02:38:01  14  history is DTX-54, and we're on Page DTX-54.40.

02:38:07  15  A.  Okay.

02:38:08  16  Q.  All right.  And this is also signed by Dr. Manli Zhu.

02:38:11  17  Do you see that?

02:38:12  18  A.  Yes.

02:38:13  19  Q.  Also on October 14th, 2016?

02:38:15  20  A.  Right.

02:38:15  21  Q.  On Page DTX-54.42.

02:38:18  22         All right.  What happened after the -- at the -- I

02:38:20  23  think you were skipping ahead a second ago.  But what

02:38:24  24  happened after the application was applied for?

02:38:25  25  A.  Well, after the application was applied for, the patent

02:38:29  1   examiner rejected the claims -- as I said before, rejected

02:38:33  2   the claims under the -- the reissue statute, 251,

02:38:38  3   improper -- or improper declaration.  Also rejected the

02:38:42  4   claims on prior art.

02:38:45  5   Q.  Okay.

02:38:45  6   A.  There was -- there was a -- a rejection of the claims

02:38:47  7   based on 35 U.S.C. 103.  And some references were applied

02:38:52  8   in the claims of -- at that point in time, the Patent

02:38:56  9   Office took the position that the claims were obvious.

02:38:58  10  Q.  Okay.  So with respect to the declarations, I want to

02:39:01  11  focus on -- with respect to this first Office Action, and

02:39:04  12  that would have been on October 5th, 2017.

02:39:08  13           We're on now DDX-8.36.

02:39:12  14           What did the Patent Office say?

02:39:13  15  A.  Well, as you can see, the Patent Office said that the

02:39:17  16  examiner notes that the reissue declaration recites the

02:39:20  17  following reasons:  The reissue is a broadening reissue.

02:39:24  18           The examiner determines that the statement does

02:39:26  19  not identify the specific claim or claims.  And the

02:39:31  20  specific language -- therein lies the error.

02:39:34  21           In other words, again, the -- the Patent Office is

02:39:36  22  saying, tell me the claim and tell me the specific language

02:39:40  23  that's broadened here.

02:39:43  24  Q.  And that's at 54 -- DTX-54.115 and 116.  Do you see

02:39:51  25  that -- page numbers?

| | | |
|---|---|---|
| 02:39:52 | 1 | A.  Yes, I see that. |
| 02:39:59 | 2 | Q.  And I ask that because -- do you have a notebook in |
| 02:40:02 | 3 | front of you, Mr. Godici? |
| 02:40:03 | 4 | A.  Yes. |
| 02:40:04 | 5 | Q.  If you'll turn to DTX-54.115. |
| 02:40:10 | 6 | MS. DOAN:  Mr. Berk, if you could pull this page |
| 02:40:13 | 7 | up, DTX-54 -- 54.115? |
| 02:40:21 | 8 | Q.  (By Ms. Doan)  Above the issue -- above the Reissue |
| 02:40:25 | 9 | Declaration at the very bottom of that page -- |
| 02:40:27 | 10 | MS. DOAN:  Two paragraphs up, Mr. Berk, please. |
| 02:40:31 | 11 | Q.  (By Ms. Doan)  This applicant is further reminded? |
| 02:40:33 | 12 | A.  Yes.  Oh, I'm sorry. |
| 02:40:34 | 13 | Q.  Do you see where I am:  The applicant is further |
| 02:40:36 | 14 | reminded of the continuing obligation under 37 CFR 1.56 to |
| 02:40:42 | 15 | timely apprise the office of any information which is |
| 02:40:45 | 16 | material to patentability of the claims under consideration |
| 02:40:48 | 17 | in this reissue application? |
| 02:40:49 | 18 | Do you see that? |
| 02:40:50 | 19 | A.  Yes. |
| 02:40:50 | 20 | Q.  At any time in the '049 was either the Li article or |
| 02:40:56 | 21 | the Brandstein article submitted? |
| 02:40:59 | 22 | A.  No. |
| 02:41:00 | 23 | Q.  All right.  Now let's turn to -- |
| 02:41:00 | 24 | THE COURT:  Let me interrupt for just a minute. |
| 02:41:02 | 25 | Let's go off the record. |

02:41:05  1              (Off-the-record discussion.)

02:41:35  2              THE COURT:  All right.  Let's go back on the

02:41:37  3  record.

02:41:41  4  Q.  (By Ms. Doan)  All right.  So that was in the first

02:41:43  5  Office Action, and then did the applicant make a response?

02:41:45  6  A.  Yes.

02:41:46  7              MS. DOAN:  If you could advance this, please,

02:41:48  8  Mr. Berk.

02:41:49  9  Q.  (By Ms. Doan)  And the response came on January 29th,

02:41:55 10  2018; is that right?

02:41:57 11  A.  Yes.

02:41:57 12  Q.  And it's found in DTX-54.271?

02:42:01 13              Can you tell us what the applicant's response was?

02:42:03 14  A.  Well, the applicants responded by submitting a new

02:42:11 15  reissue declaration.  And this is -- this is a -- this is

02:42:13 16  the renew issue -- or the second reissue declaration that

02:42:18 17  was submitted by the applicants.

02:42:19 18  Q.  And, again, he's signing -- Dr. Li and Dr. Zhu are

02:42:23 19  signing under the penalty of perjury; is that right?

02:42:25 20  A.  Yes.

02:42:26 21  Q.  And are they, again, saying -- checking both boxes that

02:42:29 22  they are applying for the reissue by reason of the patentee

02:42:33 23  claiming more or less than they had a right to claim in the

02:42:37 24  patent and by reason of other errors?

02:42:39 25  A.  Yes, the same two blocks were checked in the original

02:42:43  1  declaration.

02:42:43  2  Q.  And the next page here of the same form where it says

02:42:47  3  that the actual claim must be identified that is broadened

02:42:52  4  and the box below had to be checked; is that right?

02:42:54  5  A.  Yes, that's part of the form, yes.

02:42:56  6  Q.  And there's Peter Li's signature again; do you see

02:42:59  7  that?

02:42:59  8  A.  Yes.

02:43:00  9  Q.  Were any claims identified as being broadened here?

02:43:02  10  A.  No.  Again, there were no claims that were identified

02:43:04  11  as being broadened.

02:43:05  12  Q.  But there are certain claims here that deal with

02:43:08  13  they're being amended for more clarity.  So can you give us

02:43:11  14  some explanation on that?

02:43:12  15  A.  Exactly.  The -- the changes that are -- that are

02:43:17  16  described here are not for broadening the claim but for

02:43:21  17  clarifying the claim.  And that would be the -- the other

02:43:25  18  reasons block that's on the first page, as opposed to more

02:43:28  19  or less than -- than block.

02:43:30  20       So right now, what's being identified are -- are

02:43:33  21  amendments, but not broadening amendments or broadening

02:43:37  22  changes, but changes for clarity.

02:43:39  23  Q.  And then after this went in, did the Patent Office --

02:43:47  24  I'm sorry.  I misspoke -- let me strike that.

02:43:50  25       With respect to the applicants' -- strike that.

02:43:54    1            With respect to the -- after that went in, did the
02:43:57    2    Patent Office issue a final rejection?
02:43:59    3    A.   Yes.
02:44:00    4    Q.   Was the final rejection based on the prior art?
02:44:02    5    A.   No.   The prior art rejection that I mentioned earlier
02:44:06    6    was actually withdrawn, in view of the arguments that --
02:44:10    7    that the applicants made.
02:44:11    8            But the -- there was a final rejection, but it was
02:44:13    9    only based on the reissue statute and the fact that the
02:44:17   10    reissue declaration was improper.
02:44:19   11    Q.   And is the Patent Office clear in their final rejection
02:44:22   12    that the examiner finds the patent arguments persuasive and
02:44:27   13    reviews -- will withdraw the rejections to the claims based
02:44:30   14    on the prior art found in DTX-54.292?
02:44:35   15    A.   Yes, that's the last sentence down there.   The
02:44:37   16    rejection that they're -- that the examiner is talking
02:44:40   17    about is the prior art rejection, not the rejection on the
02:44:42   18    reissue statute.
02:44:43   19    Q.   And why does the rejection stand?
02:44:45   20    A.   On the reissue?   Because -- again, because there was a
02:44:48   21    failure to identify a claim that was broadened and the
02:44:53   22    specific language in the claim and how it was broadened.
02:44:56   23    Q.   Okay.   And we can find that at DTX-54.287 and
02:45:04   24    DTX-54.288 of the file history?
02:45:05   25    A.   Correct.

| | | |
|---|---|---|
| 02:45:05 | 1 | THE COURT:  Let me ask you, Ms. Doan, it's pretty |
| 02:45:08 | 2 | clear from the file history what has and what hasn't |
| 02:45:11 | 3 | happened.  And I've seen many, if not all, of these forms |
| 02:45:15 | 4 | as a part of the jury trial or -- if not during the actual |
| 02:45:19 | 5 | jury trial, during the pre-trial hearings. |
| 02:45:22 | 6 | How does this relate to the issue of intent? |
| 02:45:26 | 7 | MS. DOAN:  About to get there.  This is not -- |
| 02:45:28 | 8 | THE COURT:  Let's get there. |
| 02:45:29 | 9 | MS. DOAN:  We'll get there.  This is not the |
| 02:45:31 | 10 | issue -- |
| 02:45:31 | 11 | THE COURT:  No, let's get there now. |
| 02:45:32 | 12 | MS. DOAN:  I'll go right now.  This was not raised |
| 02:45:35 | 13 | at pre-trial, Your Honor.  This is a different file |
| 02:45:39 | 14 | application. |
| 02:45:39 | 15 | THE COURT:  Well, I know all about the attempt to |
| 02:45:41 | 16 | broaden the claims. |
| 02:45:42 | 17 | MS. DOAN:  Okay.  All right.  So -- |
| 02:45:43 | 18 | THE COURT:  I want to know about intent. |
| 02:45:45 | 19 | MS. DOAN:  Yes, Your Honor. |
| 02:45:46 | 20 | Q.  (By Ms. Doan)  After the final rejection, what did the |
| 02:45:50 | 21 | patent applicant do? |
| 02:45:50 | 22 | A.  Filed a third reissue declaration. |
| 02:45:52 | 23 | Q.  Is that shown here in DTX-54.326? |
| 02:45:56 | 24 | A.  Yes. |
| 02:45:56 | 25 | Q.  And what happened here? |

02:45:57  1   A.  Well, it changed.  The block that would have been

02:45:59  2   checked if there was any broadening in the claims was not

02:46:03  3   checked this time.  And the explanation that we see here is

02:46:05  4   that the independent claims were amended for clarity.

02:46:12  5          So there's no -- in this situation, what the

02:46:15  6   applicant is telling the Patent Office is, I'm amending

02:46:18  7   these claims for clarity only, and I -- I'm not amending

02:46:22  8   these claims for reason of broadening the claims.

02:46:27  9   Q.  Why is that significant here?

02:46:28  10  A.  Well, the Patent Office had rejected the claims under

02:46:33  11  the statute, the 251 statute, saying the reissue

02:46:37  12  declaration was -- was incorrect.  And -- and you haven't

02:46:41  13  told us what you're -- if you're broadening -- if this is a

02:46:46  14  broadening reissue like you told me, you know, tell me the

02:46:50  15  claim and tell me the -- the portion of that claim that's

02:46:54  16  broadened.

02:46:54  17         And after two times failing to do that, the third

02:46:56  18  time the declaration came in changing the reason for

02:47:00  19  reissue, changing it to just clarifying, as opposed to

02:47:02  20  broadening.

02:47:03  21  Q.  And then withdrew the signing the box on broadening?

02:47:08  22  A.  The consequence -- in the next action, the consequence

02:47:11  23  was that, yes, the -- the patent examiner then withdrew the

02:47:15  24  rejection on the reissued statute and issued the patent.

02:47:19  25  Q.  Did they file an Attached Sheet explaining what they

02:47:25   1   had done instead?

02:47:25   2   A.  Yes, this was the Attached Sheet that would have went

02:47:28   3   with the declaration.

02:47:29   4   Q.  And did the Attached Sheet in any way say, hey, I'm

02:47:30   5   unchecking this box, but I'm going to go ahead and broaden

02:47:30   6   the claims anyway?

02:47:31   7   A.  No, it did not.

02:47:32   8   Q.  Did it give an indication to the Patent Office that

02:47:35   9   indeed they were no longer broadening the claims?

02:47:38  10   A.  No.

02:47:39  11   Q.  And is it signed by not only Peter Li but also Manli

02:47:44  12   Zhu and Ashok Tankha?

02:47:47  13   A.  Yes.

02:47:51  14   Q.  So what's the problem, then, if they just decided not

02:47:54  15   to broaden the claims?

02:47:55  16   A.  Well, according to their attorney, the claims were

02:47:59  17   broadened.  I mean, you can see this is deposition

02:48:03  18   testimony by -- by Mr. Tankha.  And he says -- and he's

02:48:07  19   questioned:  So it was your understanding that the claims

02:48:10  20   of the '049 reissue patent were broadened from the claims

02:48:13  21   in the '756 patent in at least one respect, right?

02:48:17  22          And he agreed.

02:48:18  23   Q.  And when you -- in your review of Mr. Tankha's

02:48:21  24   deposition testimony at the deposition transcript,

02:48:24  25   Page 154, does he specifically list certain claims that

02:48:28  1  were broadened with respect to the -- the reissue?  I

02:48:33  2  believe it was Claim 32?

02:48:34  3  A.  Yes, that's my recollection.  He was asked was there at

02:48:40  4  least one claim or what claims were broadened, and he

02:48:42  5  identified Claim 32.

02:48:48  6  Q.  So what you -- on your review, is this something --

02:48:53  7  before I get to that.  Is this something with respect to

02:48:55  8  false declarations -- why -- is that something that

02:48:56  9  Judge Gilstrap should consider in making his determination

02:49:00  10  as to whether inequitable conduct has occurred here?

02:49:02  11  A.  Exactly.  But for the -- the filing of that last

02:49:06  12  declaration that indicated -- or did not indicate there was

02:49:09  13  broadening, but, in fact, Claim 32 was broadened, the

02:49:13  14  reject -- the patent was issued.

02:49:15  15        In other words, with that explanation that there

02:49:17  16  was no broadening, the patent was issued, and the rejection

02:49:21  17  of the claims was -- was withdrawn based on that

02:49:24  18  representation by the applicant.

02:49:27  19        THE COURT:  And you believe that goes to

02:49:29  20  materiality?

02:49:29  21        THE WITNESS:  I believe that goes to materiality,

02:49:32  22  because, yes, Your Honor, because the patent would not have

02:49:35  23  issued.

02:49:36  24        THE COURT:  Do you believe that goes to the issue

02:49:39  25  of intent?

02:49:39   1          THE WITNESS:  Well, I think that's your -- your --

02:49:42   2   your call, yes.  But it looks to me like he knew that

02:49:46   3   the -- the reissued declaration -- or, excuse me, the

02:49:52   4   changes in the reissue application broadened the claims.

02:49:55   5          He admitted that Claim 32 was broadened.  It's

02:49:58   6   clear that you have to identify -- if you are broadening

02:50:01   7   any one claim in the patent, you have to identify that --

02:50:04   8   by number that claim and how it was broadened.  And he

02:50:07   9   failed to do that.

02:50:08  10          And by failure to identify that broadening, the

02:50:14  11   declaration that was submitted was accepted by the Patent

02:50:17  12   Office, and the '049 patent was issued.

02:50:20  13          THE COURT:  All right.

02:50:21  14   Q.  (By Ms. Doan)  Mr. Godici, in your opinion, was this

02:50:23  15   declaration false, the final declaration that was filed?

02:50:27  16   A.  Yes, because it failed to identify the claim that was

02:50:30  17   broadened.

02:50:30  18   Q.  And, indeed, the claims were broadened; is that right?

02:50:32  19   A.  Yes.

02:50:33  20   Q.  And Mr. Tankha knew that the claims were broadened,

02:50:37  21   right?

02:50:37  22   A.  Correct.

02:50:38  23   Q.  Mr. Godici, there's three separate claims that you've

02:50:44  24   dealt with here.  Tell us, if you believe there's a pattern

02:50:47  25   of inequitable conduct, why is that something that we

02:50:50   1   should consider here?

02:50:52   2   A.  Well, Judge Gilstrap will -- will look at the facts,

02:50:58   3   and there are three allegations of inequitable conduct that

02:51:00   4   I've -- that I've -- point out facts relative to.

02:51:05   5          So the question is not just one instance that

02:51:08   6   occurred, but during the prosecution of these applications,

02:51:11   7   there's more than one instance that occurred.  And so

02:51:15   8   the -- you know, the -- the fact that there may be a

02:51:18   9   pattern here is something to be considered by

02:51:21  10   Judge Gilstrap.

02:51:22  11   Q.  All right.  And down here, you have other bases, as

02:51:25  12   well.

02:51:25  13          Does your report just list the bases, the failure

02:51:29  14   to disclose the Li article, the failure to disclose the

02:51:32  15   Brandstein book, and the submission of the false reissue

02:51:35  16   declarations in the '049 patent?

02:51:37  17   A.  Those are the only bases that I identified in my

02:51:40  18   report, yes.

02:51:40  19   Q.  And you are aware that there are other bases that we

02:51:43  20   are raising here that have developed recently but they're

02:51:47  21   not included in your report, is that right?

02:51:49  22   A.  Correct.

02:51:53  23          MS. DOAN:  Your Honor, I went through Mr. Godici's

02:51:53  24   qualifications, but apparently I failed to offer him as an

02:51:55  25   expert witness.  We'd like to --

02:51:55   1          THE COURT:  It's before the Court, I consider him

02:51:57   2   an expert witness.

02:51:59   3          MS. DOAN:  Thank you, Your Honor.  Pass the

02:51:59   4   witness.

02:51:59   5          THE COURT:  Cross-examination.

02:52:30   6          Proceed when you're ready, Mr. Lambrianakos.

02:52:33   7          MR. LAMBRIANAKOS:  Thank you very much,

02:52:33   8   Your Honor.

02:52:33   9                     CROSS-EXAMINATION

02:52:39  10   BY MR. LAMBRIANAKOS:

02:52:39  11   Q.  Good afternoon, Mr. Godici.

02:52:41  12   A.  Good afternoon.

02:52:42  13   Q.  You're not here as a technical expert, correct?

02:52:48  14   A.  That's correct, I am not.

02:52:49  15   Q.  And you don't claim to have any technical expertise in

02:52:52  16   the areas that are disclosed in the Li article or the

02:52:54  17   Brandstein book, right?

02:52:56  18   A.  That's correct.

02:52:56  19   Q.  And you don't have any independent opinion regarding

02:52:59  20   the scope of the delay technology that's disclosed in the

02:53:05  21   Li article, right?

02:53:06  22   A.  I'm not here to opine on the -- the scope of that

02:53:10  23   particular limitation as a technical expert, no.

02:53:14  24   Q.  All right.  And that's -- that goes the same for the --

02:53:17  25   the Brandstein book.  You're not here to offer opinions

02:53:21  1   about what it discloses, right?

02:53:22  2   A.  That's correct.  I'm not up here to talk about the

02:53:25  3   technical parts of the Brandstein book, but just to refer

02:53:28  4   to others that have -- that have identified those portions,

02:53:31  5   yes.

02:53:32  6   Q.  You're not an attorney, right?

02:53:34  7   A.  I am not.

02:53:36  8   Q.  You don't offer opinions on claim construction,

02:53:42  9   correct?

02:53:42  10  A.  I do not.

02:53:43  11  Q.  So you don't have any understanding of the scope of the

02:53:48  12  claims of the '756 patent, right?

02:53:51  13  A.  Well, I wouldn't say I don't have any understanding

02:53:54  14  of the -- of the scope of the claims.  I -- I -- you know,

02:53:57  15  I worked at the Patent Office for many years.  I understand

02:54:00  16  how the Patent Office would look at those claims.  But I'm

02:54:04  17  not here to offer opinions, let's put it that way -- with

02:54:07  18  respect to the scope of the claims.

02:54:08  19  Q.  And the same goes for the '049 patent, right?

02:54:10  20  A.  I -- I'm not here to offer opinions with respect to the

02:54:13  21  scope of the claims of the '049 patent.

02:54:16  22  Q.  You're familiar with the regulations of the Patent

02:54:19  23  Office, right?

02:54:20  24  A.  Yes.

02:54:21  25  Q.  What is an incorporation by reference, to your

02:54:28  1  understanding?

02:54:29  2  A.  An incorporation by reference is when you actually

02:54:32  3  state that you're incorporating by reference some other

02:54:37  4  information, and it has to be a specific statement that's

02:54:43  5  made -- normally in the specification of an application,

02:54:48  6  you will see incorporation by reference.

02:54:50  7  Q.  And is the effective incorporation by reference that

02:54:54  8  the document, which is incorporated by reference, is deemed

02:54:57  9  to be in the document which incorporates by reference as if

02:55:00  10  its entire contents were in the document incorporated?

02:55:04  11  A.  I think I followed that.  But, in general, yes.  If you

02:55:09  12  make -- if you make the specific statement the way the

02:55:12  13  Patent Office recognizes that statement, it's possible that

02:55:16  14  you can incorporate by reference, yes.

02:55:18  15  Q.  So an application can incorporate another application

02:55:21  16  by reference, correct?

02:55:22  17  A.  It's possible, yes.

02:55:24  18  Q.  And that document, which is incorporated, is deemed to

02:55:28  19  be part of the content of the document that incorporates

02:55:31  20  it, right?

02:55:31  21  A.  If done properly, yes.

02:55:33  22  Q.  Have you reviewed the application that issued as the

02:55:40  23  '756 patent?

02:55:40  24  A.  Yes.

02:55:42  25  Q.  You've reviewed it in its entirety?

| | | |
|---|---|---|
| 02:55:45 | 1 | A.  Yes. |
| 02:55:46 | 2 | Q.  So you agree that the application, as filed for the |
| 02:55:50 | 3 | '756 patent, incorporated the provisional application we |
| 02:55:53 | 4 | have been discussing by reference, right? |
| 02:55:55 | 5 | A.  No. |
| 02:55:59 | 6 | Q.  Why do you disagree? |
| 02:56:01 | 7 | A.  I -- I haven't seen any document or I haven't seen |
| 02:56:05 | 8 | any -- any incorporation by reference of the provisional |
| 02:56:09 | 9 | application to the -- that's -- appears in the '756. |
| 02:56:59 | 10 | MR. LAMBRIANAKOS:  May I please have the ELMO? |
| 02:57:02 | 11 | Q.  (By Mr. Lambrianakos)  Sir -- |
| 02:57:11 | 12 | MS. DOAN:  Your Honor -- |
| 02:57:12 | 13 | THE COURT:  Yes, Ms. Doan. |
| 02:57:13 | 14 | MS. DOAN:  I'd like to have the page reference |
| 02:57:17 | 15 | before -- |
| 02:57:17 | 16 | MR. LAMBRIANAKOS:  I'm about to give you that. |
| 02:57:19 | 17 | MS. DOAN:  Thank you, sir. |
| 02:57:19 | 18 | Q.  (By Mr. Lambrianakos)  I'm showing you a document that |
| 02:57:21 | 19 | is part of PTX-4.  The ending Bates number is 151. |
| 02:57:33 | 20 | Have you seen this before, sir? |
| 02:57:34 | 21 | A.  I don't recall seeing it, no. |
| 02:57:36 | 22 | Q.  Do you see the first paragraph says that the |
| 02:57:39 | 23 | application claims benefit of the provisional Patent |
| 02:57:43 | 24 | No. 61/403,952? |
| 02:57:46 | 25 | A.  Yes. |

02:57:46  1   Q.  And is that the provisional application that we've been

02:57:49  2   discussing?

02:57:51  3   A.  I believe it is.  I don't have the -- the serial number

02:57:59  4   memorized, but I could identify it if I had the front page

02:58:05  5   of the '756.

02:58:08  6   Q.  Sir, is this the '756 patent?

02:58:25  7   A.  Yes.

02:58:25  8   Q.  Do you see under "related U.S. application data" in the

02:58:30  9   left-hand column next to Item 60, it names the provisional

02:58:35  10  application No. 61/403,952?

02:58:39  11  A.  I see that, yes.

02:58:41  12  Q.  And that's the same number that is referred to in the

02:58:51  13  application for the '756 patent, right?

02:58:52  14  A.  Yes.  If this is the application for the '756, yes.

02:58:54  15  Q.  Do you see the application number from the previous

02:59:26  16  page in this application, 13/09877?

02:59:35  17  A.  I see that's the application number identified in this

02:59:37  18  paper, yes.

02:59:38  19  Q.  And is that the application number for the '756 patent?

02:59:44  20  A.  If you -- if you bring back the '756 patent -- yes, it

02:59:47  21  is.

02:59:47  22  Q.  So, after that, can we agree that the content of the

03:00:00  23  specification of the provisional application ending in '952

03:00:07  24  was incorporated by reference in its entirety into the '756

03:00:12  25  patent application?

03:00:12   1   A.  Well, that's the statement that's made here.  They talk

03:00:15   2   about the specification, and I -- and I assume what you're

03:00:20   3   talking about is the -- the listing at the end of the

03:00:25   4   application.  And I don't know if that's considered part of

03:00:28   5   the specification or not.  I -- I wouldn't consider it.

03:00:30   6   But I see what you're saying.  I understand that.

03:00:32   7   Q.  You wouldn't consider the references listed at the end

03:00:36   8   of the specification of the provisional application to be

03:00:38   9   part of the provisional application specification?

03:00:41   10  A.  I -- I -- to be honest with you, I've never -- I've

03:00:45   11  never been asked that question before.  I don't know if I

03:00:49   12  would or not.  But the specification is normally just the

03:00:53   13  description of the invention and not other parts of the

03:00:55   14  application.

03:00:56   15          The other part of the situation here would be --

03:01:00   16  if I may, Your Honor.

03:01:02   17          THE COURT:  Go ahead.

03:01:04   18  A.  The fact that -- we've talked about the fact that

03:01:07   19  examiners wouldn't normally look at the provisional

03:01:09   20  application because, in this case, there was no intervening

03:01:12   21  prior art.

03:01:13   22          So whether or not it's incorporated or not, really

03:01:16   23  wouldn't make a difference.  The real question is, did the

03:01:19   24  examiner go back and review it, and did the examiner know

03:01:26   25  and -- and consider the Brandstein book that was listed in

03:01:30   1   the provisional?  And, as I said before, there's no

03:01:32   2   indication that the examiner did that.

03:01:34   3           THE COURT:  So let me interrupt.  Are you saying

03:01:38   4   beyond the duty of candor and disclosure, there's a duty to

03:01:43   5   ensure that the examiner sees what you disclose?

03:01:44   6           THE WITNESS:  No.

03:01:45   7           THE COURT:  Or do you just have a duty to disclose

03:01:47   8   it, and then it's the examiner's responsibility to either

03:01:49   9   consider it or not consider it once it's been disclosed?

03:01:53  10           THE WITNESS:  The latter, Your Honor.

03:01:56  11           THE COURT:  Okay.  Mr. Rubin -- Mr. Rubino, if it

03:02:00  12   will help you to stay up there, whatever moves this process

03:02:03  13   along.

03:02:04  14           MR. RUBINO:  Potentially, Your Honor.

03:02:05  15           THE COURT:  There's a lot of paper up there.  If

03:02:07  16   you can assist your co-counsel, whatever -- in whatever way

03:02:11  17   you can, maybe that will speed the process along.

03:02:23  18   Q.  (By Mr. Lambrianakos)  Do you recognize this page as

03:02:25  19   the last page of the specification of the provisional

03:02:27  20   application we've been discussing, DTX-15?

03:02:30  21   A.  It's the last page of the application.  I don't know if

03:02:33  22   it's the specification or not.  I mean, I'm not saying it

03:02:36  23   is.  I just -- you know, the format here in the -- in the

03:02:40  24   provisional application is much different than the format

03:02:43  25   of a -- of a normal application.  But it is the last page

03:02:49  1  of that application, yes.

03:02:52  2       MR. LAMBRIANAKOS:  Mr. Thompson, could you please

03:02:54  3  put DTX-15 up on the screen?  Would you please move to

03:03:04  4  the -- DTX-15.28, the 28th page -- the prior page?

03:03:14  5  Q.  (By Mr. Lambrianakos)  So you see, sir, we're getting

03:03:16  6  to the end of the specification in this application, right?

03:03:20  7  A.  Well, that's the page before the ending, yes.

03:03:22  8  Q.  Right.  And then the next page comes?

03:03:26  9  A.  Yes.

03:03:26  10  Q.  And at the bottom of the last page of the

03:03:28  11  specification, we see the Brandstein book reference, right?

03:03:31  12  A.  I see that, yes.

03:03:34  13  Q.  So do you -- do you -- would you agree, then, that this

03:03:40  14  document, having been incorporated by reference, would

03:03:43  15  include the entire specification, including the references

03:03:47  16  to the Brandstein book?

03:03:50  17  A.  Well, no.  As I said before, the -- the real question

03:03:53  18  is whether or not the Brandstein book was made available to

03:03:57  19  the -- to the patent examiner and whether it was considered

03:03:58  20  by the patent examiner at the Patent Office.  Was it cited?

03:04:04  21  And -- if you'll let me finish.

03:04:08  22       And -- and what I said before is that, even though

03:04:10  23  the Brandstein book is -- is listed at the end of the

03:04:15  24  provisional application, based on what I've seen, there's

03:04:18  25  no indication that the patent examiner reviewed the

03:04:21  1  provisional application.

03:04:23  2      So whether it's incorporated by reference or not,

03:04:26  3  unless he reviewed it and understood that the Brandstein

03:04:30  4  book was important, it wasn't cited and it wasn't

03:04:35  5  considered by the Patent Office.

03:04:37  6      So if you -- if you -- if you don't review the

03:04:40  7  document that's supposedly incorporated by reference, then

03:04:44  8  you haven't reviewed that document.

03:04:50  9  Q.  Sir, is the -- was the Brandstein reference citation

03:04:55  10  here incorporated by reference into the '756 patent

03:04:59  11  application?

03:04:59  12  A.  The specification of the -- of the -- of the

03:05:02  13  provisional was, yes.  I mean, I -- you can make an

03:05:06  14  argument both ways whether or not this listing is part of

03:05:09  15  the specification.  That's the only distinction I'm trying

03:05:12  16  to make.

03:05:12  17  Q.  So it's possible that one might draw an imaginary line

03:05:16  18  over the -- above where it says reference and only what's

03:05:19  19  incorporated is above the imaginary line, and then what's

03:05:23  20  below it is -- is not?  Do you think that's a reasonable

03:05:27  21  argument, sir?

03:05:28  22  A.  Well, I -- I think -- I don't understand when they say

03:05:31  23  incorporate the specification, because this specification

03:05:34  24  is -- is unusual.  That's all.  It's not the normal format

03:05:38  25  of a specification.

03:05:39   1   Q.   Is it your opinion, sir, that if the applicant intended
03:05:47   2   to deceive the Patent Office by hiding the Brandstein
03:05:50   3   reference, that he would incorporate a document by
03:05:54   4   reference into his application from the very beginning that
03:05:57   5   cites specifically to the Brandstein reference?
03:05:59   6   A.   Well, again, I'll -- I'll -- Judge Gilstrap will --
03:06:03   7   will consider the intent prong here.
03:06:07   8          The other factor to be considered is, even though
03:06:09   9   it's -- it's listed here in the provisional application, it
03:06:13   10  was removed, and it was not listed when the -- when the
03:06:16   11  actual application was filed.
03:06:18   12         So for some reason, it -- it was removed.  That
03:06:22   13  reference or -- or that listing was not put into the
03:06:27   14  specification or was not listed in the application for the
03:06:33   15  '756.
03:06:33   16  Q.   But doesn't your answer assume that it's not already
03:06:37   17  incorporated by reference and listed within the
03:06:39   18  specification?
03:06:40   19  A.   No, my answer is that it's not -- doesn't appear in the
03:06:43   20  specification of the '756 application.
03:06:46   21  Q.   But it is incorporated by reference, isn't it?
03:06:49   22  A.   The -- the provisional specification is incorporated by
03:06:53   23  reference, yes.
03:06:54   24             THE COURT:  Let me ask you a question, Mr. Godici.
03:06:57   25             In a former life, I used to have a pretty robust

03:07:02   1   real estate practice.  And in that area of the law, if

03:07:05   2   there is an item in your chain of title, you're held to

03:07:10   3   have constructive notice of everything in your chain of

03:07:12   4   title.  Whether you know it's there, whether you've seen

03:07:16   5   it, whether you've considered it or not, if it's in that

03:07:18   6   chain, you're charged with notice of it.

03:07:20   7         Is there anything similar or analogous to that

03:07:25   8   that applies to the Patent Office, or is it only what the

03:07:28   9   examiner actually has put before them and either they

03:07:34  10   themselves or someone else causes them to actually focus on

03:07:38  11   it?

03:07:39  12         THE WITNESS:  That's a tough one to answer, sir.

03:07:43  13         But, yes, I think -- I think in some situations,

03:07:46  14   yes.  The -- the -- the question is whether or not

03:07:50  15   information is in some way brought to the attention of the

03:07:56  16   Patent Office.

03:07:56  17         THE COURT:  I guess asked another way, is it the

03:07:59  18   examiner's duty to scour the record, or is it the

03:08:02  19   applicant's duty to not only disclose it but to ensure

03:08:07  20   the -- the examiner sees what they have disclosed?

03:08:09  21         THE WITNESS:  It's the examiner's duty to fully

03:08:11  22   consider information that's submitted in -- in an

03:08:14  23   information disclosure statement, where copies are

03:08:18  24   submitted and so on and so forth.

03:08:20  25         It is possible to -- to -- to cite information --

03:08:26  1   for example, in the specification, you can mention a

03:08:28  2   document or -- or a textbook or another patent, and so on

03:08:35  3   and so forth, that the examiner will -- will consider.

03:08:39  4        All I can say is, when I looked at this patent

03:08:43  5   application, the provisional and the non-provisional,

03:08:47  6   granted the Brandstein book was cited as a reference at the

03:08:51  7   bottom of the provisional application, there's no

03:08:56  8   indication that the examiner actually looked at the

03:08:58  9   provisional application, but that Brandstein book citation

03:09:00  10  was not in the non-provisional application.  Those are the

03:09:04  11  facts that I can explain to you.

03:09:06  12        THE COURT:  I'm aware.  Okay.  Let's move on,

03:09:13  13  please.

03:09:13  14  Q.  (By Mr. Lambrianakos)  Regarding the Li article that

03:09:17  15  you discussed --

03:09:18  16  A.  Yes.

03:09:18  17  Q.  -- what's your understanding about whether the Li

03:09:22  18  article disclosed the '756 patent claim limitation of the

03:09:29  19  sound source localization unit?

03:09:35  20  A.  Well, again, I -- I didn't do an evaluation of the --

03:09:39  21  of the technology.  I'm not the technical expert.  I relied

03:09:43  22  on -- on others with respect to the technology.

03:09:48  23        What I talked about with respect to the Li article

03:09:50  24  was the fact that the Li article and several folks

03:09:54  25  testified that the Li article had that -- determining a

03:09:57  1   delay feature, and the importance of that was the fact that

03:10:02  2   during the prosecution of the '756, the attorney, Tankha,

03:10:06  3   put that delay feature into the claim, amended claim, in

03:10:10  4   the Patent Office, and argued that that carried the weight

03:10:15  5   of patentability.  And the Patent Office agreed and allowed

03:10:18  6   it.

03:10:18  7           So I talked about the determining a delay feature,

03:10:25  8   but you're asking me about a different feature.  And I

03:10:28  9   didn't talk about that, and I haven't evaluated that.

03:10:31  10  Q.  And you haven't evaluated whether the Li article

03:10:35  11  discloses the adaptive beamformer of the claims of the '756

03:10:38  12  patent, right?

03:10:38  13  A.  Personally, I haven't evaluated it from a technology

03:10:41  14  standpoint.  I rely on the technical experts.

03:10:44  15  Q.  So you don't have an opinion regarding whether the Li

03:10:48  16  reference discloses all the limitations of the '756 patent?

03:10:52  17  A.  I don't have an independent evaluation of that.  That

03:10:56  18  would be up to the -- the technical expert.  I have to -- I

03:10:59  19  would have to refer to their -- to their expertise.

03:11:02  20  Q.  And you haven't been given any opinion regarding the

03:11:05  21  claims of the '756 patent, right?

03:11:09  22  A.  I disagree with that.  Could you restate that question?

03:11:13  23  Q.  You haven't been given any opinion from a technical

03:11:17  24  expert regarding the scope of the claims of the '756

03:11:19  25  patent, correct?

| | | |
|---|---|---|
| 03:11:25 | 1 | A.  Well, certainly, there's been a lot of discussion from |
| 03:11:28 | 2 | the technical experts about the limitations that are in the |
| 03:11:31 | 3 | claims of the '049.  To the extent that some are identical |
| 03:11:37 | 4 | or substantially identical, then that would carry back to |
| 03:11:41 | 5 | the '756.  But I think to answer you specifically, what was |
| 03:11:45 | 6 | treated at trial today was -- or over the last week was -- |
| 03:11:50 | 7 | were the claims of the '049. |
| 03:11:51 | 8 | Q.  So you're not here to offer an opinion regarding |
| 03:12:05 | 9 | whether the Li -- the Li article from 2009 was material to |
| 03:12:09 | 10 | the scope of the patents -- the scope of the '756 patent |
| 03:12:12 | 11 | application at the time it was filed, right? |
| 03:12:18 | 12 | A.  No, I think the way I explained it now, and I hate to |
| 03:12:22 | 13 | be repetitive, but the Li article discloses the determining |
| 03:12:27 | 14 | a delay feature -- or limitation in the claims, and that's |
| 03:12:31 | 15 | what carried weight and the patentability of the '756 |
| 03:12:35 | 16 | patent.  That's why the Patent Office allowed that claim. |
| 03:12:39 | 17 | So, yes, the -- I -- I've stated that opinion that |
| 03:12:43 | 18 | the Li article is -- does disclose that limitation, and |
| 03:12:45 | 19 | that's relevant to the claims of the '756. |
| 03:12:48 | 20 | Q.  The '756 patent disclosed determining a delay to enable |
| 03:12:52 | 21 | beamforming in a plurality of arbitrary configurations, |
| 03:12:56 | 22 | right? |
| 03:12:56 | 23 | A.  Well, again, I'm not testifying with respect to the |
| 03:13:02 | 24 | technology.  We've all seen the phrase, the determining a |
| 03:13:07 | 25 | delay limitation.  I think, as someone said, it's a hundred |

03:13:12   1   and some-odd words.  So that's the limitation that -- that

03:13:17   2   I'm talking about.

03:13:18   3   Q.  Well, the examiner was looking at that limitation when

03:13:21   4   he decided whether or not it was disclosed in the prior

03:13:24   5   art, right?

03:13:26   6   A.  Yes, the examiner would -- would -- would determine

03:13:28   7   whether or not that limitation is disclosed, yes.

03:13:31   8   Q.  And the materiality issue depends on understanding the

03:13:35   9   scope of that claim term, determining a delay that enables

03:13:40   10   beamforming for a plurality of arbitrary configurations,

03:13:45   11   right?

03:13:45   12   A.  Well, I think you just shortened it again.  But, yes,

03:13:49   13   the patent examiner would look at that limitation, all

03:13:53   14   hundred and nine words or whatever, and then look to see

03:13:56   15   whether that was part of the prior art or not.

03:13:58   16   Q.  And you pointed to some testimony that was given by

03:14:04   17   Manli Zhu about the determining a delay step?

03:14:08   18   A.  (Nods head affirmatively.)

03:14:09   19   Q.  Was she addressing the issue of whether her article

03:14:13   20   disclosed the ability to determine a delay to enable

03:14:18   21   beamforming in a plurality of arbitrary configurations?

03:14:20   22   A.  My recollection is that she was describing determining

03:14:24   23   a delay in a linear -- in -- in the situation where the --

03:14:27   24   the microphones were linear.  And that -- and as I said

03:14:32   25   before, that's part -- that's within the -- that's within

03:14:36   1   the claim language.  It could be linear, circular, or other

03:14:40   2   configuration.

03:14:42   3   Q.  Well, not in the '756 patent, though, is it?

03:14:45   4   A.  The '756 says arbitrary, but it was corrected in the --

03:14:50   5   in the '049 or clarified, let's put it, in the '049, yes.

03:14:55   6   Q.  So as far as the '756 patent is concerned, there was no

03:14:58   7   testimony regarding whether the Li article enables

03:15:02   8   beamforming in a plurality of arbitrary configurations,

03:15:06   9   right?

03:15:06  10   A.  Well, unless you look at the term "arbitrary" to

03:15:10  11   possibly include a straight line, yes.  I mean, arbitrary

03:15:14  12   is a very broad term, and may, in fact, again, not -- not

03:15:19  13   determining the scope of the claim, but just for putting my

03:15:21  14   patent examiner hat on, if it says arbitrary, it means that

03:15:25  15   it could be most any kind of limit -- configuration and

03:15:32  16   could be the straight line limitation or configuration.

03:15:35  17   Q.  But that wasn't what Manli Zhu was referring to, right?

03:15:39  18   She was referring to whether or not the -- the Li article

03:15:44  19   in 2009 disclosed determining a delay with respect to a

03:15:52  20   linear array, not an arbitrary configuration.  Right?

03:15:54  21   A.  Right.  My understanding was she was looking at the

03:15:57  22   language of the claim as it existed in the '049 patent,

03:15:59  23   yes.

03:15:59  24   Q.  Well, your slide, Slide 8.19?

03:16:17  25           MR. LAMBRIANAKOS:  If we could put that up.

03:16:19   1   Q.   (By Mr. Lambrianakos)   That doesn't refer to claim

03:16:20   2   language, right; that just talks about determining -- the

03:16:23   3   determining a delay limitation in general?

03:16:25   4   A.   Correct.   But I -- you know, as we went through the --

03:16:29   5   the earlier slides, we clearly identified what constituted

03:16:34   6   the determining the delay limitation, that 109-word

03:16:41   7   paragraph we see in the claims.

03:16:43   8   Q.   In the claims of the '049 patent?

03:16:44   9   A.   Well, it was incorporated -- it went into -- it went

03:16:49   10  into the '756, and then it also appears in the '049.

03:16:52   11  Q.   And it was amended, right, and reissued?

03:16:57   12  A.   Yes, the claim was amended and reissued, yes.

03:17:00   13  Q.   So the scope of the claim of the '756 patent, with

03:17:03   14  respect to that specific limitation, was different than it

03:17:06   15  was in the '049 patent, right?

03:17:09   16  A.   My recollection, there was an amendment where -- we

03:17:12   17  just talked about it -- where the word "arbitrary"  was

03:17:15   18  replaced by circular or linear or other, yes, that was --

03:17:20   19  that was a change in the -- in the claim.

03:17:47   20          THE COURT:   Counsel, I've been on the bench two

03:17:49   21  hours and 25 minutes.   We're going to take a short recess.

03:17:54   22  And while we're on recess, I'd like to see Mr. Fabricant,

03:17:59   23  Mr. Lambrianakos, Ms. Doan, and Mr. Re in chambers briefly.

03:18:04   24          We stand in recess.

03:18:11   25          COURT SECURITY OFFICER:   All rise.

| | | |
|---|---|---|
| 03:28:47 | 1 | (Recess.) |
| 03:28:56 | 2 | COURT SECURITY OFFICER:  All rise. |
| 03:28:57 | 3 | THE COURT:  Be seated, please. |
| 03:28:59 | 4 | All right.  Mr. Lambrianakos, please continue. |
| 03:29:08 | 5 | Q.  (By Mr. Lambrianakos)  Mr. Godici, we saw that in the |
| 03:29:11 | 6 | reissue of the '756 into the '059 [sic] there was an |
| 03:29:19 | 7 | amendment to the delay step, correct? |
| 03:29:21 | 8 | A.  I'd have to -- I'd have to look at that.  We can tell |
| 03:29:26 | 9 | that very easily by looking at the claim of the '049 |
| 03:29:31 | 10 | indicating what's in brackets and what's in italics. |
| 03:29:35 | 11 | MR. LAMBRIANAKOS:  PTX-1, please, Claim 1.  Zoom |
| 03:29:40 | 12 | in on the delay step quickly, please. |
| 03:29:44 | 13 | Q.  (By Mr. Lambrianakos)  So do you see at Line 55 |
| 03:30:09 | 14 | "arbitrary numbers"? |
| 03:30:12 | 15 | A.  Yes, I see that. |
| 03:30:13 | 16 | Q.  And "arbitrary configurations," those were removed from |
| 03:30:19 | 17 | the claims? |
| 03:30:19 | 18 | A.  I see arbitrary numbers are removed from the claims. |
| 03:30:23 | 19 | Arbitrary -- the word "arbitrary" was removed, not |
| 03:30:26 | 20 | configurations.  It looks like configuration is still in |
| 03:30:29 | 21 | there. |
| 03:30:30 | 22 | Q.  Right, sure.  So instead of a plurality of arbitrary |
| 03:30:33 | 23 | configurations, the claim now says:  A plurality of |
| 03:30:37 | 24 | configurations.  So "arbitrary" is removed, right? |
| 03:30:39 | 25 | A.  Correct. |

03:30:40  1    Q.  Now, by removing "arbitrary," is it your view the

03:30:47  2    claims have been broadened or narrowed?

03:30:51  3    A.  Well, I'll just go by what the -- what the attorney

03:30:55  4    told the Patent Office.  He said, we're clarifying, okay.

03:30:59  5    So when he said that the claims of the application were

03:31:05  6    amended and pointed out those amendments, he said this is

03:31:08  7    for clarification purposes.  Again, I'm not here to -- to

03:31:13  8    opine on the interpreting the claim or the scope of the

03:31:17  9    claim.

03:31:18  10   Q.  You think --

03:31:19  11   A.  But the attorney told us that it's for clarification

03:31:21  12   purposes.

03:31:21  13   Q.  You think that checking the box that the claim is

03:31:24  14   broadened or narrowed was false?

03:31:27  15   A.  You mean in the original two declarations?  Is that

03:31:36  16   what you're asking?

03:31:37  17   Q.  In the amendment to the -- in the '049 reissue --

03:31:43  18   A.  Correct.

03:31:43  19   Q.  -- would you view the checking of the box as broadening

03:31:48  20   to have been false based on this amendment?

03:31:50  21   A.  I guess I -- I'm not quite understanding your question,

03:31:58  22   other than the way I've already answered it.  What the

03:32:00  23   applicant told the Patent Office with respect to this

03:32:04  24   amendment, that it was made for clarity purposes, and --

03:32:09  25   and when -- when asked to identify or when required to

03:32:12   1   identify if there's a broadened claim, this claim wasn't
03:32:19   2   identified as a broadened claim.  It was -- the changes
03:32:23   3   were identified as clarification changes.
03:32:27   4   Q.  In your view, if this claim were indefinite because of
03:32:30   5   the use of the word "arbitrary," would this amendment be
03:32:31   6   broadening?
03:32:31   7   A.  Again, you're asking me to interpret the scope of the
03:32:36   8   claim.  What -- what the applicant said was that the
03:32:41   9   original claim was vague.  That was the wording that --
03:32:45   10  that the applicant put in the declaration and that this
03:32:50   11  amendment clarified that claim.
03:32:51   12           I can only tell you what the applicants told the
03:32:54   13  Patent Office.
03:32:55   14  Q.  So you -- you can't tell what the applicant was
03:32:57   15  thinking regarding his intent when he checked the boxes,
03:33:02   16  right?
03:33:02   17  A.  I'm not here to speculate on what the applicant was
03:33:05   18  thinking.  I'm here to tell you what the record shows.
03:33:09   19  Q.  And all you know from the record is that a box --
03:33:14   20  certain boxes were checked and others weren't, and it
03:33:18   21  changed over time, right?
03:33:19   22  A.  No, that's not correct.  I think it's -- it's much more
03:33:23   23  serious than that.  There's a -- there's a requirement that
03:33:26   24  if you're broadening the claim, you must identify the claim
03:33:31   25  that's broadened, and that's a requirement.  And you must

03:33:33    1    tell the Patent Office how it was broadened.

03:33:36    2         And after being rejected -- the claims being

03:33:39    3    rejected for not identifying that information, the

03:33:46    4    applicant decided to change the declaration, not check that

03:33:48    5    particular block, and state that the clarifications were

03:33:50    6    for clarity purposes.

03:33:55    7         So it changed the purpose -- the way I see it from

03:33:58    8    the Patent Office's perspective -- it changed the purpose

03:34:00    9    of the reexamination from broadening to clarifying.

03:34:02   10    Q.   If the -- if the attorney was correct in unchecking the

03:34:09   11    box, then there's no inequitable conduct, right?

03:34:17   12    A.   If the attorney was correct, but there was a broadened

03:34:21   13    claim -- the attorney testified in his deposition that

03:34:26   14    Claim 32 was broadened.  So it was an improper declaration

03:34:29   15    because it failed to identify the fact that there was a

03:34:32   16    broadened claim.

03:34:34   17    Q.   Now, it's important to identify whether your reissue is

03:34:42   18    broadening based on a two-year limit, correct?

03:34:45   19    A.   Correct.  We haven't discussed that.  But you are

03:34:47   20    required to -- if you want a broadening reissue, you have

03:34:52   21    to file your case within two years of the issuance of the

03:34:55   22    underlying patent.

03:34:56   23    Q.   And both of the -- and the reissue -- the '049 reissue

03:35:00   24    was filed within two years, correct?

03:35:02   25    A.   It was filed on the date -- the exact two-year date,

03:35:06  1   yes.

03:35:06  2   Q.  So the applicant had the right to seek a broadening

03:35:10  3   reissue at that time?

03:35:10  4   A.  Had the right to, yes.  But we see what happened.

03:35:24  5            MR. LAMBRIANAKOS:  Nothing further, Your Honor.

03:35:27  6            THE COURT:  All right.

03:35:27  7            MS. DOAN:  Brief redirect, Your Honor?  Very

03:35:29  8   brief?

03:35:30  9            THE COURT:  Ms. Doan?

03:35:31  10            MS. DOAN:  Yes, Your Honor.

03:35:31  11            THE COURT:  Do you have something that has not

03:35:33  12   been raised before that I have not heard before that is for

03:35:36  13   the first time only?  If you do, I'll allow you to --

03:35:40  14            MS. DOAN:  I think so, Your Honor.  I don't know.

03:35:44  15            THE COURT:  Well, if you don't know, I don't know

03:35:46  16   who does.

03:35:47  17            MS. DOAN:  Okay.  I'll be very brief.

03:35:49  18            THE COURT:  Take a minute.

03:35:50  19            MS. DOAN:  Yes, Your Honor.

03:35:50  20                    REDIRECT EXAMINATION

03:35:52  21   BY MS. DOAN:

03:35:52  22   Q.  Mr. Godici, was the Li article or the Brandstein book

03:35:56  23   considered by the Patent Office in -- in the applications

03:36:02  24   for the '756 and '049 patents?

03:36:02  25   A.  No, there's no indication that the patent examiner

03:36:06   1   considered either of those two references.

03:36:07   2   Q.  Were they ever listed on an IDS or the actual reference

03:36:11   3   provided to the Patent Office?

03:36:13   4   A.  No.

03:36:13   5   Q.  Is it still the rule that non-patent literature has to

03:36:16   6   be provided by the applicant?

03:36:18   7   A.  Any information that's material to examination,

03:36:22   8   including non-patent literature, has to be submitted to the

03:36:26   9   Patent Office.

03:36:26  10   Q.  Mr. Lambrianakos was asking you about the false

03:36:29  11   declarations that you were talking about earlier.

03:36:29  12   A.  Yes.

03:36:30  13   Q.  With respect to your opinion on the false declaration,

03:36:32  14   were you focusing on the third declaration being the false

03:36:36  15   declaration?

03:36:36  16   A.  Yes.

03:36:37  17   Q.  So any comments that Mr. Lambrianakos made about the

03:36:37  18   first declaration would be irrelevant to your declar --

03:36:43  19   your opinion about the false declaration on the third

03:36:46  20   declaration, correct?

03:36:46  21   A.  That's correct.

03:36:46  22   Q.  Is there anything he asked about that changed your

03:36:50  23   opinions that you gave to Judge Gilstrap earlier?

03:36:52  24   A.  No, there isn't.

03:36:54  25           MS. DOAN:  Thank you, sir.

03:36:55  1          THE COURT:  Mr. Lambrianakos, do you have anything

03:36:57  2  else for this witness?

03:36:58  3          MR. LAMBRIANAKOS:  No, Your Honor.

03:36:59  4          THE COURT:  All right.  Thank you.

03:37:00  5          Counsel, I assume this is the totality of the

03:37:07  6  evidence that you intend to present.

03:37:08  7          MS. DOAN:  It is, Your Honor.  We do have our two

03:37:11  8  exhibits that we'd like to submit -- the deposition --

03:37:13  9  excerpts from the deposition testimony of Ashok Tankha and

03:37:17 10  Dr. Manli Zhu as DTX-1026.

03:37:19 11          THE COURT:  All right.  If you'd approach and hand

03:37:22 12  those to the courtroom deputy.

03:37:23 13          Are there counter-designations from the Plaintiff?

03:37:27 14          MR. LAMBRIANAKOS:  No, Your Honor.

03:37:27 15          THE COURT:  All right.  All right.  I'm now going

03:37:33 16  to afford each side -- you may step down.

03:37:36 17          THE WITNESS:  Thank you.

03:37:38 18          THE COURT:  Thank you, sir.

03:37:38 19          I'm now going to afford each side seven and a half

03:37:42 20  minutes for a targeted closing statement regarding the

03:37:46 21  evidence that's been presented.

03:37:47 22          Let me hear first from the moving Defendant,

03:37:50 23  Amazon.

03:37:51 24          MR. RE:  Thank you, Your Honor.

03:37:54 25          And thank you for allowing us to do this at this

03:38:00    1    very delicate hour.

03:38:01    2          I do want to clarify a few things.  And having

03:38:06    3    practiced patent law for 35 years, I see some

03:38:09    4    miscommunication that's occurring.

03:38:10    5          First, I want to address your real estate analogy.

03:38:13    6    This is not like real estate at all.  The public import of

03:38:17    7    being honest with the Patent Office rises to a much higher

03:38:21    8    level, as we saw, including imprisonment up to five years.

03:38:25    9          THE COURT:  As I -- as I recall, that was a

03:38:26   10    question to the witness.  You're not attempting to offer

03:38:28   11    testimony, are you, Mr. Re?

03:38:30   12          MR. RE:  No, but I -- I think it's important.

03:38:33   13          THE COURT:  You're telling me what does and

03:38:35   14    doesn't happen at the Patent Office?  That's not an attempt

03:38:37   15    to give me testimony?

03:38:38   16          MR. RE:  No, I gave you argument on the duty to

03:38:41   17    disclose.

03:38:42   18          THE COURT:  All right.  Go ahead.

03:38:42   19          MR. RE:  The duty to disclose, very, very serious.

03:38:46   20    For example, the reissue that we ended with, the third

03:38:50   21    ground, to remove -- to remove that box -- to affirmatively

03:38:56   22    remove a checkmark when you are, in fact, broadening is a

03:39:01   23    serious violation.

03:39:02   24          The checkmark is what tells the Patent Office, if

03:39:08   25    it's broadened, they must do additional searching.  The

03:39:11  1   claim is broadened.  It's like starting over.  You can only

03:39:15  2   seek a broadening reissue in the two years after issuance.

03:39:15  3          And after getting the rejection twice for an

03:39:22  4   improper declaration, the attorney removes the checkmark

03:39:24  5   and does, in fact, broaden the claims.  And it's undisputed

03:39:29  6   the claims were broadened.

03:39:31  7          What Mr. Lambrianakos was focusing on was Claim 1,

03:39:34  8   where the arbitrary and configuration language was changed.

03:39:38  9          But what he did not address was that the other

03:39:41  10  claims were broadened.  And, particularly, it stands

03:39:45  11  undisputed on this record that at least Claim 32 was

03:39:48  12  broadened.  That is dispositive of the fact that the

03:39:53  13  checkmark is absolutely incorrect, and we have the attorney

03:39:56  14  admitting that he did, in fact, broaden and remove the

03:39:59  15  checkmark from the reissue.

03:40:00  16         This reissue oath has nothing whatsoever to do

03:40:04  17  with the reissue oath we were discussing on the second

03:40:06  18  reissue.  This is the first reissue.

03:40:10  19         And there -- it appears they're abusing the

03:40:13  20  reissue process.  And, obviously, they're using it to

03:40:16  21  disclose additional references for future patents.  That's

03:40:21  22  what's going on here.

03:40:21  23         I now want to discuss Brandstein.  The applicant

03:40:25  24  has the duty to provide Brandstein.  There's no question

03:40:29  25  the applicant knows about Brandstein, used Brandstein,

03:40:32  1   cited Brandstein in an article.

03:40:35  2        So, rarely, do you have a case where it is

03:40:37  3   undisputed that the applicant knew about Brandstein, knew

03:40:40  4   about its content, used it to file applications.

03:40:44  5        And the argument we heard today is that somehow it

03:40:47  6   was disclosed to the Patent Office because it was cited in

03:40:51  7   the provisional.

03:40:53  8        I've never heard such an argument.  And I'll tell

03:40:57  9   you a few reasons why that argument is so serious.

03:41:00  10       Number one, the applicant is not relieved of any

03:41:03  11   duty by virtue of the provisional.

03:41:06  12       Number two, the provisional is a provisional.  It

03:41:09  13   is merely a placeholder for the priority date.  It is never

03:41:15  14   examined.  It has nothing whatsoever to do with the

03:41:17  15   examination process.

03:41:18  16       Number three, to ask a non-lawyer about whether

03:41:21  17   it's incorporated by reference was really out of bounds.

03:41:24  18   It's not incorporated by reference.  The related

03:41:27  19   applications are simply mentioned to show priority.  It's

03:41:31  20   just the priority date -- just the priority date.

03:41:35  21       And you may -- in the old days before we had a

03:41:39  22   provisional system, inventors used to mail the invention to

03:41:43  23   themselves.  They did that in order to have a postmark from

03:41:46  24   the pat -- from the U.S. Postal Service to prove when they

03:41:48  25   had possession of the invention.

03:41:51   1        The Patent Office eliminated the need to do that
03:41:53   2   by a provisional system.  The provisional application is
03:41:57   3   kept in the archives of the Patent Office and is not looked
03:42:00   4   at.  And it was not looked at here, because none of the
03:42:03   5   prior art was in the one-year window.
03:42:07   6        Since all the prior art was more than a year prior
03:42:09   7   to the provisional, there was no reason to examine the
03:42:16   8   provisional to see if that provisional date had any
03:42:19   9   meaning.  The 2000 date meaning is irrelevant in this case,
03:42:23  10   irrelevant in the jury trial, and irrelevant on inequitable
03:42:28  11   conduct.
03:42:28  12        And it was not -- the 2010 date was never at issue
03:42:31  13   because all of the prior art was 102(b) statutory prior
03:42:34  14   art.  It's prior art regardless of the date of invention.
03:42:38  15   And, therefore, the -- the provisional was of no relevance
03:42:40  16   whatsoever in this examination.
03:42:44  17        And they cannot rely on that provisional for any
03:42:47  18   purpose in this trial, jury or otherwise.
03:42:50  19        Next, there was no opinion by Mr. Godici on
03:42:57  20   materiality.  The materiality of these references is
03:42:59  21   undisputed.  Mr. Godici was not a technical expert.  He was
03:43:04  22   a patent procedure expert, having lived his entire adult
03:43:10  23   life in the Patent Office.  He does not know anything about
03:43:12  24   microphone arrays, but that wasn't relevant here.  We
03:43:14  25   didn't need him to talk about the technology.

03:43:17   1          All of the experts, including Dr. Zhu, admitted
03:43:22   2   that the entirety of Limitation [C] was disclosed in the Li
03:43:27   3   article, for example.  It's all disclosed in the
03:43:31   4   references.  That's not even the debate.
03:43:33   5          And Limitation [C] was a reason for allowance for
03:43:39   6   the '756, and without the '756, you can't have any
03:43:42   7   reissues.  And that's infectious enforceability.  You
03:43:46   8   cannot cure inequitable conduct.  You cannot cure it by
03:43:49   9   reissue.  No matter how much you start to disclose, it's
03:43:53  10   too late.  And the only way to cure inequitable conduct is
03:43:56  11   to tell the Patent Office what you did wrong.
03:43:58  12          Which leads me back to the importance of the
03:44:01  13   nature of the error.  Error must be explained to get any
03:44:04  14   reissue.
03:44:05  15          Lastly, the Li article.  Again, no doubt the
03:44:09  16   applicant knows about his own article.  No doubt he knows
03:44:12  17   about Brandstein.  He cites Brandstein in his own Li
03:44:15  18   article.  Li article was obviously material prior art,
03:44:18  19   regardless of the shape of the array.
03:44:21  20          Mr. Lambrianakos, in my view, very misleading
03:44:24  21   cross-examination to talk about a reference -- a limitation
03:44:27  22   not even part of the reasons for allowance.  Who cares if
03:44:31  23   it's a polka dot array?  Who cares the nature of the array?
03:44:36  24   Who cares whether it has sound source localization?  Who
03:44:40  25   cares whether they're all in the same exact DSP?

03:44:42   1          The point is, if the examiner had any of these

03:44:45   2   references, this patent would not have issued, period.

03:44:50   3          THE COURT:  You have one minute remaining.

03:44:51   4          MR. RE:  And that's the main point.  The patent

03:44:54   5   wouldn't have been allowed.  The applicant knew about it.

03:44:57   6   The applicant is a very sophisticated applicant.  The

03:45:00   7   applicants had several patent lawyers.  He fired a patent

03:45:04   8   lawyer for not keeping him abreast of what's going on.

03:45:08   9          The privilege log showed he received each and

03:45:11   10   every amendment, each and every argument.  He participated

03:45:14   11   in the prosecution.

03:45:15   12          His language is very good.  He's very

03:45:19   13   knowledgeable, has dozens of patent applications, many

03:45:24   14   filed many, many years earlier than the dates we're talking

03:45:26   15   about here.

03:45:27   16          He knows about the publication system.  He knows

03:45:30   17   about prior art.  He knows about the different kinds of

03:45:33   18   patents.  And he had Kenyon & Kenyon, one of the most

03:45:37   19   sophisticated patent firms in the country at the time.

03:45:40   20   They no longer exist.  But he's very knowledgeable, and

03:45:44   21   dealt with his patent lawyer all the time.

03:45:46   22          And we cut a deal in this case to exchange any

03:45:51   23   transmittals of prior art being exchanged between the --

03:45:51   24   the lawyer and Dr. Li --

03:45:52   25          THE COURT:  Mr. Re, your time is up.  Take one or

03:45:55  1   two more sentences and finish for me.

03:45:58  2   MR. RE:  And it shows he never gave Brandstein to

03:46:01  3   his lawyer, and he only gave Li, and Li was still not

03:46:06  4   disclosed.  Pretty good evidence.  I think it's plenty

03:46:14  5   reasonable to infer intent by Dr. Li, but particularly by

03:46:20  6   Mr. Tankha.

03:46:20  7   Thank you, Your Honor.

03:46:21  8   THE COURT:  Thank you.

03:46:21  9   Let me hear closing argument from Plaintiff.

03:46:23  10   MR. LAMBRIANAKOS:  Thank you, Your Honor.

03:46:31  11   So there are three specific issues here.

03:46:34  12   Issue one is Brandstein.  Defendant thinks that

03:46:38  13   the failure to disclose Brandstein within the body of the

03:46:41  14   non-provisional specification and removing it supposedly

03:46:45  15   from that specification is significant.

03:46:48  16   However, Defendants have no response to the fact

03:46:50  17   that the provisional was incorporated by reference, its

03:46:54  18   contents were incorporated by reference, and to the extent

03:46:57  19   that identifying Brandstein in the body of the

03:46:59  20   non-provisional would have been sufficient, it was by

03:47:02  21   operation of law disclosed in the non-provisional through

03:47:06  22   the incorporation by reference.  It's there from the very

03:47:10  23   beginning of the '756 patent application.  It was there all

03:47:13  24   the way through.

03:47:14  25   Now, they showed some testimony from Dr. Stern,

03:47:17  1   who said that all the limitations were disclosed there.

03:47:20  2   But we know on cross-examination, he admitted that a

03:47:23  3   digital signal processor that had all three of the

03:47:26  4   operative units in it was not specifically disclosed.

03:47:30  5         And even the evidence they showed merely said that

03:47:34  6   DSPs can have algorithms on them, did not disclose the

03:47:37  7   three units.

03:47:38  8         And those three units are in the '756 patent.  The

03:47:42  9   '756 patent claims include all three of those units.

03:47:44  10        And we know that the Li article did not disclose

03:47:48  11  adaptive beamforming, which was an important element of the

03:47:50  12  claims.  It did not disclose sound source localization.  It

03:47:53  13  did not disclose a plurality of arbitrary configurations

03:47:58  14  that are part of the -- of the claim.

03:48:05  15        And, importantly, the delay step provides

03:48:10  16  information that enables beamforming for a plurality of

03:48:11  17  arbitrary configurations in the '756 application so -- '756

03:48:14  18  patent.  So it's in the delay step.  That delay step has

03:48:18  19  different scope than the scope of what's disclosed in the

03:48:21  20  Li article, which discloses only one configuration, which

03:48:24  21  is linear.

03:48:25  22        Now, is a linear configuration arbitrary?  Well,

03:48:30  23  the problem with arbitrary was that no one really knows

03:48:34  24  what it means.  That -- that claim -- that patent was

03:48:37  25  reissued in part because the arbitrary configuration

```
03:48:41   1   limitation is probably indefinite.

03:48:44   2        And so when you amend the claim to remove

03:48:48   3   indefiniteness, is that broadening because you went from no

03:48:52   4   scope to broader scope?  Is it narrowing because you went

03:48:57   5   from a potentially infinite scope to a narrower scope?  I'm

03:49:01   6   not sure.  And I'm not sure the patent -- the patent lawyer

03:49:03   7   knew either.

03:49:04   8        And so when we have that amendment, we have this

03:49:08   9   significant question about what the effect of that

03:49:09  10   amendment was.  Was it broadening?  Was it narrowing?  It's

03:49:13  11   unclear.

03:49:14  12        Now, with respect to intent, I don't think we've

03:49:19  13   heard anything here that would give -- that would support

03:49:23  14   clear and convincing evidence that anyone intended to

03:49:27  15   deceive the Patent Office by not disclosing material prior

03:49:32  16   art.

03:49:32  17        I would argue that the Li article was not

03:49:35  18   material.  It was so immaterial to the '049 patent,

03:49:40  19   Your Honor, that in Tuesday's invalidity presentation by

03:49:44  20   the Defendant, the Defendant dropped its arguments based on

03:49:49  21   Li as a primary reference.  They had elected Li with

03:49:52  22   Brandstein, I believe, as a combination that they elected

03:49:56  23   to trial.

03:49:57  24        They came to the Court, and they never asserted

03:50:00  25   that.  They brought up Li just with respect to the delay
```

03:50:06  1  limitation, probably in preparation for today, but

03:50:11  2  otherwise they dropped that argument even though they had

03:50:13  3  an hour left of trial time.

03:50:16  4      And so my view is, if that reference was so

03:50:19  5  material to patentability that it would at least be a

03:50:21  6  significant primary reference to the '049 patent, that

03:50:24  7  would have been asserted at trial.  There was plenty of

03:50:28  8  time to do it.

03:50:28  9      And the difference between, of course, the two

03:50:30  10  patent claims are the specific DSP limitation.  But also

03:50:33  11  the -- the difference between the '756 and the -- and the

03:50:39  12  '049 goes to this plurality of configurations limitation,

03:50:42  13  as well.

03:50:43  14      And so it's very, very significant that the

03:50:45  15  Defendant did not regard the Li reference as material

03:50:48  16  enough to spend five or 10 more minutes at trial to go over

03:50:52  17  that and make an invalidity argument to Your Honor.

03:50:54  18      So looking at all the factors, looking at the

03:50:59  19  ambiguity involved and the amendments that gave rise to the

03:51:05  20  '049 with regard to the limitations which were changed,

03:51:07  21  which were amended, we don't see any basis to conclude by

03:51:11  22  clear and convincing evidence that the change in the check

03:51:13  23  box was intentionally done with a specific intent to

03:51:17  24  deceive the Patent Office.

03:51:18  25      We don't see the Brandstein issue as rising to

| | | |
|---|---|---|
| 03:51:21 | 1 | that level of intent because it was incorporated by |
| 03:51:25 | 2 | reference.  And there's -- there's really no question that |
| 03:51:28 | 3 | that document, the entirety of the provisional, is |
| 03:51:31 | 4 | incorporated by reference, including the reference to |
| 03:51:34 | 5 | Brandstein.  And, of course, we know that Li was just a |
| 03:51:37 | 6 | linear array, had no sound source localization, had a |
| 03:51:39 | 7 | different delay disclosure than '756. |
| 03:51:43 | 8 | THE COURT:  You have two minutes, |
| 03:51:45 | 9 | Mr. Lambrianakos. |
| 03:51:45 | 10 | MR. LAMBRIANAKOS:  And so, based on all those |
| 03:51:47 | 11 | facts, Your Honor, we don't believe that the Defendants |
| 03:51:50 | 12 | have even approached the level of proof required to show |
| 03:51:53 | 13 | material -- materiality and the specific intent to deceive |
| 03:51:58 | 14 | the Patent Office by clear and convincing evidence. |
| 03:51:59 | 15 | Thank you, Your Honor. |
| 03:52:01 | 16 | THE COURT:  Thank you. |
| 03:52:02 | 17 | Thank you, counsel, for your able argument and the |
| 03:52:07 | 18 | presentation of evidence to the bench regarding this |
| 03:52:11 | 19 | inequitable conduct defense as urged by Defendants. |
| 03:52:15 | 20 | These matters -- this matter is under submission. |
| 03:52:20 | 21 | MS. DOAN:  Your Honor? |
| 03:52:21 | 22 | THE COURT:  And I appreciate the presentation you |
| 03:52:23 | 23 | made today. |
| 03:52:23 | 24 | Do you have a question, Ms. Doan? |
| 03:52:25 | 25 | MS. DOAN:  I do, Your Honor.  How would you like |

03:52:27  1  us to submit the exhibits that came into evidence today?  I

03:52:31  2  don't know we've had a chance to meet --

03:52:33  3       THE COURT:  I'd like you to deliver them to the

03:52:37  4  courtroom deputy, who will see that I get them.

03:52:39  5       Mr. Fabricant?

03:52:41  6       MR. FABRICANT:  Would Your Honor like any

03:52:43  7  post-trial submissions on this trial?

03:52:45  8       THE COURT:  I'll leave that option open.  I won't

03:52:50  9  order it at this time.  Once I review my notes and the

03:52:55  10  evidence that you've submitted in tangible form, I may ask

03:52:56  11  for additional post-trial briefing.  I may not.  I'll carry

03:53:00  12  that option as a part of my consideration of what you

03:53:04  13  presented today.

03:53:04  14       MR. FABRICANT:  Thank you, Your Honor.

03:53:04  15       (Bench trial concluded.)

03:53:06  16       (Jury trial.)

03:53:06  17       THE COURT:  All right.  Counsel, we still do not

03:53:08  18  have a verdict from the jury.  They are clearly still

03:53:10  19  deliberating.  It's about six or seven minutes until 4:00

03:53:13  20  p.m.  You're welcome to remain here and wait for a verdict

03:53:18  21  with the Court.  Or if you're offsite, have your cell

03:53:24  22  phones on, and be prompt when we call you to return.

03:53:27  23       Other than that, we stand in recess.

03:53:29  24       COURT SECURITY OFFICER:  All rise.

03:53:30  25       (Recess.)

04:00:32   1          (Jury out.)

04:00:34   2          (Jury trial.)

04:00:34   3          COURT SECURITY OFFICER:  All rise.

04:00:36   4          THE COURT:  Be seated, please.  Counsel, I've

04:00:42   5   received the following note from the jury delivered by the

04:00:45   6   Court Security Officer.

04:00:46   7          And it says:  We have reached a unanimous

04:00:50   8   decision.  Thanks.  Elizabeth Edwards.

04:00:54   9          I'll mark this as Item 3 for identification, and

04:00:57  10   I'll hand the original to the courtroom deputy.

04:00:59  11          Let me ask, is either Plaintiff or Defendant aware

04:01:12  12   of anything the Court should take up before I bring in the

04:01:15  13   jury and receive the verdict?

04:01:17  14          MS. TRUELOVE:  Nothing from Plaintiff, Your Honor.

04:01:19  15          MR. DACUS:  Nothing from Amazon, Your Honor.

04:01:20  16          THE COURT:  I probably don't need to say this, but

04:01:22  17   I will out of an abundance of caution.

04:01:25  18          No matter what the verdict is, I don't expect any

04:01:28  19   reactions from anyone in the courtroom.  I think you all

04:01:31  20   know and understand that.

04:01:32  21          All right.  Let's bring in the jury, please,

04:01:34  22   Mr. Mixon.

04:01:35  23          COURT SECURITY OFFICER:  All rise.

04:02:20  24          (Jury in.)

04:02:21  25          THE COURT:  Please be seated.

04:02:22  1        Ms. Edwards, I understand you're the foreperson of

04:02:27  2   the jury?

04:02:27  3        THE FOREPERSON:  Yes, sir.

04:02:28  4        THE COURT:  Has the jury reached a unanimous

04:02:30  5   verdict?

04:02:32  6        THE FOREPERSON:  Yes, sir.

04:02:33  7        THE COURT:  Would you hand the signed and dated

04:02:39  8   verdict form to the Court Security Officer who will bring

04:02:46  9   it to me?

04:02:55  10        Ladies and gentlemen of the jury, I'm going to

04:03:22  11   announce the verdict into the record at this time.  And I'd

04:03:26  12   like each member of the jury to listen very carefully as I

04:03:30  13   do.  Because after I have announced the verdict into the

04:03:34  14   record, I'm going to poll the jury and ask each of you if

04:03:37  15   this is, in fact, your verdict so we can confirm on the

04:03:40  16   record that it is the unanimous verdict of all eight

04:03:43  17   members of the jury.

04:03:43  18        Turning to the verdict form.  The first question

04:03:54  19   is located on Page 4.

04:03:56  20        Question No. 1:  Did Vocalife prove by a

04:04:00  21   preponderance of the evidence that Amazon infringed any of

04:04:03  22   the asserted claims?

04:04:04  23        The jury's answer is:  Yes.

04:04:07  24        Turning to Question No. 2 on the verdict form.

04:04:17  25        Did Amazon prove by clear and convincing evidence

04:04:18  1  that any of the following asserted claims are invalid?

04:04:22  2          Claim 1 of the '049 patent, the jury's answer

04:04:28  3  is:  No.

04:04:29  4          Claim 8 of the '049 patent, the jury's answer

04:04:34  5  is:  No.

04:04:34  6          Question 3:  Did Vocalife prove by a preponderance

04:04:41  7  of the evidence that Amazon willfully infringed any of the

04:04:43  8  asserted claims that you found were infringed?

04:04:48  9          The jury's answer is:  No.

04:04:51  10         Question 4B of the verdict form:  What sum of

04:04:58  11 money, if any, paid now in cash has Vocalife proven by a

04:05:03  12 preponderance of the evidence would compensate Vocalife for

04:05:07  13 its damages resulting from infringement?

04:05:10  14         The jury's answer:  $5 million.

04:05:14  15         Question 4B:  Is the amount you awarded in

04:05:25  16 Question 4A a lump sum representing damages for past and

04:05:30  17 future sales, or is the amount you awarded in Question 4A a

04:05:34  18 reasonable royalty for past sales only?

04:05:35  19         The jury's answer:  Is lump sum.

04:05:38  20         Turning to Page 9, the final page of the verdict

04:05:45  21 form, I find that it is dated with today's date, October

04:05:49  22 the 8th, 2020.  And it's signed by Ms. Elizabeth Edwards,

04:05:53  23 as foreperson of the jury.

04:05:56  24         Ladies and gentlemen of the jury, I'm now going to

04:05:59  25 poll you to make sure this is, in fact, the unanimous

04:06:02  1  verdict of the entire eight member -- eight members of our

04:06:07  2  jury.

04:06:07  3       If this is your verdict as I have read it and

04:06:10  4  announced it, would you please stand up?

04:06:13  5       (Jury polled.)

04:06:19  6       THE COURT:  Thank you.  Please be seated.

04:06:21  7       Let the record reflect that all eight members of

04:06:26  8  the jury immediately stood and rose in response to the

04:06:30  9  Court's question to poll the jury.

04:06:32  10      Ladies and gentlemen, I find that this is the

04:06:34  11 unanimous verdict of all eight members of the jury.  And

04:06:36  12 the Court accepts your verdict.  And I will deliver the

04:06:39  13 original signed verdict form to the courtroom deputy.

04:06:42  14      Ladies and gentlemen, this now completes the trial

04:06:46  15 of this case.  From the very beginning of it, I've been

04:06:50  16 giving you instructions over and over and over again about

04:06:54  17 not discussing this case or your experience or what you

04:06:58  18 think about anything that's happened here in court with

04:07:01  19 anyone.

04:07:02  20      I'm now releasing you from that instruction, and

04:07:06  21 I'm releasing you from all the instructions I've given you

04:07:10  22 previously.  That means you are perfectly free to talk

04:07:13  23 about this case with anybody you'd like to.  This means you

04:07:19  24 are also perfectly free not to discuss this case with

04:07:26  25 anybody of your choosing.  The choice is yours, 100 percent

04:07:28   1   yours.

04:07:29   2          Let me explain something to you.  In this court

04:07:33   3   for as long as I can remember, and I've practiced law here

04:07:35   4   30 years before I got this job, it has always been the

04:07:38   5   established practice that the lawyers who very much would

04:07:42   6   like to know what you thought about the job they did are

04:07:45   7   not entitled to initiate a conversation with any of you

04:07:50   8   about this case.

04:07:52   9          But the way that has traditionally worked is the

04:07:56   10  lawyers will beat you out of the courthouse, and they will

04:08:00   11  be at the bottom of the front steps when you go out of the

04:08:03   12  building, and you will have to walk right by them.

04:08:06   13         And they will be there smiling at you hoping that

04:08:08   14  you will stop and have a conversation with them.  If you

04:08:10   15  want to do that, you're perfectly free to do that.  If you

04:08:13   16  don't want to do that, I promise you, they will not stop

04:08:18   17  you, and they will not initiate a conversation with you.

04:08:20   18  And if you don't want to discuss anything about the case

04:08:23   19  with them, just smile and walk right past them.

04:08:26   20         Also, lately, I have expanded this practice a

04:08:33   21  little bit to make it easier on everybody involved.

04:08:37   22         In a minute, I'm going to give you a couple of

04:08:39   23  phone numbers for Ms. Truelove on the Plaintiff's side of

04:08:45   24  the case and Mr. Dacus on the Defendants' side of the case.

04:08:48   25  And these are cell phones that will ring in their pocket or

04:08:52   1   on their desk or in their purse, wherever they keep them.

04:08:57   2            If at any time you'd like to talk with either or

04:08:59   3   both of them about your experience, pick up the phone and

04:09:02   4   call them.  I promise you they will take your call and be

04:09:06   5   anxious to hear what you have to say.

04:09:09   6            If you don't have any interest or desire to talk

04:09:11   7   with them about the case or answer the questions they might

04:09:14   8   have, don't call them.  They will not call you.  It is

04:09:17   9   strictly your decision and your decision alone.

04:09:19   10           But I found by giving you their cell phone numbers

04:09:23   11   they don't feel so compelled to line up like toy soldiers

04:09:28   12   at the bottom of the front steps so that you have to walk

04:09:30   13   right by them.

04:09:32   14           They're hopeful that you will call them tomorrow

04:09:34   15   or next week or some time that's convenient for you.

04:09:40   16   Again, that is your decision, your decision completely.

04:09:42   17           Also, ladies and gentlemen, I want to tell you how

04:09:45   18   much the Court appreciates your service in this case.  This

04:09:49   19   has been a long trial.  It's been a difficult trial.  We

04:09:53   20   have started early, and we have gone late.

04:09:57   21           And each of you have been exemplary jurors.  You

04:10:00   22   have listened carefully.  You have taken copious notes.

04:10:05   23   You have paid attention.  I have watched you.  That is part

04:10:08   24   of my job.  That's part of why you have those plastic face

04:10:12   25   shields instead of masks so I can see your faces, and I've

04:10:15  1   looked at you throughout this trial.

04:10:17  2        And I've conducted enough jury trials in my time

04:10:20  3   on the bench to know when a jury is paying attention and

04:10:23  4   when they're not.  And you have paid rapt attention to

04:10:27  5   everything throughout this trial.  You've done everything

04:10:29  6   the Court has asked you to do.  You've been on time, you

04:10:32  7   haven't complained, and you've served with distinction, as

04:10:36  8   members of this jury.

04:10:37  9        And I want to tell you on behalf of the Court, the

04:10:40  10  Court staff, and both of these parties and their lawyers,

04:10:44  11  and everybody present in this courtroom, we all recognize

04:10:48  12  and appreciate and honor your service as jurors, because we

04:10:53  13  all know that without you, we would not be able to have the

04:10:58  14  kind of trial we just had.  You are absolutely essential to

04:11:02  15  the process.

04:11:03  16       And we know that every one of you had other things

04:11:06  17  to do over the last several days that were important in

04:11:10  18  your lives, and you put that on hold.  You made a real and

04:11:14  19  material sacrifice to serve your country as jurors in this

04:11:17  20  case.  And that's no small thing.  You have each rendered

04:11:22  21  very real and important public service.  And I believe

04:11:26  22  that's worth special recognition.

04:11:30  23       Now, before we were visited by the Coronavirus, my

04:11:40  24  practice was always to ask the members of the jury at this

04:11:43  25  same juncture in another trial to go back into the jury

04:11:47  1   room and let me come to the jury room and let me shake each

04:11:50  2   hand and look each juror in the eye and tell them

04:11:55  3   personally, thank you.

04:11:56  4        You understand I'm not going to do that today,

04:11:58  5   given the world in which we currently live.  But I do have

04:12:00  6   a letter of appreciation which I have signed.  I do have a

04:12:05  7   certificate from the Court recognizing your service for

04:12:10  8   each of you.  And I'd like to give you that right now.

04:12:14  9        I'll paperclip these appropriate phone numbers to

04:12:17  10  it so you'll have those at the same time.  And I'd like to

04:12:20  11  let you take that with you.

04:12:21  12       Mr. Mixon, if you will help me.

04:12:25  13       COURT SECURITY OFFICER:  Yes, sir.

04:12:25  14       THE COURT:  I have a letter and certification of

04:12:28  15  appreciation for Ms. Banks.  That's Juror No. 1, if you'll

04:12:32  16  take that to her.

04:12:39  17       Ms. Banks, thank you for your service.

04:12:42  18       This is for Ms. Edwards.  Ms. Edwards, thank you

04:12:50  19  for your service.

04:12:51  20       This is for Ms. Burton.  Thank you, Ms. Burton,

04:13:04  21  for your service.

04:13:05  22       This is for Ms. Friday.  Thank you, Ms. Friday,

04:13:19  23  for your service.

04:13:19  24       This is for Mr. Amick.  Mr. Amick, thank you for

04:13:36  25  your service, sir.

04:13:37   1          This is for Ms. Stansbury.  Ms. Stansbury, thank

04:13:58   2   you for your service.  And thank you for not having that

04:14:02   3   baby in the middle of this jury trial.

04:14:04   4          This is for Ms. Huskey.  Thank you, Ms. Huskey,

04:14:15   5   for your service.

04:14:15   6          And last, but not least, for Mr. Smith.

04:14:27   7   Mr. Smith, thank you for your service, sir.

04:14:29   8          Let me conclude, ladies and gentlemen, by just

04:14:37   9   giving you a couple housekeeping instructions that may be

04:14:40   10  of interest to you.

04:14:41   11         I assume you've all left your juror notebooks in

04:14:46   12  the jury room.  They will immediately be shredded by my

04:14:49   13  staff.  None of what you've written in there will be

04:14:53   14  retained by anybody.

04:14:54   15         Number two, having served on this jury, your names

04:14:57   16  will come out of the jury wheel for two years.  You will

04:15:01   17  not be called for jury duty in federal court for the next

04:15:06   18  two years.

04:15:07   19         I cannot tell you what the State of Texas might

04:15:09   20  do.  But the United States District Court for the Eastern

04:15:14   21  District of Texas will not call you for jury duty for the

04:15:16   22  next two years.  After that period of time, your name will

04:15:20   23  go back in the hopper.

04:15:21   24         If you need anything that you've not already been

04:15:26   25  able to get from Ms. Clendening regarding anything related

1528

04:15:30  1   to your jury service, she is in the clerk's office, and she

04:15:33  2   will be more than happy to accommodate you as you leave.

04:15:36  3          Let me say one more time how much the Court

04:15:39  4   appreciates your service, how much the Court recognizes the

04:15:43  5   importance of the service that you've rendered.  And let me

04:15:47  6   thank you one more time for your hard work as jurors in

04:15:51  7   this case.

04:15:52  8          You are discharged from your position as jurors.

04:15:56  9   Ladies and gentlemen, travel to your home safely.  The

04:15:59  10  Court wishes you nothing but the best.  And you are excused

04:16:02  11  to leave at this time.

04:16:03  12         COURT SECURITY OFFICER:  All rise.

04:16:04  13         (Jury out.)

04:16:04  14         THE COURT:  Counsel, that completes the trial of

04:16:27  15  this case.  You are excused.

04:16:30  16         (Court adjourned.)

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3        I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes _____          10/8/2020
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/2020

12

13

14

15

16

17

18

19

20

21

22

23

24

25